# EXHIBIT B

1

Exhibits:  1-13                    Volume 1, Pages 1-209

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

SHEILA LYONS, DVM and HOMECOMING

FARM, INC.,

Plaintiffs

v               Civil Action No. 1:11-CV-12192

THE AMERICAN COLLEGE OF VETERINARY

SPORTS MEDICINE AND REHABILITATION,

INC. and THE AMERICAN VETERINARY

MEDICAL ASSOCIATION, INC.,

Defendants

----------------------------

DEPOSITION OF SHEILA LYONS, DVM

Monday, January 15, 2013, 10:11 a.m.

Lawson & Weitzen, LLP

88 Black Falcon Avenue, Suite 345

Boston, Massachusetts

------- Reporter:  Susan J. Blatt, RPR -------

sjb@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

2

```
 1    APPEARANCES:

 2

 3    Klieman & Lyons

 4         Stephen J. Lyons, Esq.

 5         Rikki Klieman, Esq.

 6         115 Broad Street, Fourth Floor

 7         Boston, Massachusetts 02110

 8         617.443.1000  fax: 617.608.2828

 9         sjlyons@kliemanlyons.com

10    and

11

12    Sarrouf Law, LLP (morning session)

13         Camille F. Sarrouf, Esq.

14         115 Broad Street, 4th Floor

15         Boston, Massachusetts 02110

16         617.227.5800  fax: 617.227.5470

17         cfs@sarrouflaw.com

18         for Plaintiffs

19

20

21

22

23

24
```

3

1    Foley Hoag LLP

2        David A. Kluft, Esq.

3        Daniel McFadden, Esq.

4        Seaport West

5        155 Seaport Boulevard

6        Boston, Massachusetts 02210-2600

7        617.832.1000  fax: 617.832.7000

8        dkluft@foleyhoag.com; dmcfadden@foleyhoag.com

9        for The American College of Veterinary Sports

10       Medicine and Rehabilitation, Inc.

11

12

13   Lawson & Weitzen, LLP

14       J. Mark Dickison, Esq.

15       Joshua M. D. Segal, Esq.

16       88 Black Falcon Avenue

17       Boston, Massachusetts  02210

18       617.439.4990  fax: 617.439.3987

19       mdickison@lawson-weitzen.com;

20       jsegal@lawson-weitzen.com

21       for The American Veterinary Medical Association

22

23

24

11

1    A.      Yes.

2    Q.      Could you describe for me what your

3  employment is.

4    A.      I practice veterinary medicine, the

5  specialty of sports medicine and rehabilitation.

6    Q.      That is a full-time occupation?

7    A.      Yes.  If you include my work for

8  Homecoming Farm which calls upon my work as a

9  veterinarian, yes.

10    Q.      If we were just for this moment to set

11  aside the work that you do for Homecoming Farm,

12  could you describe for me approximately how much

13  time you spend on an annual basis with respect to

14  just your practice of veterinary medicine?

15    A.      It varies so much.  It's really not

16  possible to give you a specific answer to that

17  question.

18    Q.      Could you just then describe for me your

19  practice of veterinary medicine as it currently

20  exists?

21    A.      I have private clients for whom I

22  provide consulting services, and they're horse

23  owners, sport horse owners, and those horses move

24  all over the world, and so, as needs arise, I go to

12

1   where the horses are and provide the services that

2   are necessary.

3       Q.      Are you essentially on call to attend to

4   these clients' needs whenever they may arise?

5       A.      Within the context of what I offer, yes.

6       Q.      And what types of services do you offer

7   and provide to these clients?

8       A.      Proactive sports medicine and reactive

9   rehabilitative medicine.  I do pre-purchase exams or

10  in other ways review records on horses that clients

11  may be considering purchasing.  I help to administer

12  programs for my clients' employees to carry out in

13  the care of these horses.

14      Q.      And approximately how many clients do

15  you have at this point in time?

16      A.      That's really not something that I can

17  give you a number for because it really depends on

18  their needs.

19      Q.      Okay.  Well, do you bill for your

20  services?

21      A.      Yes, I do.

22      Q.      And how often do you bill for your

23  services?

24      A.      Typically within 30 days of whenever I

13

1    have provided a service.

2         Q.      And do you, within your veterinary

3    practice, do you employ anybody else?

4         A.      No.

5         Q.      So I take it, then, you're your own

6    bookkeeper --

7         A.      Yes.

8         Q.      -- and invoicer?

9         A.      Yes.

10        Q.      In that regard, do you have a monthly

11   pattern by which the 30th of every month you bill

12   for whatever services you rendered that month or do

13   you just bill when service is complete on a specific

14   job?

15        A.      Typically after service is complete on a

16   specific job.

17        Q.      And with respect to your clients and

18   your billing, do you prepare -- how do you prepare

19   those bills?  Are they a written invoice for

20   service?

21        A.      Yes.

22        Q.      And do you have a computer database upon

23   which you keep track of your time?

24        A.      No.

14

1      Q.      Do you have a computer database as to

2   the addresses of your clients?

3      A.      No.

4      Q.      And if you were called upon to do so,

5   how would you ascertain how many clients you

6   serviced in the year of 2012, for instance?

7      A.      I would most likely go through my

8   patient records and get the information from those.

9      Q.      And the patient records -- is your

10  veterinary practice exclusively an equine practice?

11     A.      Yes.  I have on rare occasion consulted

12  on other species.

13     Q.      The questioning I'm asking you about now

14  is really -- I'm just trying to get an idea of your

15  current employment and your current practice.  And

16  so do you have any estimate as to how many clients

17  or horses you treated in the year 2012?

18     A.      No.

19     Q.      Can you tell me approximately how many

20  weeks of 2012 you were engaged in your veterinary

21  practice and the administration thereof?

22     A.      No.

23     Q.      Do you keep any time records?

24     A.      Yes, I do.  But those would be patient

15

1    records.

2        Q.        And your patient records for each horse

3    would reflect how much time you spend --

4        A.        Yes.

5        Q.        -- servicing that horse?

6        A.        Yes.

7        Q.        Now, my understanding is -- I'll step

8    back for a minute.  With regard to your veterinary

9    practice, do you have a doing business name that you

10   bill out as?

11       A.        Sheila Lyons, DVM.

12       Q.        Do you operate that business or your

13   sole proprietorship out of your home in Brockton?

14       A.        Yes.

15       Q.        I take it your home in Brockton is not a

16   horse farm; is that correct?

17       A.        That's correct.

18       Q.        Am I correct it's located near the city

19   center of Brockton?

20       A.        Well, it's -- yes.

21       Q.        Put another way, you don't have horses

22   trailered to your --

23       A.        No.

24       Q.        -- business address and never look at

16

1    them --

2         A.        No.

3         Q.        -- or perform any medical veterinary

4    services there --

5         A.        No.

6         Q.        -- right?  So with regard to your

7    veterinary practice you have to travel wherever the

8    horse is, correct?

9         A.        Yes.

10        Q.        Do you have any clients in

11   Massachusetts?

12        A.        No.

13        Q.        Do you have any clients in New England?

14        A.        It's -- I don't recall the addresses of

15   all of my clients, so I can't offer a definitive

16   answer to that.

17        Q.        Well, with respect to your provision of

18   veterinary services in 2012, is it correct that

19   essentially the time that you would devote to it

20   would include necessarily the travel from Brockton,

21   Mass. to, let's say, Florida?

22        A.        Yes.

23        Q.        And that travel time required to get

24   there, would that be something that you also bill

17

1  for and consider it part of your veterinary

2  services?

3       A.      I can't offer a yes or no to that.

4       Q.      Again, the purpose for my questioning

5  now is just to figure out how much time you're

6  currently devoting to your veterinary practice, and

7  so I'm just trying to see, did you travel often in

8  2012 with respect to your veterinary practice?

9       A.      Again, with your specific question, I

10  can't answer that.

11       Q.      Did you travel at all in 2012 --

12       A.      Yes.

13       Q.      -- with respect to your veterinary

14  practice?  Let me ask the question a different way,

15  how much did you earn from your veterinary practice

16  in 2012?

17       A.      I don't recall.

18       Q.      Do you keep track of your earnings from

19  your veterinary practice?

20       A.      Yes.

21       Q.      I understand you, like most of us, file

22  federal tax returns and state tax returns; is that

23  correct?

24       A.      Yes.

18

1    Q.      Are you preparing your state and federal

2    tax returns for the year 2012?

3    A.      No.

4    Q.      Do you have an accountant that prepares

5    your state and federal tax returns?

6    A.      No.

7    Q.      Do you prepare and file those on your

8    own?

9    A.      Yes.

10    Q.      And with respect to 2012, do you have

11    any estimate as to how much you earned from your

12    veterinary practice?

13    A.      No.

14    Q.      Do you know how much you earned in 2011

15    from your veterinary practice?

16    A.      No.

17    Q.      Do you recall -- strike that.

18          Are you claiming in this action that

19    your veterinary practice has been financially

20    affected by the actions of the AVMA?

21    A.      Yes.

22    Q.      How has your veterinary practice been

23    affected in any way by the actions of the AVMA?

24    A.      When the AVMA gave recognition to the

19

1  defendant's college as a recognized specialty board,

2  it in doing so created the perception in some minds

3  that what my clients knew about my involvement with

4  The American College of Veterinary Sports Medicine

5  and Rehabilitation was in fact not correct.  So it

6  damaged my reputation in some minds and caused

7  confusion about that issue.

8  Q.    Have you quantified any diminishment in

9  your earnings as a veterinarian with respect to the

10  actions of the AVMA?

11  A.    I don't have a specific number.

12  Q.    Let me ask you this.  Do you know

13  whether your income has diminished since the AVMA's

14  provisional recognition of the college in 2010?

15  A.    Yes.

16  Q.    How much have your earnings as a

17  veterinarian diminished since 2010 to the present?

18  A.    I don't know.

19  Q.    At this point I looked at the documents

20  produced and saw there were tax returns produced by

21  Homecoming Farm, but I didn't see any of your

22  personal tax returns.  Would you through your

23  counsel agree to produce those personal federal tax

24  returns and state tax returns?

20

1      A.        I would have to discuss that with my

2   lawyers.

3      Q.        Okay.  With respect to the clients that

4   you mentioned that were in their minds confused or

5   believed that your reputation was damaged, can you

6   identify which clients you're speaking of?

7      A.        Again, I would have to discuss that with

8   my attorneys because I just don't know what is

9   protected in terms of my client relationship.

10      Q.        Well, who would you call in this case as

11   a witness for the proposition that they thought less

12   of you or somehow were confused by the AVMA's

13   actions in terms of your clients?

14      A.        No decision has been made as to who to

15   call at this time.

16               (Ms. Klieman joined the deposition.)

17      Q.        If I wanted to independently question

18   your clients about this matter, which clients of

19   yours would you suggest I talk to to confirm that

20   they in fact thought less of you or were confused by

21   the actions of the AVMA?

22      A.        Again, I don't know that I can share

23   client confidentiality.

24               MR. DICKISON:  Can we take a quick

47

1    Q.      I take it that you didn't back them up

2    by any type of computer media --

3    A.      No.

4    Q.      -- is that correct?  Did you ever print

5    them out and keep a file copy?

6    A.      No.

7    Q.      One other item on your recordkeeping,

8    you mentioned before with regard to your patient

9    records that you would sometimes when you're on the

10   road, you'd input -- come back home and input them

11   in your computer.  With regard to the paper files,

12   the original files, would you still retain a copy of

13   those original paper files or would you throw them

14   out once you entered that information into the

15   computer?

16   A.      In some cases I kept the paper files

17   because, once again, because of the nature of my

18   work, even though I would eventually do my best to

19   make electronic records of all of my patient

20   records, it was in some cases important to have

21   those paper files because, again, I needed them when

22   I was in a stall.

23   Q.      With regard to your veterinary practice

24   in general, has it suffered as a result of the

48

1  actions you allege have been engaged in by the

2  American Veterinary Medical Association?

3      A.      Yes.

4      Q.      How has it suffered?

5      A.      When the AVMA gave the provisional

6  recognition to Dr. Gillette and his board and the

7  charter members and the organizing committee members

8  of that college were instantly given diplomate

9  status, I was suddenly the one who was not a

10  diplomate of the college that I had started.  So in

11  the horse industry, amongst clients, amongst

12  trainers, being board-certified carries a lot of

13  weight and it implies a level of expertise and it

14  certifies someone as having that expertise.  So when

15  the AVMA joined and really perfected the

16  infringement of the other defendants, then the way I

17  see it in my mind is that, you know, I was

18  essentially frozen out of a marketplace that I had

19  created.

20      Q.      Let me ask you this, though.  Can you

21  identify any client that you lost as a result of the

22  AVMA's provisional recognition of the college and

23  your not receiving a diplomate?

24      A.      I can't offer you names at this time,

1   but I can tell you that I have been told by a number

2   of horsemen across the country that not only my not

3   being recognized as a specialist but this sort of

4   dark cloud, if you will, that hangs over me for not

5   being recognized as the founder of this organization

6   has cast doubt on my reputation and on my ability as

7   a clinician.  So I can tell you that many people

8   that I work with have told me that they would like

9   to have me get involved with a horse, they're

10  colleagues in one sense or another, they're service

11  providers to these horses, and then they'll say

12  "When are you going to get that all straightened

13  out?  Because this is a problem."

14       Q.       Let me just ask you this, though.

15  Without disclosing the names of folks at this point,

16  can you tell me numbers of how many clients you lost

17  as a result of the AVMA's provisional recognition of

18  the college as a recognized specialty organization?

19       A.       To give you a number, no, I can't.  In

20  part because the nature of the sport horse industry

21  is that it's continuously turning over.  It's

22  probably a little bit like the legal profession in

23  that while I have had some clients who have kept

24  sport horses for as long as I've been in practice

50

1   and I've enjoyed a relationship with them for that

2   length of time, especially with the economy as it

3   is, there is a pretty high turnover rate, a much

4   faster turnover rate of potential clients.

5        Q.      No.  Understanding that, but did you

6   have any existing clients that you were servicing

7   that you know for a fact stopped doing business with

8   you because of the AVMA's either provisional

9   recognition of the college or publication on its

10  website of statements about the college or use of

11  the mark?

12       A.      I believe yes, but again I may not -- I

13  believe yes.

14       Q.      And how many clients would that be?

15       A.      Well, there are two that I can think of,

16  and they're both international clients.

17       Q.      And at some point are you going to be

18  able to seek their permission to disclose their

19  identities?

20       A.      Exactly.  And that's a client where I

21  would have to ask their permission first, if that's

22  all right.

23       Q.      Can you tell us the amount of veterinary

24  services that you provided for them in 2012?

51

1    A.    None.

2    Q.    The amount of veterinary services you

3  provided for them in 2011?

4    A.    I would have to look at my records.

5    Q.    Can you give us a magnitude of the

6  amount of lost income for those two clients?

7    A.    Again, I would have to look at my

8  records.

9         MR. KLUFT:  We've been going for about

10  an hour since the last break.  Do you want to take a

11  break?

12        MR. DICKISON:  I'm okay unless the

13  witness would like to.

14    Q.    With respect to your current sources of

15  income, setting aside the veterinary practice that

16  you have, do you have any other sources of income?

17    A.    No, I don't.

18    Q.    Do you make any money or any earnings

19  from Homecoming Farm?

20    A.    No.

21    Q.    Do you make any money or income from the

22  mark that's at issue in this case, The American

23  College of Veterinary Sports Medicine and

24  Rehabilitation?

52

1          A.          Indirectly, yes.

2          Q.          Okay.  And did you make any such income

3     in 2012?

4          A.          No.

5          Q.          When you say -- did you make any income

6     with respect to the mark in 2011?

7          A.          No.

8          Q.          Have you ever made any money with

9     respect to the mark?

10         A.          Well, maybe that's where I need to

11    explain a little bit.  When I say indirectly, it

12    became well known that I had founded The American

13    College of Veterinary Sports Medicine and

14    Rehabilitation starting back in 1995.  So when you

15    ask if I have had any income related to that, it

16    would be by virtue of reputation for the

17    understanding of what it took to create the plan and

18    to execute it as I have and to do the research that

19    led to an understanding of how to improve services

20    in veterinary medicine.

21         Q.          I understand that and respect that and I

22    will ask you probably a lot about that later.  Right

23    now what I'm trying to understand is, for 2012, did

24    you make any income from the sale of or provision of

53

1    any educational services under the mark --

2         A.        Oh, I see.

3         Q.        -- American College of Veterinary Sports

4    Medicine and Rehabilitation?

5         A.        No, I earned no income doing that.  It's

6    strictly volunteer.

7         Q.        Now, in 2012 --  let me step back for a

8    minute.  I take it you own the mark that's at issue

9    in this matter, right?

10        A.        Yes.

11        Q.        And therefore, just to be clear,

12   Homecoming Farm, Inc. does not own the mark, right?

13        A.        That's correct.

14        Q.        And has that always been the case?

15        A.        Yes.

16        Q.        And with respect to the mark -- and let

17   me refer you to Exhibit 1, the complaint here.  If

18   you look at page 5, paragraph 16, the allegation

19   there is "Dr. Lyons created and is the lawful owner

20   of the registered trademark 'The American College of

21   Veterinary Sports Medicine and Rehabilitation,'

22   Serial No. 78635662 which was registered by Dr.

23   Lyons on May 24, 2005."  That's an accurate

24   statement?

67

1      A.      Okay.  Thank you.  Yes, so that would be

2   in the form of donations and funds received by the

3   nonprofit.  The way we tend to work it is that the

4   fundraising that we do substantially covers the cost

5   of the educational programs that we offer.

6      Q.      I understand the fundraising part of

7   things, and we'll talk about that.  I'm asking

8   strictly about income earned with third parties,

9   either students or audience members or others who

10  would pay you or Homecoming Farm for educational

11  materials.

12     A.      In 2012?

13     Q.      2012, and 2011 for that matter.

14     A.      Again, I'm sorry.  I would have to look

15  at the records.

16     Q.      Do you recall how much you spent on

17  marketing either the acronym or the full mark in

18  2012?

19     A.      Well, I don't recall a specific number,

20  but, for example, simply maintaining the websites is

21  a form of marketing.  Maintaining the domain names.

22     Q.      Absolutely.  How much do you ballpark

23  you spent on maintaining the website?

24     A.      Probably, well, I would estimate between

68

1    500 and a thousand dollars.

2         Q.      And were there additional amounts for

3    maintaining the servers or is that maintaining the

4    servers and maintaining the domain names?

5         A.      I believe that would be mostly

6    maintaining the domain names and simply purchasing

7    the website.

8         Q.      And in addition to those costs, did you

9    make any expenditures of any sort in terms of print

10   advertising?

11        A.      Not in 2012.  We didn't have the funds

12   to do it.

13        Q.      Did you make any expenditures of print

14   advertising in support of either the full mark or

15   the acronym in 2011?

16        A.      By printing our materials that we use as

17   flyers, then that would I assume be an expense?

18        Q.      Sure.  How much was that, approximately?

19        A.      Again, I'm sorry, I'd have to look at

20   those records.  I would say between 500 and 1,500

21   dollars.

22        Q.      Have you ever made any expenditures to

23   advertise either the full mark or the acronym in any

24   newspaper or magazine or newsletter?

69

1    A.    No.

2    Q.    Have you ever made any expenditure to

3    advertise the full mark or the acronym in any

4    non-Internet electronic media like television, radio

5    or video?

6    A.    I believe at one point I paid for an ad

7    in The Blood Horse as a listing.  And, I'm sorry, I

8    don't recall the year, but there was a time period

9    when there was a fee for that service.

10    Q.    Okay.  Let me get back to that in a

11    minute.  My question was, have you ever made any

12    advertising expenditure to advertise the full mark

13    or the acronym in any television or radio medium?

14    A.    No.

15    Q.    With regard to The Blood Horse, is that

16    a -- what is The Blood Horse?

17    A.    The Blood Horse is a horse racing

18    industry publication, and it's I believe the most

19    widely distributed publication in this country.

20    Q.    And you believe you placed one

21    advertisement in that publication at some point in

22    time?

23    A.    I believe actually our listing has been

24    in that publication for many years.  And at one

70

1    point, I don't know whether it's because they

2    required everyone to pay a fee for it or whether I

3    increased the level of service that I was asking

4    them for, but there was a fee for it, yes.

5        Q.      And is there a -- when you say an

6    advertisement, what are you talking about?  Like a

7    quarter page advertisement?

8        A.      No.  It would be a listing in their

9    directory.

10       Q.      And what would the listing have been

11   offering?

12       A.      Veterinary and -- sports medicine and

13   rehabilitation, educational services, clinical

14   seminars.

15       Q.      And do you recall what time period you

16   would have placed that advertisement?

17       A.      To the best of my recollection, it would

18   have been about 2005 through the present.

19       Q.      With respect to your educational

20   services, where do you offer the seminars

21   physically?

22       A.      It depends on who's hosting it.  Until

23   we can create a permanent campus for this, which is

24   the phase we're at right now, then we offer these

71

1    clinical seminars and lectures at conferences,

2    universities, stables, meeting halls.

3        Q.      At present, you don't have any physical

4    premises for your educational services --

5        A.      No.

6        Q.      -- is that correct?  Would it be fair to

7    say that you don't have any or employ any teachers

8    to provide any services; is that correct?

9        A.      That's correct.

10       Q.      And has that always been the case, that

11   you've never had a physical premises for, a

12   permanent physical premises to offer educational

13   services under either the full mark or the acronym

14   mark?

15       A.      Well, the educational services actually

16   began when I did the research at Homecoming Farm in

17   New Hampshire, but since you're relating to in the

18   name of the full mark, then, no, that would have

19   been a permanent location.  They would have been the

20   predecessor to the courses that we have now, but the

21   mark we didn't use in association with all of those

22   programs until 1995.

23       Q.      And are there any students who are

24   receiving educational services under either the full

72

1   mark or the acronym at this point in time?

2        A.      Through our seminars, yes.

3        Q.      Do you offer any specific courses that a

4   student can enroll in under either the full mark or

5   the acronym mark?

6        A.      Yes.  And they're organized on an as-we-

7   can-offer-them basis.

8        Q.      How many students were enrolled in a

9   program or educational service offered under the --

10  by you under the full mark or the acronym mark in

11  2012?

12       A.      In 2012 we've had no enrollment in

13  ongoing programs.

14       Q.      What about in 2011, any enrollment in

15  2011?

16       A.      No.

17       Q.      When was the last time you had anyone

18  enrolled in a course under either the full mark or

19  the acronym mark?

20       A.      To the best of my recollection, that

21  would have been preceding the recognition of the

22  college.  It was before our funds essentially

23  disappeared.

24       Q.      Have you -- we've talked about

73

1    advertising expenditures.  Have you ever engaged a

2    marketing consultant with respect to marketing the

3    full mark or acronym mark?

4         A.       Not to specifically market the mark,

5    but, yes, to market the plan to create a permanent

6    campus for this.

7         Q.       If you look at Exhibit No. 2, one of the

8    questions that we ask in interrogatory number 4,

9    "Please identify all consumer surveys" --

10                  MR. SARROUF:  Which exhibit number?

11                  MR. DICKISON:  Exhibit 2, page 8.

12                  MR. SARROUF:  Your reference is as to

13   which?

14                  MR. DICKISON:  Interrogatory number 4.

15        Q.       We asked you to identify any consumer

16   surveys that you intend to utilize at trial to

17   "demonstrate that the ACVSMR mark has acquired

18   distinctiveness or secondary meaning in the

19   marketplace so that the ACVSMR mark identifies

20   Plaintiffs as the source of educational surveys."

21                  Have you or anyone on your behalf

22   undertaken any consumer surveys with regard to the

23   mark, the full mark or the acronym mark?

24        A.       When you say undertaken, I know that we

74

1   discovered a survey actually done by the AVMA

2   regarding the employment of veterinarians, and

3   that's broken down into those who have board-

4   certified credentials and those who don't.  But

5   other than that, no consumer surveys.  We haven't

6   conducted any, and at this time I don't know whether

7   or not we'll be conducting those.  That would be

8   left up to experts and attorneys, not me.

9        Q.      Understood.  What I may be clumsily

10  getting at is, in the past, let's say in the past

11  ten years, have you ever gone to a marketing firm or

12  professional consultant and said -- and asked them

13  to conduct a survey to see how many consumers or

14  veterinarians or students of veterinary practice

15  know about the mark or the acronym?

16       A.      No, I've never hired anyone to do that.

17              (Brief recess.)

18              MR. DICKISON:  Back on the record.

19       Q.      Dr. Lyons, do you, with respect to the,

20  I'm calling it the full mark and the acronym, do you

21  allow Homecoming Farm, Inc. to use those marks?

22       A.      Yes, I do.

23       Q.      Is there any document in writing between

24  you and Homecoming Farm that allows Homecoming Farm

75

1    to use those marks?

2         A.       No, there isn't.

3         Q.       Has there ever been any such document?

4         A.       No.

5         Q.       And are you, with respect to Homecoming

6    Farm, Inc., are you the sole shareholder of that

7    company?

8         A.       Well, there actually aren't any

9    shareholders because it's a nonprofit corporation.

10   Sometimes I've heard it referred to as a nonstock.

11   So there are no shareholders.

12        Q.       And are you the president of that

13   company?

14        A.       Yes, I am.

15        Q.       Have you always been the president of

16   that company?

17        A.       I believe in the early years, no, we

18   rotated.

19        Q.       And when you say "we," did you have

20   other employees or officers?

21        A.       There are board members, yes.

22        Q.       Tell me about Homecoming Farm, Inc.,

23   when was that founded?

24        A.       Well, it was incorporated I believe in

76

1    1992.  However, the work began in 1989.

2        Q.       Who founded the company?

3        A.       Well, I did, but there was a -- my

4    co-founder was a board member as well.

5        Q.       And who was that?

6        A.       June Gilch.

7        Q.       And who was she?

8        A.       June is an educator and someone who

9    brought to the project not only an understanding of

10   horses, but she came with the understanding of -- as

11   an education administrator.

12       Q.       And is she a veterinarian?

13       A.       No.

14       Q.       What was her occupation by trade?

15       A.       As an education administrator.  She had

16   been the assistant superintendent of schools for

17   Attleboro, or it may be one of the Attleboros, and

18   also for Nantucket.  And on Nantucket, I don't want

19   to misspeak, whether she was the assistant

20   superintendent or something roughly equivalent to

21   that.

22       Q.       How was it that you two became involved

23   with Homecoming Farm, Inc.?

24       A.       I met June immediately upon graduation

79

1      Q.      Sure.  Well, let me ask you to tell me,

2  with respect to Homecoming Farm it had a slate of

3  officers, president, treasurer and clerk.  Is that

4  correct?

5      A.      It had a president, vice president,

6  secretary and treasurer.

7      Q.      Who were those individuals during this

8  time period of 1989 to 1995?

9      A.      I would have to look at the records and

10 tax returns, things like that, where those would be

11 listed.

12     Q.      Were you one of those individuals?

13     A.      Yes, I was.

14     Q.      Were there any employees of Homecoming

15 Farm during that time period?

16     A.      No.

17     Q.      Have there ever been any employees of

18 Homecoming Farm, Inc.?

19     A.      No.

20     Q.      Has Homecoming Farm, Inc. ever owned any

21 real estate?

22     A.      No.

23     Q.      Has it ever owned any significant

24 assets --

83

1    A.        Well, yes, he -- we continued a research

2    project that, quite frankly, is never ending.  This

3    is the study of pathology and how it relates to

4    diseases that were once considered primary and where

5    we have figured out over the years that they're

6    actually a result of susceptible tissues being

7    exposed to repetitive traumas.  So Michael continues

8    to do these dissections, and when I can, when I have

9    the opportunity when I'm in California, then we pick

10   up and collaborate on that and advance the science.

11   Q.        Does Homecoming Farm, Inc. currently

12   have a board?

13   A.        Yes, it does.

14   Q.        Who is on that board?

15   A.        Myself, June Gilch, Joyce Falese, and

16   Patricia Cullen.

17   Q.        Who is Joyce Falese?

18   A.        Joyce Falese is a horse owner and one of

19   the principals in the Camden, South Carolina massage

20   therapy school.  She's a massage therapist that

21   works on some of the best horses in this country.

22   Q.        And Patricia Cullen, who is she?

23   A.        Patricia Cullen is a dressage rider and

24   horsewoman.

96

1    A.      Okay.  The International Federation For

2  Sports Medicine.  The International Association of

3  Physical Medicine and Rehabilitation, I would have

4  to check my records to know whether I have kept my

5  membership current in the -- it's sports medicine,

6  human sports medicine.  And the American Academy of

7  Physical Medicine and Rehabilitation.

8    Q.      Have you ever had any professional

9  affiliation with the AVMA, my client?

10    A.      Yes.  I'm sorry.  I've been a member.

11  Yes.  And I've been a member of the AAEP as well.

12    Q.      What's that?

13    A.      The American Association of Equine

14  Practitioners.

15    Q.      Just turning to the AVMA, how long have

16  you been a member of their organization?

17    A.      I joined as a student member while I was

18  at Tufts, and I believe I kept my membership active,

19  although I would need to look at my records to be

20  certain of this, through approximately 2005, but,

21  again, I'd have to look at the records to be sure of

22  the dates.

23    Q.      So you're not currently a member of the

24  AVMA?

97

1      A.      No, I'm not.

2      Q.      And you haven't been a member since

3  2005?

4      A.      Or thereabouts, whenever that date was,

5  yes.

6      Q.      Is there any reason for ending your

7  membership with the AVMA?

8      A.      Yes, there was.

9      Q.      Okay.  What was that?

10     A.      Well, it was the -- the AVMA had

11  assigned their liaison to our organizing committee,

12  and when I was blind-sided by the false accusations

13  of Dr. Gillette at the meeting in Philadelphia and

14  the AVMA liaison did not act as I believed should

15  have occurred, which is to see that a committee that

16  had been assigned a liaison would conduct its

17  business, if you will, in keeping with the policies

18  of the AVMA; and so it was such a difficult time for

19  me and such a period of adjustment and humiliation

20  that paying my dues to the AVMA after all of that

21  occurred was just something I chose not to do.

22     Q.      And so if the events in Philadelphia

23  occurred in July of 2004, I take it then your

24  decision not to pay your dues to the AVMA would have

113

1    Q.       And prior to that time you had already

2    used the mark in connection with your lectures,

3    seminars and educational opportunities?

4    A.       Yes.

5    Q.       And basically your use -- prior to

6    meeting Dr. Gillette, did you spend any money

7    advertising the mark or marketing the mark in terms

8    of newsletters or print media or anything like that?

9    A.       No, not -- no.

10   Q.       Would it be safe to say that your use of

11   the mark was as you've described in general, by

12   these various lectures, seminars and educational

13   opportunities that you provided around the United

14   States and internationally; is that correct?

15   A.       Yes, that's correct.  I'm not sure that

16   that is the limit as to how I used the mark.  I need

17   a little bit more time to think about that, so that

18   may not be a complete answer.  It's just my best

19   answer right now.

20   Q.       Sure.  Do you have an understanding as

21   to, prior to the time that you met Dr. Gillette as

22   to approximately how many people out there in the

23   world of veterinarians in particular knew about The

24   American College of Veterinary Sports Medicine and

114

1   Rehabilitation?

2       A.      Let's see, 1999.  Well, I wouldn't feel

3   comfortable stating what other people knew, but let

4   me, if it's all right --

5       Q.      Sure.  You're absolutely right.  But let

6   me ask you this in a different way and maybe you can

7   answer it.  How many people were exposed to the mark

8   through your lectures and other activities?

9       A.      Thank you.

10      Q.      Would you estimate if you can?

11              MR. KLUFT:  I'm sorry to interrupt.  Is

12  that still prior to 1999?

13              MR. DICKISON:  Yes.  Prior to meeting

14  Dr. Gillette in 1999.

15      A.      The Equine Excellence Initiative would

16  have been out for four full years, so through the

17  submission of grant proposals, the submission of the

18  Equine Excellence Initiative, just as a way of

19  introducing our organization, including The American

20  College of Veterinary Sports Medicine and

21  Rehabilitation, sent to businesses of all types from

22  pharmaceutical companies to -- everything associated

23  with the horse sports industries to veterinary

24  teaching hospitals, even the AVMA, I submitted a

1    copy of the Equine Excellence Initiative.

2              And I came upon this note in my

3    documents; that's why I believe I recall the date

4    was 1997.  I would estimate, and this is a rough

5    estimate looking back far in time, but I would say

6    that I submitted at least a thousand copies of the

7    Equine Excellence Initiative worldwide.

8         Q.        And so let me turn to your meeting with

9    Dr. Gillette at this conference in Oregon.  How did

10   you end up meeting him at that conference?

11        A.        One of the things I wanted to do at this

12   conference was to identify colleagues that I might

13   like to discuss my intention to now take my work

14   product and make an application to the AVMA for

15   potential recognition as a veterinary specialty.

16   And in my conversations with the AVMA, and the first

17   one I know was with a Dr. Park and the second one I

18   believe was with Dr. Sabin; there may have been

19   another in there somewhere, but those were the ones

20   that I found some notes on or some reference to that

21   refreshed my memory as to the timing.

22              It was my understanding that I would

23   need to organize a committee with a minimum of six

24   members; and that since any new veterinary specialty

117

1          MR. DICKISON:  Do you mind reading back

2     the last portion of her answer.

3              (Read back.)

4     A.        Thank you.

5     Q.        Do you remember what you were about to

6     say?

7     A.        I do.  I remember explaining to Dr.

8     Sabin that, with all due respect to the veterinarian

9     teaching hospitals, that this was not only a

10    clinical specialty but because it was focused in

11    sports medicine, at least from the equine

12    standpoint, that the education and the programs

13    needed to be centered where these horses train and

14    compete.  When I went to the conference in Oregon,

15    it was not only to present my paper on superficial

16    flexor tendonitis but it was with the intention of

17    seeing if I could identify individuals who might

18    meet the criteria both that the AVMA had suggested I

19    seek and any additions to my project.

20              And so it was at that point that I

21    introduced myself to Dr. Gillette.  I explained

22    where I was in this project, which was that I had

23    the curriculum essentially hashed out.  I had the

24    structure.  And I asked him if he had any opinion

118

1    about whether or not this would be a beneficial

2    specialty.

3            And at first he seemed a little confused

4    about why the two would be joined, and he said

5    something to the effect that he had already

6    approached the AVMA or was about to, something like

7    that, but it was specifically for canine sports

8    medicine.  So I was able to share with him my

9    understanding from my contact with them that it

10   would need to at the very least include all species

11   that would benefit from it.  But then I went into my

12   reasons for how not only through my unique education

13   but through my world view, really, thanks to my

14   practice, of why it was essential that

15   rehabilitation be linked with sports medicine in

16   order to have either one advance.

17           So I agreed to send him the materials,

18   some of the materials, it was the Equine Excellence

19   Initiative and some other documents, and I invited

20   him to just look at them and review them and to let

21   me know whether or not he thought that this was

22   something that he would want to join.

23   Q.       Okay.  At the conclusion of your

24   discussions with Dr. Gillette in Oregon in 1999,

124

1    A.    Okay.

2    Q.    And you can tell maybe the Bates number

3  on the bottom is your counsel's.  It says right on

4  it, obviously, May of 2003.  Do you remember how you

5  obtained this?

6    A.    I don't.

7    Q.    Do you remember the first time you

8  became generally aware that there were policies and

9  procedures regarding the establishment and

10  recognition of veterinary specialty organizations?

11    A.    It would have been in the general time

12  period of 2001 to 2003, so somewhere in there, yes.

13    Q.    Before you met Dr. Gillette, what was

14  your contact with the AVMA about this subject?  You

15  had had one conversation with Dr. Park, you believe?

16    A.    Yes.

17    Q.    And do you think there were other

18  conversations?

19    A.    With Dr. Park?

20    Q.    With Dr. Park or anybody from the AVMA,

21  prior to meeting Dr. Gillette.

22    A.    Yes.  I had a conversation with, I

23  believe it was Dr. Sabin.

24    Q.    Okay.

1    A.      No.

2    Q.      After you met with Dr. Gillette --

3  before we get to that, I was going to ask you a

4  couple of quick questions about this.  I'm sorry.

5          Were you ever made aware or have an

6  earlier version of these guidelines prior to May

7  2003 to your knowledge?

8    A.      No.  I recall finding these in my

9  materials when I produced all the documents to the

10 defendants, and this would have been certainly the

11 earliest, and I have -- I don't believe I ever

12 received anything unless it was from your document

13 production about a later version of this.

14   Q.      If you'd turn in Exhibit 4 to page 3.

15          MR. KLUFT:  I'm sorry.  What do you mean

16 by 3?  Would you read a Bates number?

17          MR. DICKISON:  2433.  I was referring to

18 page 3 in the document, but 2433.

19   Q.      Do you see a section here called

20 "Guidelines for Establishment, Recognition and

21 Supervision of Veterinary Specialty Organizations"?

22   A.      Yes.

23   Q.      Was it your understanding that such

24 organizations would only be recognized by the AVMA

128

1    if they were essentially servicing only

2    veterinarians or certifying only veterinarians?

3         A.      Yes.

4         Q.      And was it your understanding that the

5    AVMA would only recognize a veterinarian specialty

6    organization that was a nonprofit?

7         A.      I need a little bit of clarity here.

8    Are you asking this question based on what I

9    believed after my conversations before this 2003

10   or -- because we're looking at a 2003 document and

11   yet that information that you're asking me about

12   came from conversations that happened several years

13   before.

14        Q.      Okay.

15        A.      So there's --

16        Q.      That's a fair statement.  Without

17   belaboring the point, what did you know at the time

18   you went to the conference at which you met Dr.

19   Gillette, what did you know were the requirements --

20   the essential requirements for becoming a recognized

21   veterinary specialty organization by the AVMA?

22        A.      Just that you -- one had to fulfill the

23   specific guidelines set forth by the AVMA, and that

24   depending on when an organization requested

143

1    A.        That may be true.  I don't remember when
2  I got my domains, and I could refresh my memory from
3  the interrogatories.
4    Q.        Actually, my next -- the next document I
5  marked under here is a document from your
6  production, Exhibit 7.  It's a separate document.
7    A.        Okay.  Oh, good.
8    Q.        Do you recall producing this?
9    A.        Thank you.  Yes.  That's what I was
10 hoping to find.  Okay.
11   Q.        And this document appears to reflect the
12 fact that you two days after this email from Dr.
13 Gillette went online and registered the domain name
14 ACVSMR.com under the name of Homecoming Farm, Inc.
15 with you being the administrative contact.  Is that
16 accurate?
17   A.        Based on the dates that are on these,
18 yes.
19   Q.        And you also registered on January 2nd,
20 2003 the domain name ACVSMR.org?
21   A.        Yes.
22   Q.        Did you have any conversations with Dr.
23 Gillette or anyone else on the organizing committee
24 about your registration of those domain names?

144

1     A.        Actually, I believe I had originally

2  registered these in 2001, and the reason I remember

3  that date is that it happened in the context of a

4  computer lab that was part of the AVMA conference

5  when it was in Boston, and I took part in that lab,

6  and it was how to use computers and the Internet in

7  your practice, something like that.

8              And one of the things that the

9  instructor was very clear about was, when we get to

10  the end of the day, I'm going to go around to each

11  one of you.  We went through PowerPoint and things

12  like that, and he said even if you're not online

13  now, I want to help every one of you to purchase

14  domains because some day, you know, these may not be

15  available.  And so it was through that assistance

16  that I believe I first registered both ACVSMR, and I

17  don't know if it would have been .com, .org, and

18  Homecoming Farm.

19     Q.        And when would that have occurred?

20     A.        I believe that conference was in 2001.

21  It would be easy to find out because I know it was

22  the Boston conference.

23     Q.        Do you remember the AVMA representative

24  or --

145

1      A.      Yes, that's Zack March.

2      Q.      He was the AVMA representative?

3      A.      He taught the course.

4      Q.      Did he specifically help you registering

5   this domain name, ACVSMR?

6      A.      I believe he did, yes.

7      Q.      Okay.  It appears from your production

8   of documents that we don't have that registration

9   information.  Do you know why?

10      A.      I do.  And I went on whatever that

11   service is where you, you know, look up who owns

12   something, and when it only went back to this date,

13   I contacted them, and asked if I could find the date

14   that I had previously registered it, and they said

15   if it was transferred and if it wasn't continuously

16   maintained, then it would be a brand-new name in

17   terms of the system.

18              And back then I believe there was a high

19   fee for transferring a domain, not like now where

20   they'll give you a free year if you do it.  There

21   was either a fee to do it, but there was a reason

22   that I wanted to switch to Go Daddy, which I'm sure

23   was price, and so I let those domains expire and

24   immediately picked them up as soon as they were

146

1   available.  But when I contacted whatever that

2   service is, they said that that record would not be

3   available.  And obviously it had not been with Go

4   Daddy, so it's not part of their records.

5       Q.      Let me ask you this.  When do you

6   believe you did -- do you remember what year you

7   believe you first registered these domains?

8       A.      I believe it was '01.

9       Q.      Is it fair to say that even though you

10  registered those domains in '01 you never took the

11  next step of creating a web page and putting

12  material online?

13      A.      That's correct.  I didn't have a

14  computer.

15      Q.      So would it be fair to say that Dr.

16  Gillette putting the mark on his website in December

17  of 2002 would have been likely the first time that

18  the name or mark American College of Veterinary

19  Sports Medicine and Rehabilitation actually went

20  online?

21      A.      That may be true.

22      Q.      What prompted you to re-register, as

23  evidenced by Exhibit 7, on January 2nd, 2003?

24      A.      To re-register?

147

1    Q.      Well, according to this documentation

2    you produced, a registration of some sort was made

3    by -- was created on January 2nd, 2003.

4    A.      Yes.

5    Q.      And so my question to you is what

6    prompted you on that date -- did you even own a

7    computer at that point in time, January 2nd, 2003?

8    A.      I know I did in '02, so that could have

9    been.  I may have gotten it for Christmas, who

10   knows.

11   Q.      Do you know why on that particular date

12   you took the action of registering the websites

13   ACVSMR.org and ACVSMR.com?

14   A.      I believe it was related to when the

15   domains had expired and then I would re-up them with

16   a different provider.

17   Q.      Was it -- did Dr. Gillette's email of

18   December 30, 2002 in which he represented to

19   everybody on the organizing committee at that point

20   in time that he was putting this name on the

21   Internet have any part in prompting you to go out

22   and register these two domain names that are

23   exhibited in Exhibit 7?

24   A.      No, I owned them.  I owned the name, so,

156

1   see that there's been an addition in the first

2   paragraph here.

3       Q.      Okay.

4       A.      So I don't know, but if we got it from

5   you.

6               MR. LYONS:  And just for the record, she

7   was pointing to Exhibit 9.  So the record is clear,

8   and the lawyers are right about that, when you

9   indicate to an exhibit or point to something, make

10  sure that you mention it so the record is clear.

11  You were pointing to Exhibit 9 --

12              THE WITNESS:  Yes.

13              MR. LYONS:  -- as the document you last

14  saw; is that correct?

15              THE WITNESS:  That's correct.  I'm

16  sorry.

17      Q.      That's all right.  Do you generally

18  understand that a letter of intent was submitted to

19  the AVMA in January of 2003 by the organizing

20  committee?

21      A.      Yes.

22      Q.      And you agreed and consented to the fact

23  that a letter of intent be submitted in January of

24  2003 to the AVMA for the recognition of a specialty

157

1    organization in veterinary sports medicine and

2    rehabilitation?

3         A.    Yes.

4         Q.         And you at that time agreed and

5    consented that the name of the organization to be

6    recognized would be called The American College of

7    Veterinary Sports Medicine and Rehabilitation?

8         A.    Yes.

9         Q.         And why was it that Dr. Gillette was the

10   one signing the letter of intent and actually

11   submitting it and not yourself?

12        A.         Dr. Gillette asked me if I would agree

13   to name him as the chair of the committee.  He

14   explained that it would help him a great deal in his

15   desire to advance in his career at Auburn, and in

16   particular in academia, so when we were in Michigan,

17   he asked me if I would please allow him to be the

18   official chair.  So that's why his name was on this

19   letter.

20        Q.         Okay.  Now, with respect to this

21   document, there's the names and credentials --

22        A.    Yes.

23        Q.         -- of the various members.  And you

24   agree, do you not, that you were one of the original

162

1    Q.       Where were you in January of 2003?  Were

2    you at a specific stable doing specific services?

3    A.       I'm sure I was, but I don't recall.

4    Q.       Did you have multiple clients in England

5    at that time?

6    A.       Yes.

7    Q.       And so are there any records that you

8    could look at to learn precisely where you were

9    around January 24th --  between January 19 and

10   January 24, 2003?

11   A.       None that I've come across in my search

12   for documents so far.

13   Q.       Let me show you what's been marked as

14   Exhibit 11 and ask you if that's a copy of an email

15   exchange between you and Dr. Sabin in January 2004?

16   A.       I don't specifically recall this

17   document, but that would seem consistent with what I

18   remember.

19   Q.       Let me just ask you, after the letter of

20   intent was submitted in January of 2003, what

21   activities in between this email exchange of January

22   2004 with Dr. Sabin, what activities did you

23   generally engage in with respect to getting the

24   organizing committee recognized by the AVMA?

166

1    Q.        Let me show you what's been marked as

2    Exhibit 12.  Do you recognize this document, these

3    two documents?

4    A.        I recognize it from the documents that

5    the defendants have produced.

6    Q.        Had you ever seen it before this

7    litigation?

8    A.        I believe I saw a physical copy of this

9    actually at the meeting.

10   Q.        And was this something that you received

11   in the mail or otherwise inviting you to come to the

12   meeting?

13   A.        No.  I think I helped to plan the

14   meeting, so I wasn't really invited to it.

15   Q.        Did you consent at the time that this

16   document went out to the use of the name American

17   College of Veterinary Sports Medicine and

18   Rehabilitation?

19   A.        Yes.

20   Q.        And is this an accurate list of the

21   agenda for the meeting on the second page?

22   A.        Yes, I believe it is.

23   Q.        You attended the meeting, right?

24   A.        Yes, I did.

167

1    Q.        Did you actually give the 10:00 a.m. to

2    11:00 a.m. incorporation overview of options,

3    reasons and summary of legal advice?

4    A.        I gave that information.  I'll trust

5    that it was between 10:00 and 11:00.

6    Q.        At some point that morning?

7    A.        Yes.

8    Q.        And approximately at some point did you

9    impart to the other attendees that information about

10   the draft of the articles of incorporation and

11   bylaws?

12   A.        Yes, I did.

13   Q.        At this point in time at the Chicago

14   meeting, at least as evidenced by this agenda, you

15   were doing a lot of laboring work for this

16   organizing committee.  Is that fair to say?

17   A.        Yes.  I was doing the laboring work and

18   I had contributed the substance of the rest of what

19   the organizing committee was working with, so yes.

20   Q.        At this meeting it said ABVS liaison

21   attendees scheduled to attend was Dr. Larry Dee and

22   Dr. Leon Russell.  Did either of those gentlemen

23   attend this meeting in Chicago?

24   A.        That's a very good question.  I believe

186

1   communicated to the AVMA that you wanted this

2   organizing committee to be recognized, this

3   organizing committee having the name American

4   College of Veterinary Sports Medicine and

5   Rehabilitation, you wanted it to be recognized at

6   the AVMA?

7       A.      As long as you add that it would include

8   my name as well, then yes.

9       Q.      What do you mean by that, that you would

10  be one of the founding members?

11      A.      Yes.  Absolutely.  I would really be the

12  founding member.

13      Q.      And that was what you had told the AVMA

14  either directly or indirectly up until July of 2004?

15      A.      Directly or indirectly, I'm just not

16  sure I understand what the scope of that is.

17      Q.      Well, let me ask you the question

18  another way.  Since you walked out of that meeting

19  in Philadelphia, have you ever informed the AVMA

20  that you were objecting to the recognition of the

21  organizing committee chaired by Dr. Gillette and

22  objecting to it being a recognized veterinary

23  specialty organization?

24      A.      No.

FARMER ARSENAULT BROCK LLC

191

1    Q.        Following the Philadelphia meeting, did

2    you make any communications or write any letters to

3    anyone else about what occurred there?

4    A.        I don't recall.

5    Q.        Did you make any -- did you write any

6    letters to any of the members of the organizing

7    committee who didn't attend the Philadelphia

8    meeting?

9    A.        I believe they were all there.

10   Q.        Did you at any point assert any claims

11   against Dr. Gillette or any of the other members of

12   the organizing committee following July of 2004 up

13   until this case?

14   A.        Make any claims?

15   Q.        Sure.  Did you file a lawsuit?

16   A.        Oh, no.

17   Q.        Now, my understanding is there was an

18   exchange of correspondence between your attorneys

19   and the committee's attorneys about the use of the

20   mark at some point?

21   A.        Yes.  We -- I received a letter from an

22   attorney representing Dr. Gillette and I believe

23   what she referred to as an unincorporated board of

24   directors, and she acknowledged that I owned the

1   registered trademark, The American College of

2   Veterinary Sports Medicine and Rehabilitation, and

3   she asked me if I would reassign the registration to

4   her client because he now intended to use it.  And

5   at that point that was when I became aware that they

6   had apparently reformed, because as I saw it at the

7   end of that Philadelphia meeting, I owned the name,

8   I owned the materials, I explained that none of them

9   could use any of them, so as I saw it, they no

10  longer had a committee, certainly for the ACVSMR.

11       Q.     Let me ask you this.  Following

12  basically the end of your tenure of your organizing

13  committee, did you ever contemplate starting or

14  using Homecoming Farm as a specialty organization

15  and attempting to get recognition for that as a

16  veterinary specialty organization recognized by the

17  AVMA?

18       A.     In the name Homecoming Farm?

19       Q.     Just -- strike that.  Let me ask you in

20  general did you ever contemplate filing a competing

21  petition with the AVMA?

22       A.     After the experience of the meeting in

23  Philadelphia and the complete inaction of the AVMA

24  representative, it wasn't within my imagination that

1   the AVMA would accept or work with me.  I wouldn't

2   have even seen it as a competing petition, because

3   if I thought that that was an avenue that I could

4   pursue that would be productive for my original

5   purpose, I would have done it right after I left

6   that meeting.  But after seeing the way the AVMA

7   handled that, I just abandoned that thought and just

8   went on and continued the good work we do, continued

9   to develop certification programs of our own really

10  without asking for the AVMA's additional stamp of

11  approval.

12       Q.     And what prompted you filing this

13  lawsuit several years later after July 2004 in

14  December of 2011?

15       A.     Oh, that was the willful infringement of

16  both the trademark and the copyright.  And my

17  attorney sent a cease and desist letter to Dr.

18  Gillette and his unincorporated board members and in

19  that letter it promised that if he continued to

20  infringe on my registered trademark that we would

21  take all action to defend my property.

22       Q.     And what did the AVMA do that infringed

23  on your trademark?

24       A.     The AVMA I discovered from the documents

210

Exhibits: 14-53            Volume 2, Pages 210-439

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

SHEILA LYONS, DVM and HOMECOMING

FARM, INC.,

                    Plaintiffs

v                   Civil Action No. 1:11-CV-12192

THE AMERICAN COLLEGE OF VETERINARY

SPORTS MEDICINE AND REHABILITATION,

INC. and THE AMERICAN VETERINARY

MEDICAL ASSOCIATION, INC.,

                    Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SHEILA LYONS

Wednesday, January 16, 2013, 10:04 a.m.

Lawson & Weitzen, LLP

88 Black Falcon Avenue, Suite 345

Boston, Massachusetts

- - - - - - - Reporter:  Alan H. Brock, RDR, CRR - - - - - - -

ahb@fabreporters.com.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

211

1    APPEARANCES:

2

3    Klieman & Lyons

4        Stephen J. Lyons, Esq.

5        Rikki Klieman, Esq. (until afternoon break)

6        115 Broad Street, Fourth Floor

7        Boston, Massachusetts 02110

8        617.443.1000  fax: 617.608.2828

9        sjlyons@kliemanlyons.com

10       rklieman@kliemanlyons.com

11       - and

12   Sarrouf Law, LLP

13       Camille F. Sarrouf, Esq. (beginning)

14       115 Broad Street, 4th Floor

15       Boston, Massachusetts 02110

16       617.227.5800 fax: 617.227.5470

17       cfs@sarrouflaw.com

18       for Plaintiffs

19

20

21

22

23

24

212

1    Foley Hoag LLP

2        David A. Kluft, Esq.

3        Seaport West

4        155 Seaport Boulevard

5        Boston, Massachusetts 02210-2600

6        617.832.1000  fax: 617.832.7000

7        dkluft@foleyhoag.com

8        for The American College of Veterinary Sports

9        Medicine and Rehabilitation, Inc.

10

11

12   Lawson & Weitzen, LLP

13        J. Mark Dickison, Esq. (until lunch break)

14        Joshua M. D. Segal, Esq.

15        88 Black Falcon Avenue

16        Boston, Massachusetts  02210

17        617.439.4990  fax: 617.439.3987

18        mdickison@lawson-weitzen.com;

19        jsegal@lawson-weitzen.com

20        for The American Veterinary Medical Association

21

22

23

24

1   fairly shortly -- there is a term used

2   "paraprofessional."  Does a farrier concern a

3   veterinary paraprofessional?

4        A.   No, not in my use of that term.

5        Q.   What is a -- I'm sorry.  Were you finished

6   with your answer?

7        A.   Yes.

8        Q.   What is a paraprofessional?

9        A.   My definition of a paraprofessional would

10  be someone who both serves a professional but

11  someone whose professional territory, if it were,

12  had some clear definition.  So one example of a

13  paraprofessional that I would give would be a

14  physiotherapist.

15       Q.   And what kind of training would a

16  physiotherapist have?  Would they be a veterinarian?

17       A.   No.

18       Q.   Would they have a master's degree of some

19  sort?

20       A.   Typically.  I believe today they would,

21  yes.

22       Q.   And in some of the documents, specifically

23  documents that were marked as fundraising documents

24  of Homecoming Farm and/or the ACVSMR project, I saw

219

1    requests for grants for paraprofessional

2    certifications.  Can you explain what

3    paraprofessionals the Homecoming Farm works with?

4        A.    Well, the paraprofessional groups that we

5    have structured our long-term plan to offer

6    certification in would be physiotherapists, and

7    there would be a new category of farrier, and that

8    would be a farrier who has a college degree.  And we

9    are working with or have developed guidelines for a

10   master's degree in farrier science.

11       Q.    Were you finished?

12       A.    Yes.

13       Q.    And is that a master's degree that it is

14   your plan for the ACVSMR project to offer?

15       A.    No.  That would be a master's degree that

16   would be offered by other institutions but where a

17   good deal of the training that would contribute to

18   that educational project would take place through

19   the ACVSMR.

20       Q.    And do you currently have -- and when I say

21   you, I mean Homecoming Farm.  Does Homecoming Farm

22   currently have any certification programs that are

23   already in place and operating?

24       A.    We don't have any certification programs

220

1    today that are offering credentials, and it's only

2    because our funding hasn't supported it -- which is

3    not at that point of maturity.  We need our campus

4    before we can do that.

5        Q.   And do I take it from your answer that

6    Homecoming Farm has never to date offered a

7    certification program that was -- in other words,

8    that was ready for students to enter?

9        A.   Not in open admission.

10       Q.   And have you done any kind of

11   certification?  I'm not sure I understand the term

12   "open admission."

13       A.   Well, in other words, what Homecoming plans

14   to do through its ACVSMR project is to have a main

15   campus where we can continuously run courses for

16   physiotherapists, for equine health care managers --

17   that would be another certificate that we intend to

18   offer -- for farriers and --

19            Well, we'll leave it at that for now.

20   And so we are putting our energy and our focus

21   toward creating that main campus.  And then the

22   certification programs will be able to -- when I say

23   open admission, there will be courses that begin on

24   a certain date, take place at our campus, and then

1    the AVMA.  Have you produced those documents?

2        A.   Yes.

3        Q.   Do you have any documents created by

4    anybody else that are in your possession that

5    pertain to recognition by the AVMA?

6        A.   Yes.

7        Q.   Do you have documents created by any

8    defendant that pertain to recognition by the AVMA

9    that you have not produced?

10       A.   No.

11       Q.   We've going for about an hour.  I usually

12   ask every hour if you want a break, so I'll ask it

13   now.

14       A.   I'm good if you're good.

15       Q.   Okay.  Let's continue.

16            I want to ask you a couple of questions,

17   following up from yesterday, about the trademark and

18   copyrights at issue in this case.  Have you ever

19   used the ACVSMR mark to sell veterinary services --

20   in other words, your own personal veterinary

21   services that you charge for?

22       A.   When you say "try to sell," no.

23       Q.   Obviously, I understand that it's in your

24   bio; correct?

255

1      A.   Yes.

2      Q.   But have you ever sold veterinary services

3  under the business name ACVSMR?

4      A.   No.

5           Let me continue that answer.

6      Q.   Please.

7      A.   I use these founder and director or some

8  ACVSMR distinction in my reports or whatever for

9  private patients.  So that's not -- at least in my

10  mind, that's not trying to sell something.

11      Q.   Right.

12      A.   That's just stating a fact.

13      Q.   I understand.  What I'm asking is something

14  different, which is:  Do any of your clients, to

15  your knowledge, think that when they hire you to

16  perform veterinary services, they are hiring an

17  organization or a company called ACVSMR?

18      A.   You would have to ask them, but it's

19  certainly not my sense that they do.

20      Q.   Understood.  Can you take a look at Exhibit

21  1, which should be in the pile of yesterday's

22  exhibits.  And this is your complaint in this

23  action.  And I'm going to ask you to turn to Page 5,

24  Paragraph 17.  Let me know when you've had a chance

262

1        A.    Everywhere.

2        Q.    When was the first distribution of this

3    document after it was produced in 1996?

4        A.    I believe near that June 1st date in 1996.

5        Q.    How did -- I'm sorry; I didn't mean to

6    interrupt you.  How did you -- who did you send it

7    to at that time?  Do you have a list?

8        A.    I produced in my document production for

9    the defendants material relating to that, but I

10   don't have a discrete list.  I sent it to

11   pharmaceutical companies, to veterinary schools, to

12   physical therapy schools, to horse owners, to

13   industry associations.  I sent it widely.

14       Q.    I saw in your production -- and if this is

15   a mischaracterization, just tell me -- a lot of

16   copies of magazines and brochures and articles.  And

17   in some cases there was a sort of, I don't want to

18   say scribble, but there was handwriting on the side

19   that said "Send EEI" or "Sent EEI."  Yes.  Is that

20   how you decided to whom to send a copy of this?

21       A.    The decision of whom to send it to came

22   from many different sources.  So, for example, if I

23   were sending them to veterinary schools, I would

24   have gotten the addresses for a number of veterinary

263

1  schools and sent them.

2           But then when I would do things like go

3  to a competition on behalf of a client, whatever --

4  in my travels, when I came upon either individuals

5  that I thought I'd like to sent it to, or companies,

6  then I would keep those source materials, make a

7  note to myself, and then send it off.

8       Q.   Okay, fair enough.  So is it fair to say

9  that this was not sent in one bulk mailing but in

10  many, many mailings and many, many hand

11  distributions over time?

12      A.   Many, yes.

13      Q.   Can you please turn to Bates Stamp 3435.

14           I'm sorry, please turn to 3420 first.

15  And specifically, that's a document called the

16  articles of incorporation.

17      A.   Yes.

18      Q.   And is it fair to say that this document

19  goes to about Page 3435?

20      A.   Yes.  3434, actually.

21      Q.   Correct.  I apologize.  Now, yesterday

22  Mr. Dickison asked you about the creation of the

23  bylaws for the ACVSMR organizing committee; correct?

24      A.   Yes.

267

1   to adapt it significantly to be suitable for

2   veterinarians.

3       Q.   Is there a specific document that you

4   referred to that had been used -- I'm sorry.  Let me

5   start the question again.  When you were drafting

6   the bylaws and articles of incorporation, was there

7   a specific document that had something to do with a

8   human-medicine organization that you were referring

9   to?

10      A.   There were several.  It was from a number

11  of different sources.

12      Q.   And what were those?

13      A.   Oh.  I was generally informed by so many

14  different sources.  I can't name documents.

15      Q.   I'm specifically asking if there's any

16  documents that you borrowed language from.  You

17  mentioned boilerplate, and I'm wondering what those

18  documents were.  That's what I'm getting at here.

19      A.   When you say "documents," it would have

20  been in the structure of the corporate structure.

21  So whether I obtained them through advice from a

22  nonprofit attorney or not, I don't recall.

23      Q.   So fair to say that the sections you

24  described as legalese were not your original work,

268

1    "your" referring to the more substantive sections of

2    these bylaws, when you say you're the author of

3    them?

4         A.   Yes, although, again, whether some of those

5    sections -- I would have to read it carefully and

6    read each section to know whether or not I had --

7              I think actually some of it was specific

8    to the ACVSMR.

9         Q.   Can I ask you to turn to Page 3435, please.

10             MR. LYONS:   Exhibit 15?

11             MR. KLUFT:   I'm sorry, yes, the same

12   exhibit, 15.

13        Q.   Can you identify this page or the document

14   that begins with this page?

15        A.   Yes.

16        Q.   Can you turn back to the second page of

17   this document, so the one that is the certificate of

18   registration for copyright.  And I'm not trying to

19   trick you here.  I'm just trying to figure out what

20   document this is.  In other words, on Document 3435,

21   I don't see that listed as one of the titles of

22   work.  Can you explain what this document, 3435, is

23   doing in this set?

24        A.   I believe it was in the beginning of the

271

1    in some cases there was verbatim copying, and in

2    others it was just a -- I shouldn't say "just"; it

3    was a studied rephrasing of my material.  They

4    copied it.

5        Q.   Understood.  And that's the distinction I

6    was making between verbatim and rephrasing, as you

7    put it.

8              Let me show you another document, and I

9    want to ask you more about the verbatim stuff only,

10   right now.  I understand there are others in this

11   case, but I'm trying to get as granular as I can so

12   that I can understand what your claims are.

13             MR. KLUFT:  Steve, do you want to take a

14   break?

15             MR. LYONS:  It's 11:30.  How about a

16   five-minute break?

17             MR. KLUFT:  Absolutely.

18             (Exhibit 16, affidavit of Sheila Lyons,

19   marked for identification.)

20             MR. KLUFT:  Back on the record.

21       Q.   Are you ready to continue, Dr. Lyons?

22       A.   Yes.

23       Q.   I've marked over the break, had marked, a

24   document, Exhibit 16.  There's already a copy in

272

1   front of your attorney.  I am not going to go

2   through this entire document, but let me just ask

3   you:  By looking at the front page, do you recognize

4   this document?

5        A.   Based on looking at the front page, yes.

6        Q.   Is this in fact -- this purports to be your

7   affidavit in this case; correct?

8        A.   Yes.

9        Q.   And I want you to please turn to Page 17,

10  Paragraph 95.  When you've taken a look at that --

11            In fact, I think in context, why don't

12  you read 93 through 95, because I don't want to....

13            Have you had a chance to look at it?

14       A.   Yes.

15       Q.   Obviously you can see Paragraph 95 refers

16  to an Exhibit M; correct?

17       A.   Yes.

18       Q.   Can I also ask you to take a look at

19  Exhibit M, which I'll represent to you is Document

20  13-14, starting on Page 1 of 4.  Now, my question to

21  you is:  As of the time of this document, which is

22  dated February 24th, 2012, or thereabouts --

23            That's when you composed this document,

24  approximately shortly before it was filed; is that

273

1    correct?

2         A.   I believe that's correct.

3         Q.   And as of that time, were these the

4    instances that you were aware of verbatim copying by

5    my clients of your copyrighted work?

6         A.   Yes, based on the materials that I had

7    available to me at the time.

8         Q.   Since that time you've had other materials

9    available to you; is that correct?

10        A.   Yes.

11        Q.   Sitting here today, do you know of any

12   other instances of verbatim copying by my clients?

13        A.   Yes.

14        Q.   Can you tell me what those are?

15        A.   Well, I would need your clients' petition

16   to the AVMA, and I would need to go through it line

17   by line and compare it with my copyrighted documents

18   in order to be able to answer that question.  And

19   I'm happy to do that --

20        Q.   Well, I appreciate that, and that's

21   obviously something I can do as well on my own.  I

22   guess what I'm asking you is:  My understanding is

23   that you have already -- you had access when you

24   created this document to the November 2009 petition;

319

1    and the next page after that.  Do you see that?

2        A.   Yes.

3        Q.   And my question is:  Is that an amount you

4    were requesting, or is that an amount you -- is that

5    the amount of funds that the organization had raised

6    each year?

7        A.   I would need to see our tax returns to be

8    able to compare how much we raised each year to the

9    figures in this letter requesting support to answer

10   that question.

11       Q.   Can I ask you to turn to Page 3513.  About

12   in the middle of the page do you see it says 1997,

13   $126,340?

14       A.   Yes.

15       Q.   And the second paragraph under that starts

16   with, "Our ACVSMR farrier programs"?

17       A.   Yes.

18       Q.   "Our ACVSMR farrier programs began in

19   earnest this year."  By "this year" were you

20   referring to 1997?

21       A.   It would appear so.

22       Q.   What did you mean -- you authored this

23   document; correct?

24       A.   Yes.

320

1    Q.   What did you mean by "began in earnest"?

2    A.   Again, I would need records that go back to

3    1997 to see how many students we were working with.

4    But to the best of my recollection, that would

5    suggest that we had more applicants, more -- a

6    greater ability to offer educational services.

7    Q.   Well, by "programs" were you referring to

8    seminars conducted in Europe and several states?  Is

9    that what you meant by the programs starting?

10        Maybe I can ask a better question.  If

11   I'm a farrier in 1997, how do I find out about the

12   ACVSMR program for farriers?

13   A.   Actually, it was mostly word of mouth with

14   farriers.

15   Q.   And the programs that you were offering,

16   were they, again, like we talked about before, at

17   other people's farms?

18   A.   Yes.

19   Q.   Now, it refers to here "Cali Tech in

20   Pomona."  Is that Michael Savoldi's college?

21   A.   Yes.

22   Q.   It talks about developing a master's degree

23   program in farrier science.  Was that ever

24   developed?

346

1    say, for instance, '03, '04, '05?

2        A.   No, I don't.

3        Q.   Now, yesterday Mr. Dickison asked you about

4    an incident or you told Mr. Dickison about an

5    incident with Jess Jackson.  Do you remember that?

6    Is it a Mr. Jackson?

7        A.   Yes.

8        Q.   And he's passed away; correct?

9        A.   Yes.

10       Q.   And when was that, approximately, that he

11   passed away?

12       A.   Last year.

13       Q.   And you understood that Jess Jackson was

14   going to stop giving you business based on the

15   actions of the AVMA.  Was that your testimony?  And

16   again, this is another instance of my imperfect

17   memory.

18       A.   Well, I was being asked the question by the

19   AVMA.

20            MR. KLUFT:  Right.

21       A.   So my answer was responsive to the AVMA.

22       Q.   I'm not trying to exclude my client.  I'm

23   just asking -- I understand that you've already

24   testified that all the harm created by the AVMA is

1  the same as the harm you're alleging created by my

2  client.  I'm just asking, is that what essentially

3  you testified to that Mr. Jackson said he had heard

4  about something with regard to the AVMA and that was

5  going to cause him to stop giving you business?

6      A.   No.

7      Q.   What did he say to you precisely?

8      A.   I don't recall what he said to me

9  precisely.

10     Q.   And when was the last time he did hire you?

11     A.   At that race.

12     Q.   And then he passed away shortly thereafter?

13     A.   No.  Two and a half years later.  I think;

14  I don't remember the date of his death.

15     Q.   And in the intervening two and a half

16  years, do you have knowledge that he hired someone

17  else to do the job that you were doing?  Sitting

18  here today, do you know whether or not he hired

19  someone else to do the job that you were doing?

20     A.   Other veterinarians would have done the job

21  that I did to the degree that they were capable of

22  doing it.

23     Q.   Do you know for a fact that he actually

24  hired other people to do that job whether or not

1    they were capable of it?

2        A.   Well, I think my difficulty in answering is

3    that when you say "hired," veterinarians work for

4    many clients, and the horses travel extensively.  So

5    Mr. Jackson and his trainers would have many

6    veterinarians working with them.  So to say

7    specifically hire someone else -- all I know is that

8    I did no more work for him after that incident.

9        Q.   Did he have employees?

10       A.   I can't testify about Mr. Jackson's --

11       Q.   What I'm asking is, did anybody else that

12   worked with Mr. Jackson or to Mr. Jackson also talk

13   to you about this issue?  Or it was just based on

14   your conversation with him?

15       A.   I believe it was just based on....

16       Q.   And you also mentioned an incident in Hong

17   Kong at the, quote, "Beijing Olympics."  Is that

18   correct?

19       A.   That's correct.

20       Q.   I was a little confused, I had to ask

21   somebody yesterday was there a Hong Kong Olympics,

22   and Mr. Segal said the horses were there.  You had

23   mentioned that a physiotherapist had said that

24   somebody had said something about your

349

1   qualifications.  Is that my --

2       A.   Yes.

3       Q.   I'm guessing, based on your testimony

4   today, that person was Jane Hutton; is that correct?

5       A.   Yes.

6       Q.   And she had said that other -- that

7   horsemen had been talking about this issue?  Is that

8   what you testified to?

9       A.   I don't recall what I testified to.  That

10  she had been told that the reason that I was removed

11  from the organizing committee was that I am not

12  really a doctor.

13      Q.   Those were Jane Hutton's words?

14      A.   Well, that's my recollection of what she

15  communicated.

16      Q.   That's all I'm asking.  Did she give you a

17  name of who told her that?

18      A.   She did not.

19      Q.   And you connected yet Dr. Clayton with that

20  statement.

21      A.   Yes.

22      Q.   How is it that you connect Dr. Clayton with

23  that statement?

24      A.   Because another physiotherapist was there

350

1    who is employed by Dr. Clayton's lab.

2        Q.   And what did that physiotherapist, if

3    anything, say to you about this issue?

4        A.   She has said nothing to me.  But I believe

5    that she is the one that spoke to Jane Hutton.

6        Q.   Did Jane Hutton tell you that?

7        A.   I don't recall.  That's why I don't want to

8    be clear -- I don't want to make a definitive

9    statement.  She may have, or it may have been

10   implied because she had seen Narelle and had spent

11   time with her.

12       Q.   That's her name, Narelle?

13       A.   Yes.

14       Q.   What's her last name?

15       A.   Stubbs.

16       Q.   You were the one that recommended Dr.

17   Clayton to be on the organizing committee; isn't

18   that correct?

19       A.   I invited her to join my organizing

20   committee.

21       Q.   And some of the organizing committee

22   members were invited by Dr. Gillette as well; isn't

23   that correct?

24       A.   With agreement from me, yes.  We discussed

351

1    who else might be invited.

2        Q.   And then to cut to the chase, you invited

3    the horse people and he invited the dog people?  Is

4    that generally --

5        A.   Pretty much.

6        Q.   And Dr. Clayton's a horse person; correct?

7        A.   Yes.

8        Q.   And why did you select her?

9        A.   Dr. Clayton has a lab at Michigan

10   Veterinary School that conducts research in sports

11   medicine in horses.  I know that she has an interest

12   in the horse sports, and she has an academic

13   appointment, which I had been told the AVMA prefer

14   that I have academics on my committee.

15                 MR. KLUFT:  Let me mark another

16   document, as Exhibit 28.

17                 (Exhibit 28, Homecoming Farm website,

18   marked for identification.)

19       Q.   I'll tell you in advance I'm not going to

20   ask you questions about the substance of this

21   document.  This is a document that was produced in

22   this litigation with the cover page "Homecoming Farm

23   Inc. Website."  I just want you to authenticate that

24   this was the website as of December 11th, 2012.

362

1    Q.   And when was that?

2    A.   Well, it was when I discussed it with Dr.

3  Gillette, because I presented this as the ACVSMR

4  project of Homecoming Farm, and then that was what

5  we would go forward with.

6    Q.   And so there was never any discussion about

7  whether it should be called something else?

8    A.   When we went to Michigan, there was just a

9  discussion that would be the name, but not that it

10  might be something else.

11    Q.   And at Michigan, are you referring to the

12  meeting between you and Dr. Gillette and Dr.

13  Clayton?

14    A.   Yes.

15    Q.   I want to show you another document that

16  needs to be marked.

17            (Exhibit 32, letter, marked for

18  identification.)

19    Q.   I'm not going to ask you about the

20  substance of this document, by the way.  I'm just

21  going to ask you whether it's the letter that you

22  sent.

23    A.   I have to read it to know.

24            MR. KLUFT:  Off the record.

397

1      Q.   Would these people be engaged, had you

2   engaged them -- strike that.

3           Let me move ahead to the Chicago

4   meeting.  I'm going to mark this -- I know the front

5   page has already been marked, but I specifically

6   want to show you some sections that haven't been

7   marked.

8           (Exhibit 42, Organizational Meeting

9   notes, marked for identification.)

10          MR. LYONS:  You said that this has been

11  previously marked, but this exhibit contains

12  additional pages?

13          MR. KLUFT:  The first two pages have

14  been marked, and then there are additional pages

15  after that.

16          MR. LYONS:  And that is all part of the

17  same document?

18          MR. KLUFT:  As it was produced to me by

19  my client, yes.

20      Q.   I'm going to ask you to take a look at

21  Pages 485 through to the end, 500.  And I want you

22  to tell me if these are the articles of

23  incorporation and bylaws that you presented at the

24  Chicago meeting.

398

1    A.   Without my copy of what I brought to the

2  Chicago meeting, I wouldn't know whether this was

3  what I brought with notes added onto it or --

4    Q.   That's an excellent point.  Let me rephrase

5  it.  I'll represent to you that my understanding is

6  these are handwritten notes of Dr. Gillette's.  And

7  what I'm asking you is -- I don't have any other

8  copy of what was actually handed out at that

9  meeting.  And what I'm asking you is:  Absent the

10  handwritten notes, is this the version you brought

11  to Chicago, as far as you know?

12    A.   To the best of my recollection, yes.

13    Q.   You can put that document aside.  That's

14  all I wanted to know.  I apologize for that.  I

15  meant to mention the handwritten notes.  It's late

16  in the day.

17            I want to show you another document.

18            (Exhibit 43, email, marked for

19  identification.)

20    Q.   Have you had a chance to review that

21  document?

22    A.   Yes, I have.

23    Q.   And this is another document that purports

24  to be an email exchange between you and Dr.

417

1    this email, which has been marked as Exhibit 48?

2        A.   I remember seeing this in your document

3    production, and I do remember that Lauren was

4    communicating with Dr. Gillette when I was unable to

5    have email, yes.

6        Q.   And did she have your authority to

7    communicate with Dr. Gillette?

8        A.   Yes, she did.

9        Q.   Let me move on to the next.  Do you recall

10   in September of 2004 receiving an email from Dr.

11   Gillette to either Betsy Erickson or Asack, which

12   answered a series of questions?

13       A.   I remember seeing that in the production of

14   documents.

15       Q.   And is it your contention you did not

16   receive that at the time?

17       A.   Yes.

18       Q.   I'm sorry?

19       A.   I don't recall receiving it at the time.

20       Q.   Do you know that you didn't receive it at

21   the time?

22       A.   I don't recall.

23       Q.   Then I'll move through that and I will not

24   mark it.

420

1      A.   This too is not a genuine copy of an email

2  that I sent.

3      Q.   And what about 51?

4      A.   This is not a genuine document.

5      Q.   Okay.  Let's put them aside.  That's all I

6  wanted to know.

7           Now, you -- at some point the veterinary

8  board matter you prevailed in; correct?

9      A.   Yes.

10     Q.   And subsequent to that, did you have any

11  contact or did you or your attorneys have any

12  contact with Ms. Erickson or Ms. Asack?

13     A.   Subsequent to the veterinary board?  No.

14     Q.   During the time the veterinary board matter

15  was going on, did you have contact?

16           Let me cut to the chase.  Did you ever

17  threaten to sue them?

18     A.   I did sue them.

19     Q.   You did sue them.  And in what court was

20  that?

21     A.   In Brockton.

22     Q.   And was that matter in the District Court

23  or the Superior Court, if you know?

24     A.   I don't know.

421

1      MR. LYONS:  I'm happy to tell you.  It

2  was in the Superior Court.

3      Q.   And was there a judgment in that case?  Did

4  it settle, or did the judge decide it?

5      MR. LYONS:  I'll say for the record that

6  the case was resolved by mutual agreement.  I think

7  a judgment was part of it, but --

8      MR. KLUFT:  An agreed-upon judgment?

9      MR. LYONS:  Exactly.

10     Q.   Did that involve the payment of money from

11  them to you?

12     A.   No.

13     Q.   Now, are you aware that in 2009 both of

14  them sent letters to Dr. Gillette?

15     A.   Yes.

16     Q.   And was that part of the agreed settlement,

17  that they send those letters?

18     A.   Yes.

19     Q.   Did you review the letters before they were

20  sent?

21     A.   Yes, I believe so.

22     Q.   Well, if it wasn't you, it was your

23  attorney review --

24     A.   Yes.

422

1    Q.   What was the purpose of you having them

2  sent?

3    A.   Because they had made false and defamatory

4  statements about me.  They had altered emails and

5  forwarded them.  They created documents and made it

6  appear as if I had created them and distributed

7  them.  So in exchange for not having to pay me a

8  large sum of money, they had to write letters to let

9  Dr. Gillette know that what they had said to him was

10  in fact not true.

11    Q.   Was there any other part of the settlement?

12    A.   No.

13    Q.   They didn't give you anything else but the

14  letters?

15    A.   No.

16    Q.   Did they write to anybody else any other

17  letters?

18    A.   No.

19    Q.   I just want you -- just two more things,

20  and then we're done.  It's 5:00 o'clock now.  These

21  are -- I'm going to mark these as the next two

22  exhibits.  They're not one document.

23         (Exhibit 52, Statement of damages,

24  marked for identification.)

426

1    university.  There was a lot of security to get into

2    the lecture.  And so I lectured for a couple of

3    hours, and it was only that they revealed to me that

4    they had received such crazy complaints from this

5    woman, that I was scheduled to lecture and she was

6    insisting that they cancel the lecture, and when

7    they said that they were not planning to do that,

8    she was so erratic that they had to actually hire

9    extra security for the event.

10       Q.   Let me ask you:  Are you aware, sitting

11   here today -- and I'm wrapping up, so I'm going to

12   change the subject on you quickly.  Are you aware,

13   sitting here today, of any foundation that you

14   applied for that, instead of giving money to you,

15   gave money to the college that Dr. Gillette's

16   involved in?

17       A.   Well, that's actually a good question.  As

18   I've said before, I've not yet had a chance to

19   review every one of your 15,000 documents in detail.

20   But I have not seen the financials produced by

21   ACVSMR.

22       Q.   And I promise you, every single one of my

23   questions I will say for the record is premised on

24   the assumption that you haven't read 15,000

427

1   documents.

2       A.   Okay.

3       Q.   But let me ask you:  Sitting here today,

4   are you aware of any corporate sponsor that you

5   approached but did not give money to you that gave

6   money to Dr. Gillette's organization, the college,

7   incorporated college, instead?

8       A.   Again, I don't know what sponsors have

9   chosen to sponsor his programs, so --

10      Q.   Sitting here today, do you know if he has

11  any -- whether or not?

12      A.   I don't know anything about Dr. Gillette's

13  sponsorships or financials.

14      Q.   I want to just go back, so I understand, as

15  sort of a final question:  If you -- is part of the

16  harm that you suffered as a result of my client's

17  actions that you could not form your own specialty

18  board because that market had been essentially

19  captured because there was only room for one?  Am I

20  accurately assessing that part of your claim?  And

21  if I'm not, tell me I'm not.

22      A.   No, that's not something that would -- no,

23  that's not how I would say it.

24      Q.   How would you phrase the harm to Homecoming