# EXHIBIT D

1

Volume:   I

Exhibits: 1-16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 1:11-cv-12192-WGY

- - - - - - - - - - - - - - - - - - - - - - - - x

SHEILA LYONS, DVM and HOMECOMING FARM, INC.,

        Plaintiffs

vs.

ROBERT GILLETTE, THE BOARD OF DIRECTORS OF THE

AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE

AND REHABILITATION, INC. and THE AMERICAN

VETERINARY MEDICAL ASSOCIATION, INC.,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF DR. LARRY DEE

Thursday, February 7, 2013 - 10:04 a.m.

Klieman & Lyons

115 Broad Street - 4th Floor

Boston, Massachusetts

Reporter:   Maureen J. Manzi, CSR, CLR

Dunn Reporting Services, Inc.
617-422-0005

```
                                                                   2
 1   APPEARANCES:
 2   ***   KLIEMAN & LYONS
 3           (STEPHEN J. LYONS, ESQ.)
 4           115 Broad Street - 4th Floor
 5           Boston, Massachusetts   02110
 6           (617) 443-1000
 7           Counsel for the Plaintiffs
 8
 9   ***   FOLEY HOAG LLP
10           (DAVID A. KLUFT, ESQ.)
11           Seaport World Trade Center West
12           155 Seaport Boulevard
13           Boston, Massachusetts   02210
14           (617) 832-1000
15           Counsel for Robert Gillette and
16           the Board of Directors of the American
17           College of Veterinary Sports Medicine and
18           Rehabilitation, Inc.
19
20
21
22
23                 *  *  *  *  *  *  *  *  *  *  *  *
24
```

```
                                                              3
 1   APPEARANCES CONT.:
 2   ***  LAWSON & WEITZEN, LLP
 3            (J. MARK DICKISON, ESQ.)
 4            88 Black Falcon Avenue
 5            Boston, Massachusetts  02210
 6            (617) 439-4990
 7            Counsel for the American Veterinary Medical
 8            Association, Inc.
 9
10   ***  AMERICAN VETERINARY MEDICAL ASSOCIATION
11            (ISHAM R. JONES, III, ESQ.)
12            1931 N. Meacham Road – Suite 100
13            Schaumburg, Illinois  60173-4360
14            (800) 248-2682
15            Counsel for the American Veterinary Medical
16            Association
17   ALSO PRESENT:
18            Sheila Lyons
19
20
21
22
23
24
```

65

1  Veterinary Specialties.  And this document is
2  Bate-stamped 10728 through 10828.  Take a second, if
3  you would, and just have a look at that document for
4  me.
5           (Witness reviewing Exhibit 52.)
6     Q.  Now, doctor, have you had a chance to look
7  at the documents marked as Exhibit 56 and Exhibit
8  52?
9     A.  I looked at the first page.
10    Q.  Fair enough.  But based upon your
11 familiarity -- well, strike that, please.
12             Were you at least at one time familiar
13 with the petition that was filed by this ACVSMR
14 working group with the AVMA?
15    A.  I had seen one petition, and looked at it
16 briefly, I think when they sent in there first
17 petition, it might have been this one, but I can't
18 recall.
19    Q.  And when you say "this one," you're putting
20 your finger on?
21    A.  Exhibit 52.
22    Q.  Do you know how many petitions in all were
23 submitted as the lawyers were saying off the record
24 in this back and forth?

1   A.   My understanding there was the original
2   petition in 2002.  There was another petition after
3   many years that was rejected.  And my understanding
4   was there was a final petition that was approved.
5   Q.   So, to the best of your recollection, there
6   were three drafts of this petition document,
7   correct?
8   A.   Probably two drafts, the first being just a
9   letter of applying for petition.  There may have
10  been more.
11  Q.   Is that's what's known as a Letter of
12  Intent, is that what you're referring to?
13  A.   Yeah.
14  Q.   So first comes the Letter of Intent,
15  correct?
16  A.   Yes.
17  Q.   And then comes the petition?
18  A.   Right.
19  Q.   So, to the best of your recollection, there
20  were two petitions or two drafts of the petition
21  that was filed by this organizing committee with the
22  AVMA?
23  A.   At least two to my knowledge.
24  Q.   Just so far as you can tell sitting here

1  today, you think that the first one that was
2  submitted is Exhibit 52 and the second draft that
3  was submitted was Exhibit 56, is that to the best of
4  your recollection correct?
5      A.  To the best of my knowledge.  56 is not
6  dated.  So I can't tell.
7      Q.  That's why I have to ask you the question.
8  I wish I could be more help to you.
9          Do you know, based upon your working
10 with this group as the AVMA liaison, who contributed
11 to the authorship of either Exhibit No. 52 or
12 Exhibit 56?
13     A.  I don't know who contributed to the
14 authorship of the final document.  I was involved in
15 contributing some information about how to develop
16 bylaws.  And I assumed that was Exhibit 52.
17     Q.  Tell me what you did in that connection
18 then, doctor.
19     A.  In that connection there was a meeting at
20 Auburn with Dr. Gillette and Dr. Linda Blythe going
21 through the steps and the process of developing a
22 college and where they were, what were the next
23 steps they needed to do.  And I advised them that
24 somewhere along the line they needed to develop

68

1  bylaws and they needed to make a lot of decisions
2  about the idiosyncrasies of the bylaws and what they
3  had to have in those and jokingly said you ought to
4  be able to knock those out in two or three hours.
5  And then they took me up on what they thought was an
6  offer.  Because I had been involved in bylaws before
7  with specialty groups, I went home and did some word
8  swapping, name swapping and sent them off a draft of
9  the bylaws of the American Board of Veterinary
10 Practitioners, just substituting names and said, you
11 need to make decisions about do you have a
12 secretary/treasurer or a secretary and a treasurer;
13 do you have a vice president or not, and how many
14 committees do you have and what additional structure
15 do you want.  Basically a boilerplate bylaws
16 document that historically had been acceptable to
17 the American Board of Veterinary Specialties.
18      Q.  I assume this is a meeting that took place
19 at some point after the Philadelphia meeting?
20      A.  Oh, yes.
21      Q.  And can you tell me what year this meeting
22 took place?
23      A.  My recollection it was either 2007 or 2008.
24 I can't recall how far back it was.

79

1  comments; is that correct?
2             MR. DICKISON:  Objection.
3        A.   I assume it's correct.
4        Q.   Can you tell me, who were the people that
5   reviewed these petitions?
6        A.   Who are they or who were they?
7        Q.   Well, who were they in this particular case?
8        A.   I don't know.  They are members of the ABVS
9   who are a new and emerging specialties committee and
10  the people that are on it change intermittently.
11  It's one, two or three years as I understand.  But I
12  don't know who it was then.  At that time I was no
13  longer a member of the ABVS.  And even if I was, I
14  would not have been part of that process.
15       Q.   Now, I think that you said that you became a
16  member of the Executive Board in July of, was it
17  2007 or 2008?
18       A.   '08.
19       Q.   When was the first version, first draft of
20  this petition submitted to ABVS, to your
21  recollection?
22       A.   No. 52 says November 2008.
23       Q.   So by the time the first draft was submitted
24  for review to ABVS, you had already become a member

1   of the Executive Board?

2   A.  That's correct.

3   Q.  Now, when you say it was too late when you

4   received the first draft of this petition, I believe

5   you used the word it was a done deal.  Are you

6   referring to the fact that you were now, by the time

7   you received this draft, a member of the Executive

8   Board or are you referring to the fact that there

9   just wasn't enough time for you to do what you had

10  generously offered to do for them?

11  A.  There wasn't enough time for me to give them

12  the courtesy that I had offered them.

13  Q.  And to the best of your recollection, what

14  happened next in the process of this group's seeking

15  approval as an RVSO?

16  A.  To the best of my knowledge, they went back

17  and re-worked their petition and sent it in again in

18  2009.

19  Q.  Let me show you a document that was marked

20  as Exhibit No. 53 at the deposition of Dr. Sabin and

21  ask if you can identify that document, sir.

22          (Witness reviewing Exhibit 53.)

23  A.  It appears to be a response of the ACVSMR

24  organizing committee to the ABVS review committee

161

1   member.  It says you have been selected to become a
2   member, and this is one of the criteria of
3   membership, in addition to a time commitment of
4   several years.
5       Q.  And by Item 12, by the way, I don't mean to
6   correct you, but just for the record, were you
7   referring to Exhibit 12 shown to you earlier?
8       A.  I was referring to Exhibit 12.  I'm sorry.
9       Q.  That's fine.  I just wanted to make sure it
10  was clear for the record.
11              You were liaison then both to the group
12  when it was a working group and then later when it
13  was an organizing committee, correct?
14      A.  Yes.  After the initial petition or request
15  to the ABVS, they appointed me and Leon Russell as
16  liaisons.  And I continued on as a liaison until
17  July I believe it was 2008 when I went on the
18  Executive Board.
19      Q.  And as liaison to this group, is it fair to
20  say that one of your roles was to help the group
21  understand and comply with the policies and
22  procedures of the ABVS?
23      A.  That's correct.
24      Q.  And did that include assisting them in

162

1  constructing their bylaws?
2      A.  That's correct.
3      Q.  And I want to show you a couple of documents
4  just to see if I can get you to tell me if you
5  remember them or not.  Let's mark this Exhibit 16.
6          (Marked, Exhibit 16, documents
7  Bate-stamped ACVSMR008616-ACVSMR008629.)
8          (Witness reviewing Exhibit 16.)
9      Q.  Have you had a chance to take a look at this
10 document?
11     A.  Briefly.
12     Q.  You mentioned earlier that you had taken the
13 ABVP bylaws and plugged in certain words to give the
14 ACVSMR a start at drafting its bylaws.  Does this
15 appear to be the result of that effort?
16     A.  I think it does.  Especially on the last
17 page, it says adoption of bylaws.
18     Q.  Yes.
19     A.  And where I basically plugged in ACVSMR
20 instead of ABVP, I failed to change the date of the
21 laws of the State of New York in 1978.  The ABVP
22 bylaws were approved in 1978.
23     Q.  And do you know if they were approved under
24 the laws of the State of New York?

1   A.   I believe they were because Dr. Kirk was
2   from Cornell and he was one of the founding fathers
3   of that specialty college.
4   Q.   And, in fact, if you look at the cover
5   e-mail to this document, it appears to be an e-mail
6   from you to Dr. Gillette, correct?
7   A.   Yes.
8   Q.   And in that e-mail you mention just that,
9   correct, that you took the ABVP bylaws and plugged
10  in different terminology for the --
11  A.   That's correct.
12  Q.   -- ACVSMR?
13  A.   Yes.
14  Q.   Dr. Dee, I want to ask you a couple of
15  questions about your brother, Jon Dee.
16  A.   Jon Dee, yeah.
17  Q.   At what point in the process did -- let me
18  ask you this.  Now, Dr. Jon Dee, you mentioned that
19  he was associated as an adjunct with the University
20  of Florida; is that correct?
21  A.   Yes.
22  Q.   Do you know how long he's been associated
23  with the University of Florida?
24  A.   No, I don't.