UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA LYONS, DVM and<br>HOMECOMING FARM INC.,<br>　　　Plaintiffs,<br><br>v.<br><br>THE AMERICAN COLLEGE OF<br>VETERINARY SPORTS MEDICINE<br>AND REHABILITATION, INC. and<br>AMERICAN VETERINARY<br>MEDICAL ASSOCIATION<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)　　CIVIL ACTION NO. 1:11-cv-12192<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF J. MARK DICKISON
## IN SUPPORT OF AMERICAN VETERINARY MEDICAL ASSOCIATION'S
## MOTION FOR SUMMARY JUDGMENT

I, J. Mark Dickison, state as follows:

1.　　I am a partner at Lawson & Weitzen, LLP, one of the counsel for Defendant American College of Veterinary Sports Medicine (AVMA).  I submit this affidavit in support of the AVMA's Motion for Summary Judgment.

2.　　Exhibit A, attached hereto, is a true and accurate copy of the AVMA's Mission and Objective webpage, available at http://www.avma.org/About/WhoWeAre/Pages/mission.aspx.

3.　　Exhibit B, attached hereto, is a true and accurate copy of the AVMA's American Board of Veterinary Specialties webpage, available at http://www.avma.org/ProfessionalDevelopment/Education/Specialties/Pages/default.aspx.

4.　　Exhibit C, attached hereto, is a true and accurate copy of a March 11, 2011 Memo to the AVMA Executive Board, which was also Exhibit 48 to the Deposition of Dr. Elizabeth Sabin.

5.      Exhibit D, attached hereto, is a true and accurate copy of the May 2003 Policies and Procedures Manual for the AVMA ABVS, as produced by Plaintiffs, and as used as Exhibit 4 to the Deposition of Dr. Sheila Lyons.

6.      Exhibit E, attached hereto, is a true and accurate copy of excerpts from the transcript of the deposition of Dr. Sheila Lyons.

7.      Exhibit F, attached hereto, is a true and accurate copy of excerpts from the transcript of the deposition of Dr. Robert Gillette.

8.      Exhibit G, attached hereto, is a true and accurate copy of a December 30, 2002 Email from Dr. Gillette, as produced by Defendant American College of Veterinary Sports Medicine and Rehabilitation, and as used as Exhibit 6 to the Deposition of Dr. Sheila Lyons.

9.      Exhibit H, attached hereto, is a true and accurate copy of the January 24, 2003 Letter of Intent to Form an AVMA RVSO from Dr. Robert Gillette to Dr. John Oliver, used as Exhibit 10 to the Deposition of Dr. Sheila Lyons.

10.     Exhibit I, attached hereto, is a true and accurate copy of excerpts from the transcript of the deposition of Dr. Elizabeth Sabin.

11.     Exhibit J, attached hereto, is a true and accurate copy of a January 26, 2009 Memorandum to ABVS from Drs. Murtaugh and Krahwinkel, as produced by Defendant American College of Veterinary Sports Medicine and Rehabilitation.

12.     Exhibit K, attached hereto, is a true and accurate copy of Answers of the Plaintiffs, Sheila Lyons, DVM and Homecoming Farm, Inc. to the First Set of Interrogatories Submitted by Defendant American Veterinary Medication Association.

13.     Exhibit L, attached hereto, is a true and accurate copy of the Registration of the Service Mark THE AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE AND

REHABILITATION on the Supplemental Register, Reg. No. 3,088,963, as produced by Plaintiffs.

14.     Exhibit M, attached hereto, is a true and accurate copy of a December 23, 2005 email to Sheila Lyons from the United States Patent and Trademark Office concerning an action it took on the ACVSMR mark, as produced by Plaintiffs.

15.     Exhibit N, attached hereto, is a true and accurate copy of a March 7, 2006 email to Sheila Lyons from the United States Patent and Trademark Office concerning a notice of amendment, as produced by Plaintiffs.

16.     Exhibit O, attached hereto, is a true and accurate copy of Defendant, American Veterinary Medical Association's Answers to the First Set of Interrogatories of the Plaintiffs, Sheila Lyons, DVM and Homecoming Farm, Inc.


        Sworn to under the penalties of perjury.


Dated: March 1, 2013                    ___/s/ J. Mark Dickison_____
                                        J. Mark Dickison (BBO# 629170)
                                            mdickison@lawson-weitzen.com
                                        Lawson & Weitzen, LLP
                                        88 Black Falcon Avenue, Suite 345
                                        Boston, MA 02210-1736
                                        Telephone:(617) 439-4990
                                        Facsimile: (617) 439-3987


**CERTIFICATE OF SERVICE**

        I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be served upon non-registered participants.

                                         /s/ J. Mark Dickison_____
                                        J. Mark Dickison

Exhibit A



Member Center    News & Publications    Professional Development    Practice Management    Advocacy    Meetings &

**You are here:** Home | About AVMA | Who We Are | **AVMA Mission and Objective**

### Who We Are

History of the AVMA

AVMA Mission and Objective

AVMA: Celebrating 150 Years of Education, Science and Service

Advertising and Sponsorship Opportunities

Contact Us

### Governance

### AVMF

### Student AVMA (SAVMA)

### Allied Organizations

# AVMA Mission and Objective

## Mission Statement

The mission of the Association is to improve animal and human health and advance the veterinary medical profession.

## Objective

The objective of the Association shall be to advance the science and art of veterinary medicine, including its relationship to public health, biological science, and agriculture.



OTHER AVMA SITES

Aardvarks to Zebras                 Keep Our Food Safe
Externs on the Hill                 National Pet Week
MyVeterinarian.com                  Animal Health SmartBrief
WebMD® Pet Health Community

Copyright © 2013 American Veterinary Medical Association | Privacy | Terms of U




Exhibit B



**Contact** | **Join** |    **Store** | **Career Center** | **Sign In**

Member Center    News & Publications    Professional Development    Practice Management    Advocacy    Meetings &

**You are here:** Home | Professional Development | Veterinary Education | **Veterinary Specialties**

**Accreditation**

**Educational Commission for Foreign Veterinary Graduates**

**Educational Opportunities**

**Veterinary Specialties**

   About Us

   Contacts

   Policies & Procedures

   Annual Report Form - RVSO (.rtf)

   Annual Report Form - RVS (.rtf)

   Veterinary Specialty Organizations

# AVMA American Board of Veterinary Specialties

The AVMA American Board of Veterinary Specialties (ABVS) is the umbrella organization for veterinary specialties within the United States. It is composed of one voting representative from each of the AVMA-recognized veterinary specialty organizations, plus non-voting liaisons from the Association of American Veterinary Medical Colleges and the AVMA Council on Education. Staff in the AVMA Education and Research Division facilitate ABVS operations.



Currently, there are 22 AVMA-recognized veterinary specialty organizations comprising 40 distinct specialties. More than 10,600 veterinarians have been awarded diplomate status in one or more of these 22 recognized veterinary specialty organizations by completing rigorous postgraduate training, education, and examination requirements. These board-certified specialists are ready to serve the public, its animals, and the veterinary profession by providing high quality service in disciplines as varied as internal medicine, surgery, preventive medicine, toxicology, dentistry, behavior, and pathology.

The American Board of Veterinary Specialties (ABVS) of the American Veterinary Medical Association (AVMA) recognizes and encourages the development of recognized veterinary specialty organizations (RVSOs) promoting advanced levels of competency in well-defined areas of study or practice categories to provide the public with exceptional veterinary service.

— Mission Statement, AVMA ABVS

View the **AVMA American Board of Veterinary Specialties (ABVS) Policies and**

**Procedures**.

See a **complete history and description of the ABVS**.

See **guidelines on establishment, recognition, and supervision of veterinary specialty organizations**.

Find **links to each specialty organization's Web site** for information regarding a specific recognized veterinary specialty.

**Contact the ABVS**.

The ABVS has received 2 new petitions for recognition as a veterinary specialty. The first is a group petitioning for recognition as a Shelter Medicine specialty within the umbrella of the American Board of Veterinary Practitioners. The second is a group petitioning for recognition as an Equine Dentistry specialty within the umbrella of the American Veterinary Dental College. In accordance with the policies and procedures of the ABVS, public comments are being solicited to determine whether recognition of these petitioning groups would fulfill a justifiable need within the profession and for the public. More information can be found about these organizations by clicking on the links below. Please address any comments to the ABVS by email to **David Banasiak** with the subject line: Shelter Medicine comment or Equine Dental comment. All comments will be considered by the ABVS at their fall meeting before any final decision is made with regards to recognition of either of these groups as a Veterinary Specialty.

**Shelter Medicine**

**Equine Dentistry**



OTHER AVMA SITES

Aardvarks to Zebras

Externs on the Hill

MyVeterinarian.com

WebMD® Pet Health Community

Keep Our Food Safe

National Pet Week

Animal Health SmartBrief

Copyright © 2013 American Veterinary Medical Association | Privacy | Terms of U



Exhibit C



# American Veterinary Medical Association

## Recommendation

**Actions:**

Committee _____

Board _____

**Notes:**

**To:** Executive Board

**From:** Council on Education

**Date:** March 11, 2011

**Re:** Recognition of Veterinary Specialty Organizations

EXHIBIT NO. 78
2/5/13
M. J. MANZI

**Recommendation:**That the indicated level of AVMA recognition be granted for the following veterinary specialty organizations, based on ABVS review and acceptance of each organization's submitted reports. And you can read that specialty colleges in 3 levels

1. Continued full recognition based on 2010 five-year in-depth report:
   i. American Board of Veterinary Practitioners
   ii. AmericanCollege of Poultry Veterinarians
   iii. AmericanCollege of Veterinary Dermatology
   iv. AmericanCollege of Veterinary Microbiologists

2. Continued full recognition based on 2010 annual report:
   i. American Board of Veterinary Toxicology
   ii. AmericanCollege of Laboratory Animal Medicine
   iii. AmericanCollege of Theriogenologists
   iv. AmericanCollege of Veterinary Anesthesiologists
   v. AmericanCollege of Veterinary Behaviorists
   vi. AmericanCollege of Veterinary Clinical Pharmacology
   vii. AmericanCollege of Veterinary Emergency and Critical Care
   viii. AmericanCollege of Veterinary Internal Medicine
   ix. AmericanCollege of Veterinary Nutrition
   x. AmericanCollege of Veterinary Ophthalmologists
   xi. AmericanCollege of Veterinary Pathologists
   xii. AmericanCollege of Veterinary Preventive Medicine
   xiii. AmericanCollege of Veterinary Radiology
   xiv. AmericanCollege of Veterinary Surgeons
   xv. AmericanCollege of Zoological Medicine
   xvi. AmericanVeterinaryDentalCollege

3. Continued provisional recognition based on 2010 interim report
   i. AmericanCollege of Veterinary Sports Medicine and Rehabilitation

**Cost:**None

**Account Number& Name (if applicable):**

**Background:**The COE recommendation concurs with that of the ABVS. At its February 18-19, 2011 meeting, the ABVS received, reviewed, evaluated, and approved 2010 annual and 5-year in-depth reports from each of the specialty organizations listed.Per the ABVS Policies and Procedures Manual, the level of recognition is granted for one year.

COE/DEG/MM

AVMA 03095
CONFIDENTIAL



Exhibit D



EXHIBIT
Lyons
#4
1/15/13 SB

*POLICIES AND PROCEDURES*
*AMERICAN VETERINARY MEDICAL ASSOCIATION*
*AMERICAN BOARD OF VETERINARY SPECIALTIES*

*May 2003*



002427

Page(s)

American Board of Veterinary Specialties (ABVS) Mission Statement and Preface ... iv

POLICIES OF THE ABVS.................................................................................1-19

I.  History and Description of the ABVS ... 1-3
    A.  Relationships of organizational units in veterinary specialization ... 1
    B.  Objectives and duties of the ABVS ... 1
    C.  Representation on the ABVS ... 2
    D.  Liaisons to the ABVS ... 2
    E.  Appointment and tenure of representatives ... 2
    F.  ABVS meetings ... 2
    G.  Reports to the COE ... 3
    H.  ABVS meeting expenses ... 3

II.  Guidelines for Establishment, Recognition, and Supervision of Veterinary Specialty ... 3-9
     Organizations
     A.  Definition of a recognized veterinary specialty organization ... 3
     B.-B.  Criteria for recognition of veterinary specialty organizations by the AVMA ... 3
     C.-C.  Procedures for obtaining AVMA recognition of a veterinary specialty ... 5
             organization
     D.  Contents for a petition for a new veterinary specialty organization ... 7

III.-III.  Guidelines for Establishment, Recognition, and Supervision of a Veterinary Specialty ... 9-11
           Under an Existing Recognized Veterinary Specialty Organization
           A.  Definition of a recognized veterinary specialty ... 9
           B.  Procedures for obtaining AVMA recognition of a veterinary specialty ... 9

IV.-IV.  Guidelines for Establishment, Recognition, and Supervision of a Veterinary ... 11-12
         Subspecialty Under an Existing Recognized Veterinary Specialty
         A.  Definition of a recognized veterinary subspecialty ... 11
         B.  Procedures for obtaining AVMA recognition of a veterinary subspecialty ... 11

V.-V.  Reports of AVMA-recognized Veterinary Specialty Organizations, Veterinary ... 12-13
       Specialties, and Veterinary Subspecialties
       A.  Annual reports ... 12
       B.  Five-year in-depth reports ... 12
       C.  C.  Interim reports ... 13

VI.  Disciplinary Actions ... 13-14

VII.  Definitions of Terms Applied to Veterinary Specialization ... 14-18

VIII.  Advertising and Directory Listings ... 18-19

OPERATING PROCEDURES OF THE ABVS.................................................................20-30

I.  Officers and Duties ... 20

002428

| | | | |
|---|---|---|---|
| II. | Meetings | | 20-21 |
| III. | Committees | | 21-23 |
| | A. | *Executive Committee* | *21* |
| | B. | *Nominating Committee* | *21* |
| | C. | *Policies and Procedures Committee* | 22 |
| | D. | *Committee on the Development of New Specialties* | 22 |
| | E. | *Postgraduate Program Evaluation Committee* | 23 |
| | F. | *Annual Report Review Committee* | 23 |
| IV. | Reports—Review and Approval | | 23-26 |
| | A. | *Annual reports* | 23 |
| | B. | *In-depth reports* | 24 |
| | C. | *Interim reports* | 24 |
| | D. | *Petitions from new veterinary specialty organizations, veterinary specialties, and veterinary subspecialties* | 25 |
| | E. | *Liaison reports* | 25 |
| | F. | *Other reports* | 26 |
| V. | Appeal Procedures | | 26 |
| VI. | Complaints Against a Diplomate of a College/Board | | 26 |
| VII. | Mediation Procedures and Implementation | | 26-28 |
| VII-VIII. | Descriptions of Specialty Colleges/Boards in the AVMA Membership Directory and Resource Manual | | 28 |
| VIII-IX. | Residency Programs | | 28-30 |

**FIGURES**

| | | |
|---|---|---|
| 1. | Relationships of Organizational Units in Veterinary Specialization | 31 |

**APENDICES**

| | | |
|---|---|---|
| A. | Suggested Components for Curriculum Vitae | 32 |
| B. | Annual Report Form | 33-36 |
| C. | Five-year In-depth Report Form | 37-38 |
| D. | Interim Report Form | 39-42 |
| E. | Model Language for Procedure for Appeal of Adverse Decisions | 43 |

III

002429

### ABVS MISSION STATEMENT AND PREFACE

The American Board of Veterinary Specialties (ABVS) of the American Veterinary Medical Association (AVMA) recognizes and encourages the development of recognized veterinary specialty organizations (RVSOs) promoting advanced levels of competency in well-defined areas of study or practice categories to provide the public with exceptional veterinary service.

The Policies and Procedures are designed to improve communication and understanding between the AVMA, AVMA members, RVSOs, and the public. This manual will be particularly useful for specialty organizations seeking AVMA recognition.

The Policies include the current description of the AVMA ABVS from the AVMA Liaison Manual and the Guidelines for Establishment, Recognition, and Supervision of Veterinary Specialty Organizations.

The Procedures describe the general operation of the ABVS. The Procedures may be particularly helpful to newly recognized veterinary specialty organizations of the ABVS.

Suggestions on how the Policies and Procedures can be improved are welcomed by the ABVS.

002430

## POLICIES OF THE AMERICAN BOARD OF VETERINARY SPECIALTIES

I.       History and Description of the American Board of Veterinary Specialties

In 1950, the AVMA Executive Board received applications for recognition from the first two veterinary specialty organizations. These applications were from the American College of Veterinary Pathologists (ACVP) dated February 10, 1950, and from the American Board of Veterinary Public Health (ABVPH) dated July 31, 1950. The applications were referred to the Council on Education (COE) and the Association of Deans of American Veterinary Colleges for recommendations. In 1951, the AVMA House of Representatives approved criteria for recognition of veterinary specialty organizations. At the same meeting, the House of Representatives approved recognition of the ACVP and the ABVPH; and assigned the responsibility of reviewing future applications to the COE and the AVMA Executive Board. In 1957, upon the recommendation of the COE and the Executive Board, the AVMA House of Representatives granted recognition to the American College of Laboratory Animal Medicine (ACLAM).

In 1959, the COE recommended, and the House of Delegates approved, the establishment of an Advisory Board on Veterinary Specialties. The resolution establishing the Advisory Board on Veterinary Specialties also specified its composition and outlined its duties, and directed the COE to review and take action on recommendations submitted to it by the Advisory Board on Veterinary Specialties. The initial meeting of the Advisory Board on Veterinary Specialties occurred on February 20, 1960. In 1961, the House approved two documents developed by the Advisory Board on Veterinary Specialties; one was titled "Procedures for Establishment of Veterinary Specialty Organizations," and the other, "Rules for Organization and Operation of the Advisory Board on Veterinary Specialties." The Procedures document restated the criteria approved by the Executive Board in 1951. The rules, criteria, and procedures have been updated, revised, and approved by the House of Delegates in 1969, 1981, 1985, 1988, 1990, 1991, and 1992. The Advisory Board of Veterinary Specialties was renamed the American Board of Veterinary Specialties (ABVS) in 1992. The most recent update of the rules, criteria, and procedures of the ABVS were approved by the COE and the Executive Board in 2003.

A.       Relationships of organizational units in veterinary specialization (see Figure 1).

B. .     The objectives and duties of the ABVS are to:

1.       Determine whether a sufficient number of qualified and interested veterinarians exist to form a new recognized veterinary specialty organization (RVSO).

2.       Establish and evaluate criteria for determining whether a proposed specialty fills a recognizable need and represents a distinct area of specialization in veterinary medicine.

3.       Furnish advice and assistance to groups submitting petitions for establishment and recognition of veterinary specialty organizations. The ABVS will:

a.       Provide guidance and encourage development under the AVMA umbrella.

b.       Encourage emerging groups, when appropriate, to organize under an existing RVSO.

c.       Encourage existing RVSOs to embrace appropriate emerging specialties and subspecialties.

4.       Review petitions to ensure that essential requirements established by the ABVS for veterinary specialty organizations are fulfilled.

1

002431

5. Make appropriate recommendations to the COE concerning the granting of AVMA recognition.

6. Receive and review annual reports from all AVMA-recognized veterinary specialty organizations, and evaluate a detailed, in-depth review of each organization at 5-year intervals.

7. Ascertain through annual reports and 5-year reviews that each RVSO's procedures for credentialing, examination, and appeals are administered fairly.

8. Actively promote specialization and encourage the availability and enhanced use of specialty services by the veterinary profession and the public.

9. Function as a mediator in disputes between veterinarians and RVSOs, and ensure that the established appeal procedures of RVSOs are fully implemented.

C. Representation on the ABVS

Membership and voting privileges are accorded to one representative from each AVMA-recognized veterinary specialty organization. An alternate should be designated by each RVSO to attend ABVS meetings if the representative is unavailable.

D. Liaisons to the ABVS

One liaison representative from the COE and one liaison representative from the Association of American Veterinary Medical Colleges (AAVMC) will attend meetings of the ABVS. The liaison representatives are non-voting members.

E. Appointment and tenure of representatives

Representatives and alternates shall be appointed by each RVSO for renewable four-year (minimum) terms. Terms begin and end at the close of the annual session of the AVMA House of Delegates, which is held in conjunction with the AVMA annual convention. Representatives and alternates must be AVMA members in good standing, fulfill all of the requirements for the position at the time of the appointment, and understand the assignment and be willing to serve. In addition, it is recommended that each ABVS representative be a member of the RVSO's governing body or be invited to serve in a manner that ensures communication between each RVSO and the ABVS occurs in a consistent and timely manner. Each RVSO must convey current contact information for existing and newly appointed representatives and alternates to AVMA staff by July 1 of each year. If a representative or alternate cannot complete the term of his/her appointment, the RVSO will appoint a new representative and/or alternate to fill the unexpired term and must notify AVMA staff in writing within 10 days of when that new information is available.

F. ABVS meetings

The annual meeting of the ABVS is held during the late winter or early spring, prior to the scheduled meeting of the COE of each year. The ABVS Executive Committee and the Committee on Development of New Specialties are authorized to meet during the fall of each year to prepare for the annual meeting of the ABVS.

2

002432

G.     Reports to the COE

       After each annual ABVS meeting, AVMA staff prepares a report, in the form of
       recommendations for action by the COE, for review and approval by the ABVS chair.
       These recommendations are included in the agenda of the next meeting of the COE.

H.     ABVS meeting expenses

       The AVMA pays travel, lodging, and meal expenses for each RVSO's representative (or
       the alternate, but not both) to each regularly scheduled meeting.


II.    Guidelines for Establishment, Recognition, and Supervision of Veterinary Specialty
       Organizations

A.     Definition of a recognized veterinary specialty organization (RVSO)

       Only a veterinary organization that is devoted to a specialty recognized by the AVMA is
       referred to as a RVSO.

B.     Criteria for recognition of veterinary specialty organizations by the AVMA

       To be recognized by the AVMA, a veterinary organization devoted to a specialty must:

       1.     Demonstrate that improved veterinary medical services will be provided to the
              public.

       2.     Have a necessary number of potential diplomates to serve a clearly defined need
              within the profession.

       3.     Represent a distinct and identifiable specialty of veterinary medicine, one that is
              supported by a base of scientific knowledge and practice and that is acceptable to
              the profession and the public.

       4.     Establish and abide by clearly stated standards for admission to membership.

              a.     The RVSO must examine only veterinarians who:

                     i.      Graduated from a college or school of veterinary medicine
                             accredited by the AVMA; or possess a certificate issued by the
                             Educational Commission for Foreign Veterinary Graduates
                             (ECFVG); or are legally qualified to practice veterinary medicine in
                             some state, province, territory, or possession of the United States,
                             Canada, or other country.
                     ii.     Meet the education, training, and experience requirements
                             established by the RVSO.
                     iii.    Demonstrate unquestionable moral character and ethical
                             professional behavior.

              b.     The RVSO must certify only veterinarians who have demonstrated, by
                     meeting established training and/or experience requirements and by
                     attaining acceptable scores on comprehensive examinations administered
                     by the RVSO, their fitness and ability to practice the specialty.

3

002433

5. Ensure that all training or experience requirements and all prerequisites for examination serve the purpose of assessing the competency of the candidate.

6. Establish a standard route through education, training, and experience that provides the most time-efficient pathway to qualify for examination.

7. Establish an alternate route for veterinarians unable or not choosing to enroll in formal residency or training programs. The RVSO may require supervision or mentoring of these alternate pathway candidates by a diplomate.

8. Not require any period that involves merely a passage of time (waiting period) between successful completion of formal training and eligibility to sit for examination. Experience requirements must be clearly defined, relevant to the objectives of the specialty, and amenable to evaluation.

9. Notify candidates promptly (within 60 days) of any deficiencies in credentials that prevent their examination or certification by the RVSO.

10. Adhere to the following examination procedures:

    a. Written or oral examinations must reflect the professional competence expected of the diplomate.

    b. Time between credentials evaluation and the examination date must be sufficient (not less than 120 days) to permit adequate preparation for credentialed candidates and full implementation of the appeals process for those candidates whose application for examination has been denied.

    c. Candidates must receive a content outline (blueprint) of the exam and exam format prior to the exam.

    d. Candidates should be informed prior to the examination of the passing point, or, if this is not determined in advance, the method of setting the passing point. The passing point may be adjusted lower but not higher after administering the exam.

    e. Avoid personal conflict, or the appearance of conflict, that could affect results of examinations.

    f. Exam results must be sent to all candidates on the same day. A reasonable time limit must be established (not to exceed 45 days) for providing candidates with the results of the examination.

    g. Candidates who do not successfully complete the examination (including any oral examination), must, upon request, be provided with an explanation of the deficiencies that prevented their passing the examination. This procedure must be published by the veterinary specialty organization prior to the examination.

    h. All candidates must be informed of their remaining eligibility and reapplication procedures.

4

11. Issue certificates attesting to diplomate status

    i. There shall be one certificate for each RVSO and/or recognized veterinary specialty (should the RVSO have more than one recognized veterinary specialty [RVS]) indicating the individual is certified in the AVMA-recognized specialty.

    ii. If certificates are to be time-limited (eg, for the purposes of recertification), this must be clearly specified at the time that certificates are issued to new diplomates.

12. Establish a formal appeal procedure for candidates in case of an adverse decision by the RVSO. The appeal procedure must appear in the constitution or bylaws of the organization, and must accompany each application form.

13. Encourage and implement special training beyond the professional veterinary degree to enhance the ability of candidates to meet certification requirements and to maintain the competence of diplomates.

14. Avoid contracts or agreements leading to activities outside the scope of the stated objectives of the RVSO.

15. The constitution and/or bylaws of RVSOs and RVSs must contain elements as specified in section II, part D5 of the Policies of the ABVS. Organizations must notify the ABVS of all changes in the RVSO's and RVS's constitution and/or bylaws at the time of the next annual report. Annual reports should include previous and newly accepted wording. A complete copy of the revised constitution and/or bylaws must also be submitted with the annual report.

16. Be legally incorporated as a not-for-profit educational organization within a state or district of the United States, and have a determination made as to the federal tax status of the organization. Groups are encouraged to incorporate and secure tax exemption under section 501( C )(3) or 501 ( C ) (6) of the Internal Revenue Service code.

C. Procedures for obtaining AVMA recognition of a veterinary specialty organization

1. A group of veterinarians forming an organization devoted to a specialty and seeking AVMA recognition must submit a letter of intent to the AVMA.

On receipt of a letter of intent:

a. The chair of the ABVS will assign two members of the ABVS to liaise with the group and assist them in preparing a petition for recognition.

b. The liaison(s) will report to the ABVS, annually, the progress of the group toward developing a petition for recognition as a veterinary specialty organization.

c. The entire petition (see section IV, part D of the Procedures of the ABVS) should be submitted to the liaison(s) for comments prior to submission to the ABVS.

5

2.    A formal petition for AVMA recognition of a veterinary specialty organization must be submitted to the ABVS by November 1 for initial consideration during the fall meeting of the ABVS Committee on the Development of New Specialties (CDNS).

3.    All petitions will be reviewed by the CDNS before being sent for ABVS review. After initial consideration at the first fall meeting and prior to its next fall meeting, the CDNS will solicit information and opinion from the profession and from the public concerning AVMA recognition of the proposed veterinary specialty organization. Input will be directly solicited from the following groups:

   a.    The AVMA membership through an announcement in the *Journal of the American Veterinary Medical Association* and on the AVMA Web site.

   b.    Existing RVSOs.

   c.    Appropriate veterinary societies and academies.

   d.    Appropriate educational, research, governmental, military, commercial, and public bodies.

4.    At the next fall meeting of the CDNS, the committee will review the information and opinions gathered, further review the petition, and determine whether the petition should be forwarded to the full ABVS for consideration.

5.    Representatives of the organizing group will be invited to attend, at their own expense, the next annual meeting of the ABVS when their petition will be considered.

6.    The ABVS reviews the petition presented and makes appropriate suggestions to the organizing committee regarding additions or corrections. When the presented material is found to meet all of the criteria in section II, parts B and D of the Policies of the ABVS, and is recommended for approval by the ABVS, the ABVS forwards the petition along with its recommendation for recognition to the COE.

7.    The COE reviews the petition and the recommendation of the ABVS. If the review is favorable, and it appears that the specialty organization meets the applicable criteria found in section II, Parts B and D of the Policies of the ABVS, the Council recommends to the AVMA Executive Board that the petitioning organization be granted provisional recognition. If results of the COE review are not favorable, the petition is returned to the ABVS with a statement of deficiencies identified.

8.    After provisional recognition has been granted by the AVMA Executive Board, the newly recognized veterinary specialty organization takes any necessary steps to complete formalization of its structure and proceeds to function under its constitution and/or bylaws. The RVSO may examine and certify candidates, collect dues, send a representative to ABVS meetings, and conduct other business as specified in its constitution and/or bylaws.

9.    After a minimum of four years, but not more than ten years, under provisional recognition, a veterinary specialty organization may submit a request for full recognition to the ABVS. The ABVS may grant an extension of the 10-year time

6

limit, if an extension is requested in writing. A petition for full recognition should be organized in the format described under the guidelines for five-year in-depth reviews (see section V, part B of the Policies of the ABVS), and should indicate that the organization is fully functional and fulfilling its stated objectives.

10. The ABVS reviews the request for full recognition and makes appropriate suggestions to the provisionally recognized veterinary specialty organization concerning any necessary additions or corrections. If the documentation indicates that the organization meets all of the criteria in section II, parts B and D of the Policies of the ABVS, and is functioning effectively, the ABVS forwards the petition with a recommendation for approval to the COE.

11. The COE reviews the request and the recommendations of the ABVS. If the COE review is favorable and it appears that the specialty organization meets the criteria listed in section II, parts B and D of the Policies of the ABVS and is functioning effectively, the COE recommends to the AVMA Executive Board that the requesting organization be granted full recognition. If the COE review is not favorable, the petition is returned to the ABVS with a statement of deficiencies identified.

12. The AVMA Executive Board makes the final decision to grant or not grant recognition to a veterinary specialty organization. Decisions of the Executive Board are reported annually to the AVMA House of Delegates.

13. At any point during review of a petition for recognition of a veterinary specialty organization (as described in section II, parts C3 through C12 of the Policies of the ABVS), adverse decisions may be rendered. The entity denying approval will notify the requesting veterinary specialty organization, and any agency that forwarded that request, of the adverse decision and the reasons for it within 30 days of the decision. The requesting veterinary specialty organization will also be informed of its rights of appeal under the established general appellate procedures of the AVMA. The requesting veterinary specialty organization may take action to correct the deficiencies identified and resubmit its request for recognition, may petition the agency that made the adverse decision for reconsideration, or may appeal to the AVMA Board of Governors for review of the decision. Petitions for reconsideration or additional review should be made in accordance with the established general appellate procedures of the AVMA.

D. Contents for a petition for a new veterinary specialty organization

1. A veterinary specialty organization seeking AVMA recognition should designate an organizing committee limited in number to those essential to conduct the business of the specialty and to achieve provisional recognition. Members of the organizing committee should be veterinarians recognized as exceptionally qualified and who meet one or more of the following criteria:

   a. Be a professor of the proposed specialty in a college or department of veterinary medicine.

   -b. Be an author of important publications resulting from research or practice in the specialty.

   c. Have at least 10 years' experience in the specialty and, by teaching,

7

research, or practice, have contributed substantially to the development of the specialty.

d. Have advanced training in the specialty and have demonstrated competency through teaching, research, or practice in the specialty to which most of the individual's professional time is devoted.

The petition must contain a curriculum vitae (see Appendix A) for each member of the organizing committee.

2. The organization must document that it meets the criteria for veterinary specialty organizations recognized by the AVMA as specified in section II, parts B1 through B16, of the Policies of the ABVS. Each item should be specifically addressed to the veterinary specialty organization must document the number of potential diplomates of the specialty available and convince the ABVS that within a reasonable period of time, growth of the veterinary specialty organization will result in a number of specialists that will have an impact on organized, private, corporate, academic, industrialized, or governmental veterinary medicine and the public. The veterinary specialty organization must justify its role in fulfilling a recognizable need and demonstrate that its existence is acceptable to the profession and the public. The veterinary specialty organization must identify the base of scientific knowledge and practice that distinguishes it from all existing RVSOs. It will be necessary to:

a. Define the scientific basis of the proposed specialty.

b. Relate the subject matter to current professional and postgraduate veterinary medical curricula.

c. Describe how diplomates would be employed in public, institutional, and private practice (including the approximate number employed in each category, and the scientific disciplines relevant to each category).

d. Describe current or proposed continuing education programs.

3. There should be a description of relationships and commonalities with existing RVSOs.

4. There should be an explanation of why the relationships and commonalities with existing organizations are insufficient to warrant inclusion as a veterinary specialty or veterinary subspecialty of an existing organization.

5. A copy of the proposed constitution and/or bylaws should be submitted, which shall contain, at minimum:

a. The name of the RVSO.

b. A statement of objectives.

c. Titles, election procedures, and duties of officers.

d. A description of membership categories, including duties, privileges, and method of selection for each.

8

002438

done

e. A statement of the prerequisites for candidacy, including education, experience, publications, teaching, research, nature of supervision, and qualifications of preceptors that may be required.

f. A description of alternate methods of qualifying for candidacy for those unable or unwilling to enroll in formal training or residency programs.

g. A description of the scope and nature of certifying examinations.

h. Procedures for establishing and amending dues and fees.

i. Causes and procedures for censuring or suspending diplomates or cancelling certification.

j. Procedures for appealing adverse decisions.

k. Procedures for conducting business and meetings.

l. Procedures for amending the constitution and/or bylaws.

6. There should be a description of how the specialty plans to organize and initiate its functions (eg, how the initial officers will perform their duties, how examinations will be prepared, administered, and monitored, and how training programs will be established).

7. There should be evidence that facilities and programs are available for advanced training of veterinarians that will lead to certification in the veterinary specialty. A description of existing educational programs, including established postgraduate educational programs and the number of people in these programs must be provided. Objectives, measures of competence, and expected contributions and measurements of the success of such programs should be specified. Evidence for the continued existence and growth of educational programs in the veterinary specialty must be included.

8. A list of current and past officers of the organizing agency and a list of proposed charter diplomates of the veterinary specialty organization should be included, if applicable. Charter diplomates must be members of the organizing committee.

9. There should be a financial statement.

III. Guidelines for Establishment, Recognition, and Supervision of a Veterinary Specialty Under an Existing Recognized Veterinary Specialty Organization

A. Definition of a recognized veterinary specialty (RVS)

A clearly defined field of veterinary medicine comprising a species, discipline, or system, whose members acquire knowledge and skills through formal training. These focused areas of practice are under the umbrella of an AVMA-recognized veterinary specialty organization.

B. Procedures for obtaining AVMA recognition of a veterinary specialty

9

002439

1.  Veterinarians planning to form a veterinary specialty under an existing recognized veterinary specialty organization (RVSO) should submit a letter of intent to the AVMA at the earliest possible time. The representative of the parent RVSO will liaise with the specialty group and report to the ABVS on the progress of the specialty group's petition for recognition.

2.  A veterinary specialty seeking recognition as a RVS under the auspices of an existing RVSO may:

    a.  Be recognized by the AVMA Executive Board under the procedures described in section II, part C of the Policies of the ABVS with the following exceptions to those procedures:

        i.   A RVS need not be incorporated separately.

        ii.  A RVS is represented on the ABVS by the representative of the parent RVSO.

        iii. A RVSO with one or more RVSs may have
             a.  One constitution delineating the operations of the RVSO and separate bylaws delineating the functions and operations of each RVS, or
             b.  A single constitution and bylaws clearly delineating the operations of the RVSO and the functions and operations of each RVS, or
             c.  A single bylaws clearly delineating the operations of the RVSO and the functions and operations of each RVS.

    b.  Admit charter diplomates provided they are members of the veterinary specialty organizing committee, which is limited in number to those essential to conduct the business of the veterinary specialty and to achieve provisional approval. Each charter member must:

        i.   Be a diplomate of the parent RVSO, or

        ii.  Be a diplomate of another RVSO recognized by the AVMA, or

        iii. Have demonstrated competency through teaching, research, or practice of the veterinary specialty and meet the criteria for members of an organizing committee as specified in section II, part D1 of the Policies of the ABVS.

3.  A petition for provisional recognition of the veterinary specialty must be submitted to the AVMA by November 1 for consideration during the next meeting of the CDNS. The petition must include a statement of approval from the proposed parent RVSO and contain the same elements as a petition for full recognition (see section II, parts B and D of the Policies of the ABVS). Petitions for immediate full recognition may be submitted by veterinary specialties arising from a restructuring of a parent RVSO following the procedure described in section III, part B6.

4.  After provisional recognition has been granted by the Executive Board, the new RVS takes any necessary steps to complete formalization of its structure and proceeds to function under its constitution and/or bylaws. The organization may

10

002440

examine and certify candidates, collect dues, and conduct other business as specified in its constitution and/or bylaws. After a veterinary specialty is recognized, its reports (interim and annual) are included in the reports of its parent RVSO. Recognized veterinary specialties report directly to the ABVS only by special request.

5. After a minimum of four years but not more than ten years under provisional recognition, a veterinary specialty may submit a request for full recognition to the ABVS through its parent RVSO. The ABVS may grant an extension of the 10-year time limit, if an extension is requested in writing. A request for full recognition of a veterinary specialty will undergo the same in-depth review process required of a RVSO (see section V, part B of the Policies of the ABVS) and this review should indicate that the veterinary specialty is fully functional and fulfilling its stated objectives. An interim report (see section V, part C of the Policies of the ABVS) is required in addition to the in-depth report.

6. A petition for immediate full recognition may be submitted by a veterinary specialty arising from a restructuring of a parent RVSO. The petition for full recognition will undergo the same review process required for an RVSO. Results of this review should indicate that the veterinary specialty is immediately able to become fully functional and can fulfill its stated objectives. Procedures for recognition will be followed as previously described in section III, parts B1 through B3, Section II, parts B1 through B15, C10 through C13, and D5 through D9 will also apply. The petition must:

    a. Be prepared and organized as an in-depth report (see Appendix C).

    b. Provide a statement outlining the reasons for, and benefit(s) of restructuring the RVSO into the described veterinary specialties.

    c. Describe the process by which existing RVSO diplomats may be reclassified into the respective veterinary specialties.

    d. Include an organizational chart showing the present and proposed relationships of the veterinary specialties within the RVSO.

7. The AVMA Executive Board makes the final decision to grant or not grant recognition to a veterinary specialty. Decisions of the Executive Board are reported annually to the AVMA House of Delegates.

IV. Guidelines for Establishment, Recognition, and Supervision of a Veterinary Subspecialty Under an Existing Recognized Veterinary Specialty

A. Definition of a recognized veterinary subspecialty (RVSS)

   A component of a recognized veterinary specialty (RVS) requiring the exercise of skills and the application of knowledge in a specific field, but performed at a higher standard than that required for a recognized veterinary specialist functioning within a RVS.

B. Procedures for obtaining AVMA recognition of a veterinary subspecialty

   1. Diplomates planning to form a RVSS under an existing RVS should submit a letter of intent to the parent recognized veterinary specialty organization (RVSO). The

11

002441

representative of the parent RVSO will liaise with the veterinary subspecialty and report to the ABVS on the progress of the veterinary subspecialty petition for recognition.

2. A veterinary subspecialty seeking recognition by the AVMA under the auspices of an existing RVS must:

    a. Demonstrate a need for a RVSS by:

        i. Having a critical mass of diplomates within a RVS who desire to form a veterinary subspecialty.

        ii. Showing that a specific knowledge base or specific practice area exists.

    b. Petition the parent RVSO for acceptance. The petition must contain:

        i. Procedures for recognition and certification of veterinary subspecialists.

        ii. A plan for financial support of activities associated with the veterinary subspecialty.

        iii. A mechanism for demonstrating continuing professional development.

    c. Be considered for full recognition as a veterinary subspecialty by the parent RVSO after completing three years of provisional recognition by the parent RVSO.

    d. Be willing to be eliminated as a RVSS by the parent RVSO if the subspecialty is no longer seen as providing a needed service for the profession or public.

3. A petition for recognition of a veterinary subspecialty must be filed with and approved by the parent RVSO prior to seeking recognition by the AVMA. A petition for recognition of a veterinary subspecialty must be submitted to the ABVS with the annual report of the RVSO.

V. **Reports of AVMA-recognized Veterinary Specialty Organizations, Veterinary Specialties, and Veterinary Subspecialties**

A. Annual reports

Each fully recognized veterinary specialty organization is required to provide an annual report for the ABVS. A form for the annual report is provided (see Appendix B). Reports are necessary to gather statistical data and to identify issues and potential problems. Reports are due by November 1 for consideration during the annual meeting of the full ABVS. Reports for fully recognized veterinary specialties and subspecialties are submitted in conjunction with the report of the parent recognized veterinary specialty organization (RVSO).

12

002442

**B.      Five-year in-depth reports**

Each fully recognized veterinary specialty organization is required to submit an in-depth report of its status and activities to the ABVS at five-year intervals following full recognition. The in-depth report must be organized as outlined in Appendix C. Reports are necessary to gather current information and to assess compliance with the criteria in section II, part B of the Policies of the ABVS. Reports are due by November 1 for consideration during the annual meeting of the full ABVS. Reports for fully recognized veterinary specialties and subspecialties are submitted in conjunction with the report of the parent RVSO.

**C.      Interim reports**

Veterinary specialty organizations with provisional or probationary recognition by the AVMA are required to submit an interim report each year. This report must address progress toward meeting criteria (described in section II, part B of the Policies of the ABVS) required for full recognition. Reports are due by November 1 for consideration during the spring meeting of the full ABVS. A form for interim reports is included (see Appendix D). Interim reports for veterinary specialties and subspecialties are submitted in conjunction with the report of the parent RVSO.

**VI.      Disciplinary Actions**

A.      As a result of findings on review of an annual or five-year in-depth report of a recognized veterinary specialty organization (RVSO), recognized veterinary specialty (RVS), or recognized veterinary subspecialty (RVSS), or after appropriate investigation of a complaint by a third party, the ABVS may recommend withdrawal of recognition or assignment of probationary status to a RVSO, RVS, or RVSS. Causes for withdrawal of recognition or change of status are:

1.      Failure to meet criteria for a RVSO, RVS, or RVSS as listed in sections II, III, or IV, respectively, of the Policies of the ABVS.

2.      Failure to promptly address or correct deficiencies identified during an annual or five-year in-depth review.

3.      Actions by a RVSO, RVS, or RVSS that are considered detrimental to the veterinary profession or the public interest.

4.      Refusal to participate in an ABVS mediation of a legitimate complaint by a candidate(s).

5.      Failure to submit required reports.

B.      The following procedures shall apply in considering recommendation of disciplinary action by the ABVS:

1.      Notice of the proposed disciplinary action will be delivered to the president and secretary of the RVSO involved no less than 30 days prior to a regularly scheduled or special meeting of the ABVS at which the matter is to be considered. This notice will include a detailed outline of the complaint(s) received or alleged deficiencies.

2.      A meeting will be held at AVMA headquarters. A majority of representatives to the

13

ABVS must be present.

3.   Representatives of the RVSO will be given an opportunity to present relevant information and their views on the matter. Travel costs for representatives of the RVSO, other than their representative to the ABVS, will be at other than AVMA expense.

4.   In executive session, and in the absence of all representatives of the RVSO involved, the ABVS will discuss appropriate action(s) to recommend. Possible actions include:

   a.   Conclusion of the review with no further action.

   b.   Recommendation to the COE that probationary recognition be assigned to the specialty organization.

   c.   Recommendation to the COE that recognition of the specialty organization be withdrawn.

5.   Any recommendation forwarded to the COE must be approved by a two-thirds majority of ABVS members present and voting.

6.   Any recommendation for action forwarded to the COE must include a full description of the reasons for the recommendation.

7.   A specialty organization assigned probationary recognition must be in full compliance with all criteria within a time frame directed by the ABVS. Failure to comply within this time frame will lead to withdrawal of AVMA recognition. Extensions of this time limit may be granted by the ABVS in response to a written request.

C.   The COE will consider each recommendation for disciplinary action forwarded by the ABVS. The Council may:

   1.   Return the recommendation to the ABVS for further consideration, indicating the reasons for return of the recommendation.

   2.   Request from the RVSO a written presentation of its view on the matter and the reasons why it believes the ABVS recommendation should not be approved.

   3.   After reviewing any presentation from the RVSO, return the recommendation and related documents to the ABVS for further consideration, or forward the ABVS recommendation and related documents to the AVMA Executive Board with the Council's recommendation for approval.

D.   The AVMA Executive Board will make the final decision regarding the status of the veterinary specialty organization. Decisions of the Executive Board are reported annually to the AVMA House of Delegates.

VII.   Definitions of Terms Applied to Veterinary Specialization

A.   Academy—An exclusive body of learned persons with the objective of promoting

14

002444

scholarship and service. Membership is based on scientific or scholastic achievement and exercise of professional skills.

B.    *Active diplomate*—A diplomate of a recognized veterinary specialty organization (RVSO) who is in good standing with that organization through fulfilling specified requirements and who is active in the practice of the recognized veterinary specialty (RVS).

C.    *Alternate qualifying route*—An alternative to a standard residency or degree program for obtaining knowledge and experience that enables a veterinarian to qualify for certification examination in a specialty.

D.    *Association*—An organization of veterinarians with the objective of advancing mutual professional interest(s).

E.    *Board*—A small group of members designated by a recognized veterinary specialty organization (RVSO) to conduct the examination of candidates, or an organization of specialists having the objective of examining candidates for certification. Some RVSOs have used the term "board" synonymously with the broader concept of college. This use of the term has been accepted by the ABVS.

F.    *Board eligibility*—A veterinarian is board-eligible when he/she has successfully completed the established requirements of a recognized veterinary specialty organization (RVSO) and has been accepted to take its next certifying examination. As per the AVMA Guidelines for the Identification of Board-certified Veterinarians, individuals should not use the term board-eligible as a descriptor in promotional materials directed toward other members of the profession or the public.

G.    *Certification*—The process of attesting that a veterinarian has successfully completed an approved educational program and examination process designed to assess the knowledge and skills required for providing high quality professional services and patient care in a specialty.

H.    *Certified in*—The AVMA limits the use of "certified in" to those individuals who have completed the certification process of an AVMA-recognized veterinary specialty organization, veterinary specialty, or veterinary subspecialty.

I.    *Charter diplomate*—Charter diplomates are not required to submit to examination to become diplomates. Charter diplomate status may be granted to a small number of individuals at the time a specialty college or board is established. This distinction should be reserved for only the most distinguished and experienced members of the field. A charter diplomate must:

1.    Be a member of the organizing committee.

2.    Have achieved distinction in the field and have qualifications far exceeding those proposed as necessary for candidates desiring to take the certifying examination of the organization.

3.    Be recognized as a qualified specialist by peers, and

a.    Have at least 10 years' experience in the specialty, with no less than 75% of his/her professional time in each of the last five years being devoted to the specialty, and by teaching, research, or practice have contributed

15

substantially to the development of the specialty, or

b.  · Be a full professor of the specialty in a college or department of veterinary medicine, and have contributed substantially to the development of the specialty, or

c.  Have advanced training (PhD or equivalent) in the specialty; have demonstrated competency through teaching, research, or practice in the specialty to which the individual devotes most of his or her professional time; and be an author of important publications resulting from research or practice in the specialty.

J.  *College*—An organization of veterinarians that has as its objectives the establishment of standards for the education and experience necessary for qualification as a specialist, and the examination and certification of veterinarians in the specialty. The term college is favored by the ABVS and is synonymous with board in the designation of a recognized veterinary specialty organization (RVSO).

K.  *Criterion referencing*—A criterion-referenced score interpretation involves comparing a test score to a cutoff score that represents a performance standard.

L.  *Degree program*—A degree program is an educational program leading to an MS, PhD, or equivalent degree that may or may not be combined with residency training.

M.  *Diplomate*—A veterinarian who is certified as a specialist in a particular discipline by one of the AVMA-recognized veterinary specialty organizations.

N.  *Diplomate in good standing*—See active diplomate.

O.  *Diplomate not in good standing*—A diplomate of a recognized veterinary specialty organization (RVSO) who has not complied with the specified requirements of a diplomate in good standing established by that organization.

P.  *Discipline*—A field of study or expertise definable as a distinct area of veterinary medicine.

Q.  *Distinguished member*—A diplomate of a recognized veterinary specialty organization (RVSO) who is acknowledged as distinguished based on criteria established by that organization.

R.  *Emeritus diplomate*—A diplomate of a recognized veterinary specialty organization (RVSO) who either reaches an age designated by the RVSO or has retired from active practice of the recognized veterinary specialty.

S.  *Founder diplomate*—A member of the organizing committee as described in section II, part D1 of the Policies of the ABVS.

T.  *Full recognition*—A classification assigned to a veterinary specialty organization that meets or exceeds all criteria established by the ABVS for recognition by the AVMA.

U.  *Honorary diplomate or honorary member*—A veterinarian or nonveterinarian who is nominated by, and meets criteria specified by, the recognized veterinary specialty organization (RVSO) and who is elected by the members of a recognized veterinary specialty (RVS). An honorary diplomate or honorary member shall be a nonvoting

16

002446

member and shall not hold office in the specialty organization.

V. *Internship*—An internship shall be one-year of flexible, rotating clinical training in veterinary medicine beyond the professional degree. It provides practical experience in applying knowledge gained during formal professional education and offers an opportunity for recent graduates to obtain additional training in the clinical sciences. An internship is composed of a broad range of supervised clinical assignments. This year of comprehensive, broad, postgraduate training and experience prepares a veterinarian for high-quality service in practice or for a decision on an area of specialization. It is important that an internship be truly a rotation, involving a wide range of clinical activities.

W. *Job/task analysis*—A systematic procedure for defining the tasks required by a job and the knowledge, skills, abilities, and other personal characteristics required of individuals performing that job.

X. *Organizing committee*—A group of founder diplomates that conduct the business of an emerging veterinary specialty seeking recognition by the AVMA.

Y. *Probationary recognition*—A classification assigned to a recognized veterinary specialty organization (RVSO) that meets most, but not all, of the established criteria for continued full recognition.

Z. *Provisional recognition*—A classification assigned to a new veterinary specialty organization, veterinary specialty, or veterinary subspecialty that has not applied for full recognition or has not met all the criteria pertaining to complete formalization of its structure and objectives.

AA. *Recognized veterinary specialist*—A veterinarian who is certified by an AVMA-recognized veterinary specialty organization.

　　1.　*Recognized system specialist*—A recognized specialist in a field that has as its primary emphasis a specific organ or body system within veterinary medicine (e.g., ophthalmology, neurology, dermatology). This field may involve different species, and may involve different medical and/or surgical disciplines within the representative body system or organ that is the primary area of specialization.

　　2.　*Recognized discipline specialist*—A recognized specialist in a field that has as its primary emphasis a particular discipline within veterinary medicine (e.g., internal medicine, surgery, pathology, virology, toxicology, pharmacology, nutrition, preventive medicine and public health). This field may involve different species, and may involve different body systems or organs within the representative discipline that is the primary area of specialization.

　　3.　*Recognized species specialist*—A recognized specialist in a field that has as its primary emphasis a particular species or group of species within veterinary medicine (eg, laboratory animal medicine, zoological medicine, or canine and feline practice). This field may represent different medical or surgical disciplines, and may involve different body systems or organs within the representative species that are the primary focus of specialization.

BB. *Recognized veterinary specialty*—A clearly defined field of veterinary medicine comprising a species, discipline, or system within veterinary medicine and whose members acquire knowledge and skills through formal training, experimentation, and a standard approach to

002447

veterinary medicine. These focused areas of practice are under the umbrella of a parent AVMA-recognized veterinary specialty organization (see Figure 1). Examples include, but are not restricted to, the recognized veterinary specialties of neurology, cardiology, oncology, and internal medicine within the ACVIM and the practice categories of avian, feline, equine, dairy, swine, health management and food animal within the ABVP.

CC.   *Recognized veterinary specialty organization*—An organization that has been recognized by the AVMA as establishing standards for a specialty, certifying veterinarians who meet those standards, and serving as the organizational and administrative unit for one or more recognized veterinary specialties (see Figure 1). Veterinarians undergoing a formal program of credentialing and certification will be members of the recognized veterinary specialty organization (RVSO) and designated as a diplomate (a recognized specialist in one or more of the recognized veterinary specialties under the organizational umbrella.)

DD.   *Recognized veterinary subspecialty*—A component of a recognized veterinary specialty (RVS) requiring the exercise of skills and the application of knowledge in a specific field but performance at a higher standard than that required for a veterinary recognized specialist functioning within a RVS (see Figure 1).

EE.   *Residency*—A residency shall be advanced training in a specialty in veterinary medicine that is intended to lead to specialty certification in an AVMA-recognized veterinary specialty organization. An approved residency program is conducted under the supervision of a board-certified specialist. A residency is usually narrowly confined to a specific discipline. A residency may in some instances be related to an advanced degree program.

FF.   *Society*—An organization of veterinarians and others having a common interest in a discipline of veterinary medicine. A society usually has as its objective the encouragement of scholarship, through educational programs, among those interested in the discipline. A society is not a recognized specialty certifying organization.

GG.   *Specialist*—See recognized veterinary specialist.

HH.   *Specialty*—See recognized veterinary specialty.

II.   *Standard residency or route*—The minimum and most time-efficient education or training under appropriate supervision that will qualify a candidate for examination. Any experience requirements must be clearly defined, relevant to the objectives of the specialty, and amenable to evaluation.

JJ.   *Student associate*—A veterinary student who is interested in a particular recognized veterinary specialty (RVS), but who is not a diplomate of that recognized veterinary specialty organization (RVSO) and thus not a voting member of that organization.

KK.   *Subspecialty*—See recognized veterinary subspecialty.

LL.   *Waiting period*—A waiting period is defined as a period of time between completion of a standard residency or route and candidate eligibility to sit for the certifying examination that cannot be justified as necessary and relevant to the objectives of the recognized veterinary specialty organization (RVSO). A waiting period is not permitted by the ABVS.

VIII.   **Advertising and Directory Listings**

A.   Veterinarians may legally advertise in any way that is not false, misleading, or deceptive.

18

002448

Advertising guidelines and interpretations are discussed in the AVMA Principles of Veterinary Medical Ethics and the AVMA Guidelines for the Identification of Board-certified Veterinarians, which may be found in the current *AVMA Membership Directory and Resource Manual* or by contacting AVMA staff.

B.    Veterinarians should not in any way imply they are specialists unless they are certified by an AVMA-recognized veterinary specialty organization (ie, board or college).

C.    The use of the terms "board eligible" or "board qualified" as an indication of special qualification is potentially misleading to the public and should not be used in any public communication or other solicitation.

D.    Individual recognized veterinary specialty organizations (RVSOs) are encouraged to provide guidance to their members in matters pertaining to advertising and directory listings. Diplomates should choose one of the following formats, as described in the AVMA Guidelines for the Identification of Board-certified Veterinarians. The appropriate format will depend on the number of recognized veterinary specialties and subspecialties.

    1.    Examples for members of a RVSO with one recognized veterinary specialty (RVS):

        Name, Diplomate, American College of Veterinary Dermatology or

        Name, Diplomate, ACVD or

        Name, DACVD (generally reserved for publication in professional journals)

    2.    Examples for members of a RVSO with more than one RVS:

        Name, Diplomate, American College of Veterinary Internal Medicine (Cardiology) or

        Name, Diplomate, ACVIM (Cardiology) or

        Name, DACVIM (Cardiology)

    3.    Theoretical examples for members of a RVSO with a RVS that contains a recognized veterinary subspecialty (RVSS):

        Name, Diplomate, American College of Veterinary Pathologists (Anatomic Pathology; subspecialty, Ultrastructural Pathology) or

        Name, Diplomate, ACVP (Anatomic Pathology; subspecialty Ultrastructural Pathology) or

        Name, DACVP (Anatomic Pathology; subspecialty Ultrastructural Pathology)

002449

# OPERATING PROCEDURES OF THE AMERICAN BOARD OF VETERINARY SPECIALTIES

I. **Officers and Duties**

A. **Officers**

The officers of the ABVS consist of the Chair, the Chair-Elect, and the Executive Committee Member-at-Large. A slate of officers is developed and nominated by the Nominating Committee. Other nominations may come from the floor during the ABVS annual meeting. Elections are by a simple majority of the recognized veterinary specialty organizations' (RVSO) representatives attending the annual meeting of the ABVS. Officers serve a one (1) year term. The normal progression is from Member-at-Large to Chair-Elect to Chair in order to provide each individual with the experience necessary to appropriately administer the programs of the ABVS.

B. **Duties**

1. Chair—Conducts the meetings of the ABVS and the Executive Committee (EC), approves reports to the Council on Education (COE), develops meeting agendas with the assistance of the EC and AVMA staff, and handles other matters as appropriate. Term of office is one (1) year, beginning at the close of the annual session of the House of Delegates, which is held in conjunction with the AVMA annual convention.

2. Chair-Elect—Serves as Chair in the absence of the Chair. Attends the annual meeting of the EC, and handles other matters as appropriate. He/she automatically becomes Chair following his/her year as Chair-Elect, beginning at the close of the annual session of the House of Delegates, which is held in conjunction with the AVMA annual convention. The Chair-Elect will have two (2) years remaining on the term of appointment to the ABVS at the time of the election.

3. Executive Committee Member-at-Large—Serves as Chair in the absence of the both the Chair and the Chair-Elect. Attends the annual meeting of the EC and handles other matters as appropriate. The EC member-at-large is routinely nominated to Chair-Elect following the year as EC Member-at-Large.

II. **Meetings**

A. **Annual Meeting**

1. The ABVS holds one meeting per year in February or March at which the representative or designated alternate from each AVMA-recognized veterinary specialty organization is in attendance.

2. An alternate or an officer of a recognized veterinary specialty organization (RVSO) may also attend the annual meeting, but not at the expense of the AVMA (ie, the AVMA pays expenses for only one representative from each RVSO). As per AVMA policy, attendance of guests (including RVSO alternates and RVSO officers) is subject to the approval of the ABVS chair.

20

002450

3. The ABVS annual meeting is open to any interested AVMA member with the approval of the ABVS chair.

002451

4. Executive sessions during the ABVS annual meeting may be called by the chair at his/her discretion.

5. Unless otherwise approved in advance by the AVMA Executive Board or Board of Governors, the annual meeting will be held at AVMA headquarters.

6. The agenda for the annual meeting will be developed by the ABVS chair and the ABVS Executive Committee (EC) in consultation with AVMA staff. Matters pertaining to recognition of veterinary specialty organizations, in-depth reviews, approval of annual reports, and other matters requiring approval of the Council on Education (COE) may only be acted upon at the annual meeting.

B. The ABVS EC may meet at the request of the chair, once per year between annual meetings.

C. The ABVS Committee on the Development of New Specialties may meet once per year in conjunction with the EC.

III. **Committees**

A. Executive Committee

    1. Membership—The chair, chair-elect, and one member-at-large from the ABVS comprise the Executive Committee (EC). The EC member-at-large shall be elected annually for a one-year term.

    2. Meetings—Meets annually in the fall after receipt of annual reports, five-year in-depth reports, and petitions. Other business is conducted via teleconference, electronic communication, or correspondence.

    3. Charge
       a. Reviews policy and procedures.
       b. Develops recommendations for ABVS review.
       c. Serves as a long-range planning committee.
       d. Primarily responsible for developing the agenda for the annual meeting.
       e. Reviews the merits of complaints and recommend to the chair of the ABVS to accept or reject requests for mediation.
       f. Addresses other matters referred to it by the ABVS, the COE, the chair of the ABVS, or staff between annual meetings.

B. Nominating Committee

    1. Membership—Comprises three ABVS representatives appointed by the chair, with the advice of the EC, following the annual session of the AVMA House of Delegates. Terms are three years and are staggered so that one person is replaced each year.

    2. Meetings—None. Business is conducted by telecommunication, electronic communication, or correspondence.

    3. Charge
       a. Submits a slate of officers to the chair for review at the Executive Committee meeting prior to consideration and approval by the full ABVS at the annual meeting.

22

*[handwritten in right margin: See AASM ABPM + R more Comm. Hees]*

C.C. Policies and Procedures Committee

    1.1. Membership—Comprises three ABVS representatives appointed by the chair, with the advice of the EC, following the annual session of the AVMA House of Delegates. Terms are three years and are staggered so that one person is replaced each year.

    2. Meetings—None. Business is conducted by telecommunication, electronic communication, or correspondence.

    3. Charge
        a. Evaluates the *Policies and Procedures of the ABVS* for their applicability to current ABVS processes.
        b. Suggests changes or amendments to the *Policies and Procedures of the ABVS* to the EC.
        c. Drafts proposed changes to the *Policy and Procedures of the ABVS* as directed by the EC or the ABVS.

D. Committee on Development of New Specialties (CDNS)

    1. Membership—The ABVS chair shall also chair the CDNS, which consists of the EC, the COE representative to the ABVS, the representative of the AAVMC, and three ABVS representatives appointed by the chair following the annual session of the AVMA House of Delegates with the advice of the EC. Terms of appointed ABVS representatives are three years and are staggered so that one member is appointed annually.

    2. Meetings—May meet annually at the time of the EC meeting. Other business is conducted via teleconference, electronic communication, or correspondence.

    3. Charge
        a. Receives and reviews new petitions and advises the Chair on assignment of liaison ABVS members to assist prospective veterinary specialty organizations with the recognition process.
        b. Solicits opinion and views about the proposed veterinary specialty organization from the following organizations and groups:
            i. AVMA membership through an announcement in the *Journal of the American Veterinary Medical Association* and on the AVMA Web site.
            ii. Existing recognized veterinary specialty organizations (RVSOs).
            iii. Appropriate veterinary societies and academies.
            iv. Appropriate educational, research, governmental, military, commercial, and public bodies.
        c. Collates information for action at the next committee meeting.
        d. Annually evaluates petitions from prospective veterinary specialty organizations as to their appropriateness for submission to the ABVS for action. When it is deemed by the CDNS that a petition is in order and the petitioning organization has fulfilled the current concepts for standards and prerequisites for an emerging organization, the petition will be submitted to the EC for assignment of reviewers and inclusion in the ABVS agenda.
        e. CDNS shall review the interim report for every provisionally recognized veterinary specialty organization. The committee shall prepare a recommendation, including a motion on the status and future

002453

development of each college, which is due at the AVMA on February 1 for consideration by the ABVS at its annual meeting. When a provisionally recognized veterinary specialty organization applies for full recognition, the interim report will be submitted along with its petition for full recognition.

f.   Review and evaluate petitions for full recognition from provisionally recognized veterinary specialty organizations. The CDNS will consider the stage of development of the veterinary specialty organization and determine from the petition whether the organization is sufficiently mature and functional to be evaluated by the ABVS membership. The CDNS will make appropriate recommendations to the EC for further action on the petition and actions required by the veterinary specialty organization.

E.   Postgraduate Program Evaluation Committee

1.   Membership—Comprises three members of the ABVS, appointed by the chair with the advice of the EC following the annual session of the AVMA House of Delegates, plus the AAVMC representative. Terms are three years and are staggered so that one member is appointed annually.

2.   Meetings—None. Business is conducted via telecommunication, electronic communication, or correspondence.

3.   Charge

   a.   Consider matters as directed by the EC or the ABVS, such as residency training programs, alternate pathway standards, and clinical experience evaluation criteria.
   b.   Develop protocols for recertification.
   c.   Report recommendations to the EC and the ABVS.

F.   Annual Report Review Committee

1.   Membership—Comprises three ABVS representatives appointed by the chair, with the advice of the EC, following the annual session of the AVMA House of Delegates. Terms are three years and staggered so that one member is appointed annually.

2.   Meetings—None. Business is conducted by telecommunication, electronic communication, or correspondence.

3.   Charge

   a.   Reviews the annual reports of fully recognized veterinary specialty organizations.

IV.   Reports—Review and Approval

A.   Annual reports

1.   AVMA staff will mail electronic and hard copies of the annual report forms (see Appendix B) to the ABVS representative from each fully recognized veterinary specialty organization no later than September 1. It is the representative's responsibility to ensure that the annual report form is forwarded to the appropriate individuals for completion. Completed forms must be received at the AVMA headquarters no later than November 1. To facilitate distribution of annual reports

24

002454

to the Annual Report Review Committee, each recognized veterinary specialty organization (RVSO) must submit 2 hard copies and an electronic copy of the completed annual report form.

2. A summary of annual reports, including statistical information, is developed prior to the annual meeting of the ABVS and is included in the agenda for this meeting.

3. The Annual Report Review Committee reviews the annual reports of fully recognized veterinary specialty organizations. Reviewers complete a checklist and prepare a one- or two-page summary report for distribution to the ABVS. The composite review must be received at AVMA headquarters by January 15. Committee members should attempt to seek clarification to questions they have raised from the RVSO prior to the meeting.

B. In-depth reports

1. Each RVSO is required to submit an in-depth report of its status and activities to the ABVS at five-year intervals following full recognition (see Appendix C). AVMA staff will remind the ABVS representative and administrative executive of each RVSO in writing of pending in-depth five-year reports no later than May 1. Completed in-depth reports must be received at AVMA headquarters no later than November 1. To facilitate distribution of in-depth reports to the reviewers, each RVSO must submit 3 hard copies and an electronic copy of the completed report.

2. The chair designates two ABVS representatives to review each five-year in-depth report before the annual ABVS meeting.

3. Reviewers complete a checklist and prepare a one- or two-page summary report for distribution to the ABVS. The criteria found in section II, part B of the Policies of the ABVS are the primary basis for assessment of the completeness, clarity, and adequacy of the report. Reviews must be received at AVMA headquarters by January 15.

4. Reviewers initiate and lead discussions and questioning of the representatives of the RVSO under review.

5. One reviewer should be prepared to present a motion to the ABVS concerning the future recognition status of the RVSO under review.

6. Motions approved by the ABVS concerning the recognition status of a RVSO shall be provided by the chair of the ABVS to that RVSO immediately so that any changes or explanations required by the ABVS can be acted upon. An addendum report by the RVSO (due by November 1) after the five-year in depth report shall be reviewed by the ABVS Executive Committee so that a final recommendation or report to and by ABVS on the status of the RVSO's five-year review can be made.

C. Interim reports

1. Each RVSO with provisional or probationary recognition must submit an interim report (see Appendix D) each year that describes that RVSO's progress toward meeting the requirements for full recognition.

2. Completed forms must be received by AVMA no later than November 1.

002455

D.  Petitions from new veterinary specialty organizations, veterinary specialties, and veterinary subspecialties

    1.  Liaison representative(s) are designated as set forth in section II part CI, section III part B, and section IV part B of the Policies of the ABVS to assist the prospective group with their petition. Petitioning veterinary specialty groups should consult their liaison representatives during preparation of the petition.

    2.  Prior to submission to the ABVS, the petitioning veterinary specialty group should supply their liaison representative(s) with the entire petition addressing the criteria set forth in section II part B, section III part B, or section IV part B for RVSOs, recognized veterinary specialties, and recognized veterinary subspecialties, respectively, of the Policies of the ABVS. The petition will be reviewed for format and content. This should be done in a timely manner by the organizing group, but no later than September 1, to permit the liaison representative(s) time to review the petition, to communicate their comments to the petitioning organization, and to allow time for revision of the petition prior to the submission deadline, should that be necessary.

       Although the petitioning veterinary specialty group is not bound to accept the comments of the liaison representative(s), and the acceptance of any such comments does not ensure that the ABVS will accept the petition, it is generally believed that cooperation at this level will benefit the petitioning veterinary specialty group.

    3.  Completed petitions must be received by the AVMA no later than November 1.

    4.  The petition will be referred to the Committee on Development of New Specialties (CDNS) as necessary for gathering information from the veterinary community concerning the merits of the petition.

    5.  The CDNS will review the information and determine whether the petition is to be sent to the ABVS.

    6.  The Chair will designate two ABVS members to review the petition.

    7.  The reviewers will prepare a summary report for distribution to the ABVS. The criteria found in sections I through IV form the basis for evaluating the petition. The summary report is due at the AVMA by January 15 .

    8.  The petitioning veterinary specialty group will receive a copy of the summary report from the AVMA at least 15 days before the annual meeting of the ABVS.

    9.  Reviewers initiate and lead discussions and question the representatives of the petitioning veterinary specialty group at the ABVS meeting.

    10.  One reviewer should be prepared to present a motion to the ABVS concerning the petition.

E.  Liaison reports

    After each annual meeting, AVMA staff submits a summary recommendation on

002456

recognition status for all RVSOs to the Council on Education (COE). This recommendation is reviewed and approved by the ABVS prior to its submission to the COE. The COE reviews the ABVS recommendation and, if the COE is in agreement, forwards the recommendation to the AVMA Executive Board for approval. The AVMA Executive Board action on the COE recommendation is then reviewed by the House of Delegates as part of the report of Executive Board actions.

F.    Other reports

AVMA staff prepares an annual summary of ABVS and RVSO activity, including the number of current active members in each RVSO, which is included as part of the administrative report to the AVMA House of Delegates for review at its annual session.

V.    Appeal Procedures

A.    The AVMA House of Delegates has determined that each AVMA-recognized veterinary specialty organization must have a published procedure to ensure due process for appeal of adverse decisions.

B.    The specific language of an acceptable appeal procedure is determined by the recognized veterinary specialty organization (RVSO, see Appendix E for suggested language).

C.    Changes in appeal procedures should be reported to the AVMA in the RVSO's annual report.

D.    The appeal procedure must be a part of the constitution or bylaws of the RVSO. In addition, it must be included on forms used by candidates who apply for certifying examinations.

E.    The body within the RVSO reviewing appeals must be distinct from that RVSO's current executive committee, board, or examination and credentialing committees.

F.    Recognized veterinary specialty organizations are responsible for full implementation of their appeal procedures to ensure due process. The criteria for veterinary specialty organizations recognized by the AVMA should guide procedures and influence decisions in disputes between specialty organizations and dissatisfied candidates. These procedures and decisions should be fair and reasonable for all parties, in keeping with the objectives of RVSOs and the goals of the AVMA.

VI.    Complaints Against a Diplomate of a College/Board

When a complaint is registered against a diplomate of a recognized veterinary specialty organization (RVSO), the complaint will be referred to the executive director or secretary of the appropriate RVSO, and the person making the complaint will be notified of that referral. The complaint will be considered by the governing body of the RVSO. The RVSO will respond directly to the person issuing the complaint, with a copy of the response sent to the AVMA for ABVS records. A tally of complaints will be a part of the annual report of the RVSO.

VII.    Mediation Procedures and Implementation

A.    Mediation is defined as "friendly intervention, usually by consent or invitation, between conflicting parties to promote reconciliation, settlement, or compromise." The ABVS may act as a mediator in disputes between candidates for specialty board certification and

002457

recognized veterinary specialty organizations (RVSOs). The parties must agree that the matters in dispute are worthy of further discussion and that it is possible to resolve the dispute, although not necessarily during a mediation meeting.

B. When a dispute between a candidate for specialty certification and a RVSO remains unresolved after full use of the appeal procedure established by the RVSO, either party may request ABVS mediation.

C. The Executive Committee (EC) will review the request for mediation adhering to the principle that relationships between candidates and RVSOs should be fair and reasonable. The EC will determine whether:

   1. The complaint is germane to established criteria in the policies of the ABVS.

   2. Either party disregarded established criteria for certification or approval.

   3. Either party failed to follow stated procedures.

   4. Either party failed to consider relevant evidence and documentation presented in the initial appeal of the adverse decision or the response to that appeal.

   The EC should solicit a response to the request for mediation from the parties involved and request additional pertinent information. The members of the EC will, after review of all information available, recommend accepting or rejecting the mediation request to the chair of the ABVS.

D. If it is determined that the complaint lacks merit, the chair of the ABVS will notify the complaining party(ies) and the RVSO of that decision with an explanation of the basis for the decision.

E. If it is determined that the complaint has merit, the chair of the ABVS will call a meeting of the parties in dispute at AVMA headquarters at a mutually agreeable time. Pertinent correspondence and documentation will be distributed to both parties.

F. In the absence of a conflict of interest, the chair of the ABVS will conduct the meeting. In the event of a conflict of interest, another member of the EC, mutually agreeable to both parties, will conduct the meeting. A maximum of two representatives of each party in dispute, and a maximum of two members of AVMA staff, will participate in the meeting unless there are multiple complainants, in which case the number of complainants allowed to attend the meeting will be determined by the chair of ABVS in consultation with AVMA staff and the parties involved. It is anticipated that, except for very large numbers of complainants, all involved parties will be invited to attend the meeting. No party to the complaint will be represented by legal consul.

G. Detailed minutes of the meeting will be kept. An audiotape record may be made with the prior consent of all parties.

H. Each party to the dispute will have up to one hour to present its position. General discussion, questions, clarification, and eventually a search for equitable solutions will follow. The meeting will be adjourned not later than two hours after the general discussion began.

I. AVMA staff will prepare written minutes of the meeting. All participants in the meeting will

002458

have an opportunity to comment on and recommend changes to the written record. When the accuracy of the minutes is agreed upon, the minutes become final, and a copy is provided to each participant.

J.  Travel expenses for the parties in dispute will not be paid by the AVMA. Expenses will be paid as follows:

   1.  The party requesting mediation will be responsible for the cost of travel, food, and lodging, under AVMA Guidelines, for himself/herself, a second representative for the complainant, if appropriate, and the mediator. A $1,000 deposit must accompany the mediation request to ensure that the expenses of the mediator will be covered.

   2.  Travel expenses for representative(s) of the RVSO will be the responsibility of the RVSO. Any expense-sharing agreement between the parties will be independent of the AVMA.

K.  The chair of a mediation process will continue to serve in that capacity as long as he/she is a member of the ABVS, even if he/she is no longer chair.

VIII.  **Descriptions of Specialty Colleges/Boards in the *AVMA Membership Directory and Resource Manual***

A.  In July of each year, the secretaries of AVMA-recognized veterinary specialty organizations will receive a request from the AVMA to update information provided in the AVMA *Membership Directory and Resource Manual*.

B.  Information for the directory listing must be returned by the specified deadline to ensure that current and accurate information is provided.

C.  Directory listings include:

   1.  Name of college/board.
   2.  Name and address of secretary.
   3.  Objectives of the college/board.
   4.  Prerequisites for certification.
   5.  Examination procedure.
   6.  A listing of diplomates.

D.  The ABVS representative from each recognized veterinary specialty organization (RVSO) should assist the RVSO's secretary in ensuring that accurate information is conveyed in a timely fashion.

IX.  **Residency Programs**

A.  Recognized veterinary specialty organizations (RVSOs) requiring residency training for certification eligibility are requested to develop residency program criteria in sufficient detail and according to a standard format to enable a candidate, with the assistance of the training institution, to meet the requirements for certification in that specialty.

B.  A candidate should follow the guidelines of the particular RVSO with which he or she is concerned to develop a program that will fulfill the requirements for certification in that recognized veterinary specialty (RVS). The residency program should be approved in

29

002459

advance by the RVSO before the candidate embarks on it.

C.    Criteria for internship and residency programs should be formatted as follows:

1.    Brief description of the program.

2.    Detailed educational objectives of the program.

3.    Anticipated total time requirements.

4.    Minimum requirements for facilities, equipment, and diagnostic laboratory capabilities.

5.    A synopsis of the number and type of patients or cases that will be required and the emphasis and anticipated (or required) depth of study for each patient.

6.    A synopsis of the level and frequency of interactions between the candidate, board-certified member(s), and others deemed necessary for the program.

7.    Description of assessment methods.

D.    Approval

Approval of veterinary residency programs, like certification of individual recognized veterinary specialists, is the responsibility of the RVSO. Recognition of veterinary specialty organizations and veterinary specialties is the responsibility of the AVMA.

The ABVS recommends the following procedures for approval of residencies by RVSOs that have a residency component in their requirements for certification:

1.    The RVSO receives (in quadruplicate) a report of self-evaluation from the residency program. This report will state the objectives of the residency and describe how the program meets those objectives and the standards established by the RVSO.

2.    Four members of a residency approval committee appointed by the RVSO review the self-evaluation report. Each member of the committee reports, in writing, any deficiencies he or she finds in the report to the chair of the committee.

3.    The chair of the committee will communicate with the dean of the college, or the chief executive officer of any other institution within which the residency program is being conducted, with a copy to the director of the residency, requesting clarification of any items that are unclear and further information on apparent deficiencies.

4.    If deemed necessary by the chair, the committee formulates a list of not more than 10 questions concerning the residency to be answered by the COE after its next site visit to the college. The Council reports its findings to the committee in writing.

5.    In special cases (eg, new residency programs, appeal of disapproval, or reevaluation of probationary status), colleges of veterinary medicine cooperating with RVSOs and the COE may arrange for a site visit by member(s) of the RVSO and/or members of the COE with diplomate status. The findings of any such site

002460

visit are reported to the committee in writing.

6. The committee meets and considers all available information about the residency program, and develops a recommendation for action by the RVSO.

7. The RVSO approves or disapproves the residency.

31

FIGURE 1

RELATIONSHIPS OF ORGANIZATIONAL UNITS IN VETERINARY SPECIALIZATION



32

002462

## SUGGESTED COMPONENTS FOR CURRICULUM VITAE

Name

Address

Date of Birth

Education
  Colleges
  Dates
  Degrees

Professional Activities

Scientific Organizations

Honors
  Professional
  Public Service

Offices Held
  Professional
  Public Service

Bibliography
  Most relevant (not to exceed 10 citations)

33

APPENDIX B

## AVMA-RECOGNIZED VETERINARY SPECIALTY ORGANIZATION
### Annual Report Form

An officer of the recognized veterinary specialty organization (RVSO) indicated below is responsible for completion of this form and its return to the AVMA Education and Research Division by November 1. (NOTE: *The form in this appendix is an example only. AVMA staff will update the dates listed on this form each year and send hard and electronic copies of the updated form to all ABVS representatives no later than September 1.*)

RVSO_____

1.   Number of active diplomates January 1, 2002:                    _____

2.   Change in number of active diplomates:

              Added _____
              Lost _____              Net change    _____

3.   Number of active diplomates December 31, 2002:                  _____

     a. If applicable, number of active diplomates in each specialty:

     Specialty                          Number
     _____        _____
     _____        _____
     _____        _____
     _____        _____
     _____

     b. If applicable, number of diplomates in each subspecialty:

     Subspecialty                       Number
     _____        _____
     _____        _____
     _____        _____

4.   Number of diplomates having a status other than active:

     Honorary _____
     Emeritus _____
     Other (please indicate status and number)
     _____    _____              _____

34

002464

5. Total of all living diplomates December 31, 2002: _____

6. Complete the attached form on Credentialing and Examination Outcomes. Use the most current information for each class of candidates. If your college or board has a specialty or subspecialty, a separate form must be completed for each.

Job (task) analysis, test validation, and criteria referencing (for establishing cut scores) improve the fairness, accuracy, and legal defensiveness of the credentialing examination, and certification of specialists. The following questions (7-11) address these functions.

7. Has your RVSO conducted a job analysis to help substantiate entry-level requirements and examination? If not, is such an analysis planned?

8. How does your RVSO develop examination items? Is a professional examination consultant used? If so, to what extent?

9. How is your examination validated?

10. How do you set the pass point?

11. Have your testing methods been previously established and reported to the ABVS? If not, please describe them as part of this report (e.g., 300 multiple-choice questions). Are candidates notified of the passing point or the method of setting the passing point before the examination?

12. Number of active diplomates primarily associated with:
    a) Academia _____
    b) Industry _____
    c) Government _____
    d) Practice _____
    e) Other (please specify)_____ _____

13. Were changes made to your constitution or bylaws during the year?
    Yes_____ No_____

    If yes, please provide a copy with changes indicated. Deletions should be ~~struckthrough~~ and additions underlined. A "clean" copy of the constitution and/or bylaws must also be provided for ABVS records.

14. Have any complaints been registered with your RVSO against diplomates of your RVSO? _____

    If yes, how many complaints were filed? _____

35

Please attach details.

15. a) Provide the number of training/residency programs available in your discipline, if applicable. _____

b) How many individuals are enrolled in these programs? _____

16. Provide names, addresses, telephone and facsimile numbers, and e-mail addresses for current officers.

17. Describe notable events of the past year.

18. What perceived or anticipated problems will your RVSO face regarding veterinary specialization now or in the future?

19. Has a determination been made of the Federal tax status of your RVSO?_____
If so, what was the determination?

> Tax exempt under 501(c)(3)_____
> Tax exempt under 501(c)(6)_____
> Other_____

Were income tax forms filed with the IRS for the previous year?_____

Will they be filed for this year?_____ If not, why?_____
_____
_____

Name of person completing this form (please print) _____

Signature _____
Date _____

THANK YOU
PLEASE RETURN TO THE AVMA BY NOVEMBER 1.

002466

Name of Recognized Veterinary Specialty Organization, Specialty, or Subspecialty

Date_____

### 6. CREDENTIALING/EXAMINATION OUTCOMES

For this report, candidates are to be grouped together by the year in which they applied for your college/board's certification process. Once your college/board accepts an application for credentials review and examination, the candidate should be classified according to the year of their original application. If the credentials are rejected that year, or the candidate reapplies at a later time, they should still be grouped into the year of their original application. Each year, the information for each class may be updated as additional candidates complete the credentials or examination process, thus providing the most current information available for that class of candidates.

A duplicate of this form should be completed and submitted for each recognized veterinary specialty or subspecialty within your organization.

| Class of Candidates | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|
| 1. Total number of applicants in the class | | | | | | |
| 2. Number of candidates from # 1 completing the credentialing process | | | | | | |
| 3. Credentialing percentage: (#2/#1) x 100 | | | | | | |
| 4. Number of candidates in #2 who presented themselves for examination | | | | | | |
| 5. Number of candidates in #4 who passed the certifying examination and became diplomates. Of those in #5 (*beginning in 2002) | | | | | | |
| a. number successful on first attempt* | | | | | | |
| b. number successful on second attempt* | | | | | | |
| c. number successful on ≥3 attempts* | | | | | | |
| 6. Cumulative pass rate for candidates who submitted applications (#5/#1) = Overall diplomate percentage of the class | | | | | | |
| 7. Cumulative pass rate for candidates with accepted credentials (#5/#2) = Diplomate percentage of credentialed applicants | | | | | | |
| 8. Cumulative pass rate for candidates who took the exam (#5/#4) = Diplomate percentage of those taking the exam | | | | | | |
| 9. Composition of class at initial application: | | | | | | |
| a. number via standard route | | | | | | |
| b. number via alternate route | | | | | | |

002467

## AVMA-RECOGNIZED VETERINARY SPECIALTY ORGANIZATION FIVE-YEAR IN-DEPTH REPORT

### Report Due November 1

Each recognized veterinary specialty organization (RVSO) is required to submit an in-depth review of its status and activities to the ABVS at five-year intervals after full recognition. The in-depth review should be organized according to the following outline.

A.  History and progress of organization

1.  Summarize the history of the RVSO.

2.  Describe how the RVSO:
    a.  Ensures improved veterinary medical services are offered to the public.
    b.  Has a necessary number of potential diplomates to serve a clearly demonstrable need within the profession.
    c.  Represents a distinct and identifiable specialty of veterinary medicine.

3.  Other aspects of the history and progress of the RVSO.

B.  Candidate education, qualification, and evaluation

1.  Describe critical standards for admission to membership including:
    a.  Education, training, and experience.
    b.  The standard residency or route for qualification.
    c.  Alternate route for qualification.
    d.  A summary of deficiencies in credentials that have led to failure to qualify for examination.
    e.  How unsuccessful candidates are advised of deficiencies.
    f.  The time limit for notifying candidates of acceptance or denial of credentials required for examination.
    g.  Other guidelines used to assess candidate qualifications.

2.  Describe educational programs available to potential candidates and indicate how these activities are supported and encouraged by the RVSO.

3.  Examination procedures and policies
    a.  Describe the nature and scope of the examination(s).
    b.  Describe how you ensure that examination questions reflect the professional activities expected of diplomates.
    c.  Describe how examination questions are developed, reviewed, graded, and evaluated.
    d.  Indicate whether and how consultative resources are used.
    e.  Describe the procedure used for establishing the pass point.
    f.  Document the pass/fail experience of candidates with the examination, showing the past ten years of experience.
    g.  List the primary reasons candidates fail.
    h.  List the time limit (in days) for reporting scores to candidates after the examination is administered.
    i.  If you use oral examinations, describe how they are structured and evaluated, and how you strive to maintain fairness and avoid personality conflicts.
    j.  Describe how unsuccessful candidates are advised of deficiencies on examination.

38

002468

      k.    Describe other relevant aspects of your testing program.

  4.   Appeal procedures
      a.    Include the formal appeal procedure used for candidates who receive adverse decisions.
      b.    Include a complete application packet as it is sent to prospective diplomates.
      c.    Include up to three examples of correspondence to and from unsuccessful candidates or
         applicants.

C.   Describe any procedures for recertification of diplomates.

D.   Describe any procedures and policies pertaining to subspecialization and the number of diplomates
     within a subspecialty.

E.   Statement concerning incorporation and liability insurance.

F.   Current employment distribution of diplomates.

G.   Major changes in concepts or policies during the past five years.

H.   Problems perceived and proposed solutions.

I.    Describe any activities outside the scope of the stated objectives of the specialty, including contracts
     or agreements.

J.   Future plans.

K.   Reactions of the profession and the public to the specialty organization.

L.   Financial report.

M.  Copy of current constitution and/or bylaws, with indicated changes, if any, since the last annual report.
     A "clean" copy of the constitution and/or bylaws must also be provided for ABVS records.

39

002469

## AVMA PROVISIONALLY RECOGNIZED VETERINARY SPECIALTY ORGANIZATION
### Interim Report Form

An officer of the recognized veterinary specialty organization (RVSO) indicated below is responsible for completion of this form and its return to the AVMA Education and Research Division by November 1. (NOTE: *The form in this appendix is an example only. AVMA staff will update the dates listed on this form each year and send hard and electronic copies of the updated form to all ABVS representatives no later than September 1.*)

RVSO _____

1. Number of charter diplomates: _____

2. Number of years since provisional recognition. _____

3. Number of active diplomates January 1, 2002: _____

4. Has your RVSO accepted applications for membership? If not, when do you plan to do so?

5. Change in number of active diplomates:

   Added _____
   Lost _____          Net change _____

7. Number of active diplomates December 31, 2002: _____

8. Number of diplomates having a status other than active:

   Honorary _____
   Emeritus _____
   Other (please indicate status and number)
   _____          _____

9. Total of all living diplomates December 31, 2002 _____

10. Complete the attached form on Credentialing and Examination Outcomes. Use the most current information for each class of candidates.

11. Number of active diplomates primarily associated with:
    a) Academia          _____
    b) Industry          _____
    c) Government         _____
    d) Practice           _____
    e) Other (please specify) _____          _____

12. Provide a current copy of your constitution and/or bylaws. If there have been changes in your constitution or bylaws this year, please provide a second copy with deletions struckthrough and

002470

additions <u>underlined</u>.

13. Describe how you ensure that examination questions reflect the professional activities expected of diplomates.

14. Do you provide candidates with a content outline and the format of the exam prior to the exam? If so, provide a copy.

15. Describe how unsuccessful candidates are advised of deficiencies on examination.

16. Provide the time limit (in days) for reporting scores to candidates after the examination is administered. Are examination results sent to all candidates on the same day?

17. Are all unsuccessful candidates informed of their remaining eligibility and reapplication procedures? How?

18.
                                                                         **Standard / Alternate**

   a. Number of residency/training programs existing
      At time of provisional recognition:                               _____/_____

   b. Number of residency/training programs initiated
      this year:                                                        _____/_____

   c. Total number of residency/training programs
      December 31, 2002:                                                _____/_____

   d. Number of individuals in residency/training
      programs January 1, 2002 (if available):                         _____/_____

   e. Number of individuals in residency/training
      programs December 31, 2002 (if available):                       _____:__/_____

Job (task) analysis, test validation, and criteria referencing (for establishing cut scores) improve the fairness, accuracy, and legal defensiveness of the credentialing examination, and certification of specialists. The following questions (19-23) address these functions.

19. Has your RVSO conducted a job analysis to help substantiate entry-level requirements and examination? If not, is such an analysis planned?

20. How does your RVSO develop examination items? Is a professional examination consultant used? If so, to what extent?

21. How is your examination validated?

22. How do you set the pass point?

23. Have your testing methods been previously established and reported to the ABVS? If not, please describe them as a part of this report (e.g., 300 multiple-choice questions). Are candidates notified of the passing point or the method of setting the pass point before the examination?

24. Describe any changes in your examination process occurring this year (e.g., type, validation, committee size).

41

002471

25. Describe any advances in training programs, continuing education, or scientific programs made during the year.

26. Describe any other notable events occurring during the year, emphasizing those that demonstrate progress toward becoming "fully functional" and thus qualified for full recognition.

27. Provide names, addresses, phone and facsimile numbers, and e-mail addresses for current officers.

28. List any perceived or anticipated problems that might interfere with progress toward full recognition within the required time frame.

29. When do you intend to petition for full recognition? _____

30. If a determination has been made of the federal tax status of the organization was it:

        Tax exempt under 501(c)(3) _____
        Tax exempt under 501(c)(6) _____
        Other _____

31. Is there special assistance that your veterinary specialty organization desires from the ABVS?

Name of person completing this form (please print) _____

                       Signature _____

                           Date _____

**THANK YOU**
**PLEASE RETURN TO THE AVMA BY <u>NOVEMBER 1</u>**

42

002472



Exhibit E

Exhibits:  1-13                    Volume 1, Pages 1-209

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

SHEILA LYONS, DVM and HOMECOMING

FARM, INC.,

                    Plaintiffs

v                    Civil Action No. 1:11-CV-12192

THE AMERICAN COLLEGE OF VETERINARY

SPORTS MEDICINE AND REHABILITATION,

INC. and THE AMERICAN VETERINARY

MEDICAL ASSOCIATION, INC.,

                    Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SHEILA LYONS, DVM

Monday, January 15, 2013, 10:11 a.m.

Lawson & Weitzen, LLP

88 Black Falcon Avenue, Suite 345

Boston, Massachusetts

------- Reporter:  Susan J. Blatt, RPR -------

sjb@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

1  BY MR. DICKISON:

2      Q.      Just to talk about the rules of a

3  deposition, very simply, I'm going to ask you

4  questions today.  If at any point in time you didn't

5  understand what I said or didn't hear what I said,

6  would you agree to tell me that so I can rephrase my

7  question and make sure you understand the question?

8      A.      Yes.

9      Q.      Also, just because, as you'll see,

10  because we have a lot of material to cover, once we

11  start engaging in a conversation, the way we

12  normally engage in conversations sometimes means

13  that we give nonverbal answers, we shake our head or

14  you say something is "yea big," and the problem with

15  that is the court reporter needs to transcribe what

16  we're saying with some precision.  So if you can

17  agree to give me verbal answers to the best of your

18  ability, that would be great.  Okay?

19      A.      Yes.

20      Q.      And also I may jump in and remind you

21  that I need a yes or no.  I'm not trying to be mean

22  or to harass you, but I'm just trying to make a

23  better record.  Okay?

24      A.      Okay.

1    Q.        One other quick preliminary matter is

2    that if -- you can take a break at any time during

3    this proceeding if you need to use the restroom or

4    talk to your counsel.  The only exception to that

5    rule really is if I have a question pending, I

6    prefer that you first answer the question and then

7    you can take a break.  I'm sure you have able

8    attorneys that will instruct you how they want to

9    instruct you during the course of the deposition.

10            Let me just ask you to state your full

11   name for the record.

12   A.        Sheila Lyons.

13   Q.        And where do you currently reside?

14   A.        Brockton, Massachusetts.

15   Q.        At what address do you reside there?

16   A.        21 Augusta Avenue.

17   Q.        Is that a residential home?

18   A.        Yes.

19   Q.        And do you reside there with anyone?

20   A.        Yes, I do.

21   Q.        And who do you reside there with?

22   A.        My mother.

23   Q.        And how long have you resided at that

24   address?

1      A.      Off and on for 40 years.

2      Q.      Who owns that home?

3      A.      It's in a trust.

4      Q.      Has your mother always resided at that

5  location as well?

6      A.      No.

7      Q.      Are you the primary caregiver for your

8  mother at this point?

9      A.      Yes.

10     Q.      How old is your mother?

11     A.      82.

12     Q.      Does anyone else reside there except for

13 you and your mother?

14     A.      No.

15     Q.      Are you currently employed?

16     A.      Yes.

17     Q.      And by whom are you employed?

18     A.      I'm self-employed.

19     Q.      And do you own a company by which you're

20 employed?

21     A.      No.

22     Q.      Are you essentially a d/b/a?

23     A.      Yes.

24     Q.      Or a sole proprietorship?

1    A.    Yes.

2    Q.    Could you describe for me what your

3    employment is.

4    A.    I practice veterinary medicine, the

5    specialty of sports medicine and rehabilitation.

6    Q.    That is a full-time occupation?

7    A.    Yes.  If you include my work for

8    Homecoming Farm which calls upon my work as a

9    veterinarian, yes.

10    Q.    If we were just for this moment to set

11    aside the work that you do for Homecoming Farm,

12    could you describe for me approximately how much

13    time you spend on an annual basis with respect to

14    just your practice of veterinary medicine?

15    A.    It varies so much.  It's really not

16    possible to give you a specific answer to that

17    question.

18    Q.    Could you just then describe for me your

19    practice of veterinary medicine as it currently

20    exists?

21    A.    I have private clients for whom I

22    provide consulting services, and they're horse

23    owners, sport horse owners, and those horses move

24    all over the world, and so, as needs arise, I go to

1   where the horses are and provide the services that

2   are necessary.

3      Q.     Are you essentially on call to attend to

4   these clients' needs whenever they may arise?

5      A.     Within the context of what I offer, yes.

6      Q.     And what types of services do you offer

7   and provide to these clients?

8      A.     Proactive sports medicine and reactive

9   rehabilitative medicine.  I do pre-purchase exams or

10   in other ways review records on horses that clients

11   may be considering purchasing.  I help to administer

12   programs for my clients' employees to carry out in

13   the care of these horses.

14      Q.     And approximately how many clients do

15   you have at this point in time?

16      A.     That's really not something that I can

17   give you a number for because it really depends on

18   their needs.

19      Q.     Okay.  Well, do you bill for your

20   services?

21      A.     Yes, I do.

22      Q.     And how often do you bill for your

23   services?

24      A.     Typically within 30 days of whenever I

1    Q.     Do you have a computer database as to

2  the addresses of your clients?

3    A.     No.

4    Q.     And if you were called upon to do so,

5  how would you ascertain how many clients you

6  serviced in the year of 2012, for instance?

7    A.     I would most likely go through my

8  patient records and get the information from those.

9    Q.     And the patient records -- is your

10  veterinary practice exclusively an equine practice?

11    A.     Yes.  I have on rare occasion consulted

12  on other species.

13    Q.     The questioning I'm asking you about now

14  is really -- I'm just trying to get an idea of your

15  current employment and your current practice.  And

16  so do you have any estimate as to how many clients

17  or horses you treated in the year 2012?

18    A.     No.

19    Q.     Can you tell me approximately how many

20  weeks of 2012 you were engaged in your veterinary

21  practice and the administration thereof?

22    A.     No.

23    Q.     Do you keep any time records?

24    A.     Yes, I do.  But those would be patient

1 records.

2 Q. And your patient records for each horse

3 would reflect how much time you spend --

4 A. Yes.

5 Q. -- servicing that horse?

6 A. Yes.

7 Q. Now, my understanding is -- I'll step

8 back for a minute. With regard to your veterinary

9 practice, do you have a doing business name that you

10 bill out as?

11 A. Sheila Lyons, DVM.

12 Q. Do you operate that business or your

13 sole proprietorship out of your home in Brockton?

14 A. Yes.

15 Q. I take it your home in Brockton is not a

16 horse farm; is that correct?

17 A. That's correct.

18 Q. Am I correct it's located near the city

19 center of Brockton?

20 A. Well, it's -- yes.

21 Q. Put another way, you don't have horses

22 trailered to your --

23 A. No.

24 Q. -- business address and never look at

1  them --

2    A.    No.

3    Q.    -- or perform any medical veterinary

4  services there --

5    A.    No.

6    Q.    -- right?  So with regard to your

7  veterinary practice you have to travel wherever the

8  horse is, correct?

9    A.    Yes.

10   Q.    Do you have any clients in

11 Massachusetts?

12   A.    No.

13   Q.    Do you have any clients in New England?

14   A.    It's -- I don't recall the addresses of

15 all of my clients, so I can't offer a definitive

16 answer to that.

17   Q.    Well, with respect to your provision of

18 veterinary services in 2012, is it correct that

19 essentially the time that you would devote to it

20 would include necessarily the travel from Brockton,

21 Mass. to, let's say, Florida?

22   A.    Yes.

23   Q.    And that travel time required to get

24 there, would that be something that you also bill

1  for and consider it part of your veterinary

2  services?

3       A.      I can't offer a yes or no to that.

4       Q.      Again, the purpose for my questioning

5  now is just to figure out how much time you're

6  currently devoting to your veterinary practice, and

7  so I'm just trying to see, did you travel often in

8  2012 with respect to your veterinary practice?

9       A.      Again, with your specific question, I

10  can't answer that.

11      Q.      Did you travel at all in 2012 --

12      A.      Yes.

13      Q.      -- with respect to your veterinary

14  practice?  Let me ask the question a different way,

15  how much did you earn from your veterinary practice

16  in 2012?

17      A.      I don't recall.

18      Q.      Do you keep track of your earnings from

19  your veterinary practice?

20      A.      Yes.

21      Q.      I understand you, like most of us, file

22  federal tax returns and state tax returns; is that

23  correct?

24      A.      Yes.

1     Q.      Are you preparing your state and federal

2     tax returns for the year 2012?

3     A.      No.

4     Q.      Do you have an accountant that prepares

5     your state and federal tax returns?

6     A.      No.

7     Q.      Do you prepare and file those on your

8     own?

9     A.      Yes.

10     Q.      And with respect to 2012, do you have

11     any estimate as to how much you earned from your

12     veterinary practice?

13     A.      No.

14     Q.      Do you know how much you earned in 2011

15     from your veterinary practice?

16     A.      No.

17     Q.      Do you recall -- strike that.

18             Are you claiming in this action that

19     your veterinary practice has been financially

20     affected by the actions of the AVMA?

21     A.      Yes.

22     Q.      How has your veterinary practice been

23     affected in any way by the actions of the AVMA?

24     A.      When the AVMA gave recognition to the

1 defendant's college as a recognized specialty board,

2 it in doing so created the perception in some minds

3 that what my clients knew about my involvement with

4 The American College of Veterinary Sports Medicine

5 and Rehabilitation was in fact not correct. So it

6 damaged my reputation in some minds and caused

7 confusion about that issue.

8 Q. Have you quantified any diminishment in

9 your earnings as a veterinarian with respect to the

10 actions of the AVMA?

11 A. I don't have a specific number.

12 Q. Let me ask you this. Do you know

13 whether your income has diminished since the AVMA's

14 provisional recognition of the college in 2010?

15 A. Yes.

16 Q. How much have your earnings as a

17 veterinarian diminished since 2010 to the present?

18 A. I don't know.

19 Q. At this point I looked at the documents

20 produced and saw there were tax returns produced by

21 Homecoming Farm, but I didn't see any of your

22 personal tax returns. Would you through your

23 counsel agree to produce those personal federal tax

24 returns and state tax returns?

1     Q.      Let me ask you this.  As of the present

2   day, do you offer any educational services under the

3   acronym ACVSMR?

4     A.      Educational services that we offer

5   always spell the full trade name out, but within

6   those educational services then, yes, the acronym is

7   used as well.

8     Q.      And what type of educational services

9   did you provide with respect to either what I'll

10  call the full mark or the acronym in 2012?

11    A.      In 2012 I've done lectures and clinical

12  seminars where patients are presented and then

13  education is offered through the process of

14  evaluating that patient within the specialized

15  services and methods and thought processes that are

16  specific to and that identify this mark.

17    Q.      Okay.  Did you provide -- so in 2012 you

18  provided lectures and seminars?

19    A.      Yes.

20    Q.      And how many lectures did you provide in

21  2012 using the mark, the full mark and the acronym?

22    A.      Again I'd have to look at the records

23  for that.

24    Q.      Do you have any estimate?  Was it one?

1    Was it ten?

2        A.      To the best of my recollection, it would

3    have been approximately ten.

4        Q.      When was the most recent lecture that

5    you provided using the mark?

6        A.      Two weeks ago.

7        Q.      And where was that?

8        A.      Camden, South Carolina.

9        Q.      Where in Camden, South Carolina?

10        A.      At a stable.

11        Q.      And what was the -- was the stable owned

12    by a client of yours or somebody else?

13        A.      No.  I was called in by a school that

14    offers courses for massage therapists, and so we

15    offered a clinical seminar.

16        Q.      How was this event publicized?

17        A.      By the group that invited me and through

18    email.

19        Q.      And who did the publicizing and

20    marketing of this event?

21        A.      Again, that would have been the group

22    that invited me, so that would be -- I'm trying to

23    think of their business name.  I can get that

24    information for you if you'd like.

1    Q.      I have a memory of seeing it.  Was it

2    Saddle something?

3    A.      That's one of their companies.  They do

4    two things.  It's massage therapy, and saddle

5    fitting is something that fits into horses that have

6    muscle problems, so they offer both services.  And I

7    just can't recall the name of their school.

8    Q.      In providing this lecture, was your --

9    either the full mark or the acronym mark used in the

10    publicizing of the event?

11    A.      Yes, both.

12    Q.      And how many people attended this event?

13    A.      About a dozen.

14    Q.      And of those dozen people, what types of

15    people were they?  Were they veterinarians?

16    A.      Massage therapists.  A veterinarian came

17    not officially to the seminar but came to meet me

18    when the report got back that the horse had improved

19    so much.  And just horsemen and farriers.

20    Q.      Were you paid for your attendance at

21    this lecture?

22    A.      No.

23    Q.      And the other ten or so lectures that

24    you had in 2012, were they of the same type of

1    event?

2        A.        Similar.

3        Q.        So the lectures that you provide are

4    essentially for third parties who invite you to

5    speak and lecture about your type of specific

6    specialty of veterinary sports rehabilitation

7    medicine?

8        A.        That's very often what happens, but

9    things have changed so much in the last two years

10   that I'm really trying to sort out just how to go

11   from here because the business of the nonprofit has

12   been so severely impacted.  But, yes, I'd say in

13   2012 that would be correct.

14       Q.        And so was there any lecture that you

15   provided in 2012 of the ten lectures that had more

16   than a dozen people in attendance?

17       A.        I would have to check.  I'd have to look

18   at what my lecture schedule was.

19       Q.        But generally your memory would be that

20   around or approximately a dozen people were

21   attending these ten or so lectures that you gave in

22   2012; is that correct?

23       A.        No, I wouldn't want to commit to that

24   because I'm not sure if during that year I gave any

1    Q.       Would that be some of the PowerPoint

2    items we've seen in addition to the booklets?

3    A.       Yes.

4    Q.       And from how many students did you

5    receive requests for these materials in 2012?

6    A.       Again, I don't have those numbers in

7    front of me, but I would say approximately 25.

8    Q.       Do you provide -- when you say students,

9    what types of students do you provide these to,

10   veterinarian students or students of --

11   A.       Veterinary students, equine studies

12   students, horsemen, farriers, horse owners.

13   Q.       Do you provide these materials to other

14   veterinarians?

15   A.       At times, yes.

16   Q.       Is that, with respect to the educational

17   materials that you have developed under the full

18   mark and the acronym, would that be the exception

19   that you don't often provide them to other

20   veterinarians but provide them to students who are

21   learning about the profession?

22   A.       No, not at all.  The materials will

23   differ, however.  For example, there is no need to

24   include some of the very basic information that I

1  might include for a farrier or for a horseman or a

2  horse owner in materials that I provide for

3  veterinarian colleagues.

4      Q.       Were there any other educational

5  services that you provided in 2012 under the full

6  mark or the acronym that you can recall as you sit

7  here today?

8      A.       Not that I can recall now, no.

9      Q.       What was -- I take it that you didn't

10  receive any income from either the booklets,

11  seminars or lectures --

12      A.       No.

13      Q.       -- in 2012, correct?

14      A.       No.

15      Q.       Would that be fair to say for 2011 as

16  well, you didn't receive any income for the

17  educational services you offered under the full

18  trademark or the acronym in 2011?

19      A.       When you ask about income, are you

20  talking about me personally or the nonprofit?

21      Q.       I'm talking about any income that would

22  have been generated by either the full mark or the

23  acronym, whether it went to you or whether it went

24  to Homecoming Farm or some other party.

1     A.     Okay.  Thank you.  Yes, so that would be

2  in the form of donations and funds received by the

3  nonprofit.  The way we tend to work it is that the

4  fundraising that we do substantially covers the cost

5  of the educational programs that we offer.

6     Q.     I understand the fundraising part of

7  things, and we'll talk about that.  I'm asking

8  strictly about income earned with third parties,

9  either students or audience members or others who

10  would pay you or Homecoming Farm for educational

11  materials.

12     A.     In 2012?

13     Q.     2012, and 2011 for that matter.

14     A.     Again, I'm sorry.  I would have to look

15  at the records.

16     Q.     Do you recall how much you spent on

17  marketing either the acronym or the full mark in

18  2012?

19     A.     Well, I don't recall a specific number,

20  but, for example, simply maintaining the websites is

21  a form of marketing.  Maintaining the domain names.

22     Q.     Absolutely.  How much do you ballpark

23  you spent on maintaining the website?

24     A.     Probably, well, I would estimate between

1   500 and a thousand dollars.

2      Q.     And were there additional amounts for

3   maintaining the servers or is that maintaining the

4   servers and maintaining the domain names?

5      A.     I believe that would be mostly

6   maintaining the domain names and simply purchasing

7   the website.

8      Q.     And in addition to those costs, did you

9   make any expenditures of any sort in terms of print

10   advertising?

11      A.     Not in 2012.  We didn't have the funds

12   to do it.

13      Q.     Did you make any expenditures of print

14   advertising in support of either the full mark or

15   the acronym in 2011?

16      A.     By printing our materials that we use as

17   flyers, then that would I assume be an expense?

18      Q.     Sure.  How much was that, approximately?

19      A.     Again, I'm sorry, I'd have to look at

20   those records.  I would say between 500 and 1,500

21   dollars.

22      Q.     Have you ever made any expenditures to

23   advertise either the full mark or the acronym in any

24   newspaper or magazine or newsletter?

1  A.  No.

2  Q.  Have you ever made any expenditure to

3 advertise the full mark or the acronym in any

4 non-Internet electronic media like television, radio

5 or video?

6  A.  I believe at one point I paid for an ad

7 in The Blood Horse as a listing.  And, I'm sorry, I

8 don't recall the year, but there was a time period

9 when there was a fee for that service.

10  Q.  Okay.  Let me get back to that in a

11 minute.  My question was, have you ever made any

12 advertising expenditure to advertise the full mark

13 or the acronym in any television or radio medium?

14  A.  No.

15  Q.  With regard to The Blood Horse, is that

16 a -- what is The Blood Horse?

17  A.  The Blood Horse is a horse racing

18 industry publication, and it's I believe the most

19 widely distributed publication in this country.

20  Q.  And you believe you placed one

21 advertisement in that publication at some point in

22 time?

23  A.  I believe actually our listing has been

24 in that publication for many years.  And at one

1   point, I don't know whether it's because they

2   required everyone to pay a fee for it or whether I

3   increased the level of service that I was asking

4   them for, but there was a fee for it, yes.

5       Q.     And is there a -- when you say an

6   advertisement, what are you talking about? Like a

7   quarter page advertisement?

8       A.     No. It would be a listing in their

9   directory.

10      Q.     And what would the listing have been

11   offering?

12      A.     Veterinary and -- sports medicine and

13   rehabilitation, educational services, clinical

14   seminars.

15      Q.     And do you recall what time period you

16   would have placed that advertisement?

17      A.     To the best of my recollection, it would

18   have been about 2005 through the present.

19      Q.     With respect to your educational

20   services, where do you offer the seminars

21   physically?

22      A.     It depends on who's hosting it. Until

23   we can create a permanent campus for this, which is

24   the phase we're at right now, then we offer these

1    clinical seminars and lectures at conferences,

2    universities, stables, meeting halls.

3        Q.      At present, you don't have any physical

4    premises for your educational services --

5        A.      No.

6        Q.      -- is that correct?  Would it be fair to

7    say that you don't have any or employ any teachers

8    to provide any services; is that correct?

9        A.      That's correct.

10        Q.      And has that always been the case, that

11    you've never had a physical premises for, a

12    permanent physical premises to offer educational

13    services under either the full mark or the acronym

14    mark?

15        A.      Well, the educational services actually

16    began when I did the research at Homecoming Farm in

17    New Hampshire, but since you're relating to in the

18    name of the full mark, then, no, that would have

19    been a permanent location.  They would have been the

20    predecessor to the courses that we have now, but the

21    mark we didn't use in association with all of those

22    programs until 1995.

23        Q.      And are there any students who are

24    receiving educational services under either the full

1   mark or the acronym at this point in time?

2       A.      Through our seminars, yes.

3       Q.      Do you offer any specific courses that a

4   student can enroll in under either the full mark or

5   the acronym mark?

6       A.      Yes.  And they're organized on an as-we-

7   can-offer-them basis.

8       Q.      How many students were enrolled in a

9   program or educational service offered under the --

10  by you under the full mark or the acronym mark in

11  2012?

12      A.      In 2012 we've had no enrollment in

13  ongoing programs.

14      Q.      What about in 2011, any enrollment in

15  2011?

16      A.      No.

17      Q.      When was the last time you had anyone

18  enrolled in a course under either the full mark or

19  the acronym mark?

20      A.      To the best of my recollection, that

21  would have been preceding the recognition of the

22  college.  It was before our funds essentially

23  disappeared.

24      Q.      Have you -- we've talked about

1   advertising expenditures.  Have you ever engaged a

2   marketing consultant with respect to marketing the

3   full mark or acronym mark?

4        A.        Not to specifically market the mark,

5   but, yes, to market the plan to create a permanent

6   campus for this.

7        Q.        If you look at Exhibit No. 2, one of the

8   questions that we ask in interrogatory number 4,

9   "Please identify all consumer surveys" --

10                 MR. SARROUF:  Which exhibit number?

11                 MR. DICKISON:  Exhibit 2, page 8.

12                 MR. SARROUF:  Your reference is as to

13  which?

14                 MR. DICKISON:  Interrogatory number 4.

15       Q.        We asked you to identify any consumer

16  surveys that you intend to utilize at trial to

17  "demonstrate that the ACVSMR mark has acquired

18  distinctiveness or secondary meaning in the

19  marketplace so that the ACVSMR mark identifies

20  Plaintiffs as the source of educational surveys."

21                 Have you or anyone on your behalf

22  undertaken any consumer surveys with regard to the

23  mark, the full mark or the acronym mark?

24       A.        When you say undertaken, I know that we

1    discovered a survey actually done by the AVMA

2    regarding the employment of veterinarians, and

3    that's broken down into those who have board-

4    certified credentials and those who don't.  But

5    other than that, no consumer surveys.  We haven't

6    conducted any, and at this time I don't know whether

7    or not we'll be conducting those.  That would be

8    left up to experts and attorneys, not me.

9        Q.     Understood.  What I may be clumsily

10   getting at is, in the past, let's say in the past

11   ten years, have you ever gone to a marketing firm or

12   professional consultant and said -- and asked them

13   to conduct a survey to see how many consumers or

14   veterinarians or students of veterinary practice

15   know about the mark or the acronym?

16       A.     No, I've never hired anyone to do that.

17          (Brief recess.)

18          MR. DICKISON:  Back on the record.

19       Q.     Dr. Lyons, do you, with respect to the,

20   I'm calling it the full mark and the acronym, do you

21   allow Homecoming Farm, Inc. to use those marks?

22       A.     Yes, I do.

23       Q.     Is there any document in writing between

24   you and Homecoming Farm that allows Homecoming Farm

1  to use those marks?

2     A.     No, there isn't.

3     Q.     Has there ever been any such document?

4     A.     No.

5     Q.     And are you, with respect to Homecoming

6  Farm, Inc., are you the sole shareholder of that

7  company?

8     A.     Well, there actually aren't any

9  shareholders because it's a nonprofit corporation.

10 Sometimes I've heard it referred to as a nonstock.

11 So there are no shareholders.

12    Q.     And are you the president of that

13 company?

14    A.     Yes, I am.

15    Q.     Have you always been the president of

16 that company?

17    A.     I believe in the early years, no, we

18 rotated.

19    Q.     And when you say "we," did you have

20 other employees or officers?

21    A.     There are board members, yes.

22    Q.     Tell me about Homecoming Farm, Inc.,

23 when was that founded?

24    A.     Well, it was incorporated I believe in

1  1992.  However, the work began in 1989.

2      Q.      Who founded the company?

3      A.      Well, I did, but there was a -- my

4  co-founder was a board member as well.

5      Q.      And who was that?

6      A.      June Gilch.

7      Q.      And who was she?

8      A.      June is an educator and someone who

9  brought to the project not only an understanding of

10 horses, but she came with the understanding of -- as

11 an education administrator.

12     Q.      And is she a veterinarian?

13     A.      No.

14     Q.      What was her occupation by trade?

15     A.      As an education administrator.  She had

16 been the assistant superintendent of schools for

17 Attleboro, or it may be one of the Attleboros, and

18 also for Nantucket.  And on Nantucket, I don't want

19 to misspeak, whether she was the assistant

20 superintendent or something roughly equivalent to

21 that.

22     Q.      How was it that you two became involved

23 with Homecoming Farm, Inc.?

24     A.      I met June immediately upon graduation

1    from Tufts, because we kept horses at the same farm

2    in Massachusetts.  While I was -- actually, it was

3    while I was a veterinary student in my last year at

4    Tufts.  So June understood that I not only had a

5    unique background because of the human medicine

6    training, she understood that essentially as I

7    graduated, I was entering the profession and I was

8    beginning my practice with some specific questions

9    that I knew both as a horseman, as someone who had

10    been employed by veterinarians as an assistant, as

11    someone who had just undertaken four years of

12    veterinary school, so that I knew what the standard

13    was, what the expectations were in practice.

14          So we would discuss how I hoped that the

15    education that I had received in human medicine

16    would become a resource for sorting out some of the

17    problems that we both agreed horses often suffered

18    from, sport horses, and that these are problems that

19    are very often career-ending and sometimes life-

20    ending because, quite frankly, if you're a horse and

21    you can't do your job, very often you lose your

22    life.

23    Q.     So for what purpose was Homecoming Farm,

24    Inc. formed, for educational purposes?

1     A.     For education, for research, and to

2    improve the conditions for both horses in general

3    veterinary medicine and to educate the public and to

4    provide -- to develop new services that would serve

5    the public through not only improved veterinary

6    services but through a number of related services.

7     Q.     Has there ever been a time where

8    Homecoming Farm, Inc. owned any actual farm or real

9    estate?

10     A.     No.

11     Q.     It was incorporated in the state of New

12    Hampshire for what purpose?  Why New Hampshire?

13     A.     Because I had a farm in New Hampshire at

14    the time.

15     Q.     Did Homecoming Farm, Inc. own an

16    interest in that farm?

17     A.     No.

18     Q.     Was it related to the farm?

19     A.     It did not own any interest in it, no.

20     Q.     From 1989 to approximately 1995, who

21    were the individuals that conducted the business of

22    Homecoming Farm, Inc.?

23     A.     Could you be a little bit more clear

24    about "conducted the business"?

1     Q.     Sure.  Well, let me ask you to tell me,

2  with respect to Homecoming Farm it had a slate of

3  officers, president, treasurer and clerk.  Is that

4  correct?

5     A.     It had a president, vice president,

6  secretary and treasurer.

7     Q.     Who were those individuals during this

8  time period of 1989 to 1995?

9     A.     I would have to look at the records and

10  tax returns, things like that, where those would be

11  listed.

12     Q.     Were you one of those individuals?

13     A.     Yes, I was.

14     Q.     Were there any employees of Homecoming

15  Farm during that time period?

16     A.     No.

17     Q.     Have there ever been any employees of

18  Homecoming Farm, Inc.?

19     A.     No.

20     Q.     Has Homecoming Farm, Inc. ever owned any

21  real estate?

22     A.     No.

23     Q.     Has it ever owned any significant

24  assets --

1     A.     No.

2     Q.     -- of any type?  Has it always been

3 located at -- with a principal office at your

4 address in Augusta Ave., is it, in Brockton?

5     A.     No.  It had as its address the New

6 Hampshire address first and then Brockton subsequent

7 to that.

8     Q.     At what time did its address move to

9 Brockton?

10     A.     To the best of my recollection,

11 approximately 1997, somewhere close to there.

12     Q.     Did its --

13     A.     No.  Excuse me.  I'm sorry.  I'm getting

14 my years mixed up.  I'm sorry.  I have to look at

15 the records for that.  I just --

16     Q.     That's all right.  Let me ask you this:

17 Currently Homecoming Farm, Inc., its principal

18 business address is Augusta Ave. in Brockton?

19     A.     That's its mailing address, yes.

20     Q.     Does it have any other places where it

21 conducts business other than Brockton,

22 Massachusetts?

23     A.     Well, it conducts its business all over

24 the world.

1      Q.      How does it conduct its business all

2   over the world?

3      A.      By providing the educational seminars,

4   through the research that has been done.

5      Q.      And are those educational seminars

6   provided through you on behalf of Homecoming Farm,

7   Inc.?

8      A.      In most cases, yes, but.

9      Q.      Is there any other individual, natural

10  person who carries out the activities of Homecoming

11  Farm, Inc. currently other than you?

12     A.      I have a research partner and

13  educational partner in California, Michael Savoldi.

14     Q.      And he does work on behalf of Homecoming

15  Farm, Inc.?

16     A.      At times, yes.

17     Q.      Is he an employee of Homecoming Farm,

18  Inc.?

19     A.      No.

20     Q.      Is he compensated for his work by

21  Homecoming Farm, Inc.?

22     A.      No.

23     Q.      What services does he provide for the

24  benefit of Homecoming Farm, Inc.?

1     A.       Well, Michael Savoldi is a professor

2 emeritus from Cal Polytech Pomona.  So I first met

3 Michael when I wanted to study the pathology of

4 horses' hooves.  I see only the live animal, so I

5 needed to have some questions answered that could

6 only be answered by doing dissections, and Michael's

7 name came up as by far the best person in this

8 country.  So we began to collaborate on the research

9 of Homecoming Farm while he was at Cal Poly Pomona.

10         And when he retired from that academic

11 career, he founded the, and again, forgive me, I may

12 not get this name right, I believe it's the Equine

13 Research Center in Shandon, California.  So what

14 Michael has done over the years is he has taken some

15 of our students and offered education through doing

16 dissections at his center and also by sending our

17 students out into the field so that they can get

18 some clinical training in a variety of skills.

19     Q.       Is there anybody else in addition to

20 Michael who provided services for Homecoming Farm,

21 Inc. in the year 2012?

22     A.       Oh, in 2012, no.

23     Q.       Did Michael provide any services for

24 Homecoming Farm, Inc. in 2012?

1    of the membership, so I never opted for them.  It

2    was part of the membership, so, yes, that would have

3    been when they stopped.

4        Q.    Do you subscribe to any other

5    professional journals other than the AVMA at the

6    present time or during this time period after 2004,

7    2005 when you stopped getting the journals from the

8    AVMA?

9        A.    I would need, if it's possible to find

10   this on records, maybe just from looking at old

11   journals, I would need to know which ones I had

12   through memberships in which years.  But I know that

13   I receive the PM&R journal.  And, again, it's during

14   that time period through 2012, but I can't be sure

15   if it was each year.  And with some of my

16   memberships I opt for the electronic version of the

17   journal rather than getting it in print.

18       Q.    What is the PMR?

19       A.    PM&R.  Physical Medicine and

20   Rehabilitation.

21       Q.    Who publishes that journal?

22       A.    It comes with your membership with the

23   American Academy of Physical Medicine and

24   Rehabilitation.

1    Q.      Is that a human organization or is --

2    A.      Yes, it is.

3    Q.      And you're a member of that

4   organization?

5    A.      I'm renewing my membership right now,

6   but yes, I have been.

7    Q.      But historically have you been a member

8   in the past?

9    A.      Yes.

10    Q.      Let me just ask you about your

11   professional licensure.  What licenses do you

12   currently have?

13    A.      I currently have Florida, Kentucky,

14   Vermont.

15    Q.      How long have you had those licenses for

16   each state?

17    A.      Florida, I believe it was the first part

18   of 1986.  Kentucky -- and actually in Florida there

19   was a -- you had like a permit because they didn't

20   let veterinary students take the exam while they

21   were still in school.  So there was a period between

22   when you took the exam and they found the results

23   where you're able to practice under -- I don't know

24   if they call it a permit, but some structure.  So

1  that would have applied before the early part of

2  '86.  Kentucky, I'm sorry, I don't remember whether

3  that preceded Florida or was roughly at the same

4  time.  Vermont came later.  It would have been in

5  the, I think early '90s.  But, again, I need to

6  check records.  I'm sorry.

7      Q.      You're currently licensed in those three

8  jurisdictions?

9      A.      Yes.

10      Q.      Is the reason you're licensed in Florida

11  and Kentucky because they're centers for horse

12  racing and horse caring?

13      A.      Yes, that's where they're stored.

14      Q.      I was trying to avoid that myself.  But

15  I walked right into it.

16              Why not any licensure in Massachusetts?

17      A.      Because there's no real need for my

18  services in Massachusetts.  It was never my

19  intention to practice here.

20      Q.      So basically you provide your services

21  primarily in Florida and Kentucky?

22      A.      And as a consultant all over the world,

23  including this country.

24      Q.      As do you as a consultant provide a

1    different service than a veterinarian would?

2        A.      They're veterinary services that I offer

3    consulting services in, but they would be different

4    than perhaps what you may be getting from the

5    attending veterinarian, the primary veterinarian who

6    provides for the horse locally.

7        Q.      I understand you travel to the Middle

8    East to serve clients; is that correct?

9        A.      Yes, I do.

10       Q.      And would it be fair to say that there's

11   an attending veterinarian already there who's

12   licensed in that jurisdiction?

13       A.      Yes, I think so.

14       Q.      I take it -- are you licensed in those

15   Middle Eastern jurisdictions you travel to?

16       A.      No, no.

17       Q.      Do you have to essentially operate in a

18   consulting capacity because you're not licensed in a

19   jurisdiction?

20       A.      I get called in by horse owners, and so

21   I'm able to provide simply consulting services

22   there, yes.

23              MR. DICKISON:  Do you want to take a

24   break now?

1          (Lunch recess.)

2              AFTERNOON SESSION

3    BY MR. DICKISON:

4        Q.      We are back on the record after lunch.

5              So, Dr. Lyons, can you tell me with

6    respect to the mark we're here about today, The

7    American College of Veterinary Sports Medicine and

8    Rehabilitation and your acronym, when did you first

9    adopt that mark?

10       A.      That would be in 1995.

11       Q.      And just tell me, I know you've given

12   us -- we've marked Exhibit 2, and I'm not trying to

13   trip you up, but I just want to hear more in your

14   own words, could you tell me briefly how did you

15   come up with that mark?

16       A.      Well, okay.  The mark itself, the words

17   were chosen because they were perfectly descriptive

18   of the educational programs, the research that our

19   organization had organized, if you will, within its

20   mission, its objectives, its plan for the future.

21              So the reason that it was decided upon

22   and chosen officially in 1995 is that I hired a

23   fundraising consultant, a development consultant for

24   some assistance in helping me to organize materials

1   that would be used to fund our programs.  So part of

2   the advice that I was given, and it was really just

3   homework that I was given, was to break our projects

4   down into distinct projects that the reader of the

5   document would be able to easily go to if that was

6   something that they had a particular interest in.

7            So The American College of Veterinary

8   Sports Medicine and Rehabilitation was chosen to be

9   the name of our educational and research programs

10  because the void that we were filling through the

11  programs and services and continued work of this

12  segment of Homecoming Farm, it was a void in the

13  services that are available worldwide in veterinary

14  medicine.

15           And it's not just that sports medicine

16  and rehabilitation had been -- had not yet been

17  developed as distinct specialties, but it was a much

18  deeper meaning than that, and this is where I relied

19  upon my training in human medicine, all of the

20  research that I had done for many years, and

21  actually the thought process that I started to

22  develop in 1980 when I first met my physician

23  colleagues at Tufts.

24           So the reason that I linked sports

1    medicine and rehabilitation was because, while

2    neither was well developed in vet medicine, sports

3    medicine could not be developed further without the

4    simultaneous development of rehabilitation, and

5    rehabilitation really applied in veterinarian

6    medicine more predominantly with animals that have a

7    higher purpose.  Whether it's a sports horse or an

8    agility dog or a dog that you just throw a Frisbee

9    for or a police horse, that, while those aren't

10   technically all sports, it relates to medicine that

11   is applied with a knowledge of a higher function.

12          So it was my understanding through

13   applying and sort of reworking what I had learned in

14   human medicine and doing quite a bit of research to

15   figure out how with my veterinarian patients I could

16   go from A to B as we do in human medicine and what

17   was missing.  So the trade name was not only

18   perfectly descriptive, it precisely represented what

19   needed to be addressed and developed in veterinary

20   medicine, that I realized because of my work

21   internationally in sports medicine and

22   rehabilitation,.

23          I had wonderful clients; straight out of

24   veterinary school, I had clients that had me work on

1  horses that were in the Triple Crown, horses that

2  were in the Olympics.  In 1986 I was an official

3  veterinarian at the world championships for dressage

4  in Toronto.  So it gave me a unique advantage

5  because, despite being a new graduate, I had the

6  kind of clients who enabled me any time I needed to

7  call in the textbook rider; I could call in the head

8  of the veterinary school for a particular patient.

9  I could create facilities as needed.

10           So this luxury that I had through the

11  incredible gift of having these unique kinds of

12  clients and these wonderful horses to work on made

13  it very clear to me that it wasn't just because I

14  was a new graduate that the problems that these

15  horses were continuing to experience and the --

16  where veterinary medicine fell short was due to this

17  lack of service being available.  And it's not just

18  a service.  It's the understanding.  You have to ask

19  the right questions.

20           So the trade name grew out of that

21  rather complex understanding of what was needed to

22  be created in order to improve veterinary medicine,

23  improve services that were offered to the public in

24  order to improve animal welfare, in order to improve

1  safety in these horse sports, not only for the

2  horses, but riders get killed when these horses

3  break down on race tracks. So that was the reason

4  for the choice of that name.

5          And it was chosen, as I began by saying,

6  in 1995 because at that point I had enough

7  experience teaching. I had an idea of how that

8  needed to be done. I had an understanding of, you

9  know, of some of the methods and practices that were

10  transferring very successfully. So I was at a point

11  where I was ready to offer something.

12     Q.     Now, with respect to the adoption of

13  this mark, in your answer you were referring to

14  "we." Are you referring to Homecoming Farm, Inc. in

15  using the mark in relation to its services?

16     A.     I would have to know exactly where I

17  said "we" to know what I was referring to. I'm

18  sorry.

19     Q.     All right. Fair enough. Let me ask you

20  this: In terms of, you mentioned it was, the mark

21  was perfectly descriptive of the services you were

22  offering at that time in 1995. What types of

23  services were you offering at that time in 1995?

24     A.     Educational services. This is when I

1    started programs at equine rescue organizations.

2    One of the most difficult things about teaching

3    clinical skills with horses, and this is a challenge

4    that veterinary schools have, is that I can't allow

5    a student to come along and practice their

6    techniques on a client's horse.  If it's a private

7    patient of mine and I have a relationship with that

8    client, then my responsibility is the ultimate well-

9    being of that horse and that care can only be

10   delivered by the best people, the best team that I

11   can put together.

12            So when you want to teach a veterinary

13   student in that setting, and this is very often what

14   happens at vet schools, the veterinary student

15   pretty much stands in the background and gets to

16   watch and hand you things, but they don't get to

17   develop the skills.  And the particular skills that

18   go along with this new service are not the kind of

19   skills that can be developed quickly or easily.  It

20   comes with a thought process that needs to be

21   applied.  These generally take far longer.

22            Let me give you an example.  You want to

23   teach a --

24      Q.       I'm sorry.  What are you giving an

1   example of?

2       A.      Of something that would be taught, and

3   this goes to why this unique name and our unique

4   educational programs at the time of --

5       Q.      I'm looking for what was actually done,

6   though.  One thing I'm a little concerned about, not

7   to interject.  It sounds like in 1995, I know from a

8   lot of documents you produced and the allegations

9   you made in the case, that you came up with the

10  concept and you put it down in the document, The

11  Equine --

12      A.      Excellence Initiative.

13      Q.      And so I know at some point you thought

14  out all of these ideas, put pen to paper; but my

15  question is when were you actually either through

16  yourself individually or through Homecoming Farm,

17  Inc., when were you actually offering to other

18  veterinarians or other people these educational

19  services under the mark?

20      A.      1996 then.

21      Q.      Okay.  Could you just tell me about

22  that; meaning in 1996, were you holding seminars,

23  were you distributing materials?  What were you

24  actually doing that had the mark associated with it?

1    A.    Yes.  Again, forgive me for having to

2    give this answer again, but the years in my mind

3    kind of all meld together, so if I could give you an

4    answer and if we could agree that this relates to a

5    more general time period.

6    Q.    It's your memory, and I understand,

7    doing a lot of this, I know I'm asking you to relate

8    something that happened a long time ago.  Please

9    just do the best you can.  We understand you're

10   working within the limits of human memory.  So go

11   ahead.

12   A.    Thank you very much.  I gave lectures at

13   colleges.  I gave clinical seminars.  I provided

14   educational opportunities for students at equine

15   rescue organizations because, as I was probably

16   going off on too much of a tangent there, that

17   provides a wonderful situation for teaching

18   veterinary students because the horses are not

19   privately owned and the horses are all in great need

20   of all of the services that we offer and the

21   organizations never have any money.  So during this

22   general time period, I would have had students of

23   all types at equine rescues.

24         And in this period as well, I was

1    if they were essentially servicing only

2    veterinarians or certifying only veterinarians?

3         A.       Yes.

4         Q.       And was it your understanding that the

5    AVMA would only recognize a veterinarian specialty

6    organization that was a nonprofit?

7         A.       I need a little bit of clarity here.

8    Are you asking this question based on what I

9    believed after my conversations before this 2003

10   or -- because we're looking at a 2003 document and

11   yet that information that you're asking me about

12   came from conversations that happened several years

13   before.

14        Q.       Okay.

15        A.       So there's --

16        Q.       That's a fair statement.  Without

17   belaboring the point, what did you know at the time

18   you went to the conference at which you met Dr.

19   Gillette, what did you know were the requirements --

20   the essential requirements for becoming a recognized

21   veterinary specialty organization by the AVMA?

22        A.       Just that you -- one had to fulfill the

23   specific guidelines set forth by the AVMA, and that

24   depending on when an organization requested

1   consideration for recognition would define which

2   particular guidelines were in place at that time.

3       Q.     Okay.  So after you met with Dr.

4   Gillette, what happened next in terms of this --

5   your dealings with him and the desire to achieve the

6   recognition of a veterinary specialty organization

7   by the AVMA?

8       A.     Dr. Gillette contacted me after he

9   received the materials that I sent to him and was

10   very enthusiastic about the way that I had compiled

11   the information and -- that described the plan, the

12   elements that went into it, and he said that he very

13   much wanted to join my effort.

14       Q.     In your mind, what was your

15   understanding with Dr. Gillette as to what you two

16   were doing at that point?

17       A.     My understanding was that by reviewing

18   the materials and through our discussions about it

19   by telephone that Dr. Gillette reviewed my plan and

20   agreed that the plan that I was presenting and

21   proposing that would now be shaped into a form, for

22   lack of a better word, that the AVMA would require

23   in an application that the substance of that plan,

24   that the intention, the structure, was something

1  that he agreed with and would not want to make any

2  substantial changes to, no changes in substance.

3      Q.      What was the next step, then, after Dr.

4  Gillette basically provided you with his agreement

5  as to what you had to do next in order to achieve

6  recognition?

7      A.      We needed more members for this

8  committee.

9      Q.      And how did you go about doing that?

10     A.      I suggested Dr. Hilary Clayton, and so

11 we both agreed to go up and meet with her.

12     Q.      And where was she located at that time?

13     A.      In Michigan.

14     Q.      And did you travel and visit with her?

15     A.      Yes.

16     Q.      And what was the substance of that

17 conversation?

18             MR. KLUFT:  I'm sorry to interrupt, so I

19 don't have to go over the same ground, could I ask

20 you to ask her about the timing of this event?

21     Q.      What was the timing of that event when

22 you met with Dr. Clayton?

23     A.      I was just trying to think of that

24 myself.  I know that quite a bit of time went by

1  after Dr. Gillette said that he definitely wanted to

2  join my effort, because I remember at one point

3  contacting him and saying, you know, I know you're

4  very busy, but I'm going to go forward with this.

5  So if you want to be a part of it, then now is when

6  we're going forward.  And he was able to clear his

7  schedule.  And I'm trying to be responsive to the

8  question about timing, and I believe it's either in

9  the documents that I produced, but...

10      Q.      It's fine if you don't know.

11      A.      Somewhere in here.  Maybe it's 2003.  I

12  just don't know the timing for that meeting.

13      Q.      Let me ask you a couple of questions.

14  When you essentially got agreement with Dr.

15  Gillette, did you two have an agreement as to or an

16  understanding as to what the organization was going

17  to be called at that time?

18      A.      Well, the understanding that we had was

19  that the organizing committee was going to represent

20  Homecoming Farm, American College of Veterinary

21  Sports Medicine and Rehabilitation, so that the name

22  would be the same as our project's name, but that it

23  would be the committee that went forward to provide

24  the element of not only the AVMA recognition but

1    also to, you know, implement the discussion of it

2    through veterinary schools and things like that.

3       Q.      Was there an understanding between you

4    and Dr. Gillette, or at least on your part at that

5    time, that the name American College of Veterinary

6    Sports Medicine and Rehabilitation would be allowed

7    to be used by the organizing committee?

8       A.      Under the strict circumstances that it

9    be the project that I was going forward with.  So

10   the name was only allowed to be used in connection

11   with my educational project.

12       Q.      Okay.

13       A.      So if they chose to join my committee to

14   do this step of getting AVMA approval, then they had

15   permission to use it in that connection.

16       Q.      Let me ask you this.  Did you ever have

17   any written agreement about the use or your allowing

18   the use of the name by the organizing committee?

19       A.      No.  Just the agreement that it was, the

20   organizing committee was representing my work.

21       Q.      Was that --

22       A.      But not written.

23       Q.      Nothing in writing?

24       A.      Nothing.

1    Q.        Was there ever any exchange of email
2   between you and Dr. Gillette or you and any other
3   doctor that ultimately came on the organizing
4   committee on this subject?
5    A.        Not that I recall, but it's a long time
6   ago.
7    Q.        And you don't -- in your production you
8   haven't -- my understanding from your testimony
9   earlier today is you didn't save your emails from
10  that time period.
11   A.        That's correct.
12   Q.        You're not aware of any emails that
13  would document the terms and conditions upon which
14  the organizing committee could use the name.  Is
15  that right?
16   A.        That's correct.
17   Q.        If I understand your testimony
18  correctly, you don't believe there was ever anything
19  in writing, by email, formal agreement or anything
20  on that subject?
21   A.        That's correct.
22   Q.        So basically the terms and conditions by
23  which you allowed the mark to be used by the
24  organizing committee was an oral agreement between

1    you and Dr. Gillette?

2         A.        Well, you know, that's not really true,

3    because the written communications that we had

4    through email about this project and certainly the,

5    all of the documents that I had shared that was our

6    work product all clearly defined the term as being

7    the project of Homecoming Farm.  So there were no

8    signed agreements, if I was hearing that as being

9    your specific question.  But there were certainly

10   written, lots of written material that asserted in

11   many different ways that this is and -- was and

12   would continue to be a project of Homecoming Farm.

13        Q.        Isn't it by the ABVS guidelines a

14   requirement that ultimately a separate nonprofit

15   corporation in the name of veterinary specialty

16   organization be incorporated?

17        A.        Yes.

18        Q.        Wasn't it your understanding that

19   ultimately at the end of this process that the name

20   of the recognized specialty veterinary organization

21   was going to be The American College of Veterinary

22   Sports Medicine and Rehabilitation, Inc.?

23        A.        Most likely, yes.

24        Q.        And wasn't it your understanding and

1   expectation that the name American College of

2   Veterinary Sports Medicine and Rehabilitation, Inc.

3   would no longer be able to be utilized by Homecoming

4   Farm, Inc.?

5       A.      Oh, absolutely not.  As a matter of

6   fact, quite the opposite.  And that's why I went

7   through our nonprofit's attorney in order to ask for

8   his help to create the initial legal documents, and

9   the agreement that he provided with that was -- made

10  it very clear that he was being retained on behalf

11  of Homecoming Farm in order to create a new

12  nonprofit organization for Homecoming Farm.

13      Q.      Who was that attorney again?

14      A.      Paul, is it Feinberg or -- it's in the

15  discovery documents.

16      Q.      It might have been in the complaint as

17  well, right?

18      A.      Yes, I think it may have been.

19      Q.      I remember seeing that.  So after you

20  met with Dr. Clayton, she agreed to come into the

21  organizing committee?

22      A.      Yes.

23      Q.      And can you recall in substance what

24  that meeting was like between -- was it you, Dr.

1  Sports Medicine and Rehabilitation that had been

2  developed as a project of Homecoming Farm would

3  remain as it was in integrity, in its intention.

4      Q.      What I was interested in, what did you

5  mean by you wanted the organizing committee to

6  represent Homecoming Farm?  Was there a reason why

7  in your mind Homecoming Farm couldn't itself be the

8  organizing committee?

9      A.      Well, the AVMA wouldn't have allowed

10 that.

11     Q.      And so you needed the organizing

12 committee to facilitate recognition of the specialty

13 organization you were trying to achieve?

14     A.      I needed to form an organizing committee

15 for our project that would have the makeup that

16 would be -- meet the criteria of the AVMA, yes.

17     Q.      You would agree that the makeup of

18 Homecoming Farm, Inc. didn't meet the necessary

19 requirements to allow it to become a recognized

20 veterinary specialty organization by the AVMA?

21     A.      I'm not sure I understand the question,

22 "the makeup of."

23     Q.      Sure.  You would agree with me that the

24 corporate structure and additional activities and

1   operations of Homecoming Farm, Inc. would not meet

2   the requirement of the AVMA to allow it to recognize

3   it as a veterinary specialty organization?

4       A.      That's correct, and that's why I had our

5   attorney help to draft new articles of incorporation

6   so that we could incorporate our project and it

7   would meet those requirements.

8       Q.      What I put before you as Exhibit 6 is an

9   email that was produced by the college from Dr.

10  Gillette to you and others.

11      A.      Yes.

12      Q.      And I'm going to ask you, do you recall

13  receiving this email?

14      A.      I don't.

15      Q.      Do you believe that you did receive this

16  at the time it was purportedly sent on December 30

17  of 2002?

18      A.      I'd like to read it before.

19      Q.      Absolutely.

20      A.      Thank you.

21              (Pause.)

22      A.      Yes, this certainly could have been.

23      Q.      Well, does this refresh your memory that

24  in or around December 30, 2002 Dr. Gillette informed

1  you that he had been working on a letter of intent

2  and also creating a single information source for

3  everybody to view progress and air opinions?

4         A.      Actually, I knew before this about the

5  letter of intent because I had made contributions to

6  it from the start.  He and I discussed the letter of

7  intent before it began, so as I take this at face

8  value, this is an email sent to the whole of the

9  committee.  But Dr. Gillette and I would have

10  already discussed some changes to that letter.

11         Q.      Okay.  Understood.  I'll talk about that

12  in a moment.  But did you -- does this refresh your

13  memory that on December 30th, 2002 that Dr. Gillette

14  put information concerning the ACVSMR on a website

15  he controlled and the web address was

16  www.sportsvet.com/ACVSMR?

17         A.      I agree that is likely to be true.  I

18  don't remember that specifically, but I do remember

19  that he posted it somewhere.

20         Q.      Do you agree that you approved of that

21  web page at that time by Dr. Gillette?

22         A.      No, I wouldn't have had access to that

23  web page because that was I believe during the time

24  when I was in England.

1    Q.        Did you ever view this page created by

2    Dr. Gillette for the purpose of the organizing

3    committee's activities?

4    A.        Not that I recall, but I wouldn't be

5    able to recall that.

6    Q.        When you learned that Dr. Gillette had

7    put on a web page information under the mark

8    American College of Veterinary Sports Medicine and

9    Rehabilitation, were you okay with that?

10   A.        As I sit here, I'm remembering more a

11   phone conversation that I had with him about this,

12   and sure, it was fine.  And Dr. Gillette was acting

13   to -- or he was offering to sort of pull the

14   materials that, you know, we were beginning to

15   assemble together.

16   Q.        Right.

17   A.        And that was fine with me.  But since I

18   already had input into the materials directly with

19   him, then...

20   Q.        I take it this was the first time ever

21   that the name, to your knowledge, that the name or

22   mark American College of Veterinary Sports Medicine

23   and Rehabilitation had actually been put on the

24   Internet; is that correct?

1      A.      Yes, that's Zack March.

2      Q.      He was the AVMA representative?

3      A.      He taught the course.

4      Q.      Did he specifically help you registering

5 this domain name, ACVSMR?

6      A.      I believe he did, yes.

7      Q.      Okay.  It appears from your production

8 of documents that we don't have that registration

9 information.  Do you know why?

10     A.      I do.  And I went on whatever that

11 service is where you, you know, look up who owns

12 something, and when it only went back to this date,

13 I contacted them, and asked if I could find the date

14 that I had previously registered it, and they said

15 if it was transferred and if it wasn't continuously

16 maintained, then it would be a brand-new name in

17 terms of the system.

18         And back then I believe there was a high

19 fee for transferring a domain, not like now where

20 they'll give you a free year if you do it.  There

21 was either a fee to do it, but there was a reason

22 that I wanted to switch to Go Daddy, which I'm sure

23 was price, and so I let those domains expire and

24 immediately picked them up as soon as they were

1   available.  But when I contacted whatever that

2   service is, they said that that record would not be

3   available.  And obviously it had not been with Go

4   Daddy, so it's not part of their records.

5        Q.     Let me ask you this.  When do you

6   believe you did -- do you remember what year you

7   believe you first registered these domains?

8        A.     I believe it was '01.

9        Q.     Is it fair to say that even though you

10  registered those domains in '01 you never took the

11  next step of creating a web page and putting

12  material online?

13       A.     That's correct.  I didn't have a

14  computer.

15       Q.     So would it be fair to say that Dr.

16  Gillette putting the mark on his website in December

17  of 2002 would have been likely the first time that

18  the name or mark American College of Veterinary

19  Sports Medicine and Rehabilitation actually went

20  online?

21       A.     That may be true.

22       Q.     What prompted you to re-register, as

23  evidenced by Exhibit 7, on January 2nd, 2003?

24       A.     To re-register?

1    Q.    Well, according to this documentation

2  you produced, a registration of some sort was made

3  by -- was created on January 2nd, 2003.

4    A.    Yes.

5    Q.    And so my question to you is what

6  prompted you on that date -- did you even own a

7  computer at that point in time, January 2nd, 2003?

8    A.    I know I did in '02, so that could have

9  been.  I may have gotten it for Christmas, who

10  knows.

11    Q.    Do you know why on that particular date

12  you took the action of registering the websites

13  ACVSMR.org and ACVSMR.com?

14    A.    I believe it was related to when the

15  domains had expired and then I would re-up them with

16  a different provider.

17    Q.    Was it -- did Dr. Gillette's email of

18  December 30, 2002 in which he represented to

19  everybody on the organizing committee at that point

20  in time that he was putting this name on the

21  Internet have any part in prompting you to go out

22  and register these two domain names that are

23  exhibited in Exhibit 7?

24    A.    No, I owned them.  I owned the name, so,

1    no.

2    Q.      Were you registering these names

3    ACVSMR.com and ACVSMR.org for the benefit of the

4    organizing committee?

5    A.      No, I was registering them because they

6    were the acronym for the name of the project of the

7    nonprofit organization that was happy to have the

8    other members on the organizing committee to seek

9    recognition.

10    Q.      In any event, you had no objection to

11    Dr. Gillette's website at that time, did you?

12    A.      No, I didn't.  Well, not the fact that

13    he created a page for the organizing committee's

14    use, no.

15    Q.      And you had no objection to him using

16    the name and mark on his website, right?

17    A.      On the website maintained for the

18    purpose of our committee.

19    Q.      Right.

20    A.      That's correct.

21    Q.      And you testified before that you and

22    Dr. Gillette jointly prepared the letter of intent;

23    is that correct?

24    A.      Yes.

1    Q.       And were you the one who did the initial

2  draft?

3    A.       No.  I believe the initial draft

4  actually came from Dr. Sabin, which offered the most

5  basic kind of structure because, again, we were

6  following with AVMA guidelines and there are even

7  guidelines about the letter of intent.

8    Q.       Did you have -- we already discussed

9  that you had a conversation with Dr. Park and

10  another conversation with Dr. Sabin.  And that was

11  before you even met Dr. Gillette, correct?

12    A.       That's correct.

13    Q.       All right.  Subsequent to your meeting

14  with Dr. Gillette, when was the next time you had

15  any communication with anybody from the AVMA?

16    A.       I don't know the timing.  I know that I

17  spoke with Dr. Sabin at least a couple of more

18  times.

19    Q.       Do you remember the substance of those

20  conversations?

21    A.       Not at this time.

22    Q.       Would it be fair to say that the

23  conversations were at least generally about the

24  process of getting a veterinary specialty

1  paragraph, so everything but the final paragraph.  I

2  remember sending him sections like this, and then

3  over time we came up with the final draft for the

4  letter of intent.

5      Q.      Now, let me show you what's been marked

6  as Exhibit 10, and I'll represent to you that that's

7  the actual letter of intent received by the AVMA

8  that was in its records that we produced.  And I

9  want you to look at that document and let me know if

10  you had any role in drafting any portion of it?

11      A.      This is all part of the same documents,

12  all the pages?

13      Q.      Yes.  The CVs and everything.  I can

14  represent to you, as best I know, that's what the

15  AVMA gave me as their business records to produce in

16  this case.

17      A.      I think I'm ready to take you through

18  it.

19      Q.      Okay.  Do you agree that that's the

20  document that was actually submitted to the AVMA on

21  behalf of the organizing committee?

22          MR. LYONS:  If she knows.

23      A.      I don't know because what I do recall is

24  that this was the last time I saw the letter, and I

1   see that there's been an addition in the first

2   paragraph here.

3       Q.      Okay.

4       A.      So I don't know, but if we got it from

5   you.

6               MR. LYONS:  And just for the record, she

7   was pointing to Exhibit 9.  So the record is clear,

8   and the lawyers are right about that, when you

9   indicate to an exhibit or point to something, make

10  sure that you mention it so the record is clear.

11  You were pointing to Exhibit 9 --

12              THE WITNESS:  Yes.

13              MR. LYONS:  -- as the document you last

14  saw; is that correct?

15              THE WITNESS:  That's correct.  I'm

16  sorry.

17      Q.      That's all right.  Do you generally

18  understand that a letter of intent was submitted to

19  the AVMA in January of 2003 by the organizing

20  committee?

21      A.      Yes.

22      Q.      And you agreed and consented to the fact

23  that a letter of intent be submitted in January of

24  2003 to the AVMA for the recognition of a specialty

1   organization in veterinary sports medicine and

2   rehabilitation?

3       A.      Yes.

4       Q.      And you at that time agreed and

5   consented that the name of the organization to be

6   recognized would be called The American College of

7   Veterinary Sports Medicine and Rehabilitation?

8       A.      Yes.

9       Q.      And why was it that Dr. Gillette was the

10  one signing the letter of intent and actually

11  submitting it and not yourself?

12      A.      Dr. Gillette asked me if I would agree

13  to name him as the chair of the committee.  He

14  explained that it would help him a great deal in his

15  desire to advance in his career at Auburn, and in

16  particular in academia, so when we were in Michigan,

17  he asked me if I would please allow him to be the

18  official chair.  So that's why his name was on this

19  letter.

20      Q.      Okay.  Now, with respect to this

21  document, there's the names and credentials --

22      A.      Yes.

23      Q.      -- of the various members.  And you

24  agree, do you not, that you were one of the original

1    members of the organizing committee?

2        A.      Yes, I was.

3        Q.      And do you recall that your credentials

4    were to be submitted on January 2003 to the AVMA?

5        A.      I don't recall the dates, and I do

6    recall the credentials were going to be submitted.

7        Q.      With respect to your own credentials, do

8    you see on Bates number 1811 that you were

9    represented as holding a Ph.D.?

10       A.      Yes, I do see that.

11       Q.      And on page 1812, it says you were --

12   represents UMass/MIT joint program, Ph.D., 1981.

13       A.      Yes.

14       Q.      Did you submit those credentials?

15       A.      No, I did not.

16       Q.      Do you know how they came to be part of

17   the submission?

18       A.      Dr. Gillette -- first of all, I was

19   unable to receive attachments and, in many cases,

20   even emails when I was in England because at this

21   time all of England was, or at least where I was,

22   was only on dial-up.  And at one point I received

23   something, I can't remember the source, and it was

24   in the form of an attachment, and that crashed the

1  contributed to the materials, and I said all of the

2  materials were produced by me.

3       Q.      And do you remember what the materials

4  were that you provided to him at that meeting?

5       A.      Let's see.  It would have -- based on

6  the meeting agenda, it would have been the letter

7  from Attorney Feinberg, it would have been a, I

8  believe there would have been articles of

9  incorporation and bylaws and a curriculum, and I

10 believe that the Equine Excellence Initiative was

11 included at least for the members of the committee

12 that had not yet received it.  And I recall bringing

13 that document to Michigan with me, so that would

14 have left Dr. Nunamaker, Taylor and Blythe and Dee.

15 And how many of the other copyrighted documents that

16 were used in the creation of the bylaws and the

17 description of the ACVSMR, I don't remember

18 specifically which ones were included, but some

19 were.

20      Q.      Do you remember at the conclusion of the

21 meeting what the next steps or plan was with respect

22 to the organizing committee getting recognition from

23 the AVMA?

24      A.      I believe it would be the polishing up

1    of the articles of incorporation and bylaws to make

2    sure that they included all the things that the AVMA

3    required, and we had adjourned, I believe, to Dr.

4    Dee's hotel suite to continue the meeting and he

5    reviewed the materials that I had up until that

6    point --

7         Q.      Did you --

8         A.      -- as I recall.

9         Q.      Did you have any further conversations

10   with Dr. Dee as to what the next steps would be or

11   what the AVMA's position was on anything?

12        A.      Not that I specifically recall, but we

13   certainly discussed the process in general.

14        Q.      Now, after that meeting, is it safe to

15   say that the next substantive event was the meeting

16   in Philadelphia?

17        A.      Yes.

18        Q.      Did you do anything with regard to

19   moving things forward with getting recognition

20   between the Chicago meeting and the Philadelphia

21   meeting?

22        A.      Yes.

23        Q.      What did you do?

24        A.      I continued to develop the articles of

1  incorporation and bylaws, inserting the curriculum

2  in the bylaws, which I can't recall right now

3  whether or not I had done that before the Chicago

4  meeting or whether that's something that I did

5  between Chicago and Philadelphia.

6      Q.      Between the time of the Chicago meeting

7  and the Philadelphia meeting, did you have any

8  further communications with anyone at the AVMA?

9      A.      Not that I recall.

10     Q.      Now, at the meeting in Philadelphia, did

11 you ever meet with any representative of the AVMA

12 concerning the -- either your status or the

13 recognition of the ACVSMR?

14     A.      Are you asking if I had a one-on-one

15 meeting?

16     Q.      Either way.  Did you have any -- yeah,

17 let me ask you that first.  Did you have a

18 one-on-one meeting with anyone from the AVMA?

19     A.      No.

20     Q.      Okay.  Did you have a different kind of

21 meeting with anyone from the AVMA?

22     A.      Yes.

23     Q.      Okay.  Tell me what that was.

24     A.      Well, that would have been the meeting

1  itself for the organizing committee, and the Dr. Dee

2  that I met in Chicago was present at that meeting.

3      Q.     Okay.  And which Dr. Dee do you believe

4  was present at the Chicago meeting -- I mean the

5  Philadelphia meeting?

6      A.     I believe it was Jon Frederic Dee, but I

7  have never even seen a photograph of Larry Dee.

8      Q.     How do you know that Dr. Dee was present

9  at that meeting?

10      A.     Because I saw him.

11      Q.     And what did that Dr. Dee observe with

12  respect to any action taken by the organizing

13  committee as to you?

14          MS. KLIEMAN:  Are you in Philadelphia

15  now?

16          MR. DICKISON:  Yes.  This would be in

17  July of 2004 in Philadelphia.

18      A.     Well, Dr. Dee would have been part of

19  the group that met in secret that told me that they

20  had just discussed me.  He would have been present

21  when Dr. Gillette explained that I was to be removed

22  from the committee because of improper fundraising.

23  And he explained that I was to be removed from the

24  committee because there had been some complaints

1  from some horse owners in Massachusetts.

2           And when I asked for the substance of

3  that concern -- if I recall, I explained I've never

4  done any improper fundraising, because I've been

5  fundraising for Homecoming Farm since 1995, and it

6  was Dr. Gillette who had specifically asked me if I

7  could possibly raise funds in order to pay his wife

8  to be a secretary to him as chair of the committee.

9  So the fundraising that I did on behalf of the

10  committee was at Dr. Gillette's direct request.  And

11  I believe I explained that when he said that I was

12  improperly fundraising and that the decision had

13  been made previously that there wouldn't be any.  It

14  was the opposite.

15           And so when they moved on, or Dr.

16  Gillette moved on and said, well, we have these

17  complaints from owners in Massachusetts and I asked

18  him to name who they were, to explain the nature of

19  the complaint or whatever the information that he

20  was getting and to allow me to respond because I

21  assured him I had done nothing wrong, and at that

22  point Dr. Gillette just didn't look up, and he

23  literally just like -- I don't know how to describe

24  this.  Okay.

1     He just gestured as if "I don't want to

2  hear this." And I said you can't do this. This is

3  my committee. Every document that has been produced

4  that this committee is now organized to bring

5  forward, every one of them is my intellectual

6  property. These are my copyrighted documents. You

7  know, you can't remove me from the committee and

8  still keep this.

9     So I believe at that point they left the

10 room and came back and said that it was a unanimous

11 decision that I was to recuse myself. And I said

12 I'm not recusing myself from anything. I want to be

13 heard. You're making some vague accusations against

14 me. I don't even know what this is, and yet I'm

15 supposed to accept that my 25 years of work, you

16 know, isn't now going to progress. And that was it.

17 There was no -- I believe Dr. Taylor at one point,

18 this was before they left the room, he said

19 something like, "Well, you should want to resign

20 just for the good of the committee." And that's

21 when I said, "It's my committee."

22    Q.    Let me just back you up for a minute.

23 This meeting occurred on July 26th, 2004?

24    A.    I don't recall the specific date, but

1    that sounds right.

2        Q.      And do you remember the place of the

3    meeting that this all happened?

4        A.      Yes, I do.

5        Q.      Where was it?

6        A.      At New Bolton -- excuse me.  At

7    University of Pennsylvania at the veterinary school,

8    somewhere in the small animal hospital, I believe.

9        Q.      Do you remember what conference room or

10   what classroom facility it occurred in?

11       A.      No.

12       Q.      Had you ever been there before?

13       A.      No.

14       Q.      Have you ever been there since?

15       A.      No.

16       Q.      Do you remember what time of day the

17   meeting occurred, all of this activity occurred?

18       A.      I believe it was late morning.  I recall

19   getting a message.  I had to drive down from Boston.

20   I'd arrived from England literally to pick up my car

21   and drive to Philadelphia.  And somewhere after

22   coming back to the country, I believe, I recall

23   being told that the meeting was now being moved.  I

24   could have gotten that message after I arrived at

1  the hotel that night prior to the meeting.  So the

2  meeting had been moved to a slightly later time, and

3  the explanation that I was given was that someone

4  couldn't get in or whatever.  For scheduling.

5          So I recall going up to the room, and of

6  course I've come all the way down, I've come back

7  from England just for this.  So I'm there probably

8  20 minutes early, and I don't expect anyone to be

9  quite that early.  And then I'm there.  In five

10 minutes it's going to start and in two minutes it's

11 going to start, and I'm thinking I must be in the

12 wrong room.  Everybody's coming from far away.  How

13 could I be the only one sitting in this room and

14 it's two minutes to start time?  And that's when

15 they all filed in together.

16    Q.     And when you say "they all filed in

17 together," who specifically do you recall being

18 there?

19    A.     I recall Dr. Gillette, Dr. Blythe, Dr.

20 Taylor, Dr. Nunamaker, Dr. Clayton, and Dr. Dee.

21    Q.     Did Dr. Dee say anything or do anything

22 during this meeting or activities?

23    A.     I don't recall anyone with the exception

24 of Dr. Taylor saying anything once Dr. Gillette

1    explained what this was all about.

2       Q.     And you did understand at that time that

3    Dr. Dee was not on the organizing committee,

4    correct?

5       A.     Yes.  That's correct.

6       Q.     Your understanding was that Dr. Dee's

7    role was he was a liaison from the organizing

8    committee, from the AVMA to the organizing

9    committee, correct?

10       A.     Yes.  And on that point, going back to

11    the meeting in Chicago when Dr. Gillette explained

12    about Dr. Dee, because of course I asked, "Who is

13    this guy?  If he's canine, perhaps you know him."  I

14    couldn't expect to know him.  And he said, well, you

15    know, he has a big practice in Hollywood, Florida,

16    and he wasn't very complimentary about the quality

17    of veterinary services that he offered.

18            And I said, "Well, who cares?  He's the

19    AVMA liaison.  He's here to help just sort of make

20    sure that we dot the Is and cross the Ts and get the

21    petition on the right size paper and whatever the

22    AVMA requires."  And he said, "Well, he's going to

23    expect to become a charter diplomate in exchange for

24    giving us a smooth ride through the process and

1    answers are not completely responsive or overly

2    responsive.

3            MR. LYONS:  They may not be what you

4    want to hear.  It depends on which side of the table

5    you're sitting on.

6            MR. DICKISON:  I'm happy to hear the

7    answer to my question, but not -- with all due

8    respect, I know this case is important to you.  I

9    know what happened to you.  You have a very keen

10   perspective on it.  But I don't think one of the

11   relevant subject matters is whether or not someone

12   is going to be grandfathered in or not on this

13   particular organization, at least from my

14   perspective.  So I know that's an important issue.

15   I know you have strong feelings on it.  And I'm just

16   trying to get to the ground I need to cover.

17           MR. LYONS:  Mark, you've been very

18   courteous.  I'm not saying anything here was

19   intentional.  For both of you, because you're kind

20   of getting into a dialogue, it might be helpful if I

21   just cautioned both of you to let him finish his

22   question and he'll let you finish your answer.

23           MS. KLIEMAN:  And the objective fact is

24   it's getting late.

1      MR. DICKISON:  It is.  I'm going to take

2  a break in a couple of minutes, but let me try to

3  close out this part of it.

4      Q.      Did you -- with respect to the AVMA, I

5  understand your testimony here today was that from

6  at least January of 2003 to July of 2004 you either

7  directly or Dr. Gillette indicated that you were

8  part of the organizing committee for the veterinary

9  specialty organization that was to be named American

10  College -- I'm going to get this all botched up

11  again -- The American College of Veterinary Sports

12  Medicine and Rehabilitation and you were consenting

13  to the use of that name and mark for this

14  organization, correct?

15      A.      Again, when you say "for this

16  organization," in my mind, that suggests that they

17  are an independent discrete entity, and so that's my

18  only concern about answering it.

19      Q.      Without holding you to whether -- let me

20  ask you from the perspective -- would you agree with

21  me that between the time period of January 2003 and

22  July 2004 that you had, either by endorsing the

23  letter of intent that was generally filed or by

24  direct communications, had directly or indirectly

1 communicated to the AVMA that you wanted this

2 organizing committee to be recognized, this

3 organizing committee having the name American

4 College of Veterinary Sports Medicine and

5 Rehabilitation, you wanted it to be recognized at

6 the AVMA?

7     A.    As long as you add that it would include

8 my name as well, then yes.

9     Q.    What do you mean by that, that you would

10 be one of the founding members?

11     A.    Yes.  Absolutely.  I would really be the

12 founding member.

13     Q.    And that was what you had told the AVMA

14 either directly or indirectly up until July of 2004?

15     A.    Directly or indirectly, I'm just not

16 sure I understand what the scope of that is.

17     Q.    Well, let me ask you the question

18 another way.  Since you walked out of that meeting

19 in Philadelphia, have you ever informed the AVMA

20 that you were objecting to the recognition of the

21 organizing committee chaired by Dr. Gillette and

22 objecting to it being a recognized veterinary

23 specialty organization?

24     A.    No.

1     Q.      Would you agree with me that the first

2  time that the AVMA received a communication from you

3  that you objected to their recognition of the

4  veterinary specialty organization that is headed by

5  Dr. Gillette and using the name American College of

6  Veterinary Sports Medicine and Rehabilitation was

7  when you filed this lawsuit?

8     A.      Excuse me.  Is your -- if you could just

9  repeat it.

10     Q.      I can understand why you might have a

11  problem with that question.

12             Would you agree with me that the first

13  communication by you or on your behalf that was made

14  to the AVMA stating that you objected to its

15  recognition of the veterinary specialty organization

16  headed by Dr. Gillette known as The American College

17  of Veterinary Sports Medicine and Rehabilitation was

18  when you filed this lawsuit?

19     A.      Yes.

20     Q.      Do you recall that in October of --

21  strike that.

22             Do you recall that at some point in time

23  the AVMA published in its journals an opportunity

24  for public comment to comment upon whether or not

1 the AVMA should recognize the specialty organization

2 chaired by Dr. Gillette and having the name of

3 American College of Veterinary Sports Medicine and

4 Rehabilitation?

5     A.      I had no knowledge of that notice and

6 would not have received it because I no longer

7 receive the journals and so I would not have been

8 aware of that and, no, I was not aware of that.

9     Q.      Did you ever receive an email from

10 anybody in the veterinary community about the fact

11 that the AVMA was making a call for public comment

12 about the recognition of the specialty organization

13 proposed by Dr. Gillette and using the mark that you

14 allege you own?

15     A.      No.

16     Q.      Do you have any colleagues of yours in

17 the veterinary community that have since become

18 members or diplomates of the college chaired by Dr.

19 Gillette?

20     A.      Well, they're all colleagues. We're all

21 veterinarians.

22     Q.      True. I guess a better question would

23 be do you have a personal relationship or social

24 relationship with other veterinarians who have now

1   or earlier become members of the college chaired by

2   Dr. Gillette?

3       A.      Not that I'm aware of.

4               MR. DICKISON:  Let me take a break.

5               (Brief recess.)

6               (Marked, Exhibit 13, Infringement AVMA

7   packet of documents.)

8   BY MR. DICKISON:

9       Q.      Let's go back on the record.  You

10  mentioned when we were on the break that you might

11  have misheard me or not understood the question and

12  wanted to complete an answer.

13      A.      Yes.  Thank you.  The question was to

14  whether or not I had informed in any way the AVMA

15  about the events at the Philadelphia meeting,

16  something about that.  And the response that I gave

17  you was structured for whether or not I had

18  essentially written them or contacted them myself,

19  but in my opinion the AVMA was already well

20  informed, and the reason is because their

21  representative was in the room, their representative

22  heard my objections, heard what I was requesting as

23  a process in that room, and so that's why I didn't

24  turn around and call the AVMA.  According to

1   the suit because this has just destroyed the

2   business opportunity of everything that I have

3   worked for for 25 years.

4       Q.      My understanding is that Homecoming

5   Farm, Inc. is a nonprofit.

6       A.      Yes.

7       Q.      So that, although there might be some

8   opportunities lost of that entity, that financially

9   that wouldn't affect you personally.  Isn't that

10  correct?

11      A.      No, I would disagree with that.  Let me

12  give you one example.  I'll try to be concise.

13  Homecoming Farm is currently organizing to fundraise

14  to purchase a property in Florida that we, after all

15  these years, after 20 years of looking for a

16  property that is literally adjacent -- which is key

17  for our purpose -- to one of the best Thoroughbred

18  training centers in the world and has access to all

19  the other horse sports, we're fundraising to create

20  our main campus there, and it will be a campus for

21  research, for education, and for clinical services.

22  So if I am not a diplomate, if I am now not a

23  specialist in this field that I created, then that

24  completely changes our ability not only to create

1   the center but in the perception in the public of

2   the value of the services that we offer.  So it's

3   affected me that way.

4       Q.     But how does that result in a financial

5   loss to you personally?

6       A.     Okay.  And so the financial loss to me

7   personally is that by being recognized as the person

8   who created this hybrid of, you know, not only

9   interdisciplinary with the sports medicine and

10   rehabilitation but interspecies by bringing the

11   standards from human medicine to this, had this been

12   recognized according to plan, then I would have been

13   recognized as the founding diplomate of this

14   college.  It would have empowered the continuation

15   of Homecoming Farm's work and, for example, this

16   center.  But I leave that and I go out into the

17   commercial world where I offer a private veterinary

18   practice to my regular clients and to new clients

19   who are seeking services for this.

20          So by not being recognized as the

21   founder of something that I created and to be frozen

22   out of even having access to that, then that

23   completely changes the economic power that I have,

24   the business opportunity of my practice, because

1    before I started this organizing committee, no one

2    else was a diplomate in this, so we were all even.

3    But that has been changed and that completely

4    changes my economic opportunities.

5                    Here are some other opportunities --

6    Q.         Can you tell me what specific

7    opportunities that you've lost as a result of the

8    AVMA's infringement?

9    A.         The ability to apply for academic

10   appointments and associations, the ability to have

11   publications received and to receive research

12   funding for some studies that I've done.  You know,

13   I testified before Congress on a problem that is

14   killing the horse industry because it's killing the

15   horses, and I'm having a hard time getting funding,

16   and part of it is I'm not a specialist.  I'm neither

17   an academic nor am I a diplomate of anything.

18                   So when those grant proposals -- it's

19   like applying for a position at Harvard where they

20   go by GPA.  They go by the letters after your name.

21   So the fact that not only do I not have these

22   letters but that there are 27 people out there who

23   didn't even take a test who have those letters after

24   their name, that's how I've been harmed.  They

1  didn't take anything away from me, but put a horse

2  in this room, please.  Let me show you what this is

3  all about.  I would love to do that.  But the

4  marketplace comes because of the credentials.

5      Q.      I understand what you're saying in

6  theory, but in practice how are you going to prove

7  to a jury that I lost X amount of dollars because

8  the AVMA didn't recognize an organization that I was

9  a part of and recognized somebody else?

10      A.      Respectfully, it's early, and having

11  gotten, what was it, 15,000 pages of documents

12  within the last week, eight days to review as best I

13  could to prepare for this deposition, we will get

14  there.

15      Q.      All I'm pointing out, in your answer to

16  interrogatories -- I know we're getting close to my

17  promised time here -- I understood your damages

18  calculation to be based essentially on, and I'm

19  oversimplifying here, but:  I put many hours of work

20  into my ACVSMR project over the years, I have a

21  billing rate of X, and if you multiply all the time

22  I put in against my billing rate in doing all of

23  this work, that's the value that I've basically

24  lost.  Is that a fair summary?



Exhibit F

Volume:    I

Exhibits: 1-17 19-44

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 1:11-cv-12192-WGY

- - - - - - - - - - - - - - - - - - - - - - - - x

SHEILA LYONS, DVM and HOMECOMING FARM, INC.,

Plaintiffs

vs.

ROBERT GILLETTE, THE BOARD OF DIRECTORS OF THE

AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE

AND REHABILITATION, INC. and THE AMERICAN

VETERINARY MEDICAL ASSOCIATION, INC.,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF ROBERT GILLETTE

Tuesday, January 29, 2013 - 10:16 p.m.

Klieman & Lyons

115 Broad Street - 4th Floor

Boston, Massachusetts

Reporter:  Maureen J. Manzi, CSR, CLR

1      Q.   Okay.  With that, would you please state

2   your full name for the record?

3      A.   Robert L. Gillette.

4      Q.   And what is your current residential

5   address, sir?

6      A.   909 Bibb Avenue.

7      Q.   I'm going to ask you to speak up just so

8   that -- I know we're recording this and we have

9   microphones all over the place here, but if you keep

10  your voice up, it would I think help the, not only

11  the reporter and myself, but also the record.

12     A.   I'm fighting a cold a little bit.  So I may

13  not be able to be real loud but I'll do my best.

14     Q.   I understand.  We're all doing our best

15  here.  Everybody has the flu.

16          Tell me a little bit about yourself.

17  Can you tell me, where were you born and where did

18  you grow up?

19     A.   I grew up in Western Kansas.

20     Q.   And how old are you, sir?

21     A.   53.

22     Q.   Are you married?

23     A.   Yes.

24     Q.   And what's your wife's name?

1     A.  Diana.

2     Q.  Do you have any children?

3     A.  Two.

4     Q.  And what are their ages?

5     A.  One's 20 and one's 12.

6     Q.  And what's your current occupation, sir?

7     A.  Veterinarian.

8     Q.  And where are you employed currently?

9     A.  I'm employed at the Specialty Center in

10 Chicago.

11    Q.  Is that the name of the business, Specialty

12 Center?

13    A.  Veterinary Specialty Center.

14    Q.  Okay.  And what's the address of this

15 Veterinary Specialty Center?

16    A.  I don't know the physical address.  I know

17 it's in Buffalo Grove.  I just moved there.

18    Q.  And what do you do, sir?

19    A.  I'm a veterinarian.

20    Q.  Well, can you tell us, do you specialize in

21 any area of practice?  What actually are your duties

22 and responsibilities at Veterinary Specialty

23 Services?

24    A.  I'm the -- I oversee the sports medicine and

1    rehabilitation service.  And we have multiple tasks

2    related to that job.  It includes both clinical work

3    and consultant work with different detection dog

4    groups around the country.  I work with the

5    government quite often.

6        Q.  This may save us some time, Dr. Gillette.

7    I've had premarked as Exhibit 1 a document entitled

8    Curriculum Vitae Robert L. Gillette, DVM, MSE.  I'm

9    going to pass this to you and ask you if you can

10   identify it, sir.

11       A.  What would you like me to identify?

12       Q.  Can you identify that document?  Is that a

13   copy of your Curriculum Vitae?

14            MR. KLUFT:  I would just ask the witness

15   to read through each page before answering the

16   question.

17       Q.  And I'll represent to you.  As you can see

18   in the lower right-hand corner, this was produced to

19   us by The American Veterinary Medical Association.

20   And it appears to be a copy of a Curriculum Vitae

21   that perhaps you provided to the AVMA at some point

22   in time.  And so with that in mind, I'd just ask you

23   to flip through it and tell me if it looks like

24   maybe your CV.  As I said, it may save us some time.

1    A.   Yes, this appears to be a copy of my CV.

2    Q.   Okay.  Now, I know you've only had a chance

3  to glance through it.  Do you know when roughly this

4  particular Curriculum Vitae was prepared?

5    A.   Well, let's see.  I guess I could go off the

6  last --

7    Q.   Was it in 2011 or 2010?

8    A.   I'd say it's after 2008.

9    Q.   Okay.

10   A.   That's when the latest publication is on

11 there.

12   Q.   Okay.  Accepting publications and accepting

13 your new position in Chicago, are there any other

14 significant, either positions of employment or

15 academic appointments or degrees that you have

16 earned since this CV was prepared that are not

17 included on it?  And again, I'm not talking about

18 recent publications or anything like that.  I'm just

19 looking for big things like academic degrees,

20 appointments or positions of employment.  And if so,

21 just tell us what they are.

22   A.   I don't think it lists my last position at

23 Auburn University from an academic position.

24   Q.   Okay.  Can you tell us what that was,

1 please?

2     A.   Associate Professor of Research.

3     Q.   Did you say Associate Professor of Research?

4     A.   Yes.

5     Q.   Okay.  And what department was that, sir?

6     A.   Anatomy, Pharmacology and Physiology.

7     Q.   All right.  Other than that, no other

8 significant positions or academic appointments,

9 correct?

10     A.   Yes, there is more.

11     Q.   All right.  Tell us what they are, if you

12 can.

13     A.   This lists me as Director of the Sports

14 Medicine Program and I later became Director of the

15 Animal Health and Performance Program.

16     Q.   And is that at Auburn University?

17     A.   I'm sorry.  Could you hear that?

18          COURT REPORTER:  No.

19     A.   It's Director of the Animal Health and

20 Performance Program at Auburn University.

21     Q.   In between the time that you left Auburn

22 University and became employed at Veterinary

23 Specialty Services in Chicago, was there any interim

24 position or did you go directly from Auburn to

1 Chicago?

2     A.  I left Auburn and went to Chicago.

3     Q.  Okay.  How long were you at Auburn

4 University?

5     A.  Approximately 15 years.

6     Q.  And other than the position that you've

7 described that is omitted from this Curriculum

8 Vitae, does the Vitae basically describe the various

9 positions and appointments that you held at Auburn

10 University?

11     A.  I don't think it lists that I was Assistant

12 Professor before I became Associate Professor.

13     Q.  Okay.  Why did you leave your position at

14 Auburn University?

15     A.  The position at Auburn University had

16 changed.  It went from a research clinical active

17 position to where I spent most of my time in

18 administration.

19     Q.  And I take it then that it was your decision

20 to voluntarily leave Auburn University?

21     A.  Yes.

22     Q.  Did your leaving your position at Auburn

23 have anything to do with matters in this case?

24     A.  Not that I know of, no.  No.  Sorry.

1  while back, when I say a while back, it had been a

2  few years ago, and I remember us discussing that,

3  you know, instead of just sports medicine we should

4  add rehabilitation.  And I agreed that sounds like a

5  good idea.  And so we looked up and we saw most of

6  the colleges were American College of something.  So

7  we said, well, let's call ourselves American College

8  of Veterinary Sports Medicine and Rehabilitation.

9      Q.  Were you aware at that time that Dr. Lyons

10  had created the name of American College of

11  Veterinary Sports Medicine and Rehabilitation and

12  actually had been using it in publications since

13  1996?

14      A.  I was not aware of that.  She did not

15  mention that.

16      Q.  When's the first time you became aware of

17  that, is that in this case?

18      A.  Aware of the -- say it again.

19      Q.  That Dr. Lyons had created and had been

20  using the name The American College of Veterinary

21  Sports Medicine and Rehabilitation since 1996 in

22  publications.

23          MR. KLUFT:  I'm going to object to that,

24  but you can answer.

1    A.  I did not know that until all this case came

2  up.

3    Q.  So it's your testimony that, independent of

4  the fact that Dr. Lyons had been using this name in

5  documents, including the Equine Excellence

6  Initiative that had been distributed and published

7  since 1996, independent of the fact that she had

8  been using that exact name, it's your testimony that

9  in October of 2002 you and Dr. Clayton and Dr. Lyons

10  independently somehow came up with and created this

11  name a second time?

12              MR. KLUFT:  Continue to object.

13              MR. DICKISON:  Objection.

14              MR. KLUFT:  You can answer.

15    A.  We were there at the table and we came up

16  with the name.

17              THE VIDEOGRAPHER:  Excuse me, Steve.

18  Can we go off the record to change tapes?

19              MR. LYONS:  Sure.

20              THE VIDEOGRAPHER:  We're going off the

21  record to change tapes.  The time is 11:39.  End of

22  Tape No. 1.

23              (Off the record.)

24              THE VIDEOGRAPHER:  We're back on the

1    record.  This is the start of Tape No. 2.  The time

2    is 11:49.

3        Q.  Okay.  Doctor, when we I think left off we

4    were talking about your description of the Michigan

5    meeting, and we had just I think been talking about

6    how you and Dr. Clayton and Dr. Lyons you believe

7    came up with this name at the Michigan meeting.  Can

8    you tell us anything else about that process that

9    you haven't mentioned that you can recall today?

10       A.  About the name at the meeting.

11       Q.  About coming up with the name.

12       A.  At the time it wasn't, you know, it wasn't a

13   big, complicated thing.  We talked about names and

14   we discussed different ways to describe it.  So I

15   said, well, it looks like most of these colleges are

16   making college of, making College of Veterinary

17   something, and so let's --.

18       Q.  Okay.  What else can you tell us about the

19   Michigan meeting that as you sit here today you

20   recall but haven't mentioned?

21       A.  Well, we I guess kind of discussed, you

22   know, where to take the next step.  We decided we'd

23   contact some other individuals.  We decided to go

24   ahead and develop a committee and we decided to

1   head. But I know that that is a process that's --

2   it's up to the organizing committee and the charter

3   diplomates to determine.

4      Q. So the charter diplomates get to decide

5   whether or not they're going to take the test, is

6   that fair?

7          MR. KLUFT: Objection to the form.

8      A. In that context you could probably say yes.

9      Q. I can definitely say yes. You get to decide

10  as a member of the organizing committee, as a

11  charter member of the organizing committee you get

12  to decide whether or not you're going to take the

13  test?

14        MR. KLUFT: Objection.

15     A. Yes.

16     Q. And are you aware of other RVSOs where

17  everyone is required to take the test?

18     A. I think there is some.

19     Q. Can you tell me the names?

20     A. I think the dental college did.

21     Q. Any others?

22     A. I don't remember off the top of my head.

23     Q. Now, one of the things the AVMA requires you

24  to do, that is the organizing committee to do in

1    order to be recognized as an RVSO, is to create a

2    not-for-profit corporation.  Is that correct?

3        A.  Yes.

4        Q.  And that's one of the things that you as an

5    organizing committee had to do in this particular

6    case when creating the RVSO for this medical

7    specialty?

8        A.  That's correct.

9        Q.  And you created a corporation in the State

10   of Colorado, correct?

11       A.  Yes.

12       Q.  And the name of that corporation is the same

13   name as Dr. Lyons' registered trade name?

14              MR. KLUFT:  Objection.  You can answer.

15       A.  It's The American College of Veterinary

16   Sports Medicine and Rehabilitation.

17       Q.  And can you recall when you created that

18   Colorado corporation, doctor?

19       A.  I think it was 2010.  It was during that

20   same time we started.

21       Q.  If I suggested to you it was April 12th,

22   2011, does that sound correct?

23       A.  That could be right, yeah.

24       Q.  Now, doctor, I want to -- when I say you in

1   this particular case, I'm actually referring to you

2   personally.  Did you have anything personally to do

3   with the incorporation of a Colorado corporation?

4   Did you serve as a member of the Board of Directors

5   or in any capacity?

6       A.  Yes.  I was president.

7       Q.  Do you continue to be president of that

8   corporation?

9       A.  No.

10      Q.  When did you leave the position of president

11  and who is president now?

12      A.  Hilary Clayton is president now.  And I

13  left, must have been sometime in 2011.

14      Q.  Now, you created this.  And when I say you,

15  I'm talking about the college.  The college created

16  this corporation in Colorado after you had received

17  the cease and desist letter, correct?

18      A.  Yes.

19      Q.  And it was after Dr. Brandt's e-mail raising

20  concerns about use of the trade name, correct?

21      A.  That would be correct.

22      Q.  But nevertheless, you went out and organized

23  a corporation in Colorado using that very same trade

24  name, correct?



Exhibit G

EXHIBIT
Lyons
#6
1/15/13 SB

| From: | k9care@earthlink.net on behalf of<br>Robert Gillette <k9care@earthlink.net> |
|---|---|
| Sent: | Monday, December 30, 2002 11:15 AM |
| To: | Linda Blythe <Linda.Blythe@oregonstate.edu>; Hilary <claytonh@cvm.msu.edu>;<br>Sheila Lyons <homecomingfarm@attbi.com>; David Nunamaker<br><dmn@vetmed.upenn.edu>; Robert Taylor <RTDVM@aol.com>; Rob & Diana Gillette<br><k9care@earthlink.net>; Rob GIllette <gillerl@vetmed.auburn.edu> |
| Subject: | ACVSMR Information Update |

Hello everyone,

I hope your Christmas went well. I have been working on our letter of intent and creating a single information source for us to view our progress and opinions. I have created a web site for us to use. The only ones who know trhe address are the members of the committee and the people that they tell. I have not told anyone the address so at this time it is only us. Before you give this address ouot to anyone it would be better if you told the rest of the committee. This will allow some confidentiality for the committee to exchange information. The web address for this site is:

www.sportsvet.com/acvsmr

At the site I have listed information sites. The credentials of the committee members can be viewed. Let me know if I need to make changes to your credentials. I have listed my original letter, a letter proposed by Dr. Sabin at the AVMA ABVS, proposed changes by Dr. Lyons, and the current letter.

My question to you is should we go with the generic letter provided by Dr. Sabin or the more descriptive letter put together by our committee. One point is that the sooner we send in the letter the sooner we can move forward officially.

I am currently in New England doing some Sled Dog work. I will be answering my e-mails so please go ahead and respond when you get the time to few the information.

Thank you for your time.

Rob Gillette

# American College of Veterinary Sports Medicine and Rehabilitation

## Home page for the Organizing Committee

| Home Page | Letter of Intent | Committee Credentials | Information |
|---|---|---|---|

I have created this page so that we can access our progress in an easy manner. The web address will only be known by the commitee. This should keep our work confidential to the group. If there are topics that you feel should not be presented in this manner please let me know. We can still use e-mail as our communication medium. Some information is presented better via a navigatable source such as this.

## Committee Members and Contact Information

| | |
|---|---|
| Robert L. Gillette, DVM, MSE<br>Committee Chairman | (334) 844-5646<br>gillerl@vetmed.auburn.edu |
| Linda L. Blythe, DVM, PhD | Linda.Blythe@oregonstate.edu |
| Hilary M. Clayton, BVMS, PhD | claytonh@cvm.msu.edu |
| David M. Nunamaker, VMD, DACVS | dmn@vet.upenn.edu |
| Robert A Taylor, DVM, MS, DACVS | RTDVM@aol.com |
| Sheila Lyons, PhD, DVM | homecomingfarm@attbi.com |

ACVSMR000737

# American College of Veterinary Sports Medicine and Rehabilitation

## Credential Page for the Organizing Committee

## Dr. Lyons' Credentials

Return to Credentials Page

Dr. Sheila Lyons

BS; Physics, 1979
PhD; Physics, 1981
DVM; Tufts, 1985

Private Equine Sports Medicine Practice 1985-present; specializing in dressage, show jumping, thoroughbred racing, 3-day eventing, endurance, and polo sport horses internationally.

Veterinary Sports Medicine Consultant for International Equestrian Teams including:

1986 World Championships, Dressage
1988 Seoul Olympics; Dressage, Show Jumping
1992 Barcelona Olympics, 3-Day Eventing, Show Jumping
1996 Atlanta Olympics 3-Day Eventing
2000 Sydney Olympics 3-Day Eventing, Dressage
(many additional internationally recognized competitions not included above)

1989, Formed a nonprofit 501c3 organization; Homecoming Farm, Inc. to develop methods for the successful rehabilitation of equine athletes; research physiotherapy techniques for horses and develop methods to prevent injury and improve performance in equine athletes.
Developed a mathematical model for the applied anatomy of the horse and recently, in human medicine (NSF/NIH funded).

The Board of Directors and Advisors to Homecoming Farm, Inc. are founding board members for the Human Sports Medicine Specialty Committee. These physicians and researchers organized a 3-year comprehensive fellowship opportunity in Physical Medicine and Rehabilitation in Sports Medicine for Dr. Lyons.

ACVSMR000854

Fellowship completed in 1996 and all qualifying examinations were met. (board certification could not be officially obtained as it requires MD degree and licensing).

These Board members were directly involved in the 5 years of clinical research done in this specialty field at Dr. Lyons' research center in New England.

Efforts and focus of Homecoming Farm, Inc. since 1996 has been in the creation of a Veterinary Specialty in Sports Medicine and Rehabilitation.

1993-present; Consultant to several State Veterinary Practice Boards in their development of regulations, which will include paraprofessionals in rehabilitation to work with animals through the veterinary profession.

Clinical seminars and nonprofit consulting internationally including: UK, Kenya, Australia, South Africa, France, Italy,
Saudi Arabia, Oman, United Arab Emirates, and others.

ACVSMR000855

Exhibit H


EXHIBIT
Look S
#10
1/15/13 SB



# Robert L. Gillette, DVM, MSE
## Director
**Department of Clinical Sciences**
**College of Veterinary Medicine**
**Auburn University, AL 36849**



Phone #: (334) 844-5646          Fax #: (334) 844-6084          E-mail: gillerl@vetmed.auburn.edu

1/24/03

To:     Dr. John Oliver
        Chair, American Board of Veterinary Specialties

From:   Dr. Robert Gillette,
        Chair of the Organizing Committee for the American College of Veterinary Sports
        Medicine and Rehabilitation

Re:     Letter of intent to form an AVMA RVSO

Dear Dr. Oliver,

I am submitting this letter of intent to form an AVMA-recognized veterinary specialty
organization (RVSO) in Veterinary Sports Medicine and Rehabilitation. The members of the
committee other than myself are (listed alphabetically): Drs. Linda L. Blythe, Hilary M. Clayton,
Sheila Lyons, David M. Nunamaker and Robert A. Taylor. Please find their credentials on the
additional pages. The committee comprises experienced educators and expert practitioners in the
field of veterinary medicine, surgery, internal medicine, sports medicine, rehabilitation,
biomechanics and exercise physiology. Our vision is to develop a recognized veterinary specialty
organization in Veterinary Sports Medicine and Rehabilitation that will promote advanced levels
of competency in sports medicine and rehabilitation, in order to provide the public with
exceptional veterinary care from highly qualified individuals.

Veterinary sports medicine and rehabilitation meets the unique needs of athletic and working
animals and animals in need of rehabilitation. In human medicine, sports medicine is a well-
established field. The need for veterinary sports medicine specialty has arisen as a result of the
explosive growth in animal participation in sports and service activities and the recent
recognition of the benefits derived from rehabilitation. Complete veterinary care of these animals
requires expertise in the areas that address the structural, psychological and medical needs of
these performance animals. More specifically the sports medicine veterinarian must have an
expanded understanding in the areas including, but not limited, to prevention and treatment of
performance injuries, orthopedic health, kinesiology, nutrition, pharmacology, thermoregulatory
problems, rehabilitation, exercise physiology, emergency and critical care medicine. This is on
top of basic knowledge of traditional medical and surgical veterinary problems.

A specialty board would gather the diverse sources of information into a cohesive package;
establish post-graduate training, fellowship and research opportunities; and determine criteria for,

**AVMA 01805**
**CONFIDENTIAL**

and administration of the process for certification. The overall goals of the specialty are to optimize performance, minimize risk of injury or metabolic damage, and define the best treatment and therapy procedures as they correlate to the unique demands placed upon the athletic and working patients.

A similar specialty is present in the field of human medicine. The American Orthopedic Society for Sports Medicine (AOSSM) was formed in 1972. It is a national organization of orthopedic surgeons specializing in sports medicine. The fellowship curriculum for the AOSSM will be used as a general framework for the Veterinary specialty. A discussion with the founding members of the AOSSM was very helpful to our committee as we began this organizational process. It was conveyed that one weakness of their structure was its restriction to surgeons. Their suggestion was that a veterinary specialty should be a broader-one that includes these other related fields at its foundation. This important point will be addressed by the organizing committee in developing the core knowledge of this specialty.

The field is rapidly growing and the interest among professional students is high. For example, the current membership of the American Canine Sports Medicine Association is 140, and the membership of the Association of Equine Sports Medicine is almost 300. The past two Veterinary Rehabilitation Symposia have each had over 350 participants. The Annual Sports Medicine Symposia held at Auburn each year continually has more than 100 attendees and the sports medicine elective held each fall for veterinary school sophomores at Auburn University has had a class size greater than thirty.

State Veterinary Boards are increasingly asked to weigh in on ethical and paraprofessional service issues that go beyond the scope of their education and experience in these emerging fields, and yet they must act on behalf of the public and the veterinary profession on these issues. A Veterinary Specialty Board would be the best source for advice and scientific guidance on these developing issues, just as it has been in other recognized specialty fields (surgery, wildlife, etc.).

A Sports Medicine and Rehabilitation Veterinary Specialty would provide an expert service to the growing clientele base, and would create an organized training and certification protocol for all of the veterinarians that have an interest in this field.

Thank you very much for your kind consideration in this matter.

Sincerely,

Robert L. Gillette, DVM, MSE
Chair of the Organizing Committee for proposed the College of Veterinary Sports Medicine and Rehabilitation

2

AVMA 01806
CONFIDENTIAL

**Names and Credentials of the Organizing Committee for the American College of Veterinary Sports Medicine and Rehabilitation**

**Robert L. Gillette, DVM, MSE, Committee Chairman**

Education
> Kansas State University B.S. Life Sciences. 1982
> Kansas State University DVM 1988
> University of Kansas MSE Biomechanics 1998

Experience
> 3/00-Present Director of the Sports Medicine Program at the College of Veterinary Medicine, Auburn University.
> 6/90-Present Owner/operator of Sports Medicine Veterinary Services. A consulting practice devoted to working with the athletic and working dogs. Publisher of the Athletic and Working Dog Newsletter.
> 3/00-Present Chairman of the Annual Sports Medicine Symposium held at the College of Veterinary Medicine, Auburn University.
> 1997-2000 Senior Research Fellow. Scott-Ritchey Research Center, College of Veterinary Medicine, Auburn University.
> 1997-2000 Served on the sports medicine interest advisory committee, College of Veterinary Medicine, Auburn University
> 1992-1995 Instructor of Research, Voluntary Appointment. The Sports Medicine Institute, Kansas University Medical Center. Kansas City, Kansas. 12/92 - 6/95.
> 1992-1997 Assistant Scientist, Adjunct Appointment, Animal Care Unit, University of Kansas. Lawrence, KS.
> 1993-1995 Owner and operator, Northridge Animal Clinic. Bonner Springs, KS.
> 1989-1990. Kansas State Veterinarian, Woodlands Kennel Club, Kansas City, KS.
> 1990.Greyhound Racing Judge, Woodlands Kennel Club, Kansas City, KS.
> 1989-1991. Program Associate, Animal Care Unit, Univ. of Kansas. Laboratory animal residency.
> 1992-1993 Staff Veterinarian, Overland Park Veterinary Center.
> 1988-1989 Research Veterinarian, CEVA Labs Biological R & D, Lenexa, KS.

Memberships
> Past Chairman of the American Canine Sports Medicine Association Symposium 1996 - 2000.
> Past Assistant-Chairman of the International Canine Sports Medicine Symposium 1997-2000.
> Past-President and current board member of the American Canine Sports Medicine Association
> Member of Phi Zeta
> Member of the AVMA
> Member of the National Greyhound Association

3

AVMA 01807
CONFIDENTIAL

Authorships
  9 scientific publications
  20 veterinary publications
  3 Chapters written in books
  One Instructional Compact Disk titled "Analyzing Motion and Soundness of the Dog"
  Numerous Lectures and Presentations

**Linda L. Blythe, DVM, PhD**

Education
  University of California PhD, 1979
  University of California DVM, 1974
  University of California BS 1972

Experience
  1997-Present Associate Dean for Academic and Student Affairs
  1995-1997 Interim Assistant Dean for Academic and Student Affairs
  1990-1995 Professor, College of Veterinary Medicine, Oregon State University, Corvallis, Oregon
  1985-1990 Director of Racing Research, College of Veterinary Medicine, Oregon State University, Corvallis, Oregon
  1983-1990 Associate Professor, College of Veterinary Medicine, Oregon State University, Corvallis, Oregon
  1978-1983 Assistant Professor, School of Veterinary Medicine, Oregon State University, Corvallis, Oregon
  1975-1978 Equine Practitioner, Self-employed, Fairfield and Vacaville, California
  1977-1978 National Institutes of Health Fellow, Veterinary Anatomy Department, University of California, Davis, California
  1976-1977 Associate in Anatomy, Veterinary Anatomy Department, University of California, Davis, California
  Summer 1976 Veterinary Neurologist, Veterinary Medical Teaching Hospital, University of California, Davis, California
  1975-1976 Staff Research Associate, Veterinary Anatomy Department, University of California, Davis, California
  1974-1975 Intern, Large Animal Surgery, Veterinary Medical Teaching Hospital, University of California, Davis, California
  Summer and Race Track Veterinary Assistant, Hollywood Park Race Track, Inglewood, California; Vacations Del Mar Race Track, Del Mar, California; Santa Anita Race Track, Arcadia, 1973-1974 California

Honors and Awards
  1969 Dean's Honor Roll, San Joaquin Delta Junior College, Stockton, California
  1969 Frontier Award in Life Sciences, San Joaquin Delta Junior College, Stockton, California

4

**AVMA 01808**
**CONFIDENTIAL**

1970 Dean's Honor Roll, University of California, Davis, California
1970 Phi Kappa Phi Honor Society, Sophomore Year, University of California, Davis, California
1970-74 Regent's Scholar, University of California, Davis, California
1970 George Hart Scholarship, University of California, Davis, California
1972 George Hart Scholarship, University of California, Davis, California
1972 Achievement Rewards for College Scientists (ARCS), University of California, Davis, California
1973 Merck Manual Award, University of California, Davis, California
1973 Phi Zeta Veterinary Honor Society, Junior Year, University of California, Davis, California
1974 Who's Who in American Colleges and Universities, University of California, Davis, California
1974 University of California Veterinary School Medallist, University of California, Davis, California
1976 Citation for Outstanding Teaching, Department of Anatomy, University of California, Davis, California
1976 National Institutes of Health Fellowship, University of California, Davis, California
1983 Oregon Veterinary Medical Association, Distinguished Service Award (President's Award)
1986 Norden Distinguished Teaching Award, College of Veterinary Medicine, Oregon State University
1986 Nomination for Woman Veterinarian of the Year Award. Women's Veterinary Medical Association
1989 Outstanding Teacher of the Year Award - Class of 1990
1989 Oregon State University Student Chapter of American Veterinary Medical Association (SCAVMA) Basic Science Excellence of Instruction Award
1989 Student Chapter American Veterinary Medical Association (SCAVMA) National Award for Teaching Excellence - Honorable Mention
1989 Oregon State University Burlington Northern Foundation Faculty Achievement Award
1990 World Greyhound Racing Federation Diploma of Excellence
1991 Nomination for Woman Veterinarian of the Year Award. Women's Veterinary Medical Association
1991 SmithKline Beecham Award for Creativity in Teaching
1992 Norden Distinguished Teaching Award, College of Veterinary Medicine, Oregon State University
1993 Listed in American Men and Women of Science
1995 Award of Excellence, Harris Laboratories, Lincoln Nebraska
1996 Pfizer Award for Research Excellence
1998 James Yarbourgh Lecturer for International Canine Sports Medicine Symposium

Memberships
American Veterinary Medical Association
Oregon Veterinary Medical Association

5

AVMA 01809
CONFIDENTIAL

Association of American Veterinary Medical Colleges
Phi Kappa Phi Honor Society
Phi Zeta Honor Society
Gamma Sigma Delta Honor Society
Association for Canine Sports Medicine
International Sled Dog Veterinary Medical Association

Authorships
49 scientific publications
52 veterinary publications
18 Chapters written in text books
Two Books, "International Greyhound Research Database" and "Care of the Racing
Greyhound: A Guide for Trainers, Breeders, and Veterinarians"
Numerous Lectures and Presentations

## Hilary M. Clayton, BVMS, PhD

Education
Faculty of Veterinary Medicine, University of Glasgow, BVMS with commendation,
1973
Faculty of Veterinary Medicine, University of Glasgow, PhD., 1978

Experience
1997- Present McPhail Dressage Chair in Equine Sports Medicine, Michigan State
University
1988-1997 Professor, Department of Veterinary Anatomy, University of Saskatchewan
1993-1996 Head, Department of Veterinary Anatomy, University of Saskatchewan
1995-1996 Sabbatical Leave Visiting Professor, Utrecht University, The Netherlands
1988-1989 Sabbatical leave Visiting Professor, Comparative Orthopedics, New Bolton
Center, University of Pennsylvania, Visiting Professor, Sports Science Center,
University of Delaware
1985 Visiting Professor, Tufts University, Boston (2 month teaching appointment)
1982-1988 Associate Professor, Department of Veterinary Anatomy, University of
Saskatchewan
1975-1982 Lecturer, Department of Veterinary Anatomy, University of Glasgow
1979-1980 Visiting Assistant Professor, Department of Veterinary Anatomy, Michigan
State University
1975-1976 Research Assistant, Department of Veterinary Parasitology, University of
Glasgow
1973-1975 Veterinary Practitioner, McKenzie, Bryson and Marshall, Kilmarnock,
Scotland

Honors and Awards
2001 Inducted into the International Equine Veterinarian Hall of Fame
1998 Inducted into the Saskatoon Sports Hall of Fame

6

AVMA 01810
CONFIDENTIAL

1988, 1991 Western College of Veterinary Medicine, Preclinical Teacher of the Year
1990 Norden Distinguished Teacher Award
1990 Canadian Equestrian Federation, National Coaching Certification Program Award
1990 Saskatchewan Horse Federation, Special Award for contributions to coaching in
    equestrian sports
1989 International Olympic Committee Outstanding Poster Award, First World Congress
    on Sport Sciences
1984 Saskatchewan Horse Federation "Horseman of the Year"
1975 William Hunting Award for a contribution entitled "A Canine Ovarian Teratoma" in
    the Veterinary Record
1973 Glasgow University Athletics Club "Blue" for outstanding ability in equestrianism

## Memberships

American Veterinary Medical Association
American Association of Equine Practitioners (Board Member 1992-1996)
Association for Equine Sports Medicine (Board Member 1986-1994, President 1990-
    1992)
International Society for Biomechanics
Member of Editorial Advisory Board for
    *Journal of Equine Veterinary Science*
    *The Horse*
    *Equus*
    *Equine and Comparative Exercise Physiology*
Contribute regular column in *Dressage Today*
Review scientific manuscripts for:
    *Equine Veterinary Journal*
    *American Journal of Veterinary Research*
    *The Veterinary Journal*
    *Research in Veterinary Science*
    *Journal of Equine Veterinary Science*
    *Equine and Comparative Exercise Physiology*
Grant reviewer for:
    *The Horserace Betting Levy Board*

## Authorships

107 scientific publications
101 veterinary publications
13 Chapters written in text books
Four Books, "Biomechanics of Equestrian Sports"; "Equine Locomotion"; "Colour Atlas
    of Large Animal Clinical Anatomy"; "Conditioning Sport Horses."
Numerous Lectures and Presentations

**Sheila Lyons, PhD, DVM**

Education

7

**AVMA 01811
CONFIDENTIAL**

University of Massachusetts Amherst, BS, 1979,
UMass/MIT joint program, Ph.D., 1981,
Tufts Veterinary School, DVM, 1985.

## Experience

1985-Present Private Equine Sports Medicine Practice
1986 Veterinary Sports Medicine Consultant for International Equestrian Teams
including: World Championships, Dressage
1988 Seoul Olympics; Dressage, Show Jumping
1992 Barcelona Olympics, 3-Day Eventing, Show Jumping
1996 Atlanta Olympics 3-Day Eventing
2000 Sydney Olympics 3-Day Eventing, Dressage
1993-Present Consultant to several State Veterinary Practice Boards in their development
of regulations, to include paraprofessionals in rehabilitation to work with animals
through the veterinary profession.
1989 Established the nonprofit 501c3 organization; Homecoming Farm, Inc.
to develop methods for the successful rehabilitation of equine athletes;
research physiotherapy techniques for horses and develop methods to prevent
injury and improve performance in equine athletes.

## Honors and Awards

1996 Annual Award from The Center for Health Science Policy, Washington DC.
Developed a mathematical model for the applied anatomy of the horse and
recently, in human medicine (NSF/NIH funded).

## Memberships

The Board of Directors and Advisors to Homecoming Farm, Inc
American Veterinary Medical Association
American College of Sports Medicine (human)
American Physical Society

## Authorships

10 veterinary related publications
Numerous Lectures and Presentations

## Dr. David M. Nunamaker V.M.D. DACVS

## Education

University of New Hampshire, 1962-64
University of Pennsylvania, V.M.D.,1964-68
Diplomate of the American College of Veterinary Surgeons, 1974

## Experience

1996-Present Chairman, Department of Clinical Studies-New Bolton Center, School of

AVMA 01812
CONFIDENTIAL

Veterinary Medicine, University of Pennsylvania

1981-Present Director, Richard S. Reynolds, Jr. Comparative Orthopedic Research Laboratory, New Bolton Center, School of Veterinary Medicine, University of Pennsylvania

1994-Present Director, Allam Center for Equine Sports Medicine, New Bolton Center, School of Veterinary Medicine, University of Pennsylvania

1982-Present Jacques Jenny Professor of Orthopedic Surgery, Department of Clinical Studies-New Bolton Center, School of Veterinary Medicine, University of Pennsylvania

1982-Present Professor of Veterinary Medicine in Orthopedic Surgery, Department of Orthopedics, School of Medicine, University of Pennsylvania

1993-Present Member, Graduate Group in Bioengineering, University of Pennsylvania

1994-96 Acting Chairman, Department of Clinical Studies-New Bolton Center, School of Veterinary Medicine, University of Pennsylvania

1982-88 Chief, Section of Large Animal Surgery, Department of Clinical Studies-New Bolton Center, School of Veterinary Medicine, University of Pennsylvania

1979-82 Jacques Jenny Associate Professor of Orthopedic Surgery, Department of Clinical Studies, School of Veterinary Medicine, University of Pennsylvania

1979-82 Associate Professor of Veterinary Medicine in Orthopedic Surgery, Department of Orthopedics, School of Medicine, University of Pennsylvania

1977-82 Associate Professor of Orthopedic Research, Veterans Administration Hospital, Philadelphia, Pennsylvania

1976-79 Associate Professor of Orthopedic Surgery, Department of Clinical Studies, School of Veterinary Medicine, University of Pennsylvania

1972-76 Assistant Professor of Orthopedic Surgery, Department of Clinical Studies, School of Veterinary Medicine, University of Pennsylvania

1970-71 Instructor in Orthopedic Surgery, University of Pennsylvania, School of Veterinary Medicine

Honors and Awards

Phi Zeta (National Veterinary Honorary Society)

1989 Beecham Award for Research Excellence

Milne State-of-the-Art Lecture, American Association of Equine Practitioners, 2002

Three Patents, External Skeletal Fixator, United States Patent #4,604,996, (1986); External Fixation Device, United States Patent #5,578,041 (1996); LifeSaver Horse Shoe, Patent pending (2003)

Memberships

American College of Veterinary Surgeons

American Veterinary Medical Association

AOVet, President elect 1996-1998, President 1998-2000, Past President 2001-2002

North East Veterinary Orthopedic Society

Orthopedic Research Society

Veterinary Orthopedic Society

Editorial Review Board - Veterinary Surgery, 1983-86

9

AVMA 01813
CONFIDENTIAL

Ad Hoc Reviewer - American Journal of Veterinary Research, 1980-present
Ad Hoc Reviewer - Orthopedic Research Society abstracts, 1983-1997
Editorial Review Board - Veterinary and Comparative Orthopaedics and Traumatology,
    1989-present
Ad Hoc Reviewer - Journal of Biomechanics, 1990-present
Ad Hoc Reviewer - Journal of Orthopedic Research, 1989-present
Orthopedic consultant - The Equine Athlete, 1991-2000
Ad Hoc Reviewer - Clinical Orthopedics and Related Research, 1993-present
Ad Hoc Reviewer - USDA grants, 1993-1999,2002

Authorships
    49 scientific publications, 6 case studies, 34 abstracts,
    16 chapters written in text books
    Four Books, "Manual of Internal Fixation in the Horse", "Textbook of Small Animal
        Orthopaedics", "Equine Osteosynthesis: An Electronic Manual of the AO/ASIF
        Technique", "AO Principles of Equine Osteosynthesis"
    Numerous Lectures and Presentations

## Robert A. Taylor, DVM, MS, DACVS

Education
    Texas A&M, BS with Honors, 1968
    Texas A & M, DVM with Honors 1970
    Colorado State University, MS Surgery, Foothills Surgical Laboratory, Veterinary
        Teaching Hospital, 1977
    Diplomate, American College of Veterinary Surgeons, 1985

Experience
    1970-Present Owner-Director and Staff Surgeon, Alameda East Veterinary Hospital,
        Denver CO
    1998 Established Colorado Canine Sports Medicine/Rehabilitation Clinic, the first full-
        time animal physical therapy clinic in the Rocky Mountain region
    Clinical Affiliate, Colorado State University, Veterinary Teaching Hospital
    Advisory Committee for Animal Cancer Center, Colorado State University

Honors
    University Scholar, Texas A&M, 1967-69
    Certificate of Merit – Colorado Humane Society, 1982
    American Veterinary Medical Association, Presidents Award
    Phi Zeta
    Gamma Sigma Delta
    Alpha Zeta
    Phi Kappa Phi

Memberships

AVMA 01814
CONFIDENTIAL

President, Denver Area Veterinary Association, 1983-1984
President, Colorado Veterinary Association, 1995
Treasurer, American College of Veterinary Surgeons and the ACVS Research &
    Education Foundation, 1995-Present
Alpha Zeta
Board of Director, Denver Zoological Association
President, Recycled Racers Program
Past Board Member, Colorado Humane Association
Past Board Member, Morris Animal Foundation
Past President, Hospice of St. John, Denver CO
Past Board Member, Arapahoe CO 4-H Foundation
Past Board Member, C.E.T. Environmental
Past Advisory Board Member, Pet Imaging, Inc
Colorado Otologic Research Center
Newfoundland, Dalmatian, Rottweiler Rescue Leagues
Denver Animal Fund

Authorships
    12 scientific publications
    Three Books, "Manual of Post Operative Care", "Canine Sports Medicine", "Canine
        Physical Therapy"
    Numerous Lectures and Presentations

11

AVMA 01815
CONFIDENTIAL

Exhibit I

Volume:    I

Exhibits: 1-57


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


C.A. No. 1:11-cv-12192-WGY

- - - - - - - - - - - - - - - - - - - - - - - x

SHEILA LYONS, DVM and HOMECOMING FARM, INC.,

Plaintiffs

vs.

ROBERT GILLETTE, THE BOARD OF DIRECTORS OF THE

AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE

AND REHABILITATION, INC. and THE AMERICAN

VETERINARY MEDICAL ASSOCIATION, INC.,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF ELIZABETH SABIN

Tuesday, February 5, 2013 - 9:15 p.m.

Klieman & Lyons

115 Broad Street - 4th Floor

Boston, Massachusetts

Reporter:  Maureen J. Manzi, CSR, CLR

1  this is just a yes or no -- all of the questions

2  that you can recall about either the trademark

3  dispute or the issue involving the alleged

4  misrepresentation of academic credentials, all of

5  those conversations in some way involved

6  confidential communications; is that correct?

7      A.  From July 27 or July 2010 on?

8      Q.  Yes.

9      A.  Yes.

10     Q.  Did you have any such conversations prior to

11 July '10, that is conversations about, let's take

12 them one at a time, the trademark infringement

13 issue?

14     A.  No.

15     Q.  Did you have some conversations prior to

16 July of 2010 concerning alleged falsification of

17 academic credentials?

18             MR. KLUFT:  Objection.

19             THE WITNESS:  Can I answer?

20             MR. DICKISON:  Yes.

21     A.  I wouldn't refer to them as conversation.  I

22 was copied on documents.

23     Q.  Communications would may be a better word.

24 So you didn't have conversations, oral conversations

1 on the telephone or in person, but you were aware of

2 various written communications, is that fair to say?

3     A. I was copied on a letter, yeah.

4     Q. The next document I have to show you, Dr.

5 Sabin, I've premarked -- well, before I get to that

6 actually. This July 27th, 2010 e-mail from Karen

7 Brandt to Dr. Gillette preceded the AVMA's

8 provisional approval of the VSO for Dr. Gillette and

9 his group, correct?

10     A. No.

11     Q. It did not?

12     A. It did not precede.

13     Q. When was the provisional approval granted

14 for Dr. Gillette and his group?

15     A. It was either at the April 2010 Board, I

16 believe it was the April 2010 Board meeting. They

17 typically have a May 2010. But this would have gone

18 forward to them in April 2010. So it would have

19 gone to the Executive Board in April 2010. And

20 that's when provisional recognition would have been

21 granted.

22     Q. At some point did the AVMA become aware or

23 did you become aware that there was some confusion

24 over the simultaneous use of this trade name by Dr.

1  Lyons to whom it was registered and Dr. Gillette and

2  his group?

3          MR. KLUFT:  Objection.

4          MR. DICKISON:  Objection.  You can

5  answer.

6      A.  At some point did I become aware or the AVMA

7  became aware?

8      Q.  Yes, of some confusion that resulted as a

9  result of the simultaneous use of this trade name by

10 its registered owner Dr. Lyons and by Dr. Gillette

11 and members of his group?

12         MR. DICKISON:  Objection.  You can

13 answer.

14     A.  So, to the best of my knowledge, the AVMA

15 has not been made aware of confusion per se.  There

16 is a trademark issue.  That's it that I know of.

17     Q.  Let me show you a document which we've

18 premarked as Exhibit No. 8.  And it's a document

19 dated July 18th, 2012 on what appears to be the

20 stationery of an organization called American

21 College of Veterinary Sports Medicine and

22 Rehabilitation.  And I would refer to it as a press

23 release.  But that's just for the record.  I'll let

24 you take a look at it and tell me if you can

1    committee members to be named diplomates without

2    taking a test?

3        A.  Not all.

4        Q.  Are there some, in fact, who require

5    everyone who is holding themself out as being Board

6    certified to actually take and pass the proficiency

7    test?

8                MR. KLUFT:  Objection.

9        A.  There are some colleges that have no charter

10   diplomates.  So even members of the organizing

11   committee would have had to take an examination.

12   Offhand I don't know which ones those are.

13       Q.  Well, isn't it true that the organizing

14   committee for the newly proposed equine dentistry

15   subspecialty that I just mentioned requires everyone

16   to take the test?

17       A.  I don't know.  And I don't know where that's

18   at in the review process.

19                Could we take a quick bathroom break

20   soon?

21       Q.  Absolutely.

22                MR. KLUFT:  Why don't we take it now.

23                (Recess held.)

24       Q.  Dr. Sabin, let me place before you a

 1   document which has been marked as Exhibit No. 35

 2   which is an undated, for lack of a better term, form

 3   letter bearing the Bate-stamp ACVSMR00458.

 4                (Witness reviewing Exhibit 35.)

 5        A.  Okay.

 6        Q.  Have you had an opportunity to familiarize

 7   yourself with the document?

 8        A.  Yes.

 9        Q.  Have you ever seen that document before?

10        A.  Not to the best of my knowledge, no.

11        Q.  Just so the record is clear.  This isn't a

12   form document that the ABVS or AVMA provides to

13   organizing committees to assist in the -- well, the

14   business of forming an organizing committee, filing

15   a petition and recognizing charter diplomates?

16        A.  No.

17        Q.  If you'd look at paragraph 3 of this

18   document.  I just want to ask you.  I'll read it.

19   "There are currently 13 members of the organizing

20   committee, and as a result of the recent

21   aforementioned election, up to 14 new members will

22   join the committee.  All members of the organizing

23   committee will be grandfathered as charter

24   diplomates upon establishment of the college."  Did

1  I read that correctly?

2       A.  You did.

3       Q.  Now, does that in any way -- strike that,

4  please.

5            Did you have any discussions with Dr.

6  Gillette or any other members of the organizing

7  committee of this RVSO about grandfathering charter

8  diplomates of the college?

9       A.  No.  If I did, it was before this time, and

10  it would have been very general.  I don't remember

11  any specific conversations with Dr. Gillette.

12      Q.  Is the sentence that I read about the

13  grandfathering of charter diplomates consistent with

14  the ABVS policy regarding recognition of charter

15  diplomates of an RVSO?

16           MR. KLUFT:  Objection.

17      A.  I don't believe it's inconsistent.  The

18  definition of charter diplomate is relatively broad.

19  And I would have to look at the -- I don't even know

20  when this was dated.  I would have to look at the

21  P&P in place to see, at the time that this was

22  submitted to see if this was within keeping of the

23  process by naming charter diplomate.  I don't see

24  anything in it that would specifically raise

1  eyebrows I guess or raise like, oh my gosh, what are

2  they doing.

3      Q.  Well, let me just ask you this.  Would it be

4  consistent with ABVS rules and regulations regarding

5  the recognition of charter diplomates for someone to

6  be recognized as a charter diplomate who has not

7  participated in any way with the organizing

8  committee but has only paid a fee, nothing else?

9      A.  No.  The charter diplomate should be

10  involved in the organizing committee.  And this

11  letter says up to 14 new members will join the

12  organizing committee.  So they're growing the

13  organizing committee as they need to do more things.

14      Q.  Well, besides just being a member of the

15  organizing committee, don't ABVS requirements

16  regarding charter diplomates require you to be more

17  than just a member of the organizing committee?

18      A.  Yes.

19      Q.  We went through that whole thing.

20      A.  Right.

21      Q.  It's just not enough to be a member of the

22  organizing committee?

23      A.  Right.  You have to be involved in doing

24  things.

1    29th, 2004.

2              MR. DICKISON:  Do you want it to be

3    marked?

4              MR. KLUFT:  Please, yes.  51.

5              (Marked, Exhibit 51, documents

6    Bate-stamped AVMA00415-AVMA00425.)

7              (Witness reviewing Exhibit 51.)

8       Q.  Have you had a chance to look at this

9    document?

10      A.  I have.

11      Q.  Is this indeed the complete fax that you

12   sent to Dr. Gillette on that date?

13      A.  It appears to be, yes.

14      Q.  And by the way, I wanted to ask you.  The

15   document I showed you before, and I apologize, just

16   before, Exhibit 50.  Exhibit 50 refers to a previous

17   phone call you had with Dr. Lyons.  And that was the

18   phone call you described today.  Do you know how Dr.

19   Lyons got your number, if you recall?

20      A.  I would assume she got it from Dr. Gillette.

21      Q.  But you don't know one way or another?

22      A.  She could have also just called the AVMA 800

23   number and asked for me.

24      Q.  Okay, fair enough.  Now, let's go back to

1   Exhibit 51.

2       A.  Okay.

3       Q.  Now, I think you testified earlier, and tell

4   me if I'm wrong, that what precipitated this

5   communication to Dr. Gillette is that you got a call

6   from a Marina Cesar; is that right?

7       A.  Yes.

8       Q.  Prior to this communication with Dr.

9   Gillette when you sent him information -- and by the

10  way, prior to this fax, did you call Dr. Gillette?

11      A.  Prior to this fax, yes, I called Dr.

12  Gillette.

13      Q.  But that was after you talked to Dr. Cesar,

14  right?

15      A.  Absolutely.

16      Q.  Is it fair to say that Dr. Gillette never

17  came to you with this information or any allegations

18  about Dr. Lyons?

19      A.  No.

20      Q.  It was you informing him of the allegations

21  of some folks on Cape Cod; is that correct?

22      A.  Yes.

23      Q.  In fact, have you ever had a conversation

24  with Dr. Gillette about Dr. Lyons other than that

1  phone call you just described?

2      A.  No.

3      Q.  Let me move on to something that's going to

4  make my pile a lot less intimidating.  I'd like to

5  mark this Exhibit 52, please.

6              (Marked, Exhibit 52, Petition.)

7              (Witness reviewing Exhibit 52.)

8              MR. LYONS:  David, you'll have to

9  correct me if I'm wrong.  But this doesn't appear to

10  be a complete copy of the petition.  The complete

11  one I think has some 173 pages.  If I'm wrong, just,

12  you know --

13              MR. KLUFT:  There may be a version that

14  does.  This one I believe is a 97 page petition with

15  a two or four-page letter at the end of it.  So 101

16  pages.  You know, this is an electronic document.

17  So I'm pretty sure it is not incomplete.  If there's

18  another version that's 137 pages, then there's

19  another version.

20              MR. LYONS:  173.  And I always say it

21  because I just don't want to get confused with

22  documents myself.  I'll just wait for your question.

23      Q.  Have you had a chance to glance at this?

24  And I'm not going to ask you to read every page

1  wanted you to authenticate it.

2          You mentioned a term before when we were

3  talking about the petition.  You mentioned a term

4  back and forth I think.  Is it fair to say that the

5  recognition of a new RVSO and the approval of a

6  petition is a back and forth process that goes

7  through many iterations?

8     A.  Yes.

9     Q.  And that was the case here, correct?

10    A.  Yes.

11    Q.  And let me show you another document that

12  we'll mark Exhibit 53.

13        (Marked, Exhibit 53, Memorandum.)

14    Q.  And I will tell you I'm probably just going

15  to ask you about the first one-and-a-half pages of

16  this document.  You're welcome to read the whole

17  thing if you like.

18    A.  I don't think I need to.

19        (Witness reviewing Exhibit 53.)

20    Q.  Have you had a chance to look at this

21  document?

22    A.  Yes.

23    Q.  And do you recognize it?

24    A.  I recognize it, yes.

1    Q.  And what do you recognize it as?

2    A.  It would be when the petition dated November

3  of 2008 was submitted to the American Board of

4  Veterinary Specialties.  It went to the Committee on

5  Development of New Specialties in December of that

6  year of 2008.  And at that time they assigned two

7  reviewers to it, to the petition.  Dr. Robert

8  Murtaugh and Dr. D.J. Krahwinkel.  And they reviewed

9  the petition and had several questions and comments

10  and we referred to the memorandum that came from

11  them to the ABVS in early 2009 reporting on the

12  progress of that.  So this is the response of the

13  organizing committee to the concerns raised by Dr.

14  Murtaugh and Dr. Krahwinkel in that petition

15  submitted in November of 2008.  So this is the

16  organizing committee's response to those concerns.

17    Q.  Can I ask you to take a look at Exhibit 15

18  again, one of the documents we looked at earlier

19  today.

20    A.  Yes.  Yes.

21    Q.  And earlier today I think you testified you

22  mentioned that there probably would have been some

23  response to the concerns noted in this document

24  sometime in the fall of 2009; is that right?

1    A.  Yeah.

2    Q.  Is it fair to say that Exhibit 53 is at

3  least part of that response?

4    A.  Yes.

5    Q.  And, in fact, Dr. Sabin, Exhibit 15

6  references the same committee members or the same

7  individuals you just mentioned, Dr. Murtaugh and Dr.

8  Krahwinkel, correct?

9    A.  Yes.

10    Q.  Now, if you look at No. 2 on this document

11  Exhibit 53.  Is it fair to say that at this time Dr.

12  Murtaugh and Dr. Krahwinkel on behalf of the AVMA

13  recommended that the RVSO add more people to the

14  organizing committee?

15    A.  They did.

16    Q.  And is it your understanding that the RVSO

17  complied with that recommendation?

18    A.  Yes.

19    Q.  Thank you.  I think that this testimony is

20  already pretty clear, but I want to make sure.  I

21  wasn't sure it was in response to a direct question

22  before.  So let me ask you the direct question.

23           Following Dr. Lyons' removal from the

24  organizing committee, for whatever reason that was,

1 person that the staff at the office communicates

2 with directly. Otherwise you'd have too many other

3 people. It doesn't mean other people in the

4 organizing committee can't ask questions. But

5 typically it would go through the chair those

6 questions or they would be copied on the

7 communication.

8     Q. Thank you.

9     A. Um-hmm.

10     Q. I'm going to mark two more documents. So

11 let's get it up to an even 55. This will be 54 --

12 sorry. I just want to make sure. So what this is

13 is two e-mails. And I'm going to ask that they be

14 marked as one exhibit.

15         (Marked, Exhibit 54, e-mail dated

16 January 27, 2009 and e-mail dated February 24,

17 2009.)

18     Q. Now, this exhibit purports to be two

19 e-mails, correct?

20     A. Yes.

21     Q. And one of them is dated January 27th, 2009,

22 correct?

23     A. Yes.

24     Q. And that bears a Bate-stamp AVMA00591,

1    correct?

2        A.  Yes.

3        Q.  Now, do you recognize this document, 00591,

4    this e-mail?

5        A.  Yes.

6        Q.  And what is it?

7        A.  It's an e-mail from me to our AVMA news

8    service and online services.  So our news services

9    the people who produce the JAVMA News, the Journal

10   of the AVMA News and the news that goes into the

11   American Journal of Veterinary Research, both the

12   print version, and then they also post it online.

13   And our online services is in charge of our website.

14   So this is an e-mail telling them that we need to

15   put a call out for public comment for the RVSO,

16   American College of Veterinary Sports Medicine and

17   Rehabilitation.

18       Q.  And was that done?

19       A.  It was.

20       Q.  Can I ask you to look at the next e-mail,

21   February 24, 2009 Bate-stamp AVMA00400.

22       A.  Yes.

23       Q.  Do you recognize this document?

24       A.  Yes.

1    Q.  And what is it?

2    A.  This is an e-mail -- the one at 4:35 p.m.,

3  right?

4    Q.  Correct.  Well, I'm asking about the whole

5  document.

6    A.  Okay.

7    Q.  Let me make it simpler.  Earlier today you

8  mentioned something called AVMA@Work?

9    A.  Yes.

10    Q.  Is this an example of AVMA@Work?

11    A.  Yes.  And I believe this is the first page,

12  the first and last page of the entire document that

13  was referred to.  So this would be the AVMA@Work

14  that went out as part of the public call for

15  comment.  And I sent it to all members of the ABVS

16  for them to forward on at their widest -- they

17  should forward it to anybody they wanted to.

18    Q.  Let me ask you to take a look at the last

19  document I'm going to show you today I think which

20  is Exhibit 55.

21           (Marked, Exhibit 55, documents

22  Bate-stamped AVMA00143-AVMA00158.)

23           (Witness reviewing Exhibit 55.)

24    Q.  Now, I'll represent to you that although

1    Q.  Doctor, just to follow up on that exact line

2  of questioning.  Why don't I have the reporter mark

3  as the exhibit next in order this document which is

4  titled American College of Veterinary Sports

5  Medicine and Rehabilitation Petition to the American

6  Board of Veterinary Specialties.  And it is

7  Bate-stamped AVMA00650 through AVMA00822.  Let me

8  have it marked, first.

9            (Marked, Exhibit 56, American College of

10  Veterinary Sports Medicine and Rehabilitation

11  Petition to the American Board of Veterinary

12  Specialties.)

13    Q.  Let me place before you the document which

14  has been marked as Exhibit 56.  And I would ask you,

15  doctor, to take a look at it.  And feel free to

16  compare it to Exhibit 52 which has been marked by

17  Attorney Kluft.  And I'm only trying to figure out

18  which one of these documents is the final

19  application.  And I don't mean to suggest that they

20  both can't be copies of the same document.  If you

21  can be of any help, I'd appreciate it.  But one I

22  note is 90 something pages long and the other is 173

23  pages long.  And I'm just trying to reconcile the

24  two.  One was produced by the AVMA.  And that's

1    Exhibit 56.  And the other one was produced by the

2    other defendant in the case.  So please take a look.

3    If you can be of any help, I'd appreciate it.

4        A.  So I believe they're different documents

5    because the Table of Contents is different.

6        Q.  Can you tell us which one preceded or

7    succeeded the other?

8        A.  This one is dated 2008.  So --

9        Q.  And you're referring to Exhibit No. 58?  I'm

10    sorry.  Just for the record.

11        A.  Yes, Exhibit 58 is dated 2008.  So this is

12    the 2008 submission.  So this is the submission that

13    then generated a year of public comment during 2009.

14    It would have been reviewed again at the CDNS

15    meeting in the end of 2009.  Would have gone forward

16    to the American Board of Veterinary Specialties.

17    The full committee in February of 2010.  And that is

18    what would have garnered the recommendation for

19    recognition, for provisional recognition through the

20    COE and then the AVMA Executive Board with eventual

21    provisional being granted in April 2010.

22               I'm not positive, but I believe that

23    this is the first submission that happened in 2007.

24    And I'd have to compare it with our electronic

1  documents that we have.  The first time the

2  organizing committee submitted the petition in 2007,

3  it didn't go beyond the Committee on Development of

4  New Specialties.  They turned it back to the

5  organizing committee and said here's a number of

6  deficiencies and it's not ready at all to go

7  forward.  And so the organizing committee then

8  prepared this second resubmission.  And I'm just

9  saying that because if you look at the Table of

10  Contents -- so if you're looking at --

11          MR. DICKISON:  And just for the record.

12  You're comparing Exhibit --

13      A.  52 with 56.  So if you look at 52, it talks

14  about, the first differences I noticed, admission

15  requirements for ACVSMR, is followed by pathways to

16  qualification, is followed by academic pathway, and

17  then nonacademic pathway.  That's in 52.

18          In 56 it's admission requirements for

19  ACVSMR, pathways to qualification, academic pathway,

20  nonacademic/private practice pathway.  So different

21  wordings.  So that's why I'm saying I really think

22  they are different.

23          And then you continue going on.  The

24  application for process is next in both of them.


Exhibit J

<u>MEMORANDUM</u>

TO:        ABVS

FROM:     Robert Murtaugh, DVM, MS, Dip ACVECC
            D.J. Krahwinkel, Jr., DVM, MS, Dip ACVS, ACVA, ACVECC

DATE:     January 26, 2009

RE:        Review of petition for recognition of the American College of Veterinary Sports
            Medicine and Rehabilitation (ACVSMR)


**Purpose:**
The Committee on the Development of New Specialties (CDNS) met on December 13, 2008, in a conference call and discussed this new College. There was a lengthy discussion regarding this new petition, and Drs. Murtaugh and Krahwinkel were appointed to review the petition and to report to ABVS at its February, 2009, meeting.

**Discussion:**
The petition with support documents was received and discussed by the entire committee, and all information was forwarded to us. We individually reviewed the documents in preparation of this report. We then had several conference calls to discuss and finalize this report to present to ABVS at the February, 2009, meeting.

**Conclusion:**
We did note that there were numerous inconsistencies in the petition and the bylaws. Some of these included confusion in the residency training programs, which have been addressed on the attached document. There are also problems with the makeup of the Board of Regents and some of the committees. We also had concern regarding the way the business of the College would be conducted. Those comments are all in the attached document.

**Recommendations:**
Our recommendation is that we send the petition to ABVS for its consideration and for a year of public comment. Following that, a final reviewer's report will be made at the November, 2009, meeting. December CDNS meeting?

**Implementation:**
The implementation of this action will be as has been described above. Assuming that there is no major objection from the public comments and that the ACVSMR addresses the concerns, that this College be recommended for recognition by ABVS.

**ACVSMR011003**



| | Questions | Yes | No | Comments |
|---|---|---|---|---|
| | *Does the veterinary specialty organization being reviewed:* | | | |
| 1 | Intend to ensure that improved veterinary medical services will be provided to the public? | X | | |
| 2 | Have a necessary number of potential diplomates to serve a clearly demonstrable need within the profession? | X | | Starting with thirteen diplomates will impose a lot of work on that group. Need to identify potential new charter diplomates or quickly examine additional people in order to properly manage all the workload. We would recommend that you have 20 to 25 total diplomates for adequate management of the College. |
| 3 | Represent a distinct and identifiable specialty of veterinary medicine, one that is supported by a base of scientific knowledge and practice and that is acceptable to the profession and the public? | X | | |
| 4 | Establish and abide by clearly stated standards for admission to membership? | | X | The described training programs required for admission to the College are confusing and incomplete. The standards need to be more carefully identified and stated in the petition. |
| 4a | *Does the specialty organization examine only veterinarians who have:* | | | |
| 4ai | *Graduated from a college or school of veterinary medicine accredited or approved by the AVMA, or possess a certificate issued by the Educational Commission for Foreign Veterinary Graduates (ECFVG), or are legally qualified to practice veterinary medicine in some state, province, territory or possession of the United States, Canada or other country?* | X | | Admission requirements duplicate the statement, "Qualified to practice." This is stated twice in those requirements; can delete one. |
| 4aii | *Met the education, training, and experience requirements established by the specialty organization?* | X | | The petition does not state a time requirement for the academic pathway for residency; however, the bylaws state three years, which is probably correct. |
| 4aiii | *Demonstrated unquestionable moral character and impeccable professional behavior?* | X | | |
| 4b | *Does the specialty organization certify only veterinarians who have demonstrated, by meeting established training and/or experience requirements and by attaining acceptable scores on comprehension examination administered by the specialty organization, their fitness and ability to practice the specialty?* | X | | 1. The petition states that "Appropriate rehabilitation and PT modalities must be available." That statement is very open to interpretation. Would suggest a minimal list of modalities. <br> 2. Will programs be approved, or will candidates be approved on an individual basis by the College? |
| 5 | Establish approved routes through education, training, and experience to qualify candidates for examination. An approved qualifying route is a route, either established or approved by the RVSO, through education, training, and experience to qualify candidates for examination in a timely manner. Approved qualifying routes can occur either within or outside a standard residency or degree program. Any experience requirements must be clearly defined, relevant to the objectives of the specialty, and amenable to evaluation and approval by the RVSO. | | X | 1. Needs more detail for the case reports for nonacademic track such as format, grading criteria, and number that have to be acceptable. Also, who will read and grade these reports? <br> 2. What is described as the nonacademic track sounds more like a clinical experience track only that will be available for a five year time period. We assume that this track will close after the five year period. <br> 3. We would recommend that the academic track and the nonacademic track (not clearly articulated in petition) have the same requirements, except for time of completion. Also, there may be a practice track that would be similar to what is currently described as the nonacademic track, open for a limited period of time for admission to the |

| | | | College. |
|---|---|---|---|

| | Questions | Yes | No | Comments |
|---|---|---|---|---|
| 5a | Does the specialty ensure that all training and/or experience requirements and all prerequisites for examination eligibility serve the purpose of assessing the competency of the candidate? <br><br> *Any specified experience requirements must be clearly defined, relevant to the objectives of the specialty, and amendable to evaluation.* | X | | |
| 5b | *Are candidates informed within 120 days of any deficiencies in credentials that prevent their examination?* | X | | |
| 5c | *Does the specialty require any period that involves merely a passage of time (waiting period) between successful completion of formal training and permission to sit for examination?* <br><br> *The ABVS does not allow waiting periods.* | | X | |
| 6 | Encourage and implement special training beyond the professional veterinary degree to enhance the ability of candidates to meet certification requirements? | X | | |
| 7 | Does the specialty adhere to the following examination procedures: | | | |
| 7a | *All written and/or oral examinations must reflect the professional activities expected of the diplomate.* | X | | |
| 7b | *All candidates must receive a content outline (blueprint) of the exam and exam format prior to the exam.* | X | | |
| 7c | *All candidates must be informed prior to the examination of the passing point, or if this is not determined in advance, the method of setting the passing point. The passing point may be adjusted lower but not higher after administering the exam.* | X | | |
| 7d | *Candidates who are not successful in the examination, including an oral examination, must upon request be provided with an explanation of the deficiencies that prevented their passing the examination.* | X | | |
| 7e | *A reasonable time limit must be established (not to exceed 45 days) for providing candidates with the results of the examination. A procedure for providing failed candidates with an explanation of their deficiencies must be established and published by the organization prior to the examination.* | X | | |
| 7f | *Exam results must be sent to all candidates on the same day. All candidates must be informed of their remaining eligibility and reapplication procedures.* | X | | |
| 8 | Avoid personal conflict, or the appearance of conflict, that could affect results of examinations? | X | | |
| 9 | Establish a formal appeal procedure for candidates in case of an adverse decision by the specialty organization? <br><br> *The appeal procedure must appear in the constitution or bylaws of the* | X | | 1. May consider the appeal going through an appointed committee rather than through the board to avoid possible conflicts. <br> 2. Appeal process as stated in the petition is very confusing. As stated, the appeal is heard by the board and then later it says it is heard by an ad-hoc committee (reconsideration?) <br> 3. Persons involved in supervision or training of the person appealing should be reclused from the appeals |

| | | | |
|---|---|---|---|
| | *organization and must accompany each application form.* | | procedure. |

| | Questions | Yes | No | Comments |
|---|---|---|---|---|
| 10 | Require recertification? | | X | 1. This is not stated in the petition or bylaws except where it states "emeritus are except from recertification." It does lead to some confusion. Will you eventually require recertification; if so, it must be stated in the bylaws and on the certificate.<br>2. Do emeritus pay dues? |
| 10a | *If certificates are time-limited, is this clearly stated at the time certificates are awarded to new diplomates?* | | X | This issue is not addressed in the petition. |
| 10b | *Does the specialty encourage and implement special training beyond the professional veterinary degree to enhance the ability of diplomates to meet recertification requirements?* | | X | No recertification stated. |
| 11 | Have multiple specialties or subspecialties? | X | | |
| 11a | *Is one unique certificate awarded for each recognized veterinary specialty?* | X | | |
| 12 | Be legally incorporated as a not-for-profit educational organization within a state or district of the U.S., and have a determination made as to the federal tax and status of the organization? | | X | 1. There is no state mentioned with regard to incorporation.<br>2. Says that bylaws were adopted by a board of directors, but there is no list of a board of directors mentioned in the petition. |
| 13 | Have liability insurance? | X | | There is a statement in the bylaws that liability insurance would be available. |
| 14 | Avoid contracts or agreements leading to activities outside the scope of the stated objectives of the organization? | X | | |
| 15 | Notify ABVS of all changes in the constitution and bylaws?<br><br>*All changes should show previous and newly accepted wording. A clean copy of the current constitution and bylaws should be included with all reports and petitions submitted.* | X | | Petition says that this will occur. |

*General Comments/Concerns*

1. There are several inconsistencies between the petition and the bylaws. These need to be proofread and corrected. An example of this is the description of the residency programs.
2. Some comments in the bylaws are confusing. Article 3 describing the board directors includes the requirements for examination of potential diplomates. Obviously, there is some misorganization in the petition.
3. Bylaws sound like the board makes all decisions without any input from the membership.
4. The makeup of the board of directors is also confusing. There is a statement that the regents shall be comprised of the four different specialist areas, when in reality there are only two (a large and a small animal certificate). This should be clarified. The same issue exists on the credentials committee.
5. There is also confusion regarding votes on actions. In some areas the bylaws state a 2/3 majority and in another place a simple majority. Also please address the issue of the quorum required for taking a vote. Probably would need a majority of the board present to conduct business. Also, what does the membership vote on- bylaw changes?
6. It is also very unclear about how membership meetings will be announced. There is no discussion as to how much advance notice or how the membership will be informed. If membership does vote on issues, what constitutes a quorum to vote and is a simple majority required for passage of the vote.

*Reviewers:*    Robert Murtaugh, DVM, MS, Diplomate ACVECC<br>
                      D.J. Krahwinkel, Jr., DVM, MS, Dip ACVS, ACVA, ACVECC

*Date:*    01/26/09

Exhibit K

SHEILA LYONS, DVM
and HOMECOMING
FARM, INC.,

        Plaintiffs

v.

ROBERT GILLETTE,
THE BOARD OF DIRECTORS
OF THE AMERICAN COLLEGE
OF VETERINARY SPORTS
MEDICINE AND
REHABILITATION, INC., and
THE AMERICAN VETERINARY
MEDICAL ASSOCIATION, INC.,

        Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. 11-cv-12192-WGY

## ANSWERS OF THE PLAINTIFFS, SHEILA LYONS, DVM AND HOMECOMING FARM, INC., TO THE FIRST SET OF INTERROGATORIES SUBMITTED BY DEFENDANT AMERICAN VETERINARY MEDICAL ASSOCIATION, INC

        The plaintiffs, Sheila Lyons, DVM, and Homecoming Farm, Inc., hereby respond to the

first set of interrogatories propounded by the defendant, American Veterinary Medical

Association, Inc., as follows:

## INTERROGATORY NO. 1

Please describe in detail the process by which you allegedly adopted and developed the
ACVSMR Mark.

## ANSWER

The creation of Homecoming Farm, Inc. and the project known as The American College of
Veterinary Sports Medicine and Rehabilitation ("ACVSMR") originated with an understanding
that I first began to develop during my studies at Tufts Veterinary School which involved taking
joint courses with the students enrolled at Tufts Medical College and Tufts Dental College and

undertaking elective clinical rotations in human medicine. I completed clinical rotations in orthopedics, orthopedic surgery, sports medicine, physical medicine and rehabilitation, podiatry, gait lab, and others. This education began in 1980 and continued through my year of graduation in 1985. During this time, I formed relationships with physicians who were expert in the specialties of sports medicine and physical medicine and rehabilitation. Some of these specialists remained advisors to me following my graduation from veterinary school. Included were physicians who had been involved in the creation of specialty boards and professional associations in these fields of human medicine. Some were directors and advisors on the development and administration of fellowships, residency training, and other pre and post-doctoral educational programs and medical specialty certification boards.

In 1989, after four years of private clinical practice in equine sports medicine and rehabilitation, I asked these physician colleagues for advice regarding my need and intention to continue my education and to conduct veterinary research so that I could apply some of the methods in practice I understood, based upon my education, to be standard practice in human medicine but which were neither available in veterinary medical education nor as veterinary clinical services. Doctor Edwin Guise, one of the sports medicine experts in human medicine and someone with whom I had discussed sports medicine cases from my private practice since graduation agreed to help me. He created an opportunity for me to undertake post-doctoral education in human medicine in the specialties of sports medicine and physical medicine and rehabilitation from 1989-1992. During this time I conducted the early clinical research at my farm (which was called Homecoming Farm) regarding the adaptation of methodologies in human medical practice to their potential application in veterinary sports medicine and rehabilitation. I created a nonprofit corporation called Homecoming Farm, Inc., and applied for and received tax exempt status as a 501(c)(3) organization so that I could solicit grants and other funding in support of this research and education for students in veterinary sports medicine and rehabilitation. The mission of Homecoming Farm, Inc. was to improve animal health and welfare by creating a new specialty in veterinary sports medicine and rehabilitation which was modeled after the human medical specialties; conducting research in veterinary sports medicine and rehabilitation based upon the methodologies used in human medicine theory and practice; and, developing educational programs for veterinarians, veterinary students, pre-veterinary students, horsemen, farriers, physical therapists, grooms, veterinary health care managers, athletic trainers, sport horse trainers, the public, and others that were as comprehensive and ambitious as the analogous related educational programs from human medicine.

The idea to apply the principals and methodologies taught in human medicine to veterinary medical practice was unique and revolutionary such that it would eventually change the standard of care in veterinary medicine and my colleagues, including medical professionals and members of the sport horse industry and members of the public, including philanthropists and grant makers, immediately recognized the wisdom inherent in this plan and supported it.

Homecoming Farm Inc.'s research predominantly involved the clinical testing and adapted transfer of methods in practice from human medicine in these specialty fields to assess potential application with equine patients. The horses that I conducted studies on at my farm demonstrated recoveries that were not expected by the standards in veterinary practice at the time. It became clear that not only were these new methods in veterinary practice necessary to

2

affect recoveries of these patients, but many of the standards for general management and training of sport horses needed to change because they were often the underlying cause for the tissue injury and the reason for previously unsuccessful recovery or re-injury. In order to keep these patients sound and athletically optimized following their rehabilitation and sport specific conditioning while under my direct care and management, I realized that it would be necessary to educate the caregivers and service providers such as farriers and or managers and trainers of the horses, so that the animals would be managed in a way so as to enable them to remain sound once back in the training stables. Also necessary was the complimentary development of skilled paraprofessionals to work as sports medicine team members such as physical therapists, athletic trainers, and other skilled and certified paraprofessionals who would in part, deliver the specialized care to veterinary patients by prescription of these newly trained veterinary specialists just as is done in human medicine. Therefore, Homecoming Farm Inc.'s ACVSMR educational project would not only need to include veterinarians who would undertake specialized education analogous to human medical specialty training in order to become experts in sports medicine and rehabilitation, but many other paraprofessionals and new members of veterinary health care teams would have to be trained and supported by the industry to create meaningful improvement in health, welfare and safety of animals used for sport. It was during this period that I began taking student interns from equine studies programs, veterinary schools, pre-veterinary students, veterinary technicians, veterinary massage therapists, physical therapists, farriers, horsemen, grooms, owners and trainers, and veterinary colleagues. I also developed an ACVSMR educational program for a new skilled worker for sport horse stables called the "ACVSMR Equine Health Care Manager" to fill a void I recognized in skilled staff required by sport horse stables in order to coordinate and administer the various expert health care team members required to improve the health and athletic performance of their horses.

Since educating all of these participants in the sport horse industries would be essential to veterinarians having success in the practice of this combined specialty of veterinary sports medicine and rehabilitation, it became clear to me that managing this education as a distinct signature project of Homecoming Farm, Inc. would be necessary in order to manage, develop and administer the project's continued development, management, fundraising and administration. Naming Homecoming Farm's educational project "The American College of Veterinary Sports Medicine and Rehabilitation" came as the obvious choice as it is both perfectly descriptive of the professional specialty represented and also honors the source that established its basis, that being the human medical specialty fields. I asked for advice from advisors and board members who supported my choice and its reasons for selecting The American College of Veterinary Sports Medicine and Rehabilitation as the name by which we would identify Homecoming Farm Inc.'s educational project and programs. The plan from the beginning was to remain affiliated through joint research and clinical projects and educational partnerships in association with human medicine in order to provide the benefits needed in veterinary medicine and further develop this emerging and revolutionary field of veterinary medicine.

It became clear to me that while veterinary medicine did not have a recognized specialty in either sports medicine or physical medicine and rehabilitation and since horses are almost exclusively bred and kept for riding or working purposes of some sort, they could all be consider athletes because their purpose and function needed to serve something greater than just their own intrinsic comfort and health. They had to remain healthy for higher functioning purposes. In

human medicine, during my training in physical medicine and rehabilitation, it was the ultimate functional success of the patient that was the focus for the physiatrist, but not all patients were athletes. Similarly, in human medicine, the goal of sports medicine service is to deliver an optimally prepared, healthy and fit athlete to compete in their chosen sport or activities and to prevent injury and optimize performance through ideal health. This basis for expert clinical veterinary and other related services served my sports medicine patients as it provided the ideal basis to achieve our goal which was the maintenance of optimal health through proactive utilization of physical medicine and sports medicine methods in practice that kept animals sound or through the application of reactive clinical services combined with a unique thought process utilized by human medical specialists that enabled patients to recover fully from sports related injury. Based upon both my education in human medicine and experience in clinical veterinary practice, I knew that sports medicine could not advance in veterinary medicine without the complimentary development of physical medicine and rehabilitation. This unique experience in my own practice, education and research is what led me to realize that it would be essential to link the two potentially distinct specialties together and to call my program "The American College of Veterinary Sports Medicine and Rehabilitation", in order to successfully improve the health and safety of athletic animals.

This process of joining the two fields and so naming my educational programs (described above) developed prior to1995, but it was in 1995 that I hired a development consultant for Homecoming Farm, Inc. to help me to organize materials for submission with grant proposals and to also supplement funding requests submitted to individuals, corporations, foundations, trusts and others. Homecoming Farm Inc., needed to be able to introduce its comprehensive mission and plan to the public efficiently. The development consultant gave me a "to do" list which included writing summaries for the different aspects of each of Homecoming Farm, Inc.'s programs and projects as well as our future plans for which I anticipated soliciting funding. The consultant explained that this way of organizing the presentation of our mission, programs and projects would further serve as a structure for a business plan which would be needed in order to know the cost to create what was required to succeed in our mission to improve the health, welfare and optimize sport performance of animal athletes through new veterinary specialty services.

It was then, in 1995, that Homecoming Farm, Inc., first designated "The American College of Veterinary Sports Medicine and Rehabilitation" to be the official name for our signature educational project of Homecoming Farm, Inc. The document that first publicly expresses this idea and uses this mark as the name for this project was entitled "The Equine Excellence Initiative". I was advised to designate official names for each separate project because many grantors or individual contributors may only be interested in contributing towards one project and not the other. The consultant also offered that it is never too early to begin to put our project's signature name out publicly so that over time as awareness develops, the project name will have instant meaning to the public and be recognized uniquely through its name. So by separating Homecoming Farm, Inc.'s mission into named projects we would not only enable potential contributors to see the specific information that related to their consideration for funding but to also see it in its larger context to appreciate that it was part of a necessarily much more comprehensive solution to create and provide what was missing in both veterinary medicine and the animal sport industries. For over a decade, The Equine Excellence Initiative

has been widely distributed nationally and internationally to businesses, grant makers, trust attorneys, sport horse owners and trainers, physicians, veterinarians, veterinary colleges, veterinary and other academic professionals, associations, businesses, government agencies and numerous other individuals and groups.

Since 1995 Homecoming Farm, Inc. has used the signature trade name ACVSMR in association with ACVSMR educational materials for our ACVSMR programs, in grant proposals and other funding requests related to the ACVSMR project, for our ACVSMR educational seminars, on our ACVSMR applications for educational programs, for our ACVSMR scholarships, on our websites, and in our business proposals and on our plans to create the ACVSMR Center, and in the media. The ACVSMR mark is synonymous with this unique concept in veterinary medicine and identifies and distinguishes this product and service in the veterinary and sport animal industries.

I have also consulted on behalf of veterinary colleagues who specialize in food animals such as dairy and beef cattle. With these species, the ultimate success for the veterinarian's client is related to the level of production reached so the service of veterinary rehabilitation was similarly linked to a higher function, even though it is not a sport. The methods in practice that I developed through the ACVSMR and offered when providing expert consulting services and education to these veterinary colleagues have been similarly beneficial to their clinical goals with these species.

When I contacted the AVMA, which to the best of my recollection was in 1997, to discuss my ACVSMR project which had inexorably linked these two seemingly distinct specialties and explained my reasons, the AVMA representative with whom I spoke, Doctor Park, agreed with my logic for joining the two potentially distinct specialties of rehabilitative and sports medicine. Doctor Park encouraged me to seek approval and said that the AVMA would consider my request for recognition of my ACVSMR which was based upon combining the two specialties. He also said that the development of our non-veterinarian certification programs would not be recognized by the AVMA's ABVS but that it seemed like a good plan. Based upon my notes from this telephone conversation, Doctor Park and I discussed the similarities between the paraprofessionals that my ACVSMR intended to educate and certify, and whom I considered essential to a successful new veterinary specialty in service, with those of radiology technicians in human medicine.

Later, in 1999 and prior to the conference in Oregon where I introduced myself to Robert Gillette, I discussed this plan for asking the AVMA's ABVS for recognition of our ACVSMR with Doctor Elizabeth Sabin whom I had been referred to at that time by the main AVMA office. I described my reasoning for linking the two specialties together and she agreed that this seemed like a sound idea. I told Doctor Sabin that this was why we had named our educational programs ACVSMR, creating an educational plan that joined the two specialties. I explained to Doctor Sabin that eventually, once the body of veterinary scientific work was sufficient, I opined that the two specialties may be strong enough to split and become distinct areas for veterinary specialization, while continuing to overlap in expertise on the topic related to rehabilitation for sports medicine. This would eventually allow for physical medicine and rehabilitation to expand to include subspecialties such as, oncologic Physical Medicine and Rehabilitation ("PM&R");

metabolic disease PM&R; developmental, juvenile or pediatric PM&R; neurologic PM&R; geriatric PM&R, chronic pain management PM&R, and others, just as they enjoy in human medicine. I explained my reasons for the need to keep the specialties initially linked together and offered that perhaps the reason no one had created a sports medicine specialty yet was due to this previously unrecognized void in professional education that I had the opportunity to address through my education in human medicine. I explained that without this basis in the analogous human medical specialties, had my standards in clinical practice and research been based strictly upon what veterinary medicine offered to date, I could not have possibly achieved the success that derives from a unique thought process that relied upon the teachings and body of work well established in human medical science and literature.

In the ensuing years and to this date, Homecoming Farm, Inc., has used the trade name ACVSMR on grant applications and other funding requests. ACVSMR is the name for all of our educational programs and it appears on our educational materials. I have used the "ACVSMR Founder and Director" title on my professional signatures and headings, beginning in 1995. I have presented seminars and given lectures to professionals and to the public in the name of the ACVSMR mark. The ACVSMR mark has been used in business plans for the creation of a center "The ACVSMR Center" for its educational programs, research and the other projects of Homecoming Farm, Inc. Homecoming Farm, Inc. is currently in discussions with the owner of an equestrian center in Florida which Homecoming Farm, Inc., intends to purchase to accommodate all of our ACVSMR educational programs so the ACVSMR name is used in negotiations, development plans and in descriptions and architectural plans for the facility design and in describing business structure and planning for this ACVSMR project which is known as "The ACVSMR Center. So, the ACVSMR mark was created and first used in commerce by me in 1995 and has been used continuously ever since.

The ACVSMR mark has become synonymous with this unique concept in veterinary medicine and identifies and distinguishes this product and service in the veterinary and sport horse industries. The unauthorized use of the ACVSMR mark by the defendants, who provide an entirely different product based upon different standards, has weakened, blurred and tarnished the reputation and identity of this unique mark by causing confusion in the veterinary and animal sports industries, the philanthropic and grant making communities, educational institutions, and in the minds of the public.

My ACVSMR trade name has also become synonymous with the need for responsible and professionally ethical specialized sports medicine and rehabilitation services essential for the prevention of poor performance, overuse injury, catastrophic breakdown, and death in race horses. These specialized veterinary services and athletic management require the elimination of injury masking and performance enhancing drugs that is the prevailing standard of veterinary practice at race tracks. My private practice clients developed an appreciation for the unique ACVSMR based clinical veterinary specialty services I developed and apply to their horses. They also have come to understand through our ACVSMR educational programs and improved veterinary services the critical need to eliminate reckless and anti-therapeutic drug use in sport horses. This appreciation led to the creation of a legislative bill to amend the Interstate Horse Racing Act by banning all drug use on race day in horse racing. In my role to help inform the Bill's development and later when I was called by the Senate Commerce Committee

Chairman, Senator Rockefeller, to provide expert testimony on the subject of horse racing medication and safety and in support of this Bill, I did so as the Founder and Director of The American College of Veterinary Sports Medicine and Rehabilitation. It was the cumulative work of Homecoming Farm, Inc., and our ACVSMR educational programs that led to the knowledge that we could make the sport of horse racing safer for both horse and rider by replacing the drugs (as the proposed legislation would achieve) with expert services delivered by veterinarians, physical therapists, farriers, grooms, athletic trainers, nutritionists, and others. It was also understood through our work that these services could only be provided if the use of performance enhancing and injury masking drugs are eliminated by regulation of the sport. Our ACVSMR educational programs and efforts also have educated sport horse owners on the benefits of managing their horses ethically and responsibly and our ACVSMR educational programs and certification of experts will make this improvement in veterinary services possible.

The ACVSMR mark is synonymous with this concept and over the past decade has become associated with the methodology such that the use of the mark by the defendants who fail to adhere to the standards which identify the mark has damaged its reputation in addition to having confused its unique identity. The unauthorized commercial use of the mark by the defendants has whittled away the mark's distinctiveness and diminished its value in this area. . In short, consumers are being misled by the defendants' infringement of the mark which I created and first used in commerce in 1995, which has a unique national and international meaning and reputation, and have worked hard ever since to establish and maintain.

## INTERROGATORY NO. 2

Please state the date when you a) first considered the adoption of the ACVSMR Mark and b) the date you actually first used the ACVSMR Mark.

## ANSWER

a) I first considered the use of The American College of Veterinary Sports Medicine and Rehabilitation mark in 1989 when I realized the two distinct specialty fields of veterinary sports and rehabilitation medicine would need to be combined in order to provide what was missing in veterinary medical practice and education.

b) I first officially used the mark in 1995 in the creation of the document titled "The Equine Excellence Initiative". . Since 1995 this document has been provided to veterinarians, members of the sport horse industry and to the public and has been used in every grant proposal submitted by me beginning with a proposal made to Johnson and Johnson on January 15, 1996.

## INTERROGATORY NO. 3

Please identify all consumers of veterinary educational services who will testify on behalf of Plaintiffs that the ACVSMR Mark acquired distinctiveness or secondary meaning in the marketplace and provide a brief summary of their expected testimony. 3

## ANSWER

To my knowledge, no decision has been made at this time concerning witnesses who will be called to testify on my behalf at the time of trial including those who may be called to testify about the ACVSMR mark's distinctiveness or secondary meaning in the marketplace. However, on the subject of my ACVSMR mark's distinctiveness or secondary meaning, since 1995 the mark has been known to be associated with the paradigm shift I have applied as a standard in clinical practice, research, and through the ACVSMR educational programs of Homecoming Farm Inc. This unique and distinctive system of management, care and veterinary services provided to athletic animals which closely follows the standards of human medicine, is the basis for our mark's meaning in the marketplace. The system closely follows the standards of care, management and practice of human medicine and requires the certification and training of a wide range of ACVSMR professionals and ACVSMR paraprofessionals. This mark has acquired this distinctiveness nationally and internationally through our ACVSMR programs and services, and also through the information disseminated through funding requests, public statements, our websites and through the media.

## INTERROGATORY NO. 4

Please identify all consumer surveys that Plaintiffs intend to utilize at trial to demonstrate that the ACVSMR Mark has acquired distinctiveness or secondary meaning in the marketplace so that the ACVSMR mark identifies Plaintiffs as the source of educational services.

## ANSWER

At the present time, I am aware of no consumer surveys performed for the specified intention of demonstrating that the ACVSMR mark has acquired distinctiveness or secondary meaning in the marketplace. I presently have no knowledge and am not in a position to identify the expert or experts who may be called to testify on my behalf at the time of trial concerning the distinctiveness of the mark or on any other subject. However, in further answering, it is my position that the mark has acquired distinctiveness or a secondary meaning within the veterinary and sport horse industry, with educational and government institutions, philanthropic organizations and grant makers and within the minds of the public. The ACVSMR mark is distinctive and has acquired a secondary meaning because the mark is associated with a form of veterinary rehabilitative and sports medicine which is unique and derivative of and based upon the analogous human model. This is distinct from the AVMA's recently recognized College that infringes on my mark. The ACVSMR mark is synonymous with this concept and over the past decade has become associated with the methodology such that the use of the mark by the defendants who fail to adhere to the standards which identify the mark has damaged its

reputation in addition to having confused its unique identity. Since the infringement of my mark by the defendants began, there has been confusion in the minds of the public as to from whom they can find information about the projects and programs and funding needs associated with my ACVSMR mark. Consumers are also being misled by the defendants' infringement of my mark and their unauthorized commercial use of the mark has whittled away the mark's distinctiveness and diminished its value in the marketplace.

## INTERROGATORY NO. 5

Please identify and describe the amount and manner of advertising, marketing, or promotion by Plaintiffs with respect to educational services offered under the ACVSMR Mark.

## ANSWER

Homecoming Farm, Inc. advertises its ACVSMR program on the internet through the following domains which link to websites I own and control:

www.ACVSMR.org;
www.ACVSMR.net;
www.ACVSMR.biz;
www.ACVSMR.us;
www.ACVSMR.com;
www.ACVSMRclinic.org;
www.ACVSMRequinehealthcaremanager.org
www.ACVSMRfarrier.org;
www.ACVSMRphysio.org;
www.ACVSMRpodiatry.org;
www.ACVSMRscholarships.org
www.homecomingfarm.org;
www.homecomingfarm.com;
www.homecomingfarm.us;
www.vetsportsmed.com;
www.ACVSMRcenter.com;
www.ACVSMRcenter.org;
www.ACVSMRcenter.info;
www.ACVSMRcenter.net;
www.ACVSMRvetstudents.com;
www.ACVSMRstudents.org;
www.dressagevet.com;
www.dressagehorserehab.com;
www.equinesportsrehab.com;
www.racehorsemedicine.com;
www.racehorserehab.com;
www.sporthorserehab.com;
www.veterinaryphysio.com;
www.veterinaryrehabilitation.com;

www.vetsportsrehab.com;
www.worldwideveterinary.com;
www.athleticanimal.com;
www.racehorseisnotadiagnosis.com;
www.racehorseisnotadiagnosis.org;
www.sheilalyonsdvm.com;
www.idealhoof.com;
www.veterinarypodiatry.com;
www.veterinarypodiatry.org;
www.veterinarypodiatry.us
www.veterinarypodiatry.info;
www.veterinarypodiatry.net;
www.veterinaryphysio.com;
www.yourhorseshooves.com;
www.equinevetstudent.com;
www.equinevetstudents.com;
www.vetstudentexternship.com;
www.vetstudentinternsips.com;
www.vetstudentinternships.info;
www.vetstudentinternships.net;
www.vetstudentinternships.org

Each domain, with the exception of the "homecomingfarm" domains, is linked directly to the website created for The American College of Veterinary Sports Medicine and Rehabilitation which is "www.ACVSMR.org" . I have never used or created separate websites for each domain, it was simply a way to direct users of the internet to find our ACVSMR site when they searched for terms or domain names relating to our work.

Our "homecomingfarm" domains and separate website provide a direct link to the "www.ACVSMR.org" website so that visitors can learn about the ACVSMR educational programs. The "www.homecomingfarm.org" website accepts donations through Paypal to support our ACVSMR project. Our e-mail addresses include the ACVSMR mark.

"The Equine Excellence Initiative" was created in part, for the purpose of promoting, marketing, and advertising the ACVSMR project and programs. This document has been disseminated widely both nationally and internationally for more than a decade. We derive funding and disseminate information about our ACVSMR programs to the public through the development and submission of ACVSMR grant proposals and other funding requests to public and private foundations, institutions, philanthropic organizations, individuals, corporations and associations. We provide information about our ACVSMR programs and plans through ACVSMR seminars and other ACVSMR educational programs for horsemen, pre-veterinary students, equine studies students, other college students, veterinarians, farriers, physical therapists and others. We advertise our ACVSMR programs in listings in horsemen's publications under nonprofits, veterinary education, veterinary research, veterinary services; equine shelters and other categories.

## INTERROGATORY NO. 6

Please identify and describe the amount of sales and the number of customers Plaintiffs have ever had with respect to educational services offered under the ACVSMR Mark.

## ANSWER

We have received grants and other funding from more than fifteen hundred sources which include foundations, individuals, charitable trusts, philanthropists, horsemen, businesses and the members of the public over the sixteen years that we have identified our unique product through using the ACVSMR mark in commerce. We have provided lectures to the public that have been attended by more than two thousand individuals, over this same period of time and these lectures included information about ACVSMR programs and projects. We have provided education in the form of ACVSMR internships or other ACVSMR practical training programs to more than five hundred students. These students have been pre-veterinary, veterinary, farriers, grooms, trainers, owners, health care managers, massage therapists, physical therapists and veterinary colleagues.

## INTERROGATORY NO. 7

Please describe in detail the manner in which the ACVSMR Mark is used or has been used in connection with any services or goods offered by the Plaintiffs.

## ANSWER

The mark was first used in commerce in 1996 when our fundraising and marketing document called The Equine Excellence Initiative was first distributed nationally and internationally in support of our fundraising requests, business proposals, grants, and other solicitations. The Equine Excellence Initiative was distributed widely for the purpose of introducing my organization and to express our ideas and plans to the general public, businesses, associations, horsemen and others. In this document, the mark was defined as the name for Homecoming Farm's signature educational programs and services. Since 1996 the mark is used on our ACVSMR educational materials, ACVSMR applications, on ACVSMR and Homecoming Farm, Inc., websites, in email addresses used for our ACVSMR program communications, ACVSMR scholarship applications, ACVSMR fellowships, on correspondence related to the ACVSMR programs, on ACVSMR Foundation plans, in our structure for distinguishing ACVSMR certified graduates, on ACVSMR grant proposals and other ACVSMR funding requests. We have held bank accounts in the corporate name of Homecoming Farm, Inc., that also recognized us as "doing business as" "The American College of Veterinary Sports Medicine and Rehabilitation" and "doing business as" "ACVSMR". We have used the mark on our nonprofit organization's tax returns in our description of projects related to our mission and related to the work we did and the money we raised in a given tax year. Homecoming Farm Inc., has polo shirts, tee shirts, caps, and other consumer items made with the ACVSMR mark and Homecoming Farm, Inc., sold these or gave these promotional items to ACVSMR program participants and supporters. I have used the mark in association with media appearances on international, national and local radio, on national and international television, and in print. I use the title "Founder and Director,

The American College of Veterinary Sports Medicine and Rehabilitation" on my professional correspondence. I used the mark in association with my expert testimony before Congress in connection with the subject of veterinary sports medicine and rehabilitation standards of practice and regulation. I use the ACVSMR mark in association with guidelines that I have written for racing commissions regarding medication and other ethical reforms to improve safety and protect the well-being of the animals. I have used the ACVSMR mark in papers submitted to attorneys general and governors' offices when asked to provide an expert opinion regarding the standards of care for veterinarians who work with race and other sport horses. I have used the mark in association with presentations I have made to express my concerns to state veterinary licensing boards regarding the standards of practice for race track practicing veterinarians. And, I have used the mark in presentations on the subject of our work to the public and to professionals.

## INTERROGATORY NO. 8

Please describe in detail the manner in which the ACVSMR Mark is used or has been used in connection with any services or goods offered by the Plaintiffs.

## ANSWER

Please see my preceding answer to Interrogatory No. 7 above.

## INTERROGATORY NO. 9

Please describe in detail the time period in which the ACVSMR Mark is used or has been used in connection with any services or goods offered by the Plaintiffs.

## ANSWER

The ACVSMR mark has been used continuously since 1995 to the present in connection with the services and goods offered by the plaintiffs. The mark has been used nationwide and internationally in connection with all goods and services associated with the mark since 1995. The mark has been used on grant proposals and other solicitations of support associated and in the name of our educational programs and business plans and all related communications associated with the ACVSMR and Homecoming Farm, Inc., since 1995.

## INTERROGATORY NO. 10

Please identify and describe the first date on which and the manner in which Plaintiffs became aware of the ACVSMR College's use of the ACVSMR Mark.

## ANSWER

I first became aware of Robert Gillette's unauthorized use of my mark in September of 2010 when I received a letter from attorney Katherine M. Klos, of the law firm of Akridge & Balk, P.C., of Auburn, Alabama who represented Robert Gillette. In her letter, attorney Klos acknowledged that I was the lawful owner of the ACVSMR mark and asked that I agree to

voluntarily transfer my ownership in the mark to her client. Prior to this I had no knowledge that Robert Gillette or anyone else was using my mark without authority. It was clear to me from the letter from attorney Klos that Robert Gillette and others intended to use my mark without my authorization and without legal authority and so on September 17, 2010 I caused my attorneys to send a "cease and desist" letter to attorney Klos requesting that her clients refrain from any use of my mark.

## INTERROGATORY NO. 11

Please identify and describe the first date on which and the manner in which Plaintiffs became aware of the AVMA use of the ACVSMR Mark.

## ANSWER

Shortly after receiving the letter from attorney Klos in September of 2010, I was contacted by a colleague, Doctor Jill Bailey, who at the time was a regulatory veterinarian at Santa Anita Racetrack in Arcadia, California. Doctor Bailey asked me if I had "restarted" my application to have my ACVSMR programs recognized by the AVMA because she had seen a press release which suggested that the AVMA was either considering approving this as a new college or had already done so. Doctor Bailey was confused about how the AVMA could consider recognizing a group that was using my tradename and asked if I had rejoined this effort to have my ACVSMR recognized as a RVSO by the AVMA, or if I had given others permission to use my mark. To the best of my recollection, the first date on which I became aware of the AVMA's unauthorized use my mark.

## INTERROGATORY NO. 12

Please identify and describe all actions taken by Plaintiffs to police or protect the ACVSMR Mark from infringement, including but not limited to the identify of any third party infringer or possible infringer, the name or mark owned by that third party, and when and how such policing activities took place.

## ANSWER

In September, 2010, through my attorneys, I caused "cease and desist" letters to be sent to Robert Gillette and to Auburn University and Oregon State University as soon as I discovered that they had infringed on my mark. In 2012, contacted Facebook immediately after learning that Robert Gillette had also infringed on my mark by creating a Facebook page for his group using my ACVSMR mark without authorization and after he was served with a cease and desist request from my attorneys. I notified Facebook that I was the creator and registered owner of the tradename "American College of Veterinary Sports Medicine and Rehabilitation" and Facebook decided to remove the offending page. Since then, I have conducted internet searches for evidence of further infringement and continue to do so. I own all relevant "ACVSMR" domain names and e-mail addresses and I continue to add "ACVSMR" related domains as our project and programs expand.

## INTERROGATORY NO. 13

Please state whether Plaintiffs is aware of any past or present third-party uses or registrations of the ACVSMR Mark or any version thereof with respect to any goods or services, and if so, identify any such third party and the goods or services for which the designation has been or is now used or registered.

### ANSWER

I am not aware of any third party usage or registrations of my registered trademark outside of the unauthorized use by the defendants.

## INTERROGATORY NO. 14

Please identify any witnesses the Plaintiffs intend to call to trial.

### ANSWER

To my knowledge, no decision has been made regarding the witnesses the plaintiffs intend to call at the time of trial.

## INTERROGATORY NO. 15

With respect to each person whom you expect to call as an expert witness at the time of trial of this case, please state:
(a) The name and address of each such person;
(b) The subject matter on which each such expert is expected to testify;
(c) The substance of the facts and opinions to which each such expert is expected to testify; and
(d) A summary of the grounds of each and every opinion of each such expert.

### ANSWER

To my knowledge, no decision has been made regarding the expert witnesses who will be called to testify on behalf of the plaintiffs at the time of trial.

## INTERROGATORY NO. 16

Please describe in detail the basis for your allegation that the ACVSMR College intentionally copied the ACVSMR Mark.

### ANSWER

The members of the planning committee who were involved to the point of the Chicago planning committee meeting for ACVSMR were all informed that the materials that I had shared with them and which described and established the structure, administration, curriculum, and certification process for a new board specialty to be known as The American College of

Veterinary Sports Medicine and Rehabilitation were and always would remain my copyrighted work product. They were informed that they could not use any of these materials or the ACVSMR mark without my express consent and direct involvement and administration of the project through Homecoming Farm, Inc.'s board. This was a condition of their participation on the planning committee and each readily agreed to this stipulation. In addition, each member of the planning committee was given a copy of a letter from my attorney stating that the creation of a new nonprofit organization would be done solely on behalf of Homecoming Farm, Inc. A review and comparison of the materials submitted by Robert Gillette to the AVMA in association with his application for recognition of a new specialty board using my registered tradename with my copyrighted materials, including the ACVSMR mark, shows that the materials submitted to the AVMA by Robert Gillette and the other defendants were copied from the copyrighted documents provided to him and the other members of the organizing committee.

## INTERROGATORY NO. 17

Please describe and identify all trademark or servicemark registrations that you have pertaining to the ACVSMR Mark, or that you intend to introduce at trial.

## ANSWER

The only trademark registrations that I own are registered with the United States Patent and Trademark Office and they are for the mark itself which is "The American College of Veterinary Sports Medicine and Rehabilitation".

## INTERROGATORY NO. 18

Please describe in detail all instances in which you are aware, through actual or hearsay knowledge, directly or indirectly, of any third party's actual or purported association or confusion caused by the AVMA's use of the ACVSMR Mark.

## ANSWER

The defendants' infringement of my registered tradename has caused confusion among veterinarians, philanthropic organizations, members of the sport horse industry and the public. This is because the defendants are offering goods and services for sale in these communities while using a name which is exactly the same as my registered trademark. The good and services they are offering are vastly different from and inferior to the goods and services I provide and have provided since 1995. While discovery is not yet complete, the following are examples of confusion caused by the defendants of which I am presently aware:

I was contacted in 2010 by a colleague, Doctor Jill Bailey, who at the time was a regulatory veterinarian at Santa Anita Racetrack in Arcadia, California. Doctor Bailey asked me if I had "restarted" my application to have my ACVSMR programs recognized by the AVMA because she had seen a press release which suggested that the AVMA was either considering approving this as a new college or had already done so. Doctor Bailey was confused about how the AVMA could consider recognizing a group that was using my tradename and asked if I had rejoined this

effort to have my ACVSMR recognized as a RVSO by the AVMA, or if I had given others permission to use my mark.

On July 18, 2012, following my testimony before Congress on the subject of Horse Racing Medication and Safety and Standards in Veterinary Practice for Racehorse Veterinarians, a written statement in the form of a press release was issued by Robert Gillette, Hilary Clayton, James Cook, Kevin Haussler, Andris Kaneps, Wayne McIlwraith, Joseph Wakshlag, and Christine Zink in which they stated the following: "Under the rubric of Homecoming Farm, Inc., Lyons has been recently ascribing some of her activities to the "American College of Veterinary Sports Medicine and Rehabilitation". It also stated "The College is currently in litigation with Lyons over her use of the name". This written public statement included a color heading in association with a logo (that is not mine) and intentionally gave the false impression that Robert Gillette and the other individuals identified above who were signatories to the press release were the lawful owners of my mark. My registered trademark was also used at the bottom of this document, as the name of the business entity associated with this press release and provided a mailing address, a telephone number, e-mail address and website links to use to contact the American College of Veterinary Sports Medicine and Rehabilitation which based upon information and belief, is the contact information associated with the Colorado based corporate entity created by the defendants after they received a request from my attorneys to cease and desist from any and all unauthorized use of my mark. This press release was widely disseminated and re-disseminated through the internet to veterinarians, veterinary institutions, the press and other media agencies and publications, to the public, and to others. This press release infringed on my mark and caused confusion in the minds of the public and members of the veterinary communities and related industries. This press statement also misrepresented my credentials by stating "Sheila Lyons is an individual veterinarian practicing in or around Massachusetts." This is untrue and based upon information and belief, the individual defendants including Robert Gillette, Hilary Clayton, Linda Blythe, James Cook, Kevin Haussler, Andris Kaneps. Wayne McIlwraith, Joseph Wakshlag and Christine Zink knew this to be an untrue statement.

Following the defendants' issuance of this press release, a colleague from California, Doctor Christine Ross, contacted me to report that veterinary association message boards had been full of comments from veterinarians who were clearly confused as to the meaning and use of the mark and as to who was the lawful registrant of the mark. Doctor Ross reported that the thread referenced a question that was raised asking who the "real ACVSMR" was.

The defendants' infringement and their widely disseminated public statement made in their July 18, 2012 press release led to further confusion about the identity of the mark and the goods and services associated with it. This confusion put my relationship with grantors and past supporters of the development of the ACVSMR project and its educational programs at risk because the ACVSMR could be confused with Robert Gillette's new corporate identity, fundraising efforts and vastly different educational programs and philosophy. Documents received by the plaintiffs in response to a request for the production of documents by the petitioners in association with their filing of a petition to cancel my registration with the United States Patent and Trademark Office, which was filed by Robert Gillette, Hilary Clayton, Linda Blythe, James Cook, Kevin Haussler, Andris Kaneps. Wayne McIlwraith, Joseph Wakshlag and Christine Zink, revealed that

the same channels of commerce were being used by the petitioners in order to raise money to support their organization and to advertise their goods and services.

Also in 2012, a veterinary colleague, Doctor Charles Liskey, asked if I realized that based upon the information he saw on the website maintained by defendants Robert Gillette, Hilary Clayton, Linda Blythe, James Cook, Kevin Haussler, Andris Kaneps, Wayne McIlwraith, Joseph Wakshlag and Christine Zink, there appeared to be no formal didactic or specific clinical educational requirement for applicants to be recognized by the defendants' new College. He then asked if I had renewed my application to be recognized by the AVMA's VSO and, if so, had I completely changed my opinion and departed from my original plan regarding the essential requirement for highly structured and detailed education and clinical experience as a prerequisite for sitting for a multi leveled examination on the subject material. He noted that the defendants' College had none of the requirements that identified my ACVSMR criteria for board certification as diplomats. The confusion about the standards associated with my mark is misleading the public, members of the veterinary profession and others. It has damaged our reputation by offering substantially different goods and services, which I believe are vastly inferior, through the same channels of commerce, while advertising using my mark which I have spent the majority of my career in veterinary medicine and nearly two million dollars to create, administer, maintain and advertise.

The ACVSMR mark is synonymous with this unique concept in veterinary medicine and identifies and distinguishes this product and service in the veterinary and sport horse industries. The unauthorized use of the ACVSMR mark by the defendants, who provide an entirely different product based upon different standards and one which I believe to be inferior, has weakened, blurred and tarnished the reputation and identity of this unique mark by causing confusion in the veterinary and sport horse industries, the philanthropic and grant making communities and in the minds of the public. By infringing on the mark the defendants have not only misappropriated my registered tradename and copyrighted work product which required enormous effort and reources to create and uniquely define, but in doing so they have damaged my professional reputation, the reputation of Homecoming Farm, Inc., the reputation of the mark and have caused confusion about the meaning of the ACVSMR mark and values and origins associated with it in the competitive marketplace. This marketplace includes in part, the sport horse industries which includes horse racing, dressage, show jumping, endurance racing, standardbred racing, animal welfare, regulatory agencies and others. This marketplace also includes the general public who support our nonprofit organization which is known for its development of the mark and the programs associated with it.

The members of the public are also potential consumers of the services offered in the name of the mark, and we ask for their help in support of regulatory reforms that we have worked for decades to promote as an essential foundation upon which the ACVSMR is based. The press release issued by Robert Gillette, Hilary Clayton, James Cook, Kevin Haussler, Andris Kaneps, Wayne McIlwraith, Joseph Wakshlag, caused confusion in the minds of the public and related communities regarding the advocacy for drug reform as an essential starting place to improve safety in horse racing. There has been confusion caused in government and regulatory agencies in several countries by the defendants' infringement of my mark and unauthorized use of copyrighted material. There has been confusion within federal and state law enforcement

agencies for whom I have testified as an expert on subjects that are inexorably and fundamentally associated with the ACVSMR mark which has been caused by the defendants' infringement of my registered mark and their press release of 2012. There has been confusion in the minds of the public regarding the ACVSMR's position that the use of performance enhancing and injury masking drugs must be completely banned in animal sports. These infringers apparently do not share my commitment to the highest standards of veterinary ethics and animal welfare for all animals that participate in sport, both during and after their careers are over, which is a founding principle and which in part defines and underlies the purpose of the ACVSMR mark. There is confusion caused by the defendants' infringement among students who seek internships and scholarships and among veterinarians who seek post-doctoral education and fellowship training. There is confusion regarding the educational programs and certification offered to paraprofessionals and others in the name of my registered trademark. And, there has been confusion regarding our plans to purchase a property in Florida to use as our ACVSMR Center and what values, ethics, mission and purpose this proposed Center will serve.

The market for grants, donations of real property, donation of money, bequests, and gifts is an extremely competitive one. Homecoming Farm, Inc., has invested significant resources to work with consultants and to benefit from fundraising educational seminars and conferences to improve our ability to obtain grant funding and other support for more than two decades. The reason the ACVSMR project has been successful in obtaining support is due to the fact that our mission and guarantee to our supporters is that we will adhere to the same high standards in the development and administration of our educational, research and clinical service programs as are followed in human medicine. Our mark is associated with a promise to our supporters that we will continue to adhere to these standards for our programs and invite specialists from human medicine to join our research projects, teach in our educational programs, and share our ACVSMR Center for its own research purposes. The infringement, confusion, and damage to the reputation of the mark, the reputation of Homecoming Farm, Inc., and to my reputation as a veterinary professional that has been a direct result of the actions of the defendants has caused harm financially and strategically.

When Homecoming Farm, Inc. first defined the ACVSMR mark as the name for our comprehensive project and programs in 1995, we were successful in obtaining grants where several veterinary schools' seemingly similar sports medicine related programs had failed. Our supporters told us that it was the fact that we were basing our work on the foundation of the well-established analogous human specialties, and the fact that our research and specialized clinical services using these methods in practice had already showed excellent results with their horses, that we gained their trust and received their support. Since the defendants began infringing on my registered tradename there has been a noticeable drop in revenues received from grant makers and from the public. Since this reduction in revenues began at the same time that the defendants began infringing on my mark, I believe that this reduction in revenues is directly related to the defendants' infringement and the confusion it has caused as well as the diminishment in the mark's value through its association with the goods and services offered by the defendants.

## INTERROGATORY NO. 19

Please describe in detail the channels of advertising and trade used by you in your efforts to sell products or services bearing the ACVSMR Mark.

## ANSWER

Homecoming Farm, Inc., advertises its ACVSMR programs and services on the internet through the following channels which are domains that link to websites I own and control:

www.ACVSMR.org;
www.ACVSMR.net;
www.ACVSMR.biz;
www.ACVSMR.us;
www.ACVSMR.com;
www.ACVSMRclinic.org;
www.ACVSMRequinehealthcaremanager.org
www.ACVSMRfarrier.org;
www.ACVSMRphysio.org;
www.ACVSMRpodiatry.org;
www.ACVSMRscholarships.org
www.homecomingfarm.org;
www.homecomingfarm.com;
www.homecomingfarm.us;
www.vetsportsmed.com;
www.ACVSMRcenter.com;
www.ACVSMRcenter.org;
www.ACVSMRcenter.info;
www.ACVSMRcenter.net;
www.ACVSMRvetstudents.com;
www.ACVSMRstudents.org;
www.dressagevet.com;
www.dressagehorserehab.com;
www.equinesportsrehab.com;
www.racehorsemedicine.com;
www.racehorserehab.com;
www.sporthorserehab.com;
www.veterinaryphysio.com;
www.veterinaryrehabilitation.com;
www.vetsportsrehab.com;
www.worldwideveterinary.com;
www.athleticanimal.com;
www.racehorseisnotadiagnosis.com;
www.racehorseisnotadiagnosis.org;
www.sheilalyonsdvm.com;
www.idealhoof.com;

www.veterinarypodiatry.com;
www.veterinarypodiatry.org;
www.veterinarypodiatry.us
www.veterinarypodiatry.info;
www.veterinarypodiatry.net;
www.veterinaryphysio.com;
www.yourhorseshooves.com;
www.equinevetstudent.com;
www.equinevetstudents.com;
www.vetstudentexternship.com;
www.vetstudentinternsips.com;
www.vetstudentinternships.info;
www.vetstudentinternships.net;
www.vetstudentinternships.org

Each domain, with the exception of the "homecomingfarm" domains, is linked directly to the website created for The American College of Veterinary Sports Medicine and Rehabilitation which is www.ACVSMR.org . I have never used or created separate websites for each domain, it was simply a way to direct users of the internet to find our ACVSMR site when they searched for terms or domain names relating to our work. As our programs grow we will use different ACVSMR websites for each individual program. I have purchased the domains because they reflect our current ACVSMR programs and services and our plans for growth of our programs.

Our "homecomingfarm" domains provide a direct link to the www.ACVSMR.org website so that visitors can learn about the ACVSMR educational programs. The www.homecomingfarm.org website accepts donations through Paypal to support our ACVSMR project.

Other channels of advertising and trade used by Homecoming Farm, Inc. in our efforts to sell products or services bearing the ACVSMR Mark include the following:

1) We derive funding and disseminate information nationally and internationally about our ACVSMR programs to the public through the development and submission of ACVSMR grant proposals and other funding requests to foundations, individuals, corporations, associations.

2) The Equine Excellence Initiative, which was the first document developed for this purpose and which was the document that officially expressed our unique mission and identified our educational programs to be named The American College of Veterinary Sports Medicine and Rehabilitation, was distributed nationally and internationally for over a decade to philanthropists, veterinarians, associations, veterinary colleges, pre-veterinary colleges, farriers, horsemen, businesses, foundations, trust attorneys, consultants, government agencies and the public.

3) We provide information about our ACVSMR programs and plans through ACVSMR seminars and other ACVSMR educational programs for horsemen, pre-veterinary

students, equine studies students, other college students, veterinarians, farriers, physical therapists and others.

4) We advertise our ACVSMR programs in listings in horsemen's publications under nonprofits, veterinary education, veterinary research, veterinary services; equine shelters and possibly other categories (to the best of my recollection).

5) I provide statements to the national and international media about our ACVSMR programs and mission. This has included television interviews, documentary filming, newspaper articles, websites, blogs, tweets, Facebook posts, and stories broadcast on National Public Radio and national commercial radio.

6) Homecoming Farm, Inc., has provided ACVSMR seminars in many countries and we have made some of our educational materials available for sale at national and international horse shows and other equine sports events and meetings.

7) We provide brochures which describe our ACVSMR programs and disseminate them to the public when inquiries are made or make them available through horse shows, colleges and universities and at scientific meetings and other related events.

8) We have conducted e-mail campaigns to inform the public about our ACVSMR programs and have provided links to our "www.ACVSMR.org" website and on websites used by horse owners and the equine sports industries.

## INTERROGATORY NO. 20

Please state all revenues and profits related to your provision of goods and/or services, or other activities, related to the ACVSMR Project since 1995.

## ANSWER

The following is an itemization of the revenues and expenses related to the provision of goods and/or services, or other activities by ACVSMR from 1995 to the present:

1) Year 1989 through Year 1995      $625,000 in grant support and gifts.
                                    $625,000 ACVSMR Program Development Costs

2) Years 1995 through Year 1999     $562,000 in grant support and gifts
                                    $560,000 ACVSMR Program Costs

3) Year 2000      $284,500  Grants Received
                  $229,300  ACVSMR Program Costs

4) Year 2001      $92,700  Grants Received
                  $108,584 ACVSMR Program Costs

5) Year 2002    $80,650  Grants Received
                $81,650  ACVSMR Program Costs

6) Year 2003    $44,265  Grants Received
                $43,550  ACVSMR Program Costs

7) Year 2004    $95,000  Grants Received
                $90,806  ACVSMR Program Costs

8) Year 2005    $60,926  Grants Received
                $50,563  ACVSMR Program Costs

9) Year 2006    $44,800  Grants Received
                $49,661  ACVSMR Program Costs

10) Year 2007   $33,279  Grants Received
                $30,722  ACVSMR Program Costs

11) Year 2008   $23,400  Grants Received
                $25,400  ACVSMR Program Costs

12) Year 2009   $21,230  Grants Received
                $22,000  ACVSMR Program Costs

13) Year 2010   $16.840  Grants Received
                $16,900  ACVSMR Program Costs

14) Year 2011   $6,225  Grants Received
                $7,000  ACVSMR Program Costs

15) Year 2012   $5,000  Grants Received (to date)
                $5,000  ACVSMR Program Costs (to date)

Total Funds Received for ACVSMR Program $1,995,815

Total Cost to Develop and Offer ACVSMR Programs $1,946,136

## INTERROGATORY NO. 21

Please identify all persons associated with the ACVSMR Project since 1995, including staff, employees, members, faculty, officers, directors, board members, advisors, consultants, advisory board members and other agents.

Cleone Stenhouse, Kent, England
Dr. Jackson Morgan, Savannah, Georgia
Dr. Susan Yung, Hong Kong China
Jennifer Mandracia, Jupiter Farms, Florida
Albert Debrave, Baltimore Maryland
Pat Goodman, Baltimore, Maryland
Dr. Ted Stashak, Santa Rosa, California
Austine Hearst, New York, New York
Joyce Falese, Lake Worth, Florida
Charles Harris, Palm Beach, Florida
William Randolph Hearst Jr, New York, New York
Laurance Rockefeller, New York, New York
Zena Yoshida, Yufutsu-Gun, Hokaido, Joapan
Josephine Zambon, Delray Beach, Florida
Eugene Klein, Rancho Santa Fe, California
Stephen Jenkins, Shannon, California
Dr. Yasin Ali Sheyyab, Amman, Jordan
Stuart Wilson, Lexington, Kentucky
Aziz al Redha, Abu Dhabi, United Arab Emirates
Karen Barnes, Las Vegas, Nevada
Mike McGinn, Las Vegas, Nevada
Susan Perkins, Monticeto, California
Ogden Phipps, New York, New York
Suzanne Perkins, Ontario, Canada
Clive Meers Rainger, Edenbridge, Kent, England
Alan Frechette, Montreal, Quebec, Canada
Adrienne Gillette, Middleburg, Virginia
Dawn Jones, Johannesburg, South Africa
Mark Spriggs, West Sussex, England
Barbara Hunter, Nicholasville, Kentucky
Dr. Falah al-Ani, Amman, Jordan
George Griffith, Malibu, California
Jo Ivimry, Dubai, United Arab Emirates; London, England
Mr. Neil Ayer, Hamilton, Massachusetts
John Maybee, San Diego and Ramona California
Lauren Jones, Seal Beach, CA; Lexington, Kentucky
Kathy Fair, Santa Barbara, California
Martine Zinn, Highland Beach, Florida
Zachary March, Jamestown, Missouri
Pete Cullen, Chicago, Illinois
Sam Ostridge, Marlborough, England
Jay Stephens, Toronto, Canada
Georgann Konig, Temecula, California
Jane Hutton, Sai Kung, NT, Hong Kong
Michael Savoldi, Shannon, California
Dr. Irineu Palmeira, Sao Paulo, Brasil

Harry Walsh, London, England
Dr. Yung Chia, Hermosa Beach, California
Kerry Packer, Sydney, Australia
Jack Klugman, Temecula, California
Dr. Raul Silva, Rio Des Janeiro, Brasil
Dr. Hussein al Redha, Dubai, United Arab Emirates
Ali al Redha, London, England
Doctor Jill Bailey, Los Angeles, California
Habib al Redha, Dubai, United Arab Emirates
Dr. Robert Geisel, Bundall, Australia
Caroline Morgan, Savannah, Georgia
Mary Bromiley, Marlborough, England
Saud bin Khalad, Lexington, Kentucky
Mr. Curtis Burns, Wellington, Florida
Mohammed Ali al Eassa, Dubai, United Arab Emirates
Adrienne Henninger, Wellington, Florida
Linda Smith, Loxahatchee, Florida
Joan Irvine Smith, San Juan Capistrano, California

We have also met with and consulted with numerous other physicians, physical therapists, horsemen and women, educational professionals, academic colleagues, business representatives, philanthropists, and members of the public. The foregoing list represents the best of my present recollection at this time.

## INTERROGATORY NO. 22

Please describe the academic credentials of Sheila Lyons, including each degree obtained (or, if no degree was obtained a description of the coursework), the name of the academic institution, and the same of the department within the academic institution that awarded the degree or supervised the coursework.

## ANSWER

Bachelor of Science, Physics, University of Massachusetts, 1979.

Doctorate in Veterinary Medicine, Tufts University School of Veterinary Medicine, 1985

Elective rotations and grand rounds and lectures in human sports medicine, orthopedic surgery, podiatry, physical medicine and rehabilitation, outpatient physical therapy, gait lab, and others while attending Tufts.

Post-doctoral fellowship in sports medicine and physical medicine and rehabilitation organized and supervised through Edwin R. Guise, M.D. and Jerry S. Tobis, M.D. and undertaken at Harvard Medical affiliated institutions of Massachusetts General Hospital, Boston Children's Hospital, New England Baptist Hospital, Spaulding Rehabilitation, and also with rotations in California at USC Los Angeles County Hospital and USC Irvine hospital affiliates and other area

private sports medicine orthopedic and physical medicine and rehabilitation practices, hospitals and clinics, sports competition field experience for Los Angeles area college football, gymnastics and other sports.

## INTERROGATORY NO. 23

Please describe the ACVSMR Project, including the nature of the programs run by the ACVSMR Project, the relationship between the ACVSMR Project and Homecoming Farm, Inc., and attempts by you to have the ACVSMR Project recognized as a Recognized VSO by the AVMA.

## ANSWER

The American College of Veterinary Sports Medicine and Rehabilitation® ("ACVSMR") is the name for the signature educational project of Homecoming Farm, Inc., a nonprofit 501(c)(3) organization, that was created by me in 1995 and first expressed , in the document I authored titled The Equine Excellence Initiative. The ACVSMR conducts research and provides education to veterinarians; veterinary students; veterinary physical therapists; farriers; researchers; horsemen; equine health care managers; pre-veterinary students; equine studies students, sport horse owners and trainers and others worldwide. It is modeled after the human medical specialty in its scientific methods and educational structure for paraprofessionals. We disseminate educational materials to professionals, paraprofessionals, horsemen, the public and others.

The ACVSMR project and programs are educational in nature. Homecoming Farm, Inc., has developed plans and has been soliciting funding for the creation of "The ACVSMR Center" in Florida since 1996. This ACVSMR Center will serve as the main campus for our ACVSMR programs. It will provide continuous access to sport horses and offer state of the art specialized veterinary clinical and research facilities for our ACVSMR program participants and others to undertake their clinical ACVSMR education. The ACVSMR Center will also facilitate the collection of scientific data on the efficacy of ACVSMR protocols in equine practice and to enable the ACVSMR members and affiliates to conduct research studies in veterinary sports medicine and rehabilitation. This ACVSMR Center will be unique in that it will be the first center dedicated to the joint purpose of providing ongoing clinical services to a large population of elite sport horses through immediate access as the facility will house some of the horses in training and the facility will be located adjacent to one of the world's best thoroughbred training centers and in the midst of the horse show and polo communities. We will continue to partner with physician specialists for education and research at this ACVSMR Center.

I contacted the AVMA in 1997 to tell them about Homecoming Farm, Inc., and its ACVSMR educational project and to ask about the process for becoming recognized under the AVMA as a new veterinary specialty. I was referred to Doctor Park who was on the AVMA's ABVS committee and I spoke with him by telephone. I described Homecoming Farm's history and how I had formed the opinion over time through my research, education and clinical experience, that the development of a new specialty must link the two fields of veterinary sports medicine and veterinary rehabilitation, at least initially. I also described why it would also be essential to

26

provide skilled paraprofessionals to work with veterinarians such as physical therapists, farriers, and others and that my organization intended to also certify these individuals. Doctor Park explained that the AVMA would only recognize ACVSMR veterinarians as specialists and agreed that the complimentary development of allied skilled workers in this field would be beneficial. I explained that it was my opinion based upon my clinical experience and research that it would be essential to link these two potentially distinct specialties in order to make progress as a profession and improve the health, welfare and safety of animal athletes which is why I had created and named The American College of Veterinary Sports Medicine and Rehabilitation. In equine practice almost every animal meets the definition of athlete, and most rehabilitation is sought following sports related injury with the hope that the animal can return to full performance in sport. I described to Doctor Park my concerns in particular based on clinical practice and experience with race horses, explaining that the prevailing standard of care in race track practice was one that yielded to the pressure of the trainers, often in opposition to the veterinary medical needs of the patients, and that Homecoming Farm, Inc., and its ACVSMR was beginning to address this problem by conducting research and providing education to grooms, trainers, owners, physical therapists and others, as well as advocating for improved regulations for the sport. Doctor Park then described the general procedure for making an application as a new specialty under the AVMA. I discussed this with my Homecoming Farm board and advisors and decided to explore seeking AVMA recognition as a VSO as long as the project remained fully a project of Homecoming Farm, Inc., so that we could be assured that the standards of excellence that I had developed and that our entire program was based upon would not change. Also in 1997, after seeing a report in the AAEP newsletter regarding the AVMA Foundation's request for nominations for its excellence in research award, I sent a copy of The Equine Excellence Initiative to the AVMA Foundation to inform them of our mission, history and intention to create state of the art centers where collaborative research could be conducted along with our ACVSMR educational programs. Doctor Park explained that in order to be approved as an RVSO, the AVMA required that all species that could benefit from a specialty be included in its plan. As I had consulted for some small animal, food animal, and exotic and zoo animal patients utilizing the methodologies in practice that I had adapted from human medicine to veterinary patients, I explained that application to all species would not be a problem with our ACVSMR.

I spent the next two years completing the development of a curriculum and plans for structuring and administration of a new veterinary specialty based upon the guidelines and requirements I had received from the AVMA's VSO Committee. To the best of my recollection, I contacted Doctor Sabin in 1999 when the AVMA main office identified her as its current ABVS contact to discuss my finished plans and to ask about beginning the process to gain the AVMA's recognition of our ACVSMR as a new veterinary specialty. This call occurred prior to the conference in Oregon. At one point, through my discussions with Doctor Sabin, I knew that my request to the AVMA for recognition of our ACVSMR would benefit if I included colleagues on my planning committee that included small animal clinicians as well as academic colleagues. Doctor Sabin explained that the AVMA's ABVS greatly favors planning committees that include academic professionals. I explained to Doctor Sabin my concern that especially where equine sports medicine and rehabilitation was concerned, it was a clinical specialty and it was essential to the success of the specialty in practice that the services needed to be delivered in the animal's competition environment, and not at referral centers or in university settings. I explained my

reasoning for linking the two potentially distinct specialties and opined that as it went forward, perhaps there would come a time when they could become distinct and independent but at first they needed to be joined. I discussed my educational background and international elite sport horse practice experience, both of which had informed the formation of our ACVSMR project and programs and offered proof of the benefits of the specialized services. I also discussed with Doctor Sabin the need to educate and certify paraprofessionals to work with the newly trained veterinary experts if the service was to succeed in a real world setting. I told Doctor Sabin about my advisors from the human medical specialty fields and how they perceived the best plan for moving forward in veterinary medicine in a meaningful way. I told Doctor Sabin that I was already having discussions with licensing boards for the professions of physical therapy and veterinary medicine and with academic deans and educators in this field to ask for their consideration of licensing veterinary physical therapists (as they do in the UK and other countries) so that the newly specialized veterinarians would have the professional support required to benefit their patients I chose to use the Oregon conference to try to identify a small animal academic colleague or colleagues who might be interested in joining my planning committee.

I introduced myself to Robert Gillette at this Oregon conference and told him of my nonprofit organization's work, mission and plans. I explained that I had already worked out most of what the AVMA required through my advisory board members who were physicians, physiotherapists and others. At first Gillette seemed to not understand my plan to combine the two specialties. This had obviously not occurred to him before. He told me that he had once contacted the AVMA as well, but his plan was to start a new specialty in canine sports medicine only and that he had not pursued the matter. I described my experience, the process and reasoning behind the creation of the ACVSMR as a combined specialty and described Homecoming Farm Inc.'s ACVSMR educational programs and the reasoning behind their concurrent development. Gillette stated that he was eager to join my effort to seek the AVMA's ABVS's recognition of our new ACVSMR specialty. I explained that as a condition for his participation, I would require him to review the materials I had already developed which described in detail, the ACVSMR specialty and plans, because there would be no room for changes to our already well-developed structure and detailed plans for education, certification and administration which were based upon the standards in human medicine and developed through input from my physician advisors. I explained that if he did not agree with my plan, he should not join my effort to seek ABVS recognition of Homecoming Farm's ACVSMR and he readily agreed. I discussed my educational and clinical practice and research background and described why I had linked the two distinct fields of veterinary sports medicine and veterinary rehabilitation into one and why in my opinion, and based upon my experience, it could not go forward in any other way. Gillette was pleased with my idea and complimented my reasoning. I then asked if he might be able to introduce me to Doctor Janet Steiss whom I noticed was also a faculty member at Auburn Veterinary School in Alabama where Gillette was a member of the faculty so that I could invite her to also review our ACVSMR and Homecoming Farm, Inc., materials and see if she might be interested in joining my effort. Gillette asked me to please not tell Doctor Steiss anything about this project and described her as "his nemesis" at Auburn University. He explained that being the only one from his school's faculty that may be on a committee to create a new veterinary specialty would be a huge boost to his advancement at the veterinary school. Gillette explained

that he was active in the Canine Sports Medicine Association and could deliver the interest and support of the members of this association to endorse our new specialty.

Following the conference, I sent Gillette a copy of The Equine Excellence Initiative and the ACVSMR program materials I had developed which clearly expressed the mission, objectives, core curriculum and other ACVSMR specialty structure and AVMA VSO recognition materials. He immediately contacted me and said he could not believe how much I had already done and that he absolutely wanted to be a part of my planning committee.

I continued to develop and refine and do further research on the materials I had developed for application to the AVMA ABVS seeking recognition of Homecoming Farm Inc.'s ACVSMR project as a new specialty board in veterinary medicine. Several attempts to reach Gillette were met with reports that he had not found time to meet and consider the additional colleague members who we might invite to fulfill the AVMA requirement of a minimum of 4 (or 5) veterinarians. In 2001, I again contacted Gillette to bring him up to date on the progress I had made and sent him the materials I had continued to develop with my advisors in order to keep him informed of our progress. I told him that I was moving forward to seek the AVMA's ABVS's recognition of our ACVSMR, with or without him. I had fully developed all the materials needed to submit to the ABVS for their consideration of recognizing our ACVSMR as a specialty and I was ready to proceed. He said he would make himself available, asked me to please keep him on the project and then we decided to meet with Hilary Clayton at Michigan State University Veterinary School to determine her potential interest in joining my committee to seek recognition by AVMA for the ACVSMR as a new specialty.

Doctor Clayton agreed and I brought materials to her, including the Equine Excellence Initiative and asked her to review my plans to be sure she agreed with them as they were written and well devloped. As with Gillette, I explained that the plan for recognition as a subspecialty was already well developed and that her participation in the project was conditioned upon her acceptance of my plan and like Gillette, Doctor Clayton readily agreed stating that she was very impressed with the plan. We discussed who the third and fourth committee member colleagues might be and David Nunamaker from the University of Pennsylvania Veterinary School and Linda Blythe of Oregon State Veterinary College were suggested. Since I did not personally know either of these colleagues, Gillette and Clayton agreed to ask them if they would like to be considered for my planning committee. Hilary Clayton told me that she wanted to be certain that a colleague, Wayne McIlwraith, would not be invited to join the planning committee. She explained that he always completely took control of any committee he was on and took credit for all of its work. I explained that this would not be possible because joining the organizing committee would be expressly conditioned upon his agreement in advance that the structure and details of the curriculum, purpose, certification, and other details of the proposed recognition of ACVSMR by the AVMA that I had written would be adhered to. Doctor Clayton still emphasized that she wanted to be certain McIlwraith would not be allowed to join. She asked me if I could speak with Gillette (whom I was providing with transportation back to the airport) to get his agreement to not invite Doctor McIlwraith to join the planning committee. When I told Gillette what Clayton had said he would only agree if I could in exchange, persuade Clayton to be sure his so called "nemesis" Doctor Janet Steiss was kept off the committee due to his desire to advance in his position, status and standing at Auburn University.

During this day at Michigan, Gillette asked me if I would agree to let him be named as chair of the planning committee because it would be a great benefit to his standing as a faculty member at Auburn University. I agreed to this, while reminding him that I did not care whose name was placed where on the stationary, as long as he understood and fully complied with our agreement that the plan for this new specialty would be as I had developed with Homecoming Farm and our ACVSMR programs and affiliate ACVSMR educational programs and mission to fully develop the range of paraprofessionals and services required in order to serve this new veterinary specialty. Also required would be the agreement that the creation of a new corporation in the ACVSMR name (required by the AVMA's AVBS in order to recognize any new specialty) would be created and administered by Homecoming Farm, Inc., as this had been the project of Homecoming Farm, Inc., since 1995. Once again, Gillette agreed. Gillette then asked if I would be able to raise funds through Homecoming Farm, Inc., in order to compensate his wife for anticipated secretarial services she might offer during the process of submitting materials to the AVMA's ABVS for recognition as a specialty.

In 2004 I provided each member of the planning committee with a copy of the retainer letter from Homecoming Farm, Inc.'s attorney which clearly stated that the attorney was being retained by Homecoming Farm, Inc., to advise and assist me in the preparation of documents necessary for the formation of a new corporate entity to be called The American College of Veterinary Sports Medicine and Rehabilitation, Inc., on behalf of Homecoming Farm, Inc.. I provided Gillette with a copy of this letter by e-mail in the weeks prior to the Chicago meeting. The attorney's fees were paid for by Homecoming Farm, Inc., and we obtained and followed advice regarding the creation of a new nonprofit corporation on behalf of Homecoming Farm, Inc., to be organized under the laws of Delaware, and administered by a board to be chosen by Homecoming Farm, Inc.

## INTERROGATORY NO. 24

Please describe the "game changing evidence" referred to by your counsel, Stephen Lyons Esq., in a conversation at the District of Massachusetts Courthouse with Mark Dickison, Esq., counsel for AVMA, on October 3, 2012. 5

## ANSWER

As I was not present at the scheduling conference held on October 3, 2012, , I cannot speculate on what my attorney may have said or could have been referring to during the alleged conversation. In further answering, and to the extent that this interrogatory seeks the disclosure of confidential communications between my attorneys and me, or the thoughts, impressions or strategies of my attorneys which I am not privy to, I respectfully decline to disclose such confidential communications on the advice of my attorneys on the grounds that such information, to the extent that it may exist, is beyond the scope of permissible discovery.

## INTERROGATORY NO. 25

Please list all internet websites, internet domain names, and email addresses registered to and/or maintained by Sheila Lyons, Homecoming Fram, Inc., or the ACVSMR Project between 1995 and the present, including by stating when each website was created, up to what date it was active, and the amount of visitors.

## ANSWER

The internet domain names and e-mail addresse I own and control are as follows:

1) This list of domains was initially purchased and registered to me either in 2000 or 2001. The "whois" search only lists the most recent creation date. I allowed the domains I initially purchased to expire in order to change their registrar to GoDaddy. I cannot recall if this was the standard or if it was the only way I was knew how to do it as I was not using a personal computer at that time.

   www.ACVSMR,org;
   www.ACVSMR.net;
   www.ACVSMR.biz;
   www.ACVSMR.us;
   www.ACVSMR.com;
   www.homecomingfarm.org;
   www.homecomingfarm.com;
   www.homecomingfarm.us;
   www.sheilalyonsdvm.com .
   www.vermontvet.com;
   www.sheilalyons.com;

2) The following domains I believe I first registered in or about 2003:

   www.vetsportsmed.com;
   www.dressagevet.com;
   www.dressagehorserehab.com;
   www.equinesportsrehab.com;
   www.racehorsemedicine.com;
   www.racehorserehab.com;
   www.sporthorserehab.com;
   www.veterinaryrehabilitation.com;
   www.vetsportsrehab.com;
   www.worldwideveterinary.com;
   www.athleticanimal.com;
   www.athleticanimals.org
   www.athleticanimals.us

3) The following domains I first registered in 2012

www.racehorseisnotadiagnosis.com;
www.racehorseisnotadiagnosis.org;

4) The following domains I had previously registered in years between 2000 and 2010 (I do not have the original creation dates), but re-registered recently after they had lapsed briefly in 2012:

www.ACVSMRcenter.com;
www.ACVSMRcenter.org;
www.ACVSMRcenter.info;
www.ACVSMRcenter.net;
www.ACVSMRvetstudents.com;
www.ACVSMRstudents.org
www.ACVSMRclinic.org;
www.ACVSMRequinehealthcaremanager.org
www.ACVSMRfarrier.org;
www.ACVSMRphysio.org;
www.ACVSMRpodiatry.org;
www.ACVSMRscholarships.org
www.idealhoof.com;
www.veterinarypodiatry.com;
www.veterinarypodiatry.org;
www.veterinarypodiatry.us
www.veterinarypodiatry.info;
www.veterinarypodiatry.net;
www.veterinaryphysio.com;
www.yourhorseshooves.com
www.equinevetstudents.com;
www.vetstudentexternship.com;
www.vetstudentinternships.com;
www.vetstudentinternships.info;
www.vetstudentinternships.net;
www.vetstudentinternships.org

Each of the domains listed above is now and has in the past been forwarded to a website www.ACVSMR.org with the following exceptions - all "homecomingfarm" domains for which I maintain a separate "Homecoming Farm, Inc." website which includes a web link to the www.ACVSMR.org website, "vermontvet" which has its own website, and "sheilalyons" which I own but have not used a website for. Previously, in about 2003-2012, I had a separate website for www.sheilalyonsdvm.com but I removed this when many individuals and members of the media were trying to reach me following my Senate testimony in 2012 and then I chose to forward it to the www.ACVSMR.org website which contains a form for contacting me via the ACVSMR.

Each of these domains is active as of November 13, 2012. .

The only other domains I have previously registered are www.whitefenceslusitanos.com; and www.floridadressage.com which I purchased for a client and transferred to her as owner.

5) Email addresses:

homecomingfarm@juno.com  To the best of my recollection this email address was registered to me in 1997

homecomingfarm@hotmail.com  To the best of my recollection this email address was registered to me in 1997

ACVSMR@hotmail.com  To the best of my recollection this email address was registered to me in 1997

homecomingfarm@mediaone.net  To the best of my recollection this email address was registered to me in 2002

homecomingfarm@comcast.net  To the best of my recollection this email address was registered to me in approximately 2004-5 when mediaone was bought by Comcast (in southern Massachusetts).

homecomingfarm2@comcast.net To the best of my recollection this email address was registered to me in approximately 2004-5 after Comcast became email service provider replacing mediaone.

Castleton2b@comcast.net  To the best of my recollection this email address was registered to me in 1997 after Comcast became email provider replacing mediaone.
ACVSMR@comcast.net Registered to me approximately 2004-5 when Comcast became the service provider replacing mediaone.
ACVSMR@gmail.com  To the best of my recollection this email address was registered to me approximately 2008 or when Gmail became available.
homecomingfarm@gmail.com Registered to me approximately 2008 or when Gmail became available.
I have website associated email addresses with each of the two websites I own and control, www.ACVSMR.org and www.homecomingfarm.farm.

## INTERROGATORY NO. 26

Please identify each person who has knowledge concerning the allegations of the complaint for this lawsuit and the allegations and defenses set forth in the answers to the complaint and counterclaims, and for each such person, please provide their contact information (including occupation, employer, address and telephone number) and a summary of the knowledge they possess.

## ANSWER

In addition to the persons identified in response to Interrogatory No. 21 above, the following is a list of those person whom I believe may have knowledge concerning facts which may be relevant to the claims and defenses raised by the parties in this action:

Doctor Sheila Lyons; Brockton, Massachusetts
Robert Gillette, Illinois
Linda Blythe; Corvalis, Oregon
Hilary Clayton, Lansing, Michigan
David Nunamaker; New Bolton Center, University of Pennsylvania
Dr. Dee, Hollywood, Florida
Robert Taylor; Montana
June Gilch; West Jefferson, North Carolina
Zac March, Misouri
Dr. Elizabeth Sabin (AVMA)
Dr. Park (address unknown)
Ted Stashak, Santa Rosa, California
John Cullity, Sandwich, Massachusetts
Dana Pantano, Massachusetts
Jill Bailey, Los Angeles, California
Zac March, Misouri
Charles Liskey, Carpenteria, California
Curtis Burns, Wellington, Florida
Irineu Palmeira; Sao Paulo, Brasil
Michael Savoldi, Shandon, California
Dennis Brida, Saratoga Springs, New York
Ellin Asack, Sandwich, Massachusetts
Betsy Erickson, Sandwich, Massachusetts

In further answering, the plaintiffs respectfully object to the preceding interrogatory on the grounds that it is unduly burdensome and calls for information which is not in the possession of the plaintiffs insofar as it requests that the plaintiffs include in their answer "a summary of the knowledge they possess."

## INTERROGATORY NO. 27

Please set forth in detail your claim for damages in this matter. In responding to this interrogatory, please state the amount of each element or component of damages claimed as well as the factual basis for each such claim, set forth all data, actual or estimated, assumptions, hypotheses, and calculations underlying each element or component of damages claimed and the sources thereof, and identify all documents on which you rely in claiming each element or component of damages. Your answer should include, but should not be limited to, an itemization of all actual or compensatory damages claimed. To the extent that you contend that you are entitled to any prejudgment interest, any multiplier of actual or compensatory damages, any punitive or exemplary damages, or any costs or attorney's fees, your answer should include, but

should not be limited to, an itemization of such items and a statement of the basis for your contention with respect to each.

## ANSWER

I am seeking damages in the form of the value of the tradename and copyrighted work product which the defendants have misappropriated. This includes the sum of $1,946,136 in expenses incurred by me to develop ACVSMR which the defendants have misappropriated. This includes the sum of $1,946,136 in expenses incurred by me to develop ACVSMR and the fair and reasonable value of the services I provided in developing ACVSMR which exceeds 20,000 hours. Based upon my usual and customary charges this amount equals or exceeds the sum of $4,750,000. These services include time spent developing first the professional expertise and specialized knowledge which was essential to the creation of ACVSMR by linking the two specialties; the research upon which the understanding of how the application of methodologies in human specialty practice can be effectively applied to veterinary patients with substantial adjustment for species differences and compensation for developing the plan, structure, and administration for the creation of ACVSMR as a new veterinary specialty and in veterinary services in both veterinary medicine and for allied health care paraprofessionals.

The basis for this claim is that the defendants, including Robert Gillette and the other individual defendants had no plan to develop a new AVMA specialty which linked the two distinct specialty fields or sports and rehabilitative medicine and also lack the specialized skill and knowledge needed to do so especially in the field of human medicine. Gillette admitted to me that he had unsuccessfully approached the AVMA about his intention to create a new AVMA recognized specialty in canine sports medicine. He used my copyrighted materials and plan and along with Doctor Linda Blythe and the other individual defendants and falsely and shamelessly represented it to be their own work product. In misappropriating the registered tradename and copyrighted work product that I created, the defendants misappropriated over a decade of self-education in veterinary sports and rehabilitation and human medicine, clinical research and work I performed in order to create and develop ACVSMR and this new specialty board in veterinary sports and rehabilitation medicine.

I am also seeking damages for the loss of grants and other revenue caused by the confusion created by the defendants' unauthorized use of my registered tradename. The market for grants, donations of real property, donation of money, bequests, and gifts is an extremely competitive one. Homecoming Farm, Inc., has invested significant resources to hire consultants and to benefit from fundraising educational seminars and conferences to improve our ability to obtain grant funding and other support for more than two decades. The reason the ACVSMR project has been successful in obtaining support is due to the fact that our mission and guarantee to our supporters is that we will adhere to the same high standards in the development and administration of our educational, research and clinical service programs as human medicine. Our mark is associated with a promise to every supporter that we will continue to include human medical experts as advisors to our programs and invite specialists from human medicine to join our research projects, teach in our educational programs, and share our ACVSMR Center for its own research purposes. When Homecoming Farm, Inc. first defined the ACVSMR mark as the name for our comprehensive project and programs in 1995, we were successful in obtaining grants where several veterinary schools' seemingly similar sports medicine related programs had

35

failed. Our supporters told us that it was the fact that we were basing our work on the foundation of the well-established analogous human specialties, and the fact that our research and specialized clinical services using these methods in practice had already showed excellent results with their horses, that we gained their trust and received their support. Our support dropped off precipitously when the defendants began their infringement of my registered trademark and taking credit for my copyrighted work product, thereby undermining the meaning of the ACVSMR mark, diluting and diminishing its value. The defendants have misled the public, the equine racing communities, the veterinary profession, the allied paraprofessionals, associations, federations, regulators, government agencies, students, and academic professionals and institutions by giving the false impression that they are the creators of the mark as well as my copyrighted work product when in fact they are not and that they are "the official" spokespersons for the ACVSMR causing confusion in the minds of the communities upon which we depend for funding. The amount of these damages are yet to be determined.

I am seeking damages for lost income and professional opportunities in publishing, academia, and research that I would have earned if properly recognized as the creator and founder of this new veterinary specialty. The benefits of such recognition include textbook and peer-reviewed scientific paper publication benefits, academic appointments, speaking engagements, veterinary practice consulting fees and business, and the honor and prestige of being recognized as the founder of a new specialty in veterinary medicine. As the AVMA has stated on its own website: in an economic time when jobs are competitive, it's to ones advantage to have extra experience, education and training. Being board certified tells not only your employers, but the public that you are knowledgeable, hard-working and ready for the task at hand. Benefits to board certification include: (1) increased salary; (2) benefit packages; (3) bonuses; (4) location of employment; (5) work with specific animals; (6) networking within the industry; and, (7) the right to refer to yourself as a Diplomate. I also seek damages for injury sustained to my professional reputation amongst professional colleagues, horse industry participants, the public, and other potential individual and corporate, foundations, charitable trusts, businesses and other supporters of my nonprofit organization and its ACVSMR project occasioned by the defendants' wrongful conduct. The amount of these damages are yet to be determined.

I also seek damages in the form of legal fees and expenses incurred by me as a result of the defendants' infringement including the legal fees and costs associated with the bringing of this action. These legal fees and expenses presently exceed the sum of $475,000. I am also seeking the award of punitive or multiple damages provided for under state and federal law.

## INTERROGATORY NO. 28

Please identify all damages Plaintiffs contend were caused by the AVMA.

## ANSWER

Please see my answer to Interrogatory No. 28 above as I believe the AVMA is jointly responsible for all of the damages described.

## INTERROGATORY NO. 29

Please identify and itemize the damages related to all lost business opportunities of Plaintiffs that were caused by the AVMA.

## ANSWER

Please see my answer to Interrogatory No. 28 above.

## INTERROGATORY NO. 30

Please identify and itemize the damages related to the dilution of the ACVSMR mark caused by the AVMA.

## ANSWER

Please see my answer to Interrogatory No. 28 above.

Signed this 13th day of November, 2012, under the pains and penalties of perjury.

_____
Sheila Lyons, DVM, Individually


HOMECOMING FARM, INC.

By: _____
Sheila Lyons, DVM

As to objections
By her attorneys:


/Camille F. Sarrouf/                          /Stephen J. Lyons/
_____         _____
Camille F. Sarrouf (BBO #442440)          Stephen J. Lyons (BBO#309840)
SARROUF LAW LLP                           KLIEMAN & LYONS
115 Broad Street, 4th Floor               115 Broad Street, 4th Floor
Boston, MA 02110                          Boston, MA 02110
Telephone:  617-227-5800                  Telephone: 617-443-1000
cfs@sarrouflaw.com                        sjlyons@kliemanlyons.com

Dated:  November 13, 2012

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 13th day of November, 2012 the foregoing Answers of the Plaintiffs, Sheila Lyons, DVM and Homecoming Farm, Inc., to First Set of Interrogatories Submitted by the Defendant, American Veterinary Medical Association, Inc., was served upon all parties of record by electronic mail and by mailing copies thereof, postage prepaid, to all counsel of record.

/Camille F. Sarrouf/
_____
Camille F. Sarrouf


Exhibit L

Int. Cl.: 41

Prior U.S. Cls.: 100, 101, and 107

United States Patent and Trademark Office

Reg. No. 3,088,963

Registered May 2, 2006

## SERVICE MARK
### SUPPLEMENTAL REGISTER

## The American College of Veterinary Sports Medicine and Rehabilitation

LYONS, SHEILA (UNITED STATES INDIVI-
DUAL)
21 AUGUSTA AVENUE
BROCKTON, MA 02301

FOR: VETERINARY EDUCATION SERVICES
NAMELY CONDUCTING CLASSES, SEMINARS,
CLINICAL SEMINARS, CONFERENCES, WORK-
SHOPS AND INTERNSHIPS AND EXTERNSHIPS
IN VETERINARY SPORTS MEDICINE AND VETER-
INARY REHABILITATION, IN CLASS 41 (U.S. CLS.
100, 101 AND 107).

FIRST USE 12-20-1995; IN COMMERCE 6-18-1996.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-635,662, FILED P.R. 5-24-2005; AM. S.R.
3-2-2006.

DAVID ELTON, EXAMINING ATTORNEY

# Exhibit M

| To: | Lyons, Sheila (homecomingfarm@juno.com) |
|---|---|
| **Subject:** | TRADEMARK APPLICATION NO. 78635662 - THE AMERICAN COLLEGE OF VETERINARY SPORT ETC. - N/A |
| **Sent:** | 12/23/2005 8:38:28 PM |
| **Sent As:** | ECOM106@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |

## UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| **SERIAL NO:** 78/635662 <br><br> **APPLICANT:** Lyons, Sheila | | · 78033002 · |
| **CORRESPONDENT ADDRESS:** <br> LYONS, SHEILA <br> 21 AUGUSTA AVE <br> BROCKTON, MA 02301-3373 | | **RETURN ADDRESS:** <br> Commissioner for Trademarks <br> P.O. Box 1451 <br> Alexandria, VA 22313-1451 |
| **MARK:** THE AMERICAN COLLEGE OF VETERINARY SPORT ETC. | | |
| **CORRESPONDENT'S REFERENCE/DOCKET NO:** N/A <br><br> **CORRESPONDENT EMAIL ADDRESS:** <br> homecomingfarm@juno.com | | Please provide in all correspondence: <br><br> 1. Filing date, serial number, mark and applicant's name. <br> 2. Date of this Office Action. <br> 3. Examining Attorney's name and Law Office number. <br> 4. Your telephone number and e-mail address. |

## OFFICE ACTION

**RESPONSE TIME LIMIT:** TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-MAILING DATE.

**MAILING/E-MAILING DATE INFORMATION:** If the mailing or e-mailing date of this Office action does not appear above, this information can be obtained by visiting the USPTO website at http://tarr.uspto.gov/, inserting the application serial number, and viewing the prosecution history for the mailing date of the most recently issued Office communication.

http://tdrweb.uspto.gov/ts/cd/casedoc/sn78635662/OOA20051223204001/1/webcontent     2/12/2012

Serial Number 78/635662

The assigned examining attorney has reviewed the referenced application and determined the following.

## NO CONFLICTING MARKS

The examining attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d). TMEP §704.02.

## THE MARK IS PRIMARILY GEOGRAPHICALLY DESCRIPTIVE:

The examining attorney refuses registration on the Principal Register because the mark is primarily geographically descriptive of the applicant's goods/services. Trademark Act Section 2(e)(2), 15 U.S.C. §1052(e)(2); TMEP §§1210.01(a) and 1210.04(b).

The examining attorney has determined that the primary significance of the term *"AMERICAN"* is geographic. See attached definition. In this instance, the term *"AMERICAN"* is used in a way that primarily denotes the United States as the origin or scope of the goods. Hence, the fact that a term may have other meanings does not necessarily negate the basis for refusal. *In re Opryland USA Inc.*, 1 USPQ2d 1409 (TTAB 1986); *In re Cookie Kitchen, Inc.*, 228 USPQ 873 (TTAB 1986). TMEP §1210.02(b).

As the primary significance of the term *"AMERICAN"* is geographic, it is also noted that the applicant's services originate from the geographical place named in the mark. Therefore, a public association of the services with the place is presumed. *In re JT Tobacconists*, 59 USPQ2d 1080 (TTAB 2001); *In re U.S. Cargo, Inc.*, 49 USPQ2d 1702 (TTAB 1998); *In re Carolina Apparel*, 48 USPQ2d 1542 (TTAB 1998); *In re Chalk's International Airlines Inc.*, 21 USPQ2d 1637 (TTAB 1991); *In re California Pizza Kitchen*, 10 USPQ2d 1704 (TTAB 1989); *In re Handler Fenton Westerns, Inc.*, 214 USPQ 848 (TTAB 1982). TMEP §1210.04(b).

Moreover, the addition of descriptive terms to a geographic term does not obviate a determination of geographic descriptiveness. Therefore, the addition of *"COLLEGE OF VETERINARY SPORTS MEDICINE AND REHABILITATION,"* for services featuring education in the field of veterinary medicine, does not overcome the geographic significance of the mark. TMEP §1210.07(a). See *In re JT Tobacconists*, 59 USPQ2d 1080 (TTAB 2001); *In re Carolina Apparel*, 48 USPQ2d 1542 (TTAB 1998); *In re Chalk's International Airlines Inc.*, 21 USPQ2d 1637 (TTAB 1991); *In re Wine Society of America Inc.*, 12 USPQ2d 1139 (TTAB 1989); *In re California Pizza Kitchen Inc.*, 10 USPQ2d 1704 (TTAB 1988); *In re Cambridge Digital Systems*, 1 USPQ2d 1659 (TTAB 1986); *In re BankAmerica Corp.*, 231 USPQ 873 (TTAB 1986). The applicant is directed to the attached evidence consisting of printouts from websites found on the Internet utilizing the GOOGLE® search engine. Accordingly, the mark is refused registration under Section 2(e)(2) of the Trademark Act.

Although the examining attorney has refused registration, the applicant may respond to the refusal to register by submitting evidence and arguments in support of registration. If the applicant chooses to respond to the refusal to register, the applicant must also respond to the following informality.

## INDEFINITE RECITATION OF SERVICES

The recitation of services is unacceptable because the precise nature of the services is unclear. The applicant must amend the recitation to specify the common commercial names of the services. If there is no common commercial name, the applicant must describe the service and its intended uses or purpose. TMEP §1402.11; §1402.01.

The applicant may adopt the following recitation, if accurate:

EDUCATIONAL SERVICES, NAMELY, CONDUCTING CLASSES, SEMINARS, CONFERENCES AND WORKSHOPS IN THE FIELD OF VETERINARY MEDICINE, in class 041

The examining attorney *highly* recommends that the applicant consult the online Trademark Acceptable Identification of Goods and Services Manual, found on the Internet at http://www.uspto.gov/web/offices/tac/doc/gsmanual/, to ensure that any amendments made to the recitation of services comport with Office requirements. While the list is not exhaustive, the manual should give the applicant direction regarding proper international classification and information regarding the specificity required in the applicant's recitation of services.

Please note that, while the identification of services may be amended to clarify or limit the services, adding to the services or broadening the scope of the services is not permitted. 37 C.F.R. §2.71(a); TMEP §1402.06. Therefore, applicant may not amend the identification to include services that are not within the scope of the services set forth in the present identification.

## AMENDMENT TO SUPPLEMENTAL REGISTER NOT PERMITTED UNTIL ACCEPTABLE ALLEGATION OF USE IS FILED

Although an amendment to the Supplemental Register would normally be an appropriate response to this refusal, such a response is not appropriate in the present case. The instant application was filed under Trademark Act Section 1(b), 15 U.S.C. §1051(b), and is not eligible for registration on the Supplemental Register until an acceptable amendment to allege use under 37 C.F.R. §2.76 has been timely filed. 37 C.F.R. §2.47(d); TMEP §§815.02, 816.02 and 1102.03.

If applicant files an amendment to allege use and also amends to the Supplemental Register, please note that the effective filing date of the application will then be the date of filing of the amendment to allege use. 37 C.F.R. §2.75(b); TMEP §§206.01 and 816.02.

## BENEFITS OF SUPPLEMENTAL REGISTRATION

Although Supplemental Register registration does not afford all the benefits of registration on the Principal Register, it does provide the following advantages:

- The registrant may use the registration symbol ®;
- The registration is protected against registration of a confusingly similar mark under §2(d) of the Trademark Act, 15 U.S.C. §1052(d);
- The registrant may bring suit for infringement in federal court; and
- The registration may serve as the basis for a filing in a foreign country under the Paris Convention and other international agreements.

## TELEPHONE ENCOURAGED FOR CLARIFICATION

If the applicant has any questions or needs assistance in responding to this Office action, please telephone the assigned examining attorney.

/David Elton/
Examining Attorney
Law Office 106
571 272-9317

## HOW TO RESPOND TO THIS OFFICE ACTION:
- ONLINE RESPONSE: You may respond formally using the Office's Trademark Electronic

Application System (TEAS) Response to Office Action form (visit
http://www.uspto.gov/teas/index.html and follow the instructions, but if the Office Action has
been issued via email, you must wait 72 hours after receipt of the Office Action to respond via
TEAS).
- REGULAR MAIL RESPONSE: To respond by regular mail, your response should be sent to the
mailing return address above and include the serial number, law office number and examining
attorney's name in your response.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark
Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending
applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit
the Office's website at http://www.uspto.gov/main/trademarks.htm

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT
THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

# A·mer·i·can

**A·mer·i·can** (e-mèr'i-ken) *adjective*
*Abbr.* **A., Amer.**
1. Of or relating to the United States of America or its people, language, or culture.
2. Of or relating to North or South America, the West Indies, or the Western Hemisphere.
3. Of or relating to any of the Native American peoples.
4. Indigenous to North or South America. Used of plants and animals.

*noun*
*Abbr.* **A., Amer.**
1. A native or inhabitant of America.
2. A citizen of the United States.
— **A·mer'i·can·ness** *noun*[1]

[1]*The American Heritage® Dictionary of the English Language, Third Edition* copyright © 1992 by
Houghton Mifflin Company. Electronic version licensed from INSO Corporation; further reproduction and
distribution restricted in accordance with the Copyright Law of the United States. All rights reserved.

004647

# Exhibit N

## UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| SERIAL NO: 78/635662 <br><br> APPLICANT: Lyons, Sheila | ⌐/8635662⌐ |
| CORRESPONDENT ADDRESS: <br> SHEILA LYONS <br> 21 AUGUSTA AVE <br> BROCKTON MA 02301 | RETURN ADDRESS: <br> Commissioner for Trademarks <br> P.O. Box 1451 <br> Alexandria, VA 22313-1451 <br><br> If no fees are enclosed, the address should include the words "Box Responses - No Fee." |
| MARK: THE AMERICAN COLLEGE OF VETERINARY SPORT ETC. | |
| CORRESPONDENT'S REFERENCE/DOCKET NO: N/A <br><br> CORRESPONDENT EMAIL ADDRESS: <br> homecomingfarm@juno.com | Please provide in all correspondence: <br><br> 1. Filing date, serial number, mark and applicant's name. <br> 2. Date of this Office Action. <br> 3. Examining Attorney's name and Law Office number. <br> 4. Your telephone number and email address. |

Serial Number 78/635662

## EXAMINER'S AMENDMENT

**AMENDMENT(S) AUTHORIZED:** As authorized by Sheila Lyons on 3/2/06, the application is amended as noted below. *If applicant disagrees with or objects to any of the amendments below, please notify the undersigned trademark examining attorney immediately.* Otherwise, no response is necessary. TMEP §707.

Applicant amends the application to seek registration on the Supplemental Register.

http://tdrweb.uspto.gov/ts/cd/casedoc/sn78635662/EXA20060307083800/1/webcontent     2/12/2012

004664

/David Elton/
Examining Attorney
Law Office 106
Ph: 571 272-9317
Fax: 571-273-9106

004665

Exhibit O

|  |  |  |
|---|---|---|
| SHEILA LYONS, DVM and<br>HOMECOMING FARM INC.,<br>    Plaintiffs,<br>v.<br><br>THE AMERICAN COLLEGE OF<br>VETERINARY SPORTS MEDICINE<br>AND REHABILITATION, INC. and<br>THE AMERICAN VETERINARY<br>MEDICAL ASSOCIATION,<br>    Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 1:11-cv-12192 |

## **DEFENDANT, AMERICAN VETERINARY MEDICAL ASSOCIATION'S ANSWERS TO THE FIRST SET OF INTERROGATORIES OF THE PLAINTIFFS, SHEILA LYONS, DVM AND HOMECOMING FARM, INC.**

Pursuant to Fed.R.Civ.P. 26 and Local Rule 26.1, the defendant American Veterinary Medical Association ("AVMA") hereby answers Plaintiffs Sheila Lyons, DVM and Homecoming Farm, Inc.'s ("Plaintiffs") First Set of Interrogatories as follows:

### **GENERAL OBJECTIONS**

The following general objections are applicable to and incorporated by reference into each separate Answer of AVMA:

1.    AVMA objects to Plaintiffs' Definitions and Interrogatories to the extent they are unduly burdensome, overly broad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

2.    AVMA objects to Plaintiffs' Definitions and Interrogatories to the extent they seek the disclosure of information or communications subject to the attorney-client privilege, work product doctrine or other privileges and immunities such as trade secrets or proprietary information.

1

3.     AVMA objects to Plaintiffs' Definitions and Interrogatories to the extent they exceed the discovery limitations imposed by Fed. R. Civ. P. 26 and 34 and Local Rule 26.1.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify yourself fully, by stating your full name, date of birth, residential and business address, your occupation and the position you hold with the defendant, American Veterinary Medical Association, Inc.

**ANSWER TO INTERROGATORY NO. 1:** Objection. The AVMA objects to the portion of the interrogatory seeking the date of birth and residential address of the signer of these interrogatories on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence and on the grounds that it is confidential, personal information. Notwithstanding these objections, the AVMA answers as follows: Dr. Elizabeth Sabin; Associate Director for International and Diversity Initiatives; c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360.

**INTERROGATORY NO. 2:** Please identify by name, address and occupation, each person consulted by you or who assisted you in answering these interrogatories.

**ANSWER TO INTERROGATORY NO. 2:** Objection. The AVMA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and work product doctrine. The AVMA also objects to providing the residential addresses of its employees and/or volunteers. Notwithstanding these objections, the AVMA answers as follows: The following persons consulted or assisted in the answering

2

of these interrogatories:

- The AVMA's trial counsel, J. Mark Dickison of Lawson & Weitzen, LLP, 88 Black Falcon Avenue, Suite 345, Boston, MA 02210
- The AVMA's general counsel, Isham Jones, III, c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL

**INTERROGATORY NO. 3:** With respect to the corporate defendant, please state:

a. the date of incorporation;

b. the full name and address; and

c. the state(s) of incorporation and registration.

**ANSWER TO INTERROGATORY NO. 3:** The AVMA answers as follows:

a. March 17, 1917;

b. American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL; and,

c. Illinois.

**INTERROGATORY NO. 4:** Please state all of the facts that support your claim that you have the right to use the ACVSMR mark.

**ANSWER TO INTERROGATORY NO. 4:** The AVMA does not use the ACVSMR mark with respect to any goods or services offered by it and has never used the ACVSMR mark in a "trademark" sense to identify itself as a source of goods or services. Rather, it has only used the ACVSMR mark in a "non-trademark" way or as a "fair use" to identify

3

a third party veterinary specialty organization. Specifically, as part of the AVMA's mission to improve animal and human health and advance the veterinary medical profession, the AVMA has long recognized veterinary specialty organizations pursuant to the Policies and Procedures of the American Board of Veterinary Specialties (ABVS). It currently recognizes 22 veterinary specialty organizations comprising 40 distinct specialties. Virtually all of these veterinary specialty organizations have adopted names that are generic, or at best, descriptive. Approximately 14 of these 22 veterinary specialty organizations utilize a name containing the same first four words: "American College of Veterinary..." In or about, January 24, 2003, a group using the ACVSMR mark filed a letter of intent petitioning the AVMA to become a recognized specialty organization. During the process of considering the petition, the AVMA made reference to the ACVSMR mark, particularly when notifying its members about the petition and otherwise referring to or considering the petition. After several years of considering the petition pursuant to the Policies and Procedures of the ABVS, the AVMA Executive Board at its April 8-10, 2010 meeting granted provisional recognition to a veterinary specialty organization using the ACVSMR mark. In connection with the AVMA's provisional recognition of the new specialty organization, the AVMA again made reference to the ACVSMR mark, particularly when notifying its members about the provision recognition and otherwise referring to the new specialty organization. Thereafter, the AVMA has, in the course of providing its members with information about veterinary specialty organizations, occasionally referenced the veterinary specialty organization using the ACVSMR mark. The AVMA firmly believes it has a First Amendment right to fairly use the ACVSMR mark to identify, make reference to, and provide information about the veterinary specialty organization that uses the ACVSMR mark.

4

Moreover, as the ACVSMR mark is generic, or at best descriptive, the AVMA believes that it has the right to use the ACVSMR mark without the consent of the plaintiffs. Indeed, the AVMA is unaware of any use in commerce of the ACVSMR mark by plaintiffs with respect to goods and services and believes that the ACVSMR Mark has not acquired secondary meaning with any consumers. Further, the AVMA believes that the College obtained priority and ownership over the ACVSMR mark for all of the reasons set forth in their Counterclaim, and because, it appears that to the extent the ACVSMR mark has acquired any secondary meaning, the relevant consumers connect the mark with the College, rather than plaintiffs who, at best, only appear to have placed the ACVSMR mark on their website. Additionally, the AVMA believes that Lyons fraudulently obtained a supplemental registration for the ACVSMR mark from the USPTO, knowing that she was not the true owner of the mark and, in any event, subsequently failed to take any action whatsoever to police the mark-- knowingly allowing the College and its predecessors to use the mark from 2003 to the present and knowingly allowing the AVMA to use the mark from 2003 to the present. Thus, plaintiffs by their inactions are estopped from now making any claims as they have waived them.

**INTERROGATORY NO. 5:** Please list and describe any and all communications that you or any of your agents or employees have had with any past or present member of the board of directors, officers, employees or agents of the corporate defendant, the American College of Veterinary Sports Medicine and Rehabilitation, Inc., including, but not limited to, Robert Gillette, Linda Blythe and Hilary Clayton, regarding Doctor Lyons and/or Homecoming Farm, Inc. or its educational program trade-named The American College of Veterinary Sports Medicine and Rehabilitation.

5

**ANSWER INTERROGATORY NO. 5:** Objection. The AVMA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege, work product doctrine, and joint defense/common interest privilege. The AVMA also objects on the grounds that this interrogatory is overly broad and unduly burdensome. Notwithstanding these objections, the AVMA answers as follows: Pursuant to Fed. R. Civ. P. 33 (d), the AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning the ACVSMR mark except those records withheld on grounds of privilege as set forth in its privilege log, including all communications that AVMA or its agents have had with any past or present member of the board of directors, officers, employees or agents of the corporate defendant, the American College of Veterinary Sports Medicine and Rehabilitation, Inc.

**INTERROGATORY NO. 6:** Please list and describe any and all communications that you or any of your agents or employees have had with any third parties regarding Doctor Lyons and/or Homecoming Farm, Inc. or its educational program trade-named The American College of Veterinary Sports Medicine and Rehabilitation.

**ANSWER TO INTERROGATORY NO. 6:** Objection. The AVMA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege, work product doctrine, and joint defense/common interest privilege. The

6

AVMA also objects on the grounds that this interrogatory is overly broad and unduly burdensome. Notwithstanding these objections, the AVMA answers as follows: Pursuant to Fed. R. Civ. P. 33 (d), the AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning the ACVSMR mark except those records withheld on grounds of privilege as set forth in its privilege log, including all communications that the AVMA or its agents or employees have had with any third parties regarding Doctor Lyons and/or Homecoming Farm, Inc. or its educational program trade-named The American College of Veterinary Sports Medicine and Rehabilitation.

**INTERROGATORY NO. 7:** Please list and describe all of the instances in which you have used the ACVSMR Mark including in your answer the date of each use and a description of the nature of each publication or use of the Mark.

**ANSWER TO INTERROGATORY NO. 7:** Objection. The AVMA also objects on the grounds that this interrogatory is overly broad and unduly burdensome. Notwithstanding these objections, the AVMA answers as follows: The AVMA does not use the ACVSMR mark with respect to any goods or services offered by it and has never used the ACVSMR mark in a "trademark" sense to identify itself as a source of goods or services. Rather, it has only used the ACVSMR mark in a "non-trademark" way or as a "fair use" to identify a third party veterinary specialty organization. Pursuant to Fed. R. Civ. P. 33 (d), the

7

AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning the ACVSMR mark except those records withheld on grounds of privilege as set forth in its privilege log, including the instances in which the AVMA used the ACVSMR Mark. Further answering, the AVMA has referenced the ACVSMR Mark on its website www.avma.org as follows:

ABVS Entity Description

https://www.avma.org/Members/Volunteer/BecomeAVolunteer/Pages/abvs.aspx

ABVS Entity Description – Full version

https://www.avma.org/About/Governance/Councils/Pages/American-Board-of-Veterinary-Specialties-Entity-Description.aspx

ABVS Recognized Specialty Org

https://www.avma.org/professionaldevelopment/education/specialties/pages/Recognized-veterinary-specialty-organizations_result1.aspx?AspXPage=g%5FBF79C5F75272484A8D689B838FCAF3B4:%2540Organization%3DAmerican%2520College%2520of%2520Veterinary%2520Sports%2520Medicine%2520and%2520Rehabilitation%2520%2528provisional%2520recognition%2529

ABVS Minutes: February 26-27, 2005

No longer posted on website

ABVS Minutes: February 12-13, 2006

No longer posted on website

JAVMA News: New specialty college issues certification requirements, sets exam date

https://www.avma.org/News/JAVMANews/Pages/110915r.aspx

JAVMA News: Sports medicine and rehab specialty to publish certification requirements

https://www.avma.org/News/JAVMANews/Pages/110701n.aspx

JAVMA News: Sports medicine and rehab specialty recognized

https://www.avma.org/News/JAVMANews/Pages/100601h.aspx

JAVMA News: Pet rehab becoming mainstream practice

https://www.avma.org/News/JAVMANews/Pages/091001c.aspx

JAVMA News: Many faces, one profession

https://www.avma.org/News/JAVMANews/Pages/090515v.aspx

JAVMA News: Comments invited on proposed sports medicine and rehabilitation specialty

https://www.avma.org/News/JAVMANews/Pages/090315b.aspx

Convention 2011 Press Room: Podcasts

No longer posted on website

AVMA Press Release - Veterinary rehabilitation: Much more than underwater treadmills

No longer posted on website

Market Research Statistics: Veterinary specialists — 2011

https://www.avma.org/KB/Resources/Statistics/Pages/Market-research-statistics-Veterinary-specialists.aspx

Market Research Statistics: Veterinary specialists — 2010

https://www.avma.org/KB/Resources/Statistics/Pages/Market-research-statistics-Veterinary-specialists-2010.aspx

**INTERROGATORY NO. 8:** Please list and describe any all instances in which there has been any confusion over the Mark of which you are aware.

**ANSWER TO INTERROGATORY NO. 8:** The AVMA is unaware of any instances in which there has ever been any confusion over the ACVSMR Mark.

**INTERROGATORY NO. 9:** Please state all the facts relating to the selection and subsequent appointment of Doctor Jon Frederick Dees as AVMA liaison to the planning committee created by Doctor Lyons, including Doctor Dee's role and responsibilities in the work of this planning committee. Please include in your answer a description of any and all communications between the AVMA and any of its employees and Doctor Dees regarding same.

**ANSWER TO INTERROGATORY NO. 9:** Dr. Jon Frederic Dee was not, and has never been, AVMA's liaison to the ACVSMR organizing committee. Rather, his brother, Dr. Larry Dee was one of the ABVS liaisons to the ACVSMR organizing committee. To the extent there has been any communications between the AVMA and either Dr. Larry Dee or Dr. Jon Frederic Dee, the AVMA exercises its option to produce its business records pursuant to Fed. R. Civ. P. 33 (d), as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning communications with the AVMA and Dr. Larry Dee or Dr. Jon Frederic Dee except those records withheld on grounds of

10

privilege as set forth in its privilege log.

**INTERROGATORY NO. 10:** Describe any and all private or open committee meetings or communications of any kind regarding Doctor Lyons, Homecoming Farm, Inc., and or The American College of Veterinary Sports Medicine and Rehabilitation, American College of Veterinary Sports Medicine and Rehabilitation, Inc., Robert Gillette or any other parties related to any issue in this complaint.

**ANSWER TO INTERROGATORY NO. 10:** Objection. The AVMA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege, work product doctrine, and joint defense/common interest privilege. The AVMA also objects on the grounds that this interrogatory is overly broad and unduly burdensome. Notwithstanding these objections, the AVMA answers as follows: Pursuant to Fed. R. Civ. P. 33 (d), the AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning the parties except those records withheld on grounds of privilege as set forth in its privilege log, including private or open committee meetings.

**INTERROGATORY NO. 11:** Describe the procedure for closed AVMA committee or AVMA board meetings and the process of informing AVMA members of the proceedings

and discussions that take place in these meetings.

**ANSWER TO INTERROGATORY NO. 11:** Objection. The AVMA objects on the grounds that this interrogatory is overly broad and unduly burdensome and unduly vague as fails to specify which of the several AVMA committee or board meetings that the plaintiffs refer to. Notwithstanding these objections, the AVMA answers as follows: Pursuant to Fed. R. Civ. P. 33 (d), the AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies that the procedure for closed AVMA committee or AVMA board meetings and the process of informing AVMA members of the proceedings and discussions that take place in these meetings is available on the AVMA website www.avma.org, including, https://www.avma.org/ProfessionalDevelopment/Education/Specialties/Pages/abvs-procedures-ii.aspx.

**INTERROGATORY NO. 12:** Please describe in complete detail the process followed by the AVMA in granting provisional approval to the defendant, American College of Veterinary Sports Medicine and Rehabilitation, Inc. (or any past or present member of its board of directors), as a recognized specialty board in veterinary medicine including in your answer any and all extensions of time or other departures from the rules, regulations, procedures and/or guidelines of the AVMA related to that approval process.

**ANSWER TO INTERROGATORY NO. 12:** Objection. The AVMA objects on the grounds that this interrogatory is overly broad and unduly burdensome. Notwithstanding

12

these objections, the AVMA answers as follows: Pursuant to Fed. R. Civ. P. 33 (d), the AVMA exercises its option to produce its business records as the answer to this interrogatory may be determined by examining the AVMA's business records and the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Specifically, the AVMA specifies, in connection with its responses to Plaintiffs' Requests for Production of Documents, that it will be producing directly to counsel for all parties, all of its business records (Bates Stamped AVMA 1 – 3163) concerning the process followed by the AVMA in granting provisional approval to the defendant, American College of Veterinary Sports Medicine and Rehabilitation, Inc. (or any past or present member of its board of directors), as a recognized specialty board in veterinary medicine, except those records withheld on grounds of privilege as set forth in its privilege log.

**INTERROGATORY NO. 13:** Identify any trademarks or trade names registered to you.

**ANSWER TO INTERROGATORY NO. 13:** Objection. The AVMA objects on the grounds that this interrogatory is overly broad and unduly burdensome, and that it is not reasonably calculated to lead to the discovery of admissible evidence. The AVMA also object on the grounds that the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it will be for the AVMA. Notwithstanding these objections, the AVMA answers as follows: Please refer to the United States Patent and Trademark's searchable database found at www.uspto.gov.

**INTERROGATORY NO. 14:** State all the facts which you believe support the seventeen (17) affirmative defenses raised by you in your answer to the complaint.

**ANSWER TO INTERROGATORY NO. 14:** The AVMA does not use the ACVSMR mark with respect to any goods or services offered by it and has never used the ACVSMR mark in a "trademark" sense to identify itself as a source of goods or services. Rather, it has only used the ACVSMR mark in a "non-trademark" way or as a "fair use" to identify a third party veterinary specialty organization. Specifically, as part of the AVMA's mission to improve animal and human health and advance the veterinary medical profession, the AVMA has long recognized veterinary specialty organizations pursuant to the Policies and Procedures of the American Board of Veterinary Specialties (ABVS). It currently recognizes 22 veterinary specialty organizations comprising 40 distinct specialties. Virtually all of these veterinary specialty organizations have adopted names that are generic, or at best, descriptive. Approximately 14 of these 22 veterinary specialty organizations utilize a name containing the same first four words: "American College of Veterinary..." In or about, January 24, 2003, a group using the ACVSMR mark filed a letter of intent petitioning the AVMA to become a recognized specialty organization. During the process of considering the petition, the AVMA made reference to the ACVSMR mark, particularly when notifying its members about the petition and otherwise referring to or considering the petition. After several years of considering the petition pursuant to the Policies and Procedures of the ABVS, the AVMA Executive Board at its April 8-10, 2010 meeting granted provisional recognition to a veterinary specialty organization using the ACVSMR mark. In connection with the AVMA's provisional recognition of the new specialty organization, the AVMA again made reference to the ACVSMR mark, particularly when notifying its members about the provisional recognition and otherwise referring to the new specialty organization. Thereafter, the AVMA has, in the course of providing its members with information about veterinary

14

specialty organizations, occasionally referenced the veterinary specialty organization using the ACVSMR mark. The AVMA firmly believes it has a First Amendment right to fairly use the ACVSMR mark to identify, make reference to, and provide information about the veterinary specialty organization that uses the ACVSMR mark.

Moreover, as the ACVSMR mark is generic, or at best descriptive, the AVMA believes that it has the right to use the ACVSMR mark without the consent of the plaintiffs. Indeed, the AVMA is unaware of any use in commerce of the ACVSMR mark by plaintiffs with respect to goods and services and believes that the ACVSMR Mark has not acquired secondary meaning with any consumers. Further, the AVMA believes that the College obtained priority and ownership over the ACVSMR mark for all of the reasons set forth in their Counterclaim, and because, it appears that to the extent the ACVSMR mark has acquired any secondary meaning, the relevant consumers connect the mark with the College, rather than plaintiffs who, at best, only appear to have placed the ACVSMR mark on their website. Additionally, the AVMA believes that Lyons fraudulently obtained a supplemental registration for the ACVSMR mark from the USPTO, knowing that she was not the true owner of the mark and, in any event, subsequently failed to take any action whatsoever to police the mark-- knowingly allowing the College and its predecessors to use the mark from 2003 to the present and knowingly allowing the AVMA to use the mark from 2003 to the present. Thus, plaintiffs by their inactions are estopped from now making any claims as they have waived them.

As discovery is ongoing and the AVMA is in the process of obtaining information from Plaintiffs and the College about their respective uses of the ACVSMR mark, the AVMA will supplement this answer as needed. The AVMA expects to obtain discovery

15

showing that the plaintiffs abandoned the mark by its prior "assignment in gross" of the mark apart from its good will, and the "naked" license of rights in the mark without adequate quality control and also that plaintiffs misused the ACVSMR mark to misrepresent themselves as the source of the services in connection with which the mark was used.

**INTERROGATORY NO. 15:** Identify each witness or person whom you believe has knowledge of any facts related to the claims or defenses of the parties to this action, setting forth as to each person including:

(a) the name, address of each such person;

(b) occupation and the name and address of each such person's employer at the time of the events referred to in this interrogatory;

(c) to the extent known, the substance of that person's knowledge.

**ANSWER TO INTERROGATORY NO. 15:** Defendant AVMA states that the following individuals are likely to have knowledge of facts related to claim or defenses of the parties to this action:

1.      Plaintiff Sheila Lyons, DVM ("Lyons") -- residential address unknown – Dr. Lyons has knowledge of the events related to the allegations in her Complaint and the claims of her solely owned company Homecoming Farm, Inc.

2.      Defendant Robert Gillette, DVM ("Gillette") -- residential address unknown – Dr. Gillette is president of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

3.      30(b)(6) Representative(s) of Homecoming Farm, Inc. – Officers and/or

employees of Homecoming are believed to have knowledge or information about the facts alleged in the Complaint.

4.      Linda Blythe, DVM -- residential address unknown – Dr. Blythe is a past president of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

5.      Hilary Clayton-- residential address unknown – Dr. Clayton is a President-elect of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

6.      James Cook, DVM -- residential address unknown – Dr. Cook is Vice President of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

7.      Kevin K. Haussler, DVM -- residential address unknown – Dr. Haussler is the Secretary Treasurer of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

8.      Christine Zink, DVM, -- residential address unknown – Dr. Zink is the Small Animal Rehab Regent of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

9.      Joseph Wakshlag, DVM -- residential address unknown – Dr. Wakshlag is Small Animal Sports Rehab Regent of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

10.     Andris Kaneps, DVM -- residential address unknown – Dr. Kaneps is Equine Rehab Regent of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

11.     Wayne McIllwraith, DVM– residential address unknown– Dr.

McIllwraith is Equine Sports Medicine Regent of the American College of Veterinary Sports Medicine and Rehabilitation and may have knowledge of claims in the Complaint.

12.     Jon Frederic Dee, DVM –  Hollywood Animal Hospital, 2864 Hollywood Boulevard, Hollywood, FL  33020– apparently was involved with the organizing committee for ACVSMR and may have knowledge of the claims at issue in the Complaint.

13.     Elizabeth Sabin, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – a staff member of AVMA with knowledge of Dr. Lyons' interaction with the AVMA and some knowledge of the facts at issue in the Complaint.

14.     Karen Brandt, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – former staff consultant to the AVMA's  American Board of Veterinary Specialties committee and possesses some knowledge of the facts at issue in the Complaint.

15.     Larry Dee, DVM – Hollywood Animal Hospital, 2864 Hollywood Boulevard, Hollywood, FL  33020--  a former ABVS liaison to the organizing committee of ACVSMR and current member of AVMA executive board who may have some knowledge of the facts at issue in the Complaint.

16.     Greg Cima – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – a staff member of AVMA with some knowledge of the facts at issue in the Complaint or in possession or control of documents relating to facts at issue in the Complaint.

17.     Scott Nolen – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – a staff member

of AVMA with some knowledge of the facts at issue in the Complaint or in possession or control of documents relating to facts at issue in the Complaint.

18. Doug Aspros, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 –AVMA President with some knowledge of the facts at issue in the Complaint.

19. Janyce Seahorn, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

20. Lynne Anderson, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

21. William Fenner, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

22. John Oliver, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 –AVMA volunteer with some knowledge of the facts at issue in the Complaint.

23. Diane Gerken, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

24. Carla Carlton, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 –AVMA volunteer with some knowledge of the facts at issue in the Complaint.

25. John Bauer, DVM – c/o American Veterinary Medical Association, 1931

North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 –AVMA

volunteer with some knowledge of the facts at issue in the Complaint.

26. Ralph Richardson, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

27. D.J. Krahwinkel, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

28. Terry Swecker, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 – AVMA volunteer with some knowledge of the facts at issue in the Complaint.

29. Sheila Allen, DVM – c/o American Veterinary Medical Association, 1931 North Meacham Road, Suite 100, Schaumburg, IL 60173-4360 (847) 285-6708 –AVMA volunteer with some knowledge of the facts at issue in the Complaint.

30. D. Glen Esplin, DVM – 1815 E. Parkridge Drive,Salt Lake City, UT 84121– a volunteer of AVMA who may have some knowledge of the facts at issue in the Complaint, specifically the ACVSMR petition to the AVMA for recognition as a specialty college.

31. Colin Harvey, DVM-- Department of Clinical Studies, University of Pennsylvania, SVM, VHUP 3113, 3800 Delancey Street, Philadelphia, PA 19104-- a volunteer of AVMA who may have some knowledge of the facts at issue in the Complaint, specifically the ACVSMR petition to the AVMA for recognition as a specialty college.

32. Robert Pechman, DVM--4993 Tulane Drive, Baton Rouge, LA 70808 -- a

volunteer of AVMA who may have some knowledge of the facts at issue in the Complaint, specifically the ACVSMR petition to the AVMA for recognition as a specialty college.

33.     Dale Paccamonti, DVM-- Department of Veterinary Clinical Sciences, School of Veterinary Medicine, Skip Bertman Drive, Louisiana State University, Baton Rouge, LA 70803-- a volunteer of AVMA who may have some knowledge of the facts at issue in the Complaint, specifically the ACVSMR petition to the AVMA for recognition as a specialty college.

34.     Leon Russell, DVM – address and phone number currently unknown – a former ABVS liaison to the organizing committee of ACVSMR who may have some knowledge of the facts at issue in the Complaint.

35.     Suzanne Kennedy-Stoskopf, DVM – address and phone number currently unknown – a former ABVS liaison to the organizing committee of ACVSMR who may have some knowledge of the facts at issue in the Complaint.

36.     Bob Murtaugh, DVM – address and phone number currently unknown – a former ABVS liaison to the organizing committee of ACVSMR who may have some knowledge of the facts at issue in the Complaint.

37.     Ellen Asack– address and phone number currently unknown – a former client of Dr. Lyons who may have knowledge of the facts at issue in the Complaint.

38.     Betsy Erickson– address and phone number currently unknown – a former client of Dr. Lyons who may have knowledge of the facts at issue in the Complaint.

**INTERROGATORY NO. 16:** Please identify fully all persons you intend to call as witnesses at the trial of the above-entitled case.

**ANSWER TO INTERROGATORY NO. 16:** The AVMA has not yet ascertained which people it will call as witnesses at the trial of the above-entitled case.

**INTERROGATORY NO. 17:** Identify by name and business address each person whom you expect to call as an expert witness at trial, stating:

a. the qualifications of each expert witness;

b. the subject matter on which each expert witness is expected to testify;

c. in detail, the substance of the facts and opinions to which each expert witness is expected to testify; and

d. a summary of the grounds for each opinion.

**ANSWER TO INTERROGATORY NO. 17:** The AVMA has not yet ascertained which people it will call as expert witnesses at the trial of the above-entitled case.

The undersigned states that she is the authorized representative of the American Veterinary Medical Association to sign its Answers to Interrogatories, that these answers to interrogatories are accurate and true to the best of her information and belief, that due to the nature of these interrogatories and the legal analysis called for by the answers, the answers were prepared by counsel and the phraseology of the answers is that of counsel. Additionally, some of the information in these answers is derived from business records and from various individuals engaged on American Veterinary Medical Association's behalf and not necessarily from any individual's personal knowledge. However, to the best of my knowledge all of the information contained herein is true and accurate.

Signed under the pains and penalties of perjury this          day of  November, 2012,

_____
Dr. Elizabeth Sabin

AS TO OBJECTIONS:
THE AMERICAN VETERINARY
MEDICAL ASSOCIATION
By its attorneys,

_____/s/ J. Mark Dickison_____
J. Mark Dickison (BBO# 629170)
    mdickison@lawson-weitzen.com
Joshua M. D. Segal (BBO# 678367)
    jsegal@lawson-weitzen.com
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone:(617) 439-4990
Facsimile: (617) 439-3987

## CERTIFICATE OF SERVICE

I hereby certify that this document was sent via email and first class mail to all counsel of record on November 28, 2012.

_/s/ J. Mark Dickison_____
    J. Mark Dickison