# EXHIBIT B

Exhibits: 14-53          Volume 2, Pages 210-439

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

SHEILA LYONS, DVM and HOMECOMING
FARM, INC.,

                    Plaintiffs

v           Civil Action No. 1:11-CV-12192

THE AMERICAN COLLEGE OF VETERINARY

SPORTS MEDICINE AND REHABILITATION,

INC. and THE AMERICAN VETERINARY

MEDICAL ASSOCIATION, INC.,

                    Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF SHEILA LYONS

Wednesday, January 16, 2013, 10:04 a.m.

Lawson & Weitzen, LLP

88 Black Falcon Avenue, Suite 345

Boston, Massachusetts

- - - - - - - Reporter:  Alan H. Brock, RDR, CRR - - - - - - -

ahb@fabreporters.com.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

2

---

**211**

```
 1   APPEARANCES:
 2
 3   Klieman & Lyons
 4       Stephen J. Lyons, Esq.
 5       Rikki Klieman, Esq. (until afternoon break)
 6       115 Broad Street, Fourth Floor
 7       Boston, Massachusetts 02110
 8       617.443.1000  fax: 617.608.2828
 9       sjlyons@kliemanlyons.com
10       rklieman@kliemanlyons.com
11       - and
12   Sarrouf Law, LLP
13       Camille F. Sarrouf, Esq. (beginning)
14       115 Broad Street, 4th Floor
15       Boston, Massachusetts 02110
16       617.227.5800 fax: 617.227.5470
17       cfs@sarrouflaw.com
18       for Plaintiffs
19
20
21
22
23
24
```

---

**212**

```
 1   Foley Hoag LLP
 2       David A. Kluft, Esq.
 3       Seaport West
 4       155 Seaport Boulevard
 5       Boston, Massachusetts 02210-2600
 6       617.832.1000 fax: 617.832.7000
 7       dkluft@foleyhoag.com
 8       for The American College of Veterinary Sports
 9       Medicine and Rehabilitation, Inc.
10
11
12   Lawson & Weitzen, LLP
13       J. Mark Dickison, Esq. (until lunch break)
14       Joshua M. D. Segal, Esq.
15       88 Black Falcon Avenue
16       Boston, Massachusetts 02210
17       617.439.4990 fax: 617.439.3987
18       mdickison@lawson-weitzen.com;
19       jsegal@lawson-weitzen.com
20       for The American Veterinary Medical Association
21
22
23
24
```

---

**213**

```
 1                       I N D E X
 2
 3                      EXAMINATIONS
 4   SHEILA LYONS
 5       MR. KLUFT                        216
 6                    EXHIBITS MARKED
 7   14      Response of plaintiffs to    245
 8           first request for
 9           production of documents
10   15      "Copyright"           257
11   16      Affidavit of Sheila Lyons  271
12   17      Letter and attachment      280
13   18      AAEP Report           299
14   19      Letter                312
15   20      William and Charlotte      314
16           Parks Foundation for
17           Animal Welfare grant
18           proposal
19   21      Request for funding   317
20   22      Handwritten document       328
21   23      Budgets           328
22   24      Meadowbrook Animal         328
23           Sanctuary and Haven, site
24           visit report
```

---

**214**

```
 1   25      Memo              328
 2   26      Brochure          328
 3   27      Board meeting minutes      328
 4   28      Homecoming Farm website    351
 5   29      "Homecoming Farm, Inc."    353
 6   30      Web photos         355
 7   31      "Equine Musculoskeletal    357
 8           and Neuromuscular
 9           Reference Guide"
10   32      Letter            362
11   33      Email chain        371
12   34      Email             375
13   35      Email             377
14   36      Email and attachment       379
15   37      Email             382
16   38      Email             385
17   39      Email             390
18   40      Email             392
19   41      Letter            395
20   42      Organizational Meeting     397
21           notes
22   43      Email             398
23   44      Email             400
24   45      Email             403
```

---

215

| 1 | 46 | Handwritten document | 411 |
| 2 | 47 | Email | 413 |
| 3 | 48 | Email | 415 |
| 4 | 49 | Email | 418 |
| 5 | 50 | Email | 418 |
| 6 | 51 | Email | 418 |
| 7 | 52 | Statement of damages | 422 |
| 8 | 53 | Statement | 423 |

9
10   Exhibits returned to Attorney Dickison
11
12
13
14
15
16
17
18
19
20
21
22
23
24

216

1       P R O C E E D I N G S
2       January 16, 2013      10:04 a.m.
3       P R O C E E D I N G S
4       SHEILA LYONS, Previously Sworn
5       DIRECT EXAMINATION
6  BY MR. KLUFT:
7       Q. Good morning, Dr. Lyons. You've probably
8  figured out, my name is Dave Kluft, and I represent
9  The American College of Veterinary Sports Medicine
10  and Rehabilitation, Inc., and I also represent some
11  of the individuals who are named in the complaint.
12      I know that this controversy is over the
13  name of the organization, and there may be some
14  difficulty in using the word "ACVSMR." So what I'll
15  try to do is what Mr. Dickison did yesterday, and
16  I'll refer to my client as the college or the
17  organizing committee, and I'll refer to the project
18  of Homecoming Farm as the ACVSMR project, or I'll
19  just spell it out. Will you understand that, if I
20  use those terminologies?
21      A. Yes.
22      Q. I'm going to try not to cover the same
23  ground that Mark covered, but you'll forgive me if I
24  do. I apologize. And I will try to move fast

217

1  through that ground, if I feel like I have to cover
2  it.
3       One other thing I'll ask:  I know that
4  there's been some controversy in this case, as I'm
5  sure you know, over the authenticity of certain
6  documents. If I show you a document that it is your
7  contention is not authentic, please tell me. It is
8  not my intention to trick you into authenticating
9  documents you contend are not authentic. Do you
10  understand what I'm telling you?
11      A. Yes.
12      Q. I will try to ask you, but if I forget,
13  please point out to me if I show you a document that
14  purports to be authored by you, that it's your
15  position is not authored by you. All right?
16      A. Yes.
17      Q. I just want to start by asking a couple of
18  followup questions from yesterday. First of all,
19  what is a farrier?
20      A. A farrier is a person who is skilled and
21  trained in trimming and shoeing and otherwise
22  working with horses' hooves.
23      Q. Now, in some of the documents you've
24  produced -- and I think I'm going to show you one

218

1  fairly shortly -- there is a term used
2  "paraprofessional." Does a farrier concern a
3  veterinary paraprofessional?
4       A. No, not in my use of that term.
5       Q. What is a -- I'm sorry. Were you finished
6  with your answer?
7       A. Yes.
8       Q. What is a paraprofessional?
9       A. My definition of a paraprofessional would
10  be someone who both serves a professional but
11  someone whose professional territory, if it were,
12  had some clear definition. So one example of a
13  paraprofessional that I would give would be a
14  physiotherapist.
15      Q. And what kind of training would a
16  physiotherapist have? Would they be a veterinarian?
17      A. No.
18      Q. Would they have a master's degree of some
19  sort?
20      A. Typically. I believe today they would,
21  yes.
22      Q. And in some of the documents, specifically
23  documents that were marked as fundraising documents
24  of Homecoming Farm and/or the ACVSMR project, I saw

219

1    requests for grants for paraprofessional
2    certifications. Can you explain what
3    paraprofessionals the Homecoming Farm works with?
4         A.  Well, the paraprofessional groups that we
5    have structured our long-term plan to offer
6    certification in would be physiotherapists, and
7    there would be a new category of farrier, and that
8    would be a farrier who has a college degree.  And we
9    are working with or have developed guidelines for a
10   master's degree in farrier science.
11        Q.  Were you finished?
12        A.  Yes.
13        Q.  And is that a master's degree that it is
14   your plan for the ACVSMR project to offer?
15        A.  No.  That would be a master's degree that
16   would be offered by other institutions but where a
17   good deal of the training that would contribute to
18   that educational project would take place through
19   the ACVSMR.
20        Q.  And do you currently have -- and when I say
21   you, I mean Homecoming Farm.  Does Homecoming Farm
22   currently have any certification programs that are
23   already in place and operating?
24        A.  We don't have any certification programs

220

1    today that are offering credentials, and it's only
2    because our funding hasn't supported it -- which is
3    not at that point of maturity.  We need our campus
4    before we can do that.
5         Q.  And do I take it from your answer that
6    Homecoming Farm has never to date offered a
7    certification program that was -- in other words,
8    that was ready for students to enter?
9         A.  Not in open admission.
10        Q.  And have you done any kind of
11   certification?  I'm not sure I understand the term
12   "open admission."
13        A.  Well, in other words, what Homecoming plans
14   to do through its ACVSMR project is to have a main
15   campus where we can continuously run courses for
16   physiotherapists, for equine health care managers --
17   that would be another certificate that we intend to
18   offer -- for farriers and --
19        Well, we'll leave it at that for now.
20   And so we are putting our energy and our focus
21   toward creating that main campus.  And then the
22   certification programs will be able to -- when I say
23   open admission, there will be courses that begin on
24   a certain date, take place at our campus, and then

221

1    finish on a certain date.
2         Q.  I see.  So the programs that you have in
3    place now are the ones that you talked about
4    yesterday that you offer not on campus but at other
5    people's facilities?
6         A.  Yes, that's --
7         Q.  And has anybody actually received a
8    certification from the Homecoming Farm yet?
9         A.  Yes.
10        Q.  And how many people have received that and
11   in -- what were they certified in?
12        A.  I don't have the numbers available to me,
13   but they're small.  And the certifications that
14   we've offered so far are, I believe, all in equine
15   podiatry.
16        Q.  Now, equine podiatry, are those
17   veterinarians that have those certifications?
18        A.  Yes.
19        Q.  And is it less than ten, more than ten?
20        A.  I'd say less than ten.
21        Q.  Now, yesterday Mr. Dickison asked you about
22   a couple of events that you talked about, and I'm
23   going to -- so that I can recall your memory to
24   them, I'm going to summarize them.  But if I

222

1    summarize them incorrectly, just let me know.  I'm
2    not trying to put words in your mouth.
3         He asked you about a lecture -- you
4    talked about a lecture you gave in South Carolina.
5         A.  Yes.
6         Q.  Do you recall that?  And it was at a place
7    that had the word "saddle" in the same, I think?
8         A.  Well, it was -- it wasn't at a place that
9    had the word "saddle" in it.
10        Q.  It was offered by an organization that had
11   the word "saddle" in it?
12        A.  Yes.
13        Q.  What was the facility?  Was the facility
14   owned by that --
15        A.  No.
16        Q.  Was the facility a private --
17        A.  Yes.
18        Q.  -- residence or a private farm?
19        A.  Private farm.
20        Q.  And you mentioned when you talked about the
21   attendance -- and again, correct me if I'm wrong --
22   that this was not attended by veterinarians, but
23   that one veterinarian stopped by while you were
24   there because the horse had gotten better.  Do you

223

1  recall that?
2      A. Yes.
3      Q. I was confused by that statement, because
4  then you went on to say, well, you also give
5  clinical seminars, I think --
6      A. Yes.
7      Q. -- where there's actually a horse involved,
8  whereas the lectures, there's no horse involved. So
9  I guess I'm asking was there a horse involved in
10  that lecture, or was he coming by because of some
11  unrepresented event?
12     A. It was a farrier clinic, so there was a
13  horse involved for the teaching of farriers. And
14  since farrier work is essential to the work of
15  veterinary sports medicine and rehabilitation and
16  the farriers very often are carrying out
17  prescriptions, if you will, from veterinarians, then
18  teaching the farriers these skills is directly
19  related to the development of the specialty of
20  veterinary sports medicine and rehabilitation. And
21  very often, when farriers understand better how to
22  trim a horse's hoof, in order to normalize it, which
23  normalizes the biomechanics all over the body, even
24  though that's not the practice of medicine and it

224

1  involves something that a tradesperson does, it has
2  such a direct impact on the horse's wellbeing and
3  the horse's ability to recover from things that the
4  veterinarian may be dealing with that very often
5  veterinarians attend the seminars, the clinical
6  seminars that we give even for farriers.
7      Q. Now, Mr. Dickison also asked you about
8  instances where you felt that you had lost business
9  or had reputational damage because of the actions of
10  the AVMA, his client. I know he asked you about a
11  lot of --
12         And I'm going to short-circuit a bunch
13  of questions by asking you: Is it fair to say that
14  the -- that you also claim that same harm caused by
15  my client?
16     A. Yes.
17     Q. Is there any additional harm caused by my
18  client in addition to what you were thinking about
19  when you were answering Mr. Dickison's questions
20  yesterday that is specific to my client and has
21  nothing to do with the AVMA?
22     A. Yes.
23     Q. And can you tell me what that is?
24     A. If you don't mind, I'll preface this by

225

1  saying that your client produced almost 15,000
2  documents for me to review in the last -- I only got
3  them in the last few days. Obviously we had to make
4  copies of them. So some of what I recall and would
5  be, I believe, responsive to this question, would
6  lie in those documents. So I can remember a few
7  things, but I just want to be clear that until I
8  have the time to really go through those documents
9  carefully, that this may be an incomplete answer.
10  I'd like more time to study that.
11     Q. Sure. Why don't you tell me what you know
12  now.
13     A. Well, certainly let's go to something
14  that -- I believe it was in the document production,
15  but I don't recall this. It would be the press
16  release that your client put out. Now, in it they
17  make a clear distinction that they're partnered with
18  the AVMA. However, this was a press release put out
19  by your client in the name that infringes on my
20  trademark. And I don't have it in front of me, but
21  I remember one -- I don't know if it was one of
22  their bullet points or whether this was conveyed
23  over a few.
24         But they describe me to this wide

226

1  audience that they have submitted this press release
2  to as just a private or a lone -- forgive me, I
3  don't remember the word.
4      Q. I think the words were "individual
5  veterinary"?
6      A. If that's correct.
7      Q. If I'm correct, and I don't have it in
8  front of me, either, but that's my memory.
9      A. But it's relating to that document -- that
10  I'm simply an individual veterinary practicing in
11  and around or near Massachusetts.
12         Now, first of all, that's defamatory in
13  a number of ways. One is, it suggests that I'm
14  violating the law in Massachusetts, because I am not
15  licensed to practice here, and I don't, unless I'm
16  working as a consultant through an attending
17  veterinary. So that's very damaging to me as a
18  professional.
19         The other thing is that anyone in the
20  horse industry, which is the -- you know, where my
21  commercial business takes place knows -- if I simply
22  said to them there's a veterinary in Massachusetts
23  that, you know, you might want to hire for your
24  horse that's going into the Kentucky Derby, you

**227**

1  know, maybe they won't completely reject it.  But,
2  you know, that doesn't suggest someone who has
3  expertise in sports medicine and rehabilitation.
4  That industry really just doesn't take place here.
5        So if after 30-some-odd -- or nearly 30
6  years of practice I limited my practice to
7  Massachusetts and the neighboring areas, then that's
8  sending a very clear, and I believe deliberate,
9  message that is simply untrue.
10       Also in that press release the --
11       Q.  If you want, what we could do is move on,
12  and if something comes to mind later -- I'm happy to
13  wait.  We can state for the record you're not
14  complete with your answer, if you want to --
15       MR. LYONS:  Let's let her finish her
16  answer.
17       MS. KLIEMAN:  Do you have the press
18  release handy?
19       MR. KLUFT:  I do plan to show it to her
20  later.
21       You know what, I may not have it,
22  actually, now that I think about it.  We did some
23  stuff --
24       MR. DICKISON:  I might actually --

**228**

1        Q.  Why don't you finish your answer.
2        MR. LYONS:  Finish your answer, and when
3  you're done, let him know.
4        A.  Why don't I move on to a couple of other
5  examples of defamation.
6        Dr. Gillette has been repeating the
7  falsehood that I have misrepresented my credentials.
8  He has repeated that to the AVMA.  He's repeated
9  that to veterinarians.  And at one point in -- I
10  believe it was in the AVMA's production of documents
11  to me, even the AVMA warned Dr. Gillette that
12  continuing to make this statement about me is
13  considered defamatory.  Dr. McIlwraith --
14       Q.  Is this Wayne McIlwraith you're talking
15  about?
16       A.  Yes.  I'm going to have to go back through
17  the documents to refresh my memory about what was
18  produced with respect to Dr. McIlwraith.  I'm sorry;
19  it came and it went.
20       Q.  That's all right.
21       A.  Oh, and in the meeting, in this
22  Philadelphia meeting, when Dr. Gillette suggests
23  that I have harmed horses in the course of offering
24  the services on them -- and I don't remember

**229**

1  everything that he said.  But he moved quickly from
2  topic to topic, and he suggested that there were
3  accusations that I had illegally practiced and that
4  it was corroborated by owners and veterinarians, and
5  he said this in front of the committee.  Now, of
6  course, they had already met in secret, without me,
7  so -- but I heard him say these things in this room,
8  and they were false.  So that was defamatory.
9        And then, of course, the people in that
10  room dispersed, and the stories were spread.
11       Q.  Are you finished with your answer for now?
12       A.  For now.
13       Q.  With the preface that you made earlier.
14       A.  Thank you, yes.
15       Q.  Yesterday you mentioned a gentleman named
16  Michael Savoldi.
17       A.  Yes.
18       Q.  Is Michael Savoldi a veterinarian?
19       A.  No.
20       Q.  What is his profession?  I know you said he
21  was a professor at a college.  What was he a
22  professor of?
23       A.  Of farrier science.
24       Q.  And do you know what his degree is in?

**230**

1        A.  I do not.
2        Q.  How long has he been associated with
3  Homecoming Farm?
4        A.  I would have to try somehow to work that
5  out, by looking at maybe research records and
6  things.  And that's how we began our relationship.
7  But to the best of my recollection, if you can
8  accept a pretty general range, I would say between
9  1995 and '98, somewhere in there.  Maybe it was
10  earlier.  It could have been '92 to '98.  You know,
11  I'm sorry.
12       Q.  That's all right.  Now, was he involved at
13  all in the -- in the college or the organizing
14  committee?
15       A.  No.
16       Q.  And was he at the meeting in Philadelphia
17  in 2004?
18       A.  No.
19       Q.  And he teaches ACVSMR project programs; is
20  that correct?
21       A.  Yes.
22       Q.  And where does he teach those?
23       A.  Currently at his equine research center in
24  Shandon, California.

231

1    Q. And does he teach those independently or
2 only when you're in attendance?
3    A. Oh, no, I'm not there most of the time. So
4 Michael Savoldi will take our students for
5 experience doing dissections and then through his
6 farrier contacts, create opportunities for those
7 students to go out into the field at equine rescues
8 and....
9    Q. And are all of his students also students
10 of the ACVSMR project, or are only some of them
11 students of the ACVSMR project?
12   A. Michael does a lot of teaching
13 independently. He's a very -- he gives lectures all
14 over the world every year, at veterinary
15 conferences, and farrier conferences. So he does
16 teaching himself, and he accepts our students.
17   Q. So is it fair to say some of his students
18 are your students and some of his students are not
19 your students?
20   A. That's correct.
21   Q. Who is Jane Hutton?
22   A. Jane Hutton is an equine physiotherapist,
23 originally from England, now based in Hong Kong.
24   Q. Is an equine physiotherapist a veterinary?

232

1    A. No.
2    Q. And just from my ignorance, just to clear
3 up my ignorance, in England and Hong Kong, is it
4 basically the same structure for the treatment of
5 animals? They have veterinarians and then they have
6 paraprofessionals working with them?
7    A. I would disagree with your
8 characterization.
9    Q. Which was based on nothing but my
10 ignorance, as I said. So please explain to me now
11 it works over in England.
12   A. Well, how it works over in England is
13 actually quite different from how it works at this
14 time in America.
15       In England, physiotherapists are
16 licensed and certified by professional boards, just
17 as they are in this country in human medicine.
18 However, in England they have additional licensing
19 for physiotherapists who are already licensed in
20 human medicine and then they go on, do additional
21 training in veterinary physiotherapy and acquire
22 credentials. The organization is called ACAP, which
23 is the association of chartered animal
24 physiotherapists, something like that.

233

1    Q. The first English organization I've ever
2 heard without "royal" in it. Is that a government
3 organization?
4    A. I don't know. There is a board, so they
5 must be licensed.
6    Q. What was Jane Hutton's -- what is Jane
7 Hutton's involvement with the ACVSMR project?
8    A. Jane Hutton has acted as an adviser first
9 to help us to structure our educational programs for
10 veterinarians so that they can learn what licensed
11 physiotherapists in other countries are able to
12 contribute. She acts as an adviser for our
13 physiotherapy programs, and she has done teaching as
14 well for us.
15   Q. Is it one of the goals of Homecoming Farm
16 to create a professional certification board in the
17 United States similar to the one you described in
18 England?
19   A. Well, it's a goal of Homecoming Farm to
20 certainly have licensing for physiotherapists who
21 work with animals, veterinary physiotherapy. And I
22 would certainly -- we would like to have that
23 modeled after the British program -- again,
24 following the same high standards of human medicine.

234

1        However, of course, we deal with 50
2 different states, and I've had a number of meetings
3 over the years, both with the deans of the
4 physiotherapy colleges, who would need to accept the
5 plan for adding to their curriculum and adding,
6 quite frankly, to their responsibilities, because
7 they'll now be getting applicants from students who
8 want to be veterinary physiotherapists. And I've
9 also met with regulatory boards across the country.
10 And it requires meeting with both the veterinary
11 board and with the physiotherapy boards because the
12 veterinary boards have to agree to give up some of
13 their professional domain in order for the, in this
14 country, physiotherapist to be allowed to work with
15 animals in a way that is offering health-care
16 services.
17        So it's a complicated system to deal
18 with. And that's what we've done.
19   Q. In your vision, would that be something
20 that would be under the umbrella of the ACVSMR
21 project, or is that a separate project of Homecoming
22 Farm?
23   A. Well, it would be an extension of our
24 training of physiotherapists and of veterinarians,

235

1  because the training in veterinary medicine would
2  change because we now have this paraprofessional
3  that is a team member.  When I developed the
4  American College of Veterinary Sports Medicine and
5  Rehabilitation, it became clear that, as much as I
6  would like to focus only on the veterinarian's role,
7  by creating a health-care system that was modeled
8  after the human health-care system required also
9  supporting and creating all of these other team
10 members.  So in that sense it's a project, yes, of
11 ACVSMR.
12     Q.  Who is -- and I'm going to mispronounce
13 some of these -- Dennis Brida?
14     A.  Yes.  Dennis Brida is a -- was a racehorse
15 trainer for many, many years in New York and Florida
16 predominantly.  Dennis was the president of -- and I
17 might choose the wrong one.  I believe it was the
18 New York Thoroughbred Owners, Breeders, and Trainers
19 Association, but forgive me if I'm off slightly.
20 It's the major association in New York for the
21 racing industry.  Dennis was the general manager of
22 a farm just outside Saratoga called Stonebridge
23 Farm.
24     Q.  How long has he been associated with

236

1  Homecoming Farm?
2      A.  I believe since I met Dennis in about 2008.
3      Q.  I forgot to ask you:  How long has Jane
4  Hutton been associated with Homecoming Farm?
5      A.  Since 1999.
6      Q.  And how did you meet her?
7      A.  At the conference in Oregon.
8      Q.  Is this the same conference at which you
9  met Dr. Gillette?
10     A.  Yes.
11     Q.  And after you talked -- had talked to Dr.
12 Park?
13     A.  Yes.
14     Q.  By the way, you mentioned yesterday that
15 one of the reasons you went to that conference was
16 to find other people to become involved in the
17 ACVSMR project; is that correct?
18     A.  Well, I had submitted a paper, and since it
19 was on my to-do list to begin to identify small-
20 animal, in particular, colleagues, then it was my
21 sort of first stop.  I knew I was going to go to the
22 conference because I was presenting a paper.
23     Q.  Was Jane Hutton one of the people you were
24 looking to get involved in that project?

237

1      A.  Well, I wasn't looking to get anyone
2  involved in particular, so....
3      Q.  In other words, what I'm asking is:  Is
4  there anyone else -- you described a conversation
5  with Dr. Gillette --
6      A.  Yes.
7      Q.  -- that I think you said you initiated
8  because Dr. Park had told you that you needed
9  academics.
10     A.  Or Dr. Sabin.  I forget --
11     Q.  Somebody from -- I forget we're not having
12 a conversation.  Somebody from the ACVSMR told you
13 you needed academics to be involved with the ACVSMR
14 project; correct?
15     A.  No, I would say that -- your statement is
16 true.  However, my focus was on someone who did
17 canine.
18     Q.  I see.  Let me ask a different question.
19 Somebody from the American Veterinary Medical
20 Association had told you that you needed to have
21 veterinarians with experience with other species
22 involved in the project; is that correct?
23     A.  This is how I would characterize it:  The
24 AVMA told me that the -- any new specialty

238

1  organization that I would propose creating would
2  need to serve any species or all species of animal,
3  and they pretty much break it up into large and
4  small -- so large-animal medicine and small-animal
5  medicine.
6      Q.  And is it fair to say that for sports
7  medicine we're really talking about dogs and horses?
8      A.  That's certainly the majority.  I've seen a
9  few racing camels in my practice.
10     Q.  And I know you've done some small work with
11 elephants once.
12     A.  Yes, I have.
13     Q.  But not sports performing elephants.
14     A.  Although they do play polo off of elephants
15 in India, yes.
16     Q.  So when you approached Dr. Gillette, it was
17 with this small-animal/large-animal issue in mind;
18 correct?
19     A.  Yes, exactly.
20     Q.  Did you approach anyone else for that same
21 reason or with that same issue in mind?
22     A.  No, I did not.
23     Q.  Dr. Gillette was your only one?
24     A.  Yes.

**239**

1    Q. So your meeting with Jane Hutton was not
2  related to that; correct?
3    A. No. It wasn't really a meeting with Jane
4  Hutton. I wouldn't characterize it as that. She
5  actually came up to me after I presented the paper
6  and explained that she felt that what I had just
7  presented spoke directly to issues that she saw all
8  the time. And I had just come back from England
9  because I was working with other physiotherapists
10  and veterinarians there.
11    Q. One more name, Curtis Burns. Who is that?
12    A. Curtis Burns is a farrier who invented a
13  very new type of horseshoe and has patented it. And
14  this horseshoe, when applied to my patients, has
15  shown a type of benefit that is remarkable.
16    Q. What is his involvement with Homecoming
17  Farm?
18    A. That would be -- we collaborate on
19  research, and he has done some teaching, also.
20    Q. Where has that teaching taken place?
21    A. I think all in Florida.
22    Q. Is that his own facility?
23    A. No. In Florida you justly work wherever
24  the horses are. It's a very big horse area.

**240**

1    Q. Is Curtis Burns a veterinarian or a
2  farrier?
3    A. He's a farrier.
4    Q. Is Dennis Brida a veterinarian?
5    A. No, he isn't.
6    Q. How long has Curtis Burns been involved
7  with Homecoming Farm? Or since when, approximately?
8    A. I would say approximately 2008 or so. I
9  would have to look up when he came up with his shoe.
10    Q. But within the last ten years.
11    A. Yes.
12    Q. Now, what did you do in this case -- you
13  know, you received document requests from my client
14  and from Mark Dickison's client; correct?
15    A. Yes.
16    Q. What did you do to search for documents in
17  response to those requests?
18    A. I searched every box -- basically,
19  everything that I had that dated back to that time,
20  whether they were stacks of magazines or whatever
21  had been kept.
22    Q. What time period are you referring to by
23  "that time"? You said "everything that dated back
24  to that time."

**241**

1    A. Oh. The time of the creation of the
2  American College of Veterinary Sports Medicine and
3  Rehabilitation.
4    Q. The time of the creation of the project by
5  Homecoming Farm?
6    A. No, really the time of the creation of
7  Homecoming Farm.
8    Q. Now, yesterday Mr. Dickison asked you a
9  bunch of questions about your computers, and we went
10  through, and I'm not going to go through all that
11  again. But I just wanted to clarify: When you were
12  answering the questions about your computers, does
13  Homecoming Farm have computers distinct from Dr.
14  Lyons's computers?
15    A. No.
16    Q. So all those questions that you answered
17  yesterday are the same for Homecoming Farm?
18    A. Yes.
19    Q. And does anyone else have access to
20  Homecoming Farm computers besides you?
21    A. Over the years, yes.
22    Q. And who has had access?
23    A. It depends on where I am and what I'm
24  doing. So with my laptops, you know, they're

**242**

1  generally open, and others will enter data for me,
2  will check email for me, whatever.
3    Q. When you say "others," are these clients?
4    A. Clients, employees of clients, students.
5    Q. By the way, there's another veterinary
6  question I have: Do you call clients the people
7  that own the animals and patients the animals?
8    A. Yes.
9    Q. I just wanted to make sure there weren't
10  horses checking your email.
11    A. No.
12    Q. I know that Homecoming Farm doesn't employ
13  anybody; correct?
14    A. That's correct.
15    Q. Are there volunteer staff?
16    A. Not staff, no.
17    Q. Who, for instance, is Lauren Kingston?
18    A. Lauren Kingston -- I would have to look at
19  documents to remember whether she had been a board
20  member. But Lauren would help us by either sending
21  materials, if I was out of the country, to someone
22  as needed. Basically, if I asked her to help, she
23  would.
24    Q. How physically did she do that? Did she

---

**243**

1  have access to your home?

2    A.  Actually, she did come over to the home at

3  times, yes, but also through her own computers.

4    Q.  Are you still in touch with her?

5    A.  No.

6    Q.  Who is she?  What does she do for a living?

7    A.  She was a housewife.

8    Q.  Someone you just knew socially?

9    A.  Yes.

10   Q.  And why are you no longer in touch with

11  her?

12   A.  Just because I'm always gone.

13   Q.  And do you know -- if she was on your board

14  at one time, do you know why she left?

15   A.  Well, it's not a matter of leaving.  It's a

16  matter, you know, of what we need and what our

17  projects are.

18   Q.  Anybody else besides Lauren Kingston that

19  might have -- I'm sorry, scratch that.  A different

20  question.

21        If Lauren Kingston did send materials

22  while you were out of the country on your behalf,

23  would she do it from your email account -- or, I

24  should say, from one of your email accounts?

---

**244**

1    A.  I don't specifically recall, but she may

2  have checked email for me if there was a time when I

3  had no access to it.

4    Q.  Do you recall ever giving her your password

5  or user name in order to access your email?

6    A.  Yes.

7    Q.  Did you give that to anybody else that you

8  can recall?

9    A.  Yes.

10   Q.  Who would that be?

11   A.  Eleanor Code had it.

12   Q.  Is that another board member?

13   A.  Yes, she was.

14   Q.  Anyone else?

15   A.  Yes, but I can't recall who.  There were

16  many times that I was unable to access emails, and

17  if I was expecting something, I would ask someone to

18  check and let me know if it had come in.

19   Q.  Would all these people be board members?

20   A.  No.

21   Q.  Who else besides board members, what other

22  categories of people?

23   A.  Again, I don't know, because I don't know

24  as I sit here just who those people would be.  I

---

**245**

1  would need to come up with the names in order to

2  answer your question.

3    Q.  And you -- sitting here today, you can't

4  remember who those other people are?

5    A.  Not at this time.

6    Q.  Let me mark a document.  I don't think it's

7  been marked yet.

8        MR. KLUFT:  I'm going to mark a document

9  as Exhibit 14.

10        (Exhibit 14, response of plaintiffs to

11  first request for production of documents, marked

12  for identification.)

13   Q.  I'm going to ask you to take a look at this

14  document marked 14.  You can pass that other copy to

15  your attorney.  And I'll represent to you that this

16  is your answer to the document request propounded by

17  my client in this case.  Do you agree with that

18  statement?

19   A.  Yes, I agree.

20   Q.  Now, can you please read -- you don't have

21  to do this out loud, but read Request No. 1 and your

22  response to Request No. 1.  That would be starting

23  on Page 1 and going over to Page 2.

24   A.  Yes, I've read it.

---

**246**

1    Q.  Thank you.  Now, I understand that in your

2  response you object to the term -- or your attorney

3  objects to the term "selection and adoption," and

4  I'm not here to challenge you on the term.  I'm just

5  asking a simple question, which is:  I understand

6  that you agreed to produce the document known as the

7  Equine Excellence Initiative, which as you say here,

8  represents the first and official adoption of the

9  mark in commerce.  My question to you is:  Are there

10  any documents in your possession with the mark, the

11  ACVSMR mark, that precede the Equine Excellence

12  Initiative?

13   A.  I would need to review all the documents

14  that I have produced.

15   Q.  Let me make it easier, then.  Are there any

16  that you have not produced?

17   A.  No, not that I'm aware of, not that I have

18  found at this time.

19   Q.  You mentioned that you hired a consulting

20  firm back in 1995.

21   A.  Yes.

22   Q.  And that as a result of the homework given

23  to you, I think you said, by that consulting firm,

24  you came up with the name.  Is that correct?

247

1    A. That's correct. Well, no. As a result of
2  the homework that I was given, we developed distinct
3  projects within the plan of Homecoming Farm. The
4  name really had already been decided. It's not as
5  if that was a struggle when I was given that
6  assignment. But as I believe I said in my answers
7  to interrogatories, it was a time period preceding
8  that that I developed the -- or I chose in my mind
9  to use that name.
10   Q. And when did you first think of the name,
11 then? You're saying --
12       I'm sorry, let me ask you a better
13 question. Are you saying that you had the name in
14 mind prior to your engagement of the consulting
15 firm?
16   A. Yes.
17   Q. Who was the consulting firm?
18   A. I believe the name was Jane Lennox.
19   Q. Can you spell that, please? No?
20       Did you have any correspondence with
21 Jane Lennox? Any written correspondence.
22   A. I don't recall.
23   Q. Did you look for that correspondence?
24   A. I looked for everything that related to

248

1  the -- to that time period and all of the time
2  period.
3    Q. When is the last time you spoke with Jane
4  Lennox?
5    A. 1996.
6    Q. And how much did you pay her?
7    A. I don't recall.
8    Q. Did she produce any written work product
9  for you?
10   A. She created or -- excuse me, she typed the
11 documents, the Equine Excellence Initiative.
12   Q. She typed it.
13   A. Yes.
14   Q. And what were the circumstances of her
15 typing it? That's a terrible question.
16       Were you with her when she typed it?
17   A. I think I was, yes.
18   Q. Did she type it on a typewriter or on a
19 computer?
20   A. On a computer.
21   Q. And was it on a computer she owned?
22   A. Yes.
23   Q. And this was work she was doing for hire
24 for you?

249

1    A. Yes.
2    Q. Let me just ask you: Why did you have her
3  type it instead of yourself?
4    A. Because I did not have a computer.
5    Q. And what was her typing based on? Did you
6  dictate to her?
7    A. No. I had developed the materials; put
8  them together, as she had suggested, into distinct
9  projects. And she presented -- you know, she did
10 the layout of the Equine Excellence Initiative. We
11 chose the title. She helped.
12   Q. When you say -- I can't remember what
13 exactly you just said. But you had some materials
14 that you were working off of? Is that correct?
15   A. Yes.
16   Q. And have you produced those materials in
17 this litigation?
18   A. They no longer exist because they became
19 the Equine Excellence Initiative.
20   Q. Were those handwritten materials?
21   A. Yes.
22   Q. And when did you discard those materials?
23   A. Immediately.
24   Q. I just want to move on to Request No. 7 of

250

1  this Exhibit No. 14. Can you please read the
2  request and your response.
3        I'm sorry, I'm going to ask you to read
4  6 and 7, please.
5    A. Okay.
6    Q. Have you had a chance to look at it?
7    A. Yes.
8    Q. I know here again you agree to produce
9  documents including, but not limited to, all
10 cease-and-desist letters sent by the attorneys. And
11 I just want to make sure: Is there any
12 correspondence between you and any of my clients
13 that you have not produced that is in your
14 possession?
15   A. Not that -- I believe that everything that
16 I have has been produced in document discovery.
17   Q. So every email that you kept, every letter
18 between you and, say, Dr. Gillette, you turned over
19 to your attorney; is that correct?
20   A. Yes.
21   Q. And can you take a look at Request No. 11,
22 please, and please read the request and the
23 response.
24   A. Okay.

251

1    Q. Now, the request here is for printouts of
2  your -- well, the request here is for documents
3  related to your Web pages. And I know that in
4  response you produced some recent printouts from
5  your Web pages. Do you recall that?
6    A. Yes.
7    Q. And my question is: Are there any
8  documents pertaining to older versions of any of
9  your Web pages?
10    A. Yes.
11    Q. And what are those documents? Have they
12  been produced?
13    A. Yes.
14    Q. Are there any documents you have related to
15  any prior version of any of your Web pages that has
16  not been produced? Let me clarify: I know you have
17  a lot of Web pages. I'm specifically talking about
18  those related to ACVSMR.
19    A. Actually, I would say that I don't have a
20  lot of Web pages. I have a lot of domain names.
21    Q. Fair enough.
22    A. They've only ever pointed out, I believe,
23  three Web pages.
24    Q. And one of those is Homecoming Farm?

252

1    A. Yes.
2    Q. And one of those is your personal-practice
3  Web page?
4    A. Yes.
5    Q. And the other is the ACVSMR Web page; is
6  that right?
7    A. Yes.
8    Q. In terms of the pages, versions, then of
9  the Homecoming Farm and the ACVSMR pages, do you
10  have in your possession copies or any documents
11  pertaining to older versions of those pages?
12    A. I've produced those in the -- I think it
13  was the U.S. PTO file.
14    Q. Everything that you have has been produced
15  in this action or the other action.
16    A. Yes.
17    Q. Who actually produces your Web page? In
18  other words, who types that one in?
19    A. Which Web page?
20    Q. Well, let's start with Homecoming Farm.
21  Who actually is the webmaster, if you will?
22    A. The current Web page that I have, I've
23  created it.
24    Q. You created it personally.

253

1    A. Yes.
2    Q. So you learned how to use the software and
3  created it?
4    A. No, it's not software. I use a --
5  whatever -- a host, and they provide just templates.
6    Q. I see. And who is that host?
7    A. I believe currently it's Homestead.
8    Q. And have you contacted them to see if they
9  have earlier versions of your Web page? I'm
10  speaking about Homecoming Farm right now.
11    A. No.
12    Q. How about the ACVSMR Web page? Is that
13  also hosted by Homestead?
14    A. Yes.
15    Q. And you haven't contacted them about that
16  page either; correct?
17    A. No.
18    Q. Can you please read Request No. 14 and
19  Response No. 14, please. And again, this is Exhibit
20  No. 14.
21    Now, in it, I know that your lawyer in
22  part objected, but you agreed to produce documents
23  created by the plaintiff -- i.e., you and Homecoming
24  Farm -- for the purposes of obtaining recognition by

254

1  the AVMA. Have you produced those documents?
2    A. Yes.
3    Q. Do you have any documents created by
4  anybody else that are in your possession that
5  pertain to recognition by the AVMA?
6    A. Yes.
7    Q. Do you have documents created by any
8  defendant that pertain to recognition by the AVMA
9  that you have not produced?
10    A. No.
11    Q. We've going for about an hour. I usually
12  ask every hour if you want a break, so I'll ask it
13  now.
14    A. I'm good if you're good.
15    Q. Okay. Let's continue.
16    I want to ask you a couple of questions,
17  following up from yesterday, about the trademark and
18  copyrights at issue in this case. Have you ever
19  used the ACVSMR mark to sell veterinary services --
20  in other words, your own personal veterinary
21  services that you charge for?
22    A. When you say "try to sell," no.
23    Q. Obviously, I understand that it's in your
24  bio; correct?

255

1    A. Yes.
2    Q. But have you ever sold veterinary services
3  under the business name ACVSMR?
4    A. No.
5        Let me continue that answer.
6    Q. Please.
7    A. I use these founder and director or some
8  ACVSMR distinction in my reports or whatever for
9  private patients. So that's not -- at least in my
10  mind, that's not trying to sell something.
11    Q. Right.
12    A. That's just stating a fact.
13    Q. I understand. What I'm asking is something
14  different, which is: Do any of your clients, to
15  your knowledge, think that when they hire you to
16  perform veterinary services, they are hiring an
17  organization or a company called ACVSMR?
18    A. You would have to ask them, but it's
19  certainly not my sense that they do.
20    Q. Understood. Can you take a look at Exhibit
21  1, which should be in the pile of yesterday's
22  exhibits. And this is your complaint in this
23  action. And I'm going to ask you to turn to Page 5,
24  Paragraph 17. Let me know when you've had a chance

257

1  own mind, other than anything your attorneys told
2  you, any knowledge of what the use of the word
3  "individually" means here?
4    A. I wouldn't be comfortable answering that,
5  because these aren't my words.
6    Q. Now, in your complaint -- and I can point
7  you to a specific paragraph, but I think it's
8  generally there -- you're alleging that there's
9  confusion between -- in the marks; correct? Because
10  the -- and let me make sure I understand -- because
11  there's two organizations both using the acronym and
12  the words ACVSMR. Correct?
13    A. Yes.
14    Q. And they're both related to veterinary --
15  the veterinary profession; correct?
16    A. Yes.
17    Q. And do you dispute that there is confusion
18  based on the dual use of the same name by both
19  organizations?
20    A. I do not dispute that there's confusion.
21    Q. I'm going to show you another document,
22  that I'm going to mark as Exhibit 15.
23        (Exhibit 15, "Copyright," marked for
24  identification.)

256

1  to read that paragraph.
2    A. Yes.
3    Q. My question is this; it's about the word
4  "individually." When you say that -- I mean, I can
5  read the whole sentence, if you want. But it lists
6  a number of activities and says that you have used
7  them -- you've done them individually on behalf of
8  Homecoming Farm in the name of ACVSMR. What do you
9  mean here by "individually"?
10    MR. LYONS: When you say "What did you
11  mean individually," this just goes to the form of
12  your question. It might be why the witness is
13  having trouble answering it. You're asking her
14  about a document which she did not author. This is
15  a document that was authored by her attorneys. So
16  are you asking what did her attorneys mean, or are
17  you asking whether she understands what that means
18  or whether she did it individually? Maybe you
19  could clarify your question.
20    MR. KLUFT: That's a very fair -- I'll
21  take it as an objection, and a good one.
22    Q. Do you -- and I don't want you to tell me
23  anything that your attorney told me (sic). That's
24  not what I'm here for today. Do you have in your

258

1    Q. Take a look at Exhibit 15. I represent to
2  you that this is a document produced in this form as
3  a single PDF file by you and your attorney in this
4  case. Do you -- and I believe that the cover page
5  is actually a cover page produced by your attorney
6  to identify the category of document. Do you
7  recognize this document?
8    A. Yes.
9    Q. And is this in fact the entire set of
10  copyrighted material in dispute in this case?
11    MR. LYONS: These are the documents that
12  were produced that were in her possession at the
13  time. And as she's told you, there have been
14  additional documents produced since that time which
15  she has not had an opportunity to thoroughly review.
16  I'm trying to understand your question.
17    MR. KLUFT: My understanding is that
18  these are documents authored by her, not documents
19  that -- so my question is -- I think I can short-
20  circuit this, because I'm not trying to do that. I
21  know what you're getting at.
22    Q. Can you please turn to the second page of
23  this document, which would be on the back. It's
24  double-sided. Is that a title -- is that a true and

## 259

1  accurate copy of your certificate of registration
2  for copyright No. TXU 1786800?
3      A. Yes.
4      Q. And is this -- is that -- are the documents
5  registered under that number the documents on which
6  you base your copyright claim in this case?
7      A. In part.
8      Q. Do you have other copyrights, other than
9  this one?
10     A. I'm not a lawyer, and I think that might be
11 a bit of a legal question, because, as I understand
12 it, a copyright is created the minute a document is
13 created.
14     Q. That's absolutely correct, so let me ask it
15 a little differently.  Do you have any other
16 copyright registrations, other than this one?
17     A. No.
18     Q. Now, this document is a collection of four
19 documents, as I see it; correct?  According to the
20 title of the work.  I see four titles.
21     A. I see five.
22     Q. I'm sorry, you're right:  five titles.  I
23 just want to ask you a couple of questions about
24 some of these.

## 260

1          Can you turn to -- and you understand
2  what a Bates number is; correct?
3      A. Yes, I do.
4      Q. Can you please turn to Bates No. 3412,
5  please.  Do you recognize this document?
6      A. Yes.
7      Q. And what is it?
8      A. It's the Equine Excellence Initiative.
9      Q. Is this the document you produced in 1996
10 after speaking with the consultant?
11     A. Yes.
12     Q. This is the actual -- a true and accurate
13 copy of what she actually typed at that time?
14     A. Yes.
15     Q. Has it changed since then?
16     A. I don't believe so.
17     Q. Has this document ever changed since 1996,
18 when you originally typed it or had it typed by the
19 consultant?
20     A. There was a second one of these that was
21 made specifically for, I believe, the Johnson &
22 Johnson proposal.  It was simply printed
23 additionally.  And I don't recall now whether or not
24 there might have been a designation that it was for

## 261

1  that proposal.
2      Q. Fair enough.  So some of the formatting and
3  words might have changed, but the substance wouldn't
4  have changed at that time?
5      A. That's correct.
6      Q. And do you know, the Johnson & Johnson
7  version, that's not the version you registered;
8  correct?
9      A. That's correct.
10     Q. This is the original that we're looking at
11 right here?
12     A. That's correct, although I believe the
13 Johnson & Johnson was printed first, because I
14 needed it before I needed 100 copies of....
15     Q. When was the Johnson & Johnson proposal?
16     A. It was in 1996, and I can't remember.  It
17 may have predated June 1st.
18     Q. I'll ask you a question about that later.
19 I think I'm going to show you a copy of it in a
20 little bit.
21     A. Okay.
22     Q. So let me move on.  I'm going to ask you --
23         Oh, where did you make the copies of
24 this after you first produced it?

## 262

1      A. Everywhere.
2      Q. When was the first distribution of this
3  document after it was produced in 1996?
4      A. I believe near that June 1st date in 1996.
5      Q. How did -- I'm sorry; I didn't mean to
6  interrupt you.  How did you -- who did you send it
7  to at that time?  Do you have a list?
8      A. I produced in my document production for
9  the defendants material relating to that, but I
10 don't have a discrete list.  I sent it to
11 pharmaceutical companies, to veterinary schools, to
12 physical therapy schools, to horse owners, to
13 industry associations.  I sent it widely.
14     Q. I saw in your production -- and if this is
15 a mischaracterization, just tell me -- a lot of
16 copies of magazines and brochures and articles.  And
17 in some cases there was a sort of, I don't want to
18 say scribble, but there was handwriting on the side
19 that said "Send EEI" or "Sent EEI."  Yes.  Is that
20 how you decided to whom to send a copy of this?
21     A. The decision of whom to send it to came
22 from many different sources.  So, for example, if I
23 were sending them to veterinary schools, I would
24 have gotten the addresses for a number of veterinary

263

1    schools and sent them.
2        But then when I would do things like go
3    to a competition on behalf of a client, whatever --
4    in my travels, when I came upon either individuals
5    that I thought I'd like to sent it to, or companies,
6    then I would keep those source materials, make a
7    note to myself, and then send it off.
8        Q. Okay, fair enough. So is it fair to say
9    that this was not sent in one bulk mailing but in
10   many, many mailings and many, many hand
11   distributions over time?
12       A. Many, yes.
13       Q. Can you please turn to Bates Stamp 3435.
14       I'm sorry, please turn to 3420 first.
15   And specifically, that's a document called the
16   articles of incorporation.
17       A. Yes.
18       Q. And is it fair to say that this document
19   goes to about Page 3435?
20       A. Yes. 3434, actually.
21       Q. Correct. I apologize. Now, yesterday
22   Mr. Dickison asked you about the creation of the
23   bylaws for the ACVSMR organizing committee; correct?
24       A. Yes.

264

1        Q. Are these those bylaws and articles of
2    incorporation? And I apologize; I'm not a corporate
3    lawyer, so I tend to use those terms a little
4    loosely. But this is called articles of
5    incorporation; correct? And then there's also a set
6    of bylaws.
7        A. That's correct.
8        Q. And these were always -- as far as you
9    know, these were always together as articles and
10   bylaws; correct?
11       A. Correct.
12       Q. I'll just talk about it as one document.
13   Is in the document that you produced for that
14   purpose -- in other words, originally for the
15   organizing committee?
16       A. This was a document that I produced for the
17   Homecoming Farm project, the American College of
18   Veterinary Sport Medicine and Rehabilitation, which
19   was certain the organizing committee that I was the
20   founder of.
21       Q. And did you type this yourself or did you
22   have an attorney's help? And I don't want you to
23   tell me what that attorney said.
24       A. I don't recall.

265

1        Q. Yesterday Mr. Dickison asked you a series
2    of questions about some back-and-forth you had with
3    the members of the organizing committee about the
4    bylaws.
5        A. Yes.
6        Q. And that there was input from multiple
7    people in these bylaws; is that correct?
8        A. No, I would disagree with that.
9        Q. You were the sole author of this? And when
10   I say "this," I'm not talking about the whole
11   exhibit, but just the bylaws and articles of
12   incorporation. Are you the sole author of that
13   document?
14       A. I prepared this document. There are --
15   going back to your question before, some of which is
16   what lay people would call legalese. So some of
17   that is boilerplate.
18       Q. And where did you get that boilerplate?
19       A. I don't recall.
20       Q. Can you take a look at Exhibit 1 again.
21   I'm going to ask you to turn to Page 8, Table 28.
22   Take a look at that. Have you had a chance to look
23   at that?
24       A. Yes, I have.

266

1        Q. Just so I know, in this paragraph, do you
2    know if that refers to -- and I understand you're
3    not the author of this document. But do you
4    understand if that paragraph refers to the bylaws
5    and articles of incorporation? In other words, did
6    you base the bylaws and articles of incorporation on
7    a similar set of bylaws from something that was in
8    place in human medicine?
9        A. That's not what that paragraph says.
10       Q. That's why I'm asking. So this paragraph
11   does not address the issue of the bylaws and
12   articles of incorporation; correct?
13       A. Well, it includes a portion of the bylaws,
14   yes, because the ACVSMR's educational programs and
15   initiatives, which described the training programs,
16   the curriculum for training veterinarians,
17   essentially a training manual -- that's part of the
18   bylaws.
19       Q. And so when it says -- so to the extent --
20   were any of those aspects of the bylaws, as it says
21   here, developed and adapted following the standards
22   in place in human medicine?
23       A. The whole program was created to take my
24   experience and understanding of human medicine and

267

1  to adapt it significantly to be suitable for
2  veterinarians.
3      Q.  Is there a specific document that you
4  referred to that had been used -- I'm sorry.  Let me
5  start the question again.  When you were drafting
6  the bylaws and articles of incorporation, was there
7  a specific document that had something to do with a
8  human-medicine organization that you were referring
9  to?
10     A.  There were several.  It was from a number
11 of different sources.
12     Q.  And what were those?
13     A.  Oh.  I was generally informed by so many
14 different sources.  I can't name documents.
15     Q.  I'm specifically asking if there's any
16 documents that you borrowed language from.  You
17 mentioned boilerplate, and I'm wondering what those
18 documents were.  That's what I'm getting at here.
19     A.  When you say "documents," it would have
20 been in the structure of the corporate structure.
21 So whether I obtained them through advice from a
22 nonprofit attorney or not, I don't recall.
23     Q.  So fair to say that the sections you
24 described as legalese were not your original work,

268

1  "your" referring to the more substantive sections of
2  these bylaws, when you say you're the author of
3  them?
4      A.  Yes, although, again, whether some of those
5  sections -- I would have to read it carefully and
6  read each section to know whether or not I had --
7          I think actually some of it was specific
8  to the ACVSMR.
9      Q.  Can I ask you to turn to Page 3435, please.
10         MR. LYONS:  Exhibit 15?
11         MR. KLUFT:  I'm sorry, yes, the same
12 exhibit, 15.
13     Q.  Can you identify this page or the document
14 that begins with this page?
15     A.  Yes.
16     Q.  Can you turn back to the second page of
17 this document, so the one that is the certificate of
18 registration for copyright.  And I'm not trying to
19 trick you here.  I'm just trying to figure out what
20 document this is.  In other words, on Document 3435,
21 I don't see that listed as one of the titles of
22 work.  Can you explain what this document, 3435, is
23 doing in this set?
24     A.  I believe it was in the beginning of the

269

1  educational-program description.  Yes.
2      Q.  So this is the last document listed.
3  They're not necessarily in order.
4      A.  That's correct.  As I recall, when I
5  registered this copyright, they simply asked for
6  general terms to describe the work that we -- that I
7  was submitting for copyright protection.  So each
8  page did not need to be included and titled in the
9  work, because this was submitted as a compilation,
10 or I can't remember the term that they used.
11         So I called everything from Page 3435 to
12 3491 --
13     Q.  Sorry, I have 3492 as the last page.
14     A.  I'm sorry, I didn't look on the back.
15     Q.  Did you mean to say 3492?
16     A.  Yes, I did.
17         -- as ACVSMR educational program
18 description with ACVSMR student applications.
19     Q.  Thank you.  Do you know, this document, the
20 pages from 3435 to 3492, sitting here today -- and I
21 understand that you haven't reviewed every document
22 in this case.  But sitting here today, what parts of
23 this document do you claim were copied by my
24 clients?

270

1      A.  Well, it's difficult to know how to present
2  this.  Are you asking me on a page-by-page basis?
3  Or would you like a general answer?
4      Q.  Let me try and make it easier, if I can.  I
5  understand that your claim in this case is that all
6  of my client's stuff, all their work product, is
7  based on your work.  But I'm getting at something
8  different, which is actually the copying of language
9  directly, not based on research.  I understand that
10 we all stand on the shoulders of giants, as it were,
11 and sometimes, as in this case, those giants don't
12 want to be stood on.  But what I'm talking about is
13 something different, which is:  What language in
14 these documents that you published was later
15 published by my clients?
16     A.  I would say the majority of it.
17     Q.  The majority of it.
18     A.  Your clients took my compilation, which is
19 what all of these copyright documents are -- they're
20 a compilation of various facts and elements of a
21 plan, a curriculum for training veterinarians, the
22 way that I describe the purpose and mission, and
23 just what this ACVSMR will accomplish --
24         Your clients took these documents, and

271

1    in some cases there was verbatim copying, and in
2    others it was just a -- I shouldn't say "just"; it
3    was a studied rephrasing of my material.  They
4    copied it.
5         Q.  Understood.  And that's the distinction I
6    was making between verbatim and rephrasing, as you
7    put it.
8             Let me show you another document, and I
9    want to ask you more about the verbatim stuff only,
10   right now.  I understand there are others in this
11   case, but I'm trying to get as granular as I can so
12   that I can understand what your claims are.
13            MR. KLUFT:  Steve, do you want to take a
14   break?
15            MR. LYONS:  It's 11:30.  How about a
16   five-minute break?
17            MR. KLUFT:  Absolutely.
18            (Exhibit 16, affidavit of Sheila Lyons,
19   marked for identification.)
20            MR. KLUFT:  Back on the record.
21        Q.  Are you ready to continue, Dr. Lyons?
22        A.  Yes.
23        Q.  I've marked over the break, had marked, a
24   document, Exhibit 16.  There's already a copy in

272

1    front of your attorney.  I am not going to go
2    through this entire document, but let me just ask
3    you:  By looking at the front page, do you recognize
4    this document?
5         A.  Based on looking at the front page, yes.
6         Q.  Is this in fact -- this purports to be your
7    affidavit in this case; correct?
8         A.  Yes.
9         Q.  And I want you to please turn to Page 17,
10   Paragraph 95.  When you've taken a look at that --
11            In fact, I think in context, why don't
12   you read 93 through 95, because I don't want to...
13            Have you had a chance to look at it?
14        A.  Yes.
15        Q.  Obviously you can see Paragraph 95 refers
16   to an Exhibit M; correct?
17        A.  Yes.
18        Q.  Can I also ask you to take a look at
19   Exhibit M, which I'll represent to you is Document
20   13-14, starting on Page 1 of 4.  Now, my question to
21   you is:  As of the time of this document, which is
22   dated February 24th, 2012, or thereabouts --
23            That's when you composed this document,
24   approximately shortly before it was filed; is that

273

1    correct?
2         A.  I believe that's correct.
3         Q.  And as of that time, were these the
4    instances that you were aware of verbatim copying by
5    my clients of your copyrighted work?
6         A.  Yes, based on the materials that I had
7    available to me at the time.
8         Q.  Since that time you've had other materials
9    available to you; is that correct?
10        A.  Yes.
11        Q.  Sitting here today, do you know of any
12   other instances of verbatim copying by my clients?
13        A.  Yes.
14        Q.  Can you tell me what those are?
15        A.  Well, I would need your clients' petition
16   to the AVMA, and I would need to go through it line
17   by line and compare it with my copyrighted documents
18   in order to be able to answer that question.  And
19   I'm happy to do that --
20        Q.  Well, I appreciate that, and that's
21   obviously something I can do as well on my own.  I
22   guess what I'm asking you is:  My understanding is
23   that you have already -- you had access when you
24   created this document to the November 2009 petition;

274

1    is that correct?  To the AVMA.  You refer to it in
2    Exhibit M; correct?
3             Tell me if I'm misreading this.  I'm
4    referring specifically to Page 2 of 4, the bottom
5    block, where it says on the right-hand side,
6    "Petition to AVMA ABVS."  Is that the petition
7    you're referring to?
8         A.  That would have been the name that was on
9    the document that I had to compare it to.  But quite
10   frankly, between the document production from the
11   AVMA and the document production for ACVSMR, I have
12   come across so many different versions of this
13   petition that at this time, now that I have the rest
14   of your documents that have been produced, I can't
15   say whether or not what I was working on is what is
16   the 2009.
17        Q.  Completely understandable.  Let me ask the
18   question again but with:  Putting aside other
19   versions of these same documents, are you aware of
20   any other instances of verbatim copying?
21        A.  Yes.
22        Q.  And what are those?
23        A.  I would need to go through the petition
24   line by line.

275

1    Q. We've already talked about the petition.
2  I'm talking about -- and maybe I didn't make the
3  question clear enough. You already had one version
4  of the petition when you prepared this document;
5  correct?
6         MR. LYONS: I don't think that's what
7  she said.
8    A. I don't -- I can't be sure now that
9  whatever document I had to work with here was
10  actually the document that your client produced and
11  represented -- or that the AVMA produced.
12    Q. Let me try it a different way. Let's take
13  the petition, all versions, as read. Putting aside
14  the petition and any version that has been produced
15  or that hasn't been produced -- and they all have
16  been, as far as I know. But putting aside all
17  versions of the petition that exist, are you aware
18  of any other instances of verbatim copying in other
19  documents?
20         With the understanding that you have
21  not -- and I'm saying sitting here today. I'm not
22  asking you for an encyclopedic knowledge of 15,000
23  documents. I'm saying, sitting here today, are you
24  aware of any?

276

1    A. I believe, yes.
2    Q. And what are those?
3    A. I would need to go through them --
4    Q. I've just prefaced the question by -- I'm
5  not trying to be rude, but I've prefaced the
6  question with the understanding that you have not
7  had the opportunity to memorize 15,000 documents.
8  What I'm asking you is, sitting here today, from
9  your review so far, are you aware of any other
10  documents in which, besides versions of the
11  petition, in which there's been verbatim copying by
12  my client?
13    A. I need the question again.
14    Q. Sure. Excluding all versions of the
15  petition, and with the understanding that you have
16  not reviewed every document produced in this case
17  and have not memorized every document in this case,
18  sitting here today, do you know of any additional
19  instances of my client publishing something with
20  verbatim copies of your work -- verbatim copies of
21  elements of your work?
22    A. I believe I do, but I can't give you the
23  verbatim copying from my memory.
24    Q. I'm not asking you for that. I'm asking

277

1  for the name of the document. So, in other words,
2  you already told me the petition. Is there any
3  other type of document --
4    A. Oh, oh, Oh.
5    Q. -- that I should be looking at to see what
6  your claim of copyright infringement consists of?
7  In other words, let me give you an example: Another
8  document you mentioned here is the articles of
9  incorporation. Let's also exclude that. Let's
10  assume that all versions of those are suspect.
11  Let's assume that all versions of the petition are
12  suspect. Let's assume that all versions of the
13  website of my client are suspect.
14         And what I'm asking you is: In addition
15  to those, do any existing versions that ever
16  existed -- I'm trying to make it easy -- of those
17  three documents -- are you aware of any other
18  documents in which my client published verbatim
19  copies of your work or any other element of your
20  work? Verbatim copies.
21    A. Yes.
22    Q. And what are those documents?
23    A. I'm sorry. I would need to go through all
24  of your documents and pull those pages out.

278

1    Q. And my question assumes that you do not
2  have the opportunity to do that. Sitting here
3  today, when you answered the question yes, what
4  documents are in your mind? I'm not asking you to
5  prove your case right now. I'm asking you what
6  documents you think have verbatim copies of your
7  work in them.
8    A. I can't give a name to a document.
9  However, as I went through the documents that have
10  been produced as well as I could under the
11  circumstances, I did find verbatim copying. And
12  here's the other reason this is difficult; I'm
13  struggling to answer this accurately: I would have
14  to compare those documents to the petition, because
15  perhaps those documents were inserted into Dr.
16  Gillette's petition, and you've excluded that.
17         So my -- my answer is yes, but I can't
18  name a document. I'm unable to do that under these
19  circumstances.
20    Q. And you understand that in our
21  interrogatories to you we've asked you also to list
22  these instances of copying; correct?
23    A. I would need to --
24    Q. I'm just asking: You're aware that there

279

1   was an interrogatory response --
2       A. Yes.
3       Q. -- or an interrogatory request requesting
4   that; correct?
5       A. I would need to read the....
6       Q. I want to ask you probably about an easier
7   topic, which is Homecoming Farm. I just want to
8   understand the timeline. Was there ever a farm, a
9   physical harm, called Homecoming Farm?
10      A. Yes, there was.
11      Q. Was that located in New Hampshire?
12      A. Yes.
13      Q. And when did you first acquire that farm?
14      A. I believe it was 1989. I'm not sure.
15      Q. Was it acquired by you personally, or was
16  it acquired by an organization called Homecoming
17  Farm?
18      A. By me personally.
19      Q. Did the organization ever own it?
20      A. No.
21      Q. And when did you divest yourself of that
22  property?
23      A. I don't recall the year.
24      Q. Approximately how many years did you have

281

1       A. Yes.
2       Q. And is this in fact the articles of
3   incorporation of Homecoming Farm?
4       A. Yes.
5       Q. This was filed in approximately 1992; is
6   that correct?
7       A. Yes.
8       Q. And are these still the articles of
9   incorporation of Homecoming Farm?
10      A. Yes.
11      Q. If you see, there's a paragraph that begins
12  with the capital letters "FIRST," and then there's a
13  mess of paragraphs that begin with the capital
14  letters "SECOND." Do you see that? It's on the
15  first page of the articles. I'm talking about the
16  first few lines, yes.
17          After the word "SECOND" it says, "The
18  purposes of the corporation shall be those described
19  in Section 501(c)(3) of the IRS code to be
20  accomplished by."
21      A. Yes.
22      Q. And then it goes on to list the purposes
23  for which the Homecoming Farm was founded, or the
24  activities that they will engage in to meet their

280

1   it?
2       A. I think four, but....
3       Q. So sometime in the early '90s?
4       A. My guess, yes.
5       Q. I want to mark another document, as Exhibit
6   17. And this is a collection of documents that I
7   can tell you that I personally downloaded from the
8   New Hampshire Secretary of State's website sometimes
9   towards the beginning, after the complaint was
10  filed.
11          MR. LYONS: Do we need to have it
12  marked?
13          THE REPORTER: It's not marked yet.
14          MR. KLUFT: I'm sorry. Thank you,
15  Steve.
16          (Exhibit 17, letter and attachment,
17  marked for identification.)
18      Q. I'm not actually going to ask you about the
19  first page. I'm going to ask you about the document
20  starting on the second page. My question is: Do
21  you recognize this document?
22      A. Yes.
23      Q. Starting on -- do you recognize the
24  document beginning on Page ACVSMR 000248?

282

1   purpose. Is that correct?
2       A. Yes.
3       Q. And is this an accurate statement of those
4   activities?
5       A. It's a generally accurate statement, yes.
6   I'd say they've evolved. As medicine changes,
7   language changes.
8       Q. Okay. Let me ask you to look at Page Bates
9   Stamp 251. In the middle of the paragraph you've
10  see a paragraph marked 7, and under it it says
11  "Homecoming Farm works primarily with." Do you see
12  that?
13      A. Yes.
14      Q. And then one of the organizations listed is
15  the American Veterinarian Medical Association. Do
16  you see that?
17      A. Yes.
18      Q. What work was Homecoming Farm doing with
19  the American Veterinarian Medical Association in
20  1992?
21      A. By forming in order to serve its
22  membership.
23      Q. Did you have any kind of formal arrangement
24  with the American Veterinarian Medical Association?

283

1    A. No.
2    Q. Did you contact them and tell them you were
3  forming to serve its membership?
4    A. No.
5    Q. Did I ask that question poorly? Did you
6  contact the AVMA to announce to them that you were
7  forming in order to serve their membership?
8    A. No.
9    Q. At the time of this document, was it your
10  intent to form a recognized veterinary specialty
11  organization under the AVMA?
12    A. At the time of creating this document, it
13  was my intent to conduct the research, develop the
14  educational programs, and based on the outcome of
15  our results, to have it lead, if it would, to
16  perhaps their recognition of our programs.
17    Q. And what form -- what form of recognition
18  were you thinking of? Are there other kinds of
19  forms, other than being an RVSO?
20    A. You know what? I really don't know. I
21  would have to have the AVMA book from this time
22  period. Let me give you an example: contributing
23  to their conferences, offering some of our workshops
24  to its members, providing clinical rotations for

284

1  veterinary students that are in AVMA-accredited
2  veterinary schools where the rotations that the
3  students did at my farm actually was something that
4  they got credit for as course content. So, in a
5  way, that is serving the AVMA.
6    Q. As of the time of this document's creation,
7  though, none of those programs existed yet; is that
8  correct?
9    A. '92? Yes, we already had students at the
10  farm.
11    Q. You had students.
12    A. Yes.
13    Q. Help me out with this: When you created
14  the ACVSMR project in 1995 or 1996, did Homecoming
15  Farm still have projects that were not ACVSMR
16  projects?
17    A. We still had the capacity to do other
18  projects, and depending year to year is whether or
19  not we were called upon to do those other projects.
20    Q. Is it fair to say that at that point ACVSMR
21  became the mark for all Homecoming Farm educational
22  projects?
23    A. For the educational projects, I'd say
24  that's accurate.

285

1    Q. And did they become the mark for all the
2  ACVSMR clinical seminars?
3    A. Yes.
4    Q. And at the time -- I know you had the
5  capacity to do other things -- what programs still
6  existed of Homecoming Farm that were not under the
7  umbrella of the ACVSMR project?
8    A. I can give you a few examples.
9    Q. Please.
10    A. But again, from year to year, I can't tell
11  you which project was done in which year.
12    Q. I'm happy with the examples for now.
13    A. I can give you some examples. In my
14  travels, since -- when I do teaching, I have offered
15  ACVSMR educational programs at equine rescue
16  organizations or veterinary schools in other
17  countries. In connection with the relationships
18  that I have made through those efforts, I'm very
19  often contacted by colleagues, horsemen, in some
20  cases governmental agencies, to ask if through
21  Homecoming Farm we would be able to offer assistance
22  in some of the following ways: to raise funds to
23  help animals following natural disasters or disease
24  outbreaks.

286

1    I'll give you an example of that. In
2  England there was an outbreak of hoof and mouth
3  disease. I can't remember the timing; let's say it
4  was approximately ten years ago, maybe a little bit
5  more.
6    Q. I remember.
7    A. Exactly. So I happened to be over in
8  England teaching and consulting, and because of the
9  outbreak of the disease, it impacted what we could
10  do, because horses could no longer even walk across
11  a road if they went from one field to another
12  because of the transmission -- the potential to
13  transmit the disease. Local constables were going
14  around and asking farmers to voluntarily give over
15  their shotguns because the suicide rate was up so
16  high because the farmer would have a barnful of
17  sheep, the beautiful pasture is 20 feet across the
18  road, and he wouldn't be able to --
19    So what Homecoming Farm did is, it
20  helped to ask foundations that had helped us, ask
21  philanthropists that had helped us, if they would
22  donate money directly to the causes in England. So
23  we were very helpful in that way.
24    Q. So Homecoming Farm -- I'm sorry. I

287

1  interrupted you.  I did not mean to.
2      A.  So that's just one example of a project
3  involving an animal disaster, if you will, or a need
4  in the world that Homecoming Farm addressed.
5          And also, we were able to network to
6  send some students over to help, you know, during
7  that disease outbreak.
8      Q.  And I saw in some document that you were a
9  finalist for some award offered by -- is it a
10 pharmaceutical company or Ralston Purina or someone
11 that offered an award?  Do you recall what I'm
12 talking about?  Was it for that work?
13     A.  No, that would be -- I believe you're
14 referring to the Bayer Legend of the Year Award.
15     Q.  The pharmaceutical company.  It sounds
16 right.
17         Let me ask you another question:  Who is
18 Mary Marquez?
19     A.  Mary was the secretary for a gentleman
20 named Neil Ayer, who owned a farm in Hamilton where
21 I kept my horses, and he was very helpful to me and
22 encouraging to me in starting up a nonprofit
23 organization to do my work.
24     Q.  And she was on the board of the original

288

1  Homecoming Farm?
2      A.  She was on the original --
3      Q.  Or the original board.
4      A.  Just to file the papers, exactly, for a
5  corporation.
6      Q.  And having her there was a good way to
7  maintain the relationship with that person that she
8  worked for?
9      A.  I don't understand the question.
10     Q.  Why was she on the board?
11     A.  Well, Neil asked her.
12     Q.  And who is Heidi Ford?
13     A.  Heidi Ford was a horseman in Massachusetts
14 at the time.
15     Q.  And I'm sorry, I'm referring to Page
16 No. 252.  I'm not trying to hide the ball on you.
17 Are either of them veterinarians?
18     A.  No.
19     Q.  Other than yourself, has there ever been a
20 veterinary on the board of Homecoming Farm?
21     A.  Yes.
22     Q.  And who was that?
23     A.  I believe Andressa Maranhao.
24     Q.  Can you spell that, please?

289

1      A.  M-a-r-a-n-h-a-o.
2      Q.  And the first name?
3      A.  Oh, Andressa.
4          MR. SARROUF:  If you'll excuse me.
5          MR. KLUFT:  Very nice to meet you.
6          (Mr. Sarrouf left the deposition.)
7      Q.  Is Andressa a man or a woman?
8      A.  A woman.
9      Q.  And how long did she serve on the board?
10     A.  I don't recall.  I'd need to get the series
11 of board members.
12     Q.  Do you recall approximately the time
13 period?
14     A.  I don't.
15     Q.  Was it in the 1990s, or was it in the
16 aughts?
17     A.  I would need the paperwork.
18     Q.  Approximately how long, if you recall, did
19 Andressa served on the board?
20     A.  I don't recall.
21     Q.  Have any other veterinarians ever served on
22 the board?
23     A.  I would need to consult the paperwork.
24 There have been many veterinarians on advisory

290

1  boards to us, so I don't know if you're referring
2  specifically to the corporate board.
3      Q.  I'm currently referring to the corporate
4  board.  I'll ask you about the advisory board in a
5  second.
6      A.  Okay.
7      Q.  So other than Andressa, are you aware,
8  sitting here today, of any other veterinarians that
9  have been on the corporate board?
10     A.  I can't recall now, but perhaps, yes --
11 Irineu Palmeira.
12     Q.  And where does Andressa practice?
13     A.  Andressa is in Florida in the winter and
14 Brazil in the summer.
15     Q.  Is Andressa also a client of your private
16 practice?
17     A.  No.
18     Q.  How do you know her?
19     A.  She was a student.
20     Q.  Of?  I'm sorry, a student of you?
21     A.  Of ACVSMR.
22     Q.  When?
23     A.  In the 2000s, I believe.
24     Q.  Did she became a board member after she was

Sheila Lyons, DVM - Vol. 2 - 1/16/2013

22

---

291

1    a student?
2        A.  I believe, yes.
3        Q.  And then Mr. Palmeira?
4        A.  Dr. Palmeira.
5        Q.  He?
6        A.  Yes.
7        Q.  Where is he located?
8        A.  In Brazil at this time.
9        Q.  Was Dr. Palmeira also a student at ACVSMR?
10       A.  Yes.
11       Q.  And did he become a board member after he
12   became a student?
13       A.  I believe so, yes.  Well, if he became a
14   board member.  He's been an advisory board member,
15   and I need to look at that paperwork.
16       Q.  Anybody else you can think of that's been a
17   veterinary that's served on the board?  On the
18   corporate board.
19       A.  Not that I can recall as I sit here.
20       Q.  I see here Lauren Kingston was on the
21   original board; is that correct?
22       A.  Yes.
23       Q.  So she was on for a very long time; is that
24   right?

---

292

1        A.  No.  Those are the incorporators.
2        Q.  I see.
3        A.  So we rotated.  Members rotated on and off
4    of the board.
5        Q.  Now, your advisory board, can you describe
6    what that is?
7        A.  Depending on what project we have that
8    we're currently working on and developing, I ask
9    individuals that I believe will be able to inform
10   that project in a way that will help us.
11       Q.  And do those individuals meet together as a
12   group?
13       A.  No.
14       Q.  Is there a list of advisory board members
15   anywhere in existence?
16       A.  Not a complete list, no.
17       Q.  Is there an incomplete list?
18       A.  Well, that information was, as I recall,
19   part of my document production.  And I recall seeing
20   references to advisory board members as I was
21   copying documents or....
22       Q.  So if there is a list of advisory board
23   members, it's been produced; is that right?
24       A.  Yes, it has.

---

293

1        Q.  All lists that you have in your possession?
2    In other words -- and I say "all lists" meaning the
3    board changes over time?
4        A.  Yes.
5        Q.  The advisory board.  Any list of advisory
6    board members at any one time has been produced, if
7    you still have it?
8        A.  Yes.
9        Q.  When did the advisory board first come into
10   existence?
11       A.  Well, really, before the formation of
12   Homecoming Farm as a corporate entity, I had
13   advisers to help me to create a structure and to
14   decide whether or not to go ahead.  So I'd say that
15   there have been advisory boards for Homecoming Farm
16   since before we incorporated.
17       Q.  And does the corporate board vote on the
18   members of the advisory board?
19       A.  No.
20       Q.  They're selected by you?
21       A.  They're -- they generally present
22   themselves.
23       Q.  Are they given any kind of letter or
24   correspondence welcoming them to the board?

---

294

1        A.  No.
2        Q.  When you came up with the name ACVSMR, or
3    American College of Veterinary Sports Medicine and
4    Rehabilitation, at that time you were coming up with
5    that name did you consider other names?
6        A.  If by that do you mean did I make a list of
7    names and then choose that one, no.
8        Q.  Did you ever have a draft document that had
9    another name on it?
10       A.  No.
11       Q.  And just to go over something Mark went
12   over yesterday, Mr. Dickison went over -- I'm
13   sorry --
14       MR. DICKISON:  You can refer to me as
15   Mark.
16       Q.  You were aware at the time that the AVMA --
17   and by "at the time," I mean in 1995 and 1996 -- you
18   were aware that they already had a recognized
19   veterinary specialty organization also; correct?
20       A.  Yes.
21       Q.  And that many of those veterinary specialty
22   organizations began -- their titles began with the
23   words "American College of Veterinary"; correct?
24       A.  Yes.

---

295

1   Q.  Are you aware of any organization starting
2   with the words "American College of Veterinary" that
3   are not affiliated with the AVMA other than your own
4   organization?
5   A.  No.
6   Q.  You mentioned in part yesterday that the
7   plan -- that part of the name -- and this is, again,
8   another instance where you correct me if I'm
9   misstating what you said.  But I think you said that
10  part of the reason you came up with the name was
11  that it was descriptive of what you were doing in
12  your plan for the future.  Is that correct?
13  A.  Yes.
14  Q.  And again I'm asking:  Did that plan for
15  the future at the time involve recognition by the
16  AVMA of a veterinary specialty?
17  A.  No.
18  Q.  When was the first time that Homecoming
19  Farm offered a program to the public under the name
20  ACVSMR?  I know there's the Equine Excellence
21  Initiative that was a piece of paper that was passed
22  around.  I'm talking about a public event, a
23  program, that people could attend.
24  A.  I don't recall to be able to answer you

296

1   specifically.  But if it helps to give you a
2   range --
3   Q.  Please.
4   A.  It would have been shortly after 1996.
5   Q.  Are you thinking of a lecture or a seminar,
6   clinical seminar?
7   A.  Yes.
8   Q.  Any one in particular?
9   A.  No.  That's why I don't have a specific
10  memory.  But I began using ACVSMR for the programs
11  starting back then.
12  Q.  I believe yesterday, when Mr. Dickison
13  asked you how you were using the mark prior to
14  January of 2003, you mentioned the Equine Excellence
15  Initiative, and you also mentioned you used the word
16  "brochures."  Do you recall using that word
17  yesterday?
18  A.  Yes.
19  Q.  What are those brochures?  Can you describe
20  them?
21  A.  Actually, I produced them.
22  Q.  And can you describe them so I understand
23  what you mean by "brochures"?  I'm not doubting you.
24  It's just that one person's brochure may be another

297

1   person's flyer may be another person's white paper.
2   I just want to understand what you mean by
3   "brochure."
4   A.  It was just a paper-sized document, and it
5   contained information, just general information,
6   about our programs.  I'd need to look at the
7   document.
8   Q.  Was one of those documents called General
9   History of Homecoming Farm, in your recollection?
10  A.  I don't think so, no.
11  Q.  I'm going to show you some documents today.
12  If you see one of those things you are referring to
13  as a brochure, will you tell me, please, if you
14  remember?
15  A.  Sure, yes.
16  Q.  Thank you.  Are there any brochures that
17  existed as of that time that you still have and have
18  not produced?
19  A.  No.
20  Q.  Do you still have copies of all the
21  brochures that you produced at that time?
22  A.  I'm not sure.
23  Q.  Is there anyone in particular that you're
24  thinking of that's lost?

298

1   A.  Well, no, but let me explain my thought
2   process.  When a brochure is created for -- that
3   describes our programs, as those programs may
4   change, that brochure would be changed to reflect
5   that.  So if we add -- I'm thinking of the equine
6   health care manager program that we have.  So there
7   is a point at which that was added to the ACVSMR
8   brochure.  So whether I had the predecessor -- and
9   I'm just giving you an example of one program that
10  would have been added to it.  I would not have kept
11  copies of the old brochure because I was updating
12  it.
13  Q.  You didn't have a computer at the time when
14  these brochures were first distributed; correct?
15  A.  No.
16  Q.  Who kept the copies that were to be
17  updated?  They were on a computer, I presume;
18  correct?
19  A.  That would be Eleanor Code.
20  Q.  And were they kept on her home computer?
21  A.  I'm not sure.
22  Q.  Can you please spell Eleanor Code?
23  A.  E-l-e-a-n-o-r  C-o-d-e.
24  Q.  That was for the reporter.  He asked me

299

1    that during the break.
2         And who is she?
3    A. Eleanor has been a board member, and she
4    has been very helpful in our development of
5    fundraising materials.
6    Q. What is her profession?
7    A. Eleanor was an executive secretary to
8    Mickey Rooney.
9    Q. That's one of the best deposition answers
10   I've ever heard. And was Mickey Rooney ever located
11   in Massachusetts?
12   A. No, California.
13   Q. She relocated --
14   A. Actually, I do not know the background of
15   Mickey Rooney.
16   Q. Let me object to my own question on that
17   grounds. I apologize. I was just curious.
18        And when did she start becoming involved
19   with Homecoming Farm?
20   A. I don't recall.
21   Q. Let me show you a document. I'm going to
22   mark this as 18.
23        (Exhibit 18, AAEP Report, marked for
24   identification.)

300

1    Q. Here is the official exhibit copy. I'm not
2    going to ask you about any of the contents of these
3    articles.
4    A. Okay.
5    Q. What I'm going to ask you is: Is this one
6    of the documents you produced in your production?
7    A. Yes.
8    Q. And when you were talking about going
9    through old magazines and seeing what you had from
10   the period, are you referring to documents such as
11   this?
12   A. Yes.
13   Q. And if you look on the second page, is that
14   your handwriting?
15   A. Yes.
16   Q. And it says on the side, "Sent Equine
17   Excellence Initiative." Is that --
18        Is this one of the ways you kept records
19   of who you sent materials to?
20   A. What it represents is a record of who I
21   believed we should send materials to, and sometimes
22   we just had. But I would keep these kinds of
23   brochures if I thought that it would be something
24   useful to us in the future.

301

1    Q. It refers to something a lawyer said here.
2    Without telling me anything a lawyer said, what
3    lawyer was this referring to, if you remember? I'm
4    specifically referring to where it says, "Lawyer
5    said send one-page request."
6    A. I don't recall. 1997?
7    Q. Did you have a lawyer for Homecoming Farm
8    in 1997?
9    A. No.
10   Q. On the next page it talks about estate
11   planning in your notes, for ACVSMR. What does that
12   refer to? And again, is this your handwriting page
13   as well?
14   A. I believe so.
15   Q. Do you have any recollection of what
16   "estate planning" refers to?
17   A. I believe that what I was referring to here
18   is, in our solicitation of funds to support
19   Homecoming Farm, that by going to development
20   conferences and fundraising seminars, which I did to
21   try to learn about the process of fundraising, I
22   became generally informed about estate planning and
23   how nonprofit organizations can benefit from making
24   their programs known. So that's what I would say

302

1    the general context is there.
2    Q. Okay. So this was part of your part of
3    sort of brainstorming ideas for fundraising for
4    ACVSMR. Is that correct?
5    A. Yes.
6    Q. If you turn to the next page, it says
7    Fellowship Application. I'm referring once again to
8    the handwritten notes. Are these yours as well?
9    A. Yes.
10   Q. It says in handwriting, "Fellowship
11   application -- Draft for ACVSMR." Then there's a
12   little dash again, and it says "Diff types?" And
13   then "M.D.'s?" Were you at some point planning on
14   having a program for M.D.'s as part of the ACVSMR?
15   A. No.
16   Q. What does this refer to here?
17   A. To the best of my recollection, going
18   back -- how many years is this?
19   Q. 1997.
20   A. It would be my best guess -- it's not a
21   direct memory.
22        MR. LYONS: I don't want you to guess,
23   and neither does Mr. Kluft. Give him your best
24   recollection.

303

1    THE WITNESS: Okay.
2    A. My best recollection is the note is a note
3    to myself to think about how M.D.'s create their
4    fellowships.
5    Q. And my understanding from that is the idea
6    is you're looking at how the human medical
7    profession works in order to model your plans for
8    ACVSMR.
9    A. Yes.
10   Q. And you mentioned that you were -- I think
11   this is an organization that you mentioned you were
12   a member of yesterday, the American Association of
13   Equine Practitioners. Is that correct?
14   A. Yes.
15   Q. Are you still a member?
16   A. No.
17   Q. Are they a veterinary organization?
18   A. They're a membership organization, and I
19   don't know whether they admit nonveterinarians as
20   well.
21   Q. But their members tend to be veterinarians;
22   is that right?
23   A. Yes.
24   Q. And are you still a member?

304

1    A. No.
2    Q. And what are the circumstances that led to
3    your leaving?
4    A. The circumstances related to a difference
5    of opinion that I have with the policies or with
6    many of the individuals who have held positions in
7    the AAEP. I have a difference of opinion over
8    ethics as it applies to the practice of sports
9    medicine with horses, particularly at racetracks,
10   but also with other sports. I had a difference of
11   opinion over the veterinary client-patient
12   relationship and abiding by the standards of
13   practice for racetrack practitioners, especially
14   over the years of drugs.
15   Q. Are you finished?
16   A. Yes.
17   Q. Can I ask, did the AAEP take a public
18   position in favor of drugs? Or are you referring to
19   the personal -- your knowledge of the personal
20   activities of individual members?
21   A. I would need to review all of the
22   information that they have put out on that topic to
23   be able to answer that question. As I sit here --
24   They have certainly come out as a group

305

1    opposing the currently proposed Federal legislation
2    that I provided expert witness testimony before
3    Congress.
4    Q. I see. And have they presented publicly a
5    reason for their opposition?
6    A. I don't know.
7    Q. But your proposal before Congress was
8    within the last year; is that correct?
9    A. Yes.
10   Q. So their option to that proposal was not
11   the basis for your leaving the organization.
12   A. No.
13   Q. When did you leave the organization?
14   A. I believe that it was probably around 1999
15   or maybe 2000. And the issue that had come up or
16   the event that had brought all of this into focus
17   for me was my working as -- being retained as an
18   expert witness by the Ohio Attorney General's Office
19   in a prosecution that they brought against
20   veterinarians who work with race horses and in the
21   general issues related to the standards of practice
22   being applied equally regardless of the nature of
23   the use of the patient.
24   Q. You said yesterday you've never been

306

1    deposed before. You were not deposed in that
2    matter?
3    A. I don't think so. I just remember
4    testifying.
5    Q. You testified before what body?
6    A. A hearing.
7    Q. I'm not asking you to be a lawyer, but was
8    it a State of Ohio body? Is it a governmental body
9    of the State of Ohio? Or was it a private --
10   A. It would be a governmental --
11   Q. A governmental organization.
12   A. Yes.
13   Q. And it was not in a court. There wasn't a
14   judge there, wasn't there?
15   A. There was.
16   Q. Oh, there was a judge.
17   A. Yes.
18   Q. And have you ever given testimony other
19   than that?
20   A. Yes.
21   Q. And what were the circumstances of that
22   testimony.
23   A. Before a grand jury. And the circumstances
24   of that related to a prosecution brought -- or a

---

**307**

1  case developed by the FBI. This was in Chicago.
2  And it was a RICO case. But the issues involved --
3  or part of the story -- I guess I'll tell it that
4  way -- involved people who were having their horses
5  killed in order to be able to collect the mortality
6  insurance. And the case was actually the Helen
7  Brock murder case. So my testimony was necessary in
8  order to help the grand jury be able to understand
9  quite frankly how easy it is to euthanize a horse,
10  make a false insurance claim, and collect the money.
11  Q. And approximately when was that testimony?
12  A. That would have been probably in -- oh, in
13  Chicago?
14  Q. Yes.
15  A. Yeah, I don't recall. I was at Homecoming
16  Farm in New Hampshire, so it's somewhere in there.
17  Q. Who does the fundraising for Homecoming
18  Farm?
19  A. I do, mostly.
20  Q. Is the fundraising function at Homecoming
21  Farm separated between ACVSMR and other Homecoming
22  Farm programs? In other words, do you seek
23  different grants for Homecoming Farm than you do for
24  an ACVSMR project?

---

**308**

1  A. Homecoming Farm is the entity that can
2  request funds. ACVSMR is not a 501(c)(3).
3  Q. Other than asking as a fiscal sponsor, does
4  Homecoming Farm raise any of its own funds for
5  projects that are not related to the ACVSMR?
6  A. Yes.
7  Q. And you do that as well?
8  A. Yes.
9  Q. How many hours do you devote to
10  fundraising? That's an unfair question, because I
11  didn't give you a time period. Let's say -- do you
12  have any sense in a week how many of it you devote
13  to fundraising?
14  A. I don't. And I'd like to offer a context,
15  as I'm hearing your question. "Devoted to
16  fundraising" conjures up in my mind the work of a
17  development professional, so putting proposals
18  together, things like that. But fundraising, as the
19  founder of an organization, I can tell you takes
20  place in your communications with clients. It takes
21  place when you give presentations in a room that are
22  educational.
23  So I'm trying to respond accurately to
24  your question, and it's sometimes hard to --

---

**309**

1  Q. I think that's a very fair distinction, and
2  I meant the first kind of fundraising: development,
3  the kind of person you'd hire for development if you
4  had the money to hire a development person.
5  A. Yes.
6  Q. I'm talking about grant writing, and I'm
7  talking about, not only grant writing, but the
8  occasional lunch with a wealthy potential donor.
9  I'm talking about that kind of development. How
10  much time do you devote to that kind of development?
11  MS. KLIEMAN: When?
12  MR. KLUFT: That's a fair question.
13  Q. In 2012.
14  A. Did you ask in a week?
15  Q. You know, if there's an easy way for you to
16  quantify, you can give it to me in whatever way you
17  think is -- I'm trying to get a sense of what
18  percentage of your time is devoted to that. If it's
19  easier to say a month, a year, a week, however you
20  want.
21  A. I'm afraid I can't recall going back over
22  an entire year how much time I spent.
23  Q. And is that -- would that be the same
24  answer for any particular year?

---

**310**

1  A. Yes.
2  Q. Are there records that you keep that would
3  indicate how much time you spent on that activity?
4  A. No.
5  Q. I think you mentioned that Eleanor Code
6  helps you with fundraising?
7  A. Yes.
8  Q. What is her function?
9  A. She has in the past. Eleanor helped to
10  send the Equine Excellence Initiative to countless
11  recipients. She helped to draft, if you will,
12  boilerplate letters for -- "Thank you for your
13  donation" sort of letters, things like that. And
14  she distributed or sent out a lot of the materials.
15  For example, when I would identify
16  additional sources that I thought might benefit us
17  to either send a copy of the Equine Excellence
18  Initiative or to inquire about their giving programs
19  and guidelines, then very often Eleanor, because she
20  had a desk job, would be able to do that for me.
21  Q. And what was her job at the time?
22  A. She was Mickey Rooney's secretary.
23  Q. Oh, she still served that function. So she
24  was still located in California?

---



311

1     A. Oh, yes.
2     Q. I'm sorry. I misunderstood. And she did
3  this as a volunteer?
4     A. Yes.
5     Q. And what were the circumstances under which
6  you met her?
7     A. I met Eleanor because a friend of mine
8  called me to say -- I'm trying to remember the name
9  of the friend -- called me to say, "That was great.
10  How did you meet Mickey Rooney?  This is
11  unbelievable.  You made it, Sheila.  You're going to
12  launch this now."  And I said, "That sounds great.
13  I don't know what you're talking about."  And he had
14  done a talk show in connection with one of the
15  movies that he was promoting, and he was asked about
16  his history with horses and "Are you still around
17  horses" and things like that.  And apparently Mickey
18  Rooney had heard about Homecoming Farm and the
19  Equine Excellence Initiative, because I'm told he
20  gave it quite a pitch.
21     Q. Do you know what talk show that was on?
22     A. I don't.  And this was before -- and
23  naturally, I tried to get a copy of this.  So I
24  contacted his office, and that's how I met Eleanor

312

1  Code.
2     Q. And do you know how -- is she still
3  involved in fundraising?
4     A. Eleanor Code died.
5     Q. And when was that?
6     A. I don't recall.
7     Q. Was it within the last year?
8     A. No.  It was several years ago.  It was, I'd
9  say, more than five years ago.  I don't recall.
10     Q. I'm sorry to hear that.  Did anyone take
11  over her volunteer fundraising duties?
12     A. Not officially.
13     Q. Anybody unofficially take them over?
14     A. I've had individuals help me.  For example,
15  they will send me potential funding sources when
16  they come across them.
17     Q. I want to show you a document that I think
18  you referred to earlier.
19         MR. KLUFT:  Can you please mark this.
20         (Exhibit 19, letter, marked for
21  identification.)
22     Q. I'll ask you to just look at the official
23  marked copy, please.  I should have said earlier --
24  I didn't want to interrupt you -- I'm not going to

313

1  ask you enough questions about this document to make
2  that worth it.  I'll try to tell you in advance on
3  the others.
4         Is this the Johnson & Johnson proposal
5  you were referring to earlier?
6     A. It's the cover letter.
7     Q. I'm sorry; it's the cover letter.
8     A. Yes.
9     Q. And the following pages, is that the budget
10  that was sent along with the proposal?
11     A. It was the projected budget for what I was
12  asking them to help support.
13     Q. And the thing you were asking them to help
14  support was the American College of Sports -- of
15  Veterinary Sports Medicine and Rehabilitation;
16  correct?
17     A. Yes.
18     Q. Is this the first grant that you ever
19  sent -- that you ever applied for for the ACVSMR
20  project?
21     A. I believe it is, yes.
22     Q. From this point forward, are you aware of
23  any grant you applied for for Homecoming Farm that
24  was not for the ACVSMR project?

314

1     A. Yes.
2     Q. I'll move on.  I'm sorry.  I should have
3  stopped you earlier.  I wasn't going to ask you
4  about the contents.
5         MR. KLUFT:  Anyone want to take a break?
6         MS. KLIEMAN:  Whenever you're ready for
7  lunch.
8         MR. KLUFT:  I have a few more grants I
9  want to show her, mostly to authenticate them, and
10  then we can stop.  Is that fair enough?  But anytime
11  you want to stop, that's fine.
12         (Exhibit 20, William and Charlotte Parks
13  Foundation for Animal Welfare grant proposal, marked
14  for identification.)
15     Q. I have a few questions about this.  Is this
16  also a grant that you wrote for the ACVSMR?  Or a
17  grant proposal, I should say, that you wrote for the
18  ACVSMR?
19     A. Yes.
20     Q. If you look at the handwriting on the first
21  page, is that all yours?  Is some of it yours and
22  some of it not yours?
23     A. It's all mine.
24     Q. You have beautiful handwriting, by the way.

---

315

1    Now, if you look at the brief narrative
2  of proposal.  Do you see that?
3      A.  Yes.
4      Q.  It says, "This project involves developing
5  a curriculum for new paraprofessionals to work in
6  vet medicine and administrative costs to organize
7  the establishment of rehabilitation as a service and
8  specialty for veterinary ends."  I think that was
9  cut off.
10     A.  Probably.
11     Q.  "Through the ACVSMR - our educational
12  program."
13     A.  Yes.
14     Q.  Did that educational program, was that only
15  in reference to the second part of this, the
16  veterinarians, or was that also in reference to the
17  paraprofessionals?
18     A.  The way it reads, it appears to be for
19  both.
20     Q.  Well, obviously these were your projects;
21  correct?  Are they both within the ACVSMR?
22     A.  Could you be....
23     Q.  Well, there's a program here for new
24  paraprofessionals; correct?

---

316

1      A.  Yes.
2      Q.  And there's also a program, it seems to me,
3  for veterinarians; is that correct?
4      A.  It doesn't describe it as a program, but
5  yes.
6      Q.  Are they both within the ACVSMR project?
7      A.  Yes.
8      Q.  Can I ask you to turn to the last page of
9  this document, to your CV at the bottom, or the
10  little bio at the bottom of the last page.  Do you
11  see the second sentence?  If you could just read the
12  first two sentences of that bio.
13     A.  Yes.
14     Q.  This really goes to a question Mr. Dickison
15  was asking yesterday:  Is that a fair estimate of
16  the number of patients that you had treated from
17  1995 up to the time of this document, 1998?
18     A.  I would need my records to know.  But I
19  would say that would be --
20         '85.  What is this?  Ninety....
21         It would be my -- I would say that is an
22  approximate number, which is what it says.  So if
23  you put the term "approximate" with one thousand,
24  then yes.

---

317

1      Q.  Well, you drafted this; correct?
2      A.  Yes.
3      Q.  And at the time you were trying to be as
4  accurate as you could based on the knowledge you had
5  at the time.
6      A.  Yes.
7      Q.  Let me put another document in front of
8  you.
9         (Exhibit 21, request for funding, marked
10  for identification.)
11         MR. KLUFT:  I have a lot of questions
12  about this document.  Do you want to break for lunch
13  now?
14         MR. LYONS:  If it's 10 minutes' worth of
15  questions, let's go to 1:00.  If it's 20 minutes,
16  let's break.
17         MR. KLUFT:  I don't mind stopping in the
18  middle.
19     Q.  I'll just ask you to take a look at this.
20  I'm going to ask you some specific questions; so if
21  at any time you want to read through more for
22  context, just let me know.
23         Is this another grant proposal that you
24  drafted for ACVSMR?

---

318

1      A.  No.
2      Q.  What is this?
3      A.  This is a letter that -- it's a request for
4  funding, but it's not a grant proposal.  Grants come
5  from grant-making organizations.
6      Q.  This is to a -- I'm gathering from the
7  name, a wealthy individual.
8      A.  Yes.
9         MR. LYONS:  Before you put your next
10  question, I'm sorry, could we get the official
11  marked version of it?
12         MR. KLUFT:  Sure.
13         MR. LYONS:  I think that's it right
14  there.
15         MR. KLUFT:  My apologies.
16         MR. DICKISON:  To confirm, we're on 21?
17         MS. KLIEMAN:  21.
18     Q.  If you look through the document -- and if
19  you need to read the whole thing, that's fine -- it
20  refers to amounts of money next to years.  Do you
21  see that?  So on the first page it's No. 1, 1995,
22  $38,140.
23     A.  Yes.
24     Q.  And then it continues into the next page

---



319

1  and the next page after that. Do you see that?
2     A. Yes.
3     Q. And my question is: Is that an amount you
4  were requesting, or is that an amount you -- is that
5  the amount of funds that the organization had raised
6  each year?
7     A. I would need to see our tax returns to be
8  able to compare how much we raised each year to the
9  figures in this letter requesting support to answer
10  that question.
11     Q. Can I ask you to turn to Page 3513. About
12  in the middle of the page do you see it says 1997,
13  $126,340?
14     A. Yes.
15     Q. And the second paragraph under that starts
16  with, "Our ACVSMR farrier programs"?
17     A. Yes.
18     Q. "Our ACVSMR farrier programs began in
19  earnest this year." By "this year" were you
20  referring to 1997?
21     A. It would appear so.
22     Q. What did you mean -- you authored this
23  document; correct?
24     A. Yes.

320

1     Q. What did you mean by "began in earnest"?
2     A. Again, I would need records that go back to
3  1997 to see how many students we were working with.
4  But to the best of my recollection, that would
5  suggest that we had more applicants, more -- a
6  greater ability to offer educational services.
7     Q. Well, by "programs" were you referring to
8  seminars conducted in Europe and several states? Is
9  that what you meant by the programs starting?
10     Maybe I can ask a better question. If
11  I'm a farrier in 1997, how do I find out about the
12  ACVSMR program for farriers?
13     A. Actually, it was mostly word of mouth with
14  farriers.
15     Q. And the programs that you were offering,
16  were they, again, like we talked about before, at
17  other people's farms?
18     A. Yes.
19     Q. Now, it refers to here "Cali Tech in
20  Pomona." Is that Michael Savoldi's college?
21     A. Yes.
22     Q. It talks about developing a master's degree
23  program in farrier science. Was that ever
24  developed?

321

1     A. It was developed. It hasn't yet been
2  offered.
3     Q. Are they planning to offer it? Do you
4  know?
5     A. I don't know. The....
6     Q. I'm sorry?
7     A. It doesn't matter. I was going to expand
8  on it. It doesn't matter.
9     Q. But there's no program yet.
10     A. No.
11     Q. Now, the last paragraph of this document --
12  of this page; I'm sorry -- it says, "I contacted the
13  AVMA to get their information -- to get information
14  regarding their potential recognition of our ACVSMR
15  programs. They will only consider veterinarians who
16  we certify, but the need to develop all the other
17  paraprofessional programs is essential to the
18  long-term success of the specialty." Do you see
19  that?
20     A. Yes.
21     Q. What conversation were you referring to
22  when you said you contacted the AVMA?
23     A. I believe, based on the date of 1997, that
24  that would be with Dr. Park. Or it would have been

322

1  whoever the AVMA had put me in touch with when I
2  contacted them at that time.
3     Q. Okay. So although the date of this
4  document, Exhibit 21, is January 23rd, 2000, this
5  paragraph is still referring to the subheading 1997.
6     A. Yes.
7     Q. I'm just trying to -- because it starts
8  to -- it starts in the past tense, and then the next
9  sentence future tense.
10     A. Yes.
11     Q. So I'm just trying to make sure I
12  understand.
13     A. Yes.
14     Q. What did Dr. Park, in your recollection,
15  tell you about the fact that -- or the statement
16  here you made that -- I'm sorry. Let me start the
17  question again.
18     What did Dr. Park tell you that led you
19  to make the statement "They will only consider the
20  veterinarians whom we certify"?
21     A. I had described our programs to him and
22  offered the substance that without these
23  paraprofessionals and farriers and other members of
24  the team, if it were, that both delivered health

323

1  care and preventive services and proper management
2  to horses to prevent injury, that -- he explained
3  that the AVMA would only recognize a specialty
4  organization for veterinarians only, so that these
5  other programs that I had developed under ACVSMR
6  would not be included in the AVMA's recognition
7  should we decide to pursue and be successful.
8      Q.  And what would happen to those programs,
9  then, under your vision, as you articulate here?
10     A.  They would just stay -- remain our ACVSMR
11 programs for farriers, physiotherapists, and so
12 forth.
13     Q.  Now, in 1998 and 1999, when you describe
14 your efforts on the next page, it doesn't mention
15 any further contact with the AVMA about creating a
16 specialty.  Did you have any further contact with
17 the AVMA during those years?
18     A.  I know I contacted them again before the
19 conference in Oregon.  And I want to be very clear:
20 This is a letter requesting support from an
21 individual.  This is not the record of Homecoming
22 Farm or --
23     Q.  I understand.
24     A.  So I would not expect to put it there.

324

1      Q.  And if you take a look at Page 3517.
2  There's a series of budgets for different years
3  prior to 2000.  Do you see that?
4      A.  Yes.
5      Q.  And are these -- are these the historic
6  budgets of the Homecoming Farm for those years?
7      A.  Historic?
8      Q.  In other words, these were -- this is a
9  grant -- this is a request in 2000 that you're
10 making.
11     A.  Yes.
12     Q.  And so you're not -- when it says, the very
13 first line, "Office and administration, $500,"
14 that's historically what -- your best estimate of
15 what you actually spent that year; correct?
16     A.  Yes.
17     Q.  That's what I meant by "historic."  You're
18 not asking her for funds to cover previous years.
19     A.  No.
20     Q.  And No. 8 here, it says, "Consultant to
21 create EEI."  Do you see that?
22     A.  Yes.
23     Q.  Is that the Equine Excellence Initiative?
24     A.  Oh, yes.

325

1      Q.  Does that refresh your memory as to how
2  much you paid the consultants?
3      A.  Yes.
4      Q.  And that amount was $500?
5      A.  Yes.
6      Q.  And this was the entire budget for
7  Homecoming Farm and ACVSMR combined in 1995?
8      A.  Again, I would need to compare this with
9  our tax records, because those are the official
10 records for this.  But yes, I believe so.
11     Q.  I guess what I'm asking is:  Whether or not
12 it's exactly reflected in the tax returns -- and I
13 can represent to you that I'm pretty sure it is,
14 from my memory -- this is for both the Homecoming
15 Farm in general and for the project?  There's not a
16 separate budget for the project, is there?
17     A.  Well, there really isn't a separate entity.
18 So we could go through and figure out whether the
19 equipment was used for ACVSMR.  But it's a budget
20 for the Homecoming Farm project, the ACVSMR --
21     Q.  And in a way -- sorry.
22     A.  -- and whatever else we did in any
23 particular year.
24     Q.  And I understand that it's not a fair

326

1  question for 1995, obviously, because that is when
2  you were still developing.
3      A.  Yes.
4      Q.  But if you turn to the next page, you'll
5  actually see some line items that specifically
6  mention ACVSMR.  Do you see that?
7      A.  Oh, yes.
8      Q.  You see there's two budget items for ACVSMR
9  that year.  One is for equipment, and one is for
10 educational materials.  Do you see that?
11     A.  Yes.
12     Q.  And is that an accurate or approximate
13 reflection of the ACVSMR project budget for that
14 year?
15     A.  Well, the research would also be included
16 in that.
17     Q.  The research was $61,000?
18     A.  Yes.
19     Q.  And who conducted that research?
20     A.  I did.
21         Well, excuse me.  Again, I'm getting my
22 years mixed up.  If I was working with Michael
23 Savoldi, it would have included his contributions.
24     Q.  And was that research published anywhere?

---

327

1    And I'm saying other than in your own literature.
2        A. Michael published in several journals, but
3    I did not publish.
4        Q. And when he published in those journals,
5    did he mention the ACVSMR?
6        A. No, he did not.
7        Q. What are -- what equipment do ACVSMR
8    students -- what were they using in 1996?
9        A. 1996, jeez.
10        Q. Let me ask you a fairer question: In general,
11    what kind of equipment does a student need?
12        A. Again, it depends on the year and what we
13    were teaching, because that has changed as we have
14    evolved and developed better methods through our
15    research.
16        So one example might be neuromuscular
17    stimulation equipment. There would be camera
18    equipment for their photo recordkeeping. It's a
19    pretty small number.
20        Q. Let me ask you one more question, and then
21    I'll take a break: Do you have budgets that further
22    itemize these numbers?
23        A. At the time I did, but not today.
24            MR. KLUFT: Should we break?

---

328

1            MR. LYONS: Fine.
2            (Lunch recess taken.)
3            (Exhibit 22, Handwritten document,
4    marked for identification.)
5            (Exhibit 23, Budgets, marked for
6    identification.)
7            (Exhibit 24, Meadowbrook Animal
8    Sanctuary and Haven, site visit report, marked for
9    identification.)
10            (Exhibit 25, memo, marked for
11    identification.)
12            (Exhibit 26, Brochure, marked for
13    identification.)
14            (Exhibit 27, Board meeting minutes,
15    marked for identification.)
16        Q. Dr. Lyons, to save time, I've had a few
17    exhibits marked during the lunch break. This is
18    Exhibit 22. I just want to ask you to identify
19    this. Are these the notes of your conversation in
20    1999 with Dr. Park?
21        A. They would be notes certainly related to a
22    conversation that I had with Dr. Park.
23        Q. Do you have any memory as to when you took
24    these notes?

---

329

1        A. I don't have a direct memory, but it would
2    have been at the time.
3        Q. The statement here, "ABVS guidelines must
4    include all species that could benefit." Do you see
5    that? It's about middle of the way through the
6    page.
7        A. Yes, I do.
8        Q. Is that something that Dr. Park told you?
9    Not necessarily in these exact words, but was that
10    information that you received from Dr. Park?
11        A. I believe that I recall getting that
12    information from Dr. Park, but I don't have a direct
13    memory.
14        Q. And did Dr. Park, where it says "Allied
15    certifications for paraprofs" -- I think that means
16    paraprofessionals --
17        A. Yes.
18        Q. -- "not also through AVMA," is that also
19    information that Dr. Park gave you?
20        A. Yes.
21        Q. You can put that away. Do you have any
22    other notes of your conversations with Dr. Park,
23    besides those?
24        A. (Shaking head.)

---

330

1        Q. Let me show you what's been marked as
2    Exhibit 23. I want to do my best to help you catch
3    your train, so I'm going to move through some
4    documents quickly. But if I'm moving too fast, just
5    tell me.
6        This was produced to us, I'll tell you,
7    in this order. This purports to be a collection of
8    budgets.
9        A. Oh.
10        Q. I just want to confirm that these are what
11    they appear to be. Are these the budgets for
12    Homecoming Farm from 1995 through 2011?
13        A. Yes.
14        Q. Are they the only budgets you have for
15    Homecoming Farm over this period?
16        In other words -- let me ask you a
17    better question -- are there any more detailed
18    budgets, for instance, in an Excel spreadsheet --
19    that exist?
20        A. No.
21        Q. These are budgets that you composed?
22        A. Yes.
23        Q. Do you know when you composed them?
24        A. To the best of my recollection, they would

---

331

1  have been composed year to year as we prepared our
2  990's.
3      Q.  If you turn to Page 4627, or Bates Stamp
4  4627.  My understanding is that on these budgets,
5  these all more or less have the same format; is that
6  correct?
7      A.  Yes.
8      Q.  And the top, as I understand it, are your
9  expenditures?
10     A.  Yes.
11     Q.  And the bottom part is the incoming money;
12  correct?
13     A.  Yes.
14     Q.  And it lists the different sources of money
15  that came in; is that correct?
16     A.  Yes.
17     Q.  And so, for instance, The Baker Trust, do
18  you see that entry?
19     A.  Yes.
20     Q.  That indicates that during the year 2001
21  you received $2,000 from The Baker Trust; is that
22  correct?
23     A.  Yes.
24     Q.  And in this particular case, that seems to

332

1  have been earmarked for a particular item.
2      A.  Yes.
3      Q.  And some of these items are earmarked
4  specifically for ACVSMR.
5      A.  Yes.
6      Q.  And some of the items are earmarked, when
7  it says "general operating," is that general
8  operating expenses of Homecoming Farm?
9      A.  Yes.  But I want to say again that, since
10  ACVSMR was a project of Homecoming Farm, that the
11  general operating expenses of Homecoming Farm would
12  include the general operating expenses of ACVSMR.
13     Q.  Do you have a breakdown of the expenses,
14  general operating expenses of ACVSMR versus other
15  Homecoming Farm projects?
16     A.  No, the general operating expenses for the
17  corporation, for Homecoming Farm, would be general
18  operating expenses also for the ACVSMR project.
19         Let me try to make it clear this way:
20  It's not as if there's an expenditure that's
21  considered general operating.  Let's say it's
22  mailing, it's buying postage.  That's a general
23  operating expense, and there are times when that
24  postage would be used to mail brochures or the

333

1  educational booklets for ACVSMR.  So in trying to
2  answer as accurately as I can, that I would have
3  put down as a general operating expense just in
4  general.
5      Q.  And looking back now at this year, 2011,
6  are you able to separate which parts of that general
7  operating expense line went to sending educational
8  materials -- for instance, postage for educational
9  materials -- and which went to things that
10  Homecoming Farm did that didn't pertain to ACVSMR,
11  such as raising money for disaster relief?  Do you
12  have a breakdown?
13     A.  No, I'm not able to do that.
14     Q.  Okay, thank you.  Several of these pages, I
15  think all of them, have a line for general public
16  donations.  Do you see that?
17     A.  Yes.
18     Q.  What are those?
19     A.  General public donations that are less than
20  whatever the IRS regulations are in a given year for
21  donations to be under the wire, so to speak, for not
22  needing an individual to be acknowledged for tax
23  purposes.
24     Q.  Who are the individuals that provided these

334

1  donations, generally?
2      A.  We receive checks or donations through
3  PayPal just because someone has found our programs.
4  So they're truly just members of the general public.
5      Q.  Do you have a breakdown of how much comes
6  in through PayPal versus how much comes in through,
7  say, checks in the mail?
8      A.  No, I don't.
9      Q.  Do you have a general sense of where the
10  majority of these donations are coming, through what
11  avenue?
12     A.  Some could be checks in the mail.  Very
13  little comes through PayPal.  Checks in the mail --
14  or let's say we do a lecture.  Many times people
15  will leave cash donations, will write a check for an
16  amount that's under, as I say, whatever the amount
17  that year that the IRS requires an individual to be
18  acknowledged.  So there are many, many different
19  ways for general public donations to be received.
20     Q.  And do you also get donations from
21  individuals when you go and give a seminar, somebody
22  might hand you a check?  Does that happen?
23     A.  A seminar?
24     Q.  Well, you mentioned clinical seminars.

335

1  Correct?
2      A.  Yes.
3      Q.  Does that commonly happen at clinical
4  seminars, that someone hands you a check?
5      A.  No.
6      Q.  Does it commonly happen at lectures, that
7  someone sends you a check?
8      A.  Certainly more often at a lecture, or what
9  they will do is, they will follow up and send a
10 check based on their support following a lecture.
11     Q.  Let me show you another document, Exhibit
12 24.  And I have to apologize if I appear to be
13 looking down at the next document while you're
14 answering questions.  I'm going to try to make some
15 headway fast now, so we can end in time for everyone
16 to catch their trains.  This document's been marked
17 Exhibit 24.  And I'll represent to you that this was
18 a document you produced in this case.  Do you
19 recognize this document?
20     A.  Yes.
21     Q.  What is the connection between -- well, let
22 me ask you this:  What is a site visit?
23     A.  A site visit is something that I do
24 sometimes on behalf of other foundations, but also

336

1  in connection with Homecoming Farm and our ACVSMR
2  project.  These are site visits and reviews, if you
3  will, that I do for -- at equine rescue
4  organizations.
5      Q.  And is the Meadowbrook Animal Sanctuary and
6  Haven one of these associations?
7      A.  Yes.
8      Q.  From the name, that's kind of a stupid
9  question, but....
10         And is this particular site visit
11 related to ACVSMR?
12     A.  I need to read this.
13     Q.  If it makes it easier, I'll represent to
14 you that I couldn't find the use of that term in
15 this document.  And my question is really:  Is that
16 an indication that it is not connected to ACVSMR but
17 is a program of Homecoming Farm that is separate?
18     A.  No.
19     Q.  So this could be connected to ACVSMR?
20     A.  Yes.
21     Q.  Do you do site visits that are not
22 connected to ACVSMR?  And when I say "connected," I
23 mean are not under part of the project of ACVSMR.
24     A.  Well, when I do a site visit, I'm doing it

337

1  on behalf of Homecoming Farm, and where the ACVSMR
2  project would come in is that, as I believe I
3  explained a little bit yesterday, one of the ways
4  that we have found is very helpful to teaching
5  students the clinical methods is to have the
6  students get practical experiences at equine rescue
7  facilities or shelters.
8          So when I do site visits for -- whether
9  it's -- in this case it says site visit report for
10 the Ahimsa Foundation.  Now, the Ahimsa Foundation
11 foundation -- and I hope this is not confidential
12 information; I'm sure it's not going to be broadcast
13 widely -- they give animal welfare grants.  And so
14 this suggests to me that they had either in the past
15 received funding from the Ahimsa Foundation or where
16 the Ahimsa Foundation was in consideration of a
17 proposal from them.
18         So I have combined my project's need to
19 identify responsible equine shelters so that they
20 may partner with her programs.  So in that sense
21 it's difficult to give you a yes or no, because when
22 I do a site visit, if I end up feeling very good
23 about the organization and if the shelter personnel
24 would like to explore receiving some of our

338

1  students, both to help their horses recover -- then
2  that's something we explore.
3          So it's a two-birds/one-stone endeavor.
4      Q.  Let me show you a document I had marked
5  during lunch as Exhibit 25.  And I'll represent to
6  you this is another document produced in your
7  production of documents.  Do you recognize this
8  document?
9      A.  Yes, I do.
10     Q.  Who is Larry Ashton?
11     A.  Larry is a farrier who had taken part in an
12 educational program.
13     Q.  As far as you know, is this date on this
14 letter accurate, 1996?  Is that when you received
15 this letter?
16     A.  I don't -- it's the date on the letter.
17     Q.  Now, he's asking in the letter to purchase
18 an ACVSMR book from you.
19     A.  Yes.
20     Q.  What book would that have been?
21     A.  That would have been one of our -- I
22 believe I produced them in the documents.  Whether
23 it was a podiatry book.  Now, since he said the
24 ACVSMR book, he wasn't more clear, and I can't

339

1  recall whether in the 1996 we had more than just the
2  farrier book or podiatry book or photographic
3  recordkeeping book.
4      Q. I'm going to show you another document
5  that's been labeled 26, Exhibit 26. I'm going to
6  ask you if you recognize this document.
7      A. Yes.
8      Q. How do you recognize it?
9      A. It was produced in your documents to me.
10     Q. When was the first time you saw this
11 document?
12     A. To the best of my recollection, I believe
13 this is the document that Ellen Asack showed to me
14 that she had created for Homecoming Farm.
15     Q. And when did she show this document to you?
16     A. I think -- I don't recall.
17     Q. At some point did you give a seminar or
18 lecture at Cape Cod in which Ellen Asack was
19 involved?
20     A. Yes.
21     Q. And was it prior to that seminar or
22 lecture?
23     A. Yes.
24     Q. Why was she creating a brochure for

340

1  Homecoming Farm -- or purportedly for Homecoming
2  Farm?
3      A. Yes. Ellen Asack is, as I mentioned a
4  little bit yesterday, she's the owner of two
5  chronically abused, neglected ponies, and sought my
6  help through Homecoming Farm to provide
7  rehabilitation services for them. I provided free
8  assistance to her ponies. The ponies recovered very
9  well. And Ellen Asack toward -- in the course of
10 helping her, it became very clear that she was just
11 mentally disturbed.
12     Q. I'm sorry, I'm going to move to strike and
13 just ask the question again. Do you know why she
14 produced this brochure? I'm not sure -- I
15 understand the history. Is that the question you
16 were answering?
17     A. Yes.
18         MR. LYONS: It's responsive to the
19 question.
20     Q. Let me withdraw the motion to strike. I
21 just didn't understand it. I just wanted to make
22 sure you understood the question.
23     A. Yes. So she was trying to both ingratiate
24 herself with me, and she wanted to make herself a

341

1  part of Homecoming Farm.
2      Q. And when did she present this to you? I'm
3  sorry, in what circumstances do you remember her
4  presenting this to you?
5      A. She showed it to me along with, I think it
6  was, a poster, and said that since Homecoming Farm
7  did not have brochures and things, that she had
8  taken care of this in order to distribute this
9  material.
10     Q. And did she distribute it; do you know?
11     A. I believe she did. But I responded rather
12 strongly to what she had reported she had done. So
13 I really never found out the extent of what she had
14 done to distribute this material.
15     Q. Now, the lecture in Cape Cod, that was in
16 2004; correct?
17     A. Yes.
18     Q. When did you first meet Ms. Asack?
19     A. I don't recall.
20     Q. Was it close to that event? Was it years
21 before, months before?
22     A. It would have been within a year, I
23 believe.
24     Q. Let me put that aside. Just to be clear,

342

1  you didn't endorse this document?
2      A. No, I did not.
3      Q. Did you instruct her not to send it to
4  anyone?
5      A. Oh, yes -- after the fact.
6      Q. After she had created it.
7      A. Yes.
8      Q. Do you know if it was distributed at the
9  lecture?
10     A. I don't believe it was. But I don't -- I
11 don't know, because by the time I arrived at the
12 lecture, the people were already in the room.
13     Q. Let me -- and I'm sorry, I didn't know if
14 you understood the question. I wasn't trying to
15 prevent you from answering. This document's been
16 marked Exhibit 27. And I'll represent to you that
17 this is another -- like the copyright document I
18 showed you before, the cover page I think was
19 something prepared by your attorney to denote the
20 category of documents that you were producing. Now,
21 are these the minutes of board meetings of the
22 Homecoming Farm?
23     A. These would be notes. There would not have
24 been a board meeting in Dubai. Dr. al Redha is a

343

1  physician and client, so it would have come under --
2  well, it says board meeting minutes on the title
3  page. But these would be notes from, in this case,
4  an advisory board member.
5      Q. I see. So Mr. Hussein al Redha -- is it
6  Dr. Hussein al Redha -- he was an advisory board
7  member?
8      A. Yes.
9      Q. How long was he an advisory board member
10  for?
11     A. I continue to, you know, seek input from
12  Dr. al Redha.
13     Q. If you turn to Page 3896, which is the one
14  with the -- I was going to say the one with the nice
15  little horse in the corner of the page, but they all
16  have that -- marked 52197: Is this meeting minutes?
17     A. Because the -- there is not a list of board
18  members here, I can't definitively answer whether
19  it's an administrative board meeting minutes or
20  whether this would have been related to the advisory
21  board.
22     Q. The first word in this document, BAH -- do
23  you see that?
24     A. Yes.

344

1      Q. Do you know what that stands for?
2      A. It's someone's initials, and I'm trying to
3  think of who.
4      Q. So this may reflect a conversation with one
5  person?
6      A. Yes. Well, no, that line might.
7      Q. If you turn to Page 3899: Are these the
8  minutes of the 2000 annual meeting of the Homecoming
9  Farm corporate board?
10     A. I'm sorry, what page again, please?
11     Q. 3899.
12     A. Yes.
13     Q. And do you know from this who attended that
14  meeting?
15     A. I don't.
16     Q. It looks like someone named Mary was there.
17  Would you agree with me on that?
18     A. No. It says "Mary to call references."
19     Q. So that doesn't necessarily mean she would
20  have been there.
21     A. That's right.
22     Q. I'm going to ask you just to flip through
23  this and let me know if, other than these minutes,
24  you have in your possession any other minutes of

345

1  meetings of the board of directors of Homecoming
2  Farm. I'm talking about the corporate board. We
3  already established earlier that the advisory board
4  doesn't meet as a group.
5      A. That's right.
6      Q. But I'm asking about the corporate board.
7  Are there any besides these that have not been
8  produced?
9      A. Not that -- no, I believe that these are
10  all the --
11     Q. These are all the minutes?
12     A. Yes.
13     Q. Are there meetings of the corporate board
14  for which there are not minutes? In other words,
15  were there meetings for which there are not minutes?
16     A. There are meetings -- there are meetings
17  for which there are no longer minutes available.
18     Q. Did your corporate board meet between 2002
19  and 2006?
20     A. Yes, it did.
21     Q. Do you have any minutes or any meetings
22  during that time?
23     A. What were your dates?
24     Q. 2002 -- between 2002 and 2006. So let's

346

1  say, for instance, '03, '04, '05?
2      A. No, I don't.
3      Q. Now, yesterday Mr. Dickison asked you about
4  an incident or you told Mr. Dickison about an
5  incident with Jess Jackson. Do you remember that?
6  Is it a Mr. Jackson?
7      A. Yes.
8      Q. And he's passed away; correct?
9      A. Yes.
10     Q. And when was that, approximately, that he
11  passed away?
12     A. Last year.
13     Q. And you understood that Jess Jackson was
14  going to stop giving you business based on the
15  actions of the AVMA. Was that your testimony? And
16  again, this is another instance of my imperfect
17  memory.
18     A. Well, I was being asked the question by the
19  AVMA.
20     MR. KLUFT: Right.
21     A. So my answer was responsive to the AVMA.
22     Q. I'm not trying to exclude my client. I'm
23  just asking -- I understand that you've already
24  testified that all the harm created by the AVMA is

347

1  the same as the harm you're alleging created by my
2  client. I'm just asking, is that what essentially
3  you testified to that Mr. Jackson said he had heard
4  about something with regard to the AVMA and that was
5  going to cause him to stop giving you business?
6      A.  No.
7      Q.  What did he say to you precisely?
8      A.  I don't recall what he said to me
9  precisely.
10     Q.  And when was the last time he did hire you?
11     A.  At that race.
12     Q.  And then he passed away shortly thereafter?
13     A.  No.  Two and a half years later.  I think;
14  I don't remember the date of his death.
15     Q.  And in the intervening two and a half
16  years, do you have knowledge that he hired someone
17  else to do the job that you were doing?  Sitting
18  here today, do you know whether or not he hired
19  someone else to do the job that you were doing?
20     A.  Other veterinarians would have done the job
21  that I did to the degree that they were capable of
22  doing it.
23     Q.  Do you know for a fact that he actually
24  hired other people to do that job whether or not

348

1  they were capable of it?
2      A.  Well, I think my difficulty in answering is
3  that when you say "hired," veterinarians work for
4  many clients, and the horses travel extensively.  So
5  Mr. Jackson and his trainers would have many
6  veterinarians working with them.  So to say
7  specifically hire someone else -- all I know is that
8  I did no more work for him after that incident.
9      Q.  Did he have employees?
10     A.  I can't testify about Mr. Jackson's --
11     Q.  What I'm asking is, did anybody else that
12  worked with Mr. Jackson or to Mr. Jackson also talk
13  to you about this issue?  Or it was just based on
14  your conversation with him?
15     A.  I believe it was just based on....
16     Q.  And you also mentioned an incident in Hong
17  Kong at the, quote, "Beijing Olympics."  Is that
18  correct?
19     A.  That's correct.
20     Q.  I was a little confused, I had to ask
21  somebody yesterday was there a Hong Kong Olympics,
22  and Mr. Segal said the horses were there.  You had
23  mentioned that a physiotherapist had said that
24  somebody had said something about your

349

1  qualifications.  Is that my --
2      A.  Yes.
3      Q.  I'm guessing, based on your testimony
4  today, that person was Jane Hutton; is that correct?
5      A.  Yes.
6      Q.  And she had said that other -- that
7  horsemen had been talking about this issue?  Is that
8  what you testified to?
9      A.  I don't recall what I testified to.  That
10  she had been told that the reason that I was removed
11  from the organizing committee was that I am not
12  really a doctor.
13     Q.  Those were Jane Hutton's words?
14     A.  Well, that's my recollection of what she
15  communicated.
16     Q.  That's all I'm asking.  Did she give you a
17  name of who told her that?
18     A.  She did not.
19     Q.  And you connected yet Dr. Clayton with that
20  statement.
21     A.  Yes.
22     Q.  How is it that you connect Dr. Clayton with
23  that statement?
24     A.  Because another physiotherapist was there

350

1  who is employed by Dr. Clayton's lab.
2      Q.  And what did that physiotherapist, if
3  anything, say to you about this issue?
4      A.  She has said nothing to me.  But I believe
5  that she is the one that spoke to Jane Hutton.
6      Q.  Did Jane Hutton tell you that?
7      A.  I don't recall.  That's why I don't want to
8  be clear -- I don't want to make a definitive
9  statement.  She may have, or it may have been
10  implied because she had seen Narelle and had spent
11  time with her.
12     Q.  That's her name, Narelle?
13     A.  Yes.
14     Q.  What's her last name?
15     A.  Stubbs.
16     Q.  You were the one that recommended Dr.
17  Clayton to be on the organizing committee; isn't
18  that correct?
19     A.  I invited her to join my organizing
20  committee.
21     Q.  And some of the organizing committee
22  members were invited by Dr. Gillette as well; isn't
23  that correct?
24     A.  With agreement from me, yes.  We discussed

351

1   who else might be invited.
2       Q.  And then to cut to the chase, you invited
3   the horse people and he invited the dog people?  Is
4   that generally --
5       A.  Pretty much.
6       Q.  And Dr. Clayton's a horse person; correct?
7       A.  Yes.
8       Q.  And why did you select her?
9       A.  Dr. Clayton has a lab at Michigan
10  Veterinary School that conducts research in sports
11  medicine in horses.  I know that she has an interest
12  in the horse sports, and she has an academic
13  appointment, which I had been told the AVMA prefer
14  that I have academics on my committee.
15          MR. KLUFT:  Let me mark another
16  document, as Exhibit 28.
17          (Exhibit 28, Homecoming Farm website,
18  marked for identification.)
19      Q.  I'll tell you in advance I'm not going to
20  ask you questions about the substance of this
21  document.  This is a document that was produced in
22  this litigation with the cover page "Homecoming Farm
23  Inc. Website."  I just want you to authenticate that
24  this was the website as of December 11th, 2012.

352

1       A.  Yes.
2       Q.  And how long had this version of the
3   website been up?  In other words, when was the last
4   time you made a change to this website prior to
5   December 11, 2012?
6       A.  I don't recall.
7       Q.  Do you have a ballpark figure of when you
8   last went into your template and made any changes to
9   your website?
10      A.  I don't.
11      Q.  Do you keep statistics on how many visitors
12  come to your website?
13      A.  I don't.
14      Q.  Do you have access to those statistics, to
15  your knowledge?
16      A.  To my knowledge, no.
17      Q.  When did this website first go up?
18      A.  I don't recall.
19      Q.  How about the ACVSMR.com website?  When was
20  the first time that went up?
21      A.  I don't recall.
22      Q.  When was the last time you made a change to
23  it?
24      A.  I don't recall.

353

1       Q.  All versions of the website that are in
2   your possession have been produced; is that correct?
3       A.  Yes.
4       Q.  Did you have prior versions of the website,
5   prior to December 11th, 2012?
6       A.  Yes.
7       Q.  And those have been produced?
8       A.  Yes.  I believe they've been produced
9   through the U.S. PTO.  I would need to see -- I
10  would need to see my documents to know where they
11  are.
12      Q.  And were those the versions that existed
13  more or less at the time you were asked to produce
14  documents at the PTO hearing?  In other words, the
15  PTO hearing was, I think, 2010-2011.  Are these the
16  websites as of that date's range, or are they
17  earlier versions?
18      A.  I don't recall.  I'd have to see the
19  documents.
20      Q.  Let me show you another document, and we'll
21  mark this Exhibit 29.
22          (Exhibit 29, "Homecoming Farm, Inc.,"
23  marked for identification.)
24      Q.  Do you recognize this document?

354

1       A.  Yes.
2       Q.  Was this ever the website for
3   HomecomingFarm.com?
4       A.  I would need to know the origin of it.  I
5   don't know if this is what I produced.
6       Q.  Has anyone else besides you ever created a
7   Web page for Homecoming Farm that is on the site
8   HomecomingFarm.com, that you know of?
9       A.  On my behalf or --
10      Q.  I'm asking, based on your knowledge, has
11  anyone else ever created a website that resided at
12  HomecomingFarm.com, aside from you?
13      A.  I can't recall.
14      Q.  Did you ever give anyone permission or
15  access to the password they would need to create a
16  website for you?
17      A.  Yes.
18      Q.  Who?
19      A.  A number of people, because the website I
20  believe was up before I had a computer.
21      Q.  And as of 2004 -- the date on this is June
22  29th, 2004 -- who had access to the Web --
23          I'm sorry, it was a bad question on the
24  record.  As of 6/29/2004, who had access to make

355

1  changes to your Web page?
2      A. Anyone who had helped to post it for me.
3      Q. And who would those people be?
4      A. I don't recall.
5      Q. So your testimony is, you don't know,
6  sitting here today, whether or not this was ever the
7  Web page of HomecomingFarm.com.
8      A. That's correct.
9      Q. We'll put that aside. I'm going to mark
10  another document.
11      (Exhibit 30, Web photos, marked for
12  identification.)
13      Q. Let me ask a different way.
14      MR. LYONS: It appears to be incomplete,
15  because at least at the top of the document it says
16  5 of 9, and it also says 1 of 1.
17      MR. KLUFT: You're talking about the --
18      Q. Let me ask you this. Let me see if I can
19  get at it a different way.
20      You've seen this picture on the website
21  before; correct?
22      A. Yes.
23      Q. It's the same picture in the brochure we
24  looked at earlier that Ms. Asack had created.

356

1      A. Yes.
2      Q. Are you aware of her creating a website for
3  you as well?
4      A. She told me that she did, yes.
5      Q. She told you that she did. Was the
6  address, as far as you know, home.comcast.net (sic)?
7      A. I do not know.
8      Q. Did she have your approval to create this
9  website?
10      A. No.
11      Q. Where did she get this picture of you? Do
12  you know?
13      A. She told me that she took things off the
14  Internet.
15      Q. You at the time that this was created
16  didn't have your own website up yet; isn't that
17  correct?
18      A. I believe I did.
19      Q. You believe you did.
20      A. Yes.
21      Q. I understand that this is a barely legible
22  document, so just tell me if you can't answer this.
23  But is it your understanding that -- and I'll
24  represent to you that the original of this is green

357

1  background. Is it your understanding that this is
2  the website or part of the website she created?
3      A. It may be, but I never saw the website that
4  she created.
5      Q. The Homecoming Farm 2@ATTBI.com: Was that
6  ever your email address?
7      A. It was one of them, yes. It was the
8  nonprofit's, actually.
9      Q. You can put that document aside. Let me
10  mark another document.
11      (Exhibit 31, "Equine Musculoskeletal and
12  Neuromuscular Reference Guide," marked for
13  identification.)
14      Q. Have you had a chance to just flip through
15  that? I'm not going to ask you substantive
16  questions about the contents. But what I would like
17  to ask you: Is this an educational book from ACVSMR
18  or an education material from ACVSMR?
19      A. Yes.
20      Q. And the contents, other than the cover
21  page, who is the author of those contents?
22      A. I believe that's Dr. Goody, is the anatomy
23  portion. And in the second portion, where there's a
24  listing, that was -- we were given that by, I

358

1  believe, ACPAT.
2      Q. And Homecoming Farm has permission to use
3  all these materials?
4      A. Yes.
5      Q. Now, in 1999 -- we already talked about the
6  Oregon conference; correct?
7      A. Yes.
8      Q. And we talked about how you met Dr.
9  Gillette there.
10      A. Yes.
11      Q. And you had expressed that at some point it
12  might have been -- so tell me if this is wrong --
13  you conditioned his participation in the ACVSMR on
14  his following certain, I think you called them
15  conditions. Can you list for me what those
16  conditions were?
17      A. Well, I'm not sure what my specific
18  testimony was and what words I used. I'm not sure I
19  used the word "conditions."
20      Q. Let me just ask you the question: When you
21  were at the Oregon conference, did you put any
22  conditions on his participation in the ACVSMR?
23      A. When I introduced myself to Dr. Gillette at
24  the Oregon conference, I described my work,

### 359

1  Homecoming Farm, ACVSMR, and asked if he might be
2  interested in considering joining my organizing
3  committee to help with the canine aspects.
4         I then, when he said yes -- and it was a
5  much longer conversation, which I explained a little
6  bit more about yesterday. But then I sent materials
7  to him, and I explained to him that I'd like him to
8  review the materials before deciding whether he
9  would like to join my committee, because the
10  committee's work would follow the guidelines or plan
11  or the description that I had made in my plan for
12  essentially developing a training curriculum for
13  veterinarians to be educated in a specialty.
14         So at the Oregon meeting, I would say at
15  that snapshot in time, the condition is that he
16  review the materials and then let me know whether or
17  not he would be comfortable joining the committee
18  with the understanding that that would be the plan,
19  as I had described it -- the compilation of plans,
20  materials, training methods, the structure, you
21  know, so that he understood that that was what I was
22  going forward with.
23         Q. My understanding of your testimony
24  yesterday was that at some point you made it clear

### 360

1  that if he didn't want to follow the basic structure
2  and substance that you had laid out in the Equine
3  Excellence Initiative, that he could, you know, go
4  do his own thing. Am I wrong?
5         A. It wasn't just the Equine Excellence
6  Initiative. There were other materials that I sent
7  to him.
8         Q. And other than the fact that there were
9  other materials, did I accurately state what you
10  communicated to Dr. Gillette?
11         A. I'd need you to....
12         Q. In other words, that you were insistent
13  that the substance of your papers be the basis for
14  the new group or the new project and, if he wasn't
15  okay with that, then he was not -- he could go do
16  his own thing, but he was not going to be part of
17  your project. Is that correct?
18         A. Well, I want to be clear that the project
19  or the committee would not be independent. So just
20  the way you phrased it suggests that the committee
21  had this independent -- and was going to use my
22  materials. But it was me forming a committee. So
23  as long as he wanted to be a part of my committee,
24  then yes, the arrangement needed to be that he -- he

### 361

1  be happy with the materials, because if he wasn't,
2  then, you know, we clearly weren't of the same mind
3  about going forward.
4         Q. And was it also a condition that the name
5  ACVSMR was set in stone? In other words, was that a
6  negotiable item as far as you were concerned, at the
7  time?
8         A. For my specialty, that would be the name,
9  yes.
10         Q. And if Dr. Gillette had said, well, "I love
11  the Equine Excellence Initiative and I love your
12  work and I want to do exactly what you want but I
13  want to call it something else," would you have
14  permitted that?
15         A. Well, it wouldn't be a matter of
16  permitting, because I would have to be on the
17  committee. So I can't abstractly imagine, if that
18  had come up, would I have been happy to have his
19  participation if he set as his condition that the
20  name change -- I can't answer that abstractly.
21         Q. Was there ever a time at any stage when the
22  organizing committee, when you were on the
23  organizing committee, that they discussed the name?
24         A. Just that it would be -- yes.

### 362

1         Q. And when was that?
2         A. Well, it was when I discussed it with Dr.
3  Gillette, because I presented this as the ACVSMR
4  project of Homecoming Farm, and then that was what
5  we would go forward with.
6         Q. And so there was never any discussion about
7  whether it should be called something else?
8         A. When we went to Michigan, there was just a
9  discussion that would be the name, but not that it
10  might be something else.
11         Q. And at Michigan, are you referring to the
12  meeting between you and Dr. Gillette and Dr.
13  Clayton?
14         A. Yes.
15         Q. I want to show you another document that
16  needs to be marked.
17         (Exhibit 32, letter, marked for
18  identification.)
19         Q. I'm not going to ask you about the
20  substance of this document, by the way. I'm just
21  going to ask you whether it's the letter that you
22  sent.
23         A. I have to read it to know.
24         MR. KLUFT: Off the record.

363

1          (Discussion off the record.)
2      Q.  Is this a letter you sent to Dr. Gillette
3  after the Oregon conference?
4      A.  Yes, I believe.
5      Q.  And is this the letter by which you
6  provided him the Equine Excellence Initiative and
7  other documents?
8      A.  Yes.
9      Q.  Are there any documents you provided him
10  enclosed with this, in your memory, that aren't
11  actually mentioned in the text of the letter?  And
12  I'll represent to you that I see two documents
13  mentioned in the text:  the Equine Excellence
14  Initiative and a curriculum.
15      A.  I don't recall what I put in the package,
16  but it was my -- I probably included a few other
17  things.
18      Q.  But you don't -- do you remember, sitting
19  here today, what they were?
20      A.  I believe one of them was the -- there's a
21  copyrighted document called something like General
22  Objectives of Homecoming Farm.
23      Q.  And we looked at that today.  I think we
24  specifically referenced that was part of the

364

1  educational --
2      A.  Yes.
3      Q.  -- documents?  Okay.  And in the third
4  paragraph here you refer to your own postdoctoral
5  training.
6      A.  Yes.
7      Q.  What were you referring to there?
8      A.  That was a fellowship that I did in
9  physical medicine and rehabilitation.
10      Q.  And was this the fellowship you mentioned
11  yesterday to Mr. Dickison that was partially in
12  Boston and partially in Los Angeles?
13      A.  Yes.
14      Q.  And what institutions were connected with
15  that fellowship in Boston and Los Angeles?
16      A.  Well, they were done through a variety of
17  hospitals.  And in Boston I believe they were all
18  Harvard-affiliated.
19      Q.  Can you name the ones that you can
20  remember?
21      A.  Spaulding, Mass. General, and I can't
22  remember if Children's was only when I was a
23  veterinary student.  It was close to when I had
24  graduated, and since I had rotated through those

365

1  places.
2      Q.  And in Los Angeles?
3      A.  That would be, I believe it was L.A.
4  County.
5      Q.  Is that Hospital?  The name of a hospital?
6      A.  Hospital.  Yes.
7      Q.  Any other hospitals in Los Angeles?
8      A.  There was one in Irvine, and I don't recall
9  what the affiliation was.
10      Q.  Who was your -- did you have an adviser or
11  a supervisor or supervisors for this fellowship?
12      A.  It was Dr. Edwin Guise.
13      Q.  And where is he today?
14      A.  I mentioned this yesterday.  He died.
15      Q.  And what institution was he connected with
16  at the time that he served as your adviser?
17      A.  He was in private practice, so I don't know
18  that he had an institution -- if you mean an
19  academic institution --
20      Q.  Correct, that's what I mean.
21      A.  -- that he was affiliated with.
22      Q.  He was not affiliated with --
23      A.  I don't know.
24      Q.  Were there any supervisors or advisers that

366

1  worked on this fellowship or that supervised you in
2  this fellowship?
3      A.  Not supervisors, no.
4      Q.  Advised you in this fellowship?
5      A.  Well, everyone that I got education from.
6  I would say Dr. Tobis.
7      Q.  Who is Dr. Tobis?
8      A.  He's physical medicine and rehabilitation.
9  He was at Irvine at the time.
10      Q.  And what institution is he connected to?
11  Is that UC Irvine?
12      A.  I wouldn't want to say.
13      Q.  When you said Irvine, though, were you
14  referring to the city or to an institution?
15      A.  Probably both.
16      Q.  Irvine, California?
17      A.  Yes.
18      Q.  And there's a hospital there called Irvine?
19      A.  Yes.  It has Irvine in the title, so
20  whether it's UC Irvine, I'm not sure.
21      Q.  Is he still there?
22      A.  Dr. Tobis died recently.
23      Q.  Who awarded you the fellowship?
24      A.  Well, it wasn't a matter of being awarded.

367

1  It wasn't a fellowship that I applied for that's
2  offered each year.  When Dr. Guise came to my farm
3  in New Hampshire and reviewed patients with me and
4  offered advice in terms of what direction my
5  education would best be served by, he created the
6  opportunities for me, and especially said, you know,
7  "You're not going to qualify -- you can't be a
8  resident because you don't have your M.D.; but since
9  you've done so much training in human medicine in
10 the Boston hospitals while you were a student at
11 tests, then it could be organized like a research
12 fellowship."
13       So the research was done at Homecoming
14 Farm at the same time.  So the fellowship was not
15 one that I needed to apply for.  That was simply the
16 structure.
17       Q.  Did the fellowship involve you receiving
18 any money?
19       A.  No.
20       Q.  Were you compensated for the time you spent
21 on rotation?
22       A.  No.
23       Q.  To get into a hospital -- are we talking
24 about late '80s, early '90s?  Is that the time

368

1  period of this fellowship?
2       A.  Yes, I think so.
3       Q.  At the time did you need an ID badge to get
4  into any of these hospitals?
5       A.  I don't recall.  I don't think so.
6       Q.  What was your title when you were
7  introduced to people at these hospitals?
8       A.  I don't -- title?  I don't know.  I guess
9  "Dr. Lyons."  When you say introduced to people, it
10 would be introduced --
11      Q.  Most people that work in a hospital have
12 some relationship, official name to the relationship
13 to the hospital.  And I don't mean to be speaking --
14      You know, you're either an internist or
15 a resident or you're an employee or a doctor.  Some
16 people are affiliated doctors.  Some people have lab
17 rights or different kinds of rights.  I'm trying to
18 figure out where you fit in within that
19 constellation when you were at the hospital.
20      A.  I think it's such a unique situation.  It's
21 not like I plugged into a program.
22      Q.  Is there any documentation of your
23 fellowship?
24      A.  Not that I'm aware of.

369

1       Q.  Did you receive a degree?
2       A.  No.
3       Q.  Did you receive a certification?
4       A.  No.
5       Q.  Did you receive a letter of introduction
6  that you used to hand to the hospitals?
7       A.  No.
8       Q.  Do you have any correspondence with Dr.
9  Guise or Dr. Tobis regarding the fellowship?
10      A.  No.
11      Q.  Did you ever have any correspondence?
12      A.  We corresponded, yes.
13      Q.  And how did you correspond?
14      A.  I received some letters.
15      Q.  And you don't have those letters any more?
16      A.  No.
17      Q.  In your letter to Dr. Gillette, you refer
18 to a curriculum you had roughed, which essentially
19 follows the coursework and clinical rotations in
20 human medicine.  And I'm reading on Page 3508, the
21 last paragraph, first sentence.
22      A.  Yes.
23      Q.  What were you referring to by "coursework"?
24      A.  The coursework would have referred to both

370

1  the medical school training and postdoctoral
2  training.
3       Q.  Did you have medical school training apart
4  from your fellowship?
5       A.  Yes.
6       Q.  And when was that?
7       A.  It was while I was a veterinary student.
8       Q.  This was what you described yesterday --
9  you took some of your Tufts classes with their
10 medical school because they didn't have a fully
11 developed program at the time for veterinary
12 students?
13      A.  Yes.
14      Q.  And did you do any coursework connected
15 with your fellowship?
16      A.  Not -- would you help me with --
17      Q.  Did you go into a class during the
18 fellowship and sit there and listen to a lecture?
19      A.  Yes.
20      Q.  And was that part of your fellowship?
21      A.  Well, it was part of the overall
22 educational experience.  But, for example, grand
23 rounds -- I'm trying to figure out whether that
24 would be --

371

1    Q.  Well, did you matriculate at any
2    educational institution as part of --
3        A.  No.
4        Q.  And did you register for any classes as
5    part of your fellowship?
6        A.  No.
7        Q.  As the day drags on, I'm going to get more
8    and more incoherent.  Let me move on to another
9    document.  I'm going to try to move through them.
10   I'll mark this and ask you to take a quick look at
11   it.  I'll represent to you this is one of the first
12   emails that I've sought -- first in time that
13   purports to be between you and Dr. Gillette.  And my
14   question is, after reviewing this, can you tell me
15   if this is an accurate copy of an exchange between
16   you and him?
17           (Exhibit 33, email chain, marked for
18       identification.)
19       A.  It is not.
20       Q.  What is it that makes you think that it is
21   not --
22           Let me ask you this:  You see that the
23   top half purports to be an email by Dr. Gillette;
24   correct?

372

1        A.  Yes.
2        Q.  And the bottom half purports to be an email
3    from you; is that right?
4        A.  Yes.
5        Q.  And --
6        A.  And -- no, I'm sorry.
7        Q.  Is there any part of this email that you
8    remember actually being sent to you?
9        A.  Well, actually, as I view this, this is a
10   copy of an email that Dr. Gillette has sent to
11   himself.
12       Q.  And what is it that leads you to believe
13   that?
14       A.  Because the From address is from Dr.
15   Gillette, and there's a cc to Canine Care, which I
16   believe is Dr. Gillette.
17       Q.  And is the address
18   homecomingfarm@medione.net one of your email
19   addresses?
20       A.  Oh, yes, that's -- yes.
21       Q.  Does that change your answer?
22       A.  No.
23       Q.  You've never seen this before?
24       A.  I may have seen it in your production of

373

1    documents; but again, 15,000 documents in five days.
2        Q.  Excluding a production of documents, have
3    you seen this before?
4        A.  No.
5        Q.  Do you have any understanding as to how
6    this came into existence?
7        A.  Below where it says "Hi, Rob" is not
8    something that I wrote.  Whether I wrote an email to
9    him at this time -- that may have happened.
10       Q.  And if there was an email written to him at
11   this time, do you have those emails?
12       A.  No, I don't.
13       Q.  Let me ask the question again:  Do you have
14   any knowledge, other than what you just said, as to
15   how this nonauthentic document, that you're
16   testifying is nonauthentic, came into existence?
17       A.  No, I don't.  It's your document.
18       Q.  Well, I realize that we produced it, but
19   I'm asking you if you have -- you could have
20   knowledge of how a document I produced was created;
21   right?  I'm asking you if you have knowledge --
22           We produced copies of the Equine
23   Excellence Initiative, for instance.  You know how
24   that was created.  And what I'm asking you is:  Do

374

1    you or do you not have knowledge as to how this
2    document, which you have identified as inauthentic,
3    was created?
4        A.  I would say that it's been altered.
5        Q.  And what is the basis for that statement?
6        A.  Because I certainly did not write "Ph.D."
7    after my name.  And I don't know -- "Hope all is
8    well and you are enjoying the holidays" -- I don't
9    recall enough of the substance of -- so I could say
10   how much of Paragraph 1....
11       Q.  Let me ask you a question:  Do you believe
12   that you did send Dr. -- do you have a memory of
13   sending Dr. Gillette an email that was similar to
14   this but in which you did not refer to yourself as a
15   Ph.D.?
16       A.  I have a memory of sending many emails to
17   Dr. Gillette, and in none of them did I indicate
18   that I had a Ph.D.
19       Q.  Well, I'm asking specifically about this
20   one.  Do you have a specific memory of at
21   approximately this date sending him an email which
22   had that substance in it but did not have the term
23   "Ph.D." in it?
24       A.  I don't have a memory of that specific

375

1  information.
2  Q. Okay. You can put that aside. Let me mark
3  a new document.
4  (Exhibit 34, email, marked for
5  identification.)
6  Q. Once you've had a chance to look at that,
7  let me know.
8  (Recess taken.)
9  Q. Have you had a chance to look at Exhibit
10  34?
11  A. I'm not finished reading.
12  Q. Have you had a chance to look at it?
13  A. Yes.
14  Q. Did you send this email?
15  A. I believe so.
16  Q. And it refers in the first paragraph to
17  "and a new laptop, which was overdue, so I lost all
18  until I get my -- back to my backup files on CD."
19  Do you see that?
20  A. Yes.
21  Q. And it says, "Computer crashed just after I
22  sent it." Do you see that?
23  A. Yes.
24  Q. Does this refresh your memory as to when

376

1  your computer crashed -- in and around late 2002?
2  A. Yes.
3  Q. I think before you mentioned that you might
4  have gotten a new computer for Christmas that year.
5  Correct?
6  A. Yes.
7  Q. Do you know what you're referring to here
8  by "the backup files on CD"?
9  A. I do.
10  Q. And what are those?
11  A. I had an external CD write drive, and the
12  reason that I got it was to back up my documents.
13  So as I would go along, I would create new CDs to
14  back up my computer's data periodically, as I added
15  files to it.
16  Q. And what data specifically? Were you
17  selective, or did you back up the whole hard drive?
18  A. No, it was onto CD. It's limited storage
19  space.
20  Q. Did you back up emails?
21  A. No.
22  Q. Did you back up client files?
23  A. Yes.
24  Q. Did you back up files for Homecoming Farm?

377

1  A. Yes.
2  Q. Have you searched those CD's in response to
3  the document request in this case?
4  A. I actually searched those CD's in a
5  previous matter, to try to get information off of
6  them. And I had never tested those CD's after
7  creating them. I can't remember how it would work.
8  But when the data that you were asking to transfer
9  would download and a CD would fill up, you'd get
10  prompted, and it would say the information has been
11  transferred, put in another CD.
12  So I never tested them. And later, when
13  I tried to access data off of them, it was like
14  hieroglyphics.
15  Q. Where are those CD's today?
16  A. When that happened, I disposed of them.
17  Q. And approximately when was that?
18  A. 2002; 2003.
19  Q. I'm going to show you another document.
20  We'll mark it.
21  (Exhibit 35, email, marked for
22  identification.)
23  A. Yes.
24  Q. Have you had a chance to look at it?

378

1  A. Yes.
2  Q. This purports to be an email that Dr.
3  Gillette sent from one of his accounts to another;
4  correct?
5  A. Yes.
6  Q. And then underneath it it purports to be
7  forwarding an email from you dated December 22nd,
8  2002. That's what it purports to be. Correct?
9  A. Yes.
10  Q. Is this an email that you sent?
11  A. Yes, I believe it is.
12  Q. And if you look at the second paragraph of
13  what you sent, it says, "Anyway, I hope you get
14  this. I'm on a plane in flight as we write. Left
15  that file behind but will rewrite more or less and
16  send them from here. A long flight. Won't look
17  like a professional resume, but that's not what you
18  need." Do you see that?
19  A. Yes, I do.
20  Q. Now, did you around this time promise to
21  send him some kind of resume?
22  A. Yes.
23  Q. And did you? Do you have a memory of
24  sending him anything?

379

1   A. No. I have a memory of not being able
2   to -- I believe I was going to England -- make any
3   attachments while I was there. So no, I was --
4   Q. Did you send -- I'm sorry. Go ahead.
5   A. I had given him previous to this some very
6   basic information. It wasn't an official resume.
7   Q. And did you -- did you send him any
8   information, biographical information or CV
9   information in the body of an email?
10   A. I don't recall.
11   Q. When were you in England, how long?
12   A. I don't recall.
13   Q. Was it weeks, months?
14   A. I don't recall.
15   Q. I'm going to mark another document.
16       (Exhibit 36, email and attachment,
17   marked for identification.)
18   Q. I am going to ask you to look through this
19   document. I am going to ask you questions about the
20   substance of it.
21       Have you had a chance to look at it?
22   A. Yes, I have.
23   Q. And this again purports to be -- the top
24   level purports to be an email of Dr. Gillette

380

1   forwarded from one of his accounts to another. Do
2   you agree with that?
3   A. I agree.
4   Q. And the bottom part of the first page
5   purports to be an email dated December 22nd, 2002,
6   from you to Dr. Gillette. That's what it purports
7   to be. Right?
8   A. Yes.
9   Q. Is that what it is?
10   A. I believe so.
11   Q. You did send him this email?
12   A. Yes.
13   Q. Now, attached to the email is an
14   attachment. Did you send him this attachment?
15   A. No, I did not.
16   Q. Did you send him an email with any
17   attachment?
18   A. At some point I did, yes.
19   Q. And do you have that attachment?
20   A. No, I don't.
21   Q. Obviously this purports to be, the second
22   two pages, a CV or resume for you; correct? That's
23   what it purports to be?
24   A. Yes.

381

1   Q. And I recognize that the third line on this
2   document is Ph.D. Physics 1981. Do you see that?
3   A. Yes.
4   Q. And you, of course, would maintain that you
5   did not write any document with that on it; correct?
6   A. Yes, I did not write this document.
7   Q. Is there anything else in this document
8   other than that line that is inaccurate, whether or
9   not you wrote it?
10   A. Yes.
11   Q. What is that?
12   A. The fellowship completed in 1996. That
13   would have been 1992.
14   Q. Did you take examinations in connection
15   with your fellowship?
16   A. No.
17   Q. Anything else?
18   A. I would not have -- it's not correct to say
19   "Efforts and focus of Homecoming Farm since 1996 has
20   been in the creation of a veterinary specialty in
21   sports medicine and rehabilitation."
22   Q. What is incorrect about that statement?
23   A. I guess it doesn't say through AVMA, does
24   it? So I'm projecting that, so....

382

1   Q. So had it implied AVMA, it would have been
2   incorrect?
3   A. Well, it would have, because that didn't
4   start in 1996.
5   Q. Did you have a written resume as of this
6   time period, January 8th, 2003, or approximately?
7   A. Not an official one, no.
8   Q. Did you have a written one of any type,
9   official or otherwise?
10   A. Yes.
11   Q. Do you still have copies of that?
12   A. It's in the Equine Excellence Initiative.
13   There's a bio section.
14   Q. And that's the one you used at the time?
15   A. Yes.
16   Q. Let me mark another document. Again, I
17   apologize for moving so quickly.
18       (Exhibit 37, email, marked for
19   identification.)
20   Q. Have you had a chance to look at this
21   document?
22   A. Yes.
23   Q. Now, this is a document that purports to be
24   an exchange between you and Dr. Gillette in or

383

1  around January 18th, 2003.  That's what it purports
2  to be; correct?
3       A.  Yes.
4       Q.  And do you recall having this exchange with
5  him?
6       A.  No, I don't.
7       Q.  Is any part of this -- do you recall having
8  any part of this exchange with Dr. Gillette?
9       A.  I don't recall this exchange, but I can say
10  that the top paragraph is something that I may have
11  written.  We exchanged a lot of emails, so I don't
12  have specific recall of content of any of them.
13       Q.  So the top part -- in other words, the part
14  in caps, all caps, that may be something you typed.
15  Is that correct?
16       A.  Yes.
17       Q.  So you may have sent Dr. Gillette --
18       Let me ask you this:  Do you know a
19  person named Mohammed in Saudi Arabia?
20       A.  Not in Saudi.
21       Q.  Do you know a person named Mohammed
22  somewhere in the Middle East --
23       A.  Yes.
24       Q.  -- whom you believe you might have been

384

1  referring to in this email?
2       A.  Yes.
3       Q.  And who is Mohammed?
4       A.  Mohammed is just an assistant to Dr. al
5  Redha.
6       Q.  And Dr. al Redha is on your advisory board;
7  correct?
8       A.  Yes.
9       Q.  If you go down to the second page, where it
10  says "authorship" -- and let me just ask you:
11  Putting aside this answer, which says --
12       What academic and scientific
13  publications have you authored?
14       A.  I've presented papers at conferences, so
15  the proceedings would be considered a scientific
16  paper.
17       Q.  Any journals?
18       A.  No.
19       Q.  How about -- that's -- let me break it
20  down.  Veterinary journals?
21       A.  No.
22       Q.  How about human medicine journals?
23       A.  No.
24       Q.  I know you've said you've published an

385

1  article in Blood Horse Magazine?
2       A.  Yes.
3       Q.  Other than articles in Blood Horse, are you
4  published anywhere?
5       A.  Yes.  I've written articles for websites,
6  for other publications, yes.
7       Q.  Other magazines?
8       A.  Yes.
9       Q.  Let me show you another document.
10       (Exhibit 38, email, marked for
11  identification.)
12       Q.  Have you had a chance to look at it?
13       A.  Yes, I have.
14       Q.  This is another email that purports to be
15  an exchange between you and Dr. Gillette?  Or,
16  rather, I should say, it purports to be an email
17  from you to Dr. Gillette at some point.  Is that
18  correct?
19       A.  Yes.
20       Q.  And did you send this email?
21       A.  Yes.
22       Q.  Did you at some point complain about the
23  alphabetical or the nonalphabetical listing on the
24  letter of intent?

386

1       A.  Yes.
2       Q.  And this represented something you talked
3  about with Mr. Dickison yesterday, I think?  And
4  tell me this is wrong -- which is the back and forth
5  on the contents of the letter of intent?
6       A.  Yes.
7       Q.  And different people were contributing
8  different parts?
9       A.  Yes.
10       Q.  And Dr. Gillette put in, for instance, a
11  paragraph about dogs, you had testified?
12       A.  Yes.
13       Q.  And here you are also correcting some
14  grammar in one of those paragraphs?
15       A.  Yes.
16       Q.  And then it also refers to, "PS on my
17  associations and memberships."  Did you also author
18  this PS?
19       A.  Yes.
20       Q.  I'm looking about halfway down.  It says,
21  "I have also taught many physics college courses,
22  from premedicine physics to engineering graduate...
23  relativity, and then 'physics for poets' and chaos
24  theory for business school (MBA) and psychology

387

1   (Ph.D.)."  What colleges did you teach at?
2        A.  It was part of my undergraduate training at
3   University of Massachusetts.
4        Q.  What specifically was your role?
5        A.  I was a student and was doing a research
6   project in physics and as part of that research
7   project was asked to do some teaching-assistant
8   responsibilities and lectured in those courses.
9        Q.  Which courses were they?
10       A.  I know physics for poets, relativity.
11       Q.  And who was the faculty member who was the
12  professor of those courses?
13       A.  I believe that was Ted Soltysik.
14       Q.  Is he still there?
15       A.  No.
16       Q.  Where is he now?
17       A.  I believe he died.  I graduated in, what,
18  1979.
19       Q.  And you lectured to Ph.D. students; is that
20  correct?
21       A.  Yes.
22       Q.  Was this all in one class, or was this in
23  several classes?
24       A.  They were individual lectures in different

388

1   courses, as I recall.
2        Q.  And how many teaching assistants were there
3   that lectured in these classes?
4        A.  A few.  I don't recall.
5        Q.  Did they break down into sections?  Do you
6   know what I mean by that?
7        A.  No.
8        Q.  In other words, when I went to college, we
9   had a professor give a lecture, and then we had the
10  graduate students run sections made up of parts of
11  the class.  Is that the structure?
12       A.  Not that I recall.
13       Q.  So you stood up in front of the class and
14  gave a lecture?
15       A.  Yes.
16       Q.  And other graduate students stood up in
17  front of the class and gave a lecture?
18       A.  Yes.
19       Q.  And how many lectures per semester did you
20  give?
21       A.  I don't recall.
22       Q.  How many semesters did you do it for?
23       A.  I don't recall.
24       Q.  Did you go to the business school and

389

1   lecture on chaos theory?
2        A.  Actually, the business school had a science
3   course, so I guess you'd say that -- I think the
4   business school was just integrated in with the rest
5   of the university.
6        Q.  Have you ever heard of an organization
7   called HOOFPAC?
8        A.  Yes, I have.
9        Q.  What is that?
10       A.  HOOFPAC is an antislaughter....
11       Q.  Are you a supporter of HOOFPAC?
12       A.  I've told the founder that, yes, she can
13  use my name in support.
14       Q.  What do they do?  They list names?
15       A.  I don't know.
16       Q.  And what was the context of you telling the
17  founder that they could list your name?
18       A.  Because we discussed the antislaughter
19  legislation.  I let her know that I was supportive
20  of what she was endeavoring to do and said that she
21  could use my name and list me as a supporter.
22       Q.  And when was that?
23       A.  I don't recall.
24       Q.  Was it within the last year?

390

1        A.  Oh, no.
2        Q.  It was many years ago?
3        A.  Many years ago.
4        Q.  I want to refer back to Exhibit 10 for a
5   moment, which is the final letter of intent to the
6   AVMA.  We looked at this document yesterday;
7   correct?
8        A.  Yes.
9        Q.  My question to you is really a followup
10  question:  You mentioned yesterday that after you
11  spoke -- that after you obtained a copy of this
12  letter, you spoke to Dr. Gillette about correcting
13  your credentials.  Is that correct?
14       A.  Yes.
15       Q.  And did you follow up with him at all after
16  that?
17       A.  Not that I recall.
18       Q.  That was my only question about that.
19  We'll mark another document.
20            (Exhibit 39, email, marked for
21  identification.)
22       Q.  Have you had a chance to look at it?
23       A.  Yes.
24       Q.  And can you tell me if this is a document

391

1  you recall receiving?
2      A. I don't have a specific recall of this
3  document, but I remember receiving these types of
4  emails.
5      Q. Anything in this email written by Dr.
6  Gillette that seems incorrect or untrue to you?
7      A. No.
8      Q. And he mentions here that he's begun to put
9  together a core curriculum based on a design by the
10  Human Sports Medicine Specialty Board that was
11  provided by Dr. Lyons.  What was that document?
12      A. I believe I provided it in our document
13  production.  I don't remember the name of it.
14      Q. And the curriculum, this is the curriculum
15  you were working on for the ACVSMR; is that correct?
16      A. I had already developed a curriculum prior
17  to this.  And the curriculum that I believe Dr.
18  Gillette is referring to is based on the specific
19  AVMA requirements for presenting a curriculum.
20      Q. Why would he be following a human medical
21  specialty board curriculum in order to comply with
22  AVMA requirements?
23      A. Well, in other words, he says, "I have
24  begun to put together a core curriculum."  And I had

392

1  based the curriculum that I had developed and the
2  rest of the documents on an augmentation, an
3  adaptation of the human model for training.
4      Q. And what organization was that human model
5  from?
6      A. I don't recall.  I'd need the document.
7      Q. Was that a document you had authored or was
8  authored by somebody else?
9      A. No, that was authored by someone else.
10      Q. Let me mark another document.
11          (Exhibit 40, email, marked for
12  identification.)
13      Q. Have you had a chance to look at this
14  document?
15      A. Yes, I have.
16      Q. Did you send this email on December 9th,
17  2003?
18      A. Yes.  I'm not -- yes.
19      Q. In the second-to-last paragraph it refers
20  to, "my board (the M.D.'s who formed the same in
21  human med)."  Do you see that?
22      A. Yes.
23      Q. What are you referring to there?
24      A. Advisory board.

393

1      Q. And who specifically are you referring to?
2      A. It would have been Dr. Guise, Dr. Richmond,
3  and I don't recall.
4      Q. Who is Dr. Richmond?
5      A. Dr. Richmond is a physician, a surgeon, at
6  Tufts.
7      Q. Is he still at Tufts?
8      A. No, I don't think he is.
9      Q. Do you know where he is now?
10      A. He may be at Children's or something like
11  that.
12      Q. Is he still on your advisory board?
13      A. Well, it wasn't -- again, it's an advisory
14  board, but these are advisers to ACVSMR.
15      Q. Let me ask you this:  Does Dr. Richards --
16  is it Dr. Richards?
17      A. Richmond.
18      Q. Richmond.  I'm sorry.  I can't read my own
19  handwriting at this time of day.  Does Dr. Richmond
20  know he's referred to as an advisory board member,
21  as opposed to advising you from time to time on
22  things?
23      A. Well, I didn't name Dr. Richmond in here.
24  That's why I wanted to clarify that he would have

394

1  been an adviser to it.  The board member who would
2  have contributed to this but who was not part of
3  that specialty is Dr. John Mack.
4      Q. At some time when you were working on the
5  bylaws and articles of incorporation for the ACVSMR,
6  that we discussed earlier today, did you contact
7  anyone from AVMA to get samples?
8      A. I don't understand "samples."
9      Q. Well, sample articles of incorporation or
10  bylaws.
11      A. I don't recall.
12      Q. I've gotten a little disorganized.  Could
13  we take a five-minute break, and I can go faster
14  after that.
15          (Recess taken.)
16          (Ms. Klieman left the deposition.)
17      Q. You mentioned that you hired a lawyer named
18  Paul Feinberg; is that correct?
19      A. Yes.
20      Q. This was -- you hired him in connection
21  with drafting the bylaws and constitution for the
22  college; correct?
23      A. Actually, I hired him to advise us and
24  then, should we go forward, to help to draft it or

395

1    to review my draft of them.
2         Q. Had you engaged Mr. Feinberg prior to this?
3         A. No.
4         Q. How did you find him?
5         A. The prosecutor in the Attorney General's
6    Office in Ohio they'd testified for suggested after
7    I worked with her on that case that if I ever needed
8    a nonprofit attorney, that she would be able to
9    recommend one, because he was the head of the bar
10   association for that subject.
11        Q. And that explains why he's located in Ohio;
12   correct?
13        A. It would explain why she would know him,
14   yes.
15        Q. Did he help you draft any of the articles
16   of incorporation or bylaws?
17        A. No.
18        Q. Did any of his partners or associates help
19   you draft them?
20        A. No.
21        Q. I don't need to mark that. I now want to
22   mark this, however, as 41.
23        (Exhibit 41, letter, marked for
24   identification.)

396

1         Q. I'm not going to ask you to read the terms
2    of this. Dr. Lyons, do you know the firm -- the
3    marketing firm of Schultz & Williams, Inc.?
4         A. Yes.
5         Q. And did you engage them at some point in
6    2004?
7         A. Can you define "engage"?
8         Q. Can you communicate with them in 2004?
9         A. Yes, I did.
10        Q. For what purpose did you communicate?
11        A. To explore the possibility of working with
12   them as a development consultant for our project.
13        Q. When you say "our project," what are you
14   referring to?
15        A. Homecoming Farm -- I'm just reading my own
16   note to myself here. It would have been for the
17   ACVSMR project and the ACVSMR foundation.
18        Q. And this is your handwriting at the top of
19   the page here?
20        A. Yes, it is.
21        Q. Would that have had anything to do with the
22   college to be recognized by the AVMA?
23        A. Whether or not the ACVSMR project ended up
24   being recognized by the AVMA was not yet determined.

397

1         Q. Would these people be engaged, had you
2    engaged them -- strike that.
3         Let me move ahead to the Chicago
4    meeting. I'm going to mark this -- I know the front
5    page has already been marked, but I specifically
6    want to show you some sections that haven't been
7    marked.
8         (Exhibit 42, Organizational Meeting
9    notes, marked for identification.)
10        MR. LYONS: You said that this has been
11   previously marked, but this exhibit contains
12   additional pages?
13        MR. KLUFT: The first two pages have
14   been marked, and then there are additional pages
15   after that.
16        MR. LYONS: And that is all part of the
17   same document?
18        MR. KLUFT: As it was produced to me by
19   my client, yes.
20        Q. I'm going to ask you to take a look at
21   Pages 485 through to the end, 500. And I want you
22   to tell me if these are the articles of
23   incorporation and bylaws that you presented at the
24   Chicago meeting.

398

1         A. Without my copy of what I brought to the
2    Chicago meeting, I wouldn't know whether this was
3    what I brought with notes added onto it or --
4         Q. That's an excellent point. Let me rephrase
5    it. I'll represent to you that my understanding is
6    these are handwritten notes of Dr. Gillette's. And
7    what I'm asking you is -- I don't have any other
8    copy of what was actually handed out at that
9    meeting. And what I'm asking you is: Absent the
10   handwritten notes, is this the version you brought
11   to Chicago, as far as you know?
12        A. To the best of my recollection, yes.
13        Q. You can put that document aside. That's
14   all I wanted to know. I apologize for that. I
15   meant to mention the handwritten notes. It's late
16   in the day.
17        I want to show you another document.
18        (Exhibit 43, email, marked for
19   identification.)
20        Q. Have you had a chance to review that
21   document?
22        A. Yes, I have.
23        Q. And this is another document that purports
24   to be an email exchange between you and Dr.

399

1    Gillette; is that correct?
2      A. That's correct.
3      Q. And did you -- to your memory, is this an
4    accurate copy of an exchange between you and Dr.
5    Gillette?
6      A. Yes.
7      Q. Did you recommend, for instance, Johanna
8    Reimer and Steve Allday --
9      A. Allday.
10     Q. Allday -- I'm sorry, to be members of the
11   organizing committee?
12     A. Yes, I did.
13     Q. Did they become members of the organizing
14   committee?
15     A. No, they did not.
16     Q. And why is that?
17     A. Well, based on the date, I would say that
18   it's because I was removed by Dr. Gillette.
19     Q. And at this time were you upset with Dr.
20   Gillette for any reason?
21     A. Not that I recall. You know, this is -- I
22   don't understand why he's saying that based on what
23   I've reviewed quickly down below.
24     Q. Let me show you another document. I don't

400

1    know if -- this may or may not give you additional
2    context for it.
3          (Exhibit 44, email, marked for
4    identification.)
5      Q. Have you had a chance to review it?
6      A. Yes, I have.
7      Q. Is this an email that you sent to Dr.
8    Gillette in or around May 28th, 2004?
9      A. Actually, it's a copy of an email that Dr.
10   Gillette sent to himself.
11     Q. And within that copy, is that an accurate
12   copy of an email that you sent?
13     A. Yes, I'd say so. I don't have specific
14   recall of it, but reading it, yes.
15     Q. Now, it refers here to a $500,000 check
16   that was redirected. Do you see that?
17     A. Yes, I do.
18     Q. Do you know what that refers to?
19     A. I don't.
20     Q. Do you recall ever having a $500,000 check
21   redirected?
22     A. Well, what I recall is that I was meeting
23   with philanthropists about endowing the ACVSMR and
24   specifically to help us to launch not only the

401

1    recognized veterinary specialty board but to help
2    provide seed money to universities to help them to
3    begin to develop the programs that would then become
4    residencies.
5          So while I don't remember it as a
6    check -- we're talking about almost ten years ago --
7    I do recall having a commitment in that range of
8    donation.
9      Q. But you don't remember a specific $500,000
10   check.
11     A. I just don't have....
12     Q. I'm sorry, go ahead.
13     A. I don't specifically recall that.
14     Q. It says here, after it mentions the
15   $500,000 check, it says "Especially since it was
16   given based on my history but pulled because of my
17   current position." Do you know what that meant?
18     A. I have no idea. It's clearly talking about
19   something that is much more substantive than I'm
20   reading in this email.
21     Q. Were you getting flak from your board at
22   this time for not being more assertive?
23     A. I don't recall.
24     Q. Were you losing their confidence "after 15

402

1    years of development of our human/vet specialty
2    initiative"?
3      A. I don't recall.
4      Q. Has anyone on your board ever given you
5    flak?
6      A. I don't think today I would refer to
7    anything as flak. But certainly there have been
8    some disagreements.
9      Q. But you don't remember any flak, however
10   referred to, around that time?
11     A. Well, you know, I don't remember the
12   specific events that this email is referring to.
13     Q. Did anyone from your board or any of your
14   donors ever tell you you would have to go separate?
15     A. Where are you seeing this?
16     Q. I'm sorry. I thought I was reading it from
17   here, but I might have gotten it from another
18   paragraph.
19          Let me ask you a different question. If
20   you look at the last paragraph, it talks about a
21   "very complex transition for me." Do you see that?
22     A. Yes.
23     Q. And the word "very" is in capital letters;
24   correct?

**403**

1    A. Yes.
2    Q. What were you referring to by "very complex
3  transition"?
4    A. I do not recall.
5    Q. Do you know if you were referring to the
6  transition of the ACVSMR project into an independent
7  organization with its own bylaws and articles of
8  incorporation?
9    A. No, I don't recall that.
10    Q. You don't recall whether you were referring
11  to that, or you just don't know? I'm sorry; that
12  was a bad question. You know that you were not
13  referring to that, or you just don't recall?
14    A. I don't recall. And since that last
15  paragraph seems to relate to the entire substance in
16  the email, it would not be possible for me to say.
17    Q. I'm going to mark this as Exhibit 45.
18      (Exhibit 45, email, marked for
19  identification.)
20    Q. Before I ask you about this document, I
21  forgot to ask you something else. Can I ask you a
22  question that has nothing to do with this document?
23  And then I'll give you a chance to read it.
24      Are there any documents that you're

**404**

1  aware of that explain what the relationship was
2  going to be between Homecoming Farm and the
3  incorporated college?
4    A. Yes.
5    Q. What is that document?
6    A. Well, the letter from Attorney Feinberg.
7    Q. Are there any other documents that you're
8  aware of that discuss that relationship -- in other
9  words, how the two were going to interact after the
10  formation of the college into an incorporation?
11    A. Not that I recall.
12    Q. And in your mind, in your memory, as you
13  sit here today, what was your understanding of that
14  relationship? And let me get a little more specific
15  than that, because I know you've talked in general
16  that one would be a project of the other. Was the
17  board of Homecoming Farm going to be able to direct
18  the activities of the board of the college?
19    A. The board of Homecoming Farm would name the
20  board of the new corporation, and it would remain a
21  project of Homecoming Farm.
22      Now, the board of Homecoming Farm
23  wouldn't direct, for example, the specific tasks
24  that the professional board of ACVSMR -- meaning the

**405**

1  organizing committee members --
2      There would be an administrative board
3  over the corporation, and then there would be a
4  board, which would have been our organizing
5  committee members, who would be responsible for
6  maintaining the necessary requirements with AVMA.
7    Q. I need to back up. "An administrative
8  board over the corporation," I think were your
9  words. What corporation did you mean?
10    A. If I had continued and separately
11  incorporated ACVSMR instead of simply letting it
12  remain within Homecoming Farm --
13    Q. That's what we're talking about.
14    A. Exactly. AVMA required an independent
15  corporation to be formed. So the way that it would
16  still remain a project of Homecoming Farm is that
17  Homecoming Farm would choose who the board members
18  would be for this new corporation.
19    Q. So post organizing committee, it would
20  actually be up to Homecoming Farm to decide whether
21  or not these people who had been on the organizing
22  committee would remain and be on the board of the
23  new incorporated college; correct?
24    A. Well --

**406**

1    Q. So, for instance, Dr. Gillette -- Dr.
2  Clayton, let's say, was on the organizing committee;
3  correct? And after the issue was whether she
4  was going to be on the board of the newly
5  incorporated college. Right? That would be one
6  issue that would have to be decided by Homecoming
7  Farm; correct?
8    A. Yes.
9    Q. Okay, I understand. Was it also your
10  vision that the Homecoming Farm continued to offer
11  farrier courses or courses to farriers and continue
12  towards its plans for farrier certification?
13    A. Yes.
14    Q. And would that also be under the mark
15  ACVSMR?
16    A. Yes.
17    Q. And was it your plan to actually offer
18  classes to veterinarians?
19    A. Yes.
20    Q. On a campus?
21    A. Yes.
22    Q. And this was the project you talked about
23  maybe buying property, maybe somewhere in Florida;
24  correct?

**407**

1    A. Yes.

2    Q. Was the -- now, you mentioned the

3  administrative board. That's not separate from the

4  Homecoming Farm board? Is that something separate

5  from the Homecoming Farm board and the board of the

6  college? Is that a third body? I'm just trying to

7  understand.

8    A. I need the question again.

9    Q. So the college, incorporated college board

10  would answer directly to the Homecoming Farm board;

11  correct?

12    A. Yes.

13    Q. There's not another board in between them.

14    A. No, but there would be a nonadministrative

15  board. It's just the terms that I use for it --

16  which would be the -- for example, the organizing

17  committee would then be the equivalent of an

18  advisory board but not have the power one way or the

19  other to administer the corporation.

20    Q. Okay. So it would actually be administered

21  by Homecoming Farm.

22    A. Well, it would be administered

23  independently because it would be an independent

24  corporation.

**408**

1    Q. Who actually would do that administering?

2    A. Homecoming Farm would name board members.

3    Q. And they would be separate from these

4  advisory board members?

5    A. Yes.

6    Q. So for someone like Dr. Clayton, which one

7  would she be on?

8    A. Well, going to the time that I was involved

9  with my organizing committee, Dr. Clayton would be

10  on the board that say had continued to administer

11  the program.

12    Q. She would be actually administering the

13  program.

14    A. Yeah, well, someone from -- it would be

15  veterinarians who would be overseeing -- let's say

16  make sure that the residencies would be in

17  accordance with our guidelines, that the curriculum

18  would be in accordance with our guidelines, things

19  like that.

20    Q. But the Homecoming Farm board would have

21  the final say over that board; is that correct?

22    A. The board that Homecoming Farm would

23  appoint to the new corporation would, yes.

24    Q. And that's one way to have final say. If

**409**

1  they're not doing something you like, you can remove

2  them. Correct? If you have the power to appoint

3  the board, you can remove them if they're....

4    A. No, once it would be independent, then that

5  board -- which, frankly, would have been the same

6  board, more or less, as Homecoming Farm.

7    Q. I see.

8    A. So we may serve two different corporate

9  entities.

10    Q. Would it include people beyond

11  veterinarians?

12    A. Yes, as an administrative board member,

13  yes.

14    Q. And then the veterinarians would remain in

15  an unofficial advisory capacity?

16    A. Again, you're talking -- I see it as

17  maintaining a corporate structure versus undertaking

18  the work.

19    Q. The advisers would undertake the work?

20    A. Well, they would undertake, yes, the

21  mission, exactly.

22    Q. And the administrators would be the

23  corporate structure.

24    A. Yes.

**410**

1    Q. Is this memorialized in writing anywhere,

2  that you know of?

3    A. I would need to review all the documents

4  that I've submitted.

5    Q. Sitting here today, do you know of any

6  documents that were -- on which this plan appears?

7    A. Not that I recall.

8    Q. Let me ask you this: You're aware of an

9  organization called the American College of

10  Veterinary Surgeons; correct?

11    A. Yes.

12    Q. And they've at one time or another accused

13  you of some species of trademark infringement.

14  You're aware of that?

15    A. Correct.

16    Q. And you're aware that at one time or

17  another they've accused my client of some species of

18  trademark infringement; correct?

19    A. Yes.

20    Q. What if the college had been incorporated

21  and the ACVS had been right, just hypothetically?

22  Who would have made the decision about what to

23  change the name to? Would that have been a decision

24  by Homecoming Farm or a decision by the

411

1   administrative board?
2     A. You know, that's such an abstraction, and
3   it's asking me for how I would -- I would get legal
4   advice.
5     Q. Fair enough. That's probably the right
6   answer.
7       Let me ask you to turn to Document 45
8   now, Exhibit 45, and finish reviewing it, please.
9     Q. Have you had a chance to look at this
10  document?
11     A. Yes.
12     Q. Is this an email that you sent to Dr.
13  Gillette?
14     A. Yes.
15     Q. When you said, "Thanks for letting me know
16  what is going on" on July 1st, 2004, what were you
17  referring to?
18     A. I have no idea.
19     Q. Did Dr. Gillette....
20       I'm going to show you a different
21  document and ask you to authenticate it.
22       (Exhibit 46, handwritten document,
23  marked for identification.)
24     Q. Have you had a chance to look at this

412

1   document?
2     A. Yes.
3     Q. Is this your handwriting?
4     A. Yes.
5     Q. Is this a document you sent?
6     A. Yes.
7     Q. On or about July 2nd, 2004?
8     A. Yes.
9     Q. And are the attachments something you sent
10  as well?
11     A. Yes.
12     Q. And this looks like it was sent from
13  Brockton, but using an envelope picked up in your
14  travels; is that correct?
15     A. Yes.
16     Q. Do you know, in or about July 2nd, 2004,
17  did Dr. Gillette ask you to send in documents
18  regarding your qualifications?
19     A. He specifically asked me to send him copies
20  of my licenses and my veterinary degree.
21     Q. Did he send you an email?
22     A. I don't recall.
23     Q. I show you another document, dated July
24  2nd, 2004.

413

1       (Exhibit 47, email, marked for
2  identification.)
3     Q. Have you had a chance to look at this?
4     A. Yes.
5     Q. And is this an email that you recall
6  receiving?
7     A. Yes.
8     Q. And it refers to some issue with some
9  people in Cape Cod; correct?
10     A. Yes.
11     Q. And did you know by this he was referring
12  to Ms. Asack and Ms. Erickson?
13     A. I believed that, but I didn't know.
14     Q. And he also in this email requests some
15  credentials; correct?
16     A. Yes.
17     Q. And do you believe that Exhibit 46 may have
18  been a response to that request? It was the one we
19  just looked at with your handwriting on it.
20     A. Yes. I want to read specifically what he's
21  asking me to provide.
22       No, that would not have been a response
23  to that, because this doesn't specifically ask for
24  my state licenses, and I do recall him asking me to

414

1  provide those, and I don't see it here. So I
2  believe that this was in response to a different
3  communication.
4     Q. Are you aware that sometime after this
5  date, in or around July, early July, 2004, that Dr.
6  Gillette was sent letters by Jane Hutton, Marc
7  Paulhus --
8     A. Yes.
9     Q. -- and June Gilch? Are you aware that they
10  had communicated with him around this time?
11     A. Yes.
12     Q. And that they were communicating to him for
13  the purpose of explaining their involvement with
14  your work?
15     A. Yes.
16     Q. Did you ask them to contact Dr. Gillette?
17     A. Yes.
18     Q. And for what purpose did you ask them to do
19  that?
20     A. Because he asked me for that.
21     Q. And this was part of his series of requests
22  for credentials at the time?
23     A. Well, it was his request for information
24  about Homecoming Farm.

---

415

1    Q. Let me do another document. I think this
2 is going to be 48.
3        (Exhibit 48, email, marked for
4 identification.)
5        MR. LYONS: I've got 10 minutes to 5:00.
6        MR. KLUFT: I think I have more than ten
7 minutes. We only started at 10:00. I'm going as
8 fast as I can.
9        MR. LYONS: That doesn't mean we have to
10 stay here all night. How much time do you have?
11 Normally we're done by 4:00 o'clock.
12        MR. KLUFT: You see what I've got here,
13 and I've been moving very fast.
14        MR. LYONS: Only four or five?
15        MR. KLUFT: I don't think I'm going to
16 use all of them. I've been weeding out as I go.
17        MR. LYONS: I understand. 5 past 5:00
18 is different than 5 past 6:00.
19        MR. KLUFT: I have a few questions, but
20 I'm moving very fast. And I think I can get through
21 certain things.
22        MR. LYONS: I just ask you to
23 prioritize, given the late hour.
24        MR. KLUFT: I completely understand.

---

416

1    Q. Dr. Lyons, do you keep an electronic
2 datebook?
3        MR. LYONS: At what point in time?
4        MR. KLUFT: Currently.
5    Q. Like an Outlook, Microsoft Word calendar,
6 something like that?
7    A. Yes.
8    Q. You have an iPad. Do you use the calendar
9 feature on the iPad?
10   A. No.
11   Q. Did you ever have an electronic calendar
12 for your appointments?
13   A. I don't believe so.
14   Q. Did you ever have a paper calendar for your
15 appointments?
16   A. Yes, I would keep them in one of those
17 yearly planners.
18   Q. And do you still have those?
19   A. No.
20   Q. How far back do you have? I assume you
21 have one for 2013 that's probably not relevant for
22 this case. Do you have any for prior years?
23   A. No.
24   Q. Now, do you recall Lauren Kingston sending

---

417

1 this email, which has been marked as Exhibit 48?
2    A. I remember seeing this in your document
3 production, and I do remember that Lauren was
4 communicating with Dr. Gillette when I was unable to
5 have email, yes.
6    Q. And did she have your authority to
7 communicate with Dr. Gillette?
8    A. Yes, she did.
9    Q. Let me move on to the next. Do you recall
10 in September of 2004 receiving an email from Dr.
11 Gillette to either Betsy Erickson or Asack, which
12 answered a series of questions?
13   A. I remember seeing that in the production of
14 documents.
15   Q. And is it your contention you did not
16 receive that at the time?
17   A. Yes.
18   Q. I'm sorry?
19   A. I don't recall receiving it at the time.
20   Q. Do you know that you didn't receive it at
21 the time?
22   A. I don't recall.
23   Q. Then I'll move through that and I will not
24 mark it.

---

418

1        Now, at some point Asack and Erickson
2 complained to the veterinary board about you; is
3 that correct?
4    A. Yes.
5    Q. And there was a proceeding; is that
6 correct?
7    A. Yes.
8        MR. KLUFT: Off the record.
9        (Discussion off the record.)
10       (Exhibit 49, email, marked for
11 identification.)
12       (Exhibit 50, email, marked for
13 identification.)
14       (Exhibit 51, email, marked for
15 identification.)
16   Q. Here are the three documents marked. Have
17 you had a chance to look at these documents?
18   A. I have.
19   Q. Are any of them emails that you sent?
20   A. Well, let's go to No. 49.
21   Q. Okay. Why don't we go to No. 49. Is this
22 an email you sent?
23   A. I don't know whether, with that email
24 heading on it for when it was sent. But this is not

---

419

1   a genuine document.
2        Q.  When you say "this," are you referring to
3   the email and the attachment?
4        A.  I believe that there's like cut-and-paste
5   going on with what you're calling an attachment.
6        Q.  Let me ask you a question:  Is the
7   attachment a document produced by Homecoming Farm?
8        A.  No.
9        Q.  Is the email something sent by Homecoming
10  Farm?
11       A.  Do you mean the words written under there?
12       Q.  I mean the first page of this document.
13  Did you send an email to Betsy Erickson which said,
14  "Another background document FYI"?
15       A.  I did not write "Another background
16  document FYI" that I recall with anything that I
17  sent to Betsy Erickson.
18       Q.  Do you know if Lauren Kingston or anyone
19  else did so on your behalf?
20       A.  No.
21       Q.  You don't know, or you know that they did
22  not?
23       A.  I know that they did not.
24       Q.  50:  Is this a document that you sent?

420

1        A.  This too is not a genuine copy of an email
2   that I sent.
3        Q.  And what about 51?
4        A.  This is not a genuine document.
5        Q.  Okay.  Let's put them aside.  That's all I
6   wanted to know.
7             Now, you -- at some point the veterinary
8   board matter you prevailed in; correct?
9        A.  Yes.
10       Q.  And subsequent to that, did you have any
11  contact or did you or your attorneys have any
12  contact with Ms. Erickson or Ms. Asack?
13       A.  Subsequent to the veterinary board?  No.
14       Q.  During the time the veterinary board matter
15  was going on, did you have contact?
16            Let me cut to the chase.  Did you ever
17  threaten to sue them?
18       A.  I did sue them.
19       Q.  You did sue them.  And in what court was
20  that?
21       A.  In Brockton.
22       Q.  And was that matter in the District Court
23  or the Superior Court, if you know?
24       A.  I don't know.

421

1             MR. LYONS:  I'm happy to tell you.  It
2   was in the Superior Court.
3        Q.  And was there a judgment in that case?  Did
4   it settle, or did the judge decide it?
5             MR. LYONS:  I'll say for the record that
6   the case was resolved by mutual agreement.  I think
7   a judgment was part of it, but --
8             MR. KLUFT:  An agreed-upon judgment?
9             MR. LYONS:  Exactly.
10       Q.  Did that involve the payment of money from
11  them to you?
12       A.  No.
13       Q.  Now, are you aware that in 2009 both of
14  them sent letters to Dr. Gillette?
15       A.  Yes.
16       Q.  And was that part of the agreed settlement,
17  that they send those letters?
18       A.  Yes.
19       Q.  Did you review the letters before they were
20  sent?
21       A.  Yes, I believe so.
22       Q.  Well, if it wasn't you, it was your
23  attorney review --
24       A.  Yes.

422

1        Q.  What was the purpose of you having them
2   sent?
3        A.  Because they had made false and defamatory
4   statements about me.  They had altered emails and
5   forwarded them.  They created documents and made it
6   appear as if I had created them and distributed
7   them.  So in exchange for not having to pay me a
8   large sum of money, they had to write letters to let
9   Dr. Gillette know that what they had said to him was
10  in fact not true.
11       Q.  Was there any other part of the settlement?
12       A.  No.
13       Q.  They didn't give you anything else but the
14  letters?
15       A.  No.
16       Q.  Did they write to anybody else any other
17  letters?
18       A.  No.
19       Q.  I just want you -- just two more things,
20  and then we're done.  It's 5:00 o'clock now.  These
21  are -- I'm going to mark these as the next two
22  exhibits.  They're not one document.
23            (Exhibit 52, Statement of damages,
24  marked for identification.)

---

423

1      (Exhibit 53, Statement, marked for
2  identification.)
3      Q.  Do you recognize Exhibit 52?
4      A.  Yes.  But I'm not a lawyer, so I don't know
5  exactly what this represents.
6      Q.  Well, I'll represent to you that this is
7  the type of document normally filed with a complaint
8  in the Superior Court, based on the Superior Court
9  rule that requires a statement of damages to be
10  filed with the complaint.  And your lawyer can
11  correct me if I'm wrong about that.
12      But my real question is:  Is the
13  statement here true, that you alleged that Asack and
14  Erickson damaged your personal and professional
15  reputation?
16      A.  Yes.
17      Q.  And is your statement here true that you
18  feel that because of their actions, you sustained
19  significant economic loss to your business?
20      A.  Yes.
21      Q.  And when you refer to your business here,
22  you're referring to your solo -- your
23  practitioner -- your veterinary practitioner?
24      A.  Yes.

---

424

1      Q.  Not Homecoming Farm.
2      A.  That's correct.
3      Q.  Can Homecoming Farm sue Asack and Erickson?
4      A.  No.
5      Q.  It was just you.
6      A.  Yes.
7      Q.  And if you look at the next document, 53,
8  can you tell me what this is?
9      A.  When you say "what this is" --
10      Q.  Did you draft this?
11      A.  Yes.
12      Q.  Is this more or less an accurate summary of
13  at least some of the things Ms. Asack did to you
14  during a three-year period?
15      A.  Yes.
16      Q.  Do you recall approximately what that
17  three-year period was?
18      A.  2003 to '6.
19      Q.  And did that end with the lawsuit?  In
20  other words, the harassment stopped once you sued
21  her; is that correct?
22      MR. LYONS:  Do you mean is Ms. Azack
23  sending her Christmas cards now?
24      Q.  It's a three-year period.  Was it only

---

425

1  three years because the lawsuit put a stop to it?
2      A.  Yes, the lawsuit put a stop to it.
3      Q.  There wasn't something else that put a stop
4  to it, as far as you know?
5      A.  No.
6      Q.  That really was my question.  And she
7  contacted a lot of people -- she contacted clients
8  of yours?
9      A.  Yes.
10      Q.  Did she contact advisory board members of
11  Homecoming Farm?  It doesn't say that here.
12      A.  No, not advisory, no.
13      Q.  But clients -- she contacted veterinary
14  boards and colleagues?
15      A.  Yes.
16      Q.  She reported you to the Massachusetts AG
17  and the IRS; is that correct?
18      A.  Yes.
19      Q.  And she also contacted the university in
20  England.  What does that refer to?  Is that the name
21  of an institution?
22      A.  It was a university where I was lecturing.
23  And this is when she was at her most prolific in
24  trying to harm me.  I went to do my lecture at the

---

426

1  university.  There was a lot of security to get into
2  the lecture.  And so I lectured for a couple of
3  hours, and it was only that they revealed to me that
4  they had received such crazy complaints from this
5  woman, that I was scheduled to lecture and she was
6  insisting that they cancel the lecture, and when
7  they said that they were not planning to do that,
8  she was so erratic that they had to actually hire
9  extra security for the event.
10      Q.  Let me ask you:  Are you aware, sitting
11  here today -- and I'm wrapping up, so I'm going to
12  change the subject on you quickly.  Are you aware,
13  sitting here today, of any foundation that you
14  applied for that, instead of giving money to you,
15  gave money to the college that Dr. Gillette's
16  involved in?
17      A.  Well, that's actually a good question.  As
18  I've said before, I've not yet had a chance to
19  review every one of your 15,000 documents in detail.
20  But I have not seen the financials produced by
21  ACVSMR.
22      Q.  And I promise you, every single one of my
23  questions I will say for the record is premised on
24  the assumption that you haven't read 15,000

---

427

1  documents.
2     A. Okay.
3     Q. But let me ask you: Sitting here today,
4  are you aware of any corporate sponsor that you
5  approached but did not give money to you that gave
6  money to Dr. Gillette's organization, the college,
7  incorporated college, instead?
8     A. Again, I don't know what sponsors have
9  chosen to sponsor his programs, so --
10    Q. Sitting here today, do you know if he has
11 any -- whether or not?
12    A. I don't know anything about Dr. Gillette's
13 sponsorships or financials.
14    Q. I want to just go back, so I understand, as
15 sort of a final question: If you -- is part of the
16 harm that you suffered as a result of my client's
17 actions that you could not form your own specialty
18 board because that market had been essentially
19 captured because there was only room for one? Am I
20 accurately assessing that part of your claim? And
21 if I'm not, tell me I'm not.
22    A. No, that's not something that would -- no,
23 that's not how I would say it.
24    Q. How would you phrase the harm to Homecoming

428

1  Farm caused by my client's actions?
2     A. Well, the harm to Homecoming Farm he is the
3  harm to the ACVSMR project.
4     Q. And what is that? I mean, what is the
5  harm? I know what the project is.
6     A. Yes.
7     Q. After two days.
8     A. The harm is in the infringement on our
9  copyrighted documents; that Dr. Gillette's college
10 has presented the illusion to the general public, to
11 veterinarians, and to the AVMA that he and his
12 organizing committee were the ones who created the
13 compilations of methods, of facts, of techniques, of
14 structure. He has presented the illusion that the
15 description of how this specialty board will improve
16 health and welfare both for the general public and
17 improve the profession -- he's created the
18 impression that that work product, that intellectual
19 property, that I took -- what was it -- 15 years or
20 20 years by that time to develop was actually his
21 work product, when in fact he copied it.
22        So the direct harm is in that, by taking
23 credit for our work and by taking credit by
24 association for everything that the American College

429

1  of Veterinary Sports Medicine and Rehabilitation has
2  done all over the world, simply by usurping our
3  registered trademark and essentially taking
4  advantage of the brand that I created, that that has
5  damaged -- that's damaged our standing globally.
6     Q. I have one more question. You've talked a
7  lot about the event in Philadelphia, and I haven't
8  asked you much about it today.
9     A. Okay.
10    Q. But I want to give you the chance, if
11 there's anything about that meeting that you
12 remember that you haven't talked about over the last
13 two days, I want to give you the chance to tell me.
14        And specifically, I'm curious to know,
15 when you told them not to use your intellectual
16 property --
17    A. Yes.
18    Q. -- when you were sort of on your way out, I
19 guess, as you described it --
20    A. Yes.
21    Q. -- what specifically do you recall saying
22 and what response did you get, if any?
23    A. I said that they were not allowed to use
24 any of the materials that I had produced for the

430

1  committee, which amounted to the entire work product
2  of the committee at the time, in substance -- that
3  they could not use the name. And there was no
4  response. I was just....
5     Q. Is there anything else about that meeting
6  that, sitting here today, you recall that you have
7  not -- any words you've remembered from -- that
8  either you said or someone else said, Dr. Taylor,
9  Dr. Gillette, that you haven't testified to yet?
10    A. After two long days, I can't remember what
11 I've testified to. So since I can't recall what
12 I've said in previous testimony, I don't know what
13 might be unsaid.
14        (Discussion off the record.)
15    Q. Back on the record for one more question,
16 which is: Do you have an understanding, sitting
17 here today, as to what, if any, Dr. Gillette's
18 motive would have been for telling any mistruths
19 about you or the things you've done?
20    A. Oh, yes.
21    Q. And what is that?
22    A. When I met privately with Dr. Gillette in
23 Chicago and he let me know that he had received word
24 from the AVMA that the liaison, Dr. Dee, would be

431

1  attending -- by then he would have known that Dr.
2  Russell was not. And I asked him if he knew him,
3  and he said yes, he's canine. And I asked if he
4  knew about his practice, and he actually said that,
5  in his opinion, it wasn't a high-quality practice.
6      And so I said, well, what difference
7  does it make? He's the liaison. He's here to help
8  make sure that any questions we have about the
9  requirements from the AVMA's policies and procedures
10 get answered, so that, you know, we can make sure
11 that we're moving in the right direction.
12     So he said, well, yeah, but he's going
13 to expect to be made a member of the -- a chartered
14 diplomate. And I said, "That's fine, he can be a
15 chartered diplomate, but, you know, as long as he
16 passes the test. We all have to pass the test. So
17 as long as he passes the test and fulfills all the
18 other requirements for case reports and things like
19 that, then of course Dr. Dee can be a chartered
20 diplomate."
21     And he said, "Well, you know, no, you
22 know, he'd just expect to be given these
23 credentials." And if we can do that, then he'll
24 make it an easy ride, or whatever his words were --

432

1  he will facilitate the AVMA's approval for us.
2      So I said, you know, well, that's not
3  going to happen. The agreement that we had coming
4  into this, all of these organizing committee
5  members, is that there would be no grandfathering.
6  No one was going to just be handed their
7  credentials. And it doesn't matter that -- and as I
8  recall, the AVMA, in the language that I read,
9  almost made it sound like it was only under some
10 special circumstances that sometimes, you know, a
11 small number of organizing committee members may be
12 made chartered diplomates without having to sit for
13 an exam.
14     But I said, "The agreement in joining my
15 effort -- my committee was that right up front
16 everybody was going to sit for the exam." And so
17 Dr. Gillette said -- sort of looked down, and he
18 said, "Well, I don't think I can pass an exam."
19     So I believe that part of Dr. Gillette's
20 motivation for wanting me to no longer be on a
21 committee was that he wanted to give these
22 credentials out to the organizing committee members
23 without any requirement for sitting for an exam, and
24 he knew that that was a nonnegotiable point with me,

433

1  that was --
2      If this had come up in the room, if that
3  became a discussion at this organizing committee
4  member (sic), then I would have reminded everyone
5  that that was the condition upon which they agreed
6  to participate in the committee; and if they had
7  changed their mind, they could leave it.
8      Q. I'm sorry, you didn't have that
9  conversation with them, though. You're saying if
10 that had come up?
11     A. Exactly. So that was my position. So that
12 would certainly be one strong motivation, because,
13 as I understand it, you know, 27 veterinarians out
14 of 80,000 instantly got some of the most important
15 letters that can go after your name when you are in
16 business as a veterinary professional, which is
17 you're distinguished as a diplomate. The public,
18 the AVMA, colleagues, academic institutions,
19 publishers, journals, conferences, students, grant
20 makers, sponsors, upon seeing that you are in this
21 elite group of being a diplomate, especially being a
22 founding diplomate, a market opens up to you that is
23 unavailable to anyone without those credentials.
24     And the AVMA is promoting your elite

434

1  status to its 80,000 members plus globally, and the
2  individuals immediately begin to market their
3  practices, market their businesses, market their
4  books and other publications, market their seminars,
5  market their lectures, market their veterinary
6  schools based on the fact that they have diplomates
7  and founding diplomates for a new specialty board.
8      I know that in veterinary schools
9  they're actually ranked -- surveys are done, and it
10 has to do with -- forgive me, I'm no economist. But
11 I remember seeing this -- I don't know if it was
12 rating veterinary schools. But one of the questions
13 is, "Just give us the number. What's the number of
14 board-certified faculty members that you have at
15 your institution?" And again, I can't remember the
16 context of that. I don't know whether it was for
17 grant funding. I don't know if it was that schools
18 are rated, you know, like the best school in the
19 country or something -- you know, one of those
20 things. But the point is that those credentials are
21 worth a lot of money. They are worth business
22 opportunities that cannot come to anyone. Anyone
23 without those credentials is frozen out of certain
24 markets.



435

1   So the opportunities that present once
2   you have those credentials are through the roof.
3   And the fact that Dr. Gillette and his group felt
4   the need and felt that it was all right to give 27
5   veterinarians, as I understand it, based on the
6   document production, these credentials as a gift --
7        You know, I read some of the email
8   exchanges between the committee members who were,
9   you know, preparing, putting the final touches on
10  the petition and trying to meet deadlines and, you
11  know, trying to work across time zones.  And they
12  would say, "We haven't heard from so and so for over
13  a year" -- no participation whatsoever.  And what do
14  you do?  "Has anyone heard from this person?  What
15  are we going to do?" -- with the members who haven't
16  even responded, to say, "Yeah, the petition looks
17  good.  It's going in on November 1st."
18       There are so-called organizing committee
19  members that didn't even respond to that, and yet
20  they were given diplomate credentials.
21  Q.   Are you finished with your answer?
22  A.   I forget the question.  It's late.  I'm
23  sorry.  It's been a long day.
24  Q.   Thank you very much.  I'm done.

436

1        MR. KLUFT:  Thank you, counsel, for your
2   patience.  Thank you, Mr. Reporter.
3        (5:23 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

437

1
2        CERTIFICATE OF COURT REPORTER
3
4
5
6        I, Alan H. Brock, Registered
Professional Reporter, do certify that the
7   deposition of Sheila Lyons, in the matter of Sheila
Lyons, et al., vs. The American College of
8   Veterinary Sports Medicine and Rehabilitation, Inc.
et al., on January 16, 2012, was stenographically
9   recorded by me; that the witness provided
satisfactory evidence of identification, as
10  prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
11  before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
13  that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
14  and further that I am not a relative or employee of
any attorney or counsel employed by the parties
15  thereto, nor financially or otherwise interested in
the outcome of the action.
16
17
18  Transcript review was requested of the reporter.
19
20
21
22
23  _____  January 18, 2013
24  Alan H. Brock, RDR, CRR

438

WITNESS:  SHEILA LYONS
CASE:     Sheila Lyons, et al., vs. The American College of
          Veterinary Sports Medicine and Rehabilitation,
          Inc. et al.

          SIGNATURE PAGE/ERRATA SHEET
PAGE  LINE  CHANGE OR CORRECTION AND REASON
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____

I have read the transcript of my deposition taken January 16,
2012.  Except for any corrections or changes noted above, I
hereby subscribe to the transcript as an accurate record of the
statements made by me.

Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, Sheila Lyons

439

1    Sent via Courier to counsel/witness on January 18, 2012

2

3                    SHEILA LYONS

4          SIGNATURE PAGE/ERRATA SHEET INFORMATION

5            For deposition taken on: January 16, 2012

6    Sheila Lyons, et al., vs. The American College of Veterinary

7            Sports Medicine and Rehabilitation, Inc. et al.

8

9          SIGNATURE INFORMATION FOR COUNSEL

10   The original signature page/errata sheet has been sent to

11   Stephen J. Lyons, Esq.  to obtain signature from the deponent.

12   When complete, please send original to J. Mark Dickison, Esq.

13

14                WITNESS INSTRUCTIONS

15   After reading the transcript of your deposition, please note

16   any change or correction and the reason on the errata/signature

17   page.  DO NOT make any notations on the transcript itself.

18   If necessary, continue the format on a separate page.

19

20   PLEASE SIGN AND DATE the errata/signature page (before a notary

21   if requested) and return it to your counsel.

22

23

24

**A**

$126,340 319:13
$2,000 331:21
$38,140 318:22
$500 324:13 325:4
$500,000 400:15,20
  401:9,15
$61,000 326:17
a.m 210:16 216:2
AAEP 213:13 299:23
  304:7,17
abiding 304:12
ability 224:3 320:6
  437:12
able 220:22 233:11
  273:18 285:1
  286:18 287:5 292:9
  295:24 304:23
  307:5,8 310:20
  319:8 333:6,13
  379:1 395:8 404:17
Absent 398:9
absolutely 259:14
  271:17
abstraction 411:2
abstractly 361:17,20
abused 340:5
ABVS 274:6 329:3
academic 351:12
  365:19 384:12
  433:18
academics 237:9,13
  351:14
ACAP 232:22
accept 230:8 234:4
accepts 231:16
access 241:19,22
  243:1 244:3,5,16
  273:23 352:14
  354:15,22,24 377:13
accomplish 270:23
accomplished 281:20
account 243:23
accounts 243:24 378:3
  380:1
accurate 259:1 260:12
  282:3,5 284:24
  317:4 326:12
  338:14 371:15
  399:4 400:11
  424:12 437:12
  438:18
accurately 278:13
  308:23 333:2 360:9
  427:20
accusations 229:3

accused 410:12,17
acknowledged 333:22
  334:18
ACPAT 358:1
acquire 232:21 279:13
acquired 279:15,16
acronym 257:11
acted 233:8
action 210:8 252:15
  252:15 255:23
  437:13,15
actions 224:9 346:15
  423:18 427:17
  428:1
activities 256:6
  281:24 282:4
  304:20 404:18
activity 310:3
acts 233:12
actual 260:12
ACVS 410:21
ACVSMR 216:14,18
  218:24 219:14,19
  220:14 230:19
  231:10,11 233:7
  234:20 235:11
  236:17 237:12,13
  246:11 251:18
  252:5,9 253:12
  254:19 255:3,8,17
  256:8 257:12
  263:23 268:8
  269:17,18 270:23
  274:11 280:24
  284:14,15,20 285:2
  285:7,15 290:21
  291:9 294:2 295:20
  296:10 298:7
  301:11 302:4,11,14
  303:8 307:21,24
  308:2,5 313:19,24
  314:16,18 315:11,21
  316:6 317:24
  319:16,18 320:12
  321:14 323:5,10
  325:7,19,20 326:6,8
  326:13 327:5,7
  332:4,10,12,14,18
  333:1,10 336:1,11
  336:16,19,22,23
  337:1 338:18,24
  357:17,18 358:13,22
  359:1 361:5 362:3
  391:15 393:14
  394:5 396:17,17,23
  400:23 403:6

404:24 405:11
406:15 426:21
428:3
ACVSMR's 266:14
ACVSMR.com
  352:19
adapt 267:1
adaptation 392:3
adapted 266:21
add 298:5
added 298:7,10
  376:14 398:3
adding 234:5,5
addition 224:18
  277:14
additional 224:17
  232:18,20 258:14
  276:18 310:16
  397:12,14 400:1
additionally 260:23
address 266:11 356:6
  357:6 372:14,17
addressed 287:4
addresses 262:24
  372:19
administer 407:19
  408:10
administered 407:20
  407:22
administering 408:1
  408:12
administration
  324:13
administrative 315:6
  343:19 405:2,7
  407:3 409:12 411:1
administrators
  409:22
admission 220:9,12,23
admit 303:19
adoption 246:3,8
advance 313:2 351:19
advantage 429:4
advice 267:21 367:4
  411:4
advise 394:23
Advised 366:4
adviser 233:8,12
  365:10,16 394:1
advisers 293:13
  365:24 393:14
  409:19
advising 393:21
advisory 289:24 290:4
  291:14 292:5,14,20
  292:22 293:5,5,9,15

293:18 343:4,6,9,20
345:3 384:6 392:24
393:12,13,20 407:18
408:4 409:15
425:10,12
affidavit 213:11
  271:18 272:7
affiliated 295:3
  365:21,22 368:16
affiliation 365:9
afraid 309:21
afternoon 211:5
AG 425:16
agencies 285:20
ago 286:4 312:8,9
  390:2,3 401:6
agree 234:12 245:17
  245:19 250:8
  344:17 380:2,3
agreed 246:6 253:22
  421:16 433:5
agreed-upon 421:8
agreement 350:24
  421:6 432:3,14
ahb@fabreporters....
  210:21
ahead 293:14 379:4
  397:3 401:12
Ahimsa 337:10,10,15
  337:16
al 342:24 343:5,6,12
  384:4,6 437:7,8
  438:1,2 439:6,7
Alan 210:20 437:6,24
Allday 399:8,9,10
alleged 423:13
alleging 257:8 347:1
Allied 329:14
allowed 234:14
  429:23
alphabetical 385:23
altered 374:4 422:4
America 232:14
American 210:9,11
  212:8,20 216:9
  235:4 237:19 241:2
  264:17 282:15,19,24
  294:3,23 295:2
  303:12 313:14
  410:9 428:24 437:7
  438:1 439:6
amount 319:3,4,5
  325:4 334:16,16
amounted 430:1
amounts 318:20
anatomy 357:22

and/or 218:24
Andressa 288:23
  289:3,7,19 290:7,12
  290:13,15
Angeles 364:12,15
  365:2,7
animal 213:17,22
  232:23 236:20
  238:2 287:3 314:13
  328:7 336:5 337:17
animals 232:5 233:21
  234:15 242:7,7
  285:23
announce 283:6
annual 344:8
answer 218:6 220:5
  225:9 227:14,16
  228:1,2 229:11
  245:2,16 255:5
  270:3 273:18
  278:13,17 295:24
  304:23 309:24
  319:9 333:2 343:18
  346:21 356:22
  361:20 372:21
  384:11 407:10
  411:6 435:21
answered 241:16
  278:3 417:12
  431:10
answering 224:19
  241:12 256:13
  257:4 335:14
  340:16 342:15
  348:2
answers 247:6 299:9
antislaughter 389:10
  389:18
anybody 221:7 242:13
  243:18 244:7 254:4
  291:16 312:13
  348:11 422:16
anytime 314:10
Anyway 378:13
apart 370:3
apologies 318:15
apologize 216:24
  263:21 264:2
  299:17 335:12
  382:17 398:14
apparently 311:17
appear 319:21 330:11
  335:12 422:6
APPEARANCES
  211:1
appears 315:18

355:14 410:6
applicants 234:7
320:5
application 302:7,11
applications 269:18
applied 239:14 305:22
313:19,23 367:1
426:14
applies 304:8
apply 367:15
appoint 408:23 409:2
appointment 351:13
appointments 416:12
416:15
appreciate 273:20
approach 238:20
approached 238:16
427:5
approval 356:8 432:1
approximate 316:22
316:23 326:12
approximately 240:7
240:8 272:24
279:24 281:5 286:4
289:12,18 307:11
346:10 374:21
377:17 382:6
424:14
Arabia 383:19
area 239:24
areas 227:7
arrangement 282:23
360:24
arrived 342:11
Arsenault 210:22
article 385:1
articles 262:16 263:16
264:1,4,9 265:11
266:5,6,12 267:6
277:8 281:2,8,15
300:3 385:3,5 394:5
394:9 395:15
397:22 403:7
articulate 323:9
Asack 339:13,18
340:3,9 341:18
355:24 413:12
417:11 418:1
420:12 423:13
424:3,13
Ashton 338:10
aside 274:18 275:13
275:16 341:24
354:12 355:9 357:9
375:2 384:11
398:13 420:5

asked 221:21 222:3
224:7,10 241:8
242:22 263:22
265:1 269:5 278:21
288:11 296:13
298:24 311:15
346:3,18 353:13
359:1 387:7 412:19
414:20 429:8 431:2
431:3
asking 217:17 223:9
224:13 237:3 246:5
255:13 256:13,16,17
266:10 267:15
270:2 273:22
275:22 276:8,24,24
277:14 278:4,5,24
286:14 295:14
306:7 308:3 313:12
313:13 316:15
324:18 325:11
338:17 345:6
346:23 347:2
348:11 349:16
354:10 373:19,21,24
374:19 377:8 398:7
398:9 411:3 413:21
413:24
aspects 266:20 359:3
assertive 401:22
assessing 427:20
assignment 247:6
assistance 285:21
340:8
assistant 384:4
assistants 388:2
associated 230:2
235:24 236:4
associates 395:18
association 210:12
212:20 232:23
235:19,20 237:20
282:15,19,24 303:12
395:10 428:24
associations 262:13
336:6 386:17
assume 277:10,11,12
416:20
assumes 278:1
assumption 426:24
attached 380:13
attachment 213:12
214:14 280:16
379:16 380:14,14,17
380:19 419:3,5,7
attachments 379:3

412:9
attend 224:5 295:23
attendance 222:21
231:2
attended 222:22
344:13
attending 226:16
431:1
attorney 215:10
245:15 246:2
250:19 256:23
258:3,5 264:23
267:22 272:1
305:18 342:19
395:5,8 404:6
421:23 437:14
attorney's 264:22
attorneys 250:10
256:15,16 257:1
420:11
audience 226:1
aughts 289:16
augmentation 392:2
authentic 217:7,9
authenticate 314:9
351:23 411:21
authenticating 217:8
authenticity 217:5
author 256:14 265:9
265:12 266:3 268:2
357:21 386:17
authored 217:14,15
256:15 258:18
319:22 384:13
392:7,8,9
authority 417:6
authorship 384:10
available 221:12
273:7,9 345:17
avenue 210:18 212:15
334:11
AVMA 224:10,21
225:18 228:8,11
237:24 254:1,5,8
273:16 274:1,6,11
275:11 283:6,11,21
284:5 294:16 295:3
295:16 321:13,22
322:1 323:3,15,17
329:18 346:15,19,21
346:24 347:4
351:13 381:23
382:1 390:6 391:19
391:22 394:7
396:22,24 405:6,14
428:11 430:24

432:8 433:18,24
AVMA's 228:10
323:6 431:9 432:1
AVMA-accredited
284:1
award 287:9,11,14
awarded 366:23,24
aware 246:17 273:4
274:19 275:17,24
276:9 277:17
278:24 290:7
294:16,18 295:1
313:22 356:2
368:24 404:1,8
410:8,14,16 414:4,9
421:13 426:10,12
427:4
Ayer 287:20
Azack 424:22

─────B─────
back 228:16 239:8
240:19,23 246:20
258:23 265:15
268:16 269:14
271:20 296:11
302:18 309:21
320:2 333:5 375:18
376:12,14,17,20,22
376:24 386:4 390:4
405:7 416:20
427:14 430:15
back-and-forth 265:2
background 299:14
357:1 419:14,15
backup 375:18 376:8
bad 354:23 403:12
badge 368:3
BAH 343:22
Baker 331:17,21
ball 288:16
ballpark 352:7
bar 395:9
barely 356:21
barnful 286:16
base 259:6 266:6
based 231:23 232:9
249:5 257:18 270:7
270:9 272:5 273:6
283:14 317:4
321:23 335:10
346:14 348:13,15
349:3 354:10 391:9
391:18 392:1
399:17,22 401:16
423:8 434:6 435:5

basic 360:1 379:6
basically 232:4 240:18
242:22
basis 270:2 305:11
360:13 374:5
Bates 260:2,4 263:13
282:8 331:3
Bayer 287:14
beautiful 286:17
314:24
becoming 299:18
began 230:6 294:22
294:22 296:10
319:18 320:1
beginning 211:13
268:24 280:9,24
begins 268:14 281:11
begun 391:8,24
behalf 243:22 256:7
263:3 335:24 337:1
354:9 419:19
Beijing 348:17
believe 218:20 221:14
225:5,14 227:8
228:10 235:17
236:2 247:6,18
250:15 251:22
253:7 258:4 260:16
260:21 261:12
262:4 268:24 273:2
276:1,22 279:14
287:13 288:23
290:23 291:2,13
292:9 296:12
301:14,17 305:14
313:21 321:23
325:10 329:11
337:2 338:22
339:12 341:11,23
342:10 345:9
348:15 350:4 353:8
354:20 356:18,19
357:22 358:1 363:4
363:20 364:17
365:3 372:12,16
374:11 375:15
378:11 379:2
380:10 383:24
387:13,17 391:12,17
413:17 414:2
416:13 419:4
421:21 432:19
believed 300:21
413:13
benefit 239:15 301:23
310:16 329:4

best 230:7 299:9
302:17,20,23 303:2
320:4 324:14 330:2
330:24 339:12
367:5 398:12
434:18 437:12
Betsy 417:11 419:13
419:17
better 222:24 223:21
247:12 320:10
327:14 330:17
beyond 409:10
big 239:24
bio 254:24 316:10,12
382:13
biographical 379:8
biomechanics 223:23
bit 259:11 261:20
286:4 337:3 340:4
359:6
Black 210:18 212:15
block 274:5
Blood 385:1,3
board 214:3 233:4,16
234:11 242:19
243:13 244:12,19,21
287:24 288:3,10,20
289:9,11,19,22
290:2,4,4,9,24
291:11,14,14,17,18
291:21 292:4,5,14
292:20,22 293:3,5,6
293:9,17,18,24
299:3 328:14
342:21,24 343:2,4,6
343:9,17,19,21
344:9 345:1,2,3,6,13
345:18 384:6
391:10,21 392:20,24
393:12,14,20 394:1
401:1,21 402:4,13
404:17,18,19,20,22
404:24 405:2,4,8,17
405:22 406:4 407:3
407:4,5,5,9,10,13,15
407:18 408:2,4,10
408:20,21,22 409:3
409:5,6,12 411:1
418:2 420:8,13,14
425:10 427:18
428:15 434:7
board-certified
434:14
boards 232:16 234:9
234:11,12 290:1
293:15 425:14

body 223:23 306:5,8,8
379:9 407:6
boilerplate 265:17,18
267:17 310:12
book 283:21 338:18
338:20,23,24 339:2
339:2,3 357:17
booklets 333:1
books 434:4
borrowed 267:16
Boston 210:19,23
211:7,15 212:5,16
364:12,15,17 367:10
bottom 274:4 316:9
316:10 331:11
372:2 380:4
Boulevard 212:4
box 240:18
brainstorming 302:3
brand 429:4
Brazil 290:14 291:8
break 211:5 212:13
238:3 254:12
271:14,16,23 299:1
314:5 317:12,16
327:21,24 328:17
384:19 388:5
394:13
breakdown 332:13
333:12 334:5
Breeders 235:18
Brida 235:13,14 240:4
brief 315:1
British 233:23
Broad 211:6,14
broadcast 337:12
brochure 214:2
296:24 297:3,13
298:2,4,8,11 328:12
339:24 340:14
355:23
brochures 262:16
296:16,19,23 297:16
297:21 298:14
300:23 332:24
341:7
Brock 210:20,22
307:7 437:6,24
Brockton 412:13
420:21
brought 305:16,19
306:24 398:1,3,10
budget 313:9,11 325:6
326:19 326:8,13
budgets 213:21 324:2
324:6 327:21 328:5

330:8,11,14,18,21
331:4
bulk 263:9
bullet 225:22
bunch 224:12 241:9
240:1,6
business 224:8 226:21
255:3 346:14 347:5
386:24 388:24
389:2,4 423:19,21
433:16 434:21
businesses 434:3
buying 332:22 406:23
bylaws 263:23 264:1,6
264:10 265:4,7,11
266:4,6,7,11,13,18
266:20 267:6 268:2
394:5,10,21 395:16
397:23 403:7

_____
C
_____

C 216:1,3
C-o-d-e 298:23
calendar 416:5,8,11
416:14
Cali 320:19
California 230:24
299:12 310:24
366:16
call 242:6 265:16
344:18 361:13
called 232:22 235:22
255:17 263:15
264:4 269:11 279:9
279:16 284:19
297:8 311:8,9
358:14 362:7
363:21 366:18
389:7 410:9
calling 419:5
camels 238:9
camera 327:17
Camille 211:13
campus 220:3,15,21
220:24 221:4
406:20
cancel 426:6
canine 237:17 359:3
372:15 431:3
capable 347:21 348:1
capacity 284:17 285:5
409:15
Cape 339:18 341:15
413:9
capital 281:12,13

402:23
caps 383:14,14
captured 427:19
cards 424:23
care 220:16 298:6
323:1 341:8 372:15
carefully 225:9 268:5
Carolina 222:4
carrying 223:16
case 217:4 240:12
245:17 254:18
258:4,10 259:6
269:22 270:5,11
271:11 272:7
276:16,17 278:5
307:1,2,6,7 331:24
335:18 337:9 343:3
377:3 395:7 416:22
421:3,6 431:18
438:1
cases 262:17 271:1
285:20
cash 334:15
catch 330:2 335:16
categories 244:22
category 219:7 258:6
342:20
cause 347:5
caused 224:14,17
428:1
causes 286:22
cc 372:15
CD 375:18 376:8,11
376:18 377:9,11
CD's 377:2,4,6,15
CDs 376:13
cease-and-desist
250:10
center 230:23
certain 217:5 220:24
221:1 264:19
358:14 415:21
434:23
certainly 225:13
233:20,22 238:8
255:19 304:24
328:21 335:8 374:6
402:7 433:12
certificate 220:17
259:1 268:17 437:1
certification 219:6,22
219:24 220:7,11,22
221:8 233:16 369:3
406:12
certifications 219:2
221:13,17 329:15

certified 221:11
232:16
certify 321:16 322:20
437:6
cfs@sarrouflaw.com
211:17
chain 214:11 371:17
challenge 246:4
chance 250:6 255:24
265:22 272:13
357:14 375:6,9,12
377:24 379:21
382:20 385:12
390:22 392:13
398:20 400:5
403:23 411:9,24
413:3 418:17
426:18 429:10,13
change 235:2 298:4
352:4,22 361:20
372:21 410:23
426:12 438:4
439:16
changed 260:15,17
261:3,4 298:4
327:13 433:7
changes 282:6,7 293:3
352:8 355:1 438:17
chaos 386:23 389:1
characterization
232:8
characterize 237:23
239:4
charge 254:21
Charlotte 213:15
314:12
chartered 232:23
431:13,15,19 432:12
chase 351:2 420:16
check 242:2 244:18
334:15,22 335:4,7
335:10 400:15,20
401:6,10,15
checked 244:2
checking 242:10
checks 334:2,7,12,13
Chicago 307:1,13
397:3,24 398:2,11
430:23
Children's 364:22
393:10
choose 235:17 294:7
405:17
chose 247:8 249:11
chosen 427:9
Christmas 376:4

4

424:23
chronically 340:5
circuit 258:20
circumstances 248:14
  278:11,19 304:2,4
  306:21,23 311:5
  341:3 432:10
city 366:14
Civil 210:8
claim 224:14 259:6
  269:23 270:5 277:6
  307:10 427:20
claims 271:12
clarify 241:11 251:16
  256:19 393:24
class 370:17 387:22
  388:11,13,17
classes 370:9 371:4
  387:23 388:3
  406:18
Clayton 349:19,22
  350:17 351:9
  362:13 406:2 408:6
  408:9
Clayton's 350:1 351:6
clear 218:12 225:7,17
  227:8 232:2 235:5
  275:3 323:19
  332:19 338:24
  340:10 341:24
  350:8 359:24
  360:18
clearly 361:2 401:18
client 216:16 224:10
  224:15,18,20 225:1
  225:16,19 240:13,14
  245:17 263:3
  275:10 276:12,19
  277:13,18 290:15
  343:1 346:22 347:2
  376:22 397:19
  410:17
client's 270:6 427:16
  428:1
client-patient 304:11
clients 242:3,4,4,6
  250:12 255:14
  269:24 270:15,18,24
  273:5,12,15 308:20
  348:4 425:7,13
clinic 223:12
clinical 223:5 224:5
  283:24 285:2 296:6
  334:24 335:3 337:5
  369:19
close 341:20 364:23

Cod 339:18 341:15
  413:9
code 244:11 281:19
  298:19,22 310:5
  312:1,4
collaborate 239:18
colleagues 236:20
  285:19 425:14
  433:18
collect 307:5,10
collection 259:18
  280:6 330:7
college 210:9 212:8
  216:9,16 219:8
  229:21 230:13
  235:4 241:2 264:17
  294:3,23 295:2
  313:14 320:20
  386:21 388:8
  394:22 396:22
  404:3,10,18 405:23
  406:5 407:6,9,9
  410:9,20 426:15
  427:6,7 428:9,24
  437:7 438:1 439:6
colleges 234:4 387:1
combined 325:7
  337:18
come 239:8 243:2
  244:18 245:1
  274:12 293:9
  304:24 305:15
  312:16 318:4 337:2
  343:1 352:12
  361:18 433:2,10
  434:22
comes 227:12 334:5,6
  334:13
comfortable 257:4
  359:17
coming 223:10 294:4
  334:10 432:3
commerce 246:9
commercial 226:21
commitment 401:7
committee 216:17
  229:5 230:14
  263:23 264:15,19
  265:3 349:11
  350:17,20,21 351:14
  359:3,9,17 360:19
  360:20;22,23 361:17
  361:22,23 399:11,14
  405:1,5,19,22 406:2
  407:17 408:9
  428:12 430:1,2

432:4,11,15,21,22
  433:3,6 435:8,18
committee's 359:10
commonly 335:3,6
Commonwealth
  437:10,11
communicate 396:8
  396:10 417:7
communicated 349:15
  360:10 414:10
communicating
  414:12 417:4
communication 414:3
communications
  308:20
companies 262:11
  263:5
company 255:17
  287:10,15
compare 273:17 274:9
  278:14 319:8 325:8
compensated 367:20
competition 263:3
compilation 269:9
  270:18,20 359:19
compilations 428:13
complain 385:22
complained 418:2
complaint 216:11
  255:22 257:6 280:9
  423:7,10
complaints 426:4
complete 227:14
  292:16 439:12
completed 381:12
completely 227:1
  274:17 415:24
complex 402:21 403:2
complicated 234:17
comply 391:21
composed 272:23
  330:21,23 331:1
computer 248:19,20
  248:21 249:4
  298:13,17,20 354:20
  375:21 376:1,4
computer's 376:14
computers 241:9,12
  241:13,14,20 243:3
concern 218:2
concerned 361:6
condition 359:15
  361:4,19 433:5
conditioned 358:21
conditions 358:15,16
  358:19,22

conduct 283:13
conducted 320:8
  326:19
conducts 351:10
conference 236:7,8,15
  236:22 323:19
  358:6,21,24 363:3
conferences 231:15,15
  283:23 301:20
  384:14 433:19
confidence 401:24
confidential 337:11
confirm 318:16
  330:10
confused 223:3
  348:20
confusion 257:9,17,20
Congress 210:23
  305:3,7
conjures 308:16
connect 349:22
connected 336:16,19
  336:22,22 349:19
  364:14 365:15
  366:10 370:14
connection 285:17
  311:14 335:21
  336:1 381:14
  394:20
consider 294:5 321:15
  322:19
consideration 337:16
considered 228:13
  332:21 384:15
considering 359:2
consists 277:6
constables 286:13
constellation 368:19
constitution 394:21
consult 289:23
consultant 226:16
  260:10,19 324:20
  396:12
consultants 325:2
consulting 246:19,23
  247:14,17 286:8
contact 283:2,6
  323:15,16 394:6
  414:16 420:11,12,15
  425:10
contacted 253:8,15
  285:19 311:24
  321:12,22 322:2
  323:18 425:7,7,13
  425:19
contacts 231:6

contained 297:5
contains 397:11
contend 217:9
content 284:4 383:12
contention 217:7
  417:15
contents 300:2 314:4
  357:16,20,21 386:5
context 272:11 302:1
  308:14 317:22
  389:16 400:2
  434:16
continue 254:15 255:5
  271:21 343:11
  406:11 439:18
continued 405:10
  406:10 408:10
continues 318:24
continuing 228:12
continuously 220:15
contribute 219:17
  233:12
contributed 394:2
contributing 283:22
  386:7
contributions 326:23
controversy 216:12
  217:4
conversation 237:4,12
  321:21 328:19,22
  344:4 348:14 359:5
  433:9
conversations 329:22
conveyed 225:22
copied 269:23 271:4
  428:21
copies 225:4 252:10
  261:14,23 262:16
  276:20,20 277:19,20
  278:6 297:20
  298:11,16 373:22
  382:11 412:19
copy 245:14 259:1
  260:13 261:19
  262:20 271:24
  300:1 310:17
  311:23 312:23
  371:15 372:10
  390:11 398:1,8
  399:4 400:9,11,12
  420:1
copying 270:8 271:1
  273:4,12 274:20
  275:18 276:11,23
  278:11,22 292:21
copyright 213:10

257:23 259:2,6,12
259:16 268:18
269:5,7 270:19
277:6 342:17
copyrighted 258:10
273:5,17 363:21
428:9
copyrights 254:18
259:8
core 391:9,24
corner 343:15
corporate 264:2
267:20 290:2,3,9
291:18 293:12,17
344:9 345:2,6,13,18
409:8,17,23 427:4
corporation 281:18
288:5 332:17
404:20 405:3,8,9,15
405:18 407:19,24
408:23
correct 222:21 226:6
226:7 230:20
231:20 236:17
237:14,22 238:18
239:2 240:14
242:13,14 246:24
247:1 249:14
250:19 253:16
254:24 257:9,12,15
259:14,19 260:2
261:5,8,9,12 263:21
263:23 264:5,7,10
264:11 265:7
266:12 269:4 272:7
272:16 273:1,2,9
274:1,2 275:5
278:22 279:4 281:6
282:1 284:8 291:21
294:19,23 295:8,12
298:14,18 302:4
303:13 305:8
313:16 315:21,24
316:3 317:1 319:23
324:15 331:6,12,15
331:22 335:1
341:16 346:8
348:18,19 349:4
350:18,23 351:6
353:2 355:8,21
356:17 358:6
360:17 365:20
371:24 376:5 378:4
378:8 380:22 381:5
381:18 383:2,15
384:7 385:18

387:20 390:7,13
391:15 394:18,22
395:12 399:1,2
402:24 405:23
406:3,7,24 407:11
408:21 409:2
410:10,15,18 412:14
413:9,15 418:3,6
420:8 423:11 424:2
424:21 425:17
correcting 386:13
390:12
correction 438:4
439:16
corrections 438:17
correspond 369:13
corresponded 369:12
correspondence
247:20,21,23 250:12
293:24 369:8,11
corroborated 229:4
costs 315:6
counsel 436:1 437:13
437:14 439:9,21
counsel/witness 439:1
countless 310:10
countries 233:11
285:17
country 232:17 234:9
234:14 242:21
243:22 434:19
County 365:4
couple 217:17 221:22
228:4 254:16
259:23 426:2
Courier 439:1
course 228:23 229:6,9
234:1 284:4 340:9
381:4 389:3 431:19
courses 220:15,23
386:21 387:8,9,12
388:1 406:11,11
coursework 369:19,23
369:24 370:14
court 210:2 306:13
420:19,22,23 421:2
423:8,8 437:1
cover 216:22 217:1
258:4,5 313:6,7
324:18 342:18
351:22 357:20
covered 216:23
crashed 375:21 376:1
crazy 426:4
create 231:6 233:16
293:13 303:3

324:21 354:15
356:8 376:13
created 248:10 252:23
252:24 253:3,23
254:3,7 259:12,13
266:23 273:24
284:13 298:2
339:14 342:6
346:24 347:1 354:6
354:11 355:24
356:15 357:2,4
367:5 373:20,24
374:3 422:5,6
428:12,17 429:4
creating 220:21 235:7
235:9 238:1 283:12
323:15 339:24
356:2 377:7
creation 241:1,4,6
263:22 284:6
381:20
credentials 220:1
228:7 232:22
390:13 413:15
414:22 431:23
432:7,22 433:23
434:20,23 435:2,6
435:20
credit 284:4 428:23
428:23
CRR 210:20 437:24
curious 299:17 429:16
current 252:22 401:17
currently 219:20,22
230:23 253:7 290:3
292:8 305:1 416:4
curriculum 234:5
266:16 270:21
315:5 359:12
363:14 369:18
391:9,14,14,16,17
391:19,21,24 392:1
408:17
Curtis 239:11,12
240:1,6
cut 315:9 351:2
420:16
cut-and-paste 419:4
CV 316:9 379:8
380:22

_____ D _____

D 212:14 213:1 216:1
216:3
damage 224:9
damaged 423:14

429:5,5
damages 215:7 422:23
423:9
damaging 226:17
dash 302:12
data 242:1 376:14,16
377:8,13
date 220:6,24 221:1
262:4 321:23 322:3
338:13,16 347:14
354:21 374:21
399:17 414:5
438:23 439:20
date's 353:16
datebook 416:2
dated 240:19,23
272:22 378:7 380:5
412:23
dates 345:23
Dave 216:8
David 212:2
day 371:7 393:19
398:16 435:23
days 225:3 373:1
428:7 429:13
430:10
deadlines 435:10
deal 219:17 234:1,17
dealing 224:4
deans 234:3
death 347:14
December 351:24
352:5 353:5 378:7
380:5 392:16
decide 293:14 323:7
405:20 421:4
decided 247:4 262:20
406:6
deciding 359:8
decision 262:21
410:22,23,24
Dee 430:24 431:19
defamation 228:5
defamatory 226:12
228:13 229:8 422:3
defendant 254:8
defendants 210:13
262:9
define 396:7
definition 218:9,12
definitive 350:8
definitively 343:18
degree 218:18 219:8
219:10,13,15 229:24
320:22 347:21
369:1 412:20

deliberate 227:8
delivered 322:24
Dennis 235:13,14,16
235:21 236:2 240:4
denote 342:19
depending 284:18
292:7
depends 241:23
327:12
deponent 438:24
439:11
deposed 306:1,1
deposition 210:15
289:6 299:9 394:16
437:7 438:16 439:5
439:15
Derby 226:24
describe 225:24 269:6
270:22 292:5
296:19,22 316:4
323:13
described 233:17
237:4 266:15
267:24 281:18
322:21 358:24
359:19 370:8
429:19
describes 298:3
description 269:1,18
359:11 428:15
descriptive 295:11
design 391:9
designation 260:24
desk 310:20
detail 426:19
detailed 330:17
determined 396:24
develop 283:13
321:16 401:3
428:20
developed 219:9
235:3 247:2,8 249:7
266:21 307:1
320:24 321:1 323:5
327:14 370:11
391:16 392:1
developing 292:8
315:4 320:22 326:2
359:12
development 223:19
299:4 301:19
308:17 309:2,3,4,9
309:10 396:12
402:1
devote 308:9,12
309:10

devoted 308:15
  309:18
Dickison 212:13
  215:10 216:15
  221:21 224:7
  227:24 241:8
  263:22 265:1
  294:12,14 296:12
  316:14 318:16
  346:3,4 364:11
  386:3 439:12
Dickison's 224:19
  240:14
dictate 249:6
died 312:4 365:14
  366:22 387:17
Diff 302:12
difference 304:4,7,10
  431:6
different 232:13 234:2
  237:18 243:19
  255:14 262:22
  267:11,14 270:8,13
  274:12 275:12
  307:23 324:2
  331:14 334:18
  355:13,19 368:17
  386:7,8 387:24
  402:19 409:8
  411:20 414:2
  415:18
differently 259:15
difficult 270:1 278:12
  337:21
difficulty 216:14
  348:2
diplomate 431:14,15
  431:20 433:17,21,22
  435:20
diplomates 432:12
  434:6,7
direct 216:5 224:2
  302:21 329:1,12
  404:17,23 428:22
direction 367:4
  431:11
directly 223:18 239:7
  270:9 286:22
  407:10
director 255:7
directors 345:1
disagree 232:7 265:8
disagreements 402:8
disaster 287:3 333:11
disasters 285:23
discard 249:22

discovery 250:16
discrete 262:10
discuss 404:8
discussed 350:24
  361:23 362:2
  389:18 394:6
discussion 362:6,9
  363:1 418:9 430:14
  433:3
disease 285:23 286:3
  286:9,13 287:7
disorganized 394:12
dispersed 229:10
disposed 377:16
dispute 257:17,20
  258:10
dissections 231:5
distinct 241:13 247:2
  249:8
distinction 225:17
  255:8 271:5 309:1
distinguished 433:17
distribute 341:8,10,14
distributed 298:14
  310:14 342:8 422:6
distribution 262:2
distributions 263:11
District 210:2,3
  420:22
disturbed 340:11
divest 279:21
dkluft@foleyhoag.c...
  212:7
doctor 349:12 368:15
doctors 368:16
document 213:20
  215:1 217:6,13
  225:14 226:9
  240:13 245:6,8,14
  245:16 246:6
  250:16 256:14,15
  257:21 258:2,6,7,23
  259:12,18 260:5,9
  260:17 262:3,8
  263:15,18 264:12,13
  264:16 265:13,14
  266:3 267:3,7
  268:13,17,20,20,22
  269:2,19,21,23
  271:8,24 272:2,4,19
  272:21,23 273:24
  274:9,10,11 275:4,9
  275:10 276:16,17
  277:1,3,8 278:8,18
  280:5,19,21,24
  283:9,12 287:8

292:19 294:8 297:4
  297:7 299:21
  312:17 313:1 316:9
  316:17 317:7,12
  318:18 319:23
  321:11 322:4 328:3
  335:11,13,18,19
  336:15 338:4,6,8
  339:4,6,11,13,15
  342:1,17 343:22
  351:16,21,21 353:20
  353:24 355:10,15
  356:22 357:9,10
  362:15,20 363:21
  371:9 373:15,17,20
  374:2 375:3 377:3
  377:19 379:15,19
  381:2,5,6,7 382:16
  382:21,23 385:9
  390:6,19,24 391:3
  391:11,12 392:6,7
  392:10,14 397:17
  398:13,17,21,23
  399:24 403:20,22
  404:5 411:7,10,21
  411:22 412:1,5,23
  415:1 417:2 419:1,7
  419:12,14,16,24
  420:4 422:22 423:7
  424:7 435:6
document's 284:6
  335:16 342:15
documentation
  368:22
documents 213:9
  217:6,9,23 218:22
  218:23,23 225:2,6,8
  228:10,17 240:16
  242:19 245:11
  246:10,13 248:11
  250:9 251:2,8,11,14
  252:10 253:22
  254:1,3,7 258:11,14
  258:18,18 259:4,5
  259:19 267:14,16,18
  267:19 270:14,19,24
  273:17 274:14,19
  275:19,23 276:7,10
  277:17,18,22,24
  278:4,6,9,14,15
  280:6 292:21 297:8
  297:11 300:6,10
  330:4 338:7,22
  339:9 342:20
  353:10,14,19 363:7
  363:9,12 364:3

373:1,1,2 376:12
  392:2 403:24 404:7
  410:3,6 412:17
  417:14 418:16,17
  422:5 426:19 427:1
  428:9
dog 351:3
dogs 238:7 386:11
doing 231:5 241:24
  248:23 268:23
  282:18 295:11
  336:24 347:17,19,22
  387:5 409:1
domain 234:13 251:20
donate 286:22
donation 310:13
  401:8
donations 333:16,19
  333:21 334:1,2,10
  334:15,19,20
donor 309:8
donors 402:14
double-sided 258:24
doubting 296:23
download 377:9
downloaded 280:7
Dr 216:7 228:6,11,13
  228:18,22 236:9,11
  237:5,8,10 238:16
  238:23 241:13
  250:18 271:21
  278:15 291:4,9
  321:24 322:14,18
  328:16,20,22 329:8
  329:10,12,14,19,22
  342:24 343:6,12
  349:19,22 350:1,16
  350:22 351:6,9
  357:22 358:8,23
  360:10 361:10
  362:2,12,12 363:2
  365:12 366:6,7,22
  367:2 368:9 369:8,9
  369:17 371:13,23
  372:10,14,16 374:12
  374:13,17 378:2
  379:24 380:6
  382:24 383:8,17
  384:4,6 385:15,17
  386:10 390:12
  391:5,11,17 393:2,2
  393:4,5,15,16,22,23
  394:3 396:2 398:6
  398:24 399:4,18,19
  400:7,9 406:1,1
  408:6,9 411:12,19

412:17 414:5,16
  416:1 417:4,7,10
  421:14 422:9
  426:15 427:6,12
  428:9 430:8,9,17,22
  430:24 431:1,19
  432:17,19 435:3
draft 294:8 302:11
  310:11 394:24
  395:1,15,19 424:10
drafted 317:1,24
drafting 267:5 394:21
drags 371:7
drive 376:11,17
drugs 304:14,18
dual 257:18
Dubai 342:24
duties 312:11
DVM 210:5

E

E 213:1 216:1,1,3,3
E-l-e-a-n-o-r 298:23
earlier 229:13 230:10
  253:9 312:18,23
  313:5 314:3 345:3
  353:17 355:24
  394:6
early 280:3 367:24
  414:5
earmarked 332:1,3,6
earnest 319:19 320:1
easier 246:15 270:4
  279:6 309:19
  336:13
East 383:22
easy 277:16 307:9
  309:15 431:24
economic 423:19
economist 434:10
educated 359:13
education 357:18
  366:5 367:5
educational 219:18
  233:9 266:14
  269:17 283:16
  284:21,23 285:15
  308:22 315:11,14
  320:6 326:10 333:1
  333:7,8 338:12
  357:17 364:1
  370:22 371:2
educational-program
  269:1
Edwin 365:12
EEI 262:19,19 324:21

effort 432:15
efforts 285:18 323:14
   381:19
either 226:8 242:20
   253:16 263:4
   288:17 310:17
   337:14 368:14
   417:11 430:8
Eleanor 244:11
   298:19,22 299:3,7
   310:5,9,19 311:7,24
   312:4
electronic 416:1,11
element 277:19
elements 270:20
   276:21
elephants 238:11,13
   238:14
elite 433:21,24
Ellen 339:13,18 340:3
   340:9
email 214:11,12,13,14
   214:15,16,17,18,22
   214:23,24 215:2,3,4
   215:5,6 242:2,10
   243:23,24 244:2,5
   250:17 357:6
   371:17,23 372:2,7
   372:10,18 373:8,10
   374:13,21 375:4,14
   377:21 378:2,7,10
   379:9,16,24 380:5
   380:11,13,16 382:18
   384:1 385:10,14,16
   385:20 390:20
   391:5 392:11,16
   398:18,24 400:3,7,9
   400:12 401:20
   402:12 403:16,18
   411:12 412:21
   413:1,5,14 415:3
   417:1,5,10 418:10
   418:12,14,22,23
   419:3,9,13 420:1
   435:7
emails 244:16 371:12
   373:11 374:16
   376:20 383:11
   391:4 418:19 422:4
employ 242:12
employed 350:1
   437:13,14
employee 368:15
   437:14
employees 242:4
   348:9

enclosed 363:10
encouraging 287:22
encyclopedic 275:22
endeavor 338:3
endeavoring 389:20
ended 396:23
endorse 342:1
endowing 400:23
ends 315:8
energy 220:20
engage 281:24 396:5,7
engaged 395:2 397:1
   397:2
engagement 247:14
engineering 386:22
England 231:23 232:3
   232:11,12,15,18
   233:18 239:8 286:2
   286:8,22 379:2,11
   425:20
English 233:1
enjoying 374:8
enter 220:8 242:1
entire 258:9 272:2
   309:22 325:6
   403:15 430:1
entities 409:9
entity 293:12 308:1
   325:17
entry 331:18
envelope 412:13
equally 305:22
equine 214:7 220:16
   221:14,16 230:23
   231:7,22,24 246:7
   246:11 248:11
   249:10,19 260:8
   285:15 295:20
   296:14 298:5
   300:16 303:13
   310:10,17 311:19
   324:23 336:3 337:6
   337:19 357:11
   360:2,5 361:11
   363:6,13 373:22
   382:12
equipment 325:19
   326:9 327:7,11,17
   327:18
equivalent 407:17
Erickson 413:12
   417:11 418:1
   419:13,17 420:12
   423:14 424:3
errata/signature
   439:16,20

erratic 426:8
especially 304:13
   367:6 401:15
   433:21
Esq 211:4,5,13 212:2
   212:13,14 439:11,12
essential 223:14
   321:17
essentially 266:17
   347:2 359:12
established 345:3
establishment 315:7
estate 301:10,16,22
estimate 316:15
   324:14
et 437:7,8 438:1,2
   439:6,7
ethics 304:8
Europe 320:8
euthanize 307:9
event 223:11 295:22
   305:16 341:20
   426:9 429:7
events 221:22 402:12
everybody 432:16
evidence 437:9
evolved 282:6 327:14
exact 329:9
exactly 238:19 249:13
   286:7 288:4 325:12
   361:12 405:14
   409:21 421:9 423:5
   433:11
exam 432:13,16,18,23
EXAMINATION
   216:5
examinations 213:3
   381:14
example 218:12
   262:22 277:7
   283:22 286:1 287:2
   298:9 310:15
   312:14 327:16
   370:22 404:23
   407:16
examples 228:5 285:8
   285:12,13
Excel 330:18
Excellence 246:7,11
   248:11 249:10,19
   260:8 295:20
   296:14 300:17
   310:10,17 311:19
   324:23 360:3,5

361:11 363:6,13
   373:23 382:12
excellent 398:4
exchange 371:15
   382:24 383:4,8,9
   385:15 398:24
   399:4 422:7
exchanged 383:11
exchanges 435:8
exclude 277:9 346:22
excluded 278:16
Excluding 276:14
   373:2
excuse 248:10 289:4
   326:21
executive 299:7
   437:10
exhibit 245:9,10 250:1
   253:19 255:20
   257:22,23 258:1
   265:11,20 268:10,12
   271:18,24 272:16,19
   274:2 280:5,16
   299:23 300:1
   312:20 314:12
   317:9 322:4 328:3,5
   328:7,10,12,14,18
   330:2 335:11,17
   338:5 339:5 342:16
   351:16,17 353:21,22
   355:11 357:11
   362:17 371:17
   375:4,9 377:21
   379:16 382:18
   385:10 390:4,20
   392:11 395:23
   397:8,11 398:18
   400:3 403:17,18
   411:8,22 413:1,17
   415:3 417:1 418:10
   418:12,14 422:23
   423:1,3
exhibits 210:1 213:6
   215:10 255:22
   328:17 422:22
exist 249:18 275:17
   330:19
existed 277:16 284:7
   285:6 297:17
   353:12
existence 292:15
   293:10 373:6,16
existing 277:15
expand 321:7
expect 323:24 431:13
   431:22

expecting 244:17
expenditure 332:20
expenditures 331:9
expense 332:23 333:3
   333:7
expenses 332:8,11,12
   332:13,14,16,18
experience 231:5
   237:21 266:24
   370:22
experiences 337:6
expert 305:2,18
expertise 227:3
explain 219:2 232:10
   268:22 298:1
   395:13 404:1
explained 239:6 323:2
   337:3 359:5,7
explaining 414:13
explains 395:11
explore 337:24 338:2
   396:11
expressed 358:11
extension 234:23
extensively 348:4
extent 266:19 341:13
external 376:11
extra 426:9

──────── F ────────
F 211:13
facilitate 432:1
facilities 221:5 337:7
facility 222:13,13,16
   239:22
fact 255:12 258:9
   272:6,11 281:2
   322:15 342:5
   347:23 360:8
   422:10 428:21
   434:6 435:3
facts 270:20 428:13
faculty 387:11 434:14
fair 224:13 231:17
   238:6 251:21
   256:20 261:2 263:8
   263:8,18 267:23
   284:20 309:1,12
   314:10 316:15
   325:24 411:5
fairer 327:10
fairly 218:1
Falcon 210:18 212:15
false 229:8 307:10
   422:3
falsehood 228:7

far 221:14 264:8
 275:16 276:9
 338:13 356:6 361:6
 398:11 416:20
 425:4
farm 210:6 214:4,5
 216:18 218:24
 219:3,21,21 220:6
 221:8 222:18,19
 230:3 233:15,19
 234:22 235:22,23
 236:1,4 239:17
 240:7 241:5,7,13,17
 241:20 242:12
 247:3 251:24 252:9
 252:20 253:10,24
 256:8 264:17 279:7
 279:8,9,13,17 281:3
 281:9,23 282:11,18
 284:3,10,15,21
 285:6,21 286:19,24
 287:4,20 288:1,20
 293:12,15 295:19
 297:9 299:19 301:7
 301:19 307:16,18,21
 307:22,23 308:1,4
 311:18 313:23
 323:22 324:6 325:7
 325:15,20 330:12,15
 332:8,10,11,15,17
 333:10 336:1,17
 337:1 339:14 340:1
 340:2,6 341:1,6
 342:22 344:9 345:2
 351:17,22 353:22
 354:7 357:5 358:2
 359:1 362:4 363:22
 367:2,14 376:24
 381:19 396:15
 404:2,17,19,21,22
 405:12,16,17,20
 406:7,10 407:4,5,10
 407:21 408:2,20,22
 409:6 410:24
 414:24 419:7,10
 424:1,3 425:11
 428:1,2
farmer 210:22 286:16
farmers 286:14
farms 320:17
farrier 217:19,20
 218:2 219:7,8,10
 223:12,14 229:23
 231:6,15 239:12
 240:2,3 319:16,18
 320:11,23 338:11

339:2 406:11,12
farriers 220:18
 223:13,16,18,21
 224:6 320:12,14
 322:23 323:11
 406:11
fast 216:24 330:4
 335:15 415:8,13,20
faster 394:13
favor 304:18
fax 210:24 211:8,16
 212:6,17
FBI 307:1
feature 416:9
February 272:22
Federal 305:1
feel 217:1 423:18
feeling 337:22
feet 286:17
Feinberg 394:18
 395:2 404:6
fellowship 302:7,10
 364:8,10,15 365:11
 366:1,2,4,23 367:1
 367:12,14,17 368:1
 368:23 369:9 370:4
 370:15,18,20 371:5
 381:12,15
fellowships 303:4
felt 224:8 239:6 435:3
 435:4
field 231:7 286:11
figure 268:19 325:18
 352:7 368:18
 370:23
figured 216:8
figures 319:9
file 252:13 258:3
 288:4 378:15
filed 272:24 280:10
 281:5 423:7,10
files 375:18 376:8,15
 360:1 390:15
fill 377:9
final 390:5 408:21,24
 427:15 435:9
finalist 287:7
financially 437:15
financials 426:20
 427:13
find 236:16 278:11
 320:11 336:14
 395:4
fine 314:11 318:19
 328:1 431:14
finish 221:1 227:15

228:1,2 411:8
finished 218:5 219:11
 229:11 304:15
 375:11 435:21
firm 246:20,23 247:15
 247:17 396:2,3
first 213:8 217:18
 226:12 233:1,8
 236:21 245:11
 246:8 247:10
 261:13,24 262:2
 263:14 279:13
 280:19 281:12,15,16
 289:2 293:9 295:18
 298:14 309:2
 313:18 314:20
 316:12 318:21
 324:13 339:10
 341:18 343:22
 352:17,20 369:21
 371:11,12 375:16
 380:4 397:13
 419:12
fiscal 308:3
fit 368:18
five 259:21,22 312:9
 373:1 415:14
five-minute 271:16
 394:13
flak 401:21 402:5,7,9
flight 378:14,16
flip 344:22 357:14
Floor 211:6,14
Florida 235:15 239:21
 239:23 290:13
 406:23
flyer 297:1
focus 220:20 235:6
 237:16 305:16
 381:19
Foley 212:1
follow 335:9 359:10
 360:1 390:15
following 233:24
 254:17 266:21
 285:22,23 313:9
 335:10 358:14
 391:20
follows 369:19
followup 217:18
 390:9
Ford 288:12,13
forget 217:12 237:10
 237:11 435:22
forgive 216:23 226:2
 235:19 434:10

forgot 236:3 403:21
form 256:11 258:2
 283:10,17,17 427:17
formal 282:23
format 331:5 439:18
formation 293:11
 404:10
formatting 261:2
formed 392:20 405:15
forming 282:21 283:3
 283:7 360:22
forms 283:19
forth 323:12 386:4
forward 313:22
 359:22 361:3 362:5
 394:24
forwarded 380:1
 422:5
forwarding 378:7
found 246:18 334:3
 337:4 341:13
foundation 213:16
 314:13 337:10,10,11
 337:15,16 396:17
 426:13
foundations 286:20
 335:24
founded 281:23
founder 255:7 264:20
 308:19 389:12,17
founding 433:22
 434:7
four 259:18,20 280:2
 415:14
Fourth 211:6
frankly 234:6 274:10
 307:9 409:5
free 340:7
friend 311:7,9
front 225:20 226:8
 229:5 272:1,3,5
 317:7 388:13,17
 397:4 432:15
frozen 434:23
fulfills 431:17
fully 370:10
function 307:20 310:8
 310:23
funding 213:19 220:2
 312:15 317:9 318:4
 337:15 434:17
fundraising 218:23
 299:5 301:20,21
 302:3 307:17,20
 308:10,13,16,18
 309:2 310:6 312:3

312:11
funds 285:22 301:18
 308:2,4 319:5
 324:18
further 323:15,16
 327:21 437:14
future 295:12,15
 300:24 322:9
FYI 419:14,16

G

G 216:1,3
gathering 318:6
general 230:8 235:21
 269:6 270:3 297:5,8
 302:1 305:21
 325:15 327:10
 332:7,7,11,12,14,16
 332:17,21,22 333:3
 333:4,6,15,19 334:4
 334:9,19 363:21
 364:21 404:15
 428:10,16
General's 305:18
 395:5
generally 242:1 257:8
 267:13 282:5
 293:21 301:22
 334:1 351:4
gentleman 229:15
 287:19
genuine 419:1 420:1,4
getting 234:7 258:21
 267:18 270:7
 326:21 329:11
 401:21
giants 270:10,11
gift 435:6
Gilch 414:9
Gillette 228:6,11,22
 236:9 237:5 238:16
 238:23 250:18
 350:22 358:9,23
 360:10 361:10
 362:3,12 363:2
 369:17 371:13,23
 372:10,15,16 374:13
 374:17 378:3
 379:24 380:6
 382:24 383:8,17
 385:15,17 386:10
 390:12 391:6,18
 399:1,5,18,20 400:8
 400:10 406:1
 411:13,19 412:17
 414:6,16 417:4,7,11

421:14 422:9 430:9
430:22 432:17
435:3
Gillette's 278:16
398:6 426:15 427:6
427:12 428:9
430:17 432:19
give 218:13 223:4
224:6 234:12 244:7
276:22 277:7 278:8
283:22 285:8,13
286:1,14 296:1
302:23 308:11,21
309:16 334:21
337:13,21 339:17
349:16 354:14
388:9,20 400:1
403:23 422:13
427:5 429:10,13
432:21 434:13
435:4
given 246:22 247:2,5
293:23 306:18
333:20 357:24
379:5 401:16 402:4
415:23 431:22
435:20
gives 231:13
giving 244:4 298:9
310:18 346:14
347:5 426:14
globally 429:5 434:1
go 225:8,13 228:16
231:7 232:20
236:21 241:10
263:2 272:1 273:16
274:23 276:3
277:23 293:14
294:11 317:15
320:2 325:18
334:21 352:17
360:3,15 362:5
370:17 376:13
379:4 384:9 388:24
394:13,24 401:12
402:14 415:16
418:20,21 427:14
433:15
goal 233:19
goals 233:15
goes 256:11 263:19
281:22 316:14
going 216:22 217:24
221:23,24 224:12
226:24 228:16
235:12 236:21

241:10 245:8,13,23
250:3 254:11
255:23 257:21,22
261:19,22 265:15,21
272:1 280:18,19
286:13 297:11
299:21 300:2,5,8
301:19 302:17
309:21 311:11
312:24 314:3
317:20 321:7 330:3
335:14 337:12
339:4,5 340:12
343:14 344:22
346:14 347:5
351:19 355:9
357:15 359:22
360:16,21 361:3
362:19,21 367:7
371:7,9 377:19
379:2,15,18,19
396:1 397:4,20
403:17 404:2,9,17
406:4 408:8 411:16
411:20 415:2,7,15
419:5 420:15
422:21 426:11
431:12 432:3,6,16
435:15,17
good 216:7 219:17
254:14,14 256:21
288:6 337:22
426:17 435:17
Goody 357:22
gotten 222:24 262:24
376:4 394:12
402:17
government 233:2
governmental 285:20
306:8,10,11
Governor 437:10
graduate 386:22
388:10,16
graduated 364:24
387:17
grammar 386:14
grand 306:23 307:8
370:22
grandfathering 432:5
grant 213:17 309:6,7
313:18,23 314:13,16
314:17 317:23
318:4 324:9 433:19
434:17
grant-making 318:5
grants 219:1 307:23

314:8 318:4 337:13
granular 271:11
great 311:9,12
greater 320:6
green 356:24
ground 216:23 217:1
grounds 299:17
group 292:12 304:24
345:4 360:14
433:21 435:3
groups 219:4
guess 223:9 273:22
280:4 302:20,22
307:3 325:11 368:8
381:23 389:3
429:19
guessing 349:3
Guide 214:9 357:12
guidelines 219:9
310:19 329:3
359:10 408:17,18
Guise 365:12 367:2
369:9 393:2

_____ H _____

H 210:20 437:6,24
half 347:13,15 371:23
372:2
halfway 386:20
Hamilton 287:20
Hampshire 279:11
280:8 307:16 367:3
hand 263:10 334:22
369:6
handed 398:8 432:6
hands 335:4
handwriting 262:18
300:14 301:12
302:10 314:20,24
393:19 396:18
412:3 413:19
handwritten 213:20
215:1 249:20 302:8
328:3 398:6,10,15
411:22
handy 227:18
happen 323:8 334:22
335:3,4 433:22
happened 286:7 373:9
377:16
happy 227:12 273:19
285:12 361:1,18
421:1
harassment 424:20
hard 308:24 376:17
harm 224:14,17 279:9

346:24 347:1
425:24 427:16,24
428:2,3,5,8,22
harmed 228:23
Harvard-affiliated
364:18
Haven 213:23 328:8
336:6
he'll 431:23
head 329:24 395:9
heading 418:24
headway 335:15
health 220:16 298:6
322:24 428:16
health-care 234:15
235:7,8
hear 312:10
heard 229:7 233:2
299:10 311:18
347:3 389:6 435:12
435:14
hearing 306:6 308:15
353:14,15
Heidi 288:12,13
held 304:6
Helen 307:6
help 233:9 242:20,22
264:22 284:13
285:23 287:6
292:10 293:13
307:8 312:14
313:12,13 330:2
338:1 340:6 359:3
370:16 394:24
395:15,18 400:24
401:1,2 431:7
helped 249:11 286:20
286:20,21 310:9,11
355:2
helpful 286:23 287:21
299:4 337:4
helping 340:10
helps 296:1 310:6
Hi 373:7
hide 288:16
hieroglyphics 377:14
high 233:24 286:16
high-quality 431:5
hire 226:23 248:23
255:15 309:3,4
347:10 348:7 426:8
hired 246:19 347:16
347:18,24 348:3
394:17,20,23
hiring 255:16
historic 324:5,7,17

historically 324:14
history 297:9 311:16
340:15 401:16
Hoag 212:1
holidays 374:8
home 243:1,2 298:20
home.comcast.net
356:6
Homecoming 210:5
214:4,5 216:18
218:24 219:3,21,21
220:6,13 221:8
230:3 233:15,19
234:21 236:1,4
239:16 240:7 241:5
241:7,13,17,20
242:12 247:3
251:24 252:9,20
253:10,23 256:8
264:17 279:7,9,16
281:3,9,23 282:11
282:18 284:14,21
285:6,21 286:19,24
287:4 288:1,20
293:12,15 295:18
297:9 299:19 301:7
301:19 307:15,17,20
307:21,23 308:1,4
311:18 313:23
323:21 324:6 325:7
325:14,20 330:12,15
332:8,10,11,15,17
333:10 336:1,17
337:1 339:14 340:1
340:1,6 341:1,6
342:22 344:8 345:1
351:17,22 353:22
354:7 357:5 358:2
359:1 362:4 363:22
367:13 376:24
381:19 396:15
404:2,17,19,21,22
405:12,16,17,20
406:6,10 407:4,5,10
407:21 408:2,20,22
409:6 410:24
414:24 419:7,9
424:1,3 425:11
427:24 428:2
HomecomingFarm...
354:3,8,12 355:7
homecomingfarm@...
372:18
Homestead 253:7,13
homework 246:22
247:2

Hong 231:23 232:3
348:16,21
hoof 223:22 286:2
HOOFPAC 389:7,10
389:11
hooves 217:22
hope 337:11 374:7
378:13
horse 222:24 223:7,8
223:9,13 226:20,24
239:24 262:12
307:9 343:15 351:3
351:6,12 385:1,3
horse's 223:22 224:2
224:3
horseman 288:13
horsemen 285:19
349:7
horses 217:22 228:23
238:7 239:24
242:10 286:10
287:21 304:9
305:20 307:4
311:16,17 323:2
338:1 348:4,22
351:11
horseshoe 239:13,14
hospital 365:5,5,6
366:18 367:23
368:11,13,19
hospitals 364:17
365:7 367:10 368:4
368:7 369:6
host 253:5,6
hosted 253:13
hour 254:11,12
415:23
hours 308:9 426:3
housewife 243:7
human 232:17,20
233:24 235:8 266:8
266:22,24 303:6
367:9 369:20
384:22 391:10,20
392:3,4,21
human-medicine
267:8
human/vet 402:1
Hussein 343:5,6
Hutton 231:21,22
233:8 236:4,23
239:1,4 349:4 350:5
350:6 414:6
Hutton's 233:6,7
349:13
hypothetically 410:21

I
i.e 253:23
ID 368:3
idea 303:5 401:18
411:18
ideas 302:3
identification 245:12
257:24 271:19
280:17 299:24
312:21 314:14
317:10 328:4,6,9,11
328:13,15 351:18
353:23 355:12
357:13 362:18
371:18 375:5
377:22 379:17
382:19 385:11
390:21 392:12
395:24 397:9
398:19 400:4
403:19 411:23
413:2 415:4 418:11
418:13,15 422:24
423:2 437:9
identified 374:2
identify 236:19 258:6
268:13 310:15
328:18 337:19
ignorance 232:2,3,10
illegally 229:3
illusion 428:10,14
imagine 361:17
immediately 249:23
434:2
impact 224:2
impacted 286:9
imperfect 346:16
implied 350:10 382:1
important 433:14
impression 428:18
improve 428:15,17
inaccurate 381:8
inauthentic 374:2
incident 346:4,5 348:8
348:16
include 329:4 332:12
409:10
included 269:8 323:6
326:15,23 363:16
includes 266:13
including 250:9
incoherent 371:8
incoming 331:11
incomplete 225:9
292:17 355:14
incorporated 293:16

404:3 405:11,23
406:5 407:9 410:20
427:7
incorporation 263:16
264:2,5 265:12
266:5,6,12 267:6
277:9 281:3,9 394:5
394:9 395:16
397:23 403:8
404:10
incorporators 292:1
incorrect 381:22
382:2 391:6
incorrectly 222:1
independent 360:19
360:21 403:6
405:14 407:23
409:4
independently 231:1
231:13 407:23
India 238:15
indicate 310:3 374:17
indicates 331:20
indication 336:16
individual 226:4,10
304:20 318:7
323:21 333:22
334:17 387:24
individually 256:4,7,9
256:11,18 257:3
individuals 216:11
263:4 292:9,11
304:6 312:14
333:24 334:21
434:2
industry 226:20 227:4
235:21 262:13
inform 292:9
information 292:18
297:5,5 304:22
321:13,13 329:10,12
329:19 337:12
375:1 377:5,10
379:6,8,8,9 414:23
439:4,9
informed 267:13
301:22
infringement 277:6
410:13,18 428:8
infringes 225:19
ingratiate 340:23
initials 344:2
initiated 237:7
initiative 246:7,12
248:11 249:10,19
260:8 295:21

296:15 300:17
310:10,18 311:19
324:23 360:3,6
361:11 363:6,14
373:23 382:12
402:2
initiatives 266:15
injury 323:2
input 265:6 343:11
inquire 310:18
inserted 278:15
insistent 360:12
insisting 426:6
instance 242:17 295:8
330:18 331:17
333:8 346:1,16
373:23 386:10
399:7 406:1
instances 224:8 273:4
273:12 274:20
275:18 276:19
278:22
instantly 433:14
institution 365:15,18
365:19 366:10,14
371:2 425:21
434:15
institutions 219:16
364:14 433:18
instruct 342:3
INSTRUCTIONS
439:14
insurance 307:6,10
integrated 389:4
intellectual 428:18
429:15
intend 220:17
intent 283:10,13
385:24 386:5 390:5
intention 217:8
interact 404:9
interest 351:11
interested 359:2
437:15
Internet 356:14
internist 368:14
interrogatories 247:7
278:21
interrogatory 279:1,3
interrupt 262:6
312:24
interrupted 287:1
intervening 347:15
introduced 358:23
368:7,9,10
introduction 369:5

invented 239:12
invited 350:19,22
351:1,2,3
involve 295:15 367:17
421:10
involved 223:7,8,9,13
230:12 236:16,24
237:2,13,22 240:6
299:18 307:2,4
312:3 339:19 408:8
426:16
involvement 233:7
239:16 414:13
involves 224:1 315:4
involving 287:3
iPad 416:8,9
Irineu 290:11
IRS 281:19 333:20
334:17 425:17
Irvine 365:8 366:9,11
366:13,16,18,19,20
issue 238:17,21
254:18 266:11
305:15 348:13
349:7 350:3 406:3,6
413:8
issued 437:10
issues 239:7 305:21
307:2
item 332:1 361:6
itemize 327:22
items 326:5,8 332:3,6

J
J 211:4 212:13 439:11
439:12
Jackson 346:5,6,13
347:3 348:5,12,12
Jackson's 348:10
Jane 231:21,22 233:6
233:6,8 236:3,23
239:1,3 247:18,21
248:3 349:4,13
350:5,6 414:6
January 210:16 216:2
296:14 322:4 382:6
383:1 437:8,23
438:16 439:1,5
jeez 327:9
Jess 346:5,13
job 310:20,21 347:17
347:19,20,24
Johanna 399:7
John 394:3
Johnson 260:21,22
261:6,6,13,13,15,15

313:4,4
join 350:19 359:9
joining 359:2,17
  432:14
Joshua 212:14
journals 327:2,4
  384:17,20,22 433:19
jsegal@lawson-weit-
  212:19
judge 306:14,16 421:4
judgment 421:3,7,8
July 411:16 412:7,16
  412:23 414:5,5
June 261:17 262:4
  354:21 414:9
jury 306:23 307:8
justly 239:23

_____
**K**
keep 263:6 300:22
  310:2 352:11 416:1
  416:16
Kentucky 226:24
kept 240:21 250:17
  287:21 298:10,16,20
  300:18
killed 307:5
kind 218:15 220:10
  282:23 293:23
  309:2,3,9,10 327:11
  336:8 378:21
kinds 283:18 300:22
  368:17
Kingston 242:17,18
  243:18,21 291:20
  416:24 419:18
Klieman 211:3,5
  227:17 309:11
  314:6 318:17
  394:16
Kluft 212:2 213:5
  216:6,8 227:19
  245:8 256:20
  258:17 268:11
  271:13,17,20 280:14
  289:5 302:23
  309:12 312:19
  314:5,8 317:11,17
  318:12,15 327:24
  346:20 351:15
  355:17 362:24
  397:13,18 415:6,12
  415:15,19,24 416:4
  418:8 421:8 436:1
knew 236:21 243:8
  431:2,4 432:24

know 216:12 217:3,5
  222:1 224:10
  225:11,21 226:20,23
  227:1,2,21 228:3
  229:20,24 230:10
  233:4 238:10
  240:13 241:24
  242:12 243:13,14,16
  244:18,23,23 249:9
  250:8 251:3,16
  253:21 255:24
  256:9 258:21 261:6
  264:9 266:1,2 268:6
  269:19 270:1
  273:11 275:16
  276:18 283:20,20
  285:4 287:6 290:1
  290:18 295:20
  299:14 303:19
  305:6 309:15
  311:13,21 312:2
  316:18 317:22
  321:4,5 323:18
  330:23 338:13
  340:13 341:10
  342:8,11,13 343:11
  344:1,13,23 347:18
  347:23 348:7
  351:11 353:10
  354:4,5,8 355:5
  356:6,7,12 359:16
  359:21 360:3 361:2
  362:23 365:17,23
  367:6 368:8,14
  373:23 374:7 375:7
  376:7 383:18,21
  384:24 387:10
  388:6 389:15,19
  393:9,20 395:13
  396:2 397:4 398:2
  398:11,14 399:21
  400:1,18 401:17
  402:11 403:5,11,12
  404:15 410:2,5
  411:2,15 412:16
  413:11,13 417:20
  418:23 419:18,21,21
  419:23 420:6,23,24
  422:9 423:4 425:4
  427:8,10,12 428:5
  429:14 430:12,23
  431:10,15,21,22
  432:2,10 433:13
  434:8,11,16,17,18
  434:19 435:7,9,11
knowledge 255:15

257:2 275:22
  304:19 317:4
  347:16 352:15,16
  354:10 373:14,20,21
  374:1
known 246:6 301:24
  431:1
knows 226:21
Kong 231:23 232:3
  348:17,21

_____
**L**
L.A 365:3
lab 350:1 351:9
  368:16
labeled 339:5
laid 360:2
language 267:16
  270:8,13 282:7
  432:8
laptop 375:17
laptops 241:24
large 238:3 422:8
large-animal 238:4
Larry 338:10,11
late 367:24 376:1
  398:15 415:23
  435:22
launch 311:12 400:24
Lauren 242:17,18,20
  243:18,21 291:20
  416:24 417:3
  419:18
law 211:12 226:14
Lawson 210:17
  212:12
lawsuit 424:19 425:1
  425:2
lawyer 253:21 259:10
  264:3 301:1,2,3,4,7
  306:7 394:17 423:4
  423:10
lay 265:16
layout 249:10
lead 283:15
leads 372:12
learn 233:10 301:21
learned 253:2
leave 220:19 305:13
  334:15 433:7
leaving 243:15 304:3
  305:11
lecture 222:3,4 223:10
  296:5 334:14 335:8
  335:10 339:18,22
  341:15 342:9,12

370:18 388:9,14,17
  389:1 425:24 426:2
  426:5,6
lectured 387:8,19
  388:3 426:2
lectures 223:8 231:13
  335:6 387:24
  388:19 434:5
lecturing 425:22
led 304:2 322:18
left 243:14 289:6
  378:14 394:16
legal 259:11 411:3
legalese 265:16
  267:24
Legend 287:14
legible 356:21
legislation 305:1
  389:19
Lennox 247:18,21
  248:4
let's 225:13 227:15
  252:20 254:15
  275:12 277:9,9,11
  277:12 286:3
  308:11 317:15,16
  332:21 334:14
  345:24 406:2
  408:15 418:20
  420:5
letter 213:12,14
  214:10,19 250:17
  280:16 293:23
  312:20 313:6,7
  318:3 319:9 323:20
  338:14,15,16,17
  362:17,21 363:2,5
  363:11 369:5,17
  385:24 386:5 390:5
  390:12 395:23
  404:6
letters 250:10 281:12
  281:14 310:12,13
  369:14,15 402:23
  414:6 421:14,17,19
  422:8,14,17 433:15
  letting 405:11 411:15
  level 379:24
  liaison 430:24 431:7
  licensed 226:15
  232:16,19 233:5,10
  licenses 412:20 413:24
  licensing 232:18
  233:20
  lie 225:6
  limited 227:6 250:9

376:18
line 273:16,17 274:24
  274:24 324:13
  326:5 333:7,15
  344:6 381:1,8 438:4
lines 281:16
list 236:19 262:7,10
  278:21 281:22
  292:14,16,17,22
  293:5 294:6 343:17
  358:15 389:14,17,21
listed 268:21 269:2
  282:14
listen 370:18
listing 357:24 385:23
lists 256:5 293:1,2
  331:14
literature 327:1
litigation 249:17
  351:22
little 259:15 261:20
  264:3 286:4 302:12
  316:10 334:13
  337:3 340:4 343:15
  348:20 359:5
  394:12 404:14
living 243:6
LLC 210:22
LLP 210:17 211:12
  212:1,12
Local 286:13
located 279:11 291:7
  299:10 310:24
  395:11
lone 226:2
long 230:2 235:24
  236:3 240:6 289:9
  289:18 291:23
  343:9 352:2 360:23
  378:16 379:11
  430:10 431:15,17
  435:23
long-term 219:5
  321:18
longer 243:10 249:18
  286:10 345:17
  359:5 432:20
look 240:9 242:18
  245:13 247:23
  250:6,21 255:20
  258:1 265:20,22,22
  269:14 272:10,13,18
  282:8 291:15 297:6
  300:13 312:22
  314:20 315:1
  317:19 318:18

324:1 371:10 375:6
375:9,12 377:24
378:12,16 379:18,21
382:20 385:12
390:22 392:13
397:20 402:20
411:9,24 413:3
418:17 424:7
looked 247:24 355:24
363:23 390:6
413:19 432:17
looking 230:5 236:24
237:1 261:10 272:3
272:5 277:5 303:6
333:5 335:13
386:20
looks 344:16 412:12
435:16
loosely 264:4
Los 364:12,15 365:2,7
losing 401:24
loss 423:19
lost 224:8 297:24
375:17
lot 224:11 231:12
251:17,20,20 262:15
310:14 317:11
383:11 425:7 426:1
429:7 434:21
loud 245:21
love 361:10,11
lunch 212:13 309:8
314:7 317:12 328:2
328:17 338:5
Lyons 210:5,15 211:3
211:4 213:4,11
216:4,7 227:15
228:2 256:10
258:11 268:10
271:15,18,21 275:6
280:11 302:22
317:14 318:9,13
328:1,16 340:18
355:14 368:9
391:11 396:2
397:10,16 415:5,9
415:14,17,22 416:1
416:3 421:1,5,9
424:22 437:7,7
438:1,1,24 439:3,6
439:11
Lyons's 241:14

M

M 212:14 272:16,19
274:2

M-a-r-a-n-h-a-o
289:1
M.D 302:13,14 303:3
367:8 392:20
Mack 394:3
Magazine 385:1
magazines 240:20
262:16 300:9 385:7
mail 332:24 334:7,12
334:13
mailing 263:9 332:22
mailings 263:10
main 220:14,21
maintain 288:7 381:4
maintaining 405:6
409:17
major 235:20
majority 238:8 270:16
270:17 334:10
makers 433:20
making 271:6 301:23
324:10
man 289:7
management 323:1
manager 235:21
298:6
managers 220:16
manual 266:17
Maranhao 288:23
Marc 414:6
mark 212:13 216:23
240:14 245:6,8
246:9,10,11 254:19
257:22 280:5
284:21 285:1
294:11,15 296:13
299:22 312:19
351:15 353:21
355:9 357:10
371:10 375:2
377:20 379:15
382:16 390:19
392:10 395:21,22
397:4 403:17
406:14 417:24
422:21 439:12
marked 213:6 218:23
245:7,11,14 257:23
271:19,23,23 280:12
280:13,17 282:10
299:23 312:20,23
314:13 317:9
318:11 328:4,5,8,10
328:12,15,17 330:1
335:16 338:4
342:16 343:16

351:18 353:23
355:11 357:12
362:16,17 371:17
375:4 377:21
379:17 382:18
385:10 390:20
392:11 395:23
397:5,7,9,11,14
398:18 400:3
403:18 411:23
413:1 415:3 417:1
418:10,12,14,16
422:24 423:1
market 427:18 433:22
434:2,3,3,4,5,5
marketing 396:3
markets 434:24
marks 257:9
Marquez 287:18
Mary 287:18,19
344:16,18
Mass 210:23 364:21
Massachusetts 210:3
210:19 211:7,15
212:5,16 226:11,14
226:22 227:7
288:13 299:11
387:3 425:16
437:10,11
master's 218:18
219:10,13,15 320:22
material 258:10 262:9
271:3 341:9,14
357:18
materials 242:21
243:21 249:7,13,16
249:20,22 263:6
273:6,8 299:5
300:19,21 310:14
326:10 333:8,9
358:3 359:6,8,16,20
360:6,9,22 361:1
429:24
matriculate 371:1
matter 243:15,16
306:2 321:7,8
361:15 366:24
377:5 420:8,14,22
432:7 437:7
maturity 220:3
MBA 386:24
McIlwraith 228:13,14
228:18
mdickison@lawson...
212:18
Meadowbrook 213:22

328:7 336:5
mean 219:21 256:4,9
256:11,16 262:5
269:15 287:1 294:6
294:17 296:23
297:2 319:22 320:1
336:23 344:19
365:18,20 368:13
388:6 405:9 415:9
419:11,12 424:22
428:4
meaning 293:2 404:24
means 256:17 257:3
329:15
meant 309:2 320:9
324:17 398:15
401:17
med 392:21
medical 210:12
212:20 237:19
282:15,19,24 303:6
370:1,3,10 391:20
medicine 210:10
212:9 216:9 223:15
223:20,24 227:3
232:17,20 233:24
235:1,4 238:4,5,7
241:2 264:18 266:8
266:22,24 282:6
294:3 304:9 313:15
315:6 351:11 364:9
366:8 367:9 369:20
381:21 384:22
391:10 429:1 437:8
438:2 439:7
meet 236:6 281:24
289:5 292:11
311:10 341:18
345:4,18 435:10
meeting 214:3,20
228:21,22 230:16
234:10 239:1,3
328:14 342:24
343:2,16,19 344:8
344:14 359:14
362:12 397:4,8,24
398:2,9 400:22
429:11 430:5
meetings 234:2
342:21 345:1,13,15
345:16,16,21
member 235:3 242:20
244:12 290:24
291:11,14,14 299:3
303:12,15,24 343:4
343:7,9 387:11

393:20 394:1
409:12 431:13
433:4
members 235:10
244:19,21 265:3
283:24 289:11
292:3,14,20,23
293:6,18 303:21
304:20 322:23
334:4 343:18
350:22 399:10,13
405:1,5,17 408:2,4
425:10 432:5,11,22
434:1,14 435:8,15
435:19
membership 282:22
283:3,7 303:18
memberships 386:17
memo 214:1 328:10
memorialized 410:1
memorize 276:7
memorized 276:17
memory 221:23 226:8
228:17 276:23
296:10 302:21
325:1,14 328:23
329:1,13 346:17
363:10 374:12,16,20
374:24 375:24
378:23 379:1 399:3
404:12
mentally 340:11
mention 323:14 326:6
327:5 398:15
mentioned 222:20
229:15 236:14
246:19 267:17
277:8 295:6 296:14
296:15 303:10,11
310:5 334:24 340:3
348:16,23 363:11,13
364:10 365:14
376:3 390:10
394:17 407:2
mentions 391:8
401:14
mess 281:13
message 227:9
met 229:6 234:9 236:2
236:9 311:6,7,24
358:8 430:22
methods 327:14 337:5
359:20 428:13
Michael 229:16,18
231:4,12 320:20
326:22 327:2

Michigan 351:9 362:8
   362:11
Mickey 299:8,10,15
   310:22 311:10,17
Microsoft 416:5
middle 282:9 317:18
   319:12 329:5
   383:22
mind 224:24 227:12
   238:17,21 247:8,14
   255:10 257:1 278:4
   308:16 317:17
   361:2 404:12 433:7
mine 311:7 314:23
minute 259:12
minutes 214:3 317:14
   317:15 328:14
   342:21 343:2,16,19
   344:8,23,24 345:11
   345:14,15,17,21
   415:5,7
mischaracterization
   262:15
mispronounce 235:12
misreading 274:3
misrepresented 228:7
mission 270:22 409:21
misstating 295:9
mistruths 430:18
misunderstood 311:2
mixed 326:22
model 303:7 392:3,4
modeled 233:23 235:7
Mohammed 383:19
   383:21 384:3,4
moment 390:5
money 286:22 307:10
   309:4 318:20
   331:11,14 333:11
   367:18 401:2
   421:10 422:8
   426:14,15 427:5,6
   434:21
month 309:19
months 341:21 379:13
morning 216:7
mortality 307:5
motion 340:20
motivation 432:20
   433:12
motive 430:18
mouth 222:2 286:2
   320:13
move 216:24 227:11
   228:4 249:24
   261:22 314:2 330:3

340:12 371:8,9
   397:3 417:9,23
moved 229:1
movies 311:15
moving 330:4 382:17
   415:13,20 431:11
multiple 265:6
murder 307:7
Musculoskeletal
   214:7 357:11
mutual 421:6

            N
N 213:1 216:1,3
name 216:8,13 225:19
   239:11 244:5
   246:24 247:4,9,10
   247:13,18 255:3
   256:8 257:18
   267:14 274:8 277:1
   278:8,18 289:2
   294:2,5,9 295:7,10
   295:19 311:8 318:7
   336:8 349:17
   350:12,14 361:4,8
   361:20,23 362:9
   364:19 365:5
   368:12 374:7
   389:13,17,21 391:13
   393:23 404:19
   408:2 410:23
   425:20 430:3
   433:15
named 216:11 229:15
   287:20 344:16
   383:19,21 394:17
names 245:1 251:20
   294:5,7 389:14
Narelle 350:10,12
narrative 315:1
natural 285:23
naturally 311:23
nature 305:22
near 226:11 262:4
nearly 227:5
necessarily 269:3
   329:9 344:19
necessary 307:7 405:6
   439:18
need 220:3 234:4
   238:2 243:16 245:1
   246:13 269:8
   273:15,16 274:23
   276:3,13 277:23
   278:23 279:5
   280:11 287:3

289:10,17,23 291:15
   297:6 304:21
   316:18 318:19
   319:7 320:2 321:16
   325:8 327:11
   336:12 337:18
   353:9,10 354:4,15
   360:11 368:3
   378:18 392:6
   395:21 405:7 407:8
   410:3 435:4
needed 237:8,13,20
   242:22 261:14,14
   360:24 367:15
   395:7
needing 333:22
needs 362:16
neglected 340:5
negotiable 361:6
neighboring 227:7
Neil 287:20 288:11
neither 302:23 437:13
network 287:5
neuromuscular 214:8
   327:16 357:12
never 220:6 305:24
   341:13 357:3 362:6
   372:23 377:6,12
new 219:7 235:15,18
   235:20 237:24
   239:13 279:11
   280:8 307:16 315:5
   315:23 360:14,14
   367:3 375:3,17
   376:4,13 404:17
   405:18,23 408:23
   434:7
newly 406:4
nice 289:5 343:14
night 415:10
Ninety 316:20
nonadministrative
   407:14
nonalphabetical
   385:23
nonauthentic 373:15
   373:16
nonnegotiable 432:24
nonprofit 267:22
   287:22 301:23
   395:8
nonprofit's 357:8
nonveterinarians
   303:19
normalize 223:22
normalizes 223:23

normally 415:11
   423:7
notary 437:11 439:20
notations 439:17
note 263:7 303:2,2
   396:16 439:15
noted 438:17
notes 214:21 301:11
   302:8 328:19,21,24
   329:22 342:23
   343:3 397:9 398:3,6
   398:10,15
November 273:24
   435:17
number 226:13 234:2
   256:6 259:5 260:2
   262:24 267:10
   316:16,22 327:19
   354:19 432:11
   434:13,13
numbers 221:12
   327:22

            O
O 216:1,3
o'clock 415:11 422:20
object 246:2 299:16
objected 253:22
objection 256:21
Objectives 363:22
objects 246:3
obtain 439:11
obtained 267:21
   390:11
obtaining 253:24
obviously 225:3
   254:23 272:15
   273:21 315:20
   326:1 380:21
occasional 309:8
offer 219:5,14 220:18
   221:4 285:21
   308:14 320:6 321:3
   406:10,17
offered 219:16 220:6
   221:14 222:10
   285:14 287:9,11
   295:19 321:2
   322:22 367:2,4
offering 220:1 228:23
   234:15 283:23
   320:15
office 305:18 311:24
   324:13 395:6
official 246:8 300:1
   312:22 318:10

325:9 368:12 379:6
   382:7,9
officially 312:12
oh 228:21 231:3 241:1
   261:23 267:13
   277:4,4,4 289:3
   306:16 307:12
   310:23 311:1
   324:24 326:7 330:9
   342:5 372:20 390:1
   430:20
Ohio 305:18 306:8,9
   395:6,11
okay 250:5,24 254:15
   261:21 263:8 282:8
   290:6 300:4 302:2
   303:1 322:3 333:14
   360:15 364:3 375:2
   406:9 407:20
   418:21 420:5 427:2
   429:9
old 298:11 300:9
older 251:8 252:11
Olympics 348:17,21
once 238:11 302:7
   375:6 409:4 424:20
   435:1
one-page 301:5
ones 221:3 364:19
   428:12
open 220:9,12,23
   242:1
opens 433:22
operating 219:23
   332:7,8,11,12,14,16
   332:18,21,23 333:3
   333:7
opinion 304:5,7,11
   431:5
opportunities 231:6
   367:6 434:22 435:1
opportunity 258:15
   277:6 278:2
opposed 393:21
opposing 305:1
opposition 305:5
option 305:10
order 223:22 234:13
   244:5 245:1 269:3
   273:18 282:21
   283:7 303:7 307:5,8
   330:7 341:8 391:21
   437:10
Oregon 236:7 323:19
   358:6,21,24 359:14
   363:3

organization 216:13
   222:10 232:22
   233:1,3 238:1
   255:17 267:8
   279:16,19 283:11
   287:23 294:19
   295:1,4 303:11,17
   303:18 305:11,13
   306:11 308:19
   319:5 323:4 337:23
   389:6 392:4 403:7
   410:9 427:6
Organizational
   214:20 397:8
organizations 257:11
   257:19 282:14
   285:16 294:22
   301:23 318:5 336:4
organize 315:6
organized 367:11
organizing 216:17
   230:13 263:23
   264:15,19 265:3
   349:11 350:17,19,21
   359:2 361:22,23
   399:11,13 405:1,4
   405:19,21 406:2
   407:16 408:9
   428:12 432:4,11,22
   433:3 435:18
origin 354:4
original 261:10
   267:24 287:24
   288:2,3 291:21
   356:24 439:10,12
originally 231:23
   260:18 264:14
outbreak 286:2,9
   287:7
outbreaks 285:24
outcome 283:14
   437:15
Outlook 416:5
outside 235:22
overall 370:21
overdue 375:17
overseeing 408:15
owned 222:14 248:21
   287:20
owner 340:4
owners 229:4 235:18
   262:12

                P
P 216:1,3
p.m 436:3

package 363:15
page 245:23,23 252:3
   252:5,17,19,22
   253:9,12,16 255:23
   258:4,5,22 263:19
   265:21 268:9,13,14
   268:16 269:8,11,13
   272:3,5,9,20 274:4
   280:19,20,24 281:15
   282:8 288:15
   300:13 301:10,12
   302:6 314:21 316:8
   316:10 318:21,24
   319:1,11,12 321:12
   323:14 324:1 326:4
   329:6 331:3 342:18
   343:3,13,15 344:7
   344:10 351:22
   354:7 355:1,7
   357:21 369:20
   380:4 384:9 396:19
   397:5 419:12 438:4
   439:17,18,20
page-by-page 270:2
page/errata 438:3
   439:4,10
pages 210:1 251:3,5,9
   251:15,17,20,23
   252:8,9,11 269:20
   277:24 313:9
   333:14 380:22
   397:12,13,14,21
paid 325:2
pains 438:21
Palmeira 290:11
   291:3,4,9
paper 236:18,22
   239:5 295:21 297:1
   384:16 416:14
paper-sized 297:4
papers 288:4 360:13
   384:14
paperwork 289:17,23
   291:15
paragraph 255:24
   256:1 257:7 266:1,4
   266:9,10 272:10,15
   281:11 282:9,10
   319:15 321:11
   322:5 364:4 369:21
   374:10 375:16
   378:12 383:10
   386:11 392:19
   402:18,20 403:15
paragraphs 281:13
   386:14

paraprofessional
   218:2,3,8,9,13 219:1
   219:4 235:2 321:17
paraprofessionals
   219:3 232:6 315:5
   315:17,24 322:23
   329:16
paraprofs 329:15
Park 236:12 237:8
   321:24 322:14,18
   328:20,22 329:8,10
   329:12,14,19,22
Parks 213:16 314:12
part 253:22 259:7
   266:17 292:19
   295:6,7,10 302:2,2
   302:14 307:3
   315:15 331:11
   336:23 338:11
   341:1 357:2 360:16
   360:23 363:24
   370:20,21 371:2,5
   372:7 380:4 383:7,8
   383:13,13 387:2,6
   394:2 397:16
   414:21 421:7,16
   422:11 427:15,20
   432:19
partially 364:11,12
participate 433:6
participation 358:13
   358:22 361:19
   435:13
particular 236:20
   237:2 296:8 297:23
   309:24 325:23
   331:24 332:1
   336:10
particularly 304:9
parties 437:13,14
partner 337:20
partnered 225:17
partners 395:18
parts 269:22 333:6
   386:8 388:10
pass 245:14 431:16
   432:18
passed 295:21 346:8
   346:11 347:12
passes 431:16,17
password 244:4
   354:15
pasture 286:17
patented 239:13
patience 436:2
patient 305:23

patients 239:14 242:7
   255:9 316:16 367:3
Paul 394:18
Paulhus 414:7
pay 248:6 422:7
payment 421:10
PayPal 334:3,6,13
PDF 258:3
penalties 438:21
people 221:10 229:9
   236:16,23 242:6
   244:19,22,24 245:4
   265:7,16 295:23
   307:4 334:14
   342:12 347:24
   351:3,3 354:19
   355:3 368:7,9,11,16
   368:16 386:7 397:1
   405:21 409:10
   413:9 425:7
people's 221:5 320:17
percentage 309:18
perform 255:16
performing 238:13
period 240:22 247:7
   248:1,2 283:22
   289:13 300:10
   308:11 330:15
   368:1 382:6 424:14
   424:17,24
periodically 376:14
perjury 438:21
permission 354:14
   358:2
permitted 361:14
permitting 361:16
person 217:20 288:7
   309:3,4 344:5 349:4
   351:6 383:19,21
   435:14
person's 296:24 297:1
   297:1
personal 254:20
   304:19,19 423:14
personal-practice
   252:2
personally 252:24
   279:15,18 280:7
personnel 337:23
pertain 254:5,8
   333:10
pertaining 251:8
   252:11
petition 273:15,24
   274:6,6,13,23 275:1
   275:4,13,14,17

276:11,15 277:2,11
   278:14,16 435:10,16
Ph.D 374:6,15,18,23
   381:2 387:1,19
pharmaceutical
   262:11 287:10,15
Philadelphia 228:22
   230:16 429:7
philanthropists
   286:21 400:23
photo 327:18
photographic 339:2
photos 214:6 355:11
phrase 427:24
phrased 360:20
physical 262:12 279:9
   364:9 366:8
physically 242:24
physician 343:1 393:5
physics 381:2 386:21
   386:22,23 387:6,10
physiotherapist
   218:14,16 231:22,24
   234:14 348:23
   349:24 350:2
physiotherapists
   219:6 220:16
   232:15,19,24 233:11
   233:20 234:8,24
   239:9 323:11
physiotherapy 232:21
   233:13,21 234:4,11
picked 412:13
picture 355:20,23
   356:11
piece 295:21
pile 255:21
pitch 311:20
place 219:18,23
   220:24 221:3 222:6
   222:8 226:21 227:4
   239:20 266:8,22
   308:20,21
places 365:1
plaintiff 253:23
plaintiffs 210:7
   211:18 213:7
   245:10
plan 219:5,14 227:19
   234:5 247:3 270:21
   295:7,12,14 359:10
   359:11,18 406:17
   410:6
plane 378:14
planners 416:17
planning 301:11,16

301:22 302:13
321:3 426:7
plans 220:13 303:7
359:19 406:12
play 238:14
please 217:7,13
232:10 245:20
247:19 250:1,4,22
250:22 253:18,19
255:6 258:22 260:4
260:5 263:13,14
268:9 272:9 285:9
288:24 296:3
297:13 298:22
312:19,23 344:10
411:8 439:12,15,20
plugged 368:21
plus 434:1
podiatry 221:15,16
338:23 339:2
poets 386:23 387:10
point 217:13 220:3
228:9 257:6 284:20
298:7 302:13
313:22 339:17
358:11 359:24
380:18 385:17,22
396:5 398:4 416:3
418:1 420:7 432:24
434:20
pointed 251:22
points 225:22
policies 304:5 431:9
polo 238:14
Pomona 320:20
ponies 340:5,8,8
poorly 283:5
portion 266:13 357:23
357:23
position 217:15
304:18 401:17
433:11
positions 304:6
possession 246:10
250:14 252:10
254:4 258:12 293:1
344:24 353:2
possibility 396:11
possible 403:16
post 355:2 405:19
postage 332:22,24
333:8
postdoctoral 364:4
370:1
poster 341:6
potential 286:12

309:8 312:15
321:14
power 407:18 409:2
practical 337:6
practice 223:24
226:15 227:6,6
238:9 290:12,16
304:8,13 305:21
365:17 431:4,5
practiced 229:3
practices 434:3
practicing 226:10
practitioner 423:23
423:23
practitioners 303:13
304:13
precede 246:11
preceding 247:7
precisely 347:7,9
predated 261:17
predecessor 298:8
predominantly
235:16
preface 224:24 229:13
prefaced 276:4,5
prefer 351:13
premedicine 386:22
premised 426:23
prepared 265:14
275:4 331:1 342:19
preparing 435:9
prescribed 437:10
prescriptions 223:17
present 270:1 293:21
341:2 435:1
presentations 308:21
presented 239:5,7
249:9 305:4 362:3
384:14 397:23
428:10,14
presenting 236:22
341:4 391:19
president 235:1
press 225:15,18 226:1
227:10,17
presume 298:17
pretty 230:8 238:3
325:13 327:19
351:5
prevailed 420:8
prevent 323:2 342:15
preventive 323:1
previous 324:18 377:5
379:5 430:12
previously 216:4
397:11

primarily 282:11
printed 260:22 261:13
printouts 251:1,4
prior 247:14 251:15
296:13 324:3
339:21 352:4 353:4
353:5 391:16 395:2
416:22
prioritize 415:23
private 222:16,18,19
226:2 255:9 290:15
306:9 365:17
privately 430:22
probably 216:7 279:6
305:14 307:12
315:10 363:16
366:15 411:5
416:21
procedures 431:9
proceeding 418:5
proceedings 384:15
437:12
process 298:2 301:21
produce 246:6 248:8
250:8 253:22
353:13
produced 217:24
225:1 228:18
246:14,16 249:16
250:13,16 251:4,12
251:16 252:12,14
254:1,9 258:2,5,12
258:14 260:9
261:24 262:3,8
264:13,16 274:14
275:10,11,14,15
276:16 278:10
292:23 293:6
296:21 297:18,21
300:6 330:6 335:18
338:6,22 339:9
340:14 345:8
351:21 353:2,7,8
354:5 373:18,20,22
397:18 419:7
426:20 429:24
437:12
produces 252:17
producing 342:20
product 248:8 270:6
428:18,21 430:1
production 213:9
225:14 228:10
245:11 262:8,14
274:10,11 292:19
300:6 338:7 372:24

373:2 391:13 417:3
417:13 435:6
profession 229:20
257:15 299:6 303:7
428:17
professional 218:10
218:11 226:18
232:16 233:16
234:13 308:17
378:17 404:24
423:14 433:16
437:6
professor 229:21,22
387:12 388:9
program 220:7
233:23 266:23
269:17 295:19,23
298:6,9 302:14
315:12,14,23 316:2
316:4 320:12,23
321:9 336:17
338:12 368:21
370:11 408:11,13
programs 219:22,24
220:22 221:2
230:19 233:9,13
266:14,15 283:14,16
284:7 285:5,15
296:10 297:6 298:3
298:3 301:24
307:22 310:18
319:16,18 320:7,9
320:15 321:15,17
322:21 323:5,8,11
334:3 337:20 401:3
427:9
project 216:17,18
218:24 219:14,18
220:14 230:19
231:10,11 233:7
234:21,21 235:10
236:17,24 237:14,22
241:4 264:17
284:14 285:7,11
287:2 292:7,10
307:24 313:20,24
315:4 316:6 325:15
325:16,20 326:13
332:10,18 336:2,23
337:2 360:14,17,18
362:4 387:6,7
396:12,13,17,23
403:6 404:16,21
405:16 406:22
428:3,5
project's 337:18

projected 313:11
projecting 381:24
projects 243:17 247:3
249:9 284:15,16,18
284:19,22,23 308:5
315:20 332:15
prolific 425:23
promise 378:20
426:22
promoting 311:15
433:24
prompted 377:10
proper 323:1
property 279:22
406:23 428:21
429:16
proposal 213:18
260:22 261:1,15
305:7,10 313:4,10
314:13,17 315:2
317:23 318:4
337:17
proposals 308:17
propose 238:1
proposed 305:1
propounded 245:16
prosecution 305:19
306:24
prosecutor 395:5
protection 269:7
prove 278:5
provide 253:5 340:6
401:2 413:21 414:1
provided 305:2
333:24 340:7 363:6
363:9 391:11,12
437:9
providing 283:24
PS 386:16,18
psychology 386:24
PTO 252:13 353:9,14
353:15
public 295:19,22
304:17 333:15,19
334:4,19 428:10,16
433:17 437:11
publications 384:13
385:6 434:4
publicly 305:4
publish 327:3
published 270:14,15
277:18 326:24
327:2,4 384:24
385:4
publishers 433:19
publishing 276:19

16

pull 277:24
pulled 401:16
purchase 338:17
Purina 287:10
purportedly 340:1
purports 217:14
    272:6 330:7 371:13
    371:23 372:2 378:2
    378:6,8 379:23,24
    380:5,6,21,23
    382:23 383:1
    385:14,16 398:23
purpose 264:14
    270:22 282:1
    396:10 414:13,18
    422:1
purposes 253:24
    281:18,22 333:23
pursue 323:7
put 222:2 225:16,18
    249:7 271:7 304:22
    316:23 317:7 318:9
    322:1 323:24
    329:21 333:3
    341:24 355:9 357:9
    358:21 363:15
    375:2 377:11
    386:10 391:8,24
    398:13 420:5 425:1
    425:2,3
putting 220:20 274:18
    275:13,16 308:17
    384:11 435:9

                Q
qualifications 349:1
    412:18
qualify 367:7
quantify 309:16
question 225:5 237:18
    242:6 243:20 245:2
    246:5,9 247:13
    248:15 251:7 256:3
    256:12,19 258:16,19
    259:11 261:18
    265:15 267:5
    272:20 273:18
    274:18 275:3 276:4
    276:6,13 278:1,3
    280:20 283:5
    287:17 288:9
    299:16 304:23
    308:10,15,24 309:12
    316:14 318:10
    319:3,10 320:10
    322:17 326:1

327:10,20 330:17
336:9,15 340:13,15
340:19,22 342:14
346:18 354:23
358:20 371:14
373:13 374:11
390:9,10,18 402:19
403:12,22 407:8
419:6 423:12 425:6
426:17 427:15
429:6 430:15
435:22
questions 217:18
    224:13,19 241:9,12
    241:16 254:16
    259:23 265:2 313:1
    314:15 317:11,15,20
    335:14 351:20
    357:16 379:19
    415:19 417:12
    426:23 431:8
    434:12
quick 371:10
quickly 229:1 330:4
    382:17 399:23
    426:12
quite 232:13 234:6
    274:9 307:9 311:20
quote 348:17

                R
R 216:1,3
race 305:20 347:11
racehorse 235:14
racetrack 304:13
racetracks 304:9
racing 235:21 238:9
raise 285:22 308:4
raised 319:5,8
raising 333:11
Ralston 287:10
range 230:8 296:2
    353:16 401:7
ranked 434:9
rate 286:15
rated 434:18
rating 434:12
RDR 210:20 437:24
read 245:20,21,24
    250:1,3,22 253:18
    256:1,5 268:5,6
    272:12 275:13
    279:5 316:11
    317:21 318:19
    336:12 362:23
    393:18 396:1

403:23 413:20
426:24 432:8 435:7
438:16
reading 369:20
    375:11 396:15
    400:14 401:20
    402:16 439:15
reads 315:18
ready 220:8 271:21
    314:6
real 423:12
realize 373:18
really 225:8 227:4
    238:7 239:3 241:6
    247:4 283:20
    293:11 316:14
    325:17 336:15
    341:13 349:12
    390:9 425:6
reason 238:21 278:12
    295:10 305:5
    349:10 376:12
    399:20 438:4
    439:16
reasons 236:15
recall 221:23 222:6
    223:1 225:4,15
    244:1,4,8,15 247:22
    248:7 251:5 260:23
    264:24 265:19
    267:22 269:4
    279:23 287:11
    289:10,12,18,20
    290:10 291:19
    292:18,19 295:24
    296:16 299:20
    301:6 307:15
    309:21 312:6,9
    329:11 339:1,16
    341:19 347:8 349:9
    350:7 352:6,18,21
    352:24 353:18
    354:13 355:4
    363:15 365:8 368:5
    374:9 379:10,12,14
    383:4,7,9,12 388:1,4
    388:12,21,23 389:23
    390:17 391:1,2
    392:6 393:3 394:11
    399:21 400:14,20,22
    401:7,13,23 402:3
    403:4,9,10,13,14
    404:11 410:7
    412:22 413:5,24
    416:24 417:9,19,22
    419:16 424:16

429:21 430:6,11
432:8
receive 334:2 369:1,3
    369:5 417:16,20
received 221:7,10
    240:13 329:10
    331:21 334:19
    337:15 338:14
    369:14 426:4
    430:23
receiving 337:24
    367:17 391:1,3
    413:6 417:10,19
recess 328:2 375:8
    394:15
recipients 310:11
recognition 253:24
    254:5,8 283:16,17
    295:15 321:14
    323:6
recognize 258:7 260:5
    272:3 280:21,23
    323:3 335:19 338:7
    339:6,8 353:24
    381:1 423:3
recognized 283:10
    294:18 396:22,24
    401:1
recollection 230:7
    297:9 301:15
    302:17,24 303:2
    320:4 322:14
    330:24 339:12
    349:14 398:12
recommend 395:9
    399:7
recommended 350:16
record 227:13 271:20
    300:20 323:21
    354:24 362:24
    363:1 418:8,9 421:5
    426:23 430:14,15
    437:12 438:18
recorded 437:9
recordkeeping 327:18
    339:3
records 230:5 300:18
    310:2 316:18 320:2
    325:9,10
recover 224:3 338:1
recovered 340:8
Redha 342:24 343:5,6
    343:12 384:5,6
redirected 400:16,21
refer 216:16,17 274:1
    294:14 301:12

302:16 364:4
369:17 374:14
390:4 402:6 423:21
425:20
reference 214:9
    315:15,16 357:12
referenced 363:24
references 292:20
    344:18
referred 267:4 312:18
    369:24 393:20
    402:10
referring 240:22
    267:8 268:1 274:4,7
    287:14 288:15
    290:1,3 297:12
    300:10 301:3,4,17
    302:7 304:18 313:5
    319:20 320:7
    321:21 322:5
    362:11 364:7
    366:14 369:23
    376:7 384:1 391:18
    392:23 393:1
    396:14 402:12
    403:2,5,10,13
    411:17 413:11
    419:2 423:22
refers 266:2,4 272:15
    301:1,16 318:20
    320:19 375:16
    386:16 392:19
    400:15,18 413:8
reflect 298:4 344:4
reflected 325:12
reflection 326:13
refresh 228:17 325:1
    375:24
regard 347:4
regarding 321:14
    369:9 412:18
regardless 305:22
register 371:4
registered 259:5
    261:7 269:5 429:3
    437:6
registration 259:1
    268:18
registrations 259:16
regulations 333:20
regulatory 234:9
rehabilitation 210:10
    212:9 216:10
    223:15,20 227:3
    235:5 241:3 264:18
    294:4 313:15 315:7

340:7 364:9 366:8
381:21 429:1 437:8
438:2 439:7
Reimer 399:8
reject 227:1
relate 403:15
related 223:19 239:2
247:24 251:3,14,18
257:14 304:4
305:21 306:24
308:5 328:21
336:11 343:20
437:13
relating 226:9 262:9
relationship 230:6
288:7 304:12
368:12,12 404:1,8
404:14
relationships 285:17
relative 437:14
relativity 386:23
387:10
release 225:16,18
226:1 227:10,18
relevant 416:21
relief 333:11
relocated 299:13
remain 323:10 404:20
405:12,16,22 409:14
remarkable 239:15
remember 225:6,21
226:3 228:24
242:19 245:4
249:12 261:16
269:10 286:3,6
297:14 301:3 306:3
311:8 341:3 346:5
347:14 363:18
364:20,22 372:8
377:7 391:3,13
401:5,9 402:9,11
417:2,3,13 429:12
430:10 434:11,15
remembered 430:7
reminded 433:4
remove 409:1,3
removed 349:10
399:18
repeated 228:8,8
repeating 228:6
rephrase 398:4
rephrasing 271:3,6
report 213:13,24
299:23 328:8 341:9
reported 341:12
425:16

reporter 210:20
280:13 298:24
436:2 437:1,6,18
reports 255:8 431:18
represent 216:8,10
245:15 258:1
272:19 325:13
335:17 336:13
338:5 342:16
356:24 363:12
371:11 398:5 423:6
represented 275:11
386:2
represents 246:8
300:20 423:5
reputation 423:15
reputational 224:9
request 213:8,19
245:11,16,21,22
249:24 250:2,21,22
251:1,2 253:18
279:3 301:5 308:22
317:9 318:3 324:9
377:3 413:18
414:23
requested 437:18
439:21
requesting 279:3
319:4,9 323:20
requests 219:1 240:13
240:17 413:14
414:21
required 235:8 405:14
requirement 432:23
requirements 391:19
391:22 405:6 431:9
431:18
requires 234:10
334:17 423:9
rescue 285:15 336:3
337:6
rescues 231:7
research 230:5,23
239:19 270:9
283:13 326:15,17,19
326:24 327:15
351:10 367:11,13
387:5,6
resided 354:11
residence 222:18
residencies 401:4
408:16
resident 367:8 368:15
resolved 421:6
respect 228:18
respond 308:23

435:19
responded 341:11
435:16
response 213:7 240:17
245:10,22 246:2
250:2,23 251:4
253:19 279:1 377:2
413:18,22 414:2
429:22 430:4
responsibilities 234:6
387:8
responsible 337:19
405:5
responsive 225:5
340:18 346:21
rest 274:13 389:4
392:2
result 246:22 247:1
427:16
results 283:15
resume 378:17,21
379:6 380:22 382:5
retained 305:17
return 439:21
returned 215:10
returns 319:7 325:12
revealed 426:3
review 225:2 246:13
258:15 276:9
304:21 359:8,16
395:1 398:20 400:5
410:3 421:19,23
426:19 437:18
reviewed 269:21
276:16 367:3
399:23
reviewing 371:14
411:8
reviews 336:2
rewrite 378:15
Richards 393:15,16
Richmond 393:2,4,5
393:17,18,19,23
RICO 307:2
ride 431:24
right 217:15 228:20
230:12 252:6
253:10 255:11
259:22 261:11
271:10 278:5
287:16 291:24
292:23 303:22
318:13 344:21
345:5 346:20 372:3
373:21 380:7 406:5
410:21 411:5

431:11 432:15
435:4
right-hand 274:5
rights 368:17,17
Rikki 211:5
rklieman@kliemanl...
211:10
road 216:11,18
Rob 373:7
role 235:6 387:4
roof 435:2
room 229:7,10 308:21
342:12 427:19
433:2
Rooney 299:8,10,15
311:10,18
Rooney's 310:22
rotated 292:3,3
364:24
rotation 367:21
rotations 283:24
284:2 369:19
roughed 369:18
rounds 370:23
royal 233:2
rude 276:5
rule 423:9
run 220:15 388:10
Russell 431:2
RVSO 283:19

_____ S _____
s 216:1,3 302:13,14
303:3 392:20
Sabin 237:10
saddle 222:7,9,11
sample 394:9
samples 394:7,8
Sanctuary 213:23
328:8 336:5
Saratoga 235:22
Sarrouf 211:12,13
289:4,6
satisfactory 437:9
Saudi 383:19,20
save 328:16
Savoldi 229:16,18
231:4 326:23
Savoldi's 320:20
saw 218:24 239:7
262:14 287:8
339:10 357:3
saying 225:1 247:11
247:13 275:21,23
327:1 399:22
429:21 433:9

says 256:6 266:9,19
266:20 274:5
281:17 282:10
300:16 301:4 302:6
302:10,12 315:4
316:22 319:12
321:12 324:12,20
329:14 332:7 337:9
343:2 344:18
355:15,16 373:7
375:21 378:13
384:10,11 386:20
391:23 401:14,15
426:5
scheduled 426:5
school 351:10 370:1,3
370:10 386:24
388:24 389:2,4
434:18
schools 262:11,12,23
263:1 284:2 285:16
434:6,8,12,17
Schultz 396:3
science 219:10 229:23
320:23 389:2
scientific 384:12,15
scratch 243:19
scribble 262:18
Seaport 212:3,4
search 240:16
searched 240:18
377:2,4
second 258:22 260:20
268:16 280:20
281:14,17 290:5
300:13 315:15
316:11 319:15
357:23 378:12
380:21 384:9
second-to-last 392:19
secret 229:6
secretary 280:8
287:19 299:7
310:22
section 268:6 281:19
382:13
sections 267:23 268:1
268:5 388:5,10
397:6
security 426:1,9
see 221:2 237:18
253:6,8 259:19,20
259:21 268:21
272:15 277:5
281:11,14 282:10,11
282:16 291:20
292:2 297:12 305:4

315:2 316:11
318:21 319:1,7,12
320:3 321:18 324:3
324:21 326:5,6,8,10
329:4 331:18
333:16 343:5,23
353:9,10,18 355:18
363:12 371:22
375:19,22 378:18
381:2 392:21
400:16 402:21
409:7,16 414:1
415:12
seed 401:2
seeing 292:19 300:9
402:15 417:2,13
433:20 434:11
seek 307:22 343:11
seen 238:8 350:10
355:20 372:23,24
373:3 426:20
Segal 212:14 348:22
select 351:8
selected 293:20
selection 246:3
selective 376:17
sell 254:19,22 255:10
semester 388:19
semesters 388:22
seminar 296:5,6
334:21,23 339:17,21
seminars 223:5 224:5
224:6 285:2 301:20
320:8 334:24 335:4
434:4
send 243:21 262:6,19
262:20,21 263:7
287:6 300:21 301:5
310:10,17 312:15
335:9 342:3 374:12
375:14 378:16,21
379:4,7 380:11,14
380:16 385:20
392:16 412:17,19,21
419:13 421:17
439:12
sending 227:8 242:20
262:23 333:7
374:13,16,21 378:24
416:24 424:23
sends 335:7
sense 235:10 255:19
308:12 309:17
334:9 337:20
sent 250:10 262:10,13
262:19 263:1,5,9

300:16,19 310:14
313:10,19 359:6
360:6 362:22 363:2
372:8,10 375:22
378:3,10,13 383:17
400:7,10,12 411:12
412:5,9,12 414:6
418:19,22,24 419:9
419:17,24 420:2
421:14,20 422:2
421:1,10
sentence 256:5 316:11
322:9 369:21
sentences 316:12
separate 234:21
325:16,17 333:6
336:17 402:14
407:3,4 408:3
439:18
separated 307:21
separately 405:10
September 417:10
series 265:1 289:10
324:2 414:21
417:12
serve 238:2 282:21
283:3,7 289:9 409:8
served 289:19,21
291:17 310:23
365:16 367:5
serves 218:10
service 315:7
services 228:24
234:16 254:19,21
255:2,16 320:6
323:1 340:7
serving 284:5
set 258:9 264:5 266:7
268:23 361:5,19
settle 421:4
settlement 421:16
422:11
Shaking 329:24
Shandon 230:24
sheep 286:17
sheet 438:3 439:4,10
Sheila 210:5,15 213:4
213:11 216:4
271:18 311:11
437:7,7 438:1,1,24
439:3,6
shelter 337:23
shelters 337:7,19
shoe 240:9
shoeing 217:21
short 258:19

short-circuit 224:12
shortly 218:1 272:24
296:4 347:12
shotguns 286:15
shoulders 270:10
show 217:6,13,24
227:19 257:21
261:19 271:8
297:11 299:21
311:14,21 312:17
314:9 330:1 335:11
338:4 339:4,15
353:20 362:15
377:19 385:9 397:6
398:17 399:24
411:20 412:23
showed 339:13 341:5
342:18
shown 239:15
sic 256:23 356:6 433:4
side 262:18 274:5
300:16
SIGN 439:20
signature 438:3 439:4
439:9,10,11
Signed 438:21
significant 423:19
significantly 267:1
similar 233:17 266:7
374:13
simple 246:5
simply 226:10,21
227:9 260:22 269:5
367:15 405:11
429:2
single 258:3 426:22
sit 244:24 291:19
304:23 370:18
404:13 432:12,16
site 213:23 328:8
335:22,23 336:2,10
336:21,24 337:8,9
337:22 354:7
sitting 245:3 269:20
269:22 273:11
275:21,23 276:8,18
278:2 290:8 347:17
355:6 363:18 410:5
426:10,13 427:3,10
430:6,16 432:23
situation 368:20
sjlyons@kliemanly...
211:9
skilled 217:20
skills 223:18
slightly 235:19

small 221:13 236:19
238:4,10 327:19
432:11
small-animal 238:4
small-animal/large-...
238:17
snapshot 359:15
so-called 435:18
socially 243:8
software 253:2,4
sold 255:2
sole 265:9,12
solicitation 301:18
solo 423:22
Soltysik 387:13
somebody 237:11,12
237:19 334:21
348:21,24 392:8
someone's 344:2
sorry 218:5 228:18
230:11 243:19
247:12 250:3
259:22 262:5
263:14 267:4
268:11 269:13,14
277:23 280:14
286:24 288:15
290:20 294:13
311:2 312:10 313:7
314:2 318:10 321:6
321:12 322:16
325:21 340:12
341:3 342:13
344:10 354:23
372:6 379:4 393:18
399:10 401:12
402:16 403:11
417:18 433:8
435:23
sort 218:19 236:21
262:17 302:3
310:13 427:15
429:18 432:17
sought 340:5 371:12
sound 432:9
sounds 287:15 311:12
source 263:6
sources 262:22 267:11
267:14 310:16
312:15 331:14
South 222:4
space 376:19
Spaulding 364:21
speak 333:21
speaking 253:10
260:10 368:13

special 432:10
specialty 223:19
237:24 283:10
294:19,21 295:16
315:8 321:18 323:3
323:16 359:13
361:8 381:20
391:10,21 394:3
401:1 402:1 427:17
428:15 434:7
species 237:21 238:2,2
329:4 410:13,17
specific 224:20 257:7
267:3,7 268:7 296:9
317:20 358:17
374:20,24 383:12
391:2,18 400:13
401:9 402:12
404:14,23
specifically 218:22
244:1 251:17
260:21 263:15
267:15 274:4 290:2
296:1 301:4 326:5
332:4 348:7 363:24
374:19 376:16
387:4 393:1 397:5
400:24 401:13
412:19 413:20,23
429:14,21
spell 216:19 247:19
288:24 298:22
spent 309:22 310:3
324:15 350:10
367:20
spoke 239:7 248:3
350:5 390:11,12
sponsor 308:3 427:4,9
sponsors 427:8 433:20
sponsorships 427:13
Sport 264:18
sports 210:10 212:8
216:9 223:15,20
227:3 235:4 238:6
238:13 241:2 294:3
304:8,10 313:14,15
351:10,12 381:21
391:10 429:1 437:8
438:2 439:7
spread 229:10
spreadsheet 330:18
stacks 240:20
staff 242:15,16
stage 361:21
Stamp 263:13 282:9
331:3

stand 270:10
standards 233:24
  266:21 304:12
  305:21
standing 429:5
stands 344:1
start 217:17 252:20
  267:5 299:18
  322:16 382:4
started 415:7
starting 245:22
  272:20 280:20,23
  287:22 295:1
  296:11 320:9
starts 319:15 322:7,8
state 227:13 306:8,9
  360:9 413:24
State's 280:8
statement 215:7,8
  223:3 228:12
  237:15 245:18
  282:3,5 322:15,19
  329:3 349:20,23
  350:9 374:5 381:22
  422:23 423:1,9,13
  423:17
statements 422:4
  438:19
states 210:2 233:17
  234:2 320:8
stating 255:12
statistics 352:11,14
status 434:1
stay 323:10 415:10
stenographically
  437:8
Stephen 211:4 439:11
Steve 271:13 280:15
  399:8
stimulation 327:17
stone 361:5
Stonebridge 235:22
stood 270:12 388:13
  388:16
stop 236:21 314:10,11
  346:14 347:5 425:1
  425:2,3
stopped 222:23 314:3
  424:20
stopping 317:17
storage 376:18
stories 229:10
story 307:3
Street 210:23 211:6
  211:14
strike 340:12,20 397:2

strong 433:12
strongly 341:12
structure 232:4 233:9
  267:20,20 293:13
  359:20 360:1
  367:16 388:11
  409:17,23 428:14
structured 219:5
struggle 247:5
struggling 278:13
Stubbs 350:15
student 269:18 290:19
  290:20 291:1,9,12
  327:11 364:23
  367:10 370:7 387:5
students 220:8 231:4
  231:7,9,9,11,16,17
  231:18,18,19 234:7
  242:4 284:1,3,9,11
  287:6 320:3 327:8
  337:5,6 338:1
  370:12 387:19
  388:10,16 433:19
studied 271:3
study 225:10
stuff 227:23 270:6
  271:9
stupid 336:8
subheading 322:5
subject 395:10 426:12
submitted 226:1
  236:18 269:9 410:4
submitting 269:7
subscribe 438:18
subsequent 420:10,13
substance 261:3
  322:22 351:20
  360:2,13 362:20
  374:9,22 379:20
  403:15 430:2
substantive 268:1
  357:15 401:19
success 321:18
successful 323:7
sue 420:17,18,19
  424:3
sued 424:20
suffered 427:16
suggest 227:2 320:5
suggested 229:2 249:8
  395:6
suggests 226:13
  228:22 337:14
  360:20
suicide 286:15
suitable 267:1

Suite 210:18,23
sum 422:8
summarize 221:24
  222:1
summary 424:12
summer 290:14
Superior 420:23
  421:2 423:8,8
supervised 366:1
supervisor 365:11
supervisors 365:11,24
  366:3
support 301:18
  313:12,14 319:9
  323:20 335:10
  389:13
supported 220:2
supporter 389:11,21
supporting 235:9
supportive 389:9
sure 217:5 220:11
  225:11 242:9
  250:11 257:10
  275:8 276:14
  279:14 297:15,22
  298:21 318:12
  322:11 325:13
  337:12 340:14,22
  358:17,18 366:20
  408:16 431:8,10
surgeon 393:5
Surgeons 410:10
surveys 434:9
suspect 277:10,12,13
sustained 423:18
sworn 216:4 437:11
system 234:17 235:7,8

_____
        T
_____
Table 265:21
take 219:18 220:5,24
  227:4 231:4 245:13
  250:21 255:20
  256:21 258:1
  265:20,22 266:23
  271:13 272:18
  275:12 304:17
  312:10,13 314:5
  317:19 324:1
  327:21 371:10
  381:14 394:13
  397:20
taken 239:20 272:10
  328:2 338:11 341:8
  375:8 394:15
  438:16 439:5

takes 226:21 308:19
  308:20
talk 264:12 311:14,21
  348:12
talked 221:3,22 222:4
  222:20 236:11,11
  275:1 320:16 358:5
  358:8 386:2 404:15
  406:22 429:6,12
talking 228:14 238:7
  251:17 265:10
  270:12 275:2
  281:15 287:12
  295:22 300:8 309:6
  309:7,9 311:13
  345:2 349:7 355:17
  367:23 401:6,18
  405:13 409:16
talks 301:10 320:22
  402:20
tasks 404:23
taught 386:21
tax 319:7 325:9,12
  333:22
Taylor 430:8
teach 230:22 231:1
  387:1
teaches 230:19
teaching 223:13,18
  231:12,16 233:13
  239:19,20 285:14
  286:8 327:13 337:4
  388:2
teaching-assistant
  387:7
team 235:3,9 322:24
Tech 320:19
techniques 428:13
Ted 387:13
tell 217:7 224:23
  225:11 256:22
  262:15 264:23
  273:14 274:3 280:7
  283:2 285:10
  297:13 307:3
  308:19 313:2
  322:15,18 330:5,6
  350:6 351:19
  356:22 358:12
  371:14 386:4
  390:24 397:22
  402:14 421:1 424:8
  427:21 429:13
telling 217:10 301:2
  389:16 430:18
template 352:8

templates 253:5
ten 221:19,19,20
  240:10 286:4 401:6
  415:6
tend 264:3 303:21
tense 322:8,9
term 218:1,4 220:11
  246:2,3,4 269:10
  316:23 336:14
  374:22
terminologies 216:20
terms 252:8 264:3
  269:6 367:4 396:1
  407:15
terrible 248:15
territory 218:11
test 431:16,16,17
tested 377:6,12
testified 306:5 346:24
  347:3 349:8,9
  386:11 395:6 430:9
  430:11
testify 348:10
testifying 306:4
  373:16
testimony 305:2
  306:18,22 307:7,11
  346:15 349:3 355:5
  358:18 359:23
  430:12
tests 367:11
text 363:11,13
thank 229:14 246:1
  269:19 280:14
  297:16 310:12
  333:14 435:24
  436:1,2
Thanks 411:15
theory 386:24 389:1
therapy 262:12
thereabouts 272:22
thereto 437:15
they'd 395:6
thing 217:3 226:19
  313:13 318:19
  360:4,16
things 224:3 225:7
  229:7 230:6 263:2
  285:5 297:12
  308:18 310:13
  311:17 333:9 341:7
  356:13 363:17
  393:22 408:18
  415:21 422:19
  424:13 430:19
  431:18 434:20

FARMER ARSENAULT BROCK LLC

think 217:24 222:7
  223:5 226:4 227:22
  237:7 239:21 245:6
  246:23 247:10
  248:17 252:12
  255:15 257:7
  258:19 259:10
  261:19 268:7
  272:11 275:6 278:6
  280:2 291:16 295:9
  297:10 303:3,10
  306:3 309:1,17
  310:5 312:17 315:8
  318:13 329:15
  333:15 339:16
  341:5 342:18 344:3
  347:13 348:2
  353:15 358:14
  363:23 368:2,5,20
  371:20 376:3 386:3
  389:3 393:8 402:6
  405:8 415:1,6,15,20
  421:6 432:18
thinking 224:18
  283:18 296:5
  297:24 298:5
third 364:3 381:1
  407:6
Thoroughbred 235:18
thoroughly 258:15
thought 263:5 298:1
  300:23 310:16
  402:16
thousand 316:23
threaten 420:17
three 251:23 277:17
  418:16 425:1
three-year 424:14,17
  424:24
time 225:8,10 231:3
  232:14 239:8
  240:19,22,23,24
  241:1,4,6 243:14
  244:2 245:5 246:18
  247:7 248:1,1,3
  258:13,14 260:13
  261:4 262:7 263:11
  272:21 273:3,7,8
  274:13 283:9,12,21
  284:6 285:4 288:14
  289:12 291:8,23
  293:3,6 294:4,16,17
  295:15,18 297:17,21
  298:13 308:11
  309:10,18,22 310:3
  310:21 316:17

317:3,5,21 322:2
327:23 328:16
329:2 335:15
339:10 342:11
345:22 347:10
350:11 352:4,20,22
353:13 356:15
359:15 361:7,21
365:16 366:9
367:14,20,24 368:3
370:11 371:12
373:9,11 378:20
382:6,14 393:19,21
393:21 394:4
399:19 401:22
402:10 408:8
410:12,16 414:10,22
415:10 416:3
417:16,19,21 420:14
428:20 430:2
435:11
timeline 279:8
times 243:3 244:16
  332:23 334:14
timing 286:3
title 249:11 258:24
  259:20 343:2
  366:19 368:6,8
titled 269:8
titles 259:20,22
  268:21 294:22
to-do 236:19
Tobis 366:6,7,22
  369:9
today 218:20 220:1
  245:3 256:24
  269:20,22 273:11
  275:21,23 276:8,18
  278:3 290:8 297:11
  327:23 347:18
  349:4 355:6 363:19
  363:23 365:13
  377:15 394:6 402:6
  404:13 410:5
  426:11,13 427:3,10
  429:8 430:6,17
told 237:8,12,20,24
  256:23 257:1
  258:13 277:2
  311:19 329:8 346:4
  349:10,17 351:13
  356:4,5,13 389:12
  429:15
top 331:8 355:15
  371:23 379:23
  383:10,13 396:18

topic 229:2,2 279:7
  304:22
touch 243:4,10 322:1
touches 435:9
trademark 225:20
  254:17 410:13,18
  429:3
tradesperson 224:1
train 330:3
trained 217:21
trainer 235:15
trainers 235:18 348:5
training 218:15
  219:17 232:21
  234:24 235:1
  266:15,16,17 270:21
  359:12,20 364:5
  367:9 370:1,2,3
  387:2 392:3
trains 335:16
transcript 437:12,18
  438:16,18 439:15,17
transfer 377:8
transferred 377:11
transition 402:21
  403:3,6
transmission 286:12
transmit 286:13
travel 348:4
travels 263:4 285:14
  412:14
treated 316:16
treatment 232:4
trick 217:8 268:19
tried 311:23 377:13
trim 223:22
trimming 217:21
trouble 256:13
true 237:16 258:24
  260:12 422:10
truly 334:4
Trust 331:17,21
try 216:15,22,24
  217:12 230:4
  254:22 270:4
  275:12 301:21
  313:2 332:19
  335:14 371:9 377:5
trying 222:2 255:10
  258:16,20 268:18,19
  271:11 276:5
  277:16 288:16
  308:23 309:17
  311:8 317:3 322:7
  322:11 333:1

340:23 342:14
344:2 346:22
368:17 370:23
407:6 425:24
435:10,11
Tufts 370:9 393:6,7
turn 255:23 258:22
  260:1,4 263:13,14
  265:21 268:9,16
  272:9 302:6 316:8
  319:11 326:4 331:3
  343:13 344:7 411:7
turned 250:18
two 257:11 316:12
  326:8 340:4 347:13
  347:15 363:12
  380:22 397:13
  404:9 409:8 422:19
  422:21 428:7
  429:13 430:10
two-birds/one-stone
  338:3
TXU 259:2
type 239:13,15 248:18
  249:3 264:21 277:3
  382:8 423:7
typed 248:10,12,16
  260:13,18,18 383:14
types 252:18 302:12
  391:3
typewriter 248:18
Typically 218:20
typing 248:15 249:5

_____
         U
_____
U.S 252:13 353:9
UC 366:11,20
umbrella 234:20
  285:7
unable 244:16 278:18
  417:4
unavailable 433:23
unbelievable 311:11
undergraduate 387:2
underneath 378:6
understand 216:19
  217:10 220:11
  223:21 246:1,5
  254:23 255:13
  257:10 258:16
  259:11 260:1 266:2
  266:4 269:21 270:5
  270:9 271:10,12
  278:20 279:8 288:9
  296:22 297:2 307:8
  322:12 323:23

325:24 331:8
340:15,21 346:23
356:21 394:8
399:22 406:9 407:7
415:17,24 427:14
433:13 435:5
understandable
  274:17
understanding 258:17
  266:24 273:22
  275:20 276:6,15
  303:5 331:4 356:23
  357:1 359:18,23
  373:5 398:5 404:13
  430:16
understands 256:17
understood 255:20
  271:5 340:22
  342:14 346:13
  359:21
undertake 409:19,20
undertaking 409:17
unfair 308:10
unique 368:20
United 210:2 233:17
universities 401:2
university 387:3
  389:5 425:19,22
  426:1
unofficial 409:15
unofficially 312:13
unrepresented 223:11
unsaid 430:13
untrue 227:9 391:6
updated 298:17
updating 298:11
upset 399:19
use 216:20 218:4
  247:9 253:2,4 255:7
  257:2,18 264:3
  305:23 336:14
  358:2 360:21
  389:13,21 407:15
  415:16 416:8
  429:15,23 430:3
useful 300:24
user 244:5
usually 254:11
usurping 429:2

_____
         V
_____
v 210:8
variety 364:16
various 270:20
verbatim 271:1,6,9
  273:4,12 274:20

275:18 276:11,20,20
276:23 277:18,20
278:6,11
**version** 251:15 261:7
261:7 275:3,14
318:11 352:2
398:10
**versions** 251:8 252:8
252:11 253:9
274:12,19 275:13,17
276:10,14 277:10,11
277:12,15 353:1,4
353:12,17
**versus** 332:14 334:6
409:17
**vet** 315:6
**veterinarian** 218:16
222:23 224:4
229:18 240:1,4
282:15,19,24
**veterinarian's** 235:6
**veterinarians** 221:17
222:22 223:17
224:5 228:9 229:4
232:5 233:10
234:24 237:21
239:10 266:16
267:2 270:21
288:17 289:21,24
290:8 303:21
305:20 315:16
316:3 321:15
322:20 323:4
347:20 348:3,6
359:13 406:18
408:15 409:11,14
428:11 433:13
435:5
**veterinary** 210:9,11
212:8,20 216:9
218:3 223:15,20
226:5,10,17,22
231:14,24 232:21
233:21 234:8,10,12
235:1,4 237:19
241:2 242:5 254:19
254:20 255:2,16
257:14,15 262:11,23
262:24 264:18
283:10 284:1,2
285:16 288:20
291:17 294:3,19,21
294:23 295:2,16
303:17 304:11
313:15 315:8
351:10 364:23

370:7,11 381:20
384:20 401:1
410:10 412:20
418:2 420:7,13,14
423:23 425:13
429:1 433:16 434:5
434:8,12 437:8
438:2 439:6
**view** 372:9
**violating** 226:14
**vision** 234:19 323:9
406:10
**visit** 213:24 328:8
335:22,23 336:10,24
337:9,22
**visitors** 352:11
**visits** 336:2,21 337:8
**Volume** 210:1
**voluntarily** 286:14
**volunteer** 242:15
311:3 312:11
**vote** 293:17
**vs** 437:7 438:1 439:6

_____

**W**

**wait** 227:13
**walk** 286:10
**want** 217:17 225:7
226:23 227:11,14
234:8 249:24
250:11 254:12,16
256:5,22 259:23
262:17 264:22
270:12 271:9,13
272:9,12 279:6,7
280:5 297:2 302:22
309:20 312:17,24
314:5,9,11 317:12
317:21 323:19
328:18 330:2,10
332:9 350:7,8
351:23 360:1,18
361:12,12,13 362:15
366:12 390:4
395:21 397:6,21
398:17 413:20
422:19 427:14
429:10,13
**wanted** 241:11 242:9
340:21,24 360:23
393:24 398:14
420:6 432:21
**wanting** 432:20
**warned** 228:11
**wasn't** 222:8 237:1
239:3 306:13,14

314:3 338:24
342:14 360:5,14
361:1 366:24 367:1
379:6 393:13
421:22 425:3 431:5
**way** 234:15 236:14
242:5 270:22
275:12 284:5
286:23 288:6
292:10 307:4
309:15,16 314:24
315:18 325:21
329:5 332:19
355:13,19 360:20
362:20 405:15
407:18 408:24
429:18
**Wayne** 228:14
**ways** 226:13 285:22
300:18 334:19
337:3
**we'll** 220:19 353:20
355:9 377:20
390:19
**we're** 237:11 238:7
261:10 292:8
318:16 401:6
405:13 415:11
422:20 431:11
**we've** 221:14 234:18
254:11 275:1
278:21
**wealthy** 309:8 318:7
**Web** 214:6 251:3,5,9
251:15,17,20,23
252:3,5,17,19,22
253:9,12 354:7,22
355:1,7,11
**webmaster** 252:21
**website** 214:4 277:13
280:8 351:17,23,24
352:3,4,9,12,17,19
353:1,4 354:2,11,16
354:19 355:20
356:2,9,16 357:2,2,3
**websites** 353:16 385:5
**Wednesday** 210:16
**weeding** 415:16
**week** 308:12 309:14
309:19
**weeks** 379:13
**Weitzen** 210:17
212:12
**welcoming** 293:24
**welfare** 213:17 314:13
337:13 428:16

**wellbeing** 224:2
**went** 223:4 228:19
236:15 241:9 278:9
286:11 294:11,12
333:7,9 352:8,20
362:8 388:8 425:24
**weren't** 242:9 361:2
**West** 212:3
**whatsoever** 435:13
**white** 297:1
**wide** 225:24
**widely** 262:13 337:13
**William** 213:15
314:12
**Williams** 396:3
**winter** 290:13
**wire** 333:21
**withdraw** 340:20
**witness** 256:12 303:1
305:2,18 437:9
438:1 439:14
**woman** 289:7,8 426:5
**wondering** 267:17
**word** 216:14 222:7,9
222:11 226:3 256:3
257:2 281:17
296:15,16 320:13
343:22 358:19
402:23 416:5
430:23
**words** 220:7,13 222:2
226:4 237:3 252:18
254:20 257:5,12
261:3 264:14 266:5
268:20 277:1,7
293:2 294:23 295:2
307:22 324:8 329:9
330:16 345:14
349:13 352:3
353:14 358:18
360:12 361:5
383:13 388:8
391:23 404:9 405:9
419:11 424:20
430:7 431:24
**work** 223:14,14 230:4
233:21 234:14
238:10 239:23
248:8,23 259:20
267:24 268:22
269:6,9 270:6,7
273:5 275:9 276:20
276:21 277:19,20
278:7 282:18
287:12,23 305:20
308:16 315:5 348:3

348:8 358:24
359:10 361:12
368:11 377:7
409:18,19 414:14
428:18,21,23 430:1
435:11
**worked** 288:8 348:12
366:1 395:7
**working** 217:22 219:9
226:16 232:6 239:9
249:14 274:15
292:8 305:17 320:3
326:22 348:6
391:15 394:4
396:11
**works** 219:3 232:11
232:12,13 282:11
303:7
**workshops** 283:23
**world** 231:14 287:4
429:2
**worth** 313:2 317:14
434:21,21
**wouldn't** 239:4 257:4
261:3 286:18
361:15 366:12
398:2 404:23
**wrapping** 426:11
**write** 334:15 374:6
376:11 378:14
381:5,6 419:15
422:8,16
**writing** 309:6,7 410:1
**written** 247:21 248:8
373:10 382:5,8
383:11 385:5 391:5
419:11
**wrong** 222:21 235:17
358:12 360:4 386:4
423:11
**wrote** 314:16,17 373:8
373:8 381:9
**www.fabreporters....**
210:21

_____

**X**

**X** 213:1

_____

**Y**

**yeah** 307:15 408:14
431:12 435:16
**year** 231:14 279:23
284:18,18 285:10,10
285:11 287:14
305:8 309:19,22,24
312:7 319:6,8,19,19

22

324:15 325:23
326:9,14 327:12
331:1,1,20 333:5,20
334:17 341:22
346:12 367:2 376:4
389:24 435:13
yearly 416:17
years 227:6 234:3
235:15 240:10
241:21 279:24
286:4 302:18
304:14 312:8,9
318:20 323:17
324:2,6,18 326:22
341:20 347:13,16
390:2,3 401:6 402:1
416:22 425:1
428:19,20
yesterday 216:15
217:18 221:4,21
224:20 229:15
236:14 241:8,17
254:17 263:21
265:1 294:12 295:6
296:12,17 303:12
305:24 316:15
337:3 340:4 346:3
348:21 359:6,24
364:11 365:14
370:8 386:3 390:6
390:10
yesterday's 255:21
York 235:15,18,20

Z
zones 435:11

0
000248 280:24
02109 210:23
02110 211:7,15
02210 212:16
02210-2600 212:5
03 346:1
03-13 437:10
04 346:1
05 346:1

1
1 245:21,22,23 255:21
265:20 272:20
318:21 355:16,16
374:10
1:00 317:15
1:11-CV-12192 210:8
10 317:14 390:4 415:5

10:00 415:7
10:04 210:16 216:2
100 261:14
11 250:21 352:5
11:30 271:15
115 211:6,14
11th 351:24 353:5
13-14 272:20
14 213:7 245:9,10,14
250:1 253:18,19,20
14-53 210:1
15 213:10 257:22,23
258:1 268:10,12
401:24 428:19
15,000 225:1 275:22
276:7 373:1 426:19
426:24
155 212:4
16 210:16 213:11
216:2 271:18,24
437:8 438:16 439:5
17 213:12 255:24
272:9 280:6,16
1786800 259:2
18 213:13 299:22,23
437:23 439:1
18th 383:1
19 213:14 312:20
1979 387:18
1981 381:2
1989 279:14
1990s 289:15
1992 281:5 282:20
381:13
1995 230:9 246:20
284:14 294:17
316:17 318:21
325:7 326:1 330:12
1996 248:5 260:9,17
261:16 262:3,4
284:14 294:17
296:4 327:8,9
338:14 339:1
381:12,19 382:4
1997 301:6,8 302:19
319:12,20 320:3,11
321:23 322:5
1998 316:17 323:13
1999 236:5 305:14
323:13 328:20
358:5
1st 261:17 262:4
411:16 435:17

2
2 210:1 245:23 274:4

2@ATTBI.com 357:5
20 213:15 286:17
314:12 317:15
428:20
2000 305:15 322:4
324:3,9 344:8
2000s 290:23
2001 331:20
2002 345:18,24,24
376:1 377:18 378:8
380:5
2003 296:14 377:18
382:6 383:1 392:17
424:18
2004 230:17 341:16
354:21,22 396:6,8
400:8 411:16 412:7
412:16,24 414:5
417:10
2006 345:19,24
2008 236:2 240:8
2009 273:24 274:16
421:13
2010-2011 353:15
2011 330:12 333:5
2012 272:22 309:13
351:24 352:5 353:5
437:8 438:17 439:1
439:5
2013 210:16 216:2
416:21 437:23
21 213:19 317:9
318:16,17 322:4
210-439 210:1
216 213:5
22 213:20 328:3,18
22nd 378:7 380:5
23 213:21 328:5 330:2
23rd 322:4
24 213:22 328:7
335:12,17
245 213:7
24th 272:22
25 214:1 328:10 338:5
251 282:9
252 288:16
257 213:10
26 214:2 328:12 339:5
339:5
27 214:3 328:14
342:16 433:13
435:4
271 213:11
28 214:4 265:21
351:16,17
280 213:12

28th 400:8
29 214:5 353:21,22
299 213:13
29th 354:22
2nd 412:7,16,24

3
30 214:6 227:5 355:11
30-some-odd 227:5
31 214:7 357:11
312 213:14
314 213:15
317 213:19
32 214:10 362:17
328 213:20,21,22
214:1,2,3
33 214:11 371:17
34 214:12 375:4,10
3412 260:4
3420 263:14
3434 263:20
3435 263:13,19 268:9
268:20,22 269:11,20
345 210:18
3491 269:12
3492 269:13,15,20
35 214:13 377:21
3508 369:20
351 214:4
3513 319:11
3517 324:1
353 214:5
355 214:6
357 214:7
36 214:14 379:16
362 214:10
37 214:15 382:18
371 214:11
375 214:12
377 214:13
379 214:14
38 214:16 385:10
382 214:15
385 214:16
3896 343:13
3899 344:7,11
39 214:17 390:20
390 214:17
392 214:18
395 214:19
397 214:20
398 214:22

4
4 272:20 274:4
4:00 415:11

40 214:18 392:11
400 214:23
403 214:24
41 214:19 395:22,23
411 215:1
413 215:2
415 210:23 215:3
418 215:4,5,6
42 214:20 397:8
422 215:7
423 215:8
43 214:22 398:18
44 214:23 400:3
45 214:24 403:17,18
411:7,8
455 437:10
46 215:1 411:22
413:17
4627 331:3,4
47 215:2 413:1
48 215:3 415:2,3
417:1
485 397:21
49 215:4 418:10,20,21
4th 211:14

5
5 255:23 355:16
415:17,18
5:00 415:5,17 422:20
5:23 436:3
50 210:23 215:5 234:1
418:12 419:24
500 397:21
501(c)(3) 281:19
308:2
51 215:6 418:14 420:3
52 215:7 422:23 423:3
52197 343:16
53 215:8 423:1 424:7

6
6 250:4 424:18
6/29/2004 354:24
6:00 415:18
617.227.5470 211:16
617.227.5800 211:16
617.439.3987 212:17
617.439.4990 212:17
617.443.1000 211:8
617.608.2828 211:8
617.728.4403 210:24
617.728.4404 210:24
617.832.1000 212:6
617.832.7000 212:6

**7**

7 249:24 250:4 282:10

**8**

8 265:21 324:20
80,000 433:14 434:1
80s 367:24
85 316:20
88 210:18 212:15
8th 382:6

**9**

9 355:16
90s 280:3 367:24
92 230:10 284:9
93 272:12
95 272:10,12,15
98 230:9,10
990's 331:2
9th 392:16