UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SHEILA LYONS and HOMECOMING               )
FARM, INC.                                )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )     CIVIL ACTION
                                          )     NO. 11-12192-WGY
AMERICAN COLLEGE OF VETERINARY            )
SPORTS MEDICINE AND                       )
REHABILITATION, INC. and                  )
AMERICAN VETERINARY MEDICAL               )
ASSOCIATION,                              )
                                          )
          Defendants.                     )
_____)


FINDINGS, RULINGS & ORDER

Young, D.J.                              February 19, 2014


I.   **INTRODUCTION**

     Sheila Lyons, DVM, ("Lyons") sought to form the

American Coll. of Veterinary Sports Medicine and

Rehabilitation (the "College"), an organization that

educates and certifies veterinarians as specialists in the

field of sports medicine and rehabilitation.  To accomplish

this goal, she joined other veterinarians in creating a

committee to petition the American Veterinary Medical

Association (the "Association") to recognize the College as

an accredited specialty organization.  The Association, a

nonprofit with a membership of thousands of veterinarians, has crafted rules and policies that specialty organizations must follow to attain its approval.

In 2004, other veterinarians in the College asked Lyons to recuse herself from the committee seeking the Association's approval.  After Lyons's relationship with the College ended, both the College and Lyons continued to use the "American Coll. of Veterinary Sports Medicine and Rehabilitation" mark.  Consequently, this trademark infringement suit arises from the disputed ownership of that mark.  Lyons has also accused the College of copying her work.

###    A.    Procedural Posture

Lyons and Homecoming Farms, Inc. initiated this action on December 12, 2011.  Civil Compl. Damages & Equitable Relief & Demand Trial by Jury ("Compl."), ECF No. 1.  The Association, the College, and the College's individual directors moved to dismiss various claims in the complaint. Def. American Veterinary Med. Ass'n's Mot. Dismiss, ECF No. 8; Partial Mot. Dismiss American Coll. Veterinary Sports Med. & Rehabilitation & Its Individual Directors, ECF No. 10.  This Court dismissed all of the claims alleged against the College's individual directors, as well as some of the claims brought against the College and Association.  Lyons

v. Gillette, 882 F. Supp. 2d 217, 236 (D. Mass. 2012).
After the Court's winnowing, this suit primarily involves
claims of trademark and copyright infringement.[1]  See id.;
Elec. Clerk's Notes, Apr. 10, 2012.

Thereafter, the parties filed cross-motions for
summary judgment on Lyons's trademark and copyright
infringement claims.  See Mot. Summ. J. American Coll.
Veterinary Sports Med. & Rehabilitation, ECF No. 68; Mem.
Supp. Mot. Summ. J. American Coll. Veterinary Sports Med. &
Rehabilitation ("College Mem. Summ. J."), ECF No. 69; Pls.'
Mot. Partial Summ. J. Against Def. American Coll.
Veterinary Sports Med. & Rehabilitation, Inc., ECF No. 75;
Mem. Law Supp. Pls.' Mot. Partial Summ. J. Against Def.,
American Coll. Veterinary Sports Med. & Rehabilitation,
Inc. ("Summ. J. Mem. Against College"), ECF. No 80;
American Veterinary Med. Ass'n's Mot. Summ. J., ECF No. 72;
Mem. Reasons Supp. American Veterinary Medical Ass'n's Mot.
Summ. J., ECF No. 73; Pls.' Mot. Partial Summ. J. Against
Def., American Veterinary Med. Ass'n, ECF No.  76; Mem. Law
Supp. Pls.' Mot. Partial Summ. J. Against Def., American
Veterinary Med. Ass'n, Inc., ECF No. 83.  At oral argument

---

[1]   Lyons's federal, common law, and state trademark
infringement and unfair competition claims (Counts I-III,
V) remain pending against both defendants.  See Lyons, 882
F. Supp. 2d at 236.  Lyons's copyright infringement claim
(Count VI) only survived against the College.  Id.

upon these motions, the parties agreed to treat the case as
a case stated based on the record evidence.  See Elec.
Clerk's Notes, May 10, 2013, ECF No. 108; Elec. Clerk's
Notes, May 13, 2013, ECF No. 110.  "In a case stated, the
parties waive trial and present the case to the court on
the undisputed facts in the pre-trial record.  The court is
then entitled to engage in a certain amount of factfinding,
including the drawing of inferences." TLT Constr. Corp. v.
RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting
United Paperworkers Int'l Union, Local 14 v. International
Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)) (internal
quotation marks omitted); see DiGregorio v. Hartford
Comprehensive Emp. Benefit Serv. Co., 423 F.3d 6, 12 (1st
Cir. 2005) (observing that converting summary judgment
motions to case stated allows court to find facts rather
than "grant[] inferences to each non-movant in turn").

    After converting the parties' motions to a case
stated, the Court heard their arguments on liability,
taking the matter under advisement.  Elec. Clerk's Notes,
May 13, 2013, ECF No. 110.  The parties submitted briefs
and requested findings of fact following the hearing.  See
Pls.' Requested Findings Fact & Rulings Law ("Lyons
Proposed Facts"), ECF No. 111; Def. ACVSMR's Post-Hr'g Br.
("College Post-Hr'g Br."), ECF No. 112; American Veterinary

4

Med. Ass'n's Post-Hr'g Br. & Reply Pls.' Oral Argument &
Requested Findings Fact & Rulings Law ("Ass'n Post-Hr'g
Br."), ECF No. 113; Pls.' Reply Mem. to Defs.' Post Hr'g
Submissions ("Lyons Post-Hr'g Br."), ECF No. 114.

### B.   Federal Jurisdiction

This Court has jurisdiction over this action under 28
U.S.C. sections 1331, 1338, and 1367.

## II.  FINDINGS OF FACT AND RULINGS OF LAW[2]

### A.   Background

Lyons is a veterinarian with experience in equine
sports medicine and rehabilitation.  See ACVSMR's Resp.
Pls.' Statement Undisputed Material Fact Supp. Its Mot.
Summ. J. & Statement Add'l Material Facts by ACVSMR
("College Resp. Lyons Facts") ¶ 85, ECF No. 91.  In 1992,
she established Homecoming Farm, Inc. ("Homecoming Farm"),
a nonprofit corporation.  Second Decl. Sheila Lyons, DVM

---

[2]   Rule 52(a)(1) of the Federal Rules of Civil
Procedure states that findings of fact and rulings of law
shall be stated "separately." Fed. R. Civ. P. 52(a)(1).
This aspect of the rule is frequently honored in the breach
as district courts instead opt for the familiar narrative
form of decision favored by appellate courts.  See
generally Lawrence S. Zacharias, The Narrative Impulse in
Judicial Opinions, 23 Law & Literature 80 (2011).  Here,
because much of this discussion involves mixed fact-law
analysis, such an approach is warranted.  See Harney v.
Sony Pictures Television, Inc., 704 F.3d 173, 179 (1st Cir.
2013) (explaining that analysis of copyright infringement
claims involves both questions of law and findings of
fact).

Opp'n Def.'s Mots. Summ. J. ("Lyons Aff.") ¶ 2, ECF No. 95-1.  In the mid-1990s, Lyons first used the phrase "The American Coll. of Veterinary Sports Medicine and Rehabilitation," which is the subject of the parties' trademark dispute, to describe a Homecoming Farm educational project.  See id.; College Resp. Lyons Facts ¶ 35.

In 1999, Lyons met Robert Gillette ("Gillette"), also a veterinarian, at a symposium focused on rehabilitation and physical therapy in veterinary medicine.  College Resp. Lyons Facts ¶¶ 82, 84.  They decided to collaborate to create a veterinary specialty organization called "The American Coll. of Veterinary Sports Medicine and Rehabilitation," which is now a defendant in this suit. See id. ¶¶ 84-88.  Veterinarians working in a specific field create specialty organizations to educate and certify specialists in that area.  Pls.' Resp. Def., American Veterinary Med. Ass'n, Inc.'s Statement Undisputed Material Facts ("Resp. Ass'n. Facts") ¶ 6, ECF No. 94.

The Association, a not-for-profit organization consisting of approximately 83,000 veterinarians nationwide, has set forth policies and procedures for specialty organizations seeking its recognition.  See id. ¶¶ 1-2, 7-8.  The Association forbids its members from

implying that they are specialists unless they are
certified by a specialty organization that has its official
approval.  See American Veterinary Med. Ass'n's Resp. Pls.'
Statement Undisputed Material Fact Supp. Their Mot. Summ.
J. & Statement Add'l Material Facts ("Ass'n Resp. Lyons
Facts") ¶ 69, ECF No. 98.  Lyons had first contacted the
Association for the purpose of creating a specialty
organization in veterinary sports medicine and
rehabilitation in 1997, which was prior to her meeting
Gillette.  See College Resp. Lyons Facts ¶ 56.

     To acquire the Association's approval, specialist
veterinarians must form an "organizing committee" and
submit a letter of intent to the Association followed by a
formal petition.  Resp. Ass'n Facts ¶ 8.  Lyons, Gillette,
and other veterinarians formed such a committee, see
College Resp. Lyons Facts ¶¶ 100-101, and in 2003 the
committee submitted a letter of intent to the Association
seeking approval as a specialty organization, id. ¶ 214.
In January 2004, Lyons contacted the Association to receive
guidance on drafting the articles of incorporation and
bylaws for the College's petition to the Association.  See
Pls.' Resp. Def., American Coll. Veterinary Sports Med. &
Rehabilitation, Inc.'s Statement Undisputed Material Facts
("Resp. College Facts") ¶ 15, ECF No. 96.  Lyons presented

her draft of these bylaws, as one of her copyrighted works, to the College's organizing committee. <u>See</u> <u>id.</u> ¶ 16. This draft was based in part on guidance from the Association. <u>Id.</u>

Lyons's relationship with the College soured in July 2004 after she was involuntarily removed from the College's organizing committee. College Resp. Lyons Facts ¶ 112. The parties dispute the reason for Lyons's removal and, as resolving this dispute will have no bearing on the outcome of this litigation, the Court passes on.

Since Lyons's removal, the College continued to call itself "The American Coll. of Veterinary Sports Medicine and Rehabilitation," while Lyons also pursued activities and offered educational services under that name. <u>See</u> Resp. Ass'n Facts ¶¶ 38-39, 47. In November 2008, the College submitted a formal petition to the Association, and subsequently the Association granted the College provisional recognition as a specialty organization in May 2010. College Resp. Lyons Facts ¶¶ 225, 228. In June 2011, the College was incorporated as a non-profit organization in Colorado. <u>Id.</u> ¶ 229. The College's primary purpose is to certify new specialists, and the College administered its first certification exam in 2012. <u>Id.</u> ¶¶ 231-32.

This suit arises out of Lyons's and the College's simultaneous use of The American Coll. of Veterinary Sports Medicine and Rehabilitation ("ACVSMR") mark.  Specifically, Lyons claims that the College and Association violated her exclusive right to use the ACVSMR trademark.  See Lyons, 882 F. Supp. 2d at 228.  Furthermore, Lyons claims that the College copied her work in its petition to the Association, thereby infringing her copyright.  See id. at 232.

### B.   Trademark Infringement[3]

To prove trademark infringement, Lyons must show that (1) "[the ACVSMR] mark merits protection and (2) the allegedly infringing use is likely to result in consumer confusion."  Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 116 (1st Cir. 2006).  A mark must be distinctive to qualify for trademark protection.  Id. Courts employ a spectrum of categories to grade a mark's distinctiveness.  This "spectrum of distinctiveness" includes marks categorized as: "(1) generic (least distinctive [and not worthy of trademark protection]), (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful

---

[3]   "Trademarks serve to identify and distinguish goods; service marks perform the same function for services."  Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 n.8 (1st Cir. 2008).  As the litigants do here, this Court uses the term trademark to describe marks that identify services.

(most distinctive)." <u>Boston Duck Tours, LP</u> v. <u>Super Duck</u>
<u>Tours, LLC</u>, 531 F.3d 1, 12 (1st Cir. 2008).

The parties agree that Lyons's ACVSMR mark falls in
the "descriptive" part of the spectrum.[4]  Descriptive marks
"convey an immediate idea of the ingredients, qualities or
characteristics of the good [or service] but are not
inherently capable of serving as source-identifiers."
<u>Peoples Fed. Sav. Bank</u> v. <u>People's United Bank</u>, 750 F.
Supp. 2d 217, 221 (D. Mass. 2010) (Gorton, J.) (quoting
<u>Boston Duck Tours</u>, 531 F.3d at 13) (internal quotation
marks omitted), <u>aff'd</u>, 672 F.3d 1 (1st Cir. 2012).  A mark
is distinctive when it identifies the source of a product
or service to consumers.  <u>See</u> <u>DeCosta</u> v. <u>Viacom Int'l,</u>
<u>Inc.</u>, 981 F.2d 602, 606-07 (1st Cir. 1992).  Because
descriptive marks are not inherently distinctive, Lyons
must affirmatively show that the ACVSMR mark has acquired
distinctiveness, or "secondary meaning," for the mark to

---

[4]   The United States Patent and Trademark Office
("PTO") determined that the ACVSMR mark is geographically
descriptive.  <u>See</u> Local R. 56.1 Statement Material Facts
Supp. American Veterinary med. Ass'n's Mot. Summ. J., Aff.
J. Mark Dickison Supp. American Veterinary Med. Ass'n's
Mot. Summ. J., Ex. M, United States Patent and Trademark
Office – Office Action, ECF No. 74-1.  Courts have
frequently "accorded weight" to the PTO's determination of
where marks fall on the spectrum of distinctiveness.
<u>Borinquen Biscuit</u>, 443 F.3d at 119.  Given the parties'
agreement that the ACVSMR mark is descriptive, this Court
will also defer to the PTO's categorization of the mark.

merit protection.  See Boston Granite Exch., Inc. v.
Greater Bos. Granite, LLC, No. 11-cv-11898-JLT, 2012 WL
3776449, at *3 (Tauro, J.) (D. Mass. Aug. 29, 2012) (noting
that descriptive marks "do not automatically qualify for
trademark protection").

>    **1.   Lyons Cannot Benefit From Evidentiary
>         Presumptions Associated With Registration on
>         the Principal Register to Prove Acquired
>         Distinctiveness**

Registration on the United States Patent and Trademark
Office's ("PTO") principal register endows a trademark with
the presumption that it is eligible for protection.  15
U.S.C. § 1057(b) (announcing that certificate of
registration on the principal register is prima facie
evidence of owner's "exclusive right to use the registered
mark in commerce").  In contrast, marks registered on the
supplemental register do not benefit from any presumption
of validity.  See 15 U.S.C. § 1094.  Rather, those marks
are considered "inherently non-distinctive," but are
"capable of achieving trademark status through the
acquisition of secondary meaning and distinctiveness."
Boston Duck Tours, 531 F.3d at 9 n.5 (quoting 2 Thomas
McCarthy, McCarthy on Trademarks and Unfair Competition §
12:1 (4th ed. 2008)).

Lyons first applied to register the ACVSMR mark in 2005.  Ass'n Resp. Lyons Facts ¶ 4.  The PTO initially rejected the ACVSMR mark for registration on the principal register, concluding that the mark was primarily descriptive and not distinctive.  See Local R. 56.1 Statement Material Facts Supp. American Veterinary Med. Ass'n's Mot. Summ J., Aff. J. Mark Dickison Supp. American Veterinary Med. Ass'n's Mot. Summ. J., Ex. M, United States Patent & Trademark Office – Office Action 2, ECF No. 74-1. Lyons then registered the mark on the supplemental register in 2006.  Ass'n Resp. Lyons Facts ¶¶ 1, 5.  In 2011, a week before commencing this action, Lyons again sought registration on the principal register and applied under 15 U.S.C. section 1052(f).  See id. ¶ 14.  Section 1052(f) enables descriptive marks that have acquired distinctiveness to join the principal register by considering proof of a mark's "substantially exclusive and continuous use" for five years prima facie evidence of that mark's secondary meaning.  15 U.S.C. § 1052(f); California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1454 (9th Cir. 1985).

The PTO approved the ACVSMR mark for registration on the principal register in 2012 under 15 U.S.C. section 1052(f).  See Lyons Aff., Ex. V, Notice of Publication 25,

ECF No. 95-8 (stating that "[t]he [ACVSMR] mark . . . appears to be entitled to registration [on the principal register].").  The College, however, opposed Lyons's registration of the ACVSMR mark, and the PTO has suspended its proceedings pending the outcome of this litigation. Ass'n. Resp. Lyons Facts ¶ 14.  Consequently, the PTO has not issued a certificate of registration on the principal register.  See 15 U.S.C. § 1057(a).  Thus, Lyons cannot rely on the statutory presumption of distinctiveness afforded to marks on the principal register despite her many attempts to do so.  See, e.g., Ass'n Resp. Lyons Facts ¶ 14 (asserting that Lyons falsely stated that the ACVSMR mark is listed on the principal register); Summ. J. Mem. Against College 4 (claiming that the validity of her trademark is "incontestable," even though that status only inures to marks that have been on the principal register for five years under 15 U.S.C. section 1065).

Lyons next argues that the presumption of acquired distinctiveness enunciated in 15 U.S.C. section 1052(f) governs this Court's determination of whether the ACVSMR mark has secondary meaning.  Lyons Post-Hr'g Br. 2 (arguing that "[a] presumption of secondary meaning arises after five years of continuous use of a trademark in commerce"); see also Ass'n Post-Hr'g Br. 2-3.  Section 1052(f),

however, only applies to trademark registration and allows
the PTO to presume that a mark has secondary meaning with
proof of five years' "substantially exclusive and
continuous use." See Maple Grove Farms of Vt., Inc. v.
Euro-Can Prods., Inc., 974 F. Supp. 85, 94 (D. Mass. 1997)
(noting that 15 U.S.C. section 1052(f) allows the PTO to
presume a mark has acquired secondary meaning "in [the]
registration context").  In contrast, in other contexts,
the First Circuit has listed various factors that are
relevant to deciding whether a trademark has acquired
secondary meaning; the length and manner of a mark's use is
only one factor that a court ought consider.  See I.P. Lund
Trading ApS v. Kohler Co., 163 F.3d 27, 41-42 (1st Cir.
1998); Stratus Computers, Inc. v. NCR Corp., Civ. A No. 87-
0141-Z, 1987 WL 7748, at *2 (D. Mass. Feb. 27, 1987)
(Zobel, J.) (noting that "bare use [of mark] for five
years" does not prove that descriptive mark has acquired
secondary meaning).  Thus, this Court refuses to apply the
section 1052(f) presumption in deciding whether Lyons's
ACVSMR mark has secondary meaning.  See Art Attacks Ink,
LLC v. MGA Entm't Inc., 581 F.3d 1138, 1146 (9th Cir. 2009)
(observing that various circuits "have explicitly held that
extensive use alone cannot establish secondary meaning").

At best, this Court can accord some weight to the PTO's finding that the ACVSMR mark has acquired secondary meaning in the analysis that follows.  See CJ Prods. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 152 (E.D.N.Y. 2011) (according "some weight" to PTO's initial approval of mark on principal register despite fact that registration was ultimately stalled in opposition period); cf. Boston Granite Exch., 2012 WL 3776449, at *2 n.28 (considering merits of trademark infringement claim independently of PTO's decision to approve registration of plaintiff's mark on the principal register).  Yet, "[d]istrict courts have broad authority to review trademark decisions by the [PTO], both before and after the registration of a mark." Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc., 525 F.3d 8, 12 (D.C. Cir. 2008); see also 15 U.S.C. § 1119 (authorizing district courts to cancel registration of marks).  Thus, Lyons ultimately bears the burden of proving that her mark is entitled to protection.

### 2.   Lyons Fails to Prove that the ACVSMR Mark has Acquired Secondary Meaning

Trademarks are used to advertise goods and services. Boston Duck Tours, 531 F.3d at 11-12.  A rationale behind federal protection of trademarks derives from marks' ability to "distinguish and identify goods, as well as

their sources, . . . reducing [consumers'] search costs and
allowing them to make decisions that more closely coincide
with their preferences." Id. at 12.  Consistent with this
rationale, descriptive marks cannot secure trademark
protection until they "acquire a special association with a
particular source of consumer products or services." Flynn
v. AK Peters, Ltd., 377 F.3d 13, 19 (1st Cir. 2004)
(emphasis added).  A mark has secondary meaning when enough
of the consuming public uses the mark to identify the
source of the product or service. See Kellogg Co. v.
National Biscuit Co., 305 U.S. 111, 118 (1938) (observing
that "the primary significance of . . . [a] term [with
secondary meaning] in the minds of the consuming public is
not the product but the producer").  Thus, the "secondary
meaning" inquiry aims to understand consumer association
and recognition.

Whether a mark has acquired secondary meaning is a
question of fact. Boston Beer Co. Ltd. P'ship v. Slesar
Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993).  The
party seeking protection of the mark bears the burden of
proving secondary meaning, which "entails vigorous
evidentiary requirements." Id. at 181 (quoting Perini
Corp. v. Perini Constr., 915 F.2d 121, 125 (4th Cir.
1990)).  Factors courts use in evaluating whether secondary

meaning has attached to a mark include: "(1) the length and manner of its use; (2) the nature and extent of advertising and promotion of the mark; and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture." Id. at 182 (quoting Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 816 (1st Cir. 1987)).  Other probative factors include media coverage, attempts to copy the mark, the size or prominence of the plaintiff's enterprise, and the product's or service's place in the market. Flynn, 377 F.3d at 20; Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 484 F. Supp. 2d 205, 214 (D. Mass. 2007) (Saylor, J.) (citing I.P. Lund Trading, 163 F.3d at 42).  Direct evidence, such as customer surveys or testimony, although not required, is considered highly probative. See Bay State, 484 F. Supp. 2d. at 214. Because Lyons has not provided direct evidence of the significance that the consuming public ascribes to the ACVSMR mark, this analysis assesses the circumstantial evidence that Lyons has produced to show secondary meaning.

Before reaching the factors that are probative of secondary meaning, the Court must first make two threshold determinations: (1) defining the services that the ACVSMR identifies, and (2) specifying the relevant consuming

public.  See Boston Beer, 9 F.3d at 181 (stating that mark
achieves secondary meaning when a "significant quantity of
the consuming public understand the name as referring
exclusively to the appropriate party") (quoting President &
Trs. of Colby Coll. v. Colby Coll.-N.H., 508 F.2d 804, 807
(1st Cir. 1975)); Flynn, 377 F.3d at 21 (noting that the
court must determine the class of consumers relevant for
secondary meaning purposes).

The ACVSMR mark is primarily used to denote
educational services in the fields of veterinary sports
medicine and rehabilitation.  See, e.g., Lyons Aff., Ex. D,
The American Coll. of Veterinary Sports Medicine and
Rehabilitation Services Website ("ACVSMR Website:
Services"), ECF No. 95-2.  This interpretation accords with
the PTO's similar treatment of the ACVSMR mark as
identifying "[e]ducational services," which include
"classes, seminars, clinical seminars, conferences,
workshops and internships and externships in the fields of
veterinary sports medicine and veterinary rehabilitation."
Lyons Aff., Ex. W, Trademark Trial & Appeal Elec. Filing
Sys., Not. Opp'n, ECF No. 95-8.

As far as the consuming public is defined, Lyons's
ACVSMR educational program appears primarily to target
individuals in the equine veterinary community or sports

18

horse industry.  See ACVSMR Website: Services (listing educational services provided to veterinarians, healthcare managers, and farriers in various areas of equine veterinary practice).

### 3.   Factors Indicative of Secondary Meaning[5]

Lyons heavily relies on the length and manner of use of the ACVSMR mark to show secondary meaning, see Lyons Post-Hr'g Br. 2-3, likely because she makes the strongest showing on these factors.  To demonstrate the length of use of the ACVSMR mark, Lyons provides Homecoming Farm's tax returns from 2000 to 2010.  Lyons Aff., Ex. G, Return of Organization Exempt from Income Tax ("Tax Returns"), ECF No. 95-3.  These tax returns consistently list the provision of ACVSMR seminars, lectures, or clinical experiences throughout the ten-year period as among Homecoming Farm's activities.  The returns, however, largely fail to show the number of students served by

---

[5] Lyons's claim for the validity of her mark is largely supported by her own affidavit.  See Lyons Aff. ¶¶ 15-28, 187-210.  "Such 'opinion' testimony by a [party] is considered self-serving and of little probative value." Flynn, 377 F.3d at 21 (alteration in original) (quoting 851 Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 648 (2d Cir. 1988)) (internal quotation marks omitted).  Thus, this Court mostly relies on the documentary evidence appended to Lyons's affidavit in evaluating Lyons's proof of secondary meaning.

ACVSMR programs.[6]  In addition, Lyons has included a
brochure summarizing ACVSMR educational programs, as well
as lecture slides that contain the ACVSMR mark, to prove
use of the mark.  Lyons Aff., Ex. F, Homecoming Farm, Inc.
ACVSMR Educ. Materials, ECF No. 95-2.  Thus, the evidence
indicates that Homecoming has offered services under the
ACVSMR mark beginning in 2000.[7]  But the length of use of a
mark, without more, is not sufficient to show the kind of
consumer association required to achieve secondary meaning.
See Art Attacks Ink, 581 F.3d at 1146 ("[C]ourts have
summarily rejected claims of secondary meaning predicated
solely upon the continued use of the mark for many
years[.]") (first alteration in original) (quoting Vision
Center v. Opticks, 596 F.2d 111, 119 (5th Cir. 1979)); I.P.
Lund Trading ApS v. Kohler Co., 118 F. Supp. 2d 92, 111 (D.
Mass. 2000) (Gertner, J.) (deciding that evidence of more

---

[6]     Only tax returns in fiscal years 2000, 2001, and
2002 list the number of ACVSMR students and attendees.  See
2000 Tax Return (listing more than 200 students
participating in ACVSMR programs); 2001 Tax Return (listing
"500 horses, students and lecture attendees"); 2002 Tax
Return (listing "over 500 attendees").

[7]     Although Lyons claims continuous use of the ACVSMR
mark since 1996, Lyons Aff. ¶ 15, there is no indication
that the ACVSMR education services were anything more than
an ambitious idea or project in development prior to 2000,
see 2 McCarthy on Trademarks and Unfair Competition § 16:4
(4th ed. 2008) (noting that only marks that are used in
commerce, most commonly through the sale of goods or
services, merit trademark protection).

than twenty years of exclusive use of trademark is not
sufficient to prove secondary meaning); cf. Shames v.
Coontz, 882 F. Supp. 1173, 1174 (D. Mass. 1995) (Lasker,
J.) (deciding that plaintiffs will likely prevail on
secondary significance claim where mark was used for 16
years with "apparent considerable success" and "broad . . .
and pervasive" advertising) (emphasis added).

Advertising of a mark can be probative of secondary
meaning. See Boston Beer, 9 F.3d at 182. "[W]hile
secondary meaning is shown by the success rather than by
the mere fact of an enterprise's promotional efforts, the
normal consequence of substantial publicity may be
inferred." President & Trs. of Colby Coll., 508 F.2d at 808
(internal citation omitted). Lyons lists postal and
electronic mailings, as well as social media practices, as
part of her advertising efforts for ACVSMR, but provides no
details regarding the number of people targeted or the
frequency of distribution of these ads. See Lyons Aff. ¶
17. Lyons also maintains a listing in The Bloodhorse
Source, "a major advertising directory for the equine
industry." Id. at ¶ 16; Lyons Aff., Ex. C, Horse Racing
and Breeding Information from The Blood-Horse, ECF No. 95-
1. In addition, Lyons reports that "lectures, seminars,

[and] speaking engagements" advertise her mark.  Lyons Aff.
¶ 17.

This sketched portrait does not depict the type of
pervasive and continuous advertising scheme that is
probative of secondary meaning.  See Unleashed Doggie Day
Care, LLC v. Petco Animal Supplies Stores, Inc., No. 10-
10742-DJC, 2011 WL 6812642, at *8 (D. Mass. Dec. 28, 2011)
(Casper, J.) (holding that small business's purchase of a
print advertisement and telephone book listing, along with
a reported $56,851 spent on advertisements during a ten
year period, were "insufficient to establish secondary
meaning").  Moreover, a website is a potential promotional
tool.  Absent any evidence that consumers became aware of
Homecoming's ACVSMR educational program through the ACVSMR
site, the mere existence of a website is not highly
probative of either an effective advertising technique or,
more to the point, the public's association of the ACVSMR
mark with Lyons or Homecoming Farm – the source of the
ACVSMR programs.  See True Fit Corp. v. True & Co., No. 12-
11006-GAO, 2013 WL 789213, at *3-4 (D. Mass. Mar. 4, 2013)
(O'Toole, J.) (holding that plaintiff's mark was
unprotectable because plaintiff failed to prove that the
public associated its marks with services from a common
source despite having invested "significant resources into

advertising and branding," id. at *3); Yankee Spirits, Inc.
v. Gasbarro, No. 96-10967PBS, 1998 WL 428092, at *8 (D.
Mass. May 26, 1998) (Alexander, M.J.) (suggesting that
evidence of trademark advertising is relevant to
determining secondary meaning only insofar as it indicates
that the public associates an advertised mark with a
particular source) (citing Aromatique, Inc. v. Gold Seal,
Inc., 28 F.3d 863, 872 (8th Cir. 1994)); Stratus Computers,
1987 WL 7748 at *3-4, (holding that mark had not acquired
secondary meaning even with advertisements costing
$4,400,000 over five years, because it did not lead
consumers to associate plaintiff's mark with its products).
Here, Lyons does not offer adequate evidence of a
connection between her advertising and any ensuring public
recognition or association.  In summary, not only is
advertising a weak proxy for the consumer recognition that
is the hallmark of secondary meaning, but also Lyons's
showing on this factor is insufficient.

Lyons alleges that she has "continuously used the
ACVSMR mark" in her varied work activities.  Lyons Aff. ¶
187; id. ¶ 28 (stating "I [Lyons] have also used the ACVSMR
mark when describing my credentials and qualifications to
private clients and potential clients, in my lectures,
seminars and clinics, when I testified before Congress,

provided expert testimony on behalf of federal prosecutors, district attorneys and law enforcement authorities, and in published media, television and radio interviews continuously since 1996."). The First Circuit discounted similar evidence where a plaintiff submitted her curriculum vitae and an affidavit listing professional accomplishments to demonstrate the secondary meaning of her name. Flynn, 377 F.3d at 20-21. The Flynn court adjudged the plaintiff's professional accomplishments too remote from the "mindset of . . . likely consumers" to establish the secondary meaning of her name. See id. at 21. Similarly, Lyons's mention of the ACVSMR when describing her credentials in disparate professional activities does not establish that consumers use the mark to identify the veterinarian educational services that she and Homecoming Farm provide.

Along this same vein, Lyons contends that media coverage demonstrates her association with the ACVSMR mark, thus giving it secondary meaning. See Lyons Aff. ¶ 199; Flynn, 377 F.3d at 20 (citing Fay's Drug Co., 842 F.2d at 648); see also 165 Park Row, Inc. v. JHR Development, LLC, No. 2:12-cv-00106-NT, 2013 WL 4519425, at *9 (D. Me. Aug. 26, 2013) (concluding that evidence of media coverage without "evidence of how many consumers were reached by

this coverage" is "not enough to withstand summary
judgment"). All of the articles that Lyons submitted in
support of this proposition were published in July 2012,
and primarily discuss Lyons's role as a witness in an
United States Senate hearing on the use of drugs in horse
racing. See Lyons Aff., Ex. CC, Media Coverage, ECF No.
95-8. Although Lyons is often referred to in these
articles as "the founder and director of the American Coll.
of Veterinary Sports Medicine and Rehabilitation," the
timing and content of the articles reveal that their focus
is on Lyons's advocacy against the overmedication of horses
rather than the services that she offers through the ACVSMR
programs. See, e.g., Media Coverage, Joe Drape & Walt
Bogdanich, Records Show Triple Crown Contender Had History
of Ailments, N.Y. Times, Jul. 11, 2012, at 3. Even had it
been otherwise, Lyons does not offer evidence of how many
consumers were reached by such coverage, and thus this
evidence would be of little probative value. See 165 Park
Row, Inc., 2013 WL 451942, at *9.

As a last-ditch effort at showing secondary meaning,
Lyons pointed to the College's July 2012 press release in
which it disassociated itself from Lyons. Lyons argues
that the College had to issue the press release to address
confusion that ensured because the ACVSMR mark is

25

synonymous with the brand of veterinary medicine that Dr.
Lyons practices.  This press release states in part that
"[t]he [College] that is recognized by the [Association]
does not have any professional affiliation with Sheila
Lyons."  Lyons Aff., Ex. R, American Coll. of Veterinary
Sports Medicine and Rehabilitation Website: News ("College
Website"), ECF No. 95-7.  To the extent that this press
release suggests a likelihood of consumer confusion between
Lyons's ACVSMR and the College, the First Circuit has
already foreclosed the use of consumer confusion, standing
alone, as proof that secondary meaning exists.  See Boston
Beer, 9 F.3d at 183 (rejecting argument that survey
evidence showing a likelihood of consumer confusion
indicates that secondary meaning exists and warning
trademark plaintiffs against placing "the cart before the
Clydesdale," by forgetting that consumer confusion was to
be considered only after secondary meaning was found).  If
anything, the College's press release after Lyons's
participation at a Senate hearing demonstrates the weakness
of Lyons's mark: despite the seniority and purportedly
extensive, continuous use of Lyons's ACVSMR mark,
individuals interested in Lyons's anti-doping advocacy
contacted the defendant-College, which indicates the lack
of public recognition of Lyons's ACVSMR educational

program.  See Lyons Aff., Ex. EE, Email from John Moore, M
& M Stable, to Kevin K. Haussler, Secretary-Treasury,
American Coll. of Veterinary Sports Medicine and
Rehabilitation (Jul. 17, 2012), ECF No. 95-8 (stating "I am
confused, as I was looking at testimony . . . by . . .
Sheila Lyons who spoke to the [U.S.] Senate this week, and
I thought she was with your organization, though I do not
see her name on your Board.").  Given the equivocal showing
of consumer confusion following Lyons's testimony at a
Senate hearing, this evidence fails to prove secondary
meaning.

        Lastly, this Court cannot infer the success,
establishment, or prominence of the ACVSMR program from the
evidence in the record.  Homecoming Farm's tax returns show
a fluctuating budget for the ACVSMR's educational programs
that may signal the program's instability or the
potentially sporadic provision of educational services in
certain years.  See generally Tax Returns.  The dearth of
evidence concerning the number of students served by the
ACVSMR further cautions against the conclusion that the
ACVSMR is internationally renowned, as Lyons contends.  See
id.; Lyons Post-Hr'g Br. 2 (asserting that there is
evidence of the ACVSMR mark's "national[] and
international[]" reputation).

Given Lyons's weak showing on the factors that are probative of secondary meaning, she has not met the rigorous standard of showing the "magic wand of consumer recognition" that reflects secondary meaning. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:7 (4th ed. 2013); see Flynn, 377 F.3d at 21 (requiring "stringent requirements for secondary meaning evidence"). Further, Lyons's efforts to protect the ACVSMR mark through applications to join PTO registers and the purchase of various domain names affiliated with ACVSMR do not, by themselves, transform her mark into one eligible for trademark protection.

Thus, because proof of a mark's distinctiveness is a common element of Lyons's federal[8] trademark claims, and because she cannot establish such distinctiveness, these claims fail.  See Borinquen Biscuit Corp., 443 F.3d at 114, 116 (noting that mark must be distinctive to qualify for protection under 15 U.S.C. sections 1114(1) and 1125(a)).

---

[8]   Although the College did not contest Lyons's trademark claims at the motion-to-dismiss stage, the Association moved to dismiss Lyons's federal trademark dilution claim under 15 U.S.C. section 1125(c).  See Lyons, 882 F. Supp. 2d at 228.  The Court dismissed Lyons's federal dilution claim as matter of law, determining that the ACVSMR mark is not "famous" as required under 15 U.S.C. section 1125(c).  Id.  For the same reason, Lyons's federal dilution claim against the College also fails.

Similarly, Lyons must prove her mark's distinctiveness to succeed on her state and common law trademark claims. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 768-69 (1986) (noting that unfair competition claim under Massachusetts common law requires proving either "palming off"[9] or that mark has acquired secondary meaning); Monroe Stationers, Inc. v. Munroe Stationers, Inc., 332 Mass. 278, 280 (1955) (stating that proof of secondary meaning is prerequisite to common law unfair competition claim); Castricone v. Mical, 74 Mass. App. Ct. 591, 594 (2009) (observing that Massachusetts common law of trademark "protect[s] the value of a trade name imbued with 'secondary meaning'"); See also Lyons, 882 F. Supp. 2d at 228 (listing distinctiveness as requirement under the Massachusetts anti-dilution statute).  Although the factors that Massachusetts courts review to determine acquired distinctiveness are not identical to those employed by federal courts, secondary meaning has the same significance in Massachusetts and federal law: proof of a "mental

_____

[9]   "Palming off" is "an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another."  Datacomm Interface, 396 Mass. at 769 (1986).  Lyons cannot recover for unfair competition under a theory of "palming off" given the lack of evidence on this point.  If anything, the College's press release disaffirming any professional association with Lyons puts paid to this theory of liability.  See College Website.

association in the buyers' minds between the alleged mark
and a single source of the product." Planned Parenthood
Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.,
398 Mass. 480, 486 (1986) (quoting 1 J. Thomas McCarthy,
Trademarks and Unfair Competition § 15:1(A) (2d ed. 1984))
(internal quotation mark omitted).  Furthermore, Lyons used
the same evidence to demonstrate secondary meaning for all
of her trademark claims.  See Mem. Law Opp'n Mot. Summ. J.
By Def., American Veterinary Med. Ass'n, Inc. 7-8, 14-16,
ECF No. 93.  Consequently, this Court's analysis of the
distinctiveness of the ACVSMR mark under federal law also
applies to Lyons's state and common law claims.  See
Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d
130, 140 (D. Mass. 2003) (Lindsay, J.) (concluding that
trademark plaintiff's failure to prove secondary meaning
under the federal Lanham Act foreclosed Massachusetts
trademark and unfair competition claims because they are
"indistinguishable" from the Lanham Act); Leejay, Inc. v.
Bed Bath & Beyond, Inc., 942 F. Supp. 699, 701 n.2 (D.
Mass. 1996) (O'Toole, J.) ("Because trademark infringement
is defined in essentially the same terms under the Lanham
Act and under Massachusetts law, . . . [an analysis of] the
state claims will not be different enough to merit separate
discussion.").  As a result, Lyons's failure to prove

secondary meaning is fatal to both her federal and state law trademark cases.

### C.   Copyright Infringement

Lyons is the owner of several copyrighted works[10] for which she has recieved a Certificate of Registration from the Copyright Office.  Lyons Aff., Ex. I, Certificate of Registration, ECF No. 95-5.  Lyons claims that the College's petition to gain recognition from the Association copied her copyrighted works.  Lyons Proposed Facts ¶¶ 100-01; see also Decl. David A. Kluft, Esq. Supp. Mot. Summ. J. ("Kluft Aff."), Ex. L, American Coll. of Veterinary Sports Med. & Rehabilitation – Petition to the American Board of Veterinary Specialties ("Petition"), ECF No. 71-12.

### 1.   Copyright Law Framework

To succeed on her copyright infringement claim, Lyons must prove "ownership of a valid copyright and illicit copying."  Harney v. Sony Pictures Television, Inc., 704 F.3d 173, 178 (1st Cir. 2013) (quoting Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001))

---

[10]  These copyrighted works are entitled: "a) The Equine Excellence Initiative; b) The American Coll. of Veterinary Sports Medicine and Rehabilitation Education; c) ACVSMR Articles of Incorporation and Bylaws; d) ACVSMR Educational Program Description with ACVSMR Student Applications; [and] e) ACVSMR Websites."  Lyons Proposed Facts ¶ 44; Lyons Aff., Ex. I, Certificate of Registration, ECF No. 95-5.

(internal quotation mark omitted).  The parties do not dispute Lyons's valid copyright.  <u>See</u> <u>CMM Cable Rep, Inc.</u> v. <u>Ocean Coast Props., Inc.</u>, 97 F.3d 1504, 1513 (1st Cir. 1996) (noting that certificate of copyright is <u>prima facie</u> evidence of copyrightability).  Thus, Lyons must prove illicit copying.

Proof of illicit copying includes two elements: (1) actual copying and (2) substantial similarity between the copyrighted and infringing works.  <u>Society of Holy Transfiguration Monastery</u> v. <u>Gregory</u>, 689 F.3d 29, 48 (1st Cir. 2012) (citing <u>Yankee Candle</u>, 259 F.3d at 33).  Actual copying establishes that the infringer factually copied the plaintiff's work.  <u>Id.</u>  If the infringer had access to the copyrighted work and the two works are similar enough such that copying can be inferred, there is proof of actual copying.  <u>Id.</u> at 49 (stating that there must be "probative similarity" between the two works to infer actual copying). Here, Lyons wrote and presented a draft of her bylaws and articles of incorporation to the College before she was removed from its organizing committee in 2004.  Resp. College Facts ¶ 16.  The bylaws are a required component of any petition submitted to the Association.  <u>See</u> Petition 19.  Given the College's access to Lyons's bylaws, one of her copyrighted works, this Court assumes for purposes of

this motion that there is sufficient proof of actual copying.[11]   Thus, the parties' dispute focuses on the second prong of copying – copying that is so "flagrantly extreme" that the infringing and copyrighted works are "substantially similar."   Gregory, 689 F.3d at 48.

In regard to the second prong, copyright "[i]nfringement is shown by a substantial similarity of protectible expression, not just an overall similarity between the works."   CMM Cable Rep, 97 F.3d at 1514 (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03(F), at 13-124 (1995)) (alteration in original).   Thus, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected.   Originality remains the sine qua non of copyright; accordingly, copyright protection may extend to

---

[11]   While there is a colorable question as to the degree of copying, the Court assumes proof of actual copying for the purposes of this section.   Because Lyons ultimately fails to prove substantial similarity between the Petition and other copyrighted works, a deep inquiry into actual copying would be superfluous.

Moreover, the College correctly disputes Lyons's implausible claim that she gave the organizing committee "copies of [her] copyrighted works" in September 1999 since the only copyrighted work that purports to precede that date is The Equine Excellence Initiative.   College Resp. Lyons Facts ¶¶ 95-97.   This Court overlooks whether the College had access to Lyons's copyrighted works other than the bylaws and articles of incorporation because the bulk of her copyright claim involves the College's copying of her bylaws.   See College Post-Hr'g Br. 1.

those components of a work that are original to the author." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991). Originality, however, is an extremely low threshold that requires only a "minimal degree of creativity." Id. at 345.

The extent to which the copyrighted work has protectable expression is matter of law. T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 114 n.7 (1st Cir. 2006). Thus, a court undertakes what is dubbed a "dissection" analysis of copyrighted work to filter out protected expression before two works are compared for substantial similarity. See Greene v. Ablon, 914 F. Supp. 2d. 110, 112 (D. Mass. 2012) (Casper, J.) (citing Hassett v. Hasselbeck, 757 F. Supp. 2d 73, 81 (D. Mass. 2010) (Wolf, J.)). In doing this analysis, "[t]he court must not 'so dissect the work as to classify all its elements as unprotectable . . . [thus] possibly blinding it [and the factfinder] to the expressiveness of their ensemble.'" Id. at 114 (fourth alteration in original) (quoting CMM Cable Rep., 97 F.3d at 1519).

## 2.   Dissection Analysis

Lyons's copyrighted works largely contain protectable expression. These works explain the need for further specialization in the sports medicine and rehabilitation

34

field of veterinary medicine.  See generally, e.g., Kluft
Aff., Ex. O, The Equine Excellence Initiative, ECF No. 71-
15.  Her works communicate the purpose and goals of
establishing a specialty organization that will certify
veterinarians in this field.  See, e.g., Kluft Aff., Ex. O,
Objectives and General Structure for Board Specialty
Training and Certification ("ACVSMR Objectives"), ECF No.
71-15; Kluft Aff., Ex. O, ACVSMR Articles of Incorporation
("ACVSMR Articles") ¶ 8, ECF No. 71-15.  In addition, both
Lyon's bylaws and the ACVSMR Objectives describe a process
for certifying veterinarians in the sports medicine and
rehabilitation specialty field, which includes pathways for
certification and a required curriculum.  See ACVSMR
Objectives 1-2; Kluft Aff., Ex. O, ACVSMR: Bylaws ("ACVSMR
Bylaws") Art. II, ECF No. 71-15.  Lyons's "creative choices
in describing [the process for certification], including
the works' overall arrangement and structure, are subject
to copyright protection."  Situations Mgmt. Sys., Inc. v.
ASP. Consulting LLC, 560 F.3d 53, 61 (1st Cir. 2009).

There are, however, aspects of Lyons's ACVSMR Bylaws
that are not protectable.  In 2003 the Association released
guidelines and requirements for groups drafting petitions
to become accredited specialty organizations.  See Kluft
Aff., Ex. E, Policies & Procedures – American Veterinary

Med. Ass'n – American Bd. of Veterinary Specialties
("Manual"), ECF No. 71-5.  Lyons had access to the Manual
when she drafted the ACVSMR Bylaws.  See Resp. College
Facts ¶¶ 5, 15.  The Manual lists certain criteria and
content that must be included in any petition submitted to
the Association.  See, e.g. Manual 5-9.  So, the parts of
Lyons's ACVSMR Bylaws that copy verbatim, or nearly so,
from the Manual are unoriginal, and are not entitled to
protection.  See Feist, 499 U.S. at 345 (noting that
originality in copyright means that the work "was
independently created by the author (as opposed to copied
from other works)").  Even to the extent that Lyons's
ACVSMR Bylaws cover topics that are required for inclusion
by the Manual, however, her choices in expressing and
organizing those topics are original.  See Situations
Mgmt., 560 F.3d at 61.  The decision to include those
topics in the first instance, however, is not entitled to
protection because it was dictated by the Manual's
instructions, and thus did not require independent
creativity.  See Manual 8-9 (listing topics that must be
addressed in a specialty organization's bylaws); see also
Feist, 499 U.S. at 348 (holding that that choices "as to
selection and arrangement" are entitled to copyright
protection only "so long as they are made independently").

### 3.   Substantial Similarity Analysis

After dissection, Lyons's copyrighted works "must . . . be compared holistically [with the College's Petition] to determine if they are 'substantially similar,' but giving weight only to the protected aspects of [Lyons's] work as determined through the dissection." Harney, 704 F.3d at 179.  Whereas dissection analysis is generally matter of law, whether two works are substantially similar is a question of fact.  Id.  Works are substantially similar if "an ordinary person of reasonable attentiveness would, [upon reviewing both works], conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005).  In other words, the copying must be so extensive that the similarities amount to a "wrongful appropriation of expression."  Id.

Lyons bears the burden of proving substantial similarity.  Id. at 17.  Despite ample opportunities to show infringement in cross-motions for summary judgment on her copyright claim, Lyons generally makes only vague declarations of copying.  Specifically, Lyons pointed to instances of verbatim copying in only eight pages of the College's 97-page Petition.  See Lyons Proposed Facts ¶ 100; Lyons Aff., Ex. L, Highlighted ASVSMR Petition to

American Bd. Veterinary Specialities ("Highlighted
Petition"), ECF No. 95-6. She identified the alleged
copying by highlighting the Petition in green to denote
verbatim copying and highlighting it in yellow to denote
"substantial" copying. Highlighted Petition. Lyons,
however, fails to indicate which of her five copyrighted
works have been copied verbatim or otherwise. See Lyons
Proposed Facts ¶ 100. She also eschews any side-by-side
comparison of her works to the Petition. See Gregory, 689
F.3d at 52 (determining that litigant waived copyright
argument where he failed to adequately identify portions of
text to which his argument applied). This Court's careful
comparison of the Petition with Lyons's works confirms that
the few similarities between them do not arise from
copyrightable elements in Lyons's works, and thus do not
amount to a substantial similarity.

### a. Alleged Verbatim Copying

The College created a chart in which it compared each
of the nine parts of the Petition Lyon alleged were copied
with the most similar text in Lyons's copyrighted works.
Decl. David A. Kluft, Esq. Opp'n Pls.' Mot. Summ. J., Ex.
G, Asserted Copyright Infringements ("Comparison Chart"),
ECF No. 92-7. In one-third of these instances, both Lyons
and the College have copied language and criteria from the

Manual, which are thus not protectable expressions.[12]  See
Comparison Chart.  Lyons also accuses the College of
copying the ACVSMR name, which is also not protected by
copyright law.  See 37 C.F.R. § 202.1(a) (listing "names,
titles, and slogans" as among short phrases that are not
copyrightable).

    In the other instances of alleged verbatim copying,
the similarities between the Petition and ACVSMR Bylaws
consist of fragmented phrases in sentences expressing
similar ideas.  Compare ACVSMR Articles Art. III, § 1 ("To
establish, promote and maintain the highest standards in
the practice of veterinary sports medicine and
rehabilitation through the establishment of educational
guidelines; dedicated facilities. . . ."), with Petition 5
("To establish and maintain credentialing and certification
standards for veterinary practitioners who excel in sports

---

    [12]   In comparing the Petition to Lyons's ACVSMR Bylaws,
this Court has identified other instances of similarity
that arise from Lyons's and the College's copying of the
Manual.  For example, both the ACVSMR Bylaws and Petition's
description of an appeals process for adverse decisions
copy from the Manual.  Compare Manual 44 (listing the
following as grounds for review of an adverse decision by a
specialty organization: a) disregarding established
criteria for certification or approval; failing to follow
its stated procedures; or failing to consider relevant
evidence and documentation presented), with Pet. 82 (same)
and ACVSMR: Bylaws 7 (same).  Again, all similarities that
arise from copying of the Manual lack the requisite
originality to merit copyright protection.  See Feist, 499
U.S. at 345.

medicine and rehabilitation and who shall be titled 'Diplomates.'") (emphasis added); compare ACVSMR: Bylaws Art. II, § 4 ("In the event of an adverse decision by the College, the affected person(s) shall be advised of the procedure for appealing the adverse decision."), with Petition 82 ("In case of an adverse decision by the ACVSMR following examination, an appeals process has been established.") (emphasis added); compare AVSMR Bylaws Art. VII, § 1(i)(A) ("The Credential Committee shall be composed of three members of the College, appointed by the President on recommendation of the Board."), with Petition 89 ("The Credentials Committee shall be composed of a Chair and a representative from each of the four practice categories.") (emphasis added).  Copyright law does not tolerate copying merely because the infringer appropriated only a small part of the plaintiff's work.  See Situation Mgmt. Sys., 560 F.3d at 59 ("[E]ven if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity." (quoting 4 Nimmer § 13.03[A][2][a], at 13-55)).  Yet "[i]t is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal

level of creativity necessary to warrant copyright protection." CMM Cable Rep, 97 F.3d at 1519 (quoting 1 Nimmer, 2.01[B], at 2-13-18); see 37 C.F.R. § 202.1(a) (excluding "[w]ords and short phrases" from copyright protection).  Whether a short phrase is sufficiently original to merit copyright protection often depends on context.  Gregory, 689 F.3d at 52.  Given the few instances of literal similarity between Lyons's work and the Petition, coupled with the brief and largely functional nature of any similar phrases, they cannot form the basis of copyright infringement.  See, e.g., Hassett, 757 F. Supp. 2d at 85-87 (refusing to find infringement on the basis of "unprotected short phrases").

The ACVSMR Bylaws and Petition's bylaws both have a section dedicated to "Committees," much like the Manual contains a section on its committees.  ACVSMR: Bylaws 10-12; Petition 88-90; Manual 22-24.  The ACVSMR Bylaws reference various committees, including, inter alia, a "Nominations" committee, "Credentials" committee, and "Examination" committee.  ACVSMR Bylaws Art. VII, § 1. Although some of the committees listed in the College's Petition are identical, including a Credentials Committee and an Examination Committee, Petition 88-90, the idea of organizing a specialty organization's membership into an

41

examination or credentials committees is hardly original
given that assessing a candidate's credentials and
administering exams comprise the core activities of these
organizations.  See Manual 9 (requiring that specialty
organizations include the credentials required of
candidates seeking certification and a description of the
certifying exam in their bylaws); Petition 80 (describing
the College as a "professional certification board and
credentialing program").  Thus, the overlap in committee
names is akin to scenes a faire among specialty
organizations seeking recognition from the Association –
"elements of a work that are for all practical purposes
indispensable, or at least customary, in the treatment of a
given subject matter."  Greene, 914 F. Supp. 2d at 114
(quoting Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62,
68 (1st Cir. 2009)) (internal quotation marks omitted); see
also 37 C.F.R. § 202.1(a) (placing names and titles outside
the ambit of copyright protection).

> b. **Alleged Copying of the Structure and
>    Arrangement of Lyons's Bylaws and
>    Articles**

Lyons's claim that the table of contents, or structure
of the Petition, comes directly from Lyons's bylaws and
articles of incorporation is also unsupported.  See Lyons
Proposed Facts ¶ 103.  Again, the structure or arrangement

of unprotected elements sometimes reflects creative choices
worthy of copyright protection.  See Situation Mgmt. Sys.,
560 F.3d at 61.  Yet, here there is no infringement; either
the Petition and Lyons's works both follow the Manual's
suggested organization, thus eliminating any potential
originality in arrangement, or the works are organized
differently.  For example, both Lyons's ACVSMR Articles and
the Petition begin by stating the ACVSMR name and listing
the organization's objectives.  See Petition 2; ACVSMR
Articles 1.  This order merely tracks the Manual's
suggested organization of a specialty organization's
bylaws, which ought include "[(a.)] The name of the
[veterinary specialty organization]. [(b.)] A statement of
objectives."  Manual 8.  After this point, the organization
of the Petition and Lyons's works largely diverge.  The
Petition follows the Manual's recommendation of including
sections on the scientific basis of the proposed specialty,
the relationship to veterinary medical curricula, the
employment of diplomats, and continuing education programs.
Petition 2; see Manual 8.  Lyons's articles and bylaws
completely omit these sections.  See generally ACVSMR
Articles; ACVSMR Bylaws.  Moreover, the Petition's bylaws
are also organized differently than the ACVSMR Bylaws.
Compare Petition 81-86 (discussing the College's Board of

43

Directors before its Officers), with ACVSMR Bylaws 7-8
(discussing those topics in the opposite order).  In
addition, most sections in the Petition are more thorough
and are organized differently than the comparable section
in the ACVSMR Bylaws.  Compare Petition 86 (discussing
annual meetings, special meetings, telephone conference
meetings, meeting quorums, and other topics in "Article V –
Meetings of the Board of Directors"), with ACVSMR Bylaws 10
(only listing notice requirement and eligibility of
attendees for the ACVSMR's annual meeting under "Article VI
– Annual Meeting [of the organization]").  Very few
sections have similar arrangements, and those that are
similar have different content or wording such that the
perception of any similarity is largely diminished.[13]

### c.   Alleged "Substantial" Copying of Lyons's Content

At oral argument, Lyons asserted that the Petition's
curriculum comes directly from Lyons's by-laws.  This bold
statement lacks support, however, because a comparison of

---

[13]  For example, both the ACVSMR Articles and the
Petition's bylaws describe the ACVSMR's objectives and
purpose in six subsections.  Compare ACVSMR Articles 1-2,
with Petition 82.  Yet, while there are some commonalities
among the topics, the Petition's bylaws convey related
ideas in a different order using wholly distinctive wording
but for isolated incidents of fragmented similarity.  Thus,
there is no perception of substantial similarity.

both curriculae reveals that their differences overwhelm
any similarities.  Firstly, Lyons and the College organize
the curriculum differently.  The College divides the
curriculum into core knowledge, a canine specialization,
and an equine specialization.  Petition 8-11.  In contrast,
Lyons's curriculum does not directly provide for separate
equine and canine tracks from its outset, though objective
two of the "Objectives and General Structure" document does
discuss creating two certification paths for equine and
canines.  See ACVSMR Bylaws 2-6; ACVSMR Objectives 1.

    Secondly, the Petition includes a detailed narrative
of different ailments that can be treated through
specialized knowledge in various study areas.  See Petition
9-14.  Lyons's curriculum, however, is merely a bulleted
list of different areas of study.  See ACVSMR Bylaws 2-5.
While Lyons's curriculum mentions some similar topics of
study, it fails to include any detailed explanation similar
to the type provided in the Petition.  See ACVSMR Bylaws 5
(listing areas of study without additional explanation).
The mere fact that both curriculae cover some of the same
topics does not support a finding of infringement because
copyright law does not grant Lyons a monopoly over the idea
of a particular curriculum for this specialty.  See Eldred
v. Ashcroft, 537 U.S. 186, 219 (2003) (holding that "every

idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication."). Given the College and Lyons's divergent expressions of the ACVSMR's curriculum, there is no substantial similarity. See Harney, 704 F.3d at 181 (holding that divergent expressions of unprotected ideas does not violate copyright law).

Furthermore, the College's Petition contains an appendix which lists examination topics for the core curriculum, the canine specialization, and the equine specialization. Petition 55-77. Again, this list of topics is not substantially similar to Lyons's curriculum because the Petition's topics for examination are organized differently than the list of topics in Lyons's curriculum. Compare Petition 55-77, with ACVSMR Bylaws 2-6. Furthermore, the Petition's list, spanning twenty-two pages, is much more exhaustive than the topics of study listed in five pages of the ACVSMR Bylaws. To the extent that a few of the topics included in the curriculum overlap, an ordinary observer would have to set out determined to find these similarities in order to notice them. Cf. Johnson, 409 F.3d at 18 (stating that works are substantially similar when an ordinary observer would regard their aesthetic appeal as the same and overlook any

46

differences unless he set out to find those disparities)
(citing Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274
F.2d 487, 489 (2d Cir. 1960) (Hand, J.)).

The College's Petition and Lyons's ACVSMR Bylaws both
describe the process of certifying specialists in the
sports medicine and rehabilitation field for the identical
purpose of attaining the Association's recognition.
Moreover, it is undisputed that the College had access to
Lyons's articles and bylaws.  Despite the ample opportunity
for illicit copying, however, Lyons has failed to prove
infringement.

Lyons has not accurately identified sufficient
examples of copying to make the works substantially
similar.  Compare Comparison Chart (listing the nine
instances of verbatim copying that Lyons identified in the
College's 97-page petition), with Situation Mgmt. Sys., 560
F.3d at 59 n.2 (suggesting that identification of "hundreds
of instances of verbatim copying and rough paraphrasing"
can support finding of substantial similarity).  The
similarities that this Court has identified arise from
unoriginal aspects of Lyons's works, such as short and
functional phrases and scenes-a-faire content.  Moreover,
an examination of Lyons's allegations of "substantial"
copying reveals only a likeness of ideas between the

47

Petition and her works without the requisite resemblance in expression.  Copyright "encourages others to build freely upon the ideas and information conveyed by a work."  Feist, 499 U.S. at 349-40; see Harney, 704 F.3d at 188 (observing that "a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's") (quoting Warner Bros. Inc. v. American Broad. Cos., 720 F.2d 231, 241 (2d Cir. 1983)).  Thus, because this Court finds no substantial similarity between the Petition and Lyons's copyrighted works, Lyons's copyright infringement claim fails.[14]

### D.  Loss of Business Opportunity Claim

Lyons claims that the defendants' conduct deprived her of business opportunities such that she is entitled to damages under the loss of chance theory enunciated in Matsumaya v. Birnbaum, 452 Mass. 1 (2008).  See Lyons, 882 F. Supp. 2d at 235.  Applying the loss of chance doctrine outside of the medical malpractice context, however, would be premature on this record.  In Matsumaya, the court took care to recognize loss of chance only "limited domain of

---

[14]  Lyons has also alleged that the College's websites, articles of incorporation and other publications copy her works.  Lyons Proposed Facts ¶ 144.  These allegations do not merit discussion given the lack of any proof or argument in support of them.

medical negligence" to advance the "fundamental goals and principals of . . . tort law."  <u>Id.</u> at 4; <u>see</u> <u>id.</u> at 11-12 (explaining that the loss of chance doctrine came about to remedy the "all or nothing" tort recovery rule).  Lyons has not convinced this Court that the rationale for adopting loss of chance in medical negligence cases also applies to this case – particularly where she has not proven any tortious conduct.  Rather, the conduct that she claims denied her business opportunities sounds in copyright and trademark infringement.  <u>See</u> Lyons Proposed Facts ¶¶ 163-64.  Even if the "loss of chance" doctrine were applicable to intellectual property claims, Lyons's failed claims cannot form the basis of recovery under this doctrine.

### E.   The College's Trademark Cancellation Request under 15 U.S.C. section 1119

In counterclaims to Lyons's trademark infringement action, the College requested that this Court cancel Lyons's registration of the ACVSMR mark on the supplemental register and Lyons's application for registration on the principal register pursuant to 15 U.S.C. section 1119. Ans. & Countercls. American Coll. of Veterinary Sports Med. and Rehabilitation ("College Countercls.") 44-45, ¶¶ 103-117, ECF No. 25; <u>see also</u> <u>Empresa Cubana del Tabaco</u> v. <u>Culbro Corp.</u>, 541 F.3d 476, 478-79 (2d Cir. 2008)

49

(discussing process to cancel trademark registrations).

Section 1119 states:

> In any action involving a registered mark the
> court may determine the right to registration,
> order the cancellation of registrations, in whole
> or in part, restore canceled registrations, and
> otherwise rectify the register with respect to
> the registrations of any party to the action.
> Decrees and orders shall be certified by the
> court to the Director, who shall make appropriate
> entry upon the records of the Patent and
> Trademark Office, and shall be controlled
> thereby.

15 U.S.C. § 1119.  A descriptive mark can only gain access

to the principal register if it has acquired secondary

meaning or become distinctive.  See Park N' Fly, Inc. v.

Dollar Park and Fly, Inc., 469 U.S. 189, 193-94 (1985).

Given this Court's finding that Lyons's ACVSMR mark has not

acquired secondary meaning, see supra Section II.A.2, - a

central issue to the registrability of her mark -

exercising this Court's authority under Section 1119 to

"determine [Lyons's] right to registration" is appropriate

in this case.  15 U.S.C. § 1119.

Ordering the PTO to reject Lyons's application to the

principal register would promote efficient resolution of

this case.  See Ditri v. Coldwell Banker Residential

Affiliates, Inc., 954 F.2d 869, 873 (3d Cir. 1992)

(observing that "[a]lthough a petition to the [PTO] is the

primary means of securing a cancellation, the district court has concurrent power to order cancellation as well for the obvious reason that an entire controversy may thus be expediently resolved in one forum."). Moreover, the pendency of a proceeding before the PTO's Trademark Trial and Appeal Board ought not discourage this Court from ruling on the propriety of registration.[15] See PHC, Inc. v. Pioneer Healthcare, Inc., 75 F.3d 75, 80 (1st Cir. 1996) (opining that the Lanham Act does not grant the Trademark Trial and Appeal Board's findings the deferential treatment typically accorded to administrative agencies' decisions). In fact, the First Circuit has instructed district courts to "resolve . . . companion validity claim[s]" under Section 1119 at the same time as they consider infringement claims if the "issues underlying the two claims overlap." Id. at 81. Here, the dispositive issues are identical because both the success of Lyons's infringement claim and her eligibility for principal registration turn on proof of acquired distinctiveness. Thus, the PTO ought rescind its

---

[15]   The PTO approved the ACVSMR mark for registration on the principal register in 2012. Lyons Aff., Ex. V, Notice of Publication. After the College opposed Lyons's registration of the ACVSMR mark, the PTO suspended its proceedings pending the outcome of this litigation. Ass'n Resp. Lyons Facts ¶ 14.

approval of the ACVSMR mark's registration on the principal

register and reject Lyons's application.[16]

This Court declines to cancel Lyons's registration on

the supplemental register.  Descriptive marks can be

registered on the supplemental register.  See Boston Duck

Tours, 531 F.3d at 9 n.5.  Although the College alleges

that the continued registration of Lyons's ACVSMR mark on

the supplemental register "is likely to cause [consumer]

---

[16]  The broad power to impact trademark registrations
under 15 U.S.C. § 1119 is only available to courts in an
"action involving a registered mark."  15 U.S.C. § 1119.
Thus, courts have been loath to interfere with applications
for registration where the underlying controversy does not
involve a registered mark.  Ditri, 954 F.2d at 873 ("[A]
controversy as to the validity or interference with a
registered mark must exist before a district court has
jurisdiction to grant the cancellation remedy [under
Section 1119].""); see, e.g., Whitney Info. Network, Inc. v.
Gagnon, 353 F. Supp. 2d 1208, 1211 (M.D. Fla. 2005)
(refusing to use cancellation power under Section 1119
where none of the parties to the action owned a registered
mark and only a pending application for registration
existed).  A "registered mark" is a "mark registered in the
United States Patent and Trademark Office under this
chapter."  15 U.S.C. § 1127.  Marks registered under either
the supplemental or principal register meet this
definition.  See id.  Thus, the ACVSMR mark's place on the
supplemental register satisfies the requirement that this
action involve a registered mark, thereby empowering this
court to rule on Lyons's applications to the principal
register.  See Airs Fragrance Prods., Inc. v. Clover Gifts,
Inc., 395 Fed Appx. 482, 485 (9th Cir. 2010) (affirming
district court's decision to cancel certain registered
marks and order the withdrawal of "pending trademark
applications" for related marks).  Such an interpretation
not only complies with the plain reading of the statute but
also enables the functional considerations of expediency
and efficiency encouraging this Court's resolution of
registration-related issues.

confusion" and is "likely to cause damage and injury" to the College's reputation, College Countercls. 44, ¶¶ 104-05, it has offered no proof in support of these allegations, and therefore cancellation of Lyons's supplemental registration is unwarranted.  See College Post-Hr'g Br. (lacking any mention of its counterclaims); College Mem. Summ. J. (same); see also E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 202 (3d Cir. 2008) (advising district court to refrain from removing trademark from supplemental register under 15 U.S.C. § 1119 unless there is proof that mark is generic).

### F.   College's Remaining Counterclaims Fail

The College has alleged four additional counterclaims against Lyons and Homecoming Farm, including trademark infringement claims and violation of Massachusetts General Laws chapter 93A, section 11.  See College Countercls. 42-46.  Because the College has made a negligible affirmative showing on any of its counterclaims, it has not satisfied its burden of proof, and its remaining counterclaims fail.

## III.   CONCLUSION

For the foregoing reasons, all of Lyons's claims[17] are dismissed.

The College's counterclaim to cancel Lyons's application for registration on the principal register is granted.  Pursuant to 15 U.S.C. section 1119, the Court orders the Director of the United States Patent and Trademark Office to deny the application associated with serial number 85-486-999.

The College's remaining counterclaims[18] are dismissed.


**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[17]   These claims include: violation of 15 U.S.C. section 1114(1), violation of 15 U.S.C. section 1125(a), common law trademark infringement, state trademark dilution, violation of 17 U.S.C. section 106, common law unfair competition, and loss of business opportunity.  See Compl. 33-44; Lyons, 882 F. Supp. 2d at 236.

[18]   These claims include:  violation of 15 U.S.C. section 1125(a), common law trademark infringement, violation of 15 U.S.C. section 1125(d), cancellation of trademark registration under 15 U.S.C. section 1119, and violation of Massachusetts General Laws, chapter 93A, section 11.  See College Countercls. 42-46.